# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:19-cv-2356 |
| MATCH GROUP, INC., AMANDA W. GINSBERG and GARY SWIDLER, | § § § § | |
| Defendants. | § § § | |

**APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants Match Group, Inc. ("Match Group"), Amanda W. Ginsberg, and Gary Swidler, by and through undersigned counsel, respectfully submit this Appendix in support of their Motion to Dismiss.

{00272567;1 }

## INDEX OF EXHIBITS

| EX. | DOCUMENT | DATE | APP. PAGE(S) |
|---|---|---|---|
| | Declaration of Peter A. Stokes, Esq. | 6/12/2020 | 1-4 |
| 1 | Match Group Form 10-K (2017) | 3/1/2018 | 5-127 |
| 2 | Match Group Form 10-K (2018) | 2/28/2019 | 128-248 |
| 3 | *Match Responds to FTC Lawsuit*, Press Release | 9/25/2019 | 249-251 |
| 4 | "Tinder Lets Known Sex Offenders Use the App. It's Not the Only One," *ProPublica* article | 12/2/2019 | 252-276 |
| 5 | Match Group Form 10-K (2019) | 2/27/2020 | 277-421 |
| 6 | Match Group Stock Price Chart | 6/12/2020 | 422-429 |
| 7 | NASDAQ Index Chart | 6/12/2020 | 430-447 |
| 8 | *Match Group Reports Third Quarter 2018 Results and Announces Special Dividend*, Press Release | 11/6/2018 | 448-461 |
| 9 | Q3 2018 Earnings Call Transcript | 11/7/2018 | 462-482 |
| 10 | *Match Group Reports Fourth Quarter and Full Year 2018 Results*, Press Release | 2/6/2019 | 483-494 |
| 11 | Q4 and FY 2018 Earnings Call Transcript | 2/7/2019 | 495-514 |
| 12 | *Match Group Reports First Quarter 2019 Results*, Press Release | 5/7/2019 | 515-526 |
| 13 | Q1 2019 Earnings Call Transcript | 5/8/2019 | 527-546 |
| 14 | Match Group Form 10-Q (Q1 2019) | 5/9/2019 | 547-606 |
| 15 | *Match Group Reports Second Quarter 2019 Results*, Press Release | 8/6/2019 | 607-618 |
| 16 | Q2 2019 Earnings Call Transcript | 8/7/2019 | 619-637 |
| 17 | Match Group Form 10-Q (Q2 2019) | 8/8/2019 | 638-688 |
| 18 | *Match Group Reports Third Quarter 2019 Results*, Press Release | 11/5/2019 | 689-700 |

| EX. | DOCUMENT | DATE | APP. PAGE(S) |
|---|---|---|---|
| 19 | Q3 2019 Earnings Call Transcript | 11/6/2019 | 701-718 |
| 20 | Match Group Form 10-Q (Q3 2019) | 11/7/2019 | 719-771 |

Dated: June 12, 2020

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP


/s/ *Peter A. Stokes*

Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 474-5201
Facsimile:  (512) 536-4598


Robert Greeson
State Bar No. 24045979
Lead Attorney
robert.greeson@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone:  (214) 855-7430
Facsimile:  (214) 855-8200


*Counsel for Defendants*

- 2 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on June 12, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Peter A. Stokes*
Peter A. Stokes

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and On Behalf of All Others Similarly Situated, | §<br>§<br>§<br>§ | |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | Civil Action No. 3:19-cv-2356 |
| MATCH GROUP, INC., AMANDA W. GINSBERG and GARY SWIDLER, | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | |

**DECLARATION OF PETER A. STOKES**

In accordance with the Federal Rules of Civil Procedure, I, Peter A. Stokes, do hereby declare as follows. My name is Peter Andrew Stokes. I am an attorney licensed to practice law in the State of Texas. I am an attorney at the law firm of Norton Rose Fulbright US LLP, attorneys of record for Defendants Match Group, Inc. ("Match Group"), Amanda W. Ginsberg, and Gary Swidler. The facts contained herein are true and correct based on my personal knowledge and investigation.

1.     Exhibit 1 to this declaration is a true and correct of a Form 10-K filed with the U.S. Securities and Exchange Commission (the "SEC") by Match Group on or about March 1, 2018, which an employee of my law firm obtained from the SEC's public website at my direction.

2.     Exhibit 2 to this declaration is a true and correct copy of a Form 10-K filed with the SEC by Match Group on or about February 28, 2019, which an employee of my law firm obtained from the SEC's public website at my direction.

3.     Exhibit 3 to this declaration is a true and correct copy of the press release published by

94737120.1

- 1 -

App. 1

Match Group on or about September 25, 2019, "Match Responds to FTC Lawsuit," which an employee of my law firm obtained from https://www.prnewswire.com/news-releases/match-responds-to-ftc-lawsuit-300925423.html at my direction.

4.      Exhibit 4 to this declaration is a true and correct copy of an article published by *ProPublica* on or about December 2, 2019, "Tinder Lets Known Sex Offenders Use the App. It's Not the Only One," which an employee of my law firm obtained from *ProPublica*'s public website at my direction.

5.      Exhibit 5 to this declaration is a true and correct copy of a Form 10-K filed with the SEC by Match Group on or about February 27, 2020, which an employee of my law firm obtained from the SEC's public website at my direction.

6.      Exhibit 6 to this declaration is a true and correct copy of Match Group's stock prices from November 5, 2018 to June 12, 2020, which an employee of my law firm obtained from Barchart OnDemand at my direction.

7.      Exhibit 7 to this declaration is a true and correct copy of the Nasdaq Index from November 5, 2018 to June 12, 2020, which an employee of my law firm obtained from Yahoo Finance at my direction.

8.      Exhibit 8 to this declaration is a true and correct copy of a November 6, 2018 press release titled *Match Group Reports Third Quarter 2018 Results and Announces Special Dividend*, which was downloaded from the URL https://ir.mtch.com/news-and-events/press-releases/press-release-details/2018/Match-Group-Reports-Third-Quarter-2018-Results/default.aspx        by        an employee of my law firm at my direction.

9.      Exhibit 9 to this declaration a true and correct copy of a transcript of a November 7, 2018 Match Group Earnings Call teleconference, which an employee of my law firm obtained

from S&P Global Market Intelligence at my direction.

10.     Exhibit 10 to this declaration is a true and correct copy of a February 6, 2019 press release titled *Match Group Reports Fourth Quarter and Full Year 2018 Results*, which was downloaded from the URL https://ir.mtch.com/news-and-events/press-releases/press-release-details/2019/Match-Group-Reports-Fourth-Quarter-2018-Results/default.aspx by an employee of my law firm at my direction.

11.     Exhibit 11 to this declaration is a true and correct copy of a transcript of a February 7, 2019 Earnings Call teleconference, which an employee at my law firm obtained from S&P Global Market Intelligence at my direction.

12.     Exhibit 12 to this declaration is a true and correct copy of a May 7, 2019 press release titled *Match Group Reports First Quarter 2018 Results*, which was downloaded from the URL https://ir.mtch.com/news-and-events/press-releases/press-release-details/2019/Match-Group-Reports-First-Quarter-2019-Results/default.aspx by an employee of my law firm at my direction.

13.     Exhibit 13 to this declaration is a true and correct copy of a May 8, 2019 Earnings Call teleconference, which an employee at my law firm obtained from S&P Global Market Intelligence at my direction.

14.     Exhibit 14 to this declaration is a true and correct copy of a Form 10-Q filed with the SEC by Match Group on or about May 9, 2019, which an employee of my law firm obtained from the SEC's public website at my direction.

15.     Exhibit 15 to this declaration is a true and correct copy of an August 6, 2019 press release titled *Match Group Reports Second Quarter 2019 Results*, which was downloaded from the URL https://ir.mtch.com/news-and-events/press-releases/press-release-details/2019/Match-Group-Reports-Second-Quarter-2019-Results/default.aspx by an employee of my law firm at my

direction.

16.  Exhibit 16 to this declaration is a true and correct copy of an August 7, 2019 Earnings Call teleconference, which an employee at my law firm obtained from S&P Global Market Intelligence at my direction.

17.  Exhibit 17 to this declaration is a true and correct copy of a Form 10-Q filed with the SEC by Match Group on or about August 8, 2019, which an employee of my law firm obtained from the SEC's public website at my direction.

18.  Exhibit 18 to this declaration is a true and correct copy of a November 5, 2019 press release titled *Match Group Reports Third Quarter 2019 Results*, which was downloaded from the URL    https://ir.mtch.com/news-and-events/press-releases/press-release-details/2019/Match-Group-Reports-Third-Quarter-2019-Results/default.aspx by an employee of my law firm at my direction.

19.  Exhibit 19 to this declaration is a true and correct copy of a November 6, 2019 Earnings Call teleconference, which an employee at my law firm obtained from S&P Global Market Intelligence at my direction.

20.  Exhibit 20 to this declaration is a true and correct copy of a Form 10-Q filed with the SEC by Match Group on or about November 7, 2019, which an employee of my law firm obtained from the SEC's public website at my direction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 12th day of June, 2020 in Austin, Texas.

*/s/ Peter A. Stokes*

Peter A. Stokes

94737120.1

- 4 -

App. 4

# Exhibit 1

10-K 1 mtch10-k20171231.htm 10-K

As filed with the Securities and Exchange Commission on March 1, 2018

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended December 31, 2017**

**Commission File No. 001-37636**



# Match Group, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | |
| (State or other jurisdiction of incorporation or organization) | **26-4278917** (I.R.S. Employer Identification No.) |
| **8750 North Central Expressway, Suite 1400, Dallas, Texas** | **75231** |
| (Address of Registrant's principal executive offices) | (Zip Code) |

**(214) 576-9352**
(Registrant's telephone number, including area code)
**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of exchange on which registered** |
|---|---|
| Common Stock, par value $0.001 | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

As of February 2, 2018, the following shares of the Registrant's Common Stock were outstanding:

| | |
|---|---|
| Common Stock | 64,411,385 |
| Class B Common Stock | 209,919,402 |
| Class C Common Stock | — |
| Total | 274,330,787 |

The aggregate market value of the voting common stock held by non-affiliates of the registrant as of June 30, 2017 was $830,720,533. For the purpose of the foregoing calculation only, shares held by IAC/InterActiveCorp and all directors and executive officers of the registrant are assumed to be affiliates of the registrant.

App. 6

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 11 of 451    PageID 534

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2018 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

App. 7

# TABLE OF CONTENTS

| | | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 10 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosure | 29 |
| **PART II** | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 30 |
| Item 6. | Selected Financial Data | 31 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 32 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 8. | Consolidated and Combined Financial Statements and Supplementary Data | 55 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 100 |
| Item 9A. | Controls and Procedures | 100 |
| Item 9B. | Other Information | 102 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 103 |
| Item 11. | Executive Compensation | 103 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 103 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 103 |
| Item 14. | Principal Accounting Fees and Services | 103 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 104 |

2

Table of Contents

**PART I**

## Item 1. Business

### Who we are

Match Group, Inc. is a leading provider of subscription dating products servicing North America, Western Europe, Asia and many other regions around the world through websites and applications we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, and Pairs as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users. We currently offer our dating products in 42 languages across more than 190 countries.

All references to "Match Group," the "Company," "we," "our" or "us" in this report are to Match Group, Inc.

Consumers' dating preferences vary significantly, influenced in part by demographics, geography, religion and sensibility. As a result, the market for dating products is fragmented, and no single product has been able to effectively serve the online dating category as a whole.

Given these wide ranging consumer preferences, our strategy focuses on a brand portfolio approach, through which we attempt to offer dating products that collectively appeal to the broadest spectrum of consumers. We believe that this approach maximizes our ability to capture additional users. We work to apply a centralized discipline to learnings, by sharing best practices and technologies across our brands in order to increase growth, reduce costs and maximize profitability. Additionally, we centralize certain other administrative functions, such as legal, human resources, finance, tax, and others. This approach allows us to quickly introduce new products and features, optimize marketing strategies, and more effectively deploy talent across our organization.

Coinciding with the general trend toward mobile technology, we have also experienced (and continue to experience) significant growth in our mobile-first dating products, as well as a meaningful shift in the user bases of our previously desktop-oriented dating products, who have gone from accessing those products via desktop devices to accessing our mobile experiences for those products via mobile devices. This shift to mobile, along with the combination of our mobile-first dating products and the deployment of mobile experiences across substantially all of our previously desktop-oriented products, has enabled us to reach groups of users which had previously proven elusive, such as the 18-25 year old audience; for example, Tinder has been able to tap into this audience rapidly over the last few years. Additionally, in previously desktop-oriented products like Match, the shift to mobile has led to increased usage of our products, as mobile users on average access our products at meaningfully higher rates than users who access our products on desktop.

### Enabling dating in a digital world

Prior to the proliferation of computers and mobile devices, human connections traditionally were limited by social circles, geography and time. Today, the adoption of the internet and mobile technology has significantly expanded the ways in which people can build relationships, create new interactions and develop romantic connections. Additionally, the ongoing adoption of technology into more aspects of daily life continues to further erode biases and stigmas that previously prevented individuals from using technology to help find and develop those connections.

We believe that dating products serve as a natural extension of the traditional means of meeting people and provide a number of benefits for their users, including:

- *Expanded options*: Dating products provide users access to a large number of like-minded people they otherwise would not have a chance to meet.

- *Efficiency*: The search and matching features, as well as the profile information available on dating products, allow users to filter a large number of options in a short period of time, increasing the likelihood that users will make a connection with someone.

- *More comfort and control*: Compared to the traditional ways that people meet, dating products provide an environment that reduces the awkwardness around the process of reaching out to new people. This leads

3

to many people who would otherwise be passive participants in the dating process taking a more active role.

- *Convenience*: The nature of the internet and the proliferation of mobile devices allow users to connect with new people at any time, regardless of where they are.

Depending on a person's circumstances at any given time, dating products can act as a supplement to, or substitute for, traditional means of meeting people. When selecting a dating product, we believe that users consider the following attributes:

- *Brand recognition*: Brand is very important. Users generally associate strong dating brands with a higher likelihood of success and a higher level of security. Generally, successful dating brands depend on large, active communities of users, strong algorithmic filtering technology and awareness of successful usage among similar users.

- *Successful experiences*: Demonstrated success of other users attracts new users through word-of-mouth recommendations. Successful experiences also drive repeat usage.

- *Community identification*: Users typically look for dating products that offer a community or communities with which the user can associate. By selecting a dating product that is focused on a particular demographic, religion, geography or intent (for example, casual dating or more serious relationships), users can increase the likelihood that they will make a connection with someone with whom they identify.

- *Product features and user experience*: Users tend to gravitate towards dating products that offer features and user experiences that resonate with them, such as question-based matching algorithms, location-based features, offline events or search capabilities. User experience is also driven by the type of user interface (for example, swiping versus scrolling), a particular mix of free and paid features, ease of use and security. Users expect every interaction with a dating product to be seamless and intuitive.

**Our Dating portfolio**

Dating is a highly personal endeavor and consumers have a wide variety of preferences that determine what type of dating product they choose.

As a result, our strategy focuses on a portfolio approach of various brands in order to reach a broad range of users. Our brands are collectively available in 42 languages, and offered in over 190 countries. The following is a list of our key brands:

*Tinder.* Tinder was launched in 2012, and has since risen to scale and popularity faster than any other product in the online dating category with very limited marketing spend, growing to over 3 million Subscribers today. Tinder's distinctive "right swipe" feature has led to significant adoption among the millennial generation, previously underserved by the online dating category. Tinder employs a freemium model, through which users are allowed to enjoy many of the core features of Tinder for free, including limited swiping and communicating with other users. However, to enjoy premium features, such as unlimited swiping, a Tinder user must subscribe to either Tinder Plus, launched in early 2015, or Tinder Gold, which was launched in late summer 2017.

*Match.* Match was launched in 1995 and helped create the online dating category. Among its distinguishing features are the ability to search profiles, receive algorithmic matches and attend live events, promoted by Match, with other Subscribers. Additionally, new features, such as Missed Connections, which uses location-based technology to enable users to connect with other users with whom they have crossed paths in the past, engage users into more meaningful connections. Match is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Match relies heavily on word-of-mouth traffic, repeat usage and paid marketing.

*PlentyOfFish.* PlentyOfFish was launched in 2003 and acquired in October 2015. Similar to Match, among its distinguishing features is the ability to both search profiles and receive algorithmic matches. Similar to Tinder, PlentyOfFish has grown to popularity over the years with very limited marketing spend and also relies on a freemium model. PlentyOfFish has broad appeal in the central United States, Canada, the United Kingdom and a number of other international markets.

4

App. 10

Table of Contents

*Meetic.* Meetic, a leading European online dating brand based in France, was founded in 2001. Similar to Match, among its distinguishing features are the ability to search profiles, receive algorithmic matches, and attend live events, promoted by Meetic, with other Subscribers and non-Subscribers from time to time. Also, similar to Match, Meetic is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Meetic relies heavily on word-of-mouth traffic, repeat usage and paid marketing.

*OkCupid.* OkCupid was launched in 2004, and has attracted users through a mathematical and Q&A approach to the online dating category. Similar to Tinder and PlentyOfFish, OkCupid has grown in popularity over the years without significant marketing spend and also relies on a freemium model. OkCupid has a loyal highly educated user base predominately located in major United States cities.

*OurTime.* OurTime is the largest brand within our affinity-oriented brands. OurTime is the largest community of singles over age 50 of any dating product.

*Pairs.* Pairs was launched in 2012 and acquired in May 2015. Pairs is a leading provider of dating products in Japan, with a strong presence in Taiwan and a growing presence in other select Asian countries. Pairs is a Facebook based dating app that was specifically designed to address social barriers generally associated with the use of dating products in Asian countries, particularly Japan.

All our products enable users to establish a profile and review other users' profiles without charge. Each product also offers additional features, some of which are free, and some of which require payment depending on the particular product. In general, access to premium features requires a subscription, which is typically offered in packages (primarily ranging from one month to six months), depending on the product and circumstance. Prices differ meaningfully within a given brand by the duration of a subscription purchased, the bundle of paid features that a user chooses to access, and whether or not a Subscriber is taking advantage of any special offers. In addition to subscriptions, many of our products offer the user certain features, such as the ability to promote themselves for a given period of time, or to review certain profiles without any signaling to the other users, and these features are offered on a pay-per-use, or à la carte, basis. The precise mix of paid and premium features is established over time on a brand-by-brand basis and is constantly subject to iteration and evolution.

The brands in our portfolio both compete and collaborate with each other. We attempt to empower individual business leaders with the authority and incentives to grow each of our brands. Our brands compete with each other and with third-party dating businesses on brand characteristics, product features, and business model. We also attempt to centrally facilitate excellence and efficiency across the entire portfolio by:

- centralizing operational functions across certain brands where we have strength in personnel and sufficient commonality of business interest (for example, ad sales, online marketing and technology centralized across some, but not all, brands);

- developing talent across the portfolio to allow for expertise development and career advancement while giving us the ability to deploy the best talent in the most critical positions across the company at any given time;

- sharing data to leverage product and marketing successes across our businesses rapidly for competitive advantage; and

- centralizing certain administrative functions, like legal, human resources and finance, across the entire portfolio to enable each brand to focus more on growth.

**Revenue**

Our revenue is primarily derived directly from users in the form of recurring subscriptions, which typically provide unlimited access to a bundle of features for a specific period of time, and the balance from à la carte features, where users pay a non-recurring fee for a specific action or event. Each of our brands offers a combination of free and paid features targeted to its unique community. In addition to direct revenue from our users, we generate indirect revenue from online advertising, which makes up a much smaller percentage of our overall revenue as compared to direct revenue.

5

App. 11

## Sales and marketing

We attract the majority of our users through word-of-mouth and other free channels. In addition, many of our brands rely on paid user acquisition for a significant percentage of their users. Our online marketing activities generally consist of purchasing social media advertising, banner and other display advertising, search engine marketing, email campaigns, video advertising, business development or partnership deals, and hiring influencers to promote our products. Our offline marketing activities generally consist of television advertising and related public relations efforts, as well as events.

## Technology

Consistent with our general operating philosophy, each of our brands tends to develop its own technology systems to support its product, leveraging both open-source and vendor supported software technology. Each of our various brands has dedicated engineering teams responsible for software development and creation of new features to support our products across the full range of devices, from desktop to mobile-web to native mobile applications. Our engineering teams use an agile development process, allowing us to deploy frequent iterative releases for product features. Excluding costs capitalized, the Company incurred $101.2 million, $78.1 million and $64.0 million in the fiscal years ended December 31, 2017, 2016 and 2015, respectively, on product development.

We host the majority of our brands in leased data centers located within the general geography served by the brand. Other brands utilize hosted web services, primarily Amazon Web Services, to support their infrastructure.

## Competition

The dating industry is competitive and has no single, dominant brand globally. We compete with a number of other companies that provide similar dating and matchmaking products.

In addition to other online dating brands, we compete with social media platforms and offline dating services, such as in-person matchmakers. Arguably, our biggest competition comes from the traditional ways that people meet each other, and the choices some people make to not utilize dating products or services.

We believe that our ability to compete successfully will depend primarily upon the following factors:

- our ability to continue to increase consumer acceptance and adoption of online dating products, including in emerging markets and other parts of the world where the stigma is only beginning to erode;

- continued growth in internet access and smart phone adoption in certain regions of the world, particularly emerging markets;

- the continued strength of our brands;

- the breadth and depth of our active communities of users relative to those of our competitors;

- our ability to evolve our products in response to our competitors' offerings, user requirements, social trends and the technological landscape;

- our ability to efficiently acquire new users for our products;

- our ability to continue to optimize our monetization strategies; and

- the design and functionality of our products.

A large portion of online dating customers use multiple dating products over a given period of time, either concurrently or sequentially, making our broad portfolio of brands a competitive advantage.

## Intellectual property

We regard our intellectual property rights, including trademarks, domain names and other intellectual property, as critical to our success.

For example, we rely heavily upon the use of trademarks (primarily Tinder, Match, PlentyOfFish, OkCupid, Meetic, OurTime, and Pairs, and associated domain names, taglines and logos) to market our dating products and applications and build and maintain brand loyalty and recognition. We have an ongoing trademark and service mark registration program, pursuant to which we register our brand names and product names, taglines and logos

6

App. 12

and renew existing trademark and service mark registrations in the United States and other jurisdictions to the extent we determine it to be necessary or otherwise appropriate and cost-effective. In addition, we have a trademark and service mark monitoring policy pursuant to which we monitor applications filed by third parties to register trademarks and service marks that may be confusingly similar to ours, as well as potential unauthorized use of our material trademarks and service marks. Our enforcement of this policy affords us valuable protection under current laws, rules and regulations. We also reserve and file registrations (to the extent available) and renew existing registrations for domain names that we believe are material to our business.

We also rely upon a combination of in-licensed third-party and proprietary trade secrets, including proprietary algorithms, and to a lesser extent, upon patented and patent-pending technologies, processes and features relating to our matching process systems or related features, products and services with expiration dates from 2023 to 2036. We have an ongoing invention recognition program pursuant to which we apply for patents to the extent we determine it to be necessary or otherwise appropriate and cost-effective.

We rely on a combination of internal and external controls, including applicable laws, rules and regulations and contractual restrictions with employees, contractors, customers, suppliers, affiliates and others, to establish, protect and otherwise control access to our various intellectual property rights.

**Government regulation**

We are subject to foreign and domestic laws and regulations that affect companies conducting business on the internet generally, including laws relating to the liability of providers of online services for their operations and the activities of their users. As a result, we could be subject to actions based on negligence, various torts and trademark and copyright infringement, among other actions. See "Risk factors—Risks relating to our business—Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business" and "—Risks relating to our business—We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties."

Because we receive, store and use a substantial amount of information received from or generated by our users, we are also impacted by laws and regulations governing privacy, the storage, sharing, use, processing, disclosure and protection of personal data and data breaches, primarily in the case of our operations in the United States and European Union and our handling of personal data of users located in the United States and European Union, respectively. As a result, we could be subject to various private and governmental claims and actions. See "Risk factors—Risks relating to our business—Unauthorized access of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights and compliance with laws designed to prevent unauthorized access of personal data could be costly."

As the provider of dating products with a subscription-based element, we are also subject to laws and regulations in certain U.S. states and other countries that apply to our automatically-renewing subscription payment models. Finally, certain U.S. states and certain countries in Asia have laws that specifically govern dating services.

**Financial information about geographic areas**

The geographic information required herein is set forth in "Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

**Employees**

As of December 31, 2017, we had approximately 1,300 full-time employees and approximately 100 part-time employees worldwide.

**Additional Information**

*Corporate information.* We were incorporated in the State of Delaware on February 12, 2009 as a wholly-owned subsidiary of IAC/InterActiveCorp ("IAC").

*Company website and public filings.* Investors and others should note that we announce material financial and operational information to our investors using our investor relations website at *http://ir.mtch.com*, Securities

7

Table of Contents

and Exchange Commission ("SEC") filings, press releases and public conference calls. We use these channels as well as social media to communicate with our users and the public about our company, our services and other issues. It is possible that the information we post on social media could be deemed to be material information. Accordingly, investors, the media, and others interested in our company should monitor the social media channels listed on our investor relations website in addition to following our SEC filings, press releases and public conference calls. Neither the information on our website, nor the information on the website of any Match Group business, is incorporated by reference into this report, or into any other filings with, or into any other information furnished or submitted to, the SEC.

The Company makes available, free of charge through its website, its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K (including related amendments) as soon as reasonably practicable after they have been electronically filed with (or furnished to) the SEC.

*Code of ethics.* The Company's code of ethics applies to all employees (including Match Group's principal executive officer, principal financial officer and principal accounting officer) and directors and is posted on the Company's website at *http://ir.mtch.com* under the heading of "Corporate Governance." This code of ethics complies with Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market LLC. Any changes to the code of ethics that affect the provisions required by Item 406 of Regulation S-K, and any waivers of such provisions of the code of ethics for Match Group's executive officers, senior financial officers or directors, will also be disclosed on Match Group's website.

**Relationship with IAC**

*Equity ownership and vote.* Match Group has outstanding shares of common stock, with one vote per share, and shares of Class B common stock, with ten votes per share and which are convertible into common stock on a share for share basis. As of February 2, 2018, IAC owned 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock and 12,843,442 shares of common stock. These holdings collectively represent approximately 81.2% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock.

*Intercompany agreements.* In connection with the initial public offering of our common stock in November 2015, we entered into certain agreements relating to our relationship with IAC after the offering. These agreements include, among others, the six agreements described below.

*Master transaction agreement.* The master transaction agreement sets forth the agreements between us and IAC regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC.

*Investor rights agreement.* Under the investor rights agreement, we are obligated to provide IAC with certain registration and other rights relating to the shares of our common stock held by it and anti-dilution rights.

*Tax sharing agreement.* The tax sharing agreement governs our and IAC's rights, responsibilities, and obligations with respect to tax liabilities and benefits, entitlements to refunds, the preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes.

*Services agreement.* The services agreement currently governs services that IAC has agreed to provide through November 24, 2018, with automatic renewal for successive one-year terms, subject to IAC's continued ownership of a majority of the combined voting power of our voting stock and any subsequent extension or truncation agreed to by us and IAC.

*Employee matters agreement.* The employee matters agreement, as amended, covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of our board of directors, we will no longer participate in IAC's employee benefit plans, but will establish our own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

*Subordinated loan credit facility.* The subordinated loan facility with IAC (the "IAC Subordinated Loan Facility") allows the Company to make one or more requests to IAC to borrow funds. If IAC agrees to fulfill any such borrowing request, such indebtedness will be incurred in accordance with the terms of the IAC Subordinated

8

Loan Facility. At December 31, 2017, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility.

For additional information regarding these agreements, see "Note 16—Related Party Transactions" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements."

9

Table of Contents

**Item 1A. Risk Factors**

**Cautionary Statement Regarding Forward-Looking Information**

This annual report on Form 10-K contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. The use of words such as "anticipates," "estimates," "expects," "plans" and "believes," among others, generally identify forward-looking statements. These forward-looking statements include, among others, statements relating to: Match Group's future financial performance, Match Group's business prospects and strategy, anticipated trends and prospects in the industries in which Match Group's businesses operate and other similar matters. These forward-looking statements are based on Match Group management's expectations and assumptions about future events as of the date of this annual report, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict.

Actual results could differ materially from those contained in these forward-looking statements for a variety of reasons, including, among others, the risk factors set forth below. Other unknown or unpredictable factors that could also adversely affect Match Group's business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this annual report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of Match Group's management as of the date of this annual report. Match Group does not undertake to update these forward-looking statements.

**Risks relating to our business**

***The limited operating history of our newer dating brands and products makes it difficult to evaluate our current business and future prospects.***

We seek to tailor each of our dating brands and products to meet the preferences of specific communities of users. Building a given brand or product is generally an iterative process that occurs over a meaningful period of time and involves considerable resources and expenditures. Although certain of our newer brands and products have experienced significant growth over relatively short periods of time, the historical growth rates of these brands and products may not be an indication of future growth rates for our newer brands and products generally. We have encountered, and may continue to encounter, risks and difficulties as we build our newer brands and products. The failure to successfully address these risks and difficulties could adversely affect our business, financial condition and results of operations.

***The dating industry is competitive, with low switching costs and a consistent stream of new products and entrants, and innovation by our competitors may disrupt our business.***

The dating industry is competitive, with a consistent stream of new products and entrants. Some of our competitors may enjoy better competitive positions in certain geographical regions or user demographics that we currently serve or may serve in the future. These advantages could enable these competitors to offer products that are more appealing to users and potential users than our products or to respond more quickly and/or cost-effectively than us to new or changing opportunities.

In addition, within the dating industry generally, costs for consumers to switch between products are low, and consumers have a propensity to try new approaches to connecting with people. As a result, new products, entrants and business models are likely to continue to emerge. It is possible that a new product could gain rapid scale at the expense of existing brands through harnessing a new technology or distribution channel, creating a new approach to connecting people or some other means. If we are not able to compete effectively against our current or future competitors and products that may emerge, the size and level of engagement of our user base may decrease, which could have an adverse effect on our business, financial condition and results of operations.

***Each of our dating products monetizes users at different rates. If a meaningful migration of our user base from our higher monetizing dating products to our lower monetizing dating products were to occur, it could adversely affect our business, financial condition and results of operations.***

We own, operate and manage a large and diverse portfolio of dating products. Each dating product has its own mix of free and paid features designed to optimize the user experience and revenue generation from that product's community of users. In general, the mix of features for the various dating products within our more established brands leads to higher monetization rates per user than the mix of features for the various dating

10

products within our newer brands. If a significant portion of our user base were to migrate to our less profitable brands, our business, financial condition and results of operations could be adversely affected. See "Item 7—Management's discussion and analysis of financial condition and results of operations—Management overview—Trends affecting our business."

***Our growth and profitability rely, in part, on our ability to attract and retain users through cost-effective marketing efforts. Any failure in these efforts could adversely affect our business, financial condition and results of operations.***

Attracting and retaining users for certain of our dating products involve considerable expenditures for online and offline marketing. Historically, we have had to increase our marketing expenditures over time in order to attract and retain users and sustain our growth.

Evolving consumer behavior can affect the availability of profitable marketing opportunities. For example, as traditional television viewership declines and as consumers spend more time on mobile devices rather than desktop computers, the reach of many of our traditional advertising channels is contracting. Similarly, as consumers communicate less via email and more via text messaging and other virtual means, the reach of email campaigns designed to attract new and repeat users (and retain current users) for our dating products is adversely impacted. To continue to reach potential users and grow our businesses, we must identify and devote more of our overall marketing expenditures to newer advertising channels, such as mobile and online video platforms, as well as targeted campaigns in which we communicate directly with potential, former and current users via new virtual means. Generally, the opportunities in and sophistication of newer advertising channels are relatively undeveloped and unproven, making it difficult to assess returns on investment associated with such advertising channels, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the advertising industry. Any failure to do so could adversely affect our business, financial condition and results of operations.

***Communicating with our users via email is critical to our success, and any erosion in our ability to communicate in this fashion that is not sufficiently replaced by other means could adversely affect our business, financial condition and results of operations.***

Historically, one of our primary means of communicating with our users and keeping them engaged with our products has been via email communication. Our ability to communicate via email enables us to keep our users updated on activity with respect to their profile, present or suggest new or interesting users from the community, invite users to offline events and present discount and free trial offers, among other things. As consumer habits evolve in the era of web-enabled mobile devices and messaging/social networking apps, usage of email, particularly among our younger users, has declined. In addition, deliverability and other restrictions imposed by third party email providers and/or applicable law could limit or prevent our ability to send emails to our users. A continued and significant erosion in our ability to communicate successfully with our users via email could have an adverse impact on user experience, levels of user engagement and the rate at which non-paying users become Subscribers.

While we continually work to find new means of communicating and connecting with our users (for example, through push notifications), there is no assurance that such alternative means of communication will be as effective as email has been. Any failure to develop or take advantage of new means of communication or limitations on those means of communications imposed by laws, device manufacturers or other sources could have an adverse effect on our business, financial condition and results of operations.

***Foreign currency exchange rate fluctuations could adversely affect our results of operations.***

We operate in various international markets, primarily in various jurisdictions within the European Union, and as result are exposed to foreign exchange risk for both the Euro and British Pound ("GBP"). During the fiscal years ended December 31, 2017 and 2016, 45% and 39% of our total revenues, respectively, were international revenues. We translate international revenues into U.S. dollar-denominated operating results and during periods of a strengthening U.S. dollar, our international revenues will be reduced when translated into U.S. dollars. In addition, as foreign currency exchange rates fluctuate, the translation of our international revenues into U.S. dollar-denominated operating results affects the period-over-period comparability of such results.

We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar.

11

Table of Contents

Our exposure is primarily related to the Euro, and to a lesser extent, the GBP. Since the average Euro exchange rate strengthened against the U.S. dollar in 2017 by 2% compared to 2016, the translation of our Euro-denominated international results into U.S. dollars did not significantly reduce our revenue nor did it have a significant effect on the period-over-period comparability of our U.S dollar-denominated operating results for the fiscal year ended December 31, 2017 versus December 31, 2016. However, for our GBP-denominated international results the significant decline in the GBP due to the United Kingdom's decision to leave the European Union ("Brexit") on June 23, 2016 generated significant foreign currency exchange gains during the fiscal year ended December 31, 2016. See "Item 7—Management's Discussion and Analysis—Match Group, Inc.'s Principles of Financial Reporting—Effects of Changes in Foreign Exchange Rates on Revenue" and "Item 7A—Quantitative and Qualitative Disclosures About Market Risk—Foreign Currency Exchange Risk."

Brexit may continue to cause disruptions to capital and currency markets worldwide, and the full impact of the Brexit decision, remains uncertain. A process of negotiation will determine the future terms of the United Kingdom's relationship with the European Union. During this period of negotiation, our operating results may be negatively affected by exchange rate and other market and economic volatility.

To the extent that the U.S. dollar strengthens relative to either the Euro, the GBP or both, the translation of our international revenues into U.S. dollars will reduce our U.S. dollar denominated operating results and will affect their period-over-period comparability. For the impact of foreign exchange effects on our revenues in 2017, see ''Management's discussion and analysis of financial condition and results of operations-Principles of financial reporting.'' Historically, we have not hedged any foreign currency exposures. The continued growth and expansion of our international operations into new countries increases our exposure to foreign exchange rate fluctuations. Significant foreign exchange rate fluctuations, in the case of one currency or collectively with other currencies, could adversely affect our future results of operations.

***Distribution and use of our dating products depends, in significant part, on a variety of third-party publishers, platforms and mobile app stores. If these third parties limit, prohibit or otherwise interfere with or change the terms of the distribution or use of our dating products in any material way, it could adversely affect our business, financial condition and results of operations.***

We market and distribute our dating products (including related mobile applications) through a variety of third-party publishers and distribution channels. Our ability to market our brands on any given property or channel is subject to the policies of the relevant third party. Certain publishers and channels have, from time to time, limited or prohibited advertisements for dating products for a variety of reasons, including as a result of poor behavior by other industry participants. There is no assurance that we will not be limited or prohibited from using certain current or prospective marketing channels in the future. If this were to happen in the case of a significant marketing channel and/or for a significant period of time, our business, financial condition and results of operations could be adversely affected.

Additionally, our mobile applications are increasingly accessed through the Apple App Store and the Google Play Store. Both Apple and Google have broad discretion to change their respective terms and conditions applicable to the distribution of our applications, including the amount of, and requirement to pay, certain fees associated with purchases facilitated by Apple and Google through our applications, and to interpret their respective terms and conditions in ways that may limit, eliminate or otherwise interfere with our ability to distribute our applications through their stores. There is no assurance that Apple or Google will not limit or eliminate or otherwise interfere with the distribution of our applications. If either or both of them did so, our business, financial condition and results of operations could be adversely affected.

Lastly, in the case of Tinder, and certain other of our products, many users currently register for (and log in to) the application exclusively through their Facebook profiles. While we recently launched an alternate authentication method that allows users to register for (and log into) Tinder using their mobile phone number, no assurances can be provided that this method will be widely adopted by users versus registering for (and logging into) Tinder through their Facebook profiles. Facebook has broad discretion to change its terms and conditions applicable to the use of its platform and to interpret its terms and conditions in ways that could limit, eliminate or otherwise interfere with our ability to use Facebook as an authentication method and if Facebook did so and no alternate method is available (or the alternate method that we ultimately develop is not adopted by users), our business, financial condition and results of operations could be adversely affected.

12

App. 18

Table of Contents

*As the distribution of our dating products through app stores increases, in order to maintain our profit margins, we may need to offset increasing app store fees by decreasing traditional marketing expenditures, increasing user volume or monetization per user or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected.*

As our user base continues to shift to mobile solutions, we increasingly rely on the Apple App Store and the Google Play Store to distribute our mobile applications and related in-app products. While our mobile applications are generally free to download from these stores, we offer our users the opportunity to purchase subscriptions and certain à la carte features through these applications. We determine the prices at which these subscriptions and features are sold; however, purchases of these subscriptions and features are required to be processed through the in-app payment systems provided by Apple and, to a lesser degree, Google. Due to these requirements, we pay Apple and Google, as applicable, a share (generally 30%) of the revenue we receive from these transactions. While we are constantly innovating on and creating our own payment systems and methods, given the increase of the distribution of our dating products through app stores and the requirement to use the in-app payments systems provided by Apple, and to a lesser degree, Google, we may need to offset these increased app store fees by decreasing traditional marketing expenditures as a percentage of revenue, increasing user volume or monetization per user, or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected.

*We depend on our key personnel.*

Our future success will depend upon our continued ability to identify, hire, develop, motivate and retain highly skilled individuals, with the continued contributions of our senior management being especially critical to our success. Competition for well-qualified employees across Match Group and its various businesses is intense and our continued ability to compete effectively depends, in part, upon our ability to attract new employees. While we have established programs to attract new employees and provide incentives to retain existing employees, particularly our senior management, we cannot guarantee that we will be able to attract new employees or retain the services of our senior management or any other key employees in the future. Effective succession planning is also important to our future success. If we fail to ensure the effective transfer of senior management knowledge and smooth transitions involving senior management across our various businesses, our ability to execute short and long term strategic, financial and operating goals, as well as our business, financial condition and results of operations generally, could be adversely affected.

*Our success depends, in part, on the integrity of our systems and infrastructures and on our ability to enhance, expand and adapt these systems and infrastructures in a timely and cost-effective manner.*

In order for us to succeed, our systems and infrastructures must perform well on a consistent basis. From time to time, we may experience system interruptions that make some or all of our systems or data unavailable and prevent our products from functioning properly for our users; any such interruption could arise for any number of reasons. Further, our systems and infrastructures are vulnerable to damage from fire, power loss, telecommunications failures and similar events. While we have backup systems in place for certain aspects of our operations, our systems and infrastructures are not fully redundant, disaster recovery planning is not sufficient for all eventualities and our property and business interruption insurance coverage may not be adequate to compensate us fully for any losses that we may suffer. Any interruptions or outages, regardless of the cause, could negatively impact our users' experiences with our products, tarnish our brands' reputations and decrease demand for our products, any or all of which could adversely affect our business, financial condition and results of operations.

We also continually work to expand and enhance the efficiency and scalability of our technology and network systems to improve the experience of our users, accommodate substantial increases in the volume of traffic to our various dating products, ensure acceptable page load times for our dating products and keep up with changes in technology and user preferences. Any failure to do so in a timely and cost-effective manner could adversely affect our users' experience with our various products and thereby negatively impact the demand for our products, and could increase our costs, either of which could adversely affect our business, financial condition and results of operations.

13

App. 19

Table of Contents

***We may not be able to protect our systems and infrastructures from cyberattacks and may be adversely affected by cyberattacks experienced by third parties.***

We are regularly under attack by perpetrators of random or targeted malicious technology-related events, such as cyberattacks, computer viruses, worms, bot attacks or other destructive or disruptive software, distributed denial of service attacks and attempts to misappropriate customer information, including credit card information. While we have invested (and continue to invest) heavily in the protection of our systems and infrastructures and in related personnel and training, there can be no assurance that our efforts will prevent significant breaches in our systems or other such events from occurring. Any cyber or similar attack we are unable to protect ourselves against could damage our systems and infrastructures, prevent us from providing our products, erode our reputation and brands, result in the disclosure of confidential or sensitive information of our users and/or be costly to remedy, as well as subject us to investigations by regulatory authorities and/or litigation that could result in liability to third parties.

The impact of cyber security events experienced by third-parties with whom we do business (or upon whom we otherwise rely in connection with our day-to-day operations) could have a similar effect on us. Moreover, even cyber or similar attacks that do not directly affect us or third parties with whom we do business may result in a loss of consumer confidence generally, which could make users less likely to use or continue to use our products. The occurrence of any of these events could have an adverse effect on our business, financial condition and results of operations.

***Our success depends, in part, on the integrity of third-party systems and infrastructures.***

We rely on third parties, primarily data center service providers and cloud-based, hosted web service providers, as well as third-party computer systems, broadband and other communications systems and service providers, in connection with the provision of our products generally, as well as to facilitate and process certain transactions with our users. We have no control over any of these third parties or their operations.

Problems experienced by third-party data center service providers and cloud-based, hosted web service providers upon whom we rely, the telecommunications network providers with whom they contract or with the systems through which telecommunications providers allocate capacity among their customers could also adversely affect us. Any changes in service levels at our data centers or hosted web service providers or any interruptions, outages or delays in our systems or those of our third-party providers, or deterioration in the performance of these systems, could impair our ability to provide our products or process transactions with our users, which would adversely impact our business, financial condition and results of operations.

***If the security of personal and confidential or sensitive user information that we maintain and store is breached or otherwise accessed by unauthorized persons, it may be costly to mitigate the impact of such an event and our reputation could be harmed.***

We receive, process, store and transmit a significant amount of personal user and other confidential or sensitive information, including credit card information, and enable our users to share their personal information with each other. In some cases, we retain third-party vendors to store this information. We continuously develop and maintain systems to protect the security, integrity and confidentiality of this information, but cannot guarantee that inadvertent or unauthorized use or disclosure will not occur or that third parties will not gain unauthorized access to this information despite our efforts. If any such event were to occur, we may not be able to remedy the event, and we may have to expend significant capital and other resources to mitigate the impact of such an event, and to develop and implement protections to prevent future events of this nature from occurring. If a breach of our security (or the security of our vendors and partners) occurs, the perception of the effectiveness of our security measures and our reputation may be harmed, we could lose current and potential users and the recognition of our various brands and their competitive positions could be diminished, any or all of which could adversely affect our business, financial condition and results of operations.

***Our business is subject to complex and evolving U.S. and international laws and regulations. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations in the United States and abroad that involve matters that are important to or may otherwise impact our business, including, among others, broadband internet access, online

14

App. 20

Table of Contents

commerce, advertising, user privacy, data protection, protection of minors, consumer protection, sex-trafficking, taxation and securities law compliance. The introduction of new products, expansion of our activities in certain jurisdictions, or other actions that we may take may subject us to additional laws, regulations, or other government scrutiny. In addition, foreign laws and regulations can impose different obligations or be more restrictive than those in the United States.

These U.S. federal and state and foreign laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are constantly evolving and can be subject to significant change. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate, and may be interpreted and applied inconsistently from country to country and inconsistently with our current policies and practices. These laws and regulations, as well as any associated inquiries or investigations or any other government actions, may be costly to comply with and may delay or impede the development of new products, result in negative publicity, increase our operating costs, require significant management time and attention, and subject us to remedies that may harm our business, including fines or demands or orders that we modify or cease existing business practices.

Proposed or new legislation and regulations could also adversely affect our business. The promulgation of new laws or regulations, or the new interpretation of existing laws and regulations, in each case that restrict or otherwise unfavorably impact the ability or manner in which we provide our services could require us to change certain aspects of our business and operations to ensure compliance, which could decrease demand for services, reduce revenues, increase costs and subject us to additional liabilities.

The adoption of any laws or regulations that adversely affect the popularity or growth in use of the internet, including laws or regulations that undermine open and neutrally administered internet access, could decrease user demand for our service offerings and increase our cost of doing business. For example, in December 2017, the Federal Communications Commission adopted an order reversing net neutrality protections in the United States, including the repeal of specific rules against blocking, throttling or "paid prioritization" of content or services by internet service providers. To the extent internet service providers engage in such blocking, throttling, "paid prioritization" of content or similar actions as a result of this order and the adoption of similar laws or regulations, our business, financial condition and results of operations could be adversely affected.

***The varying and rapidly-evolving regulatory framework on privacy and data protection across jurisdictions could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

There are numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of this kind of information, the scope of which are constantly changing, inconsistent and conflicting and subject to differing interpretations, as new laws of this nature are proposed and adopted. For example, in 2016 the European Commission adopted the General Data Protection Act, a comprehensive European Union privacy and data protection reform that becomes effective in May 2018, which applies to companies established in the European Union or otherwise providing services or monitoring the behavior of people located in the European Union and which provides for significant penalties in case of non-compliance. The European Union is also considering an update to the EU's Privacy and Electronic Communications (so-called "e-Privacy") Directive, notably to amend rules on the use of cookies. In addition, Brexit could result in the application of new and conflicting data privacy and protection laws and standards to our operations in the United Kingdom and our handling of personal data of users located in the United Kingdom. At the same time, certain developing countries in which we do business have already or are also currently considering adopting privacy and data protection laws and regulations and legislative proposals concerning privacy and the protection of user information are often pending before the U.S. Congress and various U.S. state legislatures.

While we believe that we comply with industry standards and applicable laws and industry codes of conduct relating to privacy and data protection in all material respects, there is no assurance that we will not be subject to claims that we have violated applicable laws or codes of conduct, that we will be able to successfully defend against such claims or that we will not be subject to significant fines and penalties in the event of non-compliance.

Any failure or perceived failure by us (or the third parties with whom we have contracted to store such information) to comply with applicable privacy and security laws, policies or related contractual obligations or any compromise of security that results in unauthorized access, or the use or transmission of, personal user

15

information could result in a variety of claims against us, including governmental enforcement actions, significant fines, litigation, claims of breach of contract and indemnity by third parties and adverse publicity. In the case of such an event, our reputation may be harmed, we could lose current and potential users and the competitive positions of our various brands could be diminished, any or all of which could adversely affect our business, financial condition and results of operations.

Lastly, compliance with the numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of personal data could be costly, as well as result in delays in the development of new products and features as resources are allocated to these compliance projects, particularly as these laws become more comprehensive in scope, more commonplace and continue to evolve. In addition, the varying and rapidly-evolving regulatory frameworks across jurisdictions may result in decisions to introduce products in certain jurisdictions but not others or to cease providing certain services or features to users located in certain jurisdictions. If these costs or other impacts are significant, our business, financial condition and results of operations could be adversely affected.

***We are subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations.***

We accept payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real-time basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success.

When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations.

Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort.

Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face litigation, fines, governmental enforcement action, civil liability, diminished public perception of our security measures, significantly higher credit card-related costs and substantial remediation costs, any of which could adversely affect our business, financial condition and results of operations.

Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring subscription payments may adversely affect our business, financial condition and results of operations. For example, the European Union's Payment Services Directive (PSD2), which becomes effective in 2018, could impact our ability to process auto-renewal payments or offer promotional or differentiated pricing for users in the EU. Any such impacts could adversely affect our business, financial condition and results of operations.

***Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business.***

The reputations of our brands may be adversely affected by the actions of our users that are deemed to be hostile, offensive, defamatory, inappropriate or unlawful. While we have systems and processes in place that aim to monitor and review the appropriateness of the content accessible through our dating products, which include, in particular, reporting tools through which users can inform us of such behavior on the platform, and have adopted policies regarding illegal, offensive or inappropriate use of our dating products, our users could nonetheless

16

App. 22

engage in activities that violate our policies. These safeguards may not be sufficient to avoid harm to our reputation and brands, especially if such hostile, offensive or inappropriate use is well-publicized.

In addition, it is possible that a user of our products could be physically, financially, emotionally or otherwise harmed by an individual that such user met through the use of one of our products. If one or more of our users suffers or alleges to have suffered any such harm, we could experience negative publicity or legal action that could damage our reputation and our brands. Similar events affecting users of our competitors' dating products could result in negative publicity for the dating industry generally, which could in turn negatively affect our business.

Concerns about harms and the use of dating products and social networking platforms for illegal conduct, such as romance scams, financial fraud, and sex-trafficking, could produce future legislation or other governmental action. For example, legislation has been proposed in the United States that would allow victims of sex trafficking crimes to seek redress from platforms in certain circumstances. The European Union and the United Kingdom have also recently launched consultations regarding legislation that would expose platforms to similar or more expansive liability. If these proposed laws are passed, or if future legislation or governmental action is proposed or taken to address concerns regarding such harms, changes could be required to our dating products that could restrict or impose additional costs upon the conduct of our business generally or cause users to abandon our dating products.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties.***

We rely heavily upon our trademarks and related domain names and logos to market our brands and to build and maintain brand loyalty and recognition, as well as upon trade secrets. We also rely upon patented and patent-pending proprietary technologies relating to matching process systems and related features and products.

We also rely on a combination of laws, and contractual restrictions with employees, customers, suppliers, affiliates and others, to establish and protect our various intellectual property rights. For example, we have generally registered and continue to apply to register and renew, or secure by contract where appropriate, trademarks and service marks as they are developed and used, and reserve, register and renew domain names as we deem appropriate. Effective trademark protection may not be available or may not be sought in every country in which our products are made available and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available.

We also generally seek to apply for patents or for other similar statutory protections as and if we deem appropriate, based on then-current facts and circumstances, and will continue to do so in the future. No assurances can be given that any patent application we have filed or will file will result in a patent being issued, or that any existing or future patents will afford adequate protection against competitors and similar technologies. In addition, no assurances can be given that third parties will not create new products or methods that achieve similar results without infringing upon patents we own.

Despite these measures, our intellectual property rights may still not be protected in a meaningful manner, challenges to contractual rights could arise, third parties could copy or otherwise obtain and use our intellectual property without authorization or laws and interpretations of laws regarding the enforceability of existing intellectual property rights may change over time in a manner that provides less protection. The occurrence of any of these events could result in the erosion of our brands and limit our ability to market our brands using our various domain names, as well as impede our ability to effectively compete against competitors with similar technologies, any of which could adversely affect our business, financial condition and results of operations.

From time to time, we have been subject to legal proceedings and claims, including claims of alleged infringement of trademarks, copyrights, patents and other intellectual property rights held by third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect our trade secrets and patents or to determine the validity and scope of proprietary rights claimed by others. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations.

17

App. 23

***We operate in various international markets, including certain markets in which we have limited experience. As a result, we face additional risks in connection with certain of our international operations.***

Our brands are available in over 190 countries and offered in 42 different languages. Our international revenue represented 45% and 39% of our total revenue for the fiscal years ended December 31, 2017 and 2016, respectively.

Operating internationally, particularly in countries in which we have limited experience, exposes us to a number of additional risks, including:

- operational and compliance challenges caused by distance, language and cultural differences;

- difficulties in staffing and managing international operations;

- differing levels of social and technological acceptance of our dating products or lack of acceptance of them generally;

- foreign currency fluctuations;

- restrictions on the transfer of funds among countries and back to the United States and costs associated with repatriating funds to the United States;

- differing and potentially adverse tax laws;

- multiple, conflicting and changing laws, rules and regulations, and difficulties understanding and ensuring compliance with those laws by both our employees and our business partners, over whom we exert no control;

- compliance challenges due to different laws and regulatory environments, particularly in the case of privacy and data security;

- competitive environments that favor local businesses;

- limitations on the level of intellectual property protection; and

- trade sanctions, political unrest, terrorism, war and epidemics or the threat of any of these events.

The occurrence of any or all of the events described above could adversely affect our international operations, which could in turn adversely affect our business, financial condition and results of operations.

***We may experience operational and financial risks in connection with acquisitions.***

We have made numerous acquisitions in the past and we continue to seek potential acquisition candidates. We may experience operational and financial risks in connection with historical and future acquisitions if we are unable to:

- properly value prospective acquisitions, especially those with limited operating histories;

- accurately review acquisition candidates' business practices against applicable laws and regulations and, where applicable, implement proper remediation controls, procedures, and policies;

- successfully integrate the operations, as well as the accounting, financial controls, management information, technology, human resources and other administrative systems, of acquired businesses with our existing operations and systems;

- successfully identify and realize potential synergies among acquired and existing businesses;

- retain or hire senior management and other key personnel at acquired businesses; and

- successfully manage acquisition-related strain on our management, operations and financial resources and those of the various brands in our portfolio.

Furthermore, we may not be successful in addressing other challenges encountered in connection with our acquisitions. The anticipated benefits of one or more of our acquisitions may not be realized or the value of goodwill and other intangible assets acquired could be impacted by one or more continuing unfavorable events or trends, which could result in significant impairment charges. The occurrence of any these events could have an adverse effect on our business, financial condition and results of operations.

18

Table of Contents

***We are subject to litigation and adverse outcomes in such litigation could have an adverse effect on our financial condition.***

We are, and from time to time may become, subject to litigation and various legal proceedings, including litigation and proceedings related to intellectual property matters, privacy and consumer protection laws, as well as stockholder derivative suits, class action lawsuits and other matters, that involve claims for substantial amounts of money or for other relief or that might necessitate changes to our business or operations. For example, as discussed in "Item 3—Legal Proceedings," in early 2016 we were named, among other defendants, in purported class action lawsuits on behalf of purchasers of shares of our common stock in our initial public offering and thereafter. The defense of these actions may be both time consuming and expensive. We evaluate these litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we may establish reserves and/or disclose the relevant litigation claims or legal proceedings, as and when required or appropriate. These assessments and estimates are based on information available to management at the time of such assessment or estimation and involve a significant amount of judgment. As a result, actual outcomes or losses could differ materially from those envisioned by our current assessments and estimates. Our failure to successfully defend or settle any of these litigations or legal proceedings could result in liability that, to the extent not covered by our insurance, could have an adverse effect on our business, financial condition and results of operations.

**Risks related to our ongoing relationship with IAC**

***IAC controls our company and has the ability to control the direction of our business.***

As of February 2, 2018, IAC owned 12,843,442 shares of our common stock and 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock. IAC's ownership of our outstanding common stock and Class B common stock represents approximately 81.2% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock. As long as IAC owns shares of our capital stock representing a majority of the combined voting power of our outstanding capital stock, it will be able to control any corporate action that requires a stockholder vote, regardless of the vote of any other stockholder. As a result, IAC has the ability to control significant corporate activities, including:

- the election of our board of directors and, through our board of directors, decision-making with respect to our business direction and policies, including the appointment and removal of our officers;

- acquisitions or dispositions of businesses or assets, mergers or other business combinations;

- issuances of shares of our common stock, Class B common stock, Class C common stock and our capital structure;

- corporate opportunities that may be suitable for us and IAC, subject to the corporate opportunity provisions in our certificate of incorporation, as described below;

- our financing activities, including the issuance of additional debt and equity securities, or the incurrence of other indebtedness generally;

- the payment of dividends; and

- the number of shares available for issuance under our equity incentive plans for our prospective and existing employees.

This voting control will limit the ability of other stockholders to influence corporate matters and, as a result, we may take actions that stockholders other than IAC do not view as beneficial. This voting control may also discourage transactions involving a change of control of our company, including transactions in which holders of our common stock might otherwise receive a premium for the holders' shares. Furthermore, IAC generally has the right at any time to sell or otherwise dispose of the shares of our capital stock that it owns, including the ability to transfer a controlling interest in us to a third party, without the approval of the holders of our common stock and without providing for the purchase of shares of common stock.

Even if IAC owns shares of our capital stock representing less than a majority of the combined voting power of our outstanding capital stock, so long as IAC retains shares representing a significant percentage of our combined voting power, IAC will have the ability to substantially influence these significant corporate activities.

19

Table of Contents

In addition, pursuant to an investor rights agreement between us and IAC, IAC has the right to maintain its level of ownership in us to the extent we issue additional shares of our capital stock in the future and, pursuant to an employee matters agreement between us and IAC, IAC may receive payment for certain compensation expenses through the receipt of additional shares of our capital stock. For a more complete summary of our agreements with IAC, see "Note 16—Related Party Transactions" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements."

Until such time as IAC no longer controls or has the ability to substantially influence us, we will continue to face the risks described in this "Risk factors" section relating to IAC's control of us and the potential conflicts of interest between IAC and us.

***Our certificate of incorporation could prevent us from benefiting from corporate opportunities that might otherwise have been available to us.***

Our certificate of incorporation has a "corporate opportunity" provision in which we renounce any interests or expectancy in corporate opportunities which become known to: (i) any of our directors or officers who are also officers, directors, employees or other affiliates of IAC or its affiliates (except that we and our subsidiaries shall not be deemed affiliates of IAC or its affiliates for the purposes of the provision) or (ii) IAC itself, and which relate to the business of IAC or may constitute a corporate opportunity for both IAC and us. Generally, neither IAC nor our officers or directors who are also officers or directors of IAC or its affiliates will be liable to us or our stockholders for breach of any fiduciary duty by reason of the fact that any such person pursues or acquires any corporate opportunity for the account of IAC or its affiliates, directs or transfers such corporate opportunity to IAC or its affiliates, or does not communicate information regarding such corporate opportunity to us. The corporate opportunity provision may exacerbate conflicts of interest between IAC and us because the provision effectively permits any of our directors or officers who also serves as an officer or director of IAC to choose to direct a corporate opportunity to IAC instead of to us.

***IAC's interests may conflict with our interests and the interests of our stockholders. Conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.***

Various conflicts of interest between us and IAC could arise. As of the date of this report, five of our eleven directors are current members of the board of directors or executive officers of IAC. Ownership interests of directors or officers of IAC in our stock and ownership interests of our directors and officers in the stock of IAC, or a person's service as either a director or officer of both companies, could create or appear to create potential conflicts of interest when those directors and officers are faced with decisions relating to our company. These decisions could include:

- corporate opportunities;

- the impact that operating decisions for our business may have on IAC's consolidated financial statements;

- the impact that operating or capital decisions (including the incurrence of indebtedness) for our business may have on IAC's current or future indebtedness or the covenants under that indebtedness;

- business combinations involving us;

- our dividend policy;

- management stock ownership; and

- the intercompany services and agreements between IAC and us.

Potential conflicts of interest could also arise if we decide to enter into any new commercial arrangements with IAC in the future or in connection with IAC's desire to enter into new commercial arrangements with third parties.

Furthermore, disputes may arise between IAC and us relating to our past and ongoing relationships, and these potential conflicts of interest may make it more difficult for us to favorably resolve such disputes, including those related to:

- tax, employee benefit, indemnification and other matters;

20

Table of Contents

- the nature, quality and pricing of services IAC agrees to provide to us;

- sales or other disposal by IAC of all or a portion of its ownership interest in us; and

- business combinations involving us.

We may not be able to resolve any potential conflicts with IAC, and even if we do, the resolution may be less favorable to us than if we were dealing with an unaffiliated party. While we are controlled by IAC, we may not have the leverage to negotiate amendments to these agreements, if required, on terms as favorable to us as those we would negotiate with an unaffiliated third party.

***We are a "controlled company" as defined in the NASDAQ rules, and rely on exemptions from certain corporate governance requirements that provide protection to stockholders of other companies.***

As a result of IAC owning more than 50% of the combined voting power of our share capital, we are a "controlled company" under the Marketplace Rules of the NASDAQ Stock Market, or the Marketplace Rules. As a "controlled company," we are exempt from the obligation to comply with certain Marketplace Rules related to corporate governance, including the following requirements:

- that a majority of our board of directors consists of "independent directors," as defined under the Marketplace Rules; and

- that we have a nominating/governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities.

Accordingly, for so long as we are a "controlled company," our stockholders will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the Marketplace Rules.

***In order to preserve the ability of IAC to distribute its shares of our capital stock on a tax-free basis, we may be prevented from pursuing opportunities to raise capital, to effectuate acquisitions or to provide equity incentives to our employees, which could hurt our ability to grow.***

Under current laws, IAC must retain beneficial ownership of at least 80% of our combined voting power and 80% of each class of our nonvoting capital stock (if any is outstanding) in order to effect a tax-free distribution of our shares held by IAC to its stockholders. As of the date of this annual report, IAC has advised us that it does not have any present intention or plans to undertake such a tax-free distribution. However, IAC does currently intend to use its majority voting interest to retain its ability to engage in such a transaction. This intention may cause IAC to not support transactions we wish to pursue that involve issuing shares of our common stock, including for capital raising purposes, as consideration for an acquisition or as equity incentives to our employees. The inability to pursue such transactions, if it occurs, may adversely affect our company. See "—IAC controls our company and will have the ability to control the direction of our business" and "—IAC's interests may conflict with our interests and the interests of our stockholders." Conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.

***Our agreements with IAC will require us to indemnify IAC for certain tax liabilities and may limit our ability to engage in desirable strategic or capital raising transactions, including following any distribution by IAC of our capital stock to its stockholders.***

Under a tax sharing agreement between us and IAC, we generally are responsible and are required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes us or any of our subsidiaries to the extent attributable to us or any of our subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any consolidated, combined, unitary or separate tax returns of us or any of our subsidiaries. To the extent IAC failed to pay taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes us or any of our subsidiaries, the relevant taxing authority could seek to collect such taxes (including taxes for which IAC is responsible under the tax sharing agreement) from us or our subsidiaries.

Under the tax sharing agreement, we generally will be responsible for any taxes and related amounts imposed on IAC or us that arise from the failure of a future spin-off of IAC's interest in us to qualify as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Internal Revenue Code of 1986, as amended, or the Code, to the extent that the failure to so

21

App. 27

Table of Contents

qualify is attributable to: (i) a breach of the relevant representations and covenants made by us in the tax sharing agreement or any representation letter provided in support of any tax opinion or ruling obtained by IAC with respect to the U.S. federal income tax treatment of such spin-off, or (ii) an acquisition of our equity securities.

To preserve the tax-free treatment of any potential future spin-off by IAC of its interest in us, and in addition to our indemnity obligation described above, the tax sharing agreement will restrict us, for the two-year period following any such spin-off, except in specific circumstances, from: (i) entering into any transaction pursuant to which all or a portion of shares of our stock would be acquired, whether by merger or otherwise, (ii) issuing equity securities beyond certain thresholds, (iii) repurchasing our shares other than in certain open-market transactions, (iv) ceasing to actively conduct our businesses or (v) taking or failing to take any other action that prevents the distribution and related transactions from qualifying as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Code.

These indemnity obligations and other limitations could have an adverse effect on our business, financial condition and results of operations.

### Future sales or distributions of our shares by IAC could depress our common stock price.

IAC has the right to sell or distribute to its stockholders all or a portion of the shares of our capital stock that it holds (12,843,442 shares of our common stock and 209,919,402 shares of our Class B common stock, representing all of our outstanding Class B common stock, as of February 2, 2018). As of the date of this annual report, IAC has advised us that it does not have any present intention or plans to undertake such a sale or distribution; however, any sales by IAC in the public market or distributions to its stockholders of substantial amounts of our stock in the form of common stock or Class B common stock, or the filing by IAC of a registration statement relating to a substantial amount of our stock, could depress the price of our common stock.

In addition, IAC has the right, subject to certain conditions, to require us to file registration statements covering the sale of its shares or to include its shares in other registration statements that we may file. In the event IAC exercises its registration rights and sells all or a portion of its shares of our capital stock, the price of our common stock could decline.

### The services that IAC provides to us may not be sufficient to meet our needs, which may result in increased costs and otherwise adversely affect our business.

IAC currently provides (and is expected to continue to provide) us with corporate and shared services related to certain corporate functions, including tax, treasury and other services, for a fee provided in the services agreement described in "Item 1—Business-Relationship with IAC." IAC is not obligated to provide these services in a manner that differs from the nature of the service when we were a wholly-owned subsidiary of IAC, and thus we may not be able to modify these services in a manner desirable to us as a stand-alone public company. Further, if we no longer receive these services from IAC, we may not be able to perform these services ourselves, or find appropriate third-party arrangements at a reasonable cost, and the cost may be higher than that charged by IAC.

**Risks related to our indebtedness**

### Our indebtedness may affect our ability to operate our business, which could have a material adverse effect on our financial condition and results of operations. We and our subsidiaries may incur additional indebtedness, including secured indebtedness.

As of December 31, 2017, we had total debt outstanding of approximately $1.3 billion and borrowing availability of $500 million under our revolving credit facility.

Our indebtedness could have important consequences, such as:

•   limiting our ability to obtain additional financing to fund our working capital needs, acquisitions, capital expenditures or other debt service requirements or for other purposes;

•   limiting our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to service debt;

•   limiting our ability to compete with other companies who are not as highly leveraged, as we may be less capable of responding to adverse economic and industry conditions;

22

Table of Contents

- restricting us from making strategic acquisitions, developing properties or exploiting business opportunities;

- restricting the way in which we conduct our business because of financial and operating covenants in the agreements governing our and certain of our subsidiaries' existing and future indebtedness, including, in the case of certain indebtedness of subsidiaries, certain covenants that restrict the ability of subsidiaries to pay dividends or make other distributions to us;

- exposing us to potential events of default (if not cured or waived) under financial and operating covenants contained in our or our subsidiaries' debt instruments that could have a material adverse effect on our business, financial condition and operating results; increasing our vulnerability to a downturn in general economic conditions or in pricing of our products; and

- limiting our ability to react to changing market conditions in our industry and in our customers' industries.

In addition to our debt service obligations, our operations require substantial investments on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance, which, in turn, is subject to prevailing economic conditions and financial, business, competitive, legal and other factors.

Subject to the restrictions in our credit agreement (which includes our revolving credit facility and term loan) and the restrictions included in the indentures related to our 6.375% Senior Notes due 2024 and 5.00% Senior Notes due 2027 (the "Match Group Senior Notes"), we and our subsidiaries may incur significant additional indebtedness, including additional secured indebtedness. Although the terms of our credit agreement and the indentures related to the Match Group Senior Notes contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and additional indebtedness incurred in compliance with these restrictions could be significant. If new debt is added to our and our subsidiaries' current debt levels, the risks described above could increase.

***We may not be able to generate sufficient cash to service all of our current and planned indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.***

Our ability to satisfy our debt obligations will depend upon, among other things:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control; and

- our future ability to borrow under our revolving credit facility, the availability of which will depend on, among other things, our complying with the covenants in the then-existing agreements governing our indebtedness.

We cannot assure you that our business will generate sufficient cash flow from operations, or that we will be able to draw under our revolving credit facility or otherwise, in an amount sufficient to fund our liquidity needs.

If our cash flows and capital resources are insufficient to service our indebtedness, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or restructure or refinance our indebtedness. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. In the absence of such operating results and resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations, sell equity, and/or negotiate with our lenders to restructure the applicable debt, in order to meet our debt service and other obligations. We may not be able to consummate those dispositions for fair market value or at all. Our credit agreement and the indentures related to the Match Group Senior Notes may restrict, or market or business conditions may limit, our ability to avail ourselves of some or all of these options.

23

App. 29

Table of Contents

Furthermore, any proceeds that we could realize from any such dispositions may not be adequate to meet our debt service obligations then due.

### *Our debt agreements contain restrictions that will limit our flexibility in operating our business.*

Our credit agreement and the indentures related to the Match Group Senior Notes contain, and any instruments governing future indebtedness of ours would likely contain, a number of covenants that will impose significant operating and financial restrictions on us, including restrictions on our ability to, among other things:

- create liens on certain assets;

- incur additional debt;

- make certain investments and acquisitions;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- sell certain assets;

- pay dividends on or make distributions in respect of our capital stock or make restricted payments;

- enter into certain transactions with our affiliates; and

- place restrictions on distributions from subsidiaries.

Any of these restrictions could limit our ability to plan for or react to market conditions and could otherwise restrict corporate activities. Any failure to comply with these covenants could result in a default under our credit agreement and/or the indentures related to the Match Group Senior Notes or any instruments governing future indebtedness of ours. Upon a default, unless waived, the lenders under our credit agreement could elect to terminate their commitments, cease making further loans, foreclose on our assets pledged to such lenders to secure our obligations under our credit agreement and force us into bankruptcy or liquidation. Holders of the Match Group Senior Notes also have the ability to force us into bankruptcy or liquidation in certain circumstances, subject to the terms of the related indentures. In addition, a default under our credit agreement or the indentures related to the Match Group Senior Notes may trigger a cross default under our other agreements and could trigger a cross default under the agreements governing our future indebtedness. Our operating results may not be sufficient to service our indebtedness or to fund our other expenditures and we may not be able to obtain financing to meet these requirements.

### *Variable rate indebtedness that we have incurred or may incur under our credit agreement will subject us to interest rate risk, which could cause our debt service obligations to increase significantly.*

We currently have $425 million of indebtedness outstanding under our term loan. Borrowings under the term loan are, and any borrowings under our revolving credit facility will be, at variable rates of interest. Indebtedness that bears interest at variable rates exposes us to interest rate risk. Our term loan bears interest at LIBOR plus 2.50%. As of December 31, 2017, the rate in effect was 3.85%. If LIBOR were to increase or decrease by 100 basis points, then the annual interest and expense payments on the outstanding balance as of December 31, 2017 on the term loan would increase or decrease by $4.3 million. See also "Item 7A-Quantitative and Qualitative Disclosures About Market Risk."

### Risks related to ownership of our common stock

### *The multi-class structure of our capital stock has the effect of concentrating voting control with holders of our Class B common stock and limiting the ability of holders of our common stock to influence corporate matters.*

Our publicly held common stock has one vote per share and our Class B common stock has ten votes per share. As of February 2, 2018, IAC owned all of the shares of our outstanding Class B common stock and 12,843,442 shares of our common stock, collectively representing approximately 81.2% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock. Due to the ten-to-one voting ratio between our Class B common stock and common stock, the holders of our Class B common stock collectively will continue to control a majority of the combined voting power of our capital stock, even when the outstanding shares of Class B common stock represent a small minority of our outstanding capital stock, and such voting control will be concentrated with IAC. This concentrated control will significantly limit your ability to influence corporate matters.

24

Table of Contents

***The difference in the voting rights of our common stock and our Class B common stock may harm the value and liquidity of our common stock.***

Holders of our Class B common stock are entitled to ten votes per share and holders of our common stock are entitled to one vote per share. The difference in the voting rights of our common stock and Class B common stock could harm the value of our common stock to the extent that any investor or potential future purchaser of our common stock ascribes value to the right of the holders of our Class B common stock to ten votes per share. The existence of two classes of common stock with different voting rights could result in less liquidity for either class of stock than if there were only one class of our common stock.

***The price of our common stock has been and may continue to be volatile or may decline regardless of our operating performance, and you could lose all or part of your investment.***

During 2017, our common stock has traded as high as $32.87 and as low as $15.42 and on February 27, 2018, the closing price of our common stock was $40.07. The market price of our common stock has been and may continue to be subject to wide fluctuations in response to various factors, many of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose part of your investment in our common stock since you might be unable to sell your shares at or above the price you paid. Factors that could cause fluctuations in the market price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the market prices and trading volumes of technology stocks generally, or those in our industry in particular;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- volatility in the market price of our common stock due to the limited number of shares of our common stock held by the public;

- sales of shares of our stock by us and/or our directors, executive officers, employees and stockholders;

- the failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, and any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new brands, products or services;

- the public's reaction to our earnings releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our operating results or fluctuations in our operating results;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses or technologies by us or our competitors;

- new laws or regulations or new interpretations of (or changes to) existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth in any of our significant markets.

25

Table of Contents

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. We currently are, and in the future may be, the target of this type of litigation. See "Item 3—Legal Proceedings." Securities litigation against us could result in substantial costs and a diversion of our management's attention and resources.

***You may experience dilution due to the issuance of additional securities in the future****.*

Our dilutive securities consist of vested and unvested options to purchase shares of our common stock, restricted stock unit awards, shares of our common stock issuable to IAC as reimbursement for the cost of vested and unvested IAC equity awards held by our employees and stock appreciation rights settled in IAC stock.

These dilutive securities are reflected in our share calculations underlying our dilutive earnings per share calculation contained in our financial statements for fiscal years ended December 31, 2017, 2016 and 2015. For more information, see "Note 11—Earnings per Share" to the consolidated and combined financial statements included in "Item 8-Consolidated and Combined Financial Statements and Supplementary Data." Intra-quarter movements in our stock price, could lead to more or less dilution than reflected in these calculations.

At the option of IAC, the shares Match Group issues in connection with former subsidiary equity awards, which were converted into Match Group equity awards in 2017, will either be issued to holders of such awards or to IAC. In the event they are issued to IAC, IAC would in turn provide the equity holders with IAC shares of equivalent value to the Match Group shares issued to it. In cases where Match Group shares are issued directly to equity holders, recipients may sell such stock into the open market. If sales are significant and concentrated, these sales could have a temporary impact on the trading value of our stock.

***Our quarterly results or operating metrics could fluctuate significantly, which could cause the trading price of our common stock to decline.***

Our quarterly results and operating metrics have fluctuated historically and we expect that they could continue to fluctuate in the future as a result of a number of factors, many of which are outside of our control and may be difficult to predict, including:

• the timing, size and effectiveness of our marketing efforts;

• fluctuations in the rate at which we attract new users, the level of engagement of such users and the propensity of such users to subscribe to our brands or to purchase à la carte features;

• increases or decreases in our revenues and expenses caused by fluctuations in foreign currency exchange rates;

• the timing, size and effectiveness of non-marketing operating expenses that we may incur to grow and expand our operations, develop new products and remain competitive;

• the performance, reliability and availability of our technology, network systems and infrastructure and data centers;

• operational and financial risks we may experience in connection with historical and potential future acquisitions and investments; and

• general economic conditions in either domestic or international markets.

The occurrence of any one of these factors, as well as other factors, or the cumulative effect of the occurrence of one or more of such factors could cause our quarterly results and operating metrics to fluctuate significantly. As a result, quarterly comparisons of results and operating metrics may not be meaningful.

In addition, the variability and unpredictability of our quarterly results or operating metrics could result in our failure to meet our expectations, or those of any of our investors or of analysts that cover our company, with respect to revenues or other operating results for a particular period. If we fail to meet or exceed such expectations for these or any other reasons, the market price of our common stock could fall substantially.

***We do not expect to declare any cash dividends in the foreseeable future.***

We have no current plans to pay cash dividends on our common stock and Class B common stock. Instead, we anticipate that all of our future earnings will be retained to support our operations and to finance the growth

26

Table of Contents

and development of our business. Any future determination relating to our dividend policy will be made by our board of directors and will depend on a number of factors, including:

- our historic and projected financial condition, liquidity and results of operations;

- our capital levels and needs;

- tax considerations;

- any acquisitions or potential acquisitions that we may consider;

- statutory and regulatory prohibitions and other limitations;

- the terms of any credit agreements or other borrowing arrangements that restrict our ability to pay cash dividends, including the Match Group Credit Agreement and the indenture relating to the Match Group Senior Notes;

- general economic conditions; and

- other factors deemed relevant by our board of directors.

We are not obligated to pay dividends on our common stock or Class B common stock. Consequently, investors may need to rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment. Investors seeking cash dividends should not purchase our common stock.

***Provisions in our certificate of incorporation and bylaws or Delaware law may discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.***

Delaware corporate law and our certificate of incorporation and bylaws contain provisions that could discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous, including provisions which:

- authorize the issuance of "blank check" preferred stock that our board could issue to increase the number of outstanding shares and to discourage a takeover attempt;

- limit the ability of our stockholders to call special meetings of stockholders;

- provide that certain litigation against us can only be brought in Delaware; and

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws.

Any provision of our certificate of incorporation, our bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

### Item 1B. Unresolved Staff Comments

None.

### Item 2. Properties

Match Group's corporate headquarters consists of approximately 73,000 square feet of office space in Dallas, Texas. This office space, which also houses offices for the Match and Match Affinity brands, is leased pursuant to a lease agreement that expires on March 31, 2027. We do not own any real property.

The facilities for our various businesses, which we lease (in some cases, from IAC) both in the United States and abroad, consist of executive and administrative offices and data centers. We lease space in four data centers: two for our North American, Latin American and Asian operations (one in Dallas, Texas and another in Waco, Texas), and two for our European operations (one in Paris, France and another in Zaventem, Belgium).

We believe that our current facilities are adequate to meet our ongoing needs. We also believe that, if we require additional space, we will be able to lease additional facilities on commercially reasonable terms.

App. 33

Table of Contents

**Item 3. Legal Proceedings**

**Overview**

We are, and from time to time may become, involved in various legal proceedings arising in the normal course of business activities, such as patent infringement claims, trademark oppositions and consumer or advertising complaints, as well as stockholder derivative actions, class action lawsuits and other matters. The amounts that may be recovered in such matters may be subject to insurance coverage. Although the results of legal proceedings and claims cannot be predicted with certainty, we are not currently a party to any legal proceedings the outcome of which, we believe, if determined adversely to us, would individually or in the aggregate have a material adverse effect on our business, financial condition or results of operations. See "Item 1A—Risk factors—Risks relating to our business—We are subject to litigation and adverse outcomes in such litigation could have an adverse effect on our financial condition" of our annual report on Form 10-K for the fiscal year ended December 31, 2017.

Rules of the Securities and Exchange Commission require the description of material pending legal proceedings (other than ordinary, routine litigation incident to the registrant's business) and advise that proceedings ordinarily need not be described if they primarily involve damages claims for amounts (exclusive of interest and costs) not exceeding 10% of the current assets of the registrant and its subsidiaries on a consolidated basis. In the judgment of Match Group management, none of the pending litigation matters that we are defending, including those described below, involves or is likely to involve amounts of that magnitude. The litigation matters described below involve issues or claims that may be of particular interest to our stockholders, regardless of whether any of these matters may be material to our financial position or operations based upon the standard set forth in the SEC's rules.

**Securities Class Action Litigation against Match Group**

As previously disclosed in our periodic reports, on February 26, 2016, a putative nationwide class action was filed in federal court in Texas against the Company, five of its officers and directors, and twelve underwriters of the Company's initial public offering in November 2015. *See David M. Stein v. Match Group, Inc. et al.*, No. 3:16-cv-549 (U.S. District Court, Northern District of Texas). The complaint alleged that the registration statement and prospectus issued in connection with the Company's initial public offering were materially false and misleading given their failure to state that: (i) Match Group's Non-dating business would miss its revenue projection for the quarter ended December 31, 2015, and (ii) ARPU (as defined in "Item 2—Management's Discussion and Analysis of Financial Condition and Results of Operations—General-Key Terms") would decline substantially in the quarter ended December 31, 2015. The complaint asserted that these alleged failures to timely disclose material information caused Match Group's stock price to drop after the announcement of its earnings for the quarter ended December 31, 2015. The complaint pleaded claims under the Securities Act of 1933 for untrue statements of material fact in, or omissions of material facts from, the registration statement, the prospectus, and related communications in violation of Sections 11 and 12 and, as to the officer/director defendants only, control-person liability under Section 15 for the Company's alleged violations. The complaint sought among other relief class certification and damages in an unspecified amount.

On March 9, 2016, a virtually identical class action complaint was filed in the same court against the same defendants by a different named plaintiff. *See Stephany Kam-Wan Chan v. Match Group, Inc. et al.*, No. 3:16-cv-668 (U.S. District Court, Northern District of Texas). On April 25, 2016, Judge Boyle in the *Chan* case issued an order granting the parties' joint motion to transfer that case to Judge Lindsay, who is presiding over the earlier-filed *Stein* case. On April 27, 2016, various current or former Match Group shareholders and their respective law firms filed motions seeking appointment as lead plaintiff(s) and lead or liaison counsel for the putative class. On April 28, 2016, the Court issued orders: (i) consolidating the *Chan* case into the *Stein* case, (ii) approving the parties' stipulation to extend the defendants' time to respond to the complaint until after the Court has appointed a lead plaintiff and lead counsel for the putative class and has set a schedule for the plaintiff's filing of a consolidated complaint and the defendants' response to that pleading, and (iii) referring the various motions for appointment of lead plaintiff(s) and lead or liaison counsel for the putative class to a United States Magistrate Judge for determination. On June 9, 2016, the Magistrate Judge issued an order appointing two lead plaintiffs, two law firms as co-lead plaintiffs' counsel, and a third law firm as plaintiffs' liaison counsel. In accordance with this order, the consolidated case is now captioned *Mary McCloskey et ano. v. Match Group, Inc. et al.*, No. 3:16-CV-549-L.

28

App. 34

Table of Contents

On July 27, 2016, the parties submitted to the Court a joint status report proposing a schedule for the plaintiffs' filing of a consolidated amended complaint and the parties' briefing of the defendants' contemplated motion to dismiss the consolidated complaint. On August 17, 2016, the Court issued an order approving the parties' proposed schedule. On September 9, 2016, in accordance with the schedule, the plaintiffs filed an amended consolidated complaint. The new pleading focuses solely on allegedly misleading statements or omissions concerning the Match Group's Non-dating business. The defendants filed motions to dismiss the amended consolidated complaint on November 8, 2016. The plaintiffs filed oppositions to the motions on December 23, 2016, and the defendants filed replies to the oppositions on February 6, 2017. The court delivered its decision on September 27, 2017, in which it denied our motion to dismiss without prejudice and provided the plaintiffs an opportunity to amend their claims to state an articulable cause of action by October 30, 2017. The plaintiffs amended their complaint prior to the deadline, and we filed a motion to dismiss the second amended complaint on December 15, 2017. Plaintiffs filed their response on January 29, 2018. We filed our reply on February 20, 2018. We believe that the allegations in these lawsuits are without merit and will continue to defend vigorously against them.

**Consumer Class Action Challenging Tinder's Age-Tiered Pricing**

On May 28, 2015, a putative state-wide class action was filed against Tinder in state court in California. *See Allan Candelore v. Tinder, Inc.*, No. BC583162 (Superior Court of California, County of Los Angeles). The complaint principally alleged that Tinder violated California's Unruh Civil Rights Act by offering and charging users age 30 and over a higher price than younger users for subscriptions to its premium Tinder Plus service. The complaint sought certification of a class of California Tinder Plus subscribers age 30 and over and damages in an unspecified amount. On September 21, 2015, Tinder filed a demurrer seeking dismissal of the complaint. On October 26, 2015, the court issued an opinion sustaining Tinder's demurrer to the complaint without leave to amend, ruling that the age-based pricing differential for Tinder Plus subscriptions did not violate California law in essence because offering a discount to users under age 30 was neither invidious nor unreasonable in light of that age group's generally more limited financial means. On December 29, 2015, in accordance with its ruling, the court entered judgment dismissing the action. On February 1, 2016, the plaintiff filed a notice of appeal from the judgment. On January 29, 2018, the California Court of Appeal (Second Appellate District, Division Three) issued an opinion reversing the judgment of dismissal, ruling that the lower court had erred in sustaining Tinder's demurrer because the complaint, as pleaded, stated a cognizable claim for violation of the Unruh Act. Because we believe that the appellate court's reasoning was flawed as a matter of law and runs afoul of binding California precedent, Tinder intends to file a petition with the California Supreme Court seeking interlocutory review of the Court of Appeal's decision. We believe that the allegations in this lawsuit are without merit and will continue to defend vigorously against it.

**Item 4. Mine Safety Disclosure**

Not applicable.

## PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market for Registrant's Common Equity and Related Stockholder Matters**

Our common stock is quoted on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MTCH." There is no established public trading market for our Class B common stock. The table below sets forth, for the calendar periods indicated, the historical high and low sales prices per share for our common stock as reported on NASDAQ. As of February 27, 2018, the closing price of our common stock on NASDAQ was $40.07.

|  | High | | Low | |
| --- | --- | --- | --- | --- |
| **Year Ended December 31, 2017** | | | | |
| Fourth Quarter | $ | 32.87 | $ | 23.23 |
| Third Quarter | | 24.40 | | 17.07 |
| Second Quarter | | 20.75 | | 16.27 |
| First Quarter | | 18.64 | | 15.42 |
| **Year Ended December 31, 2016** | | | | |
| Fourth Quarter | $ | 19.74 | $ | 15.08 |
| Third Quarter | | 18.20 | | 14.28 |
| Second Quarter | | 16.10 | | 10.06 |
| First Quarter | | 14.25 | | 8.41 |

As of February 2, 2018, there were 21 holders of record of the Company's common stock and one holder of record of the Company's Class B common stock. Because the substantial majority of the outstanding shares of our common stock are held by brokers and other institutions on behalf of shareholders, we are not able to estimate the total number of beneficial shareholders represented by these record holders.

**Dividend Policy**

We have no current plans to pay dividends on our common stock or Class B common stock. Instead, we anticipate that all of our future earnings will be retained to support our operations and to finance the growth and development of our business. Any future determination relating to our dividend policy will be made by our board of directors and will depend on a number of factors, including our financial condition, earnings, capital requirements, covenants associated with our debt obligations, legal requirements, regulatory constraints, general economic conditions and other factors deemed relevant by our board of directors.

30

App. 36

Table of Contents

## Item 6.    Selected Financial Data

The selected financial data set forth in the table below as of December 31, 2017, 2016 and 2015 and for the years then ended were derived from our audited consolidated and combined financial statements. The selected financial data set forth in the table below as of December 31, 2014 and 2013 and for the years then ended were derived from our audited combined financial statements. This selected financial data should be read in conjunction with the consolidated and combined financial statements and accompanying notes included herein.

| | | | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| | | | (Dollars in thousands, except per share data) | | |
| **Statement of Operations Data:**[a] | | | | | |
| Revenue | $ 1,330,661 | $ 1,118,110 | $ 909,705 | $ 836,458 | $ 788,197 |
| Earnings from continuing operations | 355,977 | 178,341 | 133,163 | 165,091 | 132,418 |
| Loss from discontinued operations | (5,650) | (6,328) | (12,676) | (16,732) | (5,791) |
| Net earnings attributable to Match Group, Inc. shareholders | 350,148 | 171,451 | 120,383 | 147,764 | 125,003 |
| Earnings per share from continuing operations attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.35 | $ 0.71 | $ 0.76 | $ 1.02 | $ 0.82 |
| Diluted | $ 1.20 | $ 0.66 | $ 0.72 | $ 0.98 | $ 0.79 |
| Earnings per share attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.33 | $ 0.68 | $ 0.69 | $ 0.92 | $ 0.78 |
| Diluted | $ 1.18 | $ 0.64 | $ 0.65 | $ 0.88 | $ 0.76 |

| | | | December 31, | | |
| | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 2,130,146 | $ 2,048,678 | $ 1,909,392 | $ 1,302,109 | $ 1,286,705 |
| Long-term debt, net including current maturities | 1,252,696 | 1,176,493 | 1,216,871 | — | — |
| Long-term debt, related party | — | — | — | 190,586 | 79,000 |

_____

(a)    We recognized items that affected the comparability of results for the years 2017, 2016, and 2015, see "Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations."

31

App. 37

Table of Contents

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Key Terms:**

When the following terms appear in this report, they have the meanings indicated below:

**Dating** - consists of all of our dating businesses globally.

**Non-dating** - consists of The Princeton Review, which was sold on March 31, 2017, and the financial results of which have been presented as discontinued operations.

**Operating metrics:**

- **North America** - consists of the financial results and metrics associated with users located in the United States and Canada.

- **International** - consists of the financial results and metrics associated with users located outside of the United States and Canada.

- **Direct Revenue** - is revenue that is received directly from end users of our products and includes both subscription and à la carte revenue.

- **Indirect Revenue** - is revenue that is not received directly from an end user of our products, substantially all of which is advertising revenue.

- **Subscribers** - are users who purchase a subscription to one of our products. Users who purchase only à la carte features are not included in Subscribers.

- **Average Subscribers** - is the number of Subscribers at the end of each day in the relevant measurement period divided by the number of calendar days in that period.

- **Average Revenue per Subscriber ("ARPU")** - is Direct Revenue from Subscribers in the relevant measurement period (whether in the form of subscription or à la carte revenue) divided by the Average Subscribers in such period and further divided by the number of calendar days in such period. Direct Revenue from users who are not Subscribers and have purchased only à la carte features is not included in ARPU.

**Operating costs and expenses:**

- **Cost of revenue -** consists primarily of in-app purchase fees, compensation (including stock-based compensation) and other employee-related costs for personnel engaged in data center and customer care functions, credit card processing fees, hosting fees, and data center rent, energy and bandwidth costs. In-app purchase fees are monies paid to Apple and Google in connection with the processing of in-app purchases of subscriptions and product features through the in-app payment systems provided by Apple and Google, as required by Apple, and to a lesser degree, Google.

- **Selling and marketing expense -** consists primarily of advertising expenditures and compensation (including stock-based compensation) and other employee-related costs for personnel engaged in selling and marketing, and sales support functions. Advertising expenditures includes online marketing, including fees paid to search engines and social media sites, offline marketing (which is primarily television advertising), and payments to partners that direct traffic to our brands.

- **General and administrative expense -** consists primarily of compensation (including stock-based compensation) and other employee-related costs for personnel engaged in executive management, finance, legal, tax and human resources, acquisition-related contingent consideration fair value adjustments (described below), fees for professional services and facilities costs.

- **Product development expense -** consists primarily of compensation (including stock-based compensation) and other employee-related costs that are not capitalized for personnel engaged in the design, development, testing and enhancement of product offerings and related technology.

- **Acquisition-related contingent consideration fair value adjustments** - relate to the portion of the purchase price of certain acquisitions that is contingent upon the future operating performance of the acquired company.  The amounts ultimately paid are generally dependent upon earnings performance

32

App. 38

Table of Contents

and/or operating metrics as stipulated in the relevant purchase agreements. The fair value of the liability is estimated at the date of acquisition and adjusted each reporting period to fair value until the liability is settled. If the payment date of the liability is longer than one year, the amount is initially recorded net of a discount, which is amortized as an expense each period. In a period where the acquired company is expected to perform better than the previous estimate, the liability will be increased resulting in additional expense; and in a period when the acquired company is expected to perform worse than the previous estimate, the liability will be decreased resulting in income. The year-over-year impact can be significant, for example, if there is income in one period and expense in the other period.

**Long-term debt:**

- **Term Loan** - The Company's seven-year term loan entered into on November 16, 2015. On August 14, 2017 the Company increased the Term Loan by $75 million to $425 million, repriced the outstanding balance at LIBOR plus 2.50% and reduced the LIBOR floor to 0.00%. At December 31, 2017, $425 million is outstanding.

- **2015 Senior Notes** - The Company's previously outstanding 6.75% Senior Notes issued on November 16, 2015 and redeemed in full on December 17, 2017 using the proceeds from the 2017 Senior Notes and cash on hand.

- **2016 Senior Notes** - The Company's 6.375% Senior Notes due June 1, 2024, with interest payable each June 1 and December 1, which were issued on June 1, 2016. At December 31, 2017, $400 million is outstanding.

- **2017 Senior Notes** - The Company's 5.00% Senior Notes due December 15, 2027, with interest payable each June 15 and December 15, which were issued on December 4, 2017. The proceeds, along with cash on hand, were used to redeem the 2015 Senior Notes and pay the related call premium. At December 31, 2017, $450 million is outstanding.

**Non-GAAP financial measure:**

- **Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")** - is a Non-GAAP financial measure. See "Principles of Financial Reporting" for the definition of Adjusted EBITDA.

## MANAGEMENT OVERVIEW

Match Group, Inc. ("Match Group," the "Company," "we," "our," or "us") is a leading provider of subscription dating products servicing North America, Western Europe, Asia and many other regions around the world through websites and applications that we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, and Pairs, each designed to increase our users' likelihood of finding a romantic connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users. We currently offer our dating products in 42 languages across more than 190 countries.

**Sources of Revenue**

All our dating products provide the use of certain features for free, and then offer a variety of additional features to Subscribers. Our Dating revenue is primarily derived directly from users in the form of recurring subscription fees.

Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by using a credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, all purchases are final and nonrefundable. Fees collected, or contractually due, in advance for subscriptions are deferred and recognized as revenue using the straight-line method over the term of the applicable subscription period, which primarily ranges from one to six months, and corresponding mobile app store fees incurred on such transactions, if any, are deferred and expensed over the same period. We also earn revenue from online advertising, the purchase of à la carte features and offline events. Online advertising revenue is recognized every time an ad is displayed. Revenue from the purchase of à la carte features is recognized based on usage. Revenue and the related expenses associated with offline events are recognized when each event occurs.

33

**Trends affecting our business**

Over the last several years, we have seen significant changes in our business. During this time, our portfolio has evolved from one dominated by our Match brand in North America, and Meetic internationally, to one in which other brands such as Tinder, PlentyOfFish, and OkCupid represent a significant portion of our overall user base. This portfolio evolution has led to, been driven by, or coincided with, a number of significant trends in our business including the following:

*Expansion of the online dating category through mobile.* We have experienced strong growth in the usage of our products on mobile devices over the last several years. Mobile adoption has improved user engagement, opened new customer acquisition channels, and attracted a younger demographic compared to our desktop products. This trend continues to help broaden the category as online dating products are more widely adopted by a new generation of users. Mobile adoption is also allowing us to accelerate growth in certain international markets that were previously under-penetrated with desktop only products. Although mobile adoption has represented, and continues to represent, a significant growth opportunity for us, it has also required dedication of additional product and technology resources. Our mobile products, taken as a whole, tend to have lower conversion rates than our desktop-first products, when other factors impacting conversion are held constant. Increased mobile adoption has led to challenges for those of our brands that have significant pre-existing desktop businesses with high percentages of Subscribers who primarily use the desktop versions of such products. As a result, we expect to continue to invest heavily to optimize and expand our product offerings, while increasing conversion levels at our formerly desktop-first brands.

*Lower cost users.* All of our brands rely on word-of-mouth, or free, customer acquisition to varying degrees. Word-of-mouth acquisition is typically a function of scale (with larger communities driving greater numbers of referrals), youthfulness (with the viral effect being more pronounced in younger populations due, in part, to a significantly higher concentration of single people in any given social circle and the increased adoption of social media and similar platforms among such populations) and monetization rate (with people generally more likely to talk openly about using online dating products that are less heavily monetized). Additionally, some, but not all, of our brands spend meaningfully on paid marketing. Accordingly, the average amount we spend to acquire a user differs significantly across brands based in large part on each brand's mix of paid and free acquisition channels. As our mix has shifted toward younger users, our mix of acquisition channels has shifted toward free channels, driving a significant decline over the past several years in the average amount we spend to acquire a new user across our portfolio. Our costs of acquiring Subscribers have also declined meaningfully. We expect the dynamics that have led to the growth in word-of-mouth user acquisition to continue going forward and for our brands to continue to acquire significant numbers of users through low-cost means.

*Changing paid acquisition dynamics.* Even as our acquisition of lower cost users increases, paid acquisition of users remains an important driver of our business. The channels through which we market our brands are always evolving, but we are currently in a period of rapid change as TV and video consumption patterns evolve and internet consumption shifts from desktop to mobile devices. However, advertising opportunities have not kept up with audience migration, putting pressure on our paid marketing activities. As the advertising market continues to evolve, we will need to adapt and improve our expertise at leveraging these evolving marketing channels.

**Other factors affecting the comparability of our results**

*Advertising spend.* Our advertising spend, which is included in our selling and marketing expense, has consistently been our largest operating expense. In recent periods, we have focused our adverting spend on display, mobile, television, social media and search channels. We seek to optimize for total return on advertising spend by frequently analyzing and adjusting this spend through numerous campaigns to focus on marketing channels and markets that generate a high return. Our data-driven approach provides us the flexibility to scale and optimize our advertising spend. We spend marketing dollars against an expected lifetime value of a Subscriber that is realized by us over a multi-year period; and while this marketing is intended to be profitable on that basis, it is nearly always negative during the period in which the expense is incurred. Accordingly, our operating results, in particular our profit measures, for a particular period may be meaningfully impacted by the timing, size, number or effectiveness of our advertising campaigns in that period. Additionally, advertising spend is typically higher during the first quarter of our fiscal year, and lower during the fourth quarter. See "Seasonality" below.

34

*Seasonality.* Historically, our Dating business has experienced seasonal fluctuations in quarterly operating results, particularly with respect to our profit measurements. This is driven primarily by a higher concentration of advertising spend in the first quarter, when advertising prices are lowest and demand for our products is highest, and a lower concentration of advertising spend in the fourth quarter, when advertising costs are highest and demand for our products is lowest.

*International markets.* Our products are available in over 190 countries. Our international revenue represented 45% and 39% of our total revenue for the years ended December 31, 2017 and 2016, respectively. We vary our pricing to align with local market conditions and our international businesses typically earn revenue in local currencies. As foreign currency exchange rates change, translation of the statement of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results.

*Business combinations.* Acquisitions are an important part of our growth strategy, and we expect to make opportunistic acquisitions in the future. During the three years ended December 31, 2017, we have invested approximately $610.4 million to acquire several new brands, including PlentyOfFish and Pairs. As a consequence of the contributions of these businesses and acquisition-related expenses, our consolidated and combined results of operations may not be comparable between periods.

## 2017 Developments

In January 2017, we entered into a definitive agreement to sell The Princeton Review to ST Unitas, a global education technology company.  The transaction closed on March 31, 2017, and the results of our previous Non-dating segment have been included in discontinued operations. The Company's financial information for prior periods has been recast to conform to this presentation.

In July 2017, Match Group elected to convert all outstanding equity awards of its wholly-owned Tinder business, which awards were primarily held by current and former Tinder employees, to stock options of Match Group. Subsequently, during 2017, we made cash payments totaling approximately $520 million to cover both withholding taxes paid on behalf of employees, as these awards were net settled, and the purchase of certain fully vested awards.

In August 2017, we increased our Term Loan by $75 million to $425 million, repriced the outstanding balance at LIBOR plus 2.50% and reduced the LIBOR floor to 0.00% (previously, the terms were LIBOR plus 3.25%, with a LIBOR floor of 0.75%).

On October 23, 2017, a cost method investment with a carrying value of $51.1 million was sold for net proceeds of $60.2 million resulting in a pre-tax gain of $9.1 million.

In December 2017, we issued $450 million aggregate principal amount of 5.00% Senior Notes due December 15, 2027. The proceeds from these notes, along with cash on hand, were used to redeem all outstanding 2015 Senior Notes and pay the related call premium.

## 2017 Consolidated Results

In 2017, revenue, operating income and Adjusted EBITDA grew 19%, 14% and 16%, respectively. Revenue growth was primarily due to strong growth at Tinder and additional contributions from Pairs and PlentyOfFish. The growth in operating income and Adjusted EBITDA was due to higher revenue and lower selling and marketing expense as a percentage of revenue due to the continued product mix shift toward brands with lower marketing spend as a percentage of revenue and a reduction in in marketing spend at our affinity brands, partially offset by an increase in cost of revenue expense primarily due to higher in-app purchase fees as a result of increased revenue from mobile app stores. Operating income was further impacted by an increase in stock-based compensation expense of $16.7 million, an increase in acquisition-related contingent consideration fair value adjustments of $14.5 million, and an increase in depreciation of $4.9 million due to growth in our business, partially offset by a $15.5 million decrease in amortization of intangibles as a significant portion of our scheduled amortization from the acquisition of PlentyOfFish concluded at the end of 2016.

35

Table of Contents

**Results of Operations for the years ended December 31, 2017, 2016 and 2015**

*Revenue*

| | 2017 | $ Change | % Change | 2016 | $ Change | % Change | 2015 |
|---|---|---|---|---|---|---|---|
| | | | **Years Ended December 31,** | | | | |
| | | | (Amounts in thousands, except ARPU) | | | | |
| **Direct Revenue:** | | | | | | | |
| North America | $ 749,402 | $ 67,593 | 10% | $ 681,809 | $ 98,577 | 17% | $ 583,232 |
| International | 531,847 | 146,292 | 38% | 385,555 | 102,204 | 36% | 283,351 |
| Total Direct Revenue | 1,281,249 | 213,885 | 20% | 1,067,364 | 200,781 | 23% | 866,583 |
| Indirect Revenue | 49,412 | (1,334) | (3)% | 50,746 | 7,624 | 18% | 43,122 |
| Total Revenue | $ 1,330,661 | $ 212,551 | 19% | $ 1,118,110 | $ 208,405 | 23% | $ 909,705 |
| | | | | | | | |
| **Percentage of Total Revenue:** | | | | | | | |
| **Direct Revenue:** | | | | | | | |
| North America | 56% | | | 61% | | | 64% |
| International | 40% | | | 34% | | | 31% |
| Total Direct Revenue | 96% | | | 95% | | | 95% |
| Indirect Revenue | 4% | | | 5% | | | 5% |
| Total Revenue | 100% | | | 100% | | | 100% |
| | | | | | | | |
| **Average Subscribers:** | | | | | | | |
| North America | 3,622 | 305 | 9% | 3,317 | 605 | 22% | 2,712 |
| International | 2,786 | 695 | 33% | 2,091 | 656 | 46% | 1,435 |
| Total | 6,408 | 1,000 | 18% | 5,408 | 1,261 | 30% | 4,147 |
| | | | | | | | |
| *(Change calculated using non-rounded numbers)* | | | | | | | |
| **ARPU:** | | | | | | | |
| North America | $ 0.56 | | —% | $ 0.56 | | (5)% | $ 0.59 |
| International | $ 0.51 | | 3% | $ 0.50 | | (7)% | $ 0.53 |
| Total | $ 0.54 | $ — | 1% | $ 0.54 | $ (0.03) | (6)% | $ 0.57 |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

North America Direct Revenue grew $67.6 million, or 10%, in 2017 versus 2016, driven by 9% growth in Average Subscribers. International Direct Revenue grew $146.3 million, or 38%, in 2017 versus 2016, driven by 33% growth in Average Subscribers, and a 3% increase in ARPU.

Growth in North America Average Subscribers was primarily due to Tinder, partially offset by declines at our affinity brands as marketing spend was reduced to better align with the expected lifetime value of a Subscriber. North America ARPU was flat as the continuing mix shift towards lower ARPU brands, with lower price points compared to most of our other brands was offset by increases in ARPU at Tinder and PlentyOfFish, as these brands are offering premium and multi-tiered subscriptions, such as Tinder Gold.

Growth in International Average Subscribers was primarily due to Tinder and additional contributions from Pairs. Growth in International ARPU was primarily due to rate increases at Tinder and Meetic, partially offset by the continued mix shift towards lower ARPU brands.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

App. 42

North America Direct Revenue grew $98.6 million, or 17%, in 2016 versus 2015, driven by 22% growth in Average Subscribers, partially offset by a 5% decline in ARPU. International Direct Revenue grew $102.2 million, or 36%, in 2016 versus 2015, driven by 46% growth in Average Subscribers, partially offset by a 7% decline in

36

App. 43

Table of Contents

ARPU. Average Subscribers growth is primarily a result of growth in Subscribers at Tinder and the 2015 acquisition of PlentyOfFish. ARPU decreased due to the continued mix shift towards lower ARPU brands. The mix shift decline was partially offset by an increase in mix-adjusted rates.

### Cost of revenue (exclusive of depreciation)

|  | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2017 | $ Change | % Change | 2016 | $ Change | % Change | 2015 |
|  | (Dollars in thousands) | | | | | | |
| Cost of revenue | $279,499 | $83,851 | 43% | $195,648 | $61,262 | 46% | $134,386 |
| Percentage of revenue | 21% | | | 17% | | | 15% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Cost of revenue increased, outpacing revenue growth, primarily due to an increase in in-app purchase fees of $75.4 million and an increase in hosting fees of $5.9 million, both as a result of growth at Tinder.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

Cost of revenue increased, outpacing revenue growth, driven primarily by a significant increase in in-app purchase fees across multiple brands, including Tinder, and the 2015 acquisitions of PlentyOfFish and Pairs.

### Selling and marketing expense

|  | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2017 | $ Change | % Change | 2016 | $ Change | % Change | 2015 |
|  | (Dollars in thousands) | | | | | | |
| Selling and marketing expense | $375,610 | $26,491 | 8% | $349,119 | $6,352 | 2% | $342,767 |
| Percentage of revenue | 28% | | | 31% | | | 38% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Selling and marketing expense increased with the growth in the business, but continued to decline as a percentage of revenue. The increase in total selling and marketing expense is primarily due to an increase of $15.3 million in marketing spend primarily at Tinder related to strategic investments in certain international markets and increased marketing related to the launch of a new brand in Europe, partially offset by a reduction in marketing spend at our Match Affinity brands. Additionally, compensation increased $9.1 million primarily related to increased headcount at Tinder and the employer portion of payroll taxes paid upon the exercise of Match Group options. The decline as a percentage of revenue is due to a continued shift towards brands with lower marketing spend as a percentage of revenue and reductions in marketing spend at our Match Affinity brands.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

Selling and marketing expense increased with the growth in the business, but declined as a percentage of revenue due to continued shift towards brands with lower marketing spend.

37

App. 44

*General and administrative expense*

|  | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | **2017** | **$ Change** | **% Change** | **2016** | **$ Change** | **% Change** | **2015** |
|  | (Dollars in thousands) | | | | | | |
| General and administrative expense | $179,804 | $44,785 | 33% | $135,019 | $12,642 | 10% | $122,377 |
| Percentage of revenue | 14% | | | 12% | | | 13% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

General and administrative expense increased, driven primarily by an increase of $20.6 million in compensation, an increase of $14.5 million in acquisition-related contingent consideration fair value adjustments (expense of $5.3 million in 2017 versus income of $9.2 million in 2016) and an increase of $6.8 million in professional fees in 2017 primarily related to the settlement of the Tinder equity plan. The increase in compensation is due to a $9.1 million increase in stock-based compensation expense primarily related to a subsidiary denominated equity award held by a non-employee, which award was settled in the third quarter of 2017, the employer portion of payroll taxes paid upon the exercise of Match Group options and an increase in headcount from business growth.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

General and administrative expense increased, driven primarily by an increase of $7.5 million in compensation due to increased headcount from both acquisitions and existing business growth, an increase of $4.0 million in rent due to growth in the business, and a decrease in income of $1.9 million in acquisition-related contingent consideration fair value adjustments, partially offset by a $2.1 million decrease in stock-based compensation expense due primarily to the inclusion in 2015 of a modification charge related to certain equity awards, partially offset by the issuance of new equity awards in 2016.

*Product development expense*

|  | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
|  | **2017** | **$ Change** | **% Change** | **2016** | **$ Change** | **% Change** | **2015** |
|  | (Dollars in thousands) | | | | | | |
| Product development expense | $101,150 | $23,033 | 29% | $78,117 | $14,151 | 22% | $63,966 |
| Percentage of revenue | 8% | | | 7% | | | 7% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Product development expense increased, driven primarily by an increase of $20.7 million in compensation, of which $14.4 million relates primarily to 1) higher headcount and 2) the employer portion of payroll taxes paid upon the exercise of Match Group options and $6.3 million of stock-based compensation expense due primarily to new grants issued since 2016.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

Product development expense increased, driven primarily by an increase of $7.4 million in stock-based compensation expense, increased headcount at Tinder, and the 2015 acquisitions of PlentyOfFish and Pairs. The increase in stock-based compensation expense was due primarily to the issuance of new equity awards and a net increase in expense associated with the modification of certain equity awards in 2016.

38

App. 45

*Depreciation*

| | | | | Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | **2017** | **$ Change** | **% Change** | **2016** | **$ Change** | **% Change** | **2015** |
| | | | (Dollars in thousands) | | | | |
| Depreciation | $32,613 | $4,887 | 18% | $27,726 | $7,935 | 40% | $19,791 |
| Percentage of revenue | 2% | | | 2% | | | 2% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Depreciation increased $4.9 million, or 18%, driven by an increase in computer hardware, internally developed software and leasehold improvements.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

Depreciation increased $7.9 million, or 40%, driven by acquisitions and an increase in computer equipment.

*Operating Income and Adjusted EBITDA*

Refer to "Note 13—Segment Information" to the consolidated and combined financial statements included in "Item 8— Consolidated Financial Statements and Supplementary Data" for reconciliations of operating income and net earnings attributable to Match Group, Inc. shareholders to Adjusted EBITDA.

| | | | | Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | **2017** | **$ Change** | **% Change** | **2016** | **$ Change** | **% Change** | **2015** |
| | | | (Dollars in thousands) | | | | |
| Operating income | $ 360,517 | $ 44,968 | 14% | $ 315,549 | $ 102,568 | 48% | $ 212,981 |
| Percentage of revenue | 27% | | | 28% | | | 23% |
| | | | | | | | |
| Adjusted EBITDA | $ 468,941 | $ 65,561 | 16% | $ 403,380 | $ 118,826 | 42% | $ 284,554 |
| Percentage of revenue | 35% | | | 36% | | | 31% |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Operating income and Adjusted EBITDA increased $45.0 million, or 14%, and $65.6 million, or 16%, respectively, primarily as a result of the increase in revenue of $212.6 million and lower selling and marketing expense as a percentage of revenue due to the ongoing product mix shift toward brands with lower marketing spend as a percentage of revenue and a reduction in marketing spend at our affinity brands, partially offset by an increase in cost of revenue primarily due to higher in-app purchase fees. Operating income was further impacted by an increase in stock-based compensation expense of $16.7 million, an increase in acquisition-related contingent consideration fair value adjustments of $14.5 million, and an increase in depreciation of $4.9 million due to growth in our business, partially offset by a $15.5 million decrease in amortization of intangibles as a significant portion of our scheduled amortization from the acquisition of PlentyOfFish concluded at the end of 2016.

At December 31, 2017, there was $148.0 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.9 years.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

Operating income and Adjusted EBITDA increased $102.6 million, or 48%, and $118.8 million, or 42%, respectively, as a result of the increase in revenue of $208.4 million and a decrease in selling and marketing expense as a percentage of revenue resulting from continued shifts towards brands with lower marketing spend, partially offset by the increase in cost of revenue. Additionally, costs incurred in 2016 related to the consolidation and streamlining of our technology systems and European operations were $4.9 million, a decline of $11.8 million compared to 2015. Operating income was further impacted by increased depreciation expense of $7.9 million, which is due to acquisitions and assets being placed in service; higher stock-based compensation expense of $3.0 million, which is due to the issuance of new equity awards and modifications in 2016; higher amortization of

App. 46

App. 47

intangibles of $3.5 million, which is due to acquisitions that occurred in 2015; and income in the current year of $9.2 million from acquisition-related contingent consideration fair value adjustments compared to income of $11.1 million in the prior year.

### Interest expense

| | | Years Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2017 | | $ Change | | % Change | | 2016 | | $ Change | | % Change | | 2015 |
| | | (Dollars in thousands) | | | | | | | | | | | |
| Interest expense—third party | $ | 77,565 | $ | (4,634) | | (6)% | $ | 82,199 | $ | 64,256 | | 358% | $ | 17,943 |
| Interest expense—related party | $ | — | $ | — | | NA | $ | — | $ | (7,965) | | NA | $ | 7,965 |

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Interest expense decreased primarily due to the reduction of the average outstanding balance in the Term Loan and the December 2016 and August 2017 repricings of the Term Loan, which reduced the contractual interest rates, partially offset by the issuance of the 2016 Senior Notes in June 2016, which replaced a corresponding amount outstanding on the Term Loan with debt at a higher interest rate.

*For the year ended December 31, 2016 compared to the year ended December 31, 2015*

The increase in interest expense is primarily due to the interest on the Term Loan and 2015 Senior Notes commencing in the fourth quarter of 2015 while the interest on the 2016 Senior Notes commenced in the second quarter of 2016, which replaced a corresponding amount outstanding on the Term Loan with debt at a higher interest rate.

### Other (expense) income, net

| | | Years Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2017 | | $ Change | | % Change | | 2016 | | $ Change | | % Change | | 2015 |
| | | (Dollars in thousands) | | | | | | | | | | | |
| Other (expense) income, net | $ | (30,827) | $ | (38,693) | | NM | $ | 7,866 | $ | (3,766) | | (32)% | $ | 11,632 |

_____

NM = not meaningful

Other expense, net, in 2017 includes expenses of $15.4 million related to the extinguishment of our 2015 Senior Notes and repricing of the Term Loan, $13.0 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $10.3 million in net foreign currency exchange losses primarily due to the strengthening of the British Pound relative to the dollar, and a $2.3 million other-than-temporary impairment charge related to a cost method investment resulting from our assessment of the near-term prospects and financial condition of the investee. These expenses were partially offset by a gain on the sale of a cost method investment of $9.1 million.

Other income, net in 2016 includes $20.0 million in foreign currency exchange gains due to strengthening of the dollar relative to the British Pound and Euro and a $3.1 million gain related to the sale of a marketable equity security, partially offset by a non-cash charge of $12.1 million related to the write-off of a proportionate share of original issue discount and deferred financing costs associated with prepayments of $440 million of the Term Loan, $2.1 million of expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $1.5 million repricing fees related to the Term Loan, and a $0.7 million other-than-temporary impairment charge related to a certain cost method investment.

Other income, net in 2015 includes $7.6 million in foreign currency exchange gains related to the €53 million 5.00% Note payable to an IAC subsidiary (this note was settled during the fourth quarter of 2015), $4.4 million of interest income, and $2.4 million in foreign currency exchange gains, partially offset by $2.7 million of

40

Table of Contents

expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee.

### *Income tax benefit (provision)*

| | | | | Years Ended December 31, | | | |
|---|---|---|---|---|---|---|---|
| | **2017** | **$ Change** | **% Change** | **2016** | **$ Change** | **% Change** | **2015** |
| | | | | **(Dollars in thousands)** | | | |
| Income tax benefit (provision) | $103,852 | $166,727 | NM | $(62,875) | $(2,667) | (4)% | $(65,542) |
| Effective income tax rate | NM | | | (26)% | | | (33)% |

For discussion of income taxes, see "Note 3—Income Taxes" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

In 2017, the Company recorded an income tax benefit of $103.9 million, which was due primarily to the effect of adopting the provisions of the Financial Accounting Standards Board issued Accounting Standards Update ("ASU") No. 2016-09, *Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*, on January 1, 2017, partially offset by the effect of the Tax Cuts and Jobs Act ("Tax Act") discussed below. Under ASU No. 2016-09, excess tax benefits generated by the exercise, purchase or settlement of stock-based awards of $279.7 million in 2017 are recognized as a reduction to the income tax provision rather than additional paid-in capital.

On December 22, 2017, the U.S. enacted the Tax Act, which subjects to U.S. taxation certain previously deferred earnings of foreign subsidiaries as of December 31, 2017 ("Transition Tax") and implements a number of changes that take effect on January 1, 2018, including but not limited to, a reduction of the U.S. federal corporate tax rate from 35% to 21% and a new minimum tax on intangible income earned by foreign subsidiaries. The Company's income tax provision for the year ended December 31, 2017 includes expense of $92.3 million related to the Tax Act, of which $23.7 million relates to the Transition Tax and $68.6 million relates to the remeasurement of U.S. net deferred tax assets due to the reduction in the corporate income tax rate. The Company has sufficient current year net operating losses to offset the taxable income resulting from the Transition Tax and, therefore, will not be required to pay the one-time Transition Tax.

The Transition Tax on deemed repatriated foreign earnings is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of the Company's foreign subsidiaries. To determine the amount of the Transition Tax, the Company must determine, among other factors, the amount of post-1986 E&P of its foreign subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. The Company was able to make a reasonable estimate of the Transition Tax and has recorded a provisional transition tax expense of $23.7 million. Any adjustment of the Company's provisional tax expense will be reflected as a change in estimate in its results in the period in which the change in estimate is made in accordance with Staff Accounting Bulletin No. 118, *Income Tax Accounting Implications of the Tax Cuts and Jobs Act*. The Company is continuing to gather additional information to more precisely compute the amount of the Transition Tax and expects to finalize its calculation prior to the filing of IAC's U.S. federal tax return, which includes the operations of Match Group, which is due October 15, 2018. In addition, our estimates may also be impacted and adjusted as the law is clarified and additional guidance is issued at the federal and state levels.

For the years ended December 31, 2016, and 2015, the Company recorded income tax provisions of $62.9 million, and $65.5 million, respectively, which represent effective income tax rates of 26% and 33%, respectively. In 2016, the effective income tax rate was lower than the statutory rate of 35% due primarily to foreign income taxed at lower rates including non-taxable foreign currency exchange gains, and a reduction in deferred tax liabilities for a foreign tax law change. In 2015, the effective income tax rate was lower than the statutory rate of 35% due primarily to nontaxable contingent consideration fair value adjustments and non-taxable foreign currency exchange gains, partially offset by state taxes.

### *Related party transactions*

For discussion of related party transactions, see "Note 16—Related Party Transactions" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

41

Table of Contents

## PRINCIPLES OF FINANCIAL REPORTING

Match Group reports Adjusted EBITDA and Revenue excluding foreign exchange effects, both of which are supplemental measures to U.S. generally accepted accounting principles ("GAAP"). The Adjusted EBITDA measure is among the primary metrics by which we evaluate the performance of our business, on which our internal budget is based and by which management is compensated. Revenue excluding foreign exchange effects provides a comparable framework for assessing how our business performed in light of the effect of exchange rate differences when compared to prior periods. We believe that investors should have access to, and we are obligated to provide, the same set of tools that we use in analyzing our results. These non-GAAP measures should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. Match Group endeavors to compensate for the limitations of the non-GAAP measures presented by providing the comparable GAAP measures with equal or greater prominence to and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measures. We encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measures, which we discuss below.

### Adjusted EBITDA

*Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")* is defined as operating income excluding: (1) stock-based compensation expense; (2) depreciation; and (3) acquisition-related items consisting of (i) amortization of intangible assets and impairments of goodwill and intangible assets, if applicable, and (ii) gains and losses recognized on changes in the fair value of contingent consideration arrangements. We believe this measure is useful for analysts and investors as this measure allows a more meaningful comparison between our performance and that of our competitors. The above items are excluded from our Adjusted EBITDA measure because these items are non-cash in nature, and we believe that by excluding these items, Adjusted EBITDA corresponds more closely to the cash operating income generated from our business, from which capital investments are made and debt is serviced. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our consolidated and combined statement of operations of certain expenses.

For a reconciliation of operating income and net earnings attributable to Match Group, Inc. shareholders to Adjusted EBITDA for the years ended December 31, 2017, 2016 and 2015, see "Note 13—Segment Information" to the consolidated and combined financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

*Non-Cash Expenses That Are Excluded From Non-GAAP Measure*

*Stock-based compensation* expense consists principally of expense associated with the grants of stock options, restricted stock units ("RSUs"), performance-based RSUs and market-based awards. These expenses are not paid in cash, and we include the related shares in our fully diluted shares outstanding using the treasury stock method; however, performance-based RSUs and market-based awards are included in dilution only to the extent the applicable performance or market condition(s) have been met (assuming the end of the reporting period is the end of the contingency period). Upon the vesting of RSUs, performance-based RSUs and market-based awards, the awards are settled on a net basis, with the Company remitting the required tax-withholding amount in cash from its current funds. Certain awards provide the employee the option to pay the applicable strike price and withholding taxes or to allow for the award to be net settled.

*Depreciation* is a non-cash expense relating to our property and equipment and is computed using the straight-line method to allocate the cost of depreciable assets to operations over their estimated useful lives or, in the case of leasehold improvements, the lease term, if shorter.

*Amortization of intangible assets and impairments of goodwill and intangible assets* are non-cash expenses related primarily to acquisitions. At the time of an acquisition, the identifiable definite-lived intangible assets of the acquired company, such as customer lists, trade names, and technology are valued and amortized over their estimated lives. Value is also assigned to acquired indefinite-lived intangible assets, which comprise trade names and trademarks, and goodwill that are not subject to amortization. An impairment is recorded when the carrying value of an intangible asset or goodwill exceeds its fair value. We believe that intangible assets represent costs incurred by the acquired company to build value prior to its acquisition and the related amortization and impairment charges of intangible assets or goodwill, if applicable, are not ongoing costs of doing business.

42

Table of Contents

*Gains and losses recognized on changes in the fair value of contingent consideration arrangements* are accounting adjustments to report contingent consideration liabilities at fair value. These adjustments can be highly variable and are excluded from our assessment of performance because they are considered non-operational in nature and, therefore, are not indicative of current or future performance or the ongoing cost of doing business.

**Effects of Changes in Foreign Exchange Rates on Revenue**

The impact of foreign exchange rates on the Company, due to its global reach, may be an important factor in understanding period over period comparisons if movement in exchange rates is significant. Since our results are reported in U.S. dollars, international revenues are favorably impacted as the U.S. dollar weakens relative to other foreign currencies, and unfavorably impacted as the U.S dollar strengthens relative to other foreign currencies. We believe the presentation of revenue excluding the effects from foreign exchange, in addition to reported revenue, helps improve the ability to understand the Company's performance because it excludes the impact of foreign currency volatility that is not indicative of Match Group's core operating results.

Revenue, excluding foreign exchange effects compares results between periods as if exchange rates had remained constant period over period. Revenue, excluding foreign exchange effects, is calculated by translating current period revenues using prior period exchange rates. The percentage change in revenue, excluding foreign exchange effects, is calculated by determining the change in current period revenues over prior period revenues where current period revenues are translated using prior period exchange rates.

The following tables present the impact of foreign exchange rates on total revenue and International ARPU:

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2017** | **$ Change** | **% Change** | | **2016** |
| | | **(Dollars in thousands, except ARPU)** | | | | |
| Revenue, as reported | $ | 1,330,661 | $ 212,551 | 19% | $ | 1,118,110 |
| Foreign exchange effects | | (422) | | | | |
| Revenue, excluding foreign exchange effects | $ | 1,330,239 | $ 212,129 | 19% | $ | 1,118,110 |
| | | | | | | |
| *(Change calculated using non-rounded numbers)* | | | | | | |
| International ARPU, as reported | $ | 0.51 | | 3% | $ | 0.50 |
| Foreign exchange effects | | — | | | | |
| International ARPU, excluding foreign exchange effects | $ | 0.51 | | 3% | $ | 0.50 |

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2016** | **$ Change** | **% Change** | | **2015** |
| | | **(Dollars in thousands, except ARPU)** | | | | |
| Revenue, as reported | $ | 1,118,110 | $ 208,405 | 23 % | $ | 909,705 |
| Foreign exchange effects | | 7,448 | | | | |
| Revenue, excluding foreign exchange effects | $ | 1,125,558 | $ 215,853 | 24 % | $ | 909,705 |
| | | | | | | |
| *(Change calculated using non-rounded numbers)* | | | | | | |
| International ARPU, as reported | $ | 0.50 | | (7)% | $ | 0.53 |
| Foreign exchange effects | | 0.01 | | | | |
| International ARPU, excluding foreign exchange effects | $ | 0.51 | | (5)% | $ | 0.53 |

43

App. 51

Table of Contents

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

**Financial Position**

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
|  | (In thousands) | |
| Cash and cash equivalents: |  |  |
| United States [a] | $ 203,452 | $ 114,035 |
| All other countries [b] | 69,172 | 139,616 |
| Total cash and cash equivalents | 272,624 | 253,651 |
|  |  |  |
| Long-term debt, net: |  |  |
| Term Loan due November 16, 2022 [c] | $ 425,000 | $ 350,000 |
| 2015 Senior Notes | — | 445,172 |
| 2016 Senior Notes | 400,000 | 400,000 |
| 2017 Senior Notes | 450,000 | — |
| Total long-term debt | 1,275,000 | 1,195,172 |
| Less: unamortized original issue discount and original issue premium, net | 8,668 | 5,245 |
| Less: unamortized debt issuance costs | 13,636 | 13,434 |
| Total long-term debt, net | $ 1,252,696 | $ 1,176,493 |

_____

[a]  Domestically, cash equivalents include AAA rated government money market funds and time deposits with maturities of less than 91 days from the date of purchase.

[b]  Internationally, cash equivalents include money market funds. All of the Company's international cash has been subjected to U.S. income taxes due to the Transition Tax imposed by the Tax Act, and accordingly could be repatriated without any significant additional tax.  The Company currently does not anticipate a need to repatriate these funds to finance our U.S. operations and it is the Company's intent to indefinitely reinvest these funds outside of the U.S.

[c]  The Term Loan was increased in August 2017 by $75 million. The balance of $425 million is due at maturity.

*Senior Notes:*

On December 4, 2017, we issued $450 million of 2017 Senior Notes due December 15, 2027. The notes were issued at 99.027% of par. The proceeds, along with cash on hand, were used to redeem the 2015 Senior Notes and pay the related call premium.

On June 1, 2016, we issued $400 million aggregate principal amount of 2016 Senior Notes due June 1, 2024. The proceeds were used to prepay a portion of indebtedness outstanding under the Term Loan.

The indentures governing the 2017 and 2016 Senior Notes contain covenants that would limit the Company's ability to pay dividends or to make distributions and repurchase or redeem Match Group stock in the event a default has occurred or Match Group's leverage ratio (as defined in the indentures) exceeds 5.0 to 1.0. As of December 31, 2017, Match Group was in compliance with all applicable covenants and was below the 5.0 to 1.0 leverage ratio.

*Term Loan and Credit Facility:*

On November 16, 2015, under a credit agreement (the "Credit Agreement"), the Company borrowed $800 million in the form of a term loan (the "Term Loan"). During 2016, the Company made $450 million of principal payments, $400 million of which was funded from proceeds from the 2016 Senior Notes. On August 14, 2017,

44

the Company increased the Term Loan by $75 million to $425 million, repriced the outstanding balance at LIBOR plus 2.50% and reduced the LIBOR floor to 0.00%. The interest rate at December 31, 2017 is 3.85%. Interest payments are due at least quarterly through the term of the loan. The Term Loan provides for additional annual principal payments as part of an excess cash flow sweep provision, the amount of which, if any, is governed by the secured net leverage ratio set forth in the Credit Agreement.

Additionally, the Company has a $500 million revolving credit facility (the "Credit Facility") that expires on October 7, 2020. At December 31, 2017 and 2016, there were no outstanding borrowings under the Credit Facility. The annual commitment fee on undrawn funds based on the current leverage ratio is 30 basis points. Borrowings under the Credit Facility bear interest, at the Company's option, at a base rate or LIBOR, in each case plus an applicable margin, which is determined by reference to a pricing grid based on the Company's consolidated net leverage ratio. The terms of the Credit Facility require the Company to maintain a consolidated net leverage ratio of not more than 5.0 to 1.0 and a minimum interest coverage ratio of not less than 2.5 to 1.0 (in each case as defined in the Credit Agreement).

There are additional covenants under the Credit Facility and the Term Loan that limit the ability of the Company and its subsidiaries to, among other things, incur indebtedness, pay dividends or make distributions. While the Term Loan remains outstanding, these same covenants under the Credit Agreement are more restrictive than the covenants that are applicable to the Credit Facility. Obligations under the Credit Facility and Term Loan are unconditionally guaranteed by certain Match Group wholly-owned domestic subsidiaries, and are also secured by the stock of certain Match Group domestic and foreign subsidiaries. The Term Loan and outstanding borrowings, if any, under the Credit Facility rank equally with each other, and have priority over the 2016 and 2017 Senior Notes to the extent of the value of the assets securing the borrowings under the Credit Agreement.

*IAC Subordinated Loan Facility:*

Prior to the IPO, the Company entered into an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allows the Company to make one or more requests to IAC to borrow funds from it. If IAC agrees to fulfill any such borrowing request from the Company, such borrowing will be incurred in accordance with the terms of the IAC Subordinated Loan Facility. Any indebtedness outstanding under the IAC Subordinated Loan Facility will be by its terms subordinated in right of payment to the obligations under the Credit Facility, the Term Loan and the 2016 and 2017 Senior Notes. The IAC Subordinated Loan Facility has a scheduled final maturity date of no earlier than 90 days after the maturity date of the Credit Facility or the latest maturity date in respect of any Term Loan outstanding under the Credit Agreement. At December 31, 2017, the Company has no indebtedness outstanding under the IAC Subordinated Loan Facility.

**Cash Flow Information**

In summary, the Company's cash flows are as follows:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| | (In thousands) | | |
| Net cash provided by operating activities attributable to continuing operations | $      321,091 | $      259,555 | $      253,893 |
| Net cash provided by (used in) investing activities attributable to continuing operations | 118,188 | (27,199) | (643,350) |
| Net cash (used in) provided by financing activities attributable to continuing operations | (423,714) | (61,194) | 369,835 |

**2017**

Net cash provided by operating activities attributable to continuing operations in 2017 includes adjustments to earnings consisting primarily of deferred income tax benefits of $118.3 million primarily related to the net operating loss created by tax deductions created from stock-based awards. Partially offsetting this adjustment was $69.1 million of stock-based compensation expense, $32.6 million of depreciation, $5.3 million of acquisition-related contingent consideration fair value adjustments, $1.5 million of amortization of intangibles, and $22.1 million in other adjustments that consist primarily of non-cash loss on extinguishment of debt of $15.4 million,

45

Table of Contents

net foreign currency losses of $9.0 million, non-cash interest expenses of $4.1 million, and a non-cash other-than-temporary impairment on a cost method investment of $2.3 million, partially offset by a gain on the sale of a cost method investment of $9.1 million. The decrease in cash from changes in working capital primarily consists of increases in accounts receivable of $51.6 million primarily related to timing of cash receipts and revenue increasingly sourced through mobile app stores, which are settled with the Company more slowly than traditional credit cards; a decrease in accounts payable and accrued expenses and other current liabilities of $16.8 million, due primarily to the cash settlement of a former subsidiary denominated equity award held by a non-employee; and decreases in cash from other assets of $10.6 million primarily related to the prepayment of certain expenses. These uses of cash were partially offset by an increase in deferred revenue of $32.8 million, due mainly to growth in subscription sales.

Net cash provided by investing activities attributable to continuing operations in 2017 consists primarily of net proceeds of $96.1 million from the sale of a business and net proceeds of $60.2 million from the sale of a cost method investment, partially offset by capital expenditures of $28.8 million that are primarily related to development of capitalized software to support our products and services and the purchase of long-term investments of $9.1 million.

Net cash used in financing activities attributable to continuing operations in 2017 is primarily due to cash payments of $272.5 million for the purchase of certain fully vested stock-based awards, $254.2 million for withholding taxes paid on behalf of employees, a $23.4 million payment related to an acquisition-related contingent consideration agreement, and debt issuance costs of $12.3 million. Offsetting these payments were proceeds of $75.0 million from the increase in the Term Loan; proceeds from the issuance of common stock pursuant to stock-based awards of $59.4 million; and net Senior Notes increase of $4.8 million as $445.2 million of 2015 Senior Notes were redeemed with the proceeds from the issuance of $450.0 million of 2017 Senior Notes.

**2016**

Net cash provided by operating activities attributable to continuing operations in 2016 includes adjustments to earnings consisting primarily of $52.4 million of stock-based compensation expense, $27.7 million of depreciation, $16.9 million of amortization of intangibles, $9.2 million in gains from acquisition-related contingent consideration fair value adjustments and $4.8 million in other adjustments that consist primarily of a non-cash charge on the prepayment of $400 million of the Term Loan, partially offset by foreign currency exchange gains on intercompany loans. The increase in cash from changes in working capital primarily consists of an increase in deferred revenue of $19.2 million, due mainly to growth in subscription revenue, and an increase of the income tax payable as accruals exceeded payments, partially offset by an increase from accounts receivable and a decrease in accounts payable and accrued expenses and other current liabilities.

Net cash used in investing activities attributable to continuing operations in 2016 consists primarily of capital expenditures of $46.1 million that are related to the development of software capitalized to support our products and services, as well as computer equipment and leasehold improvements as we continue to grow and expand our operations, partially offset by the proceeds of $11.7 million from the sale of a marketable security.

Net cash used in financing activities attributable to continuing operations in 2016 mainly relates to the prepayment of $450.0 million of the Term Loan, of which $400.0 million was financed by the issuance of the 2016 Senior Notes.

**2015**

Net cash provided by operating activities attributable to continuing operations in 2015 includes adjustments to earnings consisting primarily of $49.4 million of stock-based compensation expense, $19.8 million of depreciation and $13.4 million of amortization of intangibles, partially offset by deferred income taxes of $20.9 million and $11.1 million of acquisition-related contingent consideration fair value adjustments. The increase in changes in working capital consists primarily of an increase in deferred revenue of $30.2 million, an increase in income taxes payable of $41.8 million, and an increase in accounts payable and accrued expenses and other current liabilities of $29.9 million, partially offset by an increase in accounts receivable of $20.1 million and an increase in other assets of $10.4 million. The increase in deferred revenue is primarily due to growth in subscription revenue. The increase in accounts payable and accrued expenses and other current liabilities is primarily due to increased advertising spending, the timing of advertising payments, and an increase in accrued interest related to the Term Loan and 2015 Senior Notes. The increase in accounts receivable is primarily due to

46

App. 54

Table of Contents

growth in in-app purchases sold through mobile products. The increase in other assets was primarily due to an increase in prepaid expenses, mainly from growth and the signing of longer-term contracts.

Net cash used in investing activities attributable to continuing operations in 2015 includes acquisitions of $610.2 million, which includes $575.0 million for PlentyOfFish, and capital expenditures of $25.2 million, primarily related to the development of capitalized software to support our products and services, and computer hardware.

Net cash provided by financing activities attributable to continuing operations in 2015 includes $788.0 million in borrowings from the Term Loan, $428.8 million in net proceeds received from the IPO and $500.0 million in capital contribution from IAC to partially fund the acquisition of PlentyOfFish, partially offset by a cash dividend to IAC of $1.0 billion, the repayment of $182.5 million in related party debt, net cash transfers of $86.0 million to IAC related to its centrally managed U.S. treasury management function, $23.4 million for the repurchase of stock-based awards, $17.2 million in debt issuance costs related to our Term Loan and revolving credit facility and $7.0 million of debt issuance costs related to the 2015 Senior Notes.

**Liquidity and Capital Resources**

The Company's principal sources of liquidity are its cash flows generated from operations as well as cash and cash equivalents. The Company has a $500 million Credit Facility that expires on October 7, 2020. At December 31, 2017, there were no outstanding borrowings under the Credit Facility.

The Company anticipates that it will need to make capital and other expenditures in connection with the development and expansion of its operations. The Company expects that 2018 capital expenditures will be between $35 million and $40 million, an increase from the 2017 capital expenditures primarily related to additional capitalized software projects compared to 2017.

The Company believes its expected positive cash flows generated from operations together with its existing cash and cash equivalents and available borrowing capacity under the Credit Facility will be sufficient to fund its normal operating requirements, including the payment of withholding taxes on behalf of employees for net-settled subsidiary denominated and Company equity plans, capital expenditures, debt service, investing, and other commitments for the foreseeable future. The Company's liquidity could be negatively affected by a decrease in demand for our products and services.

In May 2017, the Board of Directors of the Company authorized Match Group to repurchase up to 6 million shares of its common stock. The timing and actual number of any shares repurchased will depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities. The Company is not obligated to purchase any shares under the repurchase program, and repurchases may be commenced, suspended or discontinued from time to time without prior notice. We did not repurchase any shares related to this repurchase authorization during the year ended December 31, 2017 and the full 6 million shares remain available for repurchase.

In July 2017, Match Group elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options at a value determined through a process involving two investment banks. During the year ended December 31, 2017, we made cash payments totaling approximately $520 million to cover both the withholding taxes paid on behalf of employees who exercised, as these awards were net settled, and the purchase of certain fully vested awards. Because the Company purchased certain of these fully vested awards, and because the Company net-settled the remaining options by paying withholding taxes on behalf of employees, the number of Company common shares that would have otherwise been issued upon exercise of these options was reduced by 27.3 million shares. We recognized a corporate tax deduction based on the intrinsic value of the awards exercised during the year. At December 31, 2017, assuming all outstanding converted Tinder awards, including vested and unvested awards, were exercised on a net basis, the Company would remit $102.4 million in cash in withholding taxes (assuming a 50% withholding rate) on behalf of the employees and issue 3.3 million of its common shares.

The Company will not be required to pay the one-time Transition Tax under the Tax Act because of its net operating loss position. The Company does not expect to be a full U.S. federal cash income tax payer until 2020. We expect the Tax Act to favorably impact our future liquidity, primarily a result of a reduction in the U.S. corporate tax rate from 35% to 21%, which will lower our effective tax rate and annual tax liability.

47

App. 55

Table of Contents

Our indebtedness could limit our ability to: (i) obtain additional financing to fund working capital needs, acquisitions, capital expenditures, debt service or other requirements; and (ii) use operating cash flow to make acquisitions, capital expenditures, invest in other areas, such as developing properties and exploiting business opportunities. As of December 31, 2017, IAC owns 81.2% of our outstanding shares of capital stock and has 97.6% of the combined voting power of our outstanding capital stock. As a result of IAC's ability to control the election and removal of our board of directors, IAC effectively has the ability to control our financing activities, including the issuance of additional debt and equity securities, or the incurrence of other indebtedness. While the Company believes we will have the ability to access debt and equity markets if needed, such transactions may require the concurrence of IAC.

48

App. 56

## CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

| Contractual Obligations[a] | Less Than 1 Year | 1–3 Years | 3–5 Years | More Than 5 Years | Total |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| Long-term debt[b] | $ 64,384 | $ 132,196 | $ 558,682 | $ 1,000,750 | $ 1,756,012 |
| Operating leases[c] | 8,299 | 15,420 | 9,119 | 10,293 | 43,131 |
| Purchase obligation[d] | 10,000 | — | — | — | 10,000 |
| Total contractual obligations | $ 82,683 | $ 147,616 | $ 567,801 | $ 1,011,043 | $ 1,809,143 |

[a] The Company has excluded $25.3 million in unrecognized tax benefits and related interest from the table above as we are unable to make a reasonably reliable estimate of the period in which these liabilities might be paid. For additional information on income taxes, see "Note 3—Income Taxes" to the consolidated and combined financial statements included in "Item 8— Consolidated and Combined Financial Statements and Supplementary Data."

[b] Represents contractual amounts due including interest on both fixed and variable rate instruments. Long-term debt at December 31, 2017 consists of the 2016 and 2017 Senior Notes of $400 million and $450 million, respectively, which bear interest at fixed rates, and the Term Loan of $425 million, which bears interest at a variable rate. The Term Loan bears interest at LIBOR plus 2.50%, or 3.85%, at December 31, 2017. The amount of interest ultimately paid on the Term Loan may differ based on changes in interest rates. For additional information on long-term debt, see "Note 8—Long-term Debt, net" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

[c] The Company leases office space, data center facilities and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company is also committed to pay a portion of the related operating expenses under certain lease agreements. These operating expenses are not included in the table above. For additional information on operating leases, see "Note 14—Commitments and Contingencies" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

[d] The purchase obligation is for a web hosting commitment.

In addition to amounts included in the table above, as of December 31, 2017, we were contingently obligated to pay, in connection with our acquisitions, up to an additional $3.0 million of cash consideration based on the earnings performance at the business acquired. The Company has accrued $2.6 million as of December 31, 2017 for its contingent consideration arrangements. We have one contingent consideration arrangement without a limit on the maximum amount, for which no payment is expected.

We also had $0.1 million of surety bonds outstanding as of December 31, 2017 that could potentially require performance by the Company in the event of demands by third parties or contingent events.

### *Off-Balance Sheet Arrangements*

Other than the items described above, the Company does not have any off-balance sheet arrangements as of December 31, 2017.

49

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The following disclosure is provided to supplement the descriptions of Match Group's accounting policies contained in "Note 2 —Summary of Significant Accounting Policies" to the consolidated and combined financial statements included in "Item 8— Consolidated and Combined Financial Statements and Supplementary Data" in regard to significant areas of judgment. Management of the Company is required to make certain estimates, judgments and assumptions during the preparation of its consolidated and combined financial statements in accordance with U.S. generally accepted accounting principles. These estimates, judgments and assumptions impact the reported amount of assets, liabilities, revenue and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated and combined financial statements than others. What follows is a discussion of some of our more significant accounting policies and estimates.

### Business Combinations and Contingent Consideration Arrangements

Acquisitions are an important part of the Company's growth strategy. The Company invested $0.3 million, $0.7 million and $614.8 million, for acquisitions of businesses, including cash acquired, in the years ended December 31, 2017, 2016 and 2015, respectively. The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The fair value of these intangible assets is based on detailed valuations that use information and assumptions provided by management. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. The contingent consideration arrangements are generally based upon earnings performance and/or operating metrics. The Company determines the fair value of the contingent consideration arrangements by using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated and combined financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement and can have a material impact on our consolidated and combined financial statements. The changes in the estimated fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated and combined statement of operations.

### Recoverability of Goodwill and Indefinite-Lived Intangible Assets

Goodwill is the Company's largest asset with a carrying value of $1.2 billion, representing 59% of the Company's total assets at both December 31, 2017 and 2016. Indefinite-lived intangible assets, which consist of the Company's acquired trade names and trademarks, have a carrying value of $228.3 million and $214.5 million at December 31, 2017 and 2016, respectively.

Goodwill and indefinite-lived intangible assets are assessed annually for impairment as of October 1 or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value. In performing its annual assessment, the Company has the option to qualitatively assess whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. The 2017 and 2016 annual assessments did not identify any material impairments.

For the Company's annual goodwill test at October 1, 2017, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of the reporting unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were that its market capitalization of $6.3 billion exceeded its carrying value by more than 1100%, and the Company's strong operating performance.

50

Table of Contents

The Company foregoes a qualitative assessment and tests the goodwill for impairment when it concludes that it is more likely than not that there may be an impairment. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of each reporting unit to its carrying value, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded.

When a quantitative assessment is required, either on an interim basis or annual basis as of October 1 each year, the fair value of the Company's reporting unit is determined using both an income approach based on discounted cash flows ("DCF") and a market approach. Determining fair value using a DCF analysis requires the exercise of significant judgment with respect to several items, including the amount and timing of expected future cash flows and appropriate discount rates. The expected cash flows used in the DCF analyses are based on the Company's most recent budget and, for years beyond the budget, the Company's estimates, which are based, in part, on forecasted growth rates. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows of the reporting unit. Assumptions used in the DCF analyses, including the discount rate, are assessed based on the reporting unit's current results and forecast, as well as macroeconomic and industry specific factors. Determining fair value using a market approach considers multiples of financial metrics based on both acquisitions and trading multiples of a selected peer group of companies. From the comparable companies, a representative market multiple is determined which is applied to financial metrics to estimate the fair value of a reporting unit. To determine a peer group of companies for our reporting unit, we consider companies relevant in terms of consumer use, monetization model, margin and growth characteristics, and brand strength operating in their respective sectors. While a primary driver in the determination of the fair value of the Company's reporting unit is the estimate of future revenue and profitability, the determination of fair value is based, in part, upon the Company's assessment of macroeconomic factors, industry and competitive dynamics and the strategies of its businesses in response to these factors.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair value of its indefinite-lived intangible asset is less than its carrying value, the Company's policy is to determine the fair value of each of its indefinite-lived intangible assets annually as of October 1. The Company determines the fair value of indefinite-lived intangible assets using an avoided royalty DCF valuation analysis. Significant judgments inherent in this analysis include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. Assumptions used in the avoided royalty DCF analyses, including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2017 and 2016, and the royalty rates used ranged from 3% to 7% in 2017 and 1% to 7% in 2016.

### Recoverability and Estimated Useful Lives of Long-Lived Assets

We review the carrying value of all long-lived assets, comprising property and equipment, including leasehold improvements, and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. In addition, the Company reviews the useful lives of its long-lived assets whenever events or changes in circumstances indicate that these lives may be changed. The carrying value of property and equipment and definite-lived intangible assets is $63.7 million and $66.2 million, at December 31, 2017 and 2016, respectively.

### Income Taxes

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be

51

App. 59

recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. As of December 31, 2017, the balance of deferred tax assets, net is $94.7 million and as of December 31, 2016, the balance of deferred tax liabilities, net, is $20.1 million.

We evaluate and account for uncertain tax positions using a two-step approach. Recognition (step one) occurs when we conclude that a tax position, based solely on its technical merits, is more-likely-than-not to be sustained upon examination. Measurement (step two) determines the amount of benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. At December 31, 2017 and 2016, the Company has unrecognized tax benefits of $26.8 million and $27.4 million, including interest and penalties, respectively. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

The ultimate amount of deferred income tax assets realized and the amounts paid for deferred income tax liabilities and uncertain tax positions may vary from our estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the various tax authorities, as well as actual operating results of the Company that vary significantly from anticipated results.

No income taxes have been provided on indefinitely reinvested cash earnings of certain foreign subsidiaries of $69.2 million at December 31, 2017. The estimated amount of the unrecognized deferred income tax liability with respect to such cash earnings would be $0.9 million.

### Stock-Based Compensation

Stock-based compensation expense reflected in our consolidated and combined statement of operations consists of expense related to the Company's stock options; RSUs; performance-based options, PSUs, and market-based RSUs for which vesting is considered probable; equity instruments denominated in shares of subsidiaries; and IAC denominated stock options, RSUs and market-based awards held by Match Group employees.

The Company recorded stock-based compensation expense of $69.1 million, $52.4 million and $49.4 million for the years ended December 31, 2017, 2016 and 2015, respectively. The Company estimated the fair value of stock options issued in 2017, 2016 and 2015 using a Black-Scholes option pricing model and, for those with a market condition, a lattice model. For stock options, the value is measured at the grant date at fair value and expensed over the vesting term. The impact on stock-based compensation expense for the year ended December 31, 2017, assuming a 1% increase in the risk-free interest rate, a 10% increase in the volatility factor and a one-year increase in the weighted average expected term of the outstanding options would be an increase of $2.2 million, $8.8 million and $4.0 million, respectively. The Company also issues RSUs. For RSUs issued, the value of the instrument is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation expense over the vesting term.

Prior to the IPO, the equity awards that relate to the Company's common stock or the common stock of certain of our subsidiaries were settleable in shares of IAC common stock having a value equal to the difference between the exercise price and the fair market value of our common stock or that of the relevant subsidiary at the date of exercise. Upon completion of the IPO, the options that relate to the Company's common stock have been adjusted in accordance with their terms to provide that the awards are exercisable for shares of our common stock, and the equity awards that relate to these subsidiaries provide that the awards are settleable, at IAC's election, in shares of IAC common stock or in shares of the Company's common stock. To the extent shares of IAC common stock are issued in settlement of these awards, the Company will reimburse IAC for the cost of those shares by issuing to IAC shares of our common stock. Therefore, the number of shares issued by the Company to settle these awards will be the same whether issued to IAC as reimbursement or directly to equity award holders.

52

Table of Contents

During the years ended December 31, 2017 and 2016, the Company issued 11.3 million and 0.5 million shares, respectively, to IAC related to the settlement of subsidiary awards.

In July 2017, the Company elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options at a value determined through a process involving two investment banks. Upon the conversion into Match Group options, these former subsidiary denominated awards, when exercised, are settled by Match Group issuing shares of its common stock equal in value to the intrinsic value of the award being settled, net of shares with a value equal to the withholding taxes due, which taxes are remitted by Match Group to the government on behalf of the employees. At the time of settlement, IAC has the option to issue its own shares directly to the award holders, in which case Match Group would in turn issue its shares to IAC as reimbursement. During 2017, IAC elected to issue its own shares related to these former subsidiary denominated awards.

### Long-term Investments

The Company evaluates each cost method investment for indicators of impairment on a quarterly basis, and recognizes an impairment loss if the decline in value is deemed to be other-than-temporary. Future events may result in reconsideration of the nature of losses as other-than-temporary and market and other factors may cause the value of our investments to decline.

The Company employs a methodology that considers available evidence in evaluating potential other-than-temporary impairments of its investments. Investments are considered to be impaired when a decline in fair value below the cost basis is determined to be other-than-temporary. Such impairment evaluations include, but are not limited to: the length of time and extent to which fair value has been less than the cost basis, the current business environment, including competition; going concern considerations such as financial condition, the rate at which the investee utilizes cash and the investee's ability to obtain additional financing to achieve its business plan; the need for changes to the investee's existing business model due to changing business and regulatory environments and its ability to successfully implement necessary changes; and comparable valuations.

### Recent Accounting Pronouncements

For a discussion of recent accounting pronouncements, see "Note 2—Summary of Significant Accounting Policies" to the consolidated and combined financial statements included in "Item 8—Consolidated and Combined Financial Statements and Supplementary Data."

53

Table of Contents

**Item 7A.    Quantitative and Qualitative Disclosures About Market Risk**

**Interest Rate Risk**

The Company's exposure to market risk for changes in interest rates relates primarily to the Company's long-term debt.

At December 31, 2017, the Company's outstanding debt was $1.3 billion, of which $850 million of Senior Notes bear interest at fixed rates. If market rates decline, the Company runs the risk that the required payments on the fixed rate debt will exceed those based on market rates. A 100 basis point increase or decrease in the level of interest rates would, respectively, decrease or increase the fair value of the fixed-rate debt by $56.0 million. Such potential increase or decrease in fair value is based on certain simplifying assumptions, including a constant level and rate of fixed-rate debt for all maturities and an immediate across-the-board increase or decrease in the level of interest rates with no other subsequent changes for the remainder of the period. The $425 million Term Loan bears interest at a variable rate, which is LIBOR plus 2.50%. As of December 31, 2017, the rate in effect was 3.85%. If LIBOR were to increase or decrease by 100 basis points, then the annual interest expense and payments on the Term Loan would increase or decrease by $4.3 million.

**Foreign Currency Exchange Risk**

The Company conducts business in certain foreign markets, primarily in the European Union, and is exposed to foreign exchange risk for both the Euro and British Pound ("GBP").

For the year ended December 31, 2017, 2016 and 2015, international revenue accounted for 45%, 39% and 35%, respectively, of consolidated revenue. We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar. As foreign currency exchange rates change, translation of the statements of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results. The average Euro exchange rate strengthened against the U.S. Dollar by 2% in 2017 compared to 2016. See "Principles of Financial Reporting—Effects of Changes in Foreign Exchange Rates on Revenue" for additional information on the impact of foreign currencies on revenue.

Foreign currency exchange gains and losses included in the Company's earnings for the years ended December 31, 2017, 2016 and 2015 are (losses) and gains of $(10.3) million, $20.0 million and $9.9 million, respectively. Historically foreign currency exchange gains and losses have not been material to the Company. The loss in 2017 is primarily related to a U.S. dollar denominated intercompany loan in which the receivable is held by a foreign subsidiary with a GBP functional currency. As the GBP versus the U.S. Dollar exchange rate has increased during the year, the intercompany loan has incurred losses. The gain in 2016 is primarily related to the significant decline in the GBP in 2016 following the Brexit vote on June 23, 2016.

Historically, the Company has not hedged foreign currency exposures. Our continued international expansion increases our exposure to exchange rate fluctuations and as a result such fluctuations could have a significant impact on our future results of operations.

54

**Item 8.    Consolidated and Combined Financial Statements and Supplementary Data**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Match Group, Inc. and subsidiaries (the Company) as of December 31, 2017 and 2016, and the related consolidated and combined statements of operations, comprehensive operations, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2017, and the related notes and the financial statement schedule listed in the Index at Item 15(a) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 1, 2018 expressed an unqualified opinion thereon.

As discussed in Note 2 to the consolidated and combined financial statements, the Company changed its method of accounting for stock compensation in 2017 due to the adoption of ASU No. 2016-09, *Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.

New York, New York
March 1, 2018

55

## MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEET

| | December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| | **(In thousands, except share data)** | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 272,624 | $ 253,651 |
| Accounts receivable, net of allowance of $778 and $676, respectively | 116,751 | 63,853 |
| Assets of a business held for sale | — | 133,272 |
| Other current assets | 55,369 | 39,618 |
| Total current assets | 444,744 | 490,394 |
| Property and equipment, net | 61,620 | 62,954 |
| Goodwill | 1,247,644 | 1,206,447 |
| Intangible assets, net | 230,345 | 217,682 |
| Deferred income taxes | 123,199 | 5,286 |
| Long-term investments | 11,137 | 55,355 |
| Other non-current assets | 11,457 | 10,560 |
| **TOTAL ASSETS** | $ 2,130,146 | $ 2,048,678 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Accounts payable | $ 10,112 | $ 7,357 |
| Deferred revenue | 198,095 | 161,124 |
| Liabilities of a business held for sale | — | 37,058 |
| Accrued expenses and other current liabilities | 110,566 | 108,720 |
| Total current liabilities | 318,773 | 314,259 |
| Long-term debt, net | 1,252,696 | 1,176,493 |
| Income taxes payable | 8,410 | 9,126 |
| Deferred income taxes | 28,478 | 25,339 |
| Other long-term liabilities | 14,484 | 20,877 |
| Redeemable noncontrolling interests | 6,056 | 6,062 |
| Commitments and contingencies | | |
| **SHAREHOLDERS' EQUITY** | | |
| Common stock, $0.001 par value, authorized 1,500,000,000 shares; 64,370,470 and 45,797,402 issued and outstanding at December 31, 2017 and December 31, 2016, respectively | 64 | 46 |
| Class B convertible common stock; $0.001 par value; authorized 1,500,000,000 shares; 209,919,402 shares issued and outstanding | 210 | 210 |
| Class C common stock; $0.001 par value; authorized 1,500,000,000 shares; no shares issued and outstanding | — | — |
| Preferred stock; $0.001 par value; authorized 500,000,000 shares; no shares issued and outstanding | — | — |
| Additional paid-in capital | 81,082 | 490,587 |
| Retained earnings | 532,211 | 182,063 |
| Accumulated other comprehensive loss | (112,318) | (176,384) |

App. 64

| | | |
|---|---|---|
| Total Match Group, Inc. shareholders' equity | 501,249 | 496,522 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 2,130,146 | $ 2,048,678 |

The accompanying Notes to Consolidated and Combined Financial Statements are an integral part of these statements.

56

App. 65

MATCH GROUP, INC. AND SUBSIDIARIES

CONSOLIDATED AND COMBINED STATEMENT OF OPERATIONS

| | | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 |
| | | (In thousands, except per share data) | | | | |
| Revenue | $ | 1,330,661 | $ | 1,118,110 | $ | 909,705 |
| Operating costs and expenses: | | | | | | |
| Cost of revenue (exclusive of depreciation shown separately below) | | 279,499 | | 195,648 | | 134,386 |
| Selling and marketing expense | | 375,610 | | 349,119 | | 342,767 |
| General and administrative expense | | 179,804 | | 135,019 | | 122,377 |
| Product development expense | | 101,150 | | 78,117 | | 63,966 |
| Depreciation | | 32,613 | | 27,726 | | 19,791 |
| Amortization of intangibles | | 1,468 | | 16,932 | | 13,437 |
| Total operating costs and expenses | | 970,144 | | 802,561 | | 696,724 |
| Operating income | | 360,517 | | 315,549 | | 212,981 |
| Interest expense—third party | | (77,565) | | (82,199) | | (17,943) |
| Interest expense—related party | | — | | — | | (7,965) |
| Other (expense) income, net | | (30,827) | | 7,866 | | 11,632 |
| Earnings from continuing operations, before tax | | 252,125 | | 241,216 | | 198,705 |
| Income tax benefit (provision) | | 103,852 | | (62,875) | | (65,542) |
| **Net earnings from continuing operations** | | 355,977 | | 178,341 | | 133,163 |
| Loss from discontinued operations, net of tax | | (5,650) | | (6,328) | | (12,676) |
| **Net earnings** | | 350,327 | | 172,013 | | 120,487 |
| Net earnings attributable to redeemable noncontrolling interests | | (179) | | (562) | | (104) |
| **Net earnings attributable to Match Group, Inc. shareholders** | $ | 350,148 | $ | 171,451 | $ | 120,383 |
| | | | | | | |
| **Net earnings per share from continuing operations:** | | | | | | |
| Basic | $ | 1.35 | $ | 0.71 | $ | 0.76 |
| Diluted | $ | 1.20 | $ | 0.66 | $ | 0.72 |
| | | | | | | |
| **Net earnings per share attributable to Match Group, Inc. shareholders:** | | | | | | |
| Basic | $ | 1.33 | $ | 0.68 | $ | 0.69 |
| Diluted | $ | 1.18 | $ | 0.64 | $ | 0.65 |
| | | | | | | |
| **Stock-based compensation expense by function:** | | | | | | |
| Cost of revenue | $ | 1,701 | $ | 1,447 | $ | 481 |
| Selling and marketing expense | | 4,545 | | 3,426 | | 6,758 |
| General and administrative expense | | 42,840 | | 33,784 | | 35,897 |
| Product development expense | | 20,004 | | 13,713 | | 6,265 |
| Total stock-based compensation expense | $ | 69,090 | $ | 52,370 | $ | 49,401 |

The accompanying Notes to Consolidated and Combined Financial Statements are an integral part of these statements.

57

App. 66

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED AND COMBINED STATEMENT OF COMPREHENSIVE OPERATIONS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| | **(In thousands)** | | |
| Net earnings | $ 350,327 | $ 172,013 | $ 120,487 |
| Other comprehensive income (loss), net of tax | | | |
| Change in foreign currency translation adjustment | 64,588 | (36,239) | (63,223) |
| Change in fair value of available-for-sale securities | — | (2,964) | 4,212 |
| Total other comprehensive income (loss) | 64,588 | (39,203) | (59,011) |
| Comprehensive income | 414,915 | 132,810 | 61,476 |
| Comprehensive income attributable to redeemable noncontrolling interests | (701) | (923) | 135 |
| Comprehensive income attributable to Match Group, Inc. shareholders | $ 414,214 | $ 131,887 | $ 61,611 |

The accompanying Notes to Consolidated and Combined Financial Statements are an integral part of these statements.

58

## MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED AND COMBINED STATEMENT OF SHAREHOLDERS' EQUITY

### Years Ended December 31, 2017, 2016 and 2015

| | Redeemable Noncontrolling Interests | Match Group, Inc. Shareholders' Equity or Invested Capital | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Common Stock $0.001 Par Value | | Shares (Pro forma)(a) | Class B Convertible Common Stock $0.001 Par Value | | Additional Paid-in Capital | Retained Earnings | Invested Capital | Accumulated Other Comprehensive Loss | Total Match Group Inc. Invested Capital or Shareholders' Equity | Noncontrolling Interests | Total Invested Capital or Shareholders' Equity |
| | | $ | Shares | | $ | Shares | | | | | | | |
| Balance as of December 31, 2014 | $ 3,678 | $ — | — | 161,130 | $ — | — | $ — | $ — | $ 877,635 | $ (78,048) | $ 799,587 | $ 189 | $ 799,776 |
| Net earnings for the year ended December 31, 2015 | 104 | — | — | — | — | — | — | 35,593 | 84,790 | — | 120,383 | — | 120,383 |
| Other comprehensive loss, net of tax | (239) | — | — | — | — | — | — | — | — | (58,772) | (58,772) | — | (58,772) |
| Stock-based compensation expense | 5,067 | — | — | — | — | — | 15,802 | — | 22,974 | — | 38,776 | — | 38,776 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | — | 10 | — | — | — | 104 | — | — | — | 104 | — | 104 |
| Income tax benefit related to stock-based awards and other | — | — | — | — | — | — | 7,821 | — | — | — | 7,821 | — | 7,821 |
| Purchase of redeemable noncontrolling interests | (2,864) | — | — | — | — | — | — | — | — | — | — | — | — |
| Transfers from noncontrolling interests to redeemable noncontrolling interests | 189 | — | — | — | — | — | — | — | — | — | — | (189) | (189) |
| Net increase in IAC's investment in Match Group Inc. | — | — | — | 12,678 | — | — | (17,119) | — | 105,970 | — | 88,851 | — | 88,851 |
| Contribution from IAC to fund PlentyOfFish | — | — | — | — | 36 | 36,111 | 344,964 | — | — | — | 345,000 | — | 345,000 |
| Capitalization as a result of IPO | — | — | — | (173,808) | 174 | 173,808 | 1,091,172 | — | (1,091,346) | — | — | — | — |
| Dividend to IAC | — | — | — | — | — | — | (1,442,787) | (24,981) | — | — | (1,467,768) | — | (1,467,768) |
| Issuance of common stock in connection with IPO | — | 38 | 38,333 | — | — | — | 428,245 | — | — | — | 428,283 | — | 428,283 |
| Purchase of stock-based awards | — | — | — | — | — | — | (23,431) | — | — | — | (23,431) | — | (23,431) |
| Other | (28) | — | — | — | — | — | — | — | (23) | — | (23) | — | (23) |
| Balance as of December 31, 2015 | 5,907 | 38 | 38,343 | — | 210 | 209,919 | 404,771 | 10,612 | — | (136,820) | 278,811 | — | 278,811 |
| Net earnings for the year ended December 31, 2016 | 562 | — | — | — | — | — | — | 171,451 | — | — | 171,451 | — | 171,451 |
| Other comprehensive income (loss), net of tax | 361 | — | — | — | — | — | — | — | — | (39,564) | (39,564) | — | (39,564) |
| Stock-based compensation expense | — | — | — | — | — | — | 44,524 | — | — | — | 44,524 | — | 44,524 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 7 | 6,495 | — | — | — | 10,224 | — | — | — | 10,231 | — | 10,231 |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 1 | 959 | — | — | — | — | — | — | — | 1 | — | 1 |

App. 68

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income tax benefits related to stock-based awards | | | | | | | 27,407 | | | | 27,407 | | 27,407 |
| Purchase of redeemable noncontrolling interests | (1,129) | — | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | 361 | — | — | — | — | — | (361) | — | — | — | (361) | — | (361) |
| Other | — | — | — | — | — | — | 4,022 | — | — | — | 4,022 | — | 4,022 |
| **Balance as of December 31, 2016** | 6,062 | 46 | 45,797 | — | 210 | 209,919 | 490,587 | 182,063 | — | (176,384) | 496,522 | — | 496,522 |
| Net earnings for the year ended December 31, 2017 | 179 | — | — | — | — | — | — | 350,148 | — | — | 350,148 | — | 350,148 |
| Other comprehensive income, net of tax | 522 | — | — | — | — | — | — | — | — | 64,066 | 64,066 | — | 64,066 |
| Stock-based compensation expense | — | — | — | — | — | — | 54,604 | — | — | — | 54,604 | — | 54,604 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 6 | 6,688 | — | — | — | (248,787) | — | — | — | (248,781) | — | (248,781) |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 12 | 11,885 | — | — | — | (215,429) | — | — | — | (215,417) | — | (215,417) |
| Purchase of redeemable noncontrolling interests | (436) | — | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | (107) | — | — | — | — | — | 107 | — | — | — | 107 | — | 107 |
| Other | (164) | — | — | — | — | — | — | — | — | — | — | — | — |
| **Balance as of December 31, 2017** | $ 6,056 | $ 64 | 64,370 | — | $ 210 | 209,919 | $ 81,082 | $ 532,211 | $ — | $ (112,318) | $ 501,249 | $ — | $ 501,249 |

(a) Common stock prior to the IPO was presented as a component of Invested Capital as the financial statements were prepared on a combined basis. Pro forma common stock is being presented for informational purposes.

The accompanying Notes to Consolidated and Combined Financial Statements are an integral part of these statements.

59

App. 69

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED AND COMBINED STATEMENT OF CASH FLOWS**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| | (In thousands) | | |
| **Cash flows from operating activities attributable to continuing operations:** | | | |
| **Net earnings from continuing operations** | $ 355,977 | $ 178,341 | $ 133,163 |
| Adjustments to reconcile net earnings from continuing operations to net cash provided by operating activities attributable to continuing operations: | | | |
| Stock-based compensation expense | 69,090 | 52,370 | 49,401 |
| Depreciation | 32,613 | 27,726 | 19,791 |
| Amortization of intangibles | 1,468 | 16,932 | 13,437 |
| Deferred income taxes | (118,251) | (10,298) | (20,927) |
| Acquisition-related contingent consideration fair value adjustments | 5,253 | (9,197) | (11,056) |
| Other adjustments, net | 22,142 | (4,797) | (1,390) |
| Changes in assets and liabilities | | | |
| Accounts receivable | (51,587) | (10,731) | (20,088) |
| Other assets | (10,564) | (5,321) | (10,367) |
| Accounts payable and accrued expenses and other current liabilities | (16,801) | (24,346) | 29,934 |
| Income taxes payable and receivable | (1,002) | 29,641 | 41,797 |
| Deferred revenue | 32,753 | 19,235 | 30,198 |
| **Net cash provided by operating activities attributable to continuing operations** | 321,091 | 259,555 | 253,893 |
| **Cash flows from investing activities attributable to continuing operations:** | | | |
| Acquisitions, net of cash acquired | (280) | (686) | (610,222) |
| Capital expenditures | (28,833) | (46,098) | (25,246) |
| Proceeds from the sale of a business, net | 96,144 | — | — |
| Proceeds from the sale of long-term investment | 60,163 | — | — |
| Proceeds from sale of a marketable security | — | 11,716 | — |
| Purchases of investments | (9,076) | (500) | — |
| Other, net | 70 | 8,369 | (7,882) |
| **Net cash provided by (used in) investing activities attributable to continuing operations** | 118,188 | (27,199) | (643,350) |
| **Cash flows from financing activities attributable to continuing operations:** | | | |
| Term Loan borrowings | 75,000 | — | 788,000 |
| Proceeds from bond offering | 450,000 | 400,000 | — |
| Principal payment on Senior Notes | (445,172) | — | — |
| Principal payments on Term Loan | — | (450,000) | — |
| Debt issuance costs | (12,285) | (7,811) | (17,174) |
| Fees and expenses related to Note Exchange | — | — | (6,954) |
| Proceeds from initial public offering, net of fees and expenses | — | — | 428,789 |
| Cash dividend to IAC | — | — | (1,022,500) |
| Transfers to IAC in periods prior to the IPO | — | — | (86,012) |
| Capital contribution from IAC to partially fund the acquisition of PlentyOfFish | — | — | 500,000 |
| Repayment of related party debt | — | — | (182,509) |
| Proceeds from issuance of common stock pursuant to stock-based awards | 59,442 | 39,378 | — |
| Withholding taxes paid on behalf of employees on net settled stock-based awards | (254,210) | (29,830) | — |
| Purchase of redeemable noncontrolling interests | (436) | (1,129) | (2,864) |

App. 70

Case 3:19-cv-02356-S     Document 39     Filed 06/12/20     Page 75 of 451     PageID 598

| | | | |
|---|---|---|---|
| Purchase of stock-based awards | (273,959) | | (23,431) |
| Acquisition-related contingent consideration payments | (23,429) | — | (5,510) |
| Other, net | (165) | (11,802) | — |
| **Net cash (used in) provided by financing activities attributable to continuing operations** | (423,714) | (61,194) | 369,835 |
| **Total cash provided by (used in) continuing operations** | 15,565 | 171,162 | (19,622) |

60

App. 71

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 76 of 451    PageID 599

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED AND COMBINED STATEMENT OF CASH FLOWS (continued)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| | **(In thousands)** | | |
| Net cash (used in) provided by operating activities attributable to discontinued operations | (6,061) | 4,231 | (6,427) |
| Net cash used in investing activities attributable to discontinued operations | (471) | (4,152) | (5,512) |
| Total cash (used in) provided by discontinued operations | (6,532) | 79 | (11,939) |
| Effect of exchange rate changes on cash and cash equivalents | 9,940 | (5,763) | (7,896) |
| **Net increase (decrease) in cash and cash equivalents** | 18,973 | 165,478 | (39,457) |
| Cash and cash equivalents at beginning of period | 253,651 | 88,173 | 127,630 |
| **Cash and cash equivalents at end of period** | $ 272,624 | $ 253,651 | $ 88,173 |

The accompanying Notes to Consolidated and Combined Financial Statements are an integral part of these statements.

61

App. 72

https://www.sec.gov/Archives/edgar/data/1575189/000157518918000019/mtch10-k20171231.htm          67/122

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS**

## NOTE 1—ORGANIZATION

Match Group, Inc. is the world's leading provider of subscription dating products servicing North America, Western Europe, Asia and many other regions around the world through websites and applications that we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, and Pairs, each designed to increase our users' likelihood of finding a romantic connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users. We currently offer our dating products in 42 languages across more than 190 countries. Following the sale of our Non-dating segment in March 2017, Match Group has one operating segment, Dating, which is managed as a portfolio of dating brands.

On November 24, 2015, the Company completed its initial public offering ("IPO") of 38.3 million shares of its common stock at a price of $12.00 per share for proceeds, net of fees and expenses, of $428.3 million. As of December 31, 2017, IAC/InterActiveCorp's ("IAC") economic ownership interest and voting interest in Match Group were 81.2% and 97.6%, respectively.

All references to "Match Group," the "Company," "we," "our," or "us" in this report are to Match Group, Inc.

## NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation and Consolidation

The Company prepares its consolidated and combined financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"). The Company's financial statements were prepared on a consolidated basis beginning October 1, 2015 and on a combined basis for periods prior thereto. The difference in presentation is due to the fact that the final steps of the legal reorganization of the entities included in Match Group at the time of the IPO were not completed until October 1, 2015. The preparation of financial statements on a combined basis for periods prior thereto allows for the financial statements to be presented on a consistent basis for all periods presented. The combined financial statements reflect the historical financial position, results of operations and cash flows of Match Group's businesses since their respective dates of acquisition by IAC. The consolidated financial statements include the accounts of the Company, all entities that are wholly-owned by the Company and all entities in which the Company has a controlling financial interest.

The consolidated and combined financial statements through the date of the IPO reflect the allocation to Match Group of certain IAC corporate expenses relating to Match Group based on the historical financial statements and accounting records of IAC. Management believes the assumptions underlying the historical consolidated and combined financial statements, including the basis on which expenses have been allocated from IAC, are reasonable and that these consolidated and combined financial statements reflect all adjustments, consisting of normal and recurring adjustments necessary for the fair presentation of our financial position, results of operations and cash flows for the years presented.

For the purposes of these consolidated and combined financial statements, income taxes have been computed for Match Group on an as if stand-alone, separate tax return basis.

All intercompany transactions and balances between and among the Company, its subsidiaries and the entities comprising Match Group have been eliminated.

### Accounting for Investments

Investments in common stock or in-substance common stock of entities in which the Company does not have the ability to exercise significant influence over the operating and financial matters of the investee are accounted for using the cost method. Investments in companies that the Company does not control, which are not in the form of common stock or in-substance common stock, are also accounted for using the cost method. The

62

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

Company evaluates each cost method investment for impairment on a quarterly basis and recognizes an impairment loss if a decline in value is determined to be other-than-temporary. Such impairment evaluations include, but are not limited to: the current business environment, including competition; going concern considerations such as financial condition, the rate at which the investee utilizes cash and the investee's ability to obtain additional financing to achieve its business plan; the need for changes to the investee's existing business model due to changing business and regulatory environments and its ability to successfully implement necessary changes; and comparable valuations. If the Company has not identified events or changes in circumstances that may have a significant adverse effect on the fair value of a cost method investment, then the fair value of such cost method investment is not estimated, as it is impracticable to do so.

**Accounting Estimates**

Management of the Company is required to make certain estimates, judgments and assumptions during the preparation of its consolidated and combined financial statements in accordance with GAAP. These estimates, judgments and assumptions impact the reported amounts of assets, liabilities, revenue and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates.

On an ongoing basis, the Company evaluates its estimates and judgments including those related to: the recoverability of goodwill and indefinite-lived intangible assets; the useful lives and recoverability of definite-lived intangible assets and property and equipment; the fair value of long-term investments; the carrying value of accounts receivable, including the determination of the allowance for doubtful accounts; the determination of revenue reserves; the fair value of acquisition-related contingent consideration arrangements; the liabilities for uncertain tax positions; the valuation allowance for deferred income tax assets; and the fair value of and forfeiture rates for stock-based awards, among others. The Company bases its estimates and judgments on historical experience, its forecasts and budgets and other factors that the Company considers relevant.

**Revenue Recognition**

The Company's revenue is primarily derived directly from users in the form of recurring subscriptions. Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by using a credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, all purchases are final and nonrefundable. Fees collected, or contractually due, in advance for subscriptions are deferred and recognized as revenue using the straight-line method over the term of the applicable subscription period, which primarily ranges from one to six months, and corresponding mobile app store fees incurred on such transactions, if any, are deferred and expensed over the same period. Deferred revenue is $198.3 million and $161.1 million at December 31, 2017 and 2016, respectively. The Company also earns revenue from online advertising, the purchase of à la carte features and offline events. Online advertising revenue is recognized every time an ad is displayed. Revenue from the purchase of à la carte features is recognized based on usage. Revenue and the related expenses associated with offline events are recognized when each event occurs.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and short-term investments, with maturities of less than 91 days from the date of purchase. Domestically, cash equivalents include AAA rated government money market funds and time deposits with maturities of less than 91 days. Internationally, cash equivalents include money market funds.

63

App. 74

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**Accounts Receivable, net of allowance for doubtful accounts and revenue reserves**

Accounts receivable are stated at amounts due from customers, net of an allowance for doubtful accounts and revenue reserves. Accounts receivable outstanding longer than the contractual payment terms are considered past due. The Company determines its allowance by considering a number of factors, including the length of time accounts receivable are past due, the Company's previous loss history, the specific customer's ability to pay its obligation to the Company and the condition of the general economy and the customer's industry. The Company writes off accounts receivable when they become uncollectible. The Company also maintains allowances to reserve for potential credits issued to customers or other revenue adjustments. The amounts of these reserves are based, in part, on historical experience.

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost. Repairs and maintenance costs are expensed as incurred. Depreciation is computed using the straight-line method over the estimated useful lives of the assets or, in the case of leasehold improvements, the lease term, if shorter.

| Asset Category | Estimated Useful Lives |
|---|---|
| Computer equipment and capitalized software | 2 to 3 years |
| Furniture and other equipment | 5 years |
| Leasehold improvements | 6 to 10 years |

The Company capitalizes certain internal use software costs including external direct costs utilized in developing or obtaining the software and compensation for personnel directly associated with the development of the software. Capitalization of such costs begins when the preliminary project stage is complete and ceases when the project is substantially complete and ready for its intended purpose. The net book value of capitalized software was $20.9 million and $25.2 million at December 31, 2017 and 2016, respectively.

**Business Combinations**

The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The fair value of these intangible assets is based on detailed valuations that use information and assumptions provided by management. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. The contingent consideration arrangements are generally based upon earnings performance and/or operating metrics. The Company determines the fair value of the contingent consideration arrangements using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated and combined financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement and can have a material impact on our consolidated and combined financial statements. The changes in the estimated fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated and combined statement of operations. See "Note 7—Fair Value Measurements and Financial Instruments" for a discussion of contingent consideration arrangements.

64

App. 75

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**Goodwill and Indefinite-Lived Intangible Assets**

The Company assesses goodwill on its one reporting unit and indefinite-lived intangible assets for impairment annually as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value.

When the Company elects to perform a qualitative assessment and concludes it is not more likely than not that the fair value of the reporting unit is less than its carrying value, no further assessment of that reporting unit's goodwill is necessary; otherwise, a quantitative assessment is performed and the fair value of the reporting unit is determined. If the carrying value of the reporting unit exceeds its fair value an impairment loss equal to the excess is recorded.

For the Company's annual goodwill test at October 1, 2017, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of the reporting unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were than its market capitalization of $6.3 billion exceeded its carrying value by more than 1100% and the Company's strong operating performance. A qualitative assessment was also performed for 2016 and the Company concluded it was more likely than not that the fair value of the reporting unit was in excess of its carrying value.

The Company foregoes a qualitative assessment and tests the goodwill for impairment when it concludes that it is more likely than not that there may be an impairment. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of the Company's reporting unit to its carrying value, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded.

When a quantitative assessment is required, either on an interim basis or annual basis as of October 1 each year, the fair value of the reporting unit is determined using both an income approach based on discounted cash flows ("DCF") and a market approach. Determining fair value using a DCF analysis requires the exercise of significant judgment with respect to several items, including the amount and timing of expected future cash flows and appropriate discount rates. The expected cash flows used in the DCF analyses are based on the Company's most recent budget and, for years beyond the budget, the Company's estimates, which are based, in part, on forecasted growth rates. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows of the reporting unit. Assumptions used in the DCF analyses, including the discount rate, are assessed based on the reporting unit's current results and forecast, as well as macroeconomic and industry specific factors. Determining fair value using a market approach considers multiples of financial metrics based on both acquisitions and trading multiples of a selected peer group of companies. From the comparable companies, a representative market multiple is determined which is applied to financial metrics to estimate the fair value of the reporting unit. To determine a peer group of companies for our reporting unit, we consider companies relevant in terms of consumer use, monetization model, margin and growth characteristics, and brand strength operating in their respective sectors. While a primary driver in the determination of the fair value of the reporting unit is the estimate of future revenue and profitability, the determination of fair value is based, in part, upon the Company's assessment of macroeconomic factors, industry and competitive dynamics and the strategies of its businesses in response to these factors.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair values of its indefinite-lived intangible assets is less than their carrying values, the Company's policy is to determine the fair value of each of its indefinite-lived intangible assets annually as of October 1. The Company determines the fair values of its indefinite-lived intangible assets using avoided royalty DCF analyses. Significant judgments inherent in these analyses include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. Assumptions used in the avoided royalty DCF analyses,

65

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2017 and 2016, and the royalty rates used ranged from 3% to 7% in 2017 and 1% to 7% in 2016.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets, which consist of property and equipment and intangible assets with definite lives, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. Amortization of definite-lived intangible assets is computed either on a straight-line basis or based on the pattern in which the economic benefits of the asset will be realized.

**Fair Value Measurements**

The Company categorizes its financial instruments measured at fair value into a fair value hierarchy that prioritizes the inputs used in pricing the asset or liability. The three levels of the fair value hierarchy are:

- Level 1: Observable inputs obtained from independent sources, such as quoted prices for identical assets and liabilities in active markets.

- Level 2: Other inputs which are observable directly or indirectly, such as quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active and inputs that are derived principally from or corroborated by observable market data. The fair values of the Company's Level 2 financial assets are primarily obtained from observable market prices for identical underlying securities that may not be actively traded. Certain of these securities may have different market prices from multiple market data sources, in which case an average market price is used.

- Level 3: Unobservable inputs for which there is little or no market data and require the Company to develop its own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the assets or liabilities. See "Note 7—Fair Value Measurements and Financial Instruments" for a discussion of fair value measurements made using Level 3 inputs.

The Company's non-financial assets, such as goodwill, intangible assets and property and equipment, as well as cost method investments, are adjusted to fair value only when an impairment charge is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

**Advertising Costs**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and represent online marketing, including fees paid to search engines and social media sites, offline marketing, which is primarily television advertising, and partner-related payments to those who direct traffic to our websites. Advertising expense was $340.4 million, $325.0 million and $316.2 million for the years ended December 31, 2017, 2016 and 2015, respectively.

**Legal Costs**

Legal costs are expensed as incurred.

**Income Taxes**

Match Group is included with IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current and deferred income tax expense has been computed for Match Group on an as if stand-alone, separate return basis.

App. 77

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. The Company records interest, net of any applicable related income tax benefit, on potential income tax contingencies as a component of income tax expense.

The Company evaluates and accounts for uncertain tax positions using a two-step approach. Recognition (step one) occurs when the Company concludes that a tax position, based on its technical merits, is more-likely-than-not to be sustainable upon examination. Measurement (step two) determines the amount of the benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained.

The Tax Cuts and Jobs Act ("Tax Act") imposes a new minimum tax on global intangible low-taxed income ("GILTI") earned by foreign subsidiaries beginning in 2018. The FASB Staff Q&A, Topic 740 No. 5, Accounting for Global Intangible Low-Taxed Income, states that an entity can make an accounting policy election to either recognize deferred taxes for temporary differences expected to reverse as GILTI in future years or provide for the tax expense related to GILTI in the year the tax is incurred. The Company intends to elect to recognize the tax on GILTI as a period expense in the period the tax is incurred.

**Earnings Per Share**

Basic earnings per share is computed by dividing net earnings attributable to Match Group shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share reflects the potential dilution that could occur if stock options and other commitments to issue common stock were exercised or equity awards vested resulting in the issuance of common stock that could share in the earnings of the Company.

**Foreign Currency Translation and Transaction Gains and Losses**

The financial position and operating results of foreign entities whose primary economic environment is based on their local currency are consolidated using the local currency as the functional currency. These local currency assets and liabilities are translated at the rates of exchange as of the balance sheet date, and local currency revenue and expenses of these operations are translated at average rates of exchange during the period. Translation gains and losses are included in accumulated other comprehensive income as a component of shareholders' equity. Transaction gains and losses resulting from assets and liabilities denominated in a currency other than the functional currency are included in the consolidated and combined statement of operations as a component of "Other (expense) income, net."

Translation gains and losses relating to foreign entities that are liquidated or substantially liquidated are reclassified out of accumulated other comprehensive loss into earnings. Losses of $0.7 million and gains of $2.2 million during the years ended December 31, 2017 and 2015, respectively, are included in "Other (expense) income, net" in the accompanying consolidated and combined statement of operations.

**Stock-Based Compensation**

Stock-based compensation is measured at the grant date based on the fair value of the award and is generally expensed over the requisite service period. See "Note 12—Stock-based Compensation" for a discussion of the Company's stock-based compensation plans.

**Redeemable Noncontrolling Interests**

Noncontrolling interests in the consolidated subsidiaries of the Company are ordinarily reported on the consolidated balance sheet within shareholders' equity, separately from the Company's equity. However, securities that are redeemable at the option of the holder and not solely within the control of the issuer must be

67

App. 78

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

classified outside of shareholders' equity. Accordingly, all noncontrolling interests that are redeemable at the option of the holder are presented outside of shareholders' equity in the accompanying consolidated balance sheet.

In connection with the acquisition of certain subsidiaries, current and former senior management of these businesses has retained an ownership interest. The Company is party to fair value put and call arrangements with respect to these interests. These put and call arrangements allow management of these businesses to require the Company to purchase these interests or allow the Company to acquire such interests at fair value, respectively. The put arrangements do not meet the definition of a derivative instrument as the put agreements do not provide for net settlement. No put and call arrangements were exercised during 2017, 2016 or 2015. These put arrangements are exercisable by the counter-party outside the control of the Company. Accordingly, to the extent that the fair value of these interests exceeds the value determined by normal noncontrolling interest accounting, the value of such interests is adjusted to fair value with a corresponding adjustment to additional paid-in capital/invested capital. During the years ended December 31, 2017, 2016 and 2015, the Company recorded adjustments of $(0.1) million, $0.4 million and less than $(0.1) million, respectively, to (decrease) increase these interests to fair value. Fair value determinations require high levels of judgment and are based on various valuation techniques, including market comparables and discounted cash flow projections.

**Certain Risks and Concentrations**

The Company's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject the Company to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are principally maintained with financial institutions that are not covered by deposit insurance.

**Recent Accounting Pronouncements**

*Accounting Pronouncements not yet adopted by the Company*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, *Revenue from Contracts with Customers,* which clarifies the principles for recognizing revenue and develops a common standard for all industries. ASU No. 2014-09 was subsequently amended during 2015, 2016 and 2017; these amendments provide further revenue recognition guidance related to principal versus agent considerations, performance obligations and licensing, narrow-scope improvements and practical expedients.

ASU No. 2014-09 is a comprehensive revenue recognition standard that will supersede nearly all existing revenue recognition guidance under GAAP. The new standard provides a single principles-based, five-step model to be applied to all contracts with customers. This five-step model includes (1) identifying the contract(s) with the customer, (2) identifying the performance obligations in the contract, (3) determining the transaction price, (4) allocating the transaction price to the performance obligations in the contract and (5) recognizing revenue when each performance obligation is satisfied. More specifically, revenue will be recognized when promised goods or services are transferred to the customer in an amount that reflects the consideration expected in exchange for those goods or services. ASU No. 2014-09 is effective for interim and annual reporting periods beginning after December 15, 2017, with early adoption permitted for interim and annual reporting periods beginning after December 15, 2016. Upon adoption, ASU No. 2014-09 may either be applied retrospectively to each prior period presented or using the modified retrospective approach with the cumulative effect recognized as of the date of initial application.

The Company's evaluation of the impact of the adoption of ASU No. 2014-09 on its consolidated financial statements is substantially complete. The Company has adopted ASU No. 2014-09 using the modified retrospective approach effective January 1, 2018. The Company does not expect to record an adjustment to beginning retained earnings in the Form 10-Q for the period ending March 31, 2018. The Company does not expect the adoption of ASU No. 2014-09 to have a material effect on its consolidated financial statements.

In January 2016, the FASB issued ASU No. 2016-01, *Financial Instruments,* which updates certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. Under ASU No. 2016-01,

68

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

certain equity investments will be measured at fair value with changes recognized in net income. ASU No. 2016-01 is effective for reporting periods beginning after December 15, 2017. The Company will adopt ASU No. 2016-01 effective January 1, 2018 and its adoption will not have a material effect on the consolidated financial statements upon adoption. The adoption of ASU No. 2016-01 may increase the volatility of our results of operations as a result of the remeasurement of our cost method investments.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases in *"Leases (Topic 840)"* and generally requires all leases to be recognized in the statement of financial position. The provisions of ASU No. 2016-02 are effective for reporting periods beginning after December 15, 2018; early adoption is permitted. The provisions of ASU No. 2016-02 are to be applied using a modified retrospective approach. The Company will adopt ASU No. 2016-02 effective January 1, 2019.

The Company is not a lessor and has no capitalized leases and does not expect to enter into any capitalized leases prior to the adoption of ASU No. 2016-02. Accordingly, the Company does not expect the amount or classification of rent expense in its statement of operations to be affected by ASU No. 2016-02. The primary effect of the adoption of ASU No. 2016-02 will be the recognition of a right of use asset and related liability to reflect the Company's rights and obligations under its operating leases. The Company will also be required to provide the additional disclosures stipulated in ASU No. 2016-02.

The adoption of ASU No. 2016-02 will not have an impact on the leverage calculation related to any of our outstanding debt or our credit agreement, as, in each circumstance, the leverage calculations are not affected by the liability that will be recorded upon adoption of the new standard.

While the Company's evaluation of the impact of the adoption of ASU No. 2016-02 on its consolidated financial statements continues, outlined below is a summary of the status of the Company's progress:

- the Company has selected a software package to assist in the determination of the right of use asset and related liability as of January 1, 2019 and to provide the required information following the adoption;

- the Company has prepared summaries of its leases for input into the software package;

- the Company is assessing the other inputs required in connection with the adoption of ASU No. 2016-02; and

- the Company is developing its accounting policy, procedures and controls related to the new standard.

The Company does not expect to have a preliminary estimate of the right of use asset and related liability as of the adoption date until the third quarter of 2018.

*Accounting Pronouncements adopted by the Company*

In May 2017, the FASB issued ASU No. 2017-09, *Compensation—Stock Compensation (Topic 718): Scope of Modification Accounting*, which provides guidance about the changes to the terms and conditions of a share-based payment award that require an entity to apply modification accounting in *"Stock Compensation (Topic 718)."* The provisions of ASU No. 2017-09 are effective for reporting periods beginning after December 15, 2017; early adoption is permitted. The provisions of ASU No. 2017-09 are to be applied prospectively to an award modified on or after the adoption date. The Company early adopted the provisions of ASU No. 2017-09 during the third quarter of 2017 and the adoption of this standard update did not have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*, which clarifies how cash receipts and cash payments in certain transactions are presented and classified on the statement of cash flows. The provisions of ASU No. 2016-15 are effective for reporting periods beginning after December 15, 2017, including interim periods. Early adoption is permitted. Upon adoption, cash payments made soon after the acquisition date of a business combination by an acquirer to settle a contingent consideration liability are classified as cash outflows for investing activities. Cash payments up to the amount of the contingent consideration liability initially recognized at the acquisition date (including measurement-period adjustments) are classified as financing activities; any excess is classified as operating activities. Cash payments which are not made soon after the acquisition date of a business to settle a

69

App. 80

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

contingent consideration liability are separated and classified as cash outflows for financing activities up to the amount of the contingent consideration liability recognized at the acquisition date and as cash outflows from operating activities for any excess. The Company early adopted the provisions of ASU No. 2016-15 on January 1, 2017 and the adoption of this standard update did not have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. The Company adopted the provisions of ASU No. 2016-09 on January 1, 2017. Excess tax benefits or deficiencies related to equity awards to employees upon the exercise of stock options and the vesting of restricted stock units after January 1, 2017 are (i) reflected in the consolidated statement of operations as a component of the provision for income taxes, rather than recognized in equity, and (ii) reflected as operating, rather than financing, cash flows in our consolidated statement of cash flows. Excess tax benefits for the years ended December 31, 2017, 2016 and 2015, of $279.7 million, $29.7 million and $38.4 million, respectively, and amounts for 2016 and 2015 were reclassified in the consolidated statement of cash flows to conform to the current year presentation. Upon adoption, the calculation of fully diluted shares excludes excess tax benefits from the assumed proceeds in applying the treasury stock method; previously such benefits were included in the calculation. This change increased fully diluted shares by approximately 10.3 million shares for the year ended December 31, 2017. The Company continues to account for forfeitures using an estimated forfeiture rate.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*, which is intended to simplify the accounting for goodwill impairment. The guidance eliminates the requirement to calculate the implied fair value of goodwill under the two-step impairment test to measure a goodwill impairment charge. The Company early adopted the provisions of ASU No. 2017-04 on January 1, 2017 and the adoption of this standard update did not have a material impact on its consolidated financial statements.

**Reclassifications**

Certain prior year amounts have been reclassified to conform to the current year presentation.

**NOTE 3—INCOME TAXES**

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis. Match Group's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated and combined statement of cash flows.

U.S. and foreign earnings before income taxes are as follows:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2017** | **2016** | **2015** |
|  | (In thousands) | | |
| U.S. | $ 143,286 | $ 109,457 | $ 168,661 |
| Foreign | 108,839 | 131,759 | 30,044 |
| Total | $ 252,125 | $ 241,216 | $ 198,705 |

70

App. 81

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The components of the provision for income taxes are as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| **Current income tax provision:** |  |  |  |
| Federal | $ (11,533) | $ 44,782 | $ 73,604 |
| State | (512) | 4,427 | 7,193 |
| Foreign | 26,444 | 23,964 | 5,672 |
| Current income tax provision | 14,399 | 73,173 | 86,469 |
| **Deferred income tax benefit:** |  |  |  |
| Federal | (102,337) | (2,119) | (14,173) |
| State | (15,731) | (280) | (1,090) |
| Foreign | (183) | (7,899) | (5,664) |
| Deferred income tax benefit | (118,251) | (10,298) | (20,927) |
| Income tax (benefit) provision | $ (103,852) | $ 62,875 | $ 65,542 |

The deferred tax asset for net operating losses ("NOLs") was increased by $279.7 million for the year ended December 31, 2017 for excess tax deductions attributable to stock-based compensation. The related income tax benefit was recorded as a component of the deferred income tax benefit. The current income tax payable was reduced by $29.7 million and $38.4 million for the years ended December 31, 2016 and 2015, respectively, for excess tax deductions attributable to stock-based compensation. For the years ended December 31, 2016 and 2015, the related income tax benefits were recorded as increases to additional paid-in capital.

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below. The valuation allowance is primarily related to deferred tax assets for net operating losses.

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In thousands) | |
| **Deferred tax assets:** |  |  |
| Accrued expenses | $ 4,327 | $ 7,428 |
| Net operating loss carryforwards | 143,156 | 24,907 |
| Stock-based compensation | 13,236 | 27,476 |
| Other | 16,217 | 8,242 |
| Total deferred tax assets | 176,936 | 68,053 |
| Less valuation allowance | (24,795) | (23,411) |
| Net deferred tax assets | 152,141 | 44,642 |
| **Deferred tax liabilities:** |  |  |
| Intangible and other assets | (52,838) | (61,980) |
| Fixed assets | (3,164) | (2,276) |
| Other | (1,418) | (439) |
| Total deferred tax liabilities | (57,420) | (64,695) |
| Net deferred tax assets (liabilities) | $ 94,721 | $ (20,053) |

71

App. 82

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 87 of 451    PageID 610

App. 83

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

At December 31, 2017, the Company has federal and state net operating losses ("NOLs") of $524.2 million and $217.4 million, respectively. If not utilized, the federal NOLs will expire in 2037, and the state NOLs will expire at various times primarily between 2027 and 2037. At December 31, 2017, the Company has foreign NOLs of $76.9 million available to offset future income. Of these foreign NOLs, $73.8 million can be carried forward indefinitely and $3.1 million will expire at various times between 2018 and 2027. During 2017, the Company recognized tax benefits related to NOLs of $134.7 million. At December 31, 2017, the Company has federal capital losses of $10.4 million. If not utilized, the capital losses will expire between 2021 and 2022. Utilization of capital losses will be limited to the Company's ability to generate future capital gains.

At December 31, 2017, the Company has tax credit carryforwards of $8.1 million. Of this amount, $4.5 million relates to federal and state tax credits for research activities, $3.0 million relates to foreign tax credits and $0.6 million to various other credits. Of these credit carryforwards, $1.2 million can be carried forward indefinitely and $6.9 million will expire within twenty years.

The Company regularly assesses the realizability of deferred tax assets considering all available evidence, including, to the extent applicable, the nature, frequency and severity of prior cumulative losses, forecasts of future taxable income, tax filing status, the duration of statutory carryforward periods, available tax planning and historical experience. As of December 31, 2017, the Company has a gross deferred tax asset of $131.5 million that the Company expects to fully utilize on a more likely than not basis.

During 2017, the Company's valuation allowance increased by $1.4 million primarily due to an other-than-temporary impairment charges on a cost method investment and an increase in foreign tax loss carryforwards. At December 31, 2017, the Company has a valuation allowance of $24.8 million related to the portion of NOLs and other items for which it is more likely than not that the tax benefit will not be realized.

A reconciliation of the income tax provision to the amounts computed by applying the statutory federal income tax rate to earnings before income taxes is shown as follows:

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 |
| | | (In thousands) | | | | |
| Income tax provision at the federal statutory rate of 35% | $ | 88,244 | $ | 84,425 | $ | 69,547 |
| Change in tax reserves, net | | (443) | | (1,049) | | (595) |
| State income taxes, net of effect of federal tax benefit | | 2,471 | | 2,804 | | 3,946 |
| Foreign income taxed at a different statutory rate | | (15,014) | | (13,761) | | (2,698) |
| Foreign rate change | | (1,523) | | (4,454) | | — |
| Transition tax | | 23,748 | | — | | — |
| Deferred tax adjustment for enacted changes in tax laws and rates | | 68,594 | | — | | — |
| Equity compensation | | (278,343) | | 3,247 | | 1,767 |
| Non-taxable contingent consideration fair value adjustments | | 1,839 | | (3,193) | | (3,898) |
| Non-taxable foreign currency exchange gains and losses | | 6,231 | | (6,837) | | (3,776) |
| Other, net | | 344 | | 1,693 | | 1,249 |
| Income tax (benefit) provision | $ | (103,852) | $ | 62,875 | $ | 65,542 |

72

App. 84

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

A reconciliation of the beginning and ending amount of unrecognized tax benefits, including penalties but excluding interest, is as follows:

| | | December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 |
| | | (In thousands) | | | | |
| Balance at January 1 | $ | 25,913 | $ | 24,908 | $ | 10,935 |
| Additions based on tax positions related to the current year | | 697 | | 1,706 | | 2,903 |
| Additions for tax positions of prior years | | 1,104 | | 1,414 | | 12,846 |
| Reductions for tax positions of prior years | | (1,233) | | (783) | | (902) |
| Settlements | | — | | (258) | | — |
| Expiration of applicable statute of limitations | | (1,418) | | (1,074) | | (874) |
| Balance at December 31 | $ | 25,063 | $ | 25,913 | $ | 24,908 |

The Company recognizes interest and, if applicable, penalties related to unrecognized tax benefits in the income tax provision. At both December 31, 2017 and 2016, the Company had accrued $1.8 million and $1.5 million, respectively, for the payment of interest. At December 31, 2017 and 2016, the Company had accrued $1.5 million and $1.6 million, respectively, for penalties.

Match Group is routinely under audit by federal, state, local and foreign authorities in the area of income tax as a result of previously filed separate company tax returns and consolidated tax returns with IAC. These audits include questioning the timing and the amount of income and deductions and the allocation of income and deductions among various tax jurisdictions. The Internal Revenue Service is currently auditing IAC's federal income tax returns for the years ended December 31, 2010 through 2012, which includes the operations of Match Group. The statute of limitations for the years 2010 through 2012 has been extended to June 30, 2019, and the statute of limitations for the year 2013 has been extended to June 30, 2018. Various other jurisdictions are open to examination for tax years beginning with 2009. Income taxes payable include reserves considered sufficient to pay assessments that may result from examination of prior year tax returns. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustments and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

At December 31, 2017 and 2016, unrecognized tax benefits, including interest, were $26.8 million and $27.4 million, respectively. At December 31, 2017 and 2016, approximately $17.6 million and $17.7 million, respectively, were included in unrecognized tax benefits for tax positions included in IAC's consolidated tax return filings. If unrecognized tax benefits at December 31, 2017 are subsequently recognized, $25.3 million, net of related deferred tax assets and interest, would reduce income tax expense. The comparable amount as of December 31, 2016 was $25.9 million. The Company believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $9.8 million by December 31, 2018, primarily due to settlements and expirations of statutes of limitations.

On December 22, 2017, the U.S. enacted the Tax Act, which subjects to U.S. taxation certain previously deferred earnings of foreign subsidiaries as of December 31, 2017 ("Transition Tax") and implements a number of changes that take effect on January 1, 2018, including but not limited to, a reduction of the U.S. federal corporate tax rate from 35% to 21% and a new minimum tax on GILTI earned by foreign subsidiaries. The Company's income tax provision for the year ended December 31, 2017 includes expense of $92.3 million related to the Tax Act, of which, $23.7 million relates to the Transition Tax and a $68.6 million relates to the remeasurement of U.S. net deferred tax assets due to the reduction in the corporate income tax rate. The Company has sufficient current year net operating losses to offset the taxable income resulting from the Transition Tax and, therefore, will not be required to pay the one-time Transition Tax.

73

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The Transition Tax on deemed repatriated foreign earnings is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of the Company's foreign subsidiaries. To determine the amount of the Transition Tax, the Company must determine, among other factors, the amount of post-1986 E&P of its foreign subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. The Company was able to make a reasonable estimate of the Transition Tax and has recorded a provisional transition tax expense of $23.7 million. Any adjustment of the Company's provisional tax expense will be reflected as a change in estimate in its results in the period in which the change in estimate is made in accordance with Staff Accounting Bulletin No. 118, *Income Tax Accounting Implications of the Tax Cuts and Jobs Act*. The Company is continuing to gather additional information to more precisely compute the amount of the Transition Tax and expects to finalize its calculation prior to the filing of IAC's U.S. federal tax return, which includes the operations of Match Group, which is due October 15, 2018. In addition, our estimates may also be impacted and adjusted as the law is clarified and additional guidance is issued at the federal and state levels.

As of December 31, 2017, the Company has $69.2 million in foreign cash that can be repatriated without any significant tax consequences as it has been substantially subjected to U.S. income tax under the Transition Tax imposed by the Tax Act. The Company has not provided for approximately $0.9 million of deferred taxes as the foreign cash earnings are indefinitely reinvested outside the U.S. The Company reassess its intention to remit or permanently reinvest these cash earnings each reporting period; any required adjustment to the income tax provision would be reflected in the period that the Company changes this judgment.

**NOTE 4—DISCONTINUED OPERATIONS**

On March 31, 2017, Match Group sold its Non-dating business, which operated under the umbrella of The Princeton Review, to ST Unitas, a global education technology company. We recognized a loss on the sale of the business of $2.1 million, which is reported within discontinued operations.

The components of assets and liabilities of a business held for sale in the accompanying consolidated balance sheet at December 31, 2016 consisted of the following:

|  | December 31, 2016 |
| --- | --- |
|  | (In thousands) |
| Accounts receivable, net | $ 8,677 |
| Other current assets | 3,847 |
| Property and equipment, net | 6,774 |
| Goodwill | 74,396 |
| Intangible assets, net | 31,488 |
| Other non-current assets | 8,090 |
| Total assets of a business held for sale | $ 133,272 |
|  |  |
| Accounts payable | $ 3,467 |
| Deferred revenue | 22,886 |
| Accrued expenses and other current liabilities | 8,771 |
| Other long-term liabilities | 1,934 |
| Total liabilities of a business held for sale | $ 37,058 |

74

App. 86

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The key components of loss from discontinued operations for the years ended December 31, 2017, 2016 and 2015 consist of the following:

| | For the years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| | (In thousands) | | |
| Revenue | $ 23,980 | $ 104,416 | $ 110,726 |
| Operating costs and expenses | (29,601) | (114,057) | (130,151) |
| Operating loss | (5,621) | (9,641) | (19,425) |
| Other (expense) income | (2,136) | 11 | 105 |
| Income tax benefit | 2,107 | 3,302 | 6,644 |
| Loss from discontinued operations | $ (5,650) | $ (6,328) | $ (12,676) |

**NOTE 5—GOODWILL AND INTANGIBLE ASSETS**

Goodwill and intangible assets, net, are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| | (In thousands) | |
| Goodwill | $ 1,247,644 | $ 1,206,447 |
| Intangible assets with indefinite lives | 228,296 | 214,461 |
| Intangible assets with definite lives, net | 2,049 | 3,221 |
| Total goodwill and intangible assets, net | $ 1,477,989 | $ 1,424,129 |

The following table presents the balance of goodwill, including the changes in the carrying value of goodwill, for the years ended December 31, 2017 and 2016:

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| | (In thousands) | |
| Balance at January 1 | $ 1,206,447 | $ 1,218,380 |
| Additions | 120 | 737 |
| Deductions | (29) | (2,984) |
| Foreign Exchange Translation | 41,106 | (9,686) |
| Balance at December 31 | $ 1,247,644 | $ 1,206,447 |

75

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

Intangible assets with indefinite lives are trade names and trademarks acquired in various acquisitions. At December 31, 2017 and 2016, intangible assets with definite lives are as follows:

| | December 31, 2017 | | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
| --- | --- | --- | --- | --- |
| | (In thousands) | | | |
| Trade names | $ 5,830 | $ (5,765) | $ 65 | 3.0 |
| Technology | 4,592 | (4,588) | 4 | 2.0 |
| Other | 3,280 | (1,300) | 1,980 | 4.4 |
| Total | $ 13,702 | $ (11,653) | $ 2,049 | 4.4 |

| | December 31, 2016 | | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
| --- | --- | --- | --- | --- |
| | (In thousands) | | | |
| Trade names | $ 5,296 | $ (5,119) | $ 177 | 3.0 |
| Technology | 4,275 | (3,531) | 744 | 2.0 |
| Other | 3,000 | (700) | 2,300 | 5.0 |
| Total | $ 12,571 | $ (9,350) | $ 3,221 | 4.2 |

At December 31, 2017, amortization of intangible assets with definite lives is estimated to be as follows:

| | (In thousands) |
| --- | --- |
| 2018 | $ 949 |
| 2019 | 600 |
| 2020 | 500 |
| Total | $ 2,049 |

**NOTE 6—MARKETABLE SECURITIES AND LONG-TERM INVESTMENTS**

During the second quarter of 2016, the Company sold its marketable security in its entirety. Proceeds and gross realized gains from the sale of the available-for-sale marketable security were $11.7 million and $3.1 million, respectively, for the year ended December 31, 2016.

Long-term investments consist of:

| | December 31, | |
| | 2017 | 2016 |
| --- | --- | --- |
| | (In thousands) | |
| Cost method investments | $ 11,137 | $ 55,355 |
| Total long-term investments | $ 11,137 | $ 55,355 |

During the years ended December 31, 2017 and 2016, we recognized other-than-temporary impairment charges of $2.3 million and $0.7 million, respectively, related to certain cost method investments as a result of our assessment of the near-term prospects and financial condition of the investees.

76

App. 88

App. 89

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

On October 23, 2017, a cost method investment with a carrying value of $51.1 million was sold for net proceeds of $60.2 million resulting in a pre-tax gain of $9.1 million, which is included in "Other (expense) income, net" in the accompanying consolidated and combined statement of operations.

**NOTE 7—FAIR VALUE MEASUREMENTS AND FINANCIAL INSTRUMENTS**

The following tables present the Company's financial instruments that are measured at fair value on a recurring basis:

| | December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 71,197 | $ — | $ — | $ 71,197 |
| Time deposits | — | 35,023 | — | 35,023 |
| Total | $ 71,197 | $ 35,023 | $ — | $ 106,220 |
| | | | | |
| **Liabilities:** | | | | |
| Contingent consideration arrangements | $ — | $ — | $ (2,647) | $ (2,647) |

| | December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 85,225 | $ — | $ — | $ 85,225 |
| | | | | |
| **Liabilities:** | | | | |
| Contingent consideration arrangements | $ — | $ — | $ (19,418) | $ (19,418) |

77

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The following table presents the changes in the Company's financial instruments that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | Contingent Consideration Arrangements | |
|  | (In thousands) | |
| Balance at January 1 | $ (19,418) | $ (28,993) |
| Total net (losses) gains: |  |  |
| Fair value adjustments | (5,253) | 9,197 |
| Included in other comprehensive (loss) income | (1,405) | (1,571) |
| Fair value at date of acquisition | — | (185) |
| Settlements | 23,429 | — |
| Other | — | 2,134 |
| Balance at December 31 | $ (2,647) | $ (19,418) |

**Contingent consideration arrangements**

As of December 31, 2017, there are two contingent consideration arrangements related to business acquisitions. One of the contingent consideration arrangements has limits as to the maximum amount that can be paid. The maximum contingent payment related to this arrangement and the gross fair value of this arrangement, before the unamortized discount, at December 31, 2017, is $3.0 million. No payment is expected for the other contingent consideration arrangement, which does not have a limit on the maximum earnout.

The current contingent consideration arrangements are based upon earnings performance. Previous contingent consideration arrangements were based upon earnings performance and/or operating metrics. The Company determined the fair value of the contingent consideration arrangement for which a payment is expected by using probability-weighted analyses to determine the amounts of the gross liability, and, for arrangements that are long-term in nature, applying a discount rate, that appropriately captures the risks associated with the obligation to determine the net amount reflected in the consolidated and combined financial statements. The fair values of the contingent consideration arrangements at both December 31, 2017 and 2016 reflect discount rates of 12%.

The fair value of the contingent consideration arrangements are sensitive to changes in the forecasts of earnings and changes in discount rates. The Company remeasures the fair value of the contingent consideration arrangements each reporting period, including the accretion of the discount, if applicable, and changes are recognized in "General and administrative expense" in the accompanying consolidated and combined statement of operations. The contingent consideration arrangement liability at December 31, 2017 and 2016 includes a current portion of $0.6 million and $19.0 million, respectively, and non-current portion of $2.0 million and $0.4 million, respectively, which are included in "Accrued expenses and other current liabilities" and "Other long-term liabilities," respectively, in the accompanying consolidated balance sheet.

**Financial instruments measured at fair value only for disclosure purposes**

The following table presents the carrying value and the fair value of financial instruments measured at fair value only for disclosure purposes.

|  | December 31, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
|  | Carrying Value | Fair Value | Carrying Value | Fair Value |
|  | (In thousands) | | | |
| Long-term debt, net | $ (1,252,696) | $ (1,320,289) | $ (1,176,493) | $ (1,244,641) |

78

App. 91

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The fair value of long-term debt, net is estimated using market prices or indices for similar liabilities and taking into consideration other factors such as credit quality and maturity, which are Level 3 inputs.

**NOTE 8—LONG-TERM DEBT, NET**

Long-term debt, net consists of:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2017 | | 2016 | |
|  | (In thousands) | | | |
| Term Loan due November 16, 2022 | $ | 425,000 | $ | 350,000 |
| 6.75% Senior Notes due December 15, 2022 (the "2015 Senior Notes"); interest payable each June 15 and December 15 | | — | | 445,172 |
| 6.375% Senior Notes due June 1, 2024 (the "2016 Senior Notes"); interest payable each June 1 and December 1 | | 400,000 | | 400,000 |
| 5.00% Senior Notes due December 15, 2027 (the "2017 Senior Notes"); interest payable each June 15 and December 15, which commences June 15, 2018 | | 450,000 | | — |
| Total long-term debt | | 1,275,000 | | 1,195,172 |
| Less: Unamortized original issue discount and original issue premium, net | | 8,668 | | 5,245 |
| Less: Unamortized debt issuance costs | | 13,636 | | 13,434 |
| Total long-term debt, net | $ | 1,252,696 | $ | 1,176,493 |

*Senior Notes*:

We issued the 2017 Senior Notes on December 4, 2017. These notes were issued at 99.027% of par. The proceeds of $445.6 million, along with cash on hand, were used to redeem the 2015 Senior Notes and pay the related call premium. At any time prior to December 15, 2022, these notes may be redeemed at a redemption price equal to the sum of the principal amount, plus accrued and unpaid interest and a make-whole premium. Thereafter, these notes may be redeemed at the redemption prices set forth below plus accrued and unpaid interest:

| Beginning December 15, | Percentage |
|---|---|
| 2022 | 102.500% |
| 2023 | 101.667% |
| 2024 | 100.833% |
| 2025 and thereafter | 100.000% |

The 2016 Senior Notes were issued on June 1, 2016. The proceeds of $400 million were used to prepay a portion of indebtedness outstanding under the Term Loan. At any time prior to June 1, 2019, these notes may be redeemed at a redemption price equal to the sum of the principal amount, plus accrued and unpaid interest and a make-whole premium. Thereafter, these notes may be redeemed at the redemption prices set forth below plus accrued and unpaid interest:

| Beginning June 1, | Percentage |
|---|---|
| 2019 | 104.781% |
| 2020 | 103.188% |
| 2021 | 101.594% |
| 2022 and thereafter | 100.000% |

79

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The 2015 Senior Notes were redeemed on December 17, 2017 with proceeds from the 2017 Senior Notes and cash on hand. The related call premium of $10.6 million is included in "Other (expense) income, net" in the consolidated and combined financial statements.

The indentures governing the 2017 and 2016 Senior Notes contain covenants that would limit the Company's ability to pay dividends or to make distributions and repurchase or redeem Match Group stock in the event a default has occurred or Match Group's leverage ratio (as defined in the indentures) exceeds 5.0 to 1.0. At December 31, 2017, there were no limitations pursuant thereto. There are additional covenants that limit the ability of the Company and its subsidiaries to, among other things, (i) incur indebtedness, make investments, or sell assets in the event the Company is not in compliance with certain ratios set forth in the indenture, and (ii) incur liens, enter into agreements restricting the ability of the Company's subsidiaries to pay dividends, enter into transactions with affiliates and consolidate, merge or sell substantially all of their assets.

*Term Loan and Credit Facility*:

On November 16, 2015, under a credit agreement (the "Credit Agreement"), the Company borrowed $800 million in the form of a term loan (the "Term Loan"). During 2016, Match Group made $450 million of principal payments, $400 million of which was funded from proceeds from the 2016 Senior Notes. On August 14, 2017, the Company increased the Term Loan by $75 million to $425 million, repriced the outstanding balance at LIBOR plus 2.50%, and reduced the LIBOR floor to 0.00%. The interest rate at December 31, 2017 is 3.85%. Interest payments are due at least quarterly through the term of the loan. The Term Loan provides for additional annual principal payments as part of an excess cash flow sweep provision, the amount of which, if any, is governed by the secured net leverage ratio contained in the Credit Agreement.

Additionally, the Company has a $500 million revolving credit facility (the "Credit Facility") that expires on October 7, 2020. At December 31, 2017 and 2016, there were no outstanding borrowings under the Credit Facility. The annual commitment fee on undrawn funds based on the current leverage ratio is 30 basis points. Borrowings under the Credit Facility bear interest, at the Company's option, at a base rate or LIBOR, in each case plus an applicable margin, which is determined by reference to a pricing grid based on the Company's consolidated net leverage ratio. The terms of the Credit Facility require the Company to maintain a consolidated net leverage ratio of not more than 5.0 to 1.0 and a minimum interest coverage ratio of not less than 2.5 to 1.0 (in each case as defined in the agreement).

There are additional covenants under the Credit Facility and the Term Loan that limit the ability of the Company and its subsidiaries to, among other things, incur indebtedness, pay dividends or make distributions. While the Term Loan remains outstanding, these same covenants under the Credit Agreement are more restrictive than the covenants that are applicable to the Credit Facility. Obligations under the Credit Facility and Term Loan are unconditionally guaranteed by certain Match Group wholly-owned domestic subsidiaries, and are also secured by the stock of certain Match Group domestic and foreign subsidiaries. The Term Loan and outstanding borrowings, if any, under the Credit Facility rank equally with each other, and have priority over the 2017 and 2016 Senior Notes to the extent of the value of the assets securing the borrowings under the Credit Agreement.

*Long-term debt maturities:*

| Years Ending December 31, | | (In thousands) |
|---|---|---|
| 2022 | $ | 425,000 |
| 2024 | | 400,000 |
| 2027 | | 450,000 |
| Total | | 1,275,000 |
| Less: Unamortized original issue discount | | 8,668 |
| Less: Unamortized debt issuance costs | | 13,636 |
| Total long-term debt, net | $ | 1,252,696 |

80

App. 93

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**NOTE 9—SHAREHOLDERS' EQUITY**

**Description of Common Stock, Class B Convertible Common Stock and Class C Common Stock**

The rights of holders of Match Group common stock, Class B common stock and Class C common stock are identical, except for voting rights, conversion rights and dividend rights. Holders of common stock are entitled to one vote per share on all matters to be voted upon by the stockholders. Holders of Class B common stock are entitled to ten votes per share on all matters to be voted upon by stockholders. Holders of Class C common stock have no voting rights, except as otherwise required by the laws of the State of Delaware, in which case holders of Class C common stock are entitled to one one-hundredth (1/100) of a vote per share. Holders of the Company's common stock, Class B common stock and Class C common stock do not have cumulative voting rights in the election of directors.

Shares of Match Group's Class B common stock are convertible into shares of our common stock at the option of the holder at any time on a share for share basis. Such conversion ratio will in all events be equitably preserved in the event of any recapitalization of Match Group by means of a stock dividend on, or a stock split or combination of, our outstanding common stock or Class B common stock, or in the event of any merger, consolidation or other reorganization of Match Group with another corporation. Upon the conversion of a share of our Class B common stock into a share of our common stock, the applicable share of Class B common stock will be retired and will not be subject to reissue. Shares of common stock and Class C common stock have no conversion rights.

The holders of shares of Match Group common stock, Class B common stock and Class C common stock are entitled to receive, share for share, such dividends as may be declared by Match Group's Board of Directors out of funds legally available therefore. In the event of a liquidation, dissolution or winding up, holders of the Company's common stock, Class B common stock and Class C common stock are entitled to receive ratably the assets available for distribution to the stockholders after payment of all liabilities and accrued but unpaid dividends and liquidation preferences on any outstanding preferred stock.

At December 31, 2017, IAC holds 209.9 million shares of our Class B common stock, representing 100% of our outstanding Class B common stock, and 12.8 million shares of our common stock, representing 20.0% of our outstanding common stock. IAC's ownership interest is 81.2% and IAC holds 97.6% of the outstanding total voting power of the Company.

In the event that Match Group issues or proposes to issue any shares of Match Group common stock, Class B common stock or Class C common stock (with certain limited exceptions), including shares issued upon the exercise, conversion or exchange of options, warrants and convertible securities, IAC will generally have a purchase right that permits it to purchase for fair market value, as defined in an investor rights agreement, up to such number of shares of the same class as the issued shares as would (i) enable IAC to maintain the same ownership interest in the Company that it had immediately prior to such issuance or proposed issuance, with respect to issuances of our voting capital stock, or (ii) enable IAC to maintain ownership of at least 80.1% of each class of the Company's non-voting capital stock, with respect to issuances of our non-voting capital stock.

**Reserved Common Shares**

In connection with equity compensation plans, 73.5 million shares of Match Group common stock are reserved at December 31, 2017.

81

App. 94

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**NOTE 10—ACCUMULATED OTHER COMPREHENSIVE LOSS**

The following tables present the components of accumulated other comprehensive loss and items reclassified out of accumulated other comprehensive loss into earnings:

| | Year Ended December 31, 2017 | |
| --- | --- | --- |
| | Foreign Currency Translation Adjustment | Accumulated Other Comprehensive (Loss) Income |
| | (In thousands) | |
| Balance at January 1 | $ (176,384) | $ (176,384) |
| Other comprehensive income before reclassifications | 63,352 | 63,352 |
| Amounts reclassified into earnings | 714 | 714 |
| Net current period other comprehensive income | 64,066 | 64,066 |
| Balance at December 31 | $ (112,318) | $ (112,318) |

| | Year Ended December 31, 2016 | | |
| --- | --- | --- | --- |
| | Foreign Currency Translation Adjustment | Unrealized Gain (Loss) on Available-For-Sale Security | Accumulated Other Comprehensive Loss |
| | (In thousands) | | |
| Balance at January 1 | $ (139,784) | $ 2,964 | $ (136,820) |
| Other comprehensive (loss) income | (36,600) | 94 | (36,506) |
| Gain on sale of available-for-sale security reclassified into earnings | — | (3,058) | (3,058) |
| Net period other comprehensive loss | (36,600) | (2,964) | (39,564) |
| Balance at December 31 | $ (176,384) | $ — | $ (176,384) |

| | Year Ended December 31, 2015 | | |
| --- | --- | --- | --- |
| | Foreign Currency Translation Adjustment | Unrealized (Loss) Gain on Available-For-Sale Security | Accumulated Other Comprehensive Loss |
| | (In thousands) | | |
| Balance at January 1 | $ (76,800) | $ (1,248) | $ (78,048) |
| Other comprehensive (loss) income before reclassifications | (60,793) | 4,212 | (56,581) |
| Foreign currency translation adjustment reclassified into earnings related to the substantial liquidation of a foreign business | (2,191) | — | (2,191) |
| Net period other comprehensive (loss) income | (62,984) | 4,212 | (58,772) |
| Balance at December 31 | $ (139,784) | $ 2,964 | $ (136,820) |

At December 31, 2017, 2016 and 2015, there was no tax benefit or provision on the accumulated other comprehensive loss.

82

App. 95

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

### NOTE 11—EARNINGS PER SHARE

The following table sets forth the computation of the basic and diluted earnings per share attributable to Match Group shareholders:

| | Years Ended December 31, | | | | | |
| | 2017 | | 2016 | | 2015 | |
| | Basic | Diluted | Basic | Diluted | Basic | Diluted |
| | (In thousands, except per share data) | | | | | |
| **Numerator** | | | | | | |
| Net earnings from continuing operations | $ 355,977 | $ 355,977 | $ 178,341 | $ 178,341 | $ 133,163 | $ 133,163 |
| Net earnings attributable to redeemable noncontrolling interests | (179) | (179) | (562) | (562) | (104) | (104) |
| Net earnings from continuing operations attributable to Match Group, Inc. shareholders | $ 355,798 | $ 355,798 | $ 177,779 | $ 177,779 | $ 133,059 | $ 133,059 |
| Loss from discontinued operations, net of tax | $ (5,650) | $ (5,650) | $ (6,328) | $ (6,328) | $ (12,676) | $ (12,676) |
| Net earnings attributable to Match Group, Inc. shareholders | $ 350,148 | $ 350,148 | $ 171,451 | $ 171,451 | $ 120,383 | $ 120,383 |
| **Denominator** | | | | | | |
| Basic weighted average common shares outstanding | 264,014 | 264,014 | 251,522 | 251,522 | 174,784 | 174,784 |
| Dilutive securities including stock options, RSUs, and subsidiary denominated equity awards [(a)(b)] | — | 32,062 | — | 18,203 | — | 10,150 |
| Dilutive weighted average common shares outstanding | 264,014 | 296,076 | 251,522 | 269,725 | 174,784 | 184,934 |
| **Earnings (loss) per share:** | | | | | | |
| Earnings per share from continuing operations | $ 1.35 | $ 1.20 | $ 0.71 | $ 0.66 | $ 0.76 | $ 0.72 |
| Loss per share from discontinued operations, net of tax | $ (0.02) | $ (0.02) | $ (0.03) | $ (0.02) | $ (0.07) | $ (0.07) |
| Earnings per share attributable to Match Group, Inc. shareholders | $ 1.33 | $ 1.18 | $ 0.68 | $ 0.64 | $ 0.69 | $ 0.65 |

App. 96

(a)  If the effect is dilutive, weighted average common shares outstanding include the incremental shares that would be issued upon the assumed exercise of stock options and subsidiary denominated equity and the vesting of restricted stock units ("RSUs"). For the years ended December 31, 2017, 2016, and 2015, 4.7

83

App. 97

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

million, 6.1 million and 5.2 million potentially dilutive securities, respectively, are excluded from the calculation of diluted earnings per share because their inclusion would have been anti-dilutive.

(b)   Market-based awards and performance-based stock options ("PSOs") and restricted stock units ("PSUs") are considered contingently issuable shares. Market-based awards, PSOs and PSUs are included in the denominator for earnings per share if (i) the applicable market or performance condition(s) has been met and (ii) the inclusion of the market-based award, PSOs and PSUs are dilutive for the respective reporting periods. For the years ended December 31, 2017, 2016, and 2015, 3.8 million, 2.5 million, and 7.5 million market-based awards, PSOs and PSUs, respectively, were excluded from the calculation of diluted earnings per share because the market or performance conditions had not been met.

**NOTE 12—STOCK-BASED COMPENSATION**

The Company currently has two active stock and annual incentive plans, one which became effective in 2015 upon the completion of the IPO and another plan approved by shareholders in 2017. The 2015 plan replaced two historical plans that governed equity awards granted prior to the IPO. The 2015 plan covers stock options to acquire shares of Match Group common stock and RSUs granted pursuant to the historical plans and stock options and stock settled stock appreciation rights denominated in the equity of certain of our subsidiaries granted prior to the IPO, as well as provides for the future grant of these and other equity awards. The 2015 and 2017 plans authorize the Company to grant awards to its employees, officers, directors and consultants. At December 31, 2017, there were 25.1 million shares available for the future grant of equity awards under the 2015 and 2017 plans collectively and an additional 4.6 million shares within the 2015 plan related to awards outstanding under the historical plans and subsidiary equity awards granted prior to the IPO.

The 2015 and 2017 plans have a stated term of ten years, and provide that the exercise price of stock options granted will not be less than the market price of the Company's common stock on the grant date. Neither plan specifies grant dates or vesting schedules of awards as those determinations have been delegated to the Compensation and Human Resources Committee of Match Group's Board of Directors (the "Committee"). Each grant agreement reflects the vesting schedule for that particular grant as determined by the Committee. Stock options granted subsequent to September 1, 2015 will generally vest in four equal annual installments over a four-year period. RSU awards outstanding generally vest over a three- or four-year period. PSU awards outstanding generally vest in two equal annual installments over a two-year period. Market-based awards outstanding generally vest over a two- to four-year period.

Stock-based compensation expense recognized in the consolidated and combined statement of operations includes expense related to the Company's stock options and RSUs, performance-based stock options, PSUs, and market-based RSUs for which vesting is considered probable, equity instruments denominated in shares of subsidiaries, and IAC denominated stock options, RSUs and market-based awards held by Match Group employees. The amount of stock-based compensation expense recognized is net of estimated forfeitures, as the expense recorded is based on awards that are ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if actual forfeitures differ from the estimated rate. At December 31, 2017, there is $148.0 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.9 years.

The total income tax benefit recognized in the accompanying consolidated and combined statement of operations for the years ended December 31, 2017, 2016 and 2015 related to stock-based compensation is $295.1 million, $16.4 million and $16.9 million, respectively. The increase in total income tax benefit recognized during 2017 is due to the adoption of ASU 2019-06 and the recognition of excess tax benefits attributable to stock-based compensation included as a component of the current year provision for income taxes rather than recognized in equity.

The Company will recognize a corporate income tax deduction based on the intrinsic value of the options exercised in 2017, however, there will be some delay in the timing of the realization of the cash benefit of the income tax deduction because it will be dependent upon the amount and timing of future taxable income and the timing of estimated income tax payments. The tax benefit to be realized on stock option deductions, including

84

App. 98

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

those net settled, for the year ended December 31, 2017 is $310.9 million. The income tax benefit realized on stock option deductions, including those net settled, for the year ended December 31, 2016 and for the period subsequent to the IPO through December 31, 2015 is $40.1 million, and less than $0.1 million, respectively. For the period prior to the IPO, the related tax benefit realized by the Company in 2015 was $41.9 million.

**Stock Options**

Stock options outstanding at December 31, 2017 and changes during the year ended December 31, 2017 are as follows:

| | December 31, 2017 | | | |
| | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | (Shares and intrinsic value in thousands) | | | |
| Outstanding at January 1, 2017 | 33,646 | $ 12.31 | | |
| Converted Tinder options | 50,805 | 3.43 | | |
| Granted | 8,223 | 20.49 | | |
| Exercised | (52,794) | 4.16 | | |
| Forfeited | (3,984) | 13.15 | | |
| Expired | (18) | 10.82 | | |
| Outstanding at December 31, 2017 [(a)] | 35,878 | $ 13.50 | 8.2 | $ 638,864 |
| Options exercisable | 7,826 | $ 12.28 | 7.5 | $ 148,954 |

_____

(a) Included in the outstanding balance at December 31, 2017 are 2.3 million performance-based stock options, which vest in varying amounts and years depending upon certain performance conditions. The Company expects 0.1 million shares to vest based on our current assessment of the performance conditions. The table above includes these awards at their maximum potential payout.

The aggregate intrinsic value in the table above represents the difference between Match Group's closing stock price on the last trading day of 2017 and the exercise price, multiplied by the number of in-the-money options that would have been exercised had all option holders exercised their options on December 31, 2017. The total intrinsic value of stock options exercised during the years ended December 31, 2017, 2016 and 2015 is $533.8 million, $37.3 million and $5.7 million, respectively.

*Converted Tinder options.* In July 2017, the Company elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options at a value determined through a process involving two investment banks. The conversion, for the majority of the awards, did not modify the vesting schedule of the award or the expiration date of the awards. These equity awards generally vest over a four-year period and have an expiration date 10 years from the initial grant date.

Upon the conversion into Match Group options, these formerly subsidiary denominated awards, when exercised, can be settled by Match Group issuing shares of its common stock equal in value to the intrinsic value of the award being settled, net of shares with a value equal to the withholding taxes due, which taxes are remitted by Match Group to the government on behalf of the employees or the employee can pay the exercise price and applicable withholding taxes and receive the number of Match Group shares equal to the number of options exercised. At the time of settlement, IAC has the option to issue its own shares directly to the award holders, in which case Match Group would in turn issue its shares to IAC as reimbursement. In either settlement scenario, the same number of Match Group shares would be issued. At December 31, 2017, assuming all outstanding converted Tinder awards, including vested and unvested awards, were exercised on a net basis on that date, the Company would have remitted $102.4 million in cash in withholding taxes (assuming a 50% withholding rate) on

85

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

behalf of the employees and issued 3.3 million of its common shares. See "Note 16—Related Party Transactions" for additional information on shares issued to IAC related to this plan.

During the year ended December 31, 2017, we made cash payments totaling $272.5 million to purchase certain fully vested options and $248.0 million to cover withholding taxes paid on behalf of employees who exercised options that were net settled. These awards are included in the "Exercised" line above.

The following table summarizes the information about stock options outstanding and exercisable at December 31, 2017:

| | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Outstanding at December 31, 2017 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price | Exercisable at December 31, 2017 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price |
| | | | (Shares in thousands) | | | |
| $0.01 to $5.00 | 1,446 | 6.8 | $ 3.39 | 263 | 6.2 | $ 2.98 |
| $5.01 to $10.00 | 6,289 | 8.5 | 8.42 | 982 | 8.4 | 8.02 |
| $10.01 to $15.00 | 15,785 | 7.8 | 12.24 | 4,972 | 7.3 | 12.52 |
| $15.01 to $20.00 | 9,450 | 8.6 | 17.02 | 1,609 | 7.8 | 15.62 |
| $20.01 to $25.00 | 1,547 | 9.7 | 23.20 | — | — | — |
| $25.01 to $30.00 | 1,356 | 9.8 | 26.93 | — | — | — |
| $30.01 to $35.00 | 5 | 9.9 | 30.61 | — | — | — |
| | 35,878 | 8.2 | $ 13.50 | 7,826 | 7.5 | $ 12.28 |

The fair value of stock option awards, with the exception of market-based awards, is estimated on the grant date using the Black-Scholes option pricing model. The Black-Scholes option pricing model incorporates various assumptions, including expected volatility and expected term. At December 31, 2017, the Company uses IAC's historical volatility due to the Company representing a large percentage of the overall value of IAC and the lack of sufficient historical volatility information for the Company since the IPO in November 2015. The risk-free interest rates are based on U.S. Treasuries with comparable terms as the awards, in effect at the grant date. Prior to the IPO, expected term was based on the mid-point of the first and last windows for exercise. Following the IPO, expected term is based upon the historical exercise pattern of IAC's employees for comparable awards, a ten-year contractual life with vesting in four equal annual installments, because the Company does not yet have sufficient data to estimate an expected term for these awards. Beginning in 2018, the Company will begin using its own historical data to inform expected term and volatility. No dividends have been assumed. The following are the weighted average assumptions used in the Black-Scholes option pricing model:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Expected volatility | 27% | 27% | 28% |
| Risk-free interest rate | 1.9% | 1.3% | 1.3% |
| Expected term | 5.0 years | 4.8 years | 4.1 years |
| Dividend yield | —% | —% | —% |

On November 18, 2015, the Company granted 1.8 million market-based stock options to its then Chairman and Chief Executive Officer. The award is subject to market-based conditions and service-based vesting. The market-based vesting condition was achieved in 2016. The award has a ten-year contractual life and vests in four equal annual installments beginning on the first anniversary of the grant date. The grant date fair value of this market-based award was estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price. The assumptions used to calculate the fair value of this award included expected volatility of

86

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

27%, a risk-free interest rate of 2.3% and a 0% dividend yield. Expense is recognized over the four-year vesting period because it exceeds the derived service period of three years, which is an output of the option pricing model.

Approximately 8.2 million, 8.7 million and 21.1 million stock options were granted by the Company during the years ended December 31, 2017, 2016 and 2015, respectively. The weighted average fair value of stock options granted during the years ended December 31, 2017, 2016 and 2015 is $5.67, $2.98 and $3.46, respectively.

Cash received from stock option exercises for the years ended December 31, 2017 and 2016 is $59.4 million and $39.4 million, respectively. For the year ended December 31, 2015, no cash was received from the exercise of stock options.

**Restricted Stock Units and Performance-based Stock Units**

RSUs and PSUs are awards in the form of phantom shares or units denominated in a hypothetical equivalent number of shares of Match Group common stock and with the value of each RSU and PSU equal to the fair value of Match Group common stock at the date of grant. Each RSU and PSU grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. PSUs also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests. For RSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term. For PSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term if the performance targets are considered probable of being achieved.

Unvested RSUs and PSUs outstanding at December 31, 2017 and changes during the year ended December 31, 2017 are as follows:

| | RSUs | | PSUs | |
|---|---|---|---|---|
| | Number of shares | Weighted Average Grant Date Fair Value | Number of shares[a] | Weighted Average Grant Date Fair Value |
| | (Shares in thousands) | | | |
| Unvested at January 1, 2017 | 539 | $ 15.21 | 165 | $ 10.11 |
| Granted | 1,919 | 19.21 | — | — |
| Vested | (244) | 15.44 | — | — |
| Forfeited | — | — | (165) | 10.11 |
| Unvested at December 31, 2017 | 2,214 | $ 18.65 | — | $ — |

[a] This represents the maximum shares issuable.

The weighted average fair value of RSUs and PSUs granted during the years ended December 31, 2017 and 2016 and for the period subsequent to the IPO through December 31, 2015, based on market prices of Match Group's common stock on the grant date, was $19.21, $12.65 and $14.52, respectively. The total fair value of RSUs and PSUs that vested during the years ended December 31, 2017 and 2016 was $6.7 million and $1.1 million, respectively. No RSUs or PSUs vested during the year ended December 31, 2015.

**Market-based Awards**

During 2017 and 2016, the Company granted market-based awards to certain employees. The number of awards that ultimately vest for certain awards is dependent upon Match Group's stock price and for other awards on the valuation of a wholly-owned business. The grant date fair value of each market-based award is estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price and, as necessary,

87

App. 101

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

the valuation of the subsidiary. Each market-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests in addition to the market condition.

Market-based awards outstanding at December 31, 2017 and changes during the year ended December 31, 2017 are as follows:

| | Market-based awards | |
| --- | --- | --- |
| | Number of shares | Weighted Average Grant Date Price |
| | (Shares in thousands) | |
| Unvested at January 1, 2017 | 1,536 | $ 10.66 |
| Granted | 5,330 | 19.56 |
| Vested | (166) | 10.65 |
| Forfeited | (593) | 11.95 |
| Unvested at December 31, 2017 | 6,107 | $ 19.41 |

The weighted average fair value of market-based awards granted during the years ended December 31, 2017 and 2016 and for the period subsequent to the IPO through December 31, 2015, based on the valuation model, was $7.50, $1.77 and $2.15, respectively. The total fair value of market-based awards that vested during the years ended December 31, 2017 and December 31, 2016 was $3.1 million and $0.1 million, respectively. There were no market-based awards that vested during the year ended December 31, 2015.

**Equity Instruments Formerly Denominated in the Shares of Certain Subsidiaries**

In July 2017, the Company elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options. See discussion above in "Converted Tinder options."

The Company issued 1.7 million Match Group common shares, and paid $22.8 million of withholding taxes, to settle awards exercised to current and former employees who exercised their subsidiary options during the year ended December 31, 2016.

During 2014, the Company granted an equity award denominated in shares of a subsidiary of the Company to a non-employee, which was marked to market each reporting period. In the third quarter of 2016, the Company settled the vested portion of the award for cash of $13.4 million. In the third quarter of 2017, the award was modified and the Company settled the remaining portion of the award for cash of $33.9 million.

During the third quarter of 2015, the Company modified certain subsidiary denominated vested equity awards and recognized a modification charge of $6.8 million. During the fourth quarter of 2015, the Company repurchased certain subsidiary denominated vested equity awards in exchange for $23.4 million in cash and fully vested modified equity awards and recognized a modification charge of $7.7 million. These modification charges are included in stock-based compensation for the year ended December 31, 2015.

**IAC Denominated Stock Options**

There were no IAC stock options granted by IAC under its equity incentive plans to employees of Match Group during the years ended December 31, 2017 and 2015. During the year ended December 31, 2016, there were less than 0.1 million IAC stock options granted by IAC under its equity incentive plans to employees of Match Group. Approximately 0.2 million IAC stock options remain outstanding to employees of Match Group as of December 31, 2017. The fair value of each stock option award was estimated on the grant date using the Black–Scholes option pricing model. IAC stock options were granted with exercise prices at least equal to the fair value on the date of grant, vest ratably in annual installments over a four-year period and expire ten years from the date of grant.

88

App. 102

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**IAC Denominated RSUs and Market-based Awards**

There were no IAC RSUs or market-based awards granted by IAC to employees of Match Group during the year ended December 31, 2017. Less than 0.1 million and 0.7 million IAC RSUs and market-based awards were granted by IAC to employees of Match Group during the years ended December 31, 2016 and 2015, respectively. RSUs are awards in the form of phantom shares or units, denominated in a hypothetical equivalent number of shares of IAC common stock and with the value of each RSU equal to the fair value of IAC common stock at the date of grant. Each RSU grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. The number of market-based awards that ultimately vest is dependent upon Match Group's stock price. The grant date fair value of each market-based award is estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price. Each market-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. Some of the market-based awards contain performance targets set at the time of grant that must be achieved before an award vests.

**NOTE 13—SEGMENT INFORMATION**

The Company has one operating segment, Dating, which is also the Company's one reportable segment.

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| Revenue | $ 1,330,661 | $ 1,118,110 | $ 909,705 |
| Operating Income | 360,517 | 315,549 | 212,981 |
| Adjusted EBITDA[a] | 468,941 | 403,380 | 284,554 |
| Capital Expenditures | 28,833 | 46,098 | 25,246 |

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In thousands) | |
| Segment Assets[b] | $ 467,338 | $ 423,037 |

_____

(a) The Company's primary financial measure is Adjusted EBITDA, which is defined as operating income excluding: (1) stock-based compensation expense; (2) depreciation; and (3) acquisition-related items consisting of (i) amortization of intangible assets and impairments of goodwill and intangible assets, if applicable, and (ii) gains and losses recognized on changes in the fair value of contingent consideration arrangements. The Company believes this measure is useful for analysts and investors as this measure allows a more meaningful comparison between our performance and that of our competitors. Moreover, our management uses this measure internally to evaluate the performance of our business as a whole, and this measure is one of the primary metrics by which our internal budgets are based and by which management is compensated. The above items are excluded from our Adjusted EBITDA measure because these items are non-cash in nature, and we believe that by excluding these items, Adjusted EBITDA corresponds more closely to the cash operating income generated from our business, from which capital investments are made and debt is serviced. Adjusted EBITDA has certain limitations in that it does not take into account the impact to Match Group's statement of operations of certain expenses.

(b) Consistent with the Company's primary metric (described in (a) above), the Company excludes, if applicable, property and equipment, goodwill, and intangible assets from the measure of segment assets presented above.

89

App. 103

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The following table presents revenue disaggregated by source:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| Direct revenue | $ 1,281,249 | $ 1,067,364 | $ 866,583 |
| Indirect revenue (principally advertising revenue) | 49,412 | 50,746 | 43,122 |
| Total Revenue | $ 1,330,661 | $ 1,118,110 | $ 909,705 |

Revenue by geography is based on where the customer is located. Geographic information about revenue and long-lived assets is presented below:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| **Revenue** |  |  |  |
| United States | $ 730,514 | $ 676,564 | $ 589,924 |
| All other countries | 600,147 | 441,546 | 319,781 |
| Total | $ 1,330,661 | $ 1,118,110 | $ 909,705 |

The United States is the only country whose revenue is greater than 10 percent of total revenue.

|  | December 31, | |
| --- | --- | --- |
|  | 2017 | 2016 |
|  | (In thousands) | |
| **Long-lived assets (excluding goodwill and intangible assets)** |  |  |
| United States | $ 37,547 | $ 41,747 |
| All other countries | 24,073 | 21,207 |
| Total | $ 61,620 | $ 62,954 |

The only countries, other than the United States, with greater than 10 percent of total long-lived assets (excluding goodwill and intangible assets), was France with $13.6 million and $14.3 million and Canada with $6.7 million and $3.6 million as of December 31, 2017 and 2016, respectively.

90

App. 104

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

The following tables reconcile operating income and net earnings attributable to Match Group, Inc. shareholders to Adjusted EBITDA:

| | | Year Ended December 31, 2017 | | | | |
|---|---|---|---|---|---|---|
| | Operating Income | Stock-based compensation | Depreciation | Amortization of Intangibles | Acquisition-related Contingent Consideration Fair Value Adjustments | Adjusted EBITDA |
| Match Group, Inc. | $ 360,517 | $ 69,090 | $ 32,613 | $ 1,468 | $ 5,253 | $ 468,941 |
| Interest expense—third party | (77,565) | | | | | |
| Other expense, net | (30,827) | | | | | |
| Earnings from continuing operations, before tax | 252,125 | | | | | |
| Income tax benefit | 103,852 | | | | | |
| Net earnings from continuing operations | 355,977 | | | | | |
| Loss from discontinuing operations, net of tax | (5,650) | | | | | |
| Net earnings | 350,327 | | | | | |
| Net earnings attributable to redeemable noncontrolling interests | (179) | | | | | |
| Net earnings attributable to Match Group, Inc. shareholders | $ 350,148 | | | | | |

| | | Year Ended December 31, 2016 | | | | |
|---|---|---|---|---|---|---|
| | Operating Income | Stock-based compensation | Depreciation | Amortization of Intangibles | Acquisition-related Contingent Consideration Fair Value Adjustments | Adjusted EBITDA |
| Match Group, Inc. | $ 315,549 | $ 52,370 | $ 27,726 | $ 16,932 | $ (9,197) | $ 403,380 |
| Interest expense—third party | (82,199) | | | | | |
| Other income, net | 7,866 | | | | | |
| Earnings from continuing operations, before tax | 241,216 | | | | | |
| Income tax provision | (62,875) | | | | | |
| Net earnings from continuing operations | 178,341 | | | | | |
| Loss from discontinuing operations, net of tax | (6,328) | | | | | |
| Net earnings | 172,013 | | | | | |
| Net earnings attributable to redeemable noncontrolling interests | (562) | | | | | |

App. 105

| | | |
|---|---|---|
| Net earnings attributable to Match Group, Inc. shareholders | $ | 171,431 |

91

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

| | Year Ended December 31, 2015 | | | | | |
|---|---|---|---|---|---|---|
| | Operating Income | Stock-based compensation | Depreciation | Amortization of Intangibles | Acquisition-related Contingent Consideration Fair Value Adjustments | Adjusted EBITDA |
| Match Group, Inc. | $ 212,981 | $ 49,401 | $ 19,791 | $ 13,437 | $ (11,056) | $ 284,554 |
| Interest expense—third party | (17,943) | | | | | |
| Interest expense—related party | (7,965) | | | | | |
| Other income, net | 11,632 | | | | | |
| Earnings from continuing operations, before tax | 198,705 | | | | | |
| Income tax provision | (65,542) | | | | | |
| Net earnings from continuing operations | 133,163 | | | | | |
| Loss from discontinuing operations, net of tax | (12,676) | | | | | |
| Net earnings | 120,487 | | | | | |
| Net earnings attributable to redeemable noncontrolling interests | (104) | | | | | |
| Net earnings attributable to Match Group, Inc. shareholders | $ 120,383 | | | | | |

The following tables reconcile segment assets to total assets:

| | December 31, | |
|---|---|---|
| | 2017 | 2016 |
| | (In thousands) | |
| Segment Assets | $ 467,338 | $ 423,037 |
| Deferred income taxes | 123,199 | 5,286 |
| Property and equipment, net | 61,620 | 62,954 |
| Goodwill | 1,247,644 | 1,206,447 |
| Indefinite-Lived Intangible Assets | 228,296 | 214,461 |
| Definite-Lived Intangible Assets | 2,049 | 3,221 |
| Assets of a business held for sale | — | 133,272 |
| Total Assets | $ 2,130,146 | $ 2,048,678 |

## NOTE 14—COMMITMENTS AND CONTINGENCIES

### Commitments

The Company leases office space, data center facilities and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company is also committed to pay a portion of the related operating expenses under certain lease agreements. These operating expenses are not included in the table below.

App. 107

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

Future minimum payments under operating lease agreements are as follows:

|  | | (In thousands) |
| --- | --- | --- |
| 2018 | $ | 8,299 |
| 2019 | | 8,141 |
| 2020 | | 7,279 |
| 2021 | | 5,349 |
| 2022 | | 3,770 |
| Thereafter | | 10,293 |
| Total | $ | 43,131 |

Expenses charged to operations under these agreements were $16.0 million, $15.5 million and $10.9 million for the years ended December 31, 2017, 2016 and 2015, respectively. See "Note 16—Related Party Transactions" for additional information related to related party transactions.

The Company also has funding commitments in the form of a purchase obligation and surety bonds. The purchase obligation relates to web hosting services with $10.0 million due for the year ended December 31, 2018. The surety bonds of $0.1 million expire within twelve months of December 31, 2017.

**Contingencies**

In the ordinary course of business, the Company is a party to various lawsuits. The Company establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where we believe an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that resolving claims against us, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. The Company also evaluates other contingent matters, including income and non-income tax contingencies, to assess the likelihood of an unfavorable outcome and estimated extent of potential loss. It is possible that an unfavorable outcome of one or more of these lawsuits or other contingencies could have a material impact on the liquidity, results of operations, or financial condition of the Company. See "Note 3—Income Taxes" for additional information related to income tax contingencies.

**NOTE 15—SUPPLEMENTAL CASH FLOW INFORMATION**

**Supplemental Disclosure of Non-Cash Transactions:**

The Company recorded acquisition-related contingent consideration liabilities of $0.2 million and $27.4 million during the years ended December 31, 2016 and 2015, respectively, in connection with various acquisitions. There were no acquisition-related contingent consideration liabilities recorded for the year ended December 31, 2017. See "Note 7—Fair Value Measurements and Financial Instruments" for additional information on contingent consideration arrangements.

On November 16, 2015, the Company exchanged $445.3 million of IAC 2012 Senior Notes for $445.2 million of Match Group Senior Notes.

93

App. 109

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**Supplemental Disclosure of Cash Flow Information:**

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| Cash paid (received) during the year for: | | | |
| Interest | $ 71,893 | $ 82,494 | $ 8,696 |
| Income tax payments, including amounts paid to IAC for Match Group's share of IAC's consolidated tax liability | 28,938 | 44,733 | 46,657 |
| Income tax refunds | (13,537) | (962) | (1,583) |

**NOTE 16—RELATED PARTY TRANSACTIONS**

**Relationship with IAC post IPO**

In connection with the IPO, the Company entered into certain agreements relating to our relationship with IAC after the IPO. These agreements include a master transaction agreement; an investor rights agreement; a tax sharing agreement; a services agreement; an employee matters agreement and a subordinated loan agreement.

For the years ended December 31, 2017 and 2016, and for the period from the date of the IPO through December 31, 2015, the Company incurred $9.9 million, $11.8 million, and $0.7 million, respectively, pursuant to the services agreement. Included in these amounts are $5.1 million, $4.3 million and $0.3 million, respectively, for leasing of office space for certain of our businesses at properties owned by IAC. Additionally, the Company paid an IAC subsidiary $1.2 million for the sublease of space in a data center for the year ended December 31, 2016, and discontinued subleasing as of December 31, 2016. In December 2017, international subsidiaries of the Company agreed to sell net operating losses that were not expected to be utilized to an IAC subsidiary for $0.9 million. All amounts were paid in full by the Company at December 31, 2017 and 2016, respectively.

*Master Transaction Agreement*

The master transaction agreement sets forth the agreements between IAC and the Company regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC post IPO. Under the master transaction agreement, the Company agrees to assume all of the assets and liabilities related to its business and agrees to indemnify IAC against any losses arising out of any breach by the Company of the master transaction agreement or the other transaction related agreements described below. IAC also agrees to indemnify the Company against losses arising out of any breach by IAC of the master transaction agreement or any of the other transaction related agreements.

*Investor Rights Agreement*

Under the investor rights agreement, the Company provides IAC with (i) specified registration and other rights relating to its shares of our common stock and (ii) anti-dilution rights. See "Note 9—Shareholders' Equity" for additional information on the anti-dilution rights.

*Tax Sharing Agreement*

The tax sharing agreement governs the rights, responsibilities, and obligations of the Company and IAC with respect to tax liabilities and benefits, entitlements to refunds, preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes. Under the tax sharing agreement, the Company is generally responsible and required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes the Company or any of its subsidiaries to the extent attributable to the Company or any of its subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any of the Company's subsidiaries' consolidated, combined, unitary or separate tax returns.

94

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

At December 31, 2017 and 2016, the Company had tax receivables of $7.3 million and $9.0 million, respectively, due from IAC pursuant to the tax sharing agreement, which is included in "Other current assets" in the accompanying consolidated balance sheet. Refunds from IAC during 2017 pursuant to this agreement were $10.9 million and payments to IAC during 2016 pursuant to this agreement were $19.9 million.

*Services Agreement*

The services agreement governs services that IAC provides to the Company including, among others: (i) assistance with certain legal, finance, internal audit, treasury, information technology support, insurance and tax matters, including assistance with certain public company reporting obligations; (ii) payroll processing services; (iii) tax compliance services; and (iv) such other services as to which IAC and the Company may agree. In addition, under the services agreement the Company provides IAC informational technology services and such other services as to which IAC and the Company may agree. The services agreement had an initial term of one year from the date of the IPO, and provides for automatic renewals for additional one year periods, subject to IAC's continued ownership of a majority of the combined voting power of the Company's voting stock.

*Employee Matters Agreement*

The employee matters agreement covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. Under the employee matters agreement, the Company's employees participate in IAC's U.S. health and welfare plans, 401(k) plan and flexible benefits plan and the Company reimburses IAC for the costs of such participation. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of the Company's Board of Directors, Match Group will no longer participate in IAC's employee benefit plans, but will establish its own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

The employee matters agreement also requires the Company to reimburse IAC for the cost of any IAC equity awards held by Match Group's employees and former employees and that IAC may elect to receive payment either in cash or Company common stock. With respect to equity awards in the Company's subsidiaries, IAC may require those awards to be settled in either shares of IAC's common stock or in shares of the Company's common stock and, to the extent shares of IAC common stock are issued in settlement, the Company will reimburse IAC for the cost of those shares by issuing to IAC additional shares of the Company's common stock.

During the years ended December 31, 2017 and 2016, 11.9 million and 1.0 million shares, respectively, of Company common stock were issued to IAC pursuant to the employee matters agreement; 11.3 million and 0.5 million, respectively, of which were issued as reimbursement for shares of IAC common stock issued in connection with the exercise and settlement of equity awards originally denominated in shares of a subsidiary of the Company; and 0.6 million and 0.5 million, respectively, of which were issued as reimbursement for shares of IAC common stock issued in connection with the exercise and vesting of IAC equity awards held by Company employees.

*IAC Subordinated Loan Facility*

Prior to the IPO, the Company entered into an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allows the Company to make one or more requests to IAC to borrow funds. If IAC agrees to fulfill any such borrowing request, the related indebtedness will be incurred in accordance with the terms of the IAC Subordinated Loan Facility. Any indebtedness outstanding under the IAC Subordinated Loan Facility will be by its terms subordinated in right of payment to the obligations under the Match Group Credit Agreement and the Match Group Senior Notes, and will bear interest at the applicable rate set forth in the pricing grid in the Match Group Credit Agreement, which rate is based on the Company's consolidated net leverage ratio at the time of borrowing, plus an additional amount to be agreed upon. The IAC Subordinated Loan Facility has a scheduled final maturity date of no earlier than 90 days after the maturity date of the Match Group Credit Facility or the latest maturity date in respect of any class of Term Loans outstanding under the Match Group Credit Agreement. At December 31, 2017, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility.

95

App. 111

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**Relationship with IAC pre-IPO**

For periods prior to the IPO, the Company's consolidated and combined statement of operations includes allocations of general and administrative costs, including stock-based compensation expense, related to IAC's accounting, treasury, legal, tax, corporate support and internal audit functions. These allocations were based on Match Group's revenue as a percentage of IAC's total revenue. Allocated general and administrative costs, inclusive of stock-based compensation expense, were $6.9 million in the year ended December 31, 2015, and are included in "General and administrative expense" in the accompanying consolidated and combined statement of operations. It is not practicable to determine the actual expenses that would have been incurred for these services had the Company operated as a stand-alone entity. Management considers the allocation method to be reasonable.

The Company and IAC entered into certain arrangements in the ordinary course of business, for: (i) the leasing of office space for certain of our businesses at properties owned by IAC, for which we paid IAC approximately $1.7 million for the year ended December 31, 2015, and (ii) the subleasing of space in a data center from an IAC subsidiary, for which we paid the IAC subsidiary approximately $1.2 million for the year ended December 31, 2015.

The portion of interest income reflected in the consolidated and combined statement of operations that is intercompany in nature was $3.8 million for the year ended December 31, 2015.

The following summarizes the components of the net increase in IAC's investment in Match Group prior to the IPO for the year ended December 31, 2015:

|  | December 31, 2015 |
|---|---|
|  | (In thousands) |
| Capital contribution from IAC to partially fund the acquisition of PlentyOfFish | $ (155,000) |
| Cash transfers to IAC related to its centrally managed U.S. treasury management function, acquisitions and cash expenses paid by IAC on behalf of Match Group, net | 126,275 |
| Taxes | (57,041) |
| Interest income, net [a] | 3,813 |
| Allocation of general and administrative expense | (6,898) |
| Net increase in IAC's investment in the Match Group | $ (88,851) |

—————————————

[a]    Does not include long-term debt, related party.

**Dividend to IAC**

During the fourth quarter of 2015, the Company paid a dividend to IAC in the amount of $1.5 billion, of which $1.0 billion was paid in cash and $445.3 million was debt assumed in the exchange of the 2015 Senior Notes for a portion of IAC's 4.75% Senior Notes due December 15, 2022.

**NOTE 17—BENEFIT PLANS**

Match Group employees are eligible to participate in a retirement savings plan sponsored by IAC in the United States, which is qualified under Section 401(k) of the Internal Revenue Code. Under the IAC/InterActiveCorp Retirement Savings Plan (the "Plan"), participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits. The employer match under the Plan is fifty cents for each dollar a participant contributes in this Plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions under the Plan for the years ended December 31, 2017, 2016 and 2015 were $2.2 million, $1.6 million and $1.4 million, respectively. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the Plan. An investment option in the Plan is IAC common stock, but neither participant nor matching contributions are required to be invested in IAC common stock. The increase in matching contributions in 2017 and 2016 is due primarily to an increase in participation in the Plan due to increased headcount.

96

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

Internationally, Match Group also has or participates in various benefit plans, primarily defined contribution plans. The Company's contributions for these plans for the years ended December 31, 2017, 2016 and 2015 were $2.2 million, $1.9 million and $2.0 million, respectively.

**NOTE 18—CONSOLIDATED AND COMBINED FINANCIAL STATEMENT DETAILS**

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In thousands) | |
| **Other current assets:** | | |
| Prepaid expenses | $ 16,374 | $ 12,508 |
| Other | 38,995 | 27,110 |
| Other current assets | $ 55,369 | $ 39,618 |

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In thousands) | |
| **Property and equipment, net:** | | |
| Computer equipment and capitalized software | $ 134,757 | $ 119,718 |
| Leasehold improvements | 22,390 | 19,503 |
| Furniture and other equipment | 7,216 | 5,719 |
| Projects in progress | 6,117 | 6,337 |
|  | 170,480 | 151,277 |
| Accumulated depreciation and amortization | (108,860) | (88,323) |
| Property and equipment, net | $ 61,620 | $ 62,954 |

|  | December 31, | |
|---|---|---|
|  | 2017 | 2016 |
|  | (In thousands) | |
| **Accrued expenses and other current liabilities:** | | |
| Accrued employee compensation and benefits | $ 30,375 | $ 30,498 |
| Accrued advertising expense | 28,878 | 20,927 |
| Contingent consideration | 590 | 18,972 |
| Other | 50,723 | 38,323 |
| Accrued expenses and other current liabilities | $ 110,566 | $ 108,720 |

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
|  | (In thousands) | | |
| **Other (expense) income, net** | $ (30,827) | $ 7,866 | $ 11,632 |

Other expense, net, in 2017 includes expenses of $15.4 million related to the redemption of our 2015 Senior Notes and repricing of the Term Loan, $13.0 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a

App. 113

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 118 of 451    PageID 641

non-employee, $10.3 million in net foreign currency exchange losses, and a $2.5 million other-than-temporary impairment charge related to a cost method investment resulting from of our assessment of the near-term prospects and financial condition of the investee. These expenses were partially offset by a gain on the sale of a cost method investment of $9.1 million.

97

App. 114

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

Other income, net in 2016 includes $20.0 million in foreign currency exchange gains due to strengthening of the dollar relative to the British Pound and Euro and a $3.1 million gain related to the sale of a marketable equity security, partially offset by a non-cash charge of $12.1 million related to the write-off of a proportionate share of original issue discount and deferred financing costs associated with prepayments of $440 million of the Term Loan, $2.1 million of expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $1.5 million repricing fees related to the Term Loan, and a $0.7 million other-than-temporary impairment charge related to a certain cost method investment.

Other income, net in 2015 includes $7.6 million in foreign currency exchange gains related to the €53 million 5.00% Note payable to an IAC subsidiary (this note was settled during the fourth quarter of 2015), $4.4 million of interest income, and $2.4 million in foreign currency exchange gains, partially offset by $2.7 million of expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee.

98

App. 115

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED AND COMBINED FINANCIAL STATEMENTS (Continued)**

**NOTE 19—QUARTERLY RESULTS (UNAUDITED)**

| | Quarter Ended March 31 | Quarter Ended June 30 | Quarter Ended September 30 [a] | Quarter Ended December 31 [b] |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| **Year Ended December 31, 2017** | | | | |
| Revenue | $ 298,764 | $ 309,572 | $ 343,418 | $ 378,907 |
| Cost of revenue | 58,848 | 62,665 | 72,044 | 85,942 |
| Operating income | 58,871 | 82,975 | 91,008 | 127,663 |
| Earnings (loss) from continuing operations | 24,555 | 51,544 | 287,771 | (7,893) |
| Loss from discontinued operations, net of tax | (4,491) | (71) | (85) | (1,003) |
| Net earnings (loss) attributable to Match Group, Inc. shareholders | 20,053 | 51,430 | 287,688 | (9,023) |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.10 | $ 0.20 | $ 1.08 | $ (0.03) |
| Diluted [c] | $ 0.08 | $ 0.17 | $ 0.98 | $ (0.03) |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.08 | $ 0.20 | $ 1.08 | $ (0.03) |
| Diluted [c] | $ 0.07 | $ 0.17 | $ 0.98 | $ (0.03) |
| | | | | |
| **Year Ended December 31, 2016** | | | | |
| Revenue | $ 260,401 | $ 275,309 | $ 287,530 | $ 294,870 |
| Cost of revenue | 43,768 | 46,978 | 50,770 | 54,132 |
| Operating income | 34,186 | 77,500 | 90,938 | 112,925 |
| Earnings from continuing operations | 10,608 | 36,769 | 56,149 | 74,815 |
| (Loss) earnings from discontinued operations, net of tax | (3,389) | (2,668) | 555 | (826) |
| Net earnings attributable to Match Group, Inc. shareholders | 7,152 | 34,078 | 56,410 | 73,811 |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.04 | $ 0.15 | $ 0.22 | $ 0.29 |
| Diluted [c] | $ 0.04 | $ 0.14 | $ 0.21 | $ 0.27 |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.03 | $ 0.14 | $ 0.22 | $ 0.29 |
| Diluted [c] | $ 0.03 | $ 0.13 | $ 0.21 | $ 0.27 |

[a]  Net earnings for the third quarter of 2017 was impacted by an income tax benefit of $226.2 million primarily due to excess tax deductions attributable to stock-based compensation.

[b]  Net loss for the fourth quarter of 2017 was impacted by an incremental income tax provision of $92.3 million related to the Tax Act, of which, $23.7 million relates to the Transition Tax and a $68.6 million relates to the remeasurement of U.S. net deferred tax assets due to the reduction in the corporate income tax rate.

[c]  Quarterly per share amounts may not add to the related annual per share amount because of differences in the average common shares outstanding during each period.

App. 116

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 121 of 451    PageID 644

App. 117

Table of Contents

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

   Not applicable.

**Item 9A.    Controls and Procedures**

**Conclusion Regarding the Effectiveness of the Company's Disclosure Controls and Procedures**

   The Company monitors and evaluates on an ongoing basis its disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant.

   As required by Rule 13a-15(b) of the Exchange Act, Match Group management, including the Chairman and Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), conducted an evaluation, as of the end of the period covered by this report, of the effectiveness of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Based on this evaluation, the CEO and the CFO concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control Over Financial Reporting**

   Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) for the Company. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on this assessment, management has determined that, as of December 31, 2017, the Company's internal control over financial reporting is effective. The effectiveness of our internal control over financial reporting as of December 31, 2017 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their attestation report, included herein.

   Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Changes in Internal Control Over Financial Reporting**

   The Company monitors and evaluates on an ongoing basis its internal control over financial reporting in order to improve its overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant. As required by Rule 13a-15(d), Match Group management, including the CEO and the CFO, also conducted an evaluation of the Company's internal control over financial reporting to determine whether any changes occurred during the quarter ended December 31, 2017 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. Based on that evaluation, there has been no such change during the quarter ended December 31, 2017.

100

App. 118

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Match Group, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Match Group, Inc. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Company as of December 31, 2017 and 2016, and the related consolidated and combined statements of operations, comprehensive operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2017, and the related notes and the financial statement schedule listed in the Index at Item 15(a), and our report dated March 1, 2018 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP
New York, New York
March 1, 2018

101

Table of Contents

**Item 9B.   Other Information**

Not applicable.

102

Table of Contents

## PART III

The information required by Part III (Items 10, 11, 12, 13 and 14) has been incorporated by reference to Match Group's definitive Proxy Statement to be used in connection with its 2018 Annual Meeting of Stockholders (the "2018 Proxy Statement"), as set forth below in accordance with General Instruction G(3) of Form 10-K.

### Item 10. Directors, Executive Officers and Corporate Governance

The information required by Items 401 and 405 of Regulation S-K relating to directors and executive officers of Match Group and their compliance with Section 16(a) of the Exchange Act is set forth in the sections entitled "Information Concerning Director Nominees" and "Information Concerning Match Group Executive Officers Who Are Not Directors," and "Section 16(a) Beneficial Ownership Reporting Compliance," respectively, in the 2018 Proxy Statement and is incorporated herein by reference. The information required by Item 406 of Regulation S-K relating to Match Group's Code of Ethics is set forth under the caption "Part I-Item 1-Business-Additional Information-Code of ethics" of this annual report and is incorporated herein by reference. The information required by subsections (c)(3), (d)(4) and (d)(5) of Item 407 of Regulation S-K is set forth in the sections entitled "Corporate Governance" and "The Board and Board Committees" in the 2018 Proxy Statement and is incorporated herein by reference.

### Item 11. Executive Compensation

The information required by Item 402 of Regulation S-K relating to executive and director compensation is set forth in the sections entitled "Executive Compensation" and "Director Compensation" in the 2018 Proxy Statement and is incorporated herein by reference. The information required by subsections (e)(4) and (e)(5) of Item 407 of Regulation S-K relating to certain compensation committee matters is set forth in the sections entitled "The Board and Board Committees," "Compensation Committee Report" and "Compensation Committee Interlocks and Insider Participation" in the 2018 Proxy Statement and is incorporated herein by reference; provided, that the information set forth in the section entitled "Compensation Committee Report" shall be deemed furnished herein and shall not be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information regarding ownership of Match Group common stock and Class B common stock required by Item 403 of Regulation S-K and securities authorized for issuance under Match Group's various equity compensation plans required by Item 201(d) of Regulation S-K is set forth in the sections entitled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information," respectively, in the 2018 Proxy Statement and is incorporated herein by reference.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information regarding certain relationships and related transactions involving Match Group required by Item 404 of Regulation S-K and director independence determinations required by Item 407(a) of Regulation S-K is set forth in the sections entitled "Certain Relationships and Related Person Transactions" and "Corporate Governance," respectively, in the 2018 Proxy Statement and is incorporated herein by reference.

### Item 14. Principal Accounting Fees and Services

Information required by Item 9(e) of Schedule 14A regarding the fees and services of Match Group's independent registered public accounting firm and the pre-approval policies and procedures applicable to services provided to Match Group by such firm is set forth in the sections entitled "Fees Paid to Our Independent Registered Public Accounting Firm" and "Audit and Non-Audit Services Pre-Approval Policy," respectively, in the 2018 Proxy Statement and is incorporated herein by reference.

103

App. 121

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

*(a)   List of documents filed as part of this Report:*

**(1)   Consolidated and Combined Financial Statements of Match Group, Inc.**

Report of Independent Registered Public Accounting Firm: Ernst & Young LLP.

Consolidated Balance Sheet as of December 31, 2017 and 2016.

Consolidated and Combined Statement of Operations for the Years Ended December 31, 2017, 2016 and 2015.

Consolidated and Combined Statement of Comprehensive Operations for the Years Ended December 31, 2017, 2016 and 2015.

Consolidated and Combined Statement of Shareholders' Equity for the Years Ended December 31, 2017, 2016 and 2015.

Consolidated and Combined Statement of Cash Flows for the Years Ended December 31, 2017, 2016 and 2015.

Notes to Consolidated and Combined Financial Statements.

**(2)  Consolidated and Combined Financial Statement Schedule of Match Group, Inc.**

| Schedule Number | |
| --- | --- |
| II | Valuation and Qualifying Accounts. |

All other financial statements and schedules not listed have been omitted since the required information is either included in the Consolidated and Combined Financial Statements or the notes thereto, is not applicable or is not required.

104

App. 122

Table of Contents

## EXHIBIT INDEX

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith, incorporated by reference herein by reference to the location indicated, or furnished herewith.

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 2.1 | Stock Purchase Agreement, dated as of July 13, 2015, by and among Match.com Inc., Plentyoffish Media Inc., Markus Frind, Markus Frind Family Trust No. 2, and Frind Enterprises Ltd. | 8-K | 000-20570 | 2.1 | 7/17/2015 | |
| 3.1 | Amended and Restated Certificate of Incorporation of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 11/24/2015 | |
| 3.2 | Amended and Restated By-laws of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 12/7/2017 | |
| 4.1 | Indenture, dated June 1, 2016, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 6/2/2016 | |
| 4.2 | Investor Rights Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 4.1 | 11/24/2015 | |
| 4.3 | Indenture, dated December 4, 2017, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 12/4/2017 | |
| 10.1 | Master Transaction Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.1 | 11/24/2015 | |
| 10.2 | Employee Matters Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.2 | 11/24/2015 | |
| 10.3 | Amendment No. 1 to the Employee Matters Agreement, dated as of April 13, 2016, by and between Match Group, Inc. and IAC/InterActiveCorp. | 10-Q | 001-37636 | 10.1 | 5/10/2016 | |
| 10.4 | Tax Sharing Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.3 | 11/24/2015 | |
| 10.5 | Services Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.4 | 11/24/2015 | |
| 10.6 | Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.5 | 11/24/2015 | |
| 10.7 | First Amendment to the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 8/4/2017 | |
| 10.8 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.7 | 2/28/2017 | |
| 10.9 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.8 | 2/28/2017 | |
| 10.10 | Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.1 | 5/24/2017 | |
| 10.11 | First Amendment to the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.3 | 8/4/2017 | |
| 10.12 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 11/9/2017 | |
| 10.13 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.2 | 11/9/2017 | |
| 10.14 | Summary of Non-Employee Director Compensation Arrangements.(1) | 10-K | 001-37636 | 10.9 | 3/28/2016 | |
| 10.15 | Amended and Restated Credit Agreement, dated as of November 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 10-K | 001-37636 | 10.11 | 3/28/2016 | |

105

App. 123

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 10.16 | Amendment No. 3, dated as of December 8, 2016, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 12/8/2016 | |
| 10.17 | Amendment No. 4, dated as of August 14, 2017, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, as further amended as of December 8, 2016, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 8/17/2017 | |
| 10.18 | Employment Agreement between Gregory R. Blatt and the Registrant, dated as of April 27, 2016.(1) | 10-K | 001-37636 | 10.12 | 2/28/2017 | |
| 10.19 | Employment Agreement between Jared F. Sine and the Registrant, dated as of July 5, 2016.(1) | 10-Q | 001-37636 | 10.1 | 11/7/2016 | |
| 21.1 | Subsidiaries of the Registrant as of December 31, 2017. | | | | | † |
| 23.1 | Consent of Ernst & Young LLP. | | | | | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 101.INS | XBRL Instance Document | | | | | ‡ |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | ‡ |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | ‡ |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | ‡ |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | ‡ |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | ‡ |

_____

(1)    Reflects management contracts and management and director compensatory plans.

106

App. 124

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

| March 1, 2018 | **MATCH GROUP, INC.** | |
| --- | --- | --- |
| | By: | /s/ GARY SWIDLER |
| | | Gary Swidler |
| | | *Chief Financial Officer* |

107

App. 125

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on March 1, 2018:

| Signature | Title |
|---|---|
| /s/ JOSEPH LEVIN<br>Joseph Levin | Chairman of the Board |
| /s/ AMANDA W. GINSBERG<br>Amanda W. Ginsberg | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ GARY SWIDLER<br>Gary Swidler | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ PHILIP D. EIGENMANN<br>Philip D. Eigenmann | Senior Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) |
| /s/ GREGORY R. BLATT<br>Gregory R. Blatt | Vice Chairman of the Board (non-executive) |
| /s/ ANN L. McDANIEL<br>Ann L. McDaniel | Director |
| /s/ THOMAS J. McINERNEY<br>Thomas J. McInerney | Director |
| /s/ GLENN H. SCHIFFMAN<br>Glenn H. Schiffman | Director |
| /s/ PAMELA S. SEYMON<br>Pamela S. Seymon | Director |
| /s/ ALAN G. SPOON<br>Alan G. Spoon | Director |
| /s/ MARK STEIN<br>Mark Stein | Director |
| /s/ GREGG WINIARSKI<br>Gregg Winiarski | Director |
| /s/ SAM YAGAN<br>Sam Yagan | Vice Chairman of the Board (non-executive) |

108

Schedule II

**MATCH GROUP, INC. AND SUBSIDIARIES**

**VALUATION AND QUALIFYING ACCOUNTS**

| Description | Balance at Beginning of Period | | Charges to Earnings | | Charges to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | | |
| **2017** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 676 | $ | 427 [a] | $ | (47) | $ | (278) [d] $ | 778 |
| Deferred tax valuation allowance | | 23,411 | | 1,157 [b] | | 227 [c] | | — | 24,795 |
| Other reserves | | 2,822 | | | | | | | 2,544 |
| **2016** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 902 | $ | 136 [a] | $ | 23 | $ | (385) [d] $ | 676 |
| Deferred tax valuation allowance | | 22,945 | | (593) [e] | | 1,059 [f] | | — | 23,411 |
| Other reserves | | 2,514 | | | | | | | 2,822 |
| **2015** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 804 | $ | 26 [a] | $ | 87 | $ | (15) [d] $ | 902 |
| Deferred tax valuation allowance | | 24,602 | | 204 [g] | | (1,861) [h] | | — | 22,945 |
| Other reserves | | 2,098 | | | | | | | 2,514 |

———————————————

[a] Additions to the allowance for doubtful accounts are charged to expense.

[b] Amount is primarily related to an other-than-temporary impairment charge for a certain cost method investment and an increase in foreign tax loss carryforwards.

[c] Amount is related to currency translation adjustments on foreign net operating losses.

[d] Write-off of fully reserved accounts receivable.

[e] Amount is primarily related to an other-than-temporary impairment charge for a certain cost method investment and an increase in foreign tax credits.

[f] Amount is related to the realization of previously unbenefited losses on an available-for-sale marketable equity security included in accumulated other comprehensive loss.

[g] Amount is primarily related to a net increase in foreign, federal and state net operating losses.

[h] Amount is primarily related to the decrease in unbenefited unrealized losses on an available-for-sale marketable equity security included in accumulated other comprehensive loss and currency translation adjustments on foreign net operating losses.

109

App. 127

# Exhibit 2

10-K 1 mtch10-k20181231.htm 10-K

As filed with the Securities and Exchange Commission on February 28, 2019

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**
**For the Fiscal Year Ended December 31, 2018**

**Commission File No. 001-37636**



# Match Group, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **26-4278917** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **8750 North Central Expressway, Suite 1400, Dallas, Texas** | **75231** |
| (Address of Registrant's principal executive offices) | (Zip Code) |

**(214) 576-9352**
(Registrant's telephone number, including area code)
**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of exchange on which registered** |
|---|---|
| Common Stock, par value $0.001 | The Nasdaq Stock Market LLC (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒  No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒   Accelerated filer ☐   Non-accelerated filer ☐   Smaller reporting company ☐   Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

As of February 1, 2019, the following shares of the Registrant's Common Stock were outstanding:

| | |
|---|---|
| Common Stock | 68,529,512 |
| Class B Common Stock | 209,919,402 |
| Class C Common Stock | — |
| Total | 278,448,914 |

The aggregate market value of the voting common stock held by non-affiliates of the registrant as of June 30, 2018 was $1,953,756,561. For the purpose of the foregoing calculation only, shares held by IAC/InterActiveCorp and all directors and executive officers of the registrant are assumed to be affiliates of the registrant.

**Documents Incorporated By Reference:**

Portions of the Registrant's proxy statement for its 2019 Annual Meeting of Stockholders are incorporated by reference into Part III herein.

App. 129

## TABLE OF CONTENTS

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 9 |
| Item 1B. | Unresolved Staff Comments | 28 |
| Item 2. | Properties | 28 |
| Item 3. | Legal Proceedings | 28 |
| Item 4. | Mine Safety Disclosure | 29 |
| **PART II** | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 30 |
| Item 6. | Selected Financial Data | 32 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 55 |
|  | Note 1—Organization | 62 |
|  | Note 2—Summary of Significant Accounting Policies | 62 |
|  | Note 3—Income Taxes | 71 |
|  | Note 4—Discontinued Operations | 75 |
|  | Note 5—Goodwill and Intangible Assets | 75 |
|  | Note 6—Financial Instruments | 76 |
|  | Note 7—Long-term Debt, net | 79 |
|  | Note 8—Shareholders' Equity | 81 |
|  | Note 9—Accumulated Other Comprehensive Loss | 83 |
|  | Note 10—Earnings per Share | 84 |
|  | Note 11—Stock-based Compensation | 85 |
|  | Note 12—Geographic Information | 90 |
|  | Note 13—Commitments and Contingencies | 91 |
|  | Note 14—Supplemental Cash Flow Information | 92 |
|  | Note 15—Related Party Transactions | 93 |
|  | Note 16—Benefit Plans | 95 |
|  | Note 17—Consolidated Financial Statement Details | 95 |
|  | Note 18—Quarterly Results (Unaudited) | 97 |
|  | Note 19—Subsequent Event (Unaudited) | 98 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 99 |
| Item 9A. | Controls and Procedures | 99 |
| Item 9B. | Other Information | 101 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 102 |
| Item 11. | Executive Compensation | 102 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 102 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 102 |

App. 131

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 136 of 451    PageID 659

Item 14.    Principal Accounting Fees and Services                                      102

**PART IV**

Item 15.    Exhibits and Financial Statement Schedules                                  103

2

Item 14.    Principal Accounting Fees and Services

**PART IV**

App. 132

## PART I

**Item 1. Business**

**Who we are**

Match Group, Inc. is a leading provider of dating products available in over 40 languages to our users all over the world through applications and websites we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, Pairs and Hinge, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users.

As used herein, "Match Group," the "Company," "we," "our," "us," and similar terms refer to Match Group, Inc. and its subsidiaries, unless the context indicates otherwise.

Consumers' dating preferences vary significantly, influenced in part by demographics, geography, religion and sensibility. As a result, the market for dating products is fragmented, and no single product has been able to effectively serve the dating category as a whole.

Given these wide-ranging consumer preferences, our strategy focuses on a brand portfolio approach, through which we attempt to offer dating products that collectively appeal to the broadest spectrum of consumers. We believe that this approach maximizes our ability to capture additional users. We work to apply a centralized discipline to learnings, by sharing best practices and technologies across our brands in order to increase growth, reduce costs and maximize profitability. Additionally, we centralize certain other administrative functions, such as legal, human resources, finance, tax, and others. This approach allows us to quickly introduce new products and features, optimize marketing strategies, and more effectively deploy talent across our organization.

**Enabling dating in a digital world**

Prior to the proliferation of mobile devices and computers, human connections traditionally were limited by social circles, geography and time. Today, the adoption of mobile technology and the internet has significantly expanded the ways in which people can build relationships, create new interactions and develop romantic connections. Additionally, the ongoing adoption of technology into more aspects of daily life continues to further erode biases and stigmas that previously prevented individuals from using technology to help find and develop those connections.

We believe that dating products serve as a natural extension of the traditional means of meeting people and provide a number of benefits for their users, including:

- *Expanded options*: Dating products provide users access to a large number of like-minded people they otherwise would not have a chance to meet.

- *Efficiency*: The search and matching features, as well as the profile information available on dating products, allow users to filter a large number of options in a short period of time, increasing the likelihood that users will make a connection with someone.

- *More comfort and control*: Compared to the traditional ways that people meet, dating products provide an environment that reduces the awkwardness around the process of reaching out to new people. This leads to many people who would otherwise be passive participants in the dating process taking a more active role.

- *Convenience*: The nature of the internet and the proliferation of mobile devices allow users to connect with new people at any time, regardless of where they are.

Depending on a person's circumstances at any given time, dating products can act as a supplement to, or substitute for, traditional means of meeting people. When selecting a dating product, we believe that users consider the following attributes:

- *Brand recognition*: Brand is very important. Users generally associate strong dating brands with a higher likelihood of success and a higher level of security. Generally, successful dating brands depend on large,

3

App. 133

active communities of users, strong algorithmic filtering technology and awareness of successful usage among similar users.

- *Successful experiences*: Demonstrated success of other users attracts new users through word-of-mouth recommendations. Successful experiences also drive repeat usage.

- *Community identification*: Users typically look for dating products that offer a community or communities with which the user can associate. By selecting a dating product that is focused on a particular demographic, religion, geography or intent (for example, casual dating or more serious relationships), users can increase the likelihood that they will make a connection with someone with whom they identify.

- *Product features and user experience*: Users tend to gravitate towards dating products that offer features and user experiences that resonate with them, such as question-based matching algorithms, location-based features, offline events or search capabilities. User experience is also driven by the type of user interface (for example, swiping versus scrolling), a particular mix of free and paid features, ease of use, privacy and security. Users expect every interaction with a dating product to be seamless and intuitive.

**Our portfolio**

Dating is a highly personal endeavor and consumers have a wide variety of preferences that determine what type of dating product they choose. As a result, our strategy focuses on a portfolio approach of various brands in order to reach a broad range of users. Our brands are collectively available in over 40 languages all over the world. The following is a list of our key brands:

*Tinder.* Tinder was launched in 2012 and has since risen to scale and popularity faster than any other product in the online dating category with limited marketing spend, growing to over 4.3 million Subscribers today. Tinder's distinctive "right swipe" feature has led to significant adoption among the millennial generation, previously underserved by the online dating category. Tinder employs a freemium model, through which users are allowed to enjoy many of the core features of Tinder for free, including limited use of the "swipe right" feature with unlimited communication with other users. However, to enjoy premium features, such as unlimited use of the "swipe right" feature, a Tinder user must subscribe to either Tinder Plus, launched in early 2015, or Tinder Gold, which was launched in late summer 2017. Tinder users and Subscribers may also pay for certain premium features, such as Super Likes and Boosts, on a pay-per-use basis.

*Match.* Match was launched in 1995 and helped create the online dating category. Among its distinguishing features are the ability to search profiles, receive algorithmic matches and attend live events, promoted by Match, with other Subscribers. Additionally, new features, such as Missed Connections, which uses location-based technology to enable users to connect with other users with whom they have crossed paths in the past, engage users into more meaningful connections. Match is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Match relies heavily on word-of-mouth traffic, repeat usage and paid marketing.

*PlentyOfFish.* PlentyOfFish was launched in 2003 and acquired in October 2015. Similar to Match, among its distinguishing features is the ability to both search profiles and receive algorithmic matches. Similar to Tinder, PlentyOfFish has grown to popularity over the years with very limited marketing spend and also relies on a freemium model. PlentyOfFish has broad appeal in the central United States, Canada, the United Kingdom and a number of other international markets.

*Meetic.* Meetic, a leading European online dating brand based in France, was launched in 2001. Similar to Match, among its distinguishing features are the ability to search profiles, receive algorithmic matches, and attend live events, promoted by Meetic, with other Subscribers and non-Subscribers from time to time. Also, similar to Match, Meetic is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Meetic relies heavily on word-of-mouth traffic, repeat usage and paid marketing.

*OkCupid.* OkCupid was launched in 2004 and has attracted users through a mathematical and Q&A approach to the online dating category. Similar to Tinder and PlentyOfFish, OkCupid has grown in popularity over the years without significant marketing spend and also relies on a freemium model. OkCupid has a loyal highly educated user base predominately located in major cities in the United States and United Kingdom.

4

Table of Contents

*OurTime.* OurTime is the largest brand within our affinity-oriented brands. OurTime is the largest community of singles over age 50 of any dating product.

*Pairs.* Pairs was launched in 2012 and acquired in May 2015. Pairs is a leading provider of dating products in Japan, with a strong presence in Taiwan and a growing presence in other select Asian countries. Pairs is a dating app that was specifically designed to address social barriers generally associated with the use of dating products in Asian countries, particularly Japan.

*Hinge.* Hinge was launched in 2012 and following a series of investments, Match took a controlling stake in Hinge in June 2018 and purchased all of the remaining outstanding equity in December 2018. Hinge is a mobile-only experience and employs a freemium model. Hinge focuses on users with a higher level of intent to enter into a relationship and its product is designed to reinforce that approach.

All our products enable users to establish a profile and review other users' profiles without charge. Each product also offers additional features, some of which are free, and some of which require payment depending on the particular product. In general, access to premium features requires a subscription, which is typically offered in packages (primarily ranging from one month to six months), depending on the product and circumstance. Prices differ meaningfully within a given brand by the duration of a subscription purchased, the bundle of paid features that a user chooses to access, and whether or not a Subscriber is taking advantage of any special offers. In addition to subscriptions, many of our products offer the user certain features, such as the ability to promote themselves for a given period of time, or to review certain profiles without any signaling to the other users, and these features are offered on a pay-per-use, or à la carte, basis. The precise mix of paid and premium features is established over time on a brand-by-brand basis and is constantly subject to iteration and evolution.

The brands in our portfolio both compete and collaborate with each other. We attempt to empower individual business leaders with the authority and incentives to grow each of our brands. Our brands compete with each other and with third-party dating businesses on brand characteristics, product features, and business model. We also attempt to centrally facilitate excellence and efficiency across the entire portfolio by:

- centralizing operational functions across certain brands where we have strength in personnel and sufficient commonality of business interest (for example, ad sales, online marketing and technology centralized across some, but not all, brands);

- developing talent across the portfolio to allow for expertise development and career advancement while giving us the ability to deploy the best talent in the most critical positions across the company at any given time;

- sharing analytics and similar data to leverage product and marketing successes across our businesses rapidly for competitive advantage; and

- centralizing certain administrative functions, like legal, trust and safety, privacy, human resources, and finance, across the entire portfolio to enable each brand to focus more on growth.

**Revenue**

Our revenue is primarily derived directly from users in the form of recurring subscriptions, which typically provide unlimited access to a bundle of features for a specific period of time, and the balance from à la carte features, where users pay a non-recurring fee for a specific action or event. Each of our brands offers a combination of free and paid features targeted to its unique community. In addition to direct revenue from our users, we generate indirect revenue from online advertising, which makes up a much smaller percentage of our overall revenue as compared to direct revenue.

**Sales and marketing**

Certain of our brands attract the majority of their users through word-of-mouth and other free channels. Other brands rely on paid user acquisition for a significant percentage of their users. Our online marketing activities generally consist of purchasing social media advertising, banner and other display advertising, search engine marketing, email campaigns, video advertising, business development or partnership deals, and hiring influencers to promote our products. Our offline marketing activities generally consist of television advertising and related public relations efforts, as well as events.

5

Table of Contents

**Technology**

Consistent with our general operating philosophy, each of our brands tends to develop its own technology systems to support its product, leveraging both open-source and vendor supported software technology. Each of our various brands has dedicated engineering teams responsible for software development and creation of new features to support our products across the full range of devices, from native mobile applications to desktop and mobile-web. Our engineering teams use an agile development process, allowing us to deploy frequent iterative releases for product features.

We host the majority of our brands in leased data centers located within the general geography served by the brand. Other brands, such as Tinder, utilize hosted web services, primarily Amazon Web Services, to support their infrastructure.

**Competition**

The dating industry is competitive and has no single, dominant brand globally. We compete with a number of other companies that provide similar dating and matchmaking products.

In addition to other online dating brands, we compete with social media platforms and offline dating services, such as in-person matchmakers. Arguably, our biggest competition comes from the traditional ways that people meet each other, and the choices some people make to not utilize dating products or services.

We believe that our ability to compete successfully will depend primarily upon the following factors:

- our ability to continue to increase consumer acceptance and adoption of online dating products, particularly in emerging markets and other parts of the world where the stigma is only beginning to erode;

- continued growth in internet access and smart phone adoption in certain regions of the world, particularly emerging markets;

- the continued strength of our brands;

- the breadth and depth of our active communities of users relative to those of our competitors;

- our ability to evolve our products in response to our competitors' offerings, user requirements, social trends, the ever-evolving technological landscape, and the ever-changing regulatory landscape, in particular, as it relates to the regulation of online platforms;

- our ability to efficiently acquire new users for our products;

- our ability to continue to optimize our monetization strategies; and

- the design and functionality of our products.

A large portion of online dating customers use multiple dating products over a given period of time, either concurrently or sequentially, making our broad portfolio of brands a competitive advantage.

**Intellectual property**

We regard our intellectual property rights, including trademarks, domain names and other intellectual property, as critical to our success.

For example, we rely heavily upon the use of trademarks (primarily Tinder, Match, PlentyOfFish, OkCupid, Meetic, OurTime, Pairs, and Hinge, and associated domain names, taglines and logos) to market our dating products and applications and build and maintain brand loyalty and recognition. We have an ongoing trademark and service mark registration program, pursuant to which we register our brand names and product names, taglines and logos and renew existing trademark and service mark registrations in the United States and other jurisdictions to the extent we determine it to be necessary or otherwise appropriate and cost-effective. In addition, we have a trademark and service mark monitoring policy pursuant to which we monitor applications filed by third parties to register trademarks and service marks that may be confusingly similar to ours, as well as potential unauthorized use of our material trademarks and service marks. Our enforcement of this policy affords us valuable protection under current laws, rules and regulations. We also reserve and file registrations (to the extent available) and renew existing registrations for domain names that we believe are material to our business.

6

App. 136

We also rely upon a combination of in-licensed third-party and proprietary trade secrets, including proprietary algorithms, and upon patented and patent-pending technologies, processes and features relating to our matching process systems or related features, products and services with expiration dates from 2023 to 2036. We have an ongoing invention recognition program pursuant to which we apply for patents to the extent we determine it to be core to our product or businesses or otherwise appropriate and cost-effective.

We rely on a combination of internal and external controls, including applicable laws, rules and regulations and contractual restrictions with employees, contractors, customers, suppliers, affiliates and others, to establish, protect and otherwise control access to our various intellectual property rights.

**Government regulation**

We are subject to foreign and domestic laws and regulations that affect companies conducting business on the internet generally, including laws relating to the liability of providers of online services for their operations and the activities of their users. As a result, we could be subject to actions based on negligence, various torts and trademark and copyright infringement, among other actions. See "Risk factors—Risks relating to our business—Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business" and "—Risks relating to our business—We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties."

Because we receive, store and use a substantial amount of information received from or generated by our users, we are also impacted by laws and regulations governing privacy, the storage, sharing, use, processing, disclosure and protection of personal data and data breaches, primarily in the case of our operations in the United States and European Union and our handling of personal data of users located in the United States and European Union, respectively. As a result, we could be subject to various private and governmental claims and actions. See "Risk factors—Risks relating to our business—Unauthorized access of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights and compliance with laws designed to prevent unauthorized access of personal data could be costly."

As the provider of dating products with a subscription-based element, we are also subject to laws and regulations in certain U.S. states and other countries that apply to our automatically-renewing subscription payment models. Finally, certain U.S. states and certain countries in Asia have laws that specifically govern dating services.

**Employees**

As of December 31, 2018, we had approximately 1,400 full-time employees and approximately 100 part-time employees worldwide.

**Additional Information**

*Corporate information.* We were incorporated in the State of Delaware on February 12, 2009 as a wholly-owned subsidiary of IAC/InterActiveCorp ("IAC").

*Company website and public filings.* Investors and others should note that we announce material financial and operational information to our investors using our investor relations website at *http://ir.mtch.com*, Securities and Exchange Commission ("SEC") filings, press releases and public conference calls. We use these channels as well as social media to communicate with our users and the public about our company, our services and other issues. It is possible that the information we post on social media could be deemed to be material information. Accordingly, investors, the media, and others interested in our company should monitor the social media channels listed on our investor relations website in addition to following our SEC filings, press releases and public conference calls. Neither the information on our website, nor the information on the website of any Match Group business, is incorporated by reference into this report, or into any other filings with, or into any other information furnished or submitted to, the SEC.

The Company makes available, free of charge through its website, its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K (including related amendments) as soon as reasonably practicable after they have been electronically filed with (or furnished to) the SEC.

7

App. 137

Table of Contents

*Code of ethics.* The Company's code of ethics applies to all employees (including Match Group's principal executive officer, principal financial officer and principal accounting officer) and directors and is posted on the Company's website at *http://ir.mtch.com* under the heading of "Corporate Governance." This code of ethics complies with Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market LLC. Any changes to the code of ethics that affect the provisions required by Item 406 of Regulation S-K, and any waivers of such provisions of the code of ethics for Match Group's executive officers, senior financial officers or directors, will also be disclosed on Match Group's website.

**Relationship with IAC**

*Equity ownership and vote.* Match Group has outstanding shares of common stock, with one vote per share, and shares of Class B common stock, with ten votes per share and which are convertible into common stock on a share for share basis. As of February 1, 2019, IAC owned 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock and 15,813,277 shares of common stock. These holdings collectively represent approximately 81.1% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock.

*Intercompany agreements.* In connection with the initial public offering of our common stock in November 2015, we entered into certain agreements relating to our relationship with IAC after the offering. These agreements include, among others, the six agreements described below.

*Master transaction agreement.* The master transaction agreement sets forth the agreements between us and IAC regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC.

*Investor rights agreement.* Under the investor rights agreement, we are obligated to provide IAC with certain registration and other rights relating to the shares of our common stock held by it and anti-dilution rights.

*Tax sharing agreement.* The tax sharing agreement governs our and IAC's rights, responsibilities, and obligations with respect to tax liabilities and benefits, entitlements to refunds, the preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes.

*Services agreement.* The services agreement currently governs services that IAC has agreed to provide through November 24, 2019, with automatic renewal for successive one-year terms, subject to IAC's continued ownership of a majority of the combined voting power of our voting stock and any subsequent extension or truncation agreed to by us and IAC.

*Employee matters agreement.* The employee matters agreement, as amended, covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of our board of directors, we will no longer participate in IAC's employee benefit plans, but will establish our own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

*Subordinated loan credit facility.* The subordinated loan facility with IAC (the "IAC Subordinated Loan Facility") allows the Company to make one or more requests to IAC to borrow funds. If IAC agrees to fulfill any such borrowing request, such indebtedness will be incurred in accordance with the terms of the IAC Subordinated Loan Facility. At December 31, 2018, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility.

For additional information regarding these agreements, see "Note 15—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements."

8

App. 138

Table of Contents

**Item 1A. Risk Factors**

**Cautionary Statement Regarding Forward-Looking Information**

This annual report on Form 10-K contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. The use of words such as "anticipates," "estimates," "expects," "plans" and "believes," among others, generally identify forward-looking statements. These forward-looking statements include, among others, statements relating to: Match Group's future financial performance, Match Group's business prospects and strategy, anticipated trends and prospects in the industries in which Match Group's businesses operate and other similar matters. These forward-looking statements are based on Match Group management's expectations and assumptions about future events as of the date of this annual report, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict.

Actual results could differ materially from those contained in these forward-looking statements for a variety of reasons, including, among others, the risk factors set forth below. Other unknown or unpredictable factors that could also adversely affect Match Group's business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, the forward-looking statements discussed in this annual report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of Match Group's management as of the date of this annual report. Match Group does not undertake to update these forward-looking statements.

**Risks relating to our business**

***The limited operating history of our newer dating brands and products makes it difficult to evaluate our current business and future prospects.***

We seek to tailor each of our dating brands and products to meet the preferences of specific communities of users. Building a given brand or product is generally an iterative process that occurs over a meaningful period of time and involves considerable resources and expenditures. Although certain of our newer brands and products have experienced significant growth over relatively short periods of time, the historical growth rates of these brands and products may not be an indication of future growth rates for such products or our newer brands and products generally. We have encountered, and may continue to encounter, risks and difficulties as we build our newer brands and products. The failure to successfully address these risks and difficulties could adversely affect our business, financial condition and results of operations.

***The dating industry is competitive, with low switching costs and a consistent stream of new products and entrants, and innovation by our competitors may disrupt our business.***

The dating industry is competitive, with a consistent stream of new products and entrants. Some of our competitors may enjoy better competitive positions in certain geographical regions, user demographics or other key areas that we currently serve or may serve in the future. These advantages could enable these competitors to offer products that are more appealing to users and potential users than our products or to respond more quickly and/or cost-effectively than us to new or changing opportunities.

In addition, within the dating industry generally, costs for consumers to switch between products are low, and consumers have a propensity to try new approaches to connecting with people and to use multiple dating products at the same time. As a result, new products, entrants and business models are likely to continue to emerge. It is possible that a new product could gain rapid scale at the expense of existing brands through harnessing a new technology or a new or existing distribution channel, creating a new or different approach to connecting people or some other means.

Potential competitors include larger companies that could devote greater resources to the promotion or marketing of their products and services, take advantage of acquisition or other opportunities more readily or develop and expand their products and services more quickly than we do. Potential competitors also include established social media companies that may develop products, features, or services that may compete with ours. For example, Facebook has introduced a dating feature on its platform, which it is testing in certain markets, and recently announced that it plans to roll this feature out globally in the near future. These social media competitors could use strong or dominant positions in one or more markets, and ready access to existing large pools of potential users and personal information regarding those users, to gain competitive advantages over us, including by offering different product features or services that users may prefer or offering their products and services to

9

App. 139

users at no charge, which may enable them to acquire and engage users at the expense of our user growth or engagement.

If we are not able to compete effectively against our current or future competitors and products that may emerge, the size and level of engagement of our user base may decrease, which could have an adverse effect on our business, financial condition and results of operations.

***Each of our dating products monetizes users at different rates. If a meaningful migration of our user base from our higher monetizing dating products to our lower monetizing dating products were to occur, it could adversely affect our business, financial condition and results of operations.***

We own, operate and manage a large and diverse portfolio of dating products. Each dating product has its own mix of free and paid features designed to optimize the user experience and revenue generation from that product's community of users. In general, the mix of features for the various dating products within our more established brands leads to higher monetization rates per user than the mix of features for the various dating products within our newer brands. Over time, users of our newer brands with lower monetization rates per user comprise an increasingly larger percentage of our user base. If this trend leads to a significant portion of users of our brands with higher monetization rates migrating to our less profitable brands, our business, financial condition and results of operations could be adversely affected. See "Item 7—Management's discussion and analysis of financial condition and results of operations—Management overview—Trends affecting our business."

***Our growth and profitability rely, in part, on our ability to attract and retain users through cost-effective marketing efforts. Any failure in these efforts could adversely affect our business, financial condition and results of operations.***

Attracting and retaining users for certain of our dating products involve considerable expenditures for online and offline marketing. Historically, we have had to increase our marketing expenditures over time in order to attract and retain users and sustain our growth.

Evolving consumer behavior can affect the availability of profitable marketing opportunities. For example, as traditional television viewership declines and as consumers spend more time on mobile devices rather than desktop computers, the reach of many of our traditional advertising channels is contracting. Similarly, as consumers communicate less via email and more via text messaging and other virtual means, the reach of email campaigns designed to attract new and repeat users (and retain current users) for our dating products is adversely impacted. To continue to reach potential users and grow our businesses, we must identify and devote more of our overall marketing expenditures to newer advertising channels, such as mobile and online video platforms, as well as targeted campaigns in which we communicate directly with potential, former and current users via new virtual means. Generally, the opportunities in and sophistication of newer advertising channels are relatively undeveloped and unproven, making it difficult to assess returns on investment associated with such advertising channels, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the advertising industry. Any failure to do so could adversely affect our business, financial condition and results of operations.

***Communicating with our users via email is critical to our success, and any erosion in our ability to communicate in this fashion that is not sufficiently replaced by other means could adversely affect our business, financial condition and results of operations.***

Historically, one of our primary means of communicating with our users and keeping them engaged with our products has been via email communication. Our ability to communicate via email enables us to keep our users updated on activity with respect to their profile, present or suggest new or interesting users from the community, invite users to offline events and present discount and promotional offers, among other things. As consumer habits evolve in the era of web-enabled mobile devices and messaging/social networking apps, usage of email, particularly among our younger users, has declined. In addition, deliverability and other restrictions imposed by third party email providers and/or applicable law could limit or prevent our ability to send emails to our users. A continued and significant erosion in our ability to communicate successfully with our users via email could have an adverse impact on user experience, levels of user engagement and the rate at which non-paying users become Subscribers.

While we continually work to find new means of communicating and connecting with our users (for example, through push notifications), there is no assurance that such alternative means of communication will be

10

Table of Contents

as effective as email has been. Any failure to develop or take advantage of new means of communication or limitations on those means of communications imposed by laws, device manufacturers or other sources could have an adverse effect on our business, financial condition and results of operations.

***Foreign currency exchange rate fluctuations could adversely affect our results of operations.***

We operate in various international markets, primarily in various jurisdictions within the European Union and Asia. During the fiscal years ended December 31, 2018 and 2017, 50% and 46% of our total revenues, respectively, were international revenues. We translate international revenues into U.S. dollar-denominated operating results and during periods of a strengthening U.S. dollar, our international revenues will be reduced when translated into U.S. dollars. In addition, as foreign currency exchange rates fluctuate, the translation of our international revenues into U.S. dollar-denominated operating results affects the period-over-period comparability of such results and can result in foreign currency exchange gains and losses.

We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar. Our exposure is primarily related to the Euro, and to a lesser extent, the British Pound ("GBP"). The average GBP and Euro exchange rates strengthened against the U.S. Dollar by 4% and 5%, respectively, in 2018 compared to 2017. See "Item 7A—Quantitative and Qualitative Disclosures About Market Risk—Foreign Currency Exchange Risk."

Brexit may continue to cause disruptions to capital and currency markets worldwide, and the full impact of the Brexit decision remains uncertain. Ongoing negotiations between the United Kingdom and the European Union will determine the terms of their relationship following Brexit. During this period of negotiation and following the completion of Brexit, our operating results may be negatively affected by exchange rate and other market and economic volatility. To the extent that the U.S. dollar strengthens relative to either the Euro, the GBP or both, the translation of our international revenues into U.S. dollars will reduce our U.S. dollar denominated operating results and will affect their period-over-period comparability.

Historically, we have not hedged any foreign currency exposures. The continued growth and expansion of our international operations into new countries increases our exposure to foreign exchange rate fluctuations. Significant foreign exchange rate fluctuations, in the case of one currency or collectively with other currencies, could adversely affect our future results of operations.

***Distribution and marketing of, and access to, our dating products depends, in significant part, on a variety of third-party publishers, platforms and mobile app stores. If these third parties limit, prohibit or otherwise interfere with or change the terms of the distribution, use, or marketing of our dating products in any material way, it could adversely affect our business, financial condition and results of operations.***

We market and distribute our dating products (including related mobile applications) through a variety of third-party publishers and distribution channels, including Facebook, which recently announced its own dating product. Our ability to market our brands on any given property or channel is subject to the policies of the relevant third party. Certain publishers and channels have, from time to time, limited or prohibited advertisements for dating products for a variety of reasons, including as a result of poor behavior by other industry participants. There is no assurance that we will not be limited or prohibited from using certain current or prospective marketing channels in the future. If this were to happen in the case of a significant marketing channel and/or for a significant period of time, our business, financial condition and results of operations could be adversely affected.

Additionally, our mobile applications are increasingly accessed through the Apple App Store and the Google Play Store. Both Apple and Google have broad discretion to change their respective terms and conditions applicable to the distribution of our applications, including the amount of, and requirement to pay, certain fees associated with purchases facilitated by Apple and Google through our applications, and to interpret their respective terms and conditions in ways that may limit, eliminate or otherwise interfere with our ability to distribute our applications through their stores, the features we provide and the manner in which we market our in-app products. There is no assurance that Apple or Google will not limit, eliminate, or otherwise interfere with the distribution of our products, the features we provide and the manner in which we market our in-app products within our applications. To the extent either or both of them do so, our business, financial condition and results of operations could be adversely affected.

11

App. 141

Table of Contents

Lastly, in the case of Tinder, Hinge, and certain other of our products, many users historically registered for (and logged into) the application exclusively through their Facebook profiles. While we have launched an alternate authentication method that allows users to register for (and log into) Tinder, Hinge, and our other products using their mobile phone number, no assurances can be provided that users will no longer register for (and log into) Tinder, Hinge, and our other products through their Facebook profiles. Facebook has broad discretion to change its terms and conditions applicable to the data collected by its platform and its use thereof and to interpret its terms and conditions in ways that could limit, eliminate or otherwise interfere with our ability to use Facebook as an authentication method or to allow Facebook to use such data to gain a competitive advantage. If Facebook did so, our business, financial condition and results of operations could be adversely affected.

***As the distribution of our dating products through app stores increases, in order to maintain our profit margins, we may need to offset increasing app store fees by decreasing traditional marketing expenditures, increasing user volume or monetization per user or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected.***

As our user base continues to shift to mobile solutions, we increasingly rely on the Apple App Store and the Google Play Store to distribute our mobile applications and related in-app products. While our mobile applications are generally free to download from these stores, we offer our users the opportunity to purchase subscriptions and certain à la carte features through these applications. We determine the prices at which these subscriptions and features are sold; however, purchases of these subscriptions and features are required to be processed through the in-app payment systems provided by Apple and, to a lesser degree, Google. Due to these requirements, we pay Apple and Google, as applicable, a meaningful share (generally 30%) of the revenue we receive from these transactions. While we are constantly innovating on and creating our own payment systems and methods, given the increase of the distribution of our dating products through app stores and the strict requirements to use the in-app payments systems tied into Apple's, and to a lesser degree, Google's distribution services, we may need to offset these increased app store fees by decreasing traditional marketing expenditures as a percentage of revenue, increasing user volume or monetization per user, or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected. Additionally, to the extent Google changes its terms and conditions or practices to require us to process purchases of subscriptions and features through their in-app payment system, our business, financial condition and results of operations could be adversely affected.

***We depend on our key personnel.***

Our future success will depend upon our continued ability to identify, hire, develop, motivate and retain highly skilled individuals, with the continued contributions of our senior management being especially critical to our success. Competition for well-qualified employees across Match Group and its various businesses is intense and our continued ability to compete effectively depends, in part, upon our ability to attract new employees. While we have established programs to attract new employees and provide incentives to retain existing employees, particularly our senior management, we cannot guarantee that we will be able to attract new employees or retain the services of our senior management or any other key employees in the future. Effective succession planning is also important to our future success. If we fail to ensure the effective transfer of senior management knowledge and smooth transitions involving senior management across our various businesses, our ability to execute short and long term strategic, financial and operating goals, as well as our business, financial condition and results of operations generally, could be adversely affected.

***Our success depends, in part, on the integrity of our systems and infrastructures and on our ability to enhance, expand and adapt these systems and infrastructures in a timely and cost-effective manner.***

In order for us to succeed, our systems and infrastructures must perform well on a consistent basis. We have in the past, and from time to time we may in the future, experience system interruptions that make some or all of our systems or data unavailable and prevent our products from functioning properly for our users; any such interruption could arise for any number of reasons. Further, our systems and infrastructures are vulnerable to damage from fire, power loss, telecommunications failures, acts of God and similar events. While we have backup systems in place for certain aspects of our operations, our systems and infrastructures are not fully redundant, disaster recovery planning is not sufficient for all eventualities and our property and business interruption insurance coverage may not be adequate to compensate us fully for any losses that we may suffer.

12

App. 142

Any interruptions or outages, regardless of the cause, could negatively impact our users' experiences with our products, tarnish our brands' reputations and decrease demand for our products, any or all of which could adversely affect our business, financial condition and results of operations.

We also continually work to expand and enhance the efficiency and scalability of our technology and network systems to improve the experience of our users, accommodate substantial increases in the volume of traffic to our various products, ensure acceptable load times for our products and keep up with changes in technology and user preferences. Any failure to do so in a timely and cost-effective manner could adversely affect our users' experience with our various products and thereby negatively impact the demand for our products, and could increase our costs, either of which could adversely affect our business, financial condition and results of operations.

***We may not be able to protect our systems and infrastructures from cyberattacks and may be adversely affected by cyberattacks experienced by third parties.***

We are regularly under attack by perpetrators of random or targeted malicious technology-related events, such as cyberattacks, computer viruses, worms, bot attacks or other destructive or disruptive software, distributed denial of service attacks and attempts to misappropriate customer information, including credit card information and account login credentials. While we have invested (and continue to invest) heavily in the protection of our systems and infrastructures, in related personnel and training and in employing a strategy of data minimization, where appropriate, there can be no assurance that our efforts will prevent significant breaches in our systems or other such events from occurring. Some of our systems have experienced past security incidents, and, although they did not have a material adverse effect on our operating results, there can be no assurance of a similar result in the future. Any cyber or similar attack we are unable to protect ourselves against could damage our systems and infrastructures, prevent us from providing our products, erode our reputation and brands, result in the disclosure of confidential or sensitive information of our users and/or be costly to remedy, as well as subject us to investigations by regulatory authorities and/or litigation that could result in liability to third parties.

The impact of cyber security events experienced by third-parties with whom we do business (or upon whom we otherwise rely in connection with our day-to-day operations) could have a similar effect on us. Moreover, even cyber or similar attacks that do not directly affect us or third parties with whom we do business may result in widespread access to user account login credentials that such users have used across multiple internet sites, including our sites, or a loss of consumer confidence generally, which could make users less likely to use or continue to use online products generally, including our products. The occurrence of any of these events could have an adverse effect on our business, financial condition and results of operations.

***Our success depends, in part, on the integrity of third-party systems and infrastructures.***

We rely on third parties, primarily data center service providers and cloud-based, hosted web service providers, such as Amazon Web Services, as well as third party computer systems, broadband and other communications systems and service providers, in connection with the provision of our products generally, as well as to facilitate and process certain transactions with our users. We have no control over any of these third parties or their operations.

Problems experienced by third-party data center service providers and cloud-based, hosted web service providers, such as Amazon Web Services, upon whom we rely, the telecommunications network providers with whom we or they contract or with the systems through which telecommunications providers allocate capacity among their customers could also adversely affect us. Any changes in service levels at our data centers or hosted web service providers, such as Amazon Web Services, or any interruptions, outages or delays in our systems or those of our third party providers, or deterioration in the performance of these systems, could impair our ability to provide our products or process transactions with our users, which would adversely impact our business, financial condition and results of operations.

***If the security of personal and confidential or sensitive user information that we maintain and store is breached or otherwise accessed by unauthorized persons, it may be costly to mitigate the impact of such an event and our reputation could be harmed.***

We receive, process, store and transmit a significant amount of personal user and other confidential or sensitive information, including credit card information, and enable our users to share their personal information with each other. In some cases, we engage third party vendors to store this information. We continuously develop

13

Table of Contents

and maintain systems to protect the security, integrity and confidentiality of this information, but cannot guarantee that inadvertent or unauthorized use or disclosure will not occur or that third parties will not gain unauthorized access to this information despite our efforts. When such events occur, we may not be able to remedy them, and we may have to expend significant capital and other resources to mitigate the impact of such events, including developing and implementing protections to prevent future events of this nature from occurring. When breaches of security (or the security of our vendors and partners) occur, the perception of the effectiveness of our security measures, the security measures of our partners and our reputation may be harmed, we may lose current and potential users and the recognition of our various brands and their competitive positions may be diminished, any or all of which might adversely affect our business, financial condition and results of operations.

***Our business is subject to complex and evolving U.S. and international laws and regulations. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations in the United States and abroad that involve matters that are important to or may otherwise impact our business, including, among others, broadband internet access, online commerce, advertising, user privacy, data protection, intermediary liability, protection of minors, consumer protection, sex-trafficking, taxation and securities law compliance. The introduction of new products, expansion of our activities in certain jurisdictions, or other actions that we may take may subject us to additional laws, regulations, or other government scrutiny. In addition, foreign laws and regulations can impose different obligations or be more restrictive than those in the United States.

These U.S. federal, state, and municipal and foreign laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are constantly evolving and can be subject to significant change. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate, and may be interpreted and applied inconsistently from state to state and country to country and inconsistently with our current policies and practices. These laws and regulations, as well as any associated inquiries or investigations or any other government actions, may be costly to comply with and may delay or impede the development of new products, result in negative publicity, increase our operating costs, require significant management time and attention, and subject us to remedies that may harm our business, including fines or demands or orders that we modify or cease existing business practices.

Specifically, in the case of tax laws, positions that we have taken or will take are subject to interpretation by the relevant taxing authorities. While we believe that the positions we have taken to date comply with applicable law, there can be no assurances that the relevant taxing authorities will not take a contrary position, and if so, that such positions will not adversely affect us. Any events of this nature could adversely affect our business, financial condition and results of operations.

Proposed or new legislation and regulations could also adversely affect our business. For example, the European Commission and several countries have issued proposals that would change various aspects of the current tax framework under which we are taxed, including proposals to change or impose new types of non-income taxes, including taxes based on a percentage of revenue. For example, the United Kingdom has proposed taxes applicable to digital services, which includes business activities on social media platforms, and would likely apply to our business. If enacted, one or more of these or similar proposals could adversely affect our business, financial condition and results of operations.

The promulgation of new laws or regulations, or the new interpretation of existing laws and regulations, in each case that restrict or otherwise unfavorably impact the ability or manner in which we provide our services could require us to change certain aspects of our business and operations to ensure compliance, which could decrease demand for services, reduce revenues, increase costs and subject us to additional liabilities. For example, in February 2019, the Secretary of State for Digital, Culture, Media and Sport of the United Kingdom, indicated in public comments that his office intends to inquire as to the measures utilized by online dating platforms, including Tinder, to prevent access by underage users. To the extent any new or more stringent measures are required to be implemented, our business, financial condition and results of operations could be adversely affected.

14

Table of Contents

The adoption of any laws or regulations that adversely affect the popularity or growth in use of the internet or our services, including laws or regulations that undermine open and neutrally administered internet access, could decrease user demand for our service offerings and increase our cost of doing business. For example, in December 2017, the Federal Communications Commission adopted an order reversing net neutrality protections in the United States, including the repeal of specific rules against blocking, throttling or "paid prioritization" of content or services by internet service providers. To the extent internet service providers engage in such blocking, throttling, "paid prioritization" of content or similar actions as a result of this order and the adoption of similar laws or regulations, our business, financial condition and results of operations could be adversely affected.

***The varying and rapidly-evolving regulatory framework on privacy and data protection across jurisdictions could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

There are numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of this kind of information, the scope of which are constantly changing, and in some cases, inconsistent and conflicting and subject to differing interpretations, as new laws of this nature are proposed and adopted. For example, in 2016 the European Commission adopted the General Data Protection Act ("GDPR"), a comprehensive European Union privacy and data protection reform that became effective in May 2018. The act applies to companies established in the European Union or otherwise providing services or monitoring the behavior of people located in the European Union and which provides for significant penalties in case of non-compliance. GDPR will continue to be interpreted by EU data protection regulators, which may require that we make changes to our business practices, and could generate additional risks and liabilities. The European Union is also considering an update to the EU's Privacy and Electronic Communications (so-called "e-Privacy") Directive, notably to amend rules on the use of cookies. In addition, Brexit could result in the application of new and conflicting data privacy and protection laws and standards to our operations in the United Kingdom and our handling of personal data of users located in the United Kingdom. At the same time, certain developing countries in which we do business have already or are also currently considering adopting privacy and data protection laws and regulations. Legislative proposals concerning privacy and the protection of user information are being considered by the U.S. Congress, such as the American Data Dissemination Act, which was introduced in February 2019 by Senator Marco Rubio, as well as various U.S. state legislatures, including the California Consumer Privacy Act of 2018, which was signed into law on June 28, 2018 and comes into effect on January 1, 2020.

While we believe that we comply with industry standards and applicable laws and industry codes of conduct relating to privacy and data protection in all material respects, there is no assurance that we will not be subject to claims that we have violated applicable laws or codes of conduct, that we will be able to successfully defend against such claims or that we will not be subject to significant fines and penalties in the event of non-compliance.

Any failure or perceived failure by us (or the third parties with whom we have contracted to process such information) to comply with applicable privacy and security laws, policies or related contractual obligations or any compromise of security that results in unauthorized access, or the use or transmission of, personal user information could result in a variety of claims against us, including governmental enforcement actions, significant fines, litigation, claims of breach of contract and indemnity by third parties and adverse publicity. When such events occur, our reputation may be harmed, we may lose current and potential users and the competitive positions of our various brands might be diminished, any or all of which could adversely affect our business, financial condition and results of operations.

Lastly, compliance with the numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of personal data could be costly, as well as result in delays in the development of new products and features as resources are allocated to these compliance projects, particularly as these laws become more comprehensive in scope, more commonplace and continue to evolve. In addition, the varying and rapidly-evolving regulatory frameworks across jurisdictions may result in decisions to introduce products in certain jurisdictions but not others or to cease providing certain services or features to users located in certain jurisdictions. If these costs or other impacts are significant, our business, financial condition and results of operations could be adversely affected.

15

App. 145

Table of Contents

***We are subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations.***

We accept payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real-time basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success and a seamless experience for our users.

When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations.

Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant user effort.

Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face litigation, fines, governmental enforcement action, civil liability, diminished public perception of our security measures, significantly higher credit card-related costs and substantial remediation costs, or refusal by credit card processors to continue to process payments on our behalf, any of which could adversely affect our business, financial condition and results of operations.

Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring subscription payments may adversely affect our business, financial condition and results of operations. For example, the European Union's Payment Services Directive (PSD2), which became effective in 2018, could impact our ability to process auto-renewal payments or offer promotional or differentiated pricing for users in the EU. Similar legislation or regulation, or changes to existing legislation or regulation governing subscription payments, are being considered in many U.S. states.

***Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business.***

The reputations of our brands may be adversely affected by the actions of our users that are deemed to be hostile, offensive, defamatory, inappropriate, untrue or unlawful. While we have systems and processes in place that aim to monitor and review the appropriateness of the content accessible through our products, which include, in particular, reporting tools through which users can inform us of such behavior on the platform, and have adopted policies regarding illegal, offensive or inappropriate use of our products, our users could nonetheless engage in activities that violate our policies. These safeguards may not be sufficient to avoid harm to our reputation and brands, especially if such hostile, offensive or inappropriate use is well-publicized.

In addition, it is possible that a user of our products could be physically, financially, emotionally or otherwise harmed by an individual that such user met through the use of one of our products. If one or more of our users suffers or alleges to have suffered any such harm, we could experience negative publicity or legal action that could damage our reputation and our brands. Similar events affecting users of our competitors' products could result in negative publicity for the dating industry generally, which could in turn negatively affect our business.

Concerns about harms and the use of dating products and social networking platforms for illegal conduct, such as romance scams, promotion of false or inaccurate information, financial fraud, and sex-trafficking, have produced and could continue to produce future legislation or other governmental action. For example, on April 11, 2018, the Allow States and Victims to Fight Online Sex Trafficking Act became effective in the United States and allows victims of sex trafficking crimes, as well as other state and local authorities, to seek redress from

16

App. 146

Table of Contents

platforms in certain circumstances in connection with sex trafficking of individuals online. The European Union and the United Kingdom have also launched consultations, and the United Kingdom is preparing to release its Online Harms White Paper, regarding proposed legislation that would expose platforms to similar or more expansive liability. If these proposed laws are passed, or if future legislation or governmental action is proposed or taken to address concerns regarding such harms, changes could be required to our products that could restrict or impose additional costs upon the conduct of our business generally or cause users to abandon our products.

***We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties.***

We rely heavily upon our trademarks and related domain names and logos to market our brands and to build and maintain brand loyalty and recognition, as well as upon trade secrets. We also rely upon patented and patent-pending proprietary technologies relating to matching process systems and related features and products.

We also rely on a combination of laws, and contractual restrictions with employees, customers, suppliers, affiliates and others, to establish and protect our various intellectual property rights. For example, we have generally registered and continue to apply to register and renew, or secure by contract where appropriate, trademarks and service marks as they are developed and used, and reserve, register and renew domain names as we deem appropriate. Effective trademark protection may not be available or may not be sought in every country in which our products are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available.

We also generally seek to apply for patents or for other similar statutory protections as and if we deem appropriate, based on then-current facts and circumstances, and will continue to do so in the future. No assurances can be given that any patent application we have filed or will file will result in a patent being issued, or that any existing or future patents will afford adequate protection against competitors and similar technologies. In addition, no assurances can be given that third parties will not create new products or methods that achieve similar results without infringing upon patents we own.

Despite these measures, our intellectual property rights may still not be protected in a meaningful manner, challenges to contractual rights could arise, third parties could copy or otherwise obtain and use our intellectual property without authorization, or laws and interpretations of laws regarding the enforceability of existing intellectual property rights may change over time in a manner that provides less protection. The occurrence of any of these events could result in the erosion of our brands and limit our ability to market our brands using our various domain names, as well as impede our ability to effectively compete against competitors with similar technologies, any of which could adversely affect our business, financial condition and results of operations.

From time to time, we have been subject to legal proceedings and claims, including claims of alleged infringement of trademarks, copyrights, patents and other intellectual property rights held by third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect our trade secrets and patents or to determine the validity and scope of proprietary rights claimed by others. For example, on March 17, 2018, we filed a lawsuit against Bumble Trading Inc., which operates and markets the online dating application Bumble in the United States, for patent and trademark infringement, as well as trade secret misappropriation. Bumble's counterclaims request that our trademark registration for our SWIPE trademark be cancelled and that a number of our pending applications for trademark registration be denied. This case is currently pending in Federal Court in the Western District of Texas. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations.

***We operate in various international markets, including certain markets in which we have limited experience. As a result, we face additional risks in connection with certain of our international operations.***

Our brands are available in over 40 different languages all over the world. Our international revenue represented 50% and 46% of our total revenue for the fiscal years ended December 31, 2018 and 2017, respectively.

17

App. 147

Operating internationally, particularly in countries in which we have limited experience, exposes us to a number of additional risks, including:

- operational and compliance challenges caused by distance, language and cultural differences;

- difficulties in staffing and managing international operations;

- differing levels of social and technological acceptance of our dating products or lack of acceptance of them generally;

- foreign currency fluctuations;

- restrictions on the transfer of funds among countries and back to the United States and costs associated with repatriating funds to the United States;

- differing and potentially adverse tax laws;

- multiple, conflicting and changing laws, rules and regulations, and difficulties understanding and ensuring compliance with those laws by both our employees and our business partners, over whom we exert no control;

- compliance challenges due to different laws and regulatory environments, particularly in the case of privacy and data security;

- competitive environments that favor local businesses;

- limitations on the level of intellectual property protection; and

- trade sanctions, political unrest, terrorism, war and epidemics or the threat of any of these events.

The occurrence of any or all of the events described above could adversely affect our international operations, which could in turn adversely affect our business, financial condition and results of operations.

***We may experience operational and financial risks in connection with acquisitions.***

We have made numerous acquisitions in the past and we continue to seek potential acquisition candidates. We may experience operational and financial risks in connection with historical and future acquisitions if we are unable to:

- properly value prospective acquisitions, especially those with limited operating histories;

- accurately review acquisition candidates' business practices against applicable laws and regulations and, where applicable, implement proper remediation controls, procedures, and policies;

- successfully integrate the operations, as well as the accounting, financial controls, management information, technology, human resources and other administrative systems, of acquired businesses with our existing operations and systems;

- successfully identify and realize potential synergies among acquired and existing businesses;

- fully identify potential risks and liabilities associated with acquired businesses;

- retain or hire senior management and other key personnel at acquired businesses; and

- successfully manage acquisition-related strain on our management, operations and financial resources and those of the various brands in our portfolio.

Furthermore, we may not be successful in addressing other challenges encountered in connection with our acquisitions. The anticipated benefits of one or more of our acquisitions may not be realized or the value of goodwill and other intangible assets acquired could be impacted by one or more continuing unfavorable events or trends, which could result in significant impairment charges. In addition, such acquisitions can result in material diversion of management's attention or other resources from our existing businesses. The occurrence of any these events could have an adverse effect on our business, financial condition and results of operations.

18

***We are subject to litigation and adverse outcomes in such litigation could have an adverse effect on our financial condition.***

We are, and from time to time may become, subject to litigation and various legal proceedings, including litigation and proceedings related to intellectual property matters, privacy and consumer protection laws, as well as stockholder derivative suits, class action lawsuits and other matters, that involve claims for substantial amounts of money or for other relief or that might necessitate changes to our business or operations. For example, as discussed in "Item 3—Legal Proceedings," in August 2018, ten then-current and former employees of our Tinder business filed a lawsuit against us in connection with a valuation of the Tinder business, and its subsequent merger into Match Group, Inc., in July 2017. The defense of these actions is time consuming and expensive. We evaluate these litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we may establish reserves and/or disclose the relevant litigation claims or legal proceedings, as and when required or appropriate. These assessments and estimates are based on information available to management at the time of such assessment or estimation and involve a significant amount of judgment. As a result, actual outcomes or losses could differ materially from those envisioned by our current assessments and estimates. Our failure to successfully defend or settle any of these litigations or legal proceedings could result in liability that, to the extent not covered by our insurance, could have an adverse effect on our business, financial condition and results of operations.

**Risks related to our ongoing relationship with IAC**

***IAC controls our company and has the ability to control the direction of our business.***

As of February 1, 2019, IAC owned 15,813,277 shares of our common stock and 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock. IAC's ownership of our outstanding common stock and Class B common stock represents approximately 81.1% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock. As long as IAC owns shares of our capital stock representing a majority of the combined voting power of our outstanding capital stock, it will be able to control any corporate action that requires a stockholder vote, regardless of the vote of any other stockholder. As a result, IAC has the ability to control significant corporate activities, including:

- the election of our board of directors and, through our board of directors, decision-making with respect to our business direction and policies, including the appointment and removal of our officers;

- acquisitions or dispositions of businesses or assets, mergers or other business combinations;

- issuances of shares of our common stock, Class B common stock, Class C common stock and our capital structure;

- corporate opportunities that may be suitable for us and IAC, subject to the corporate opportunity provisions in our certificate of incorporation, as described below;

- our financing activities, including the issuance of additional debt and equity securities, or the incurrence of other indebtedness generally;

- the payment of dividends; and

- the number of shares available for issuance under our equity incentive plans for our prospective and existing employees.

This voting control will limit the ability of other stockholders to influence corporate matters and, as a result, we may take actions that stockholders other than IAC do not view as beneficial. This voting control may also discourage transactions involving a change of control of our company, including transactions in which holders of our common stock might otherwise receive a premium for the holders' shares. Furthermore, IAC generally has the right at any time to sell or otherwise dispose of the shares of our capital stock that it owns, including the ability to transfer a controlling interest in us to a third party, without the approval of the holders of our common stock and without providing for the purchase of shares of common stock.

Even if IAC owns shares of our capital stock representing less than a majority of the combined voting power of our outstanding capital stock, so long as IAC retains shares representing a significant percentage of our combined voting power, IAC will have the ability to substantially influence these significant corporate activities.

19

App. 149

In addition, pursuant to an investor rights agreement between us and IAC, IAC has the right to maintain its level of ownership in us to the extent we issue additional shares of our capital stock in the future and, pursuant to an employee matters agreement between us and IAC, IAC may receive payment for certain compensation expenses through the receipt of additional shares of our capital stock. For a more complete summary of our agreements with IAC, see "Note 15—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements."

In addition, because of our relationship with IAC, credit rating agencies have considered, and could continue to consider, IAC's creditworthiness when determining a corporate credit rating for us or credit ratings for our debt, including the notes offered hereby. Accordingly, the activities of, or developments at, IAC that are outside of our control could have a negative impact on such credit ratings. A lowering of our corporate credit ratings or the credit ratings assigned to our debt could harm our ability to incur additional debt on acceptable terms and may adversely affect the market price or liquidity of the notes offered hereby. Until such time as IAC no longer controls or has the ability to substantially influence us, we will continue to face the risks described in this "Risk factors" section relating to IAC's control of us and the potential conflicts of interest between IAC and us.

### Our certificate of incorporation could prevent us from benefiting from corporate opportunities that might otherwise have been available to us.

Our certificate of incorporation has a "corporate opportunity" provision in which we renounce any interests or expectancy in corporate opportunities which become known to: (i) any of our directors or officers who are also officers, directors, employees or other affiliates of IAC or its affiliates (except that we and our subsidiaries shall not be deemed affiliates of IAC or its affiliates for the purposes of the provision) or (ii) IAC itself, and which relate to the business of IAC or may constitute a corporate opportunity for both IAC and us. Generally, neither IAC nor our officers or directors who are also officers or directors of IAC or its affiliates will be liable to us or our stockholders for breach of any fiduciary duty by reason of the fact that any such person pursues or acquires any corporate opportunity for the account of IAC or its affiliates, directs or transfers such corporate opportunity to IAC or its affiliates, or does not communicate information regarding such corporate opportunity to us. The corporate opportunity provision may exacerbate conflicts of interest between IAC and us because the provision effectively permits any of our directors or officers who also serves as an officer or director of IAC to choose to direct a corporate opportunity to IAC instead of to us.

### IAC's interests may conflict with our interests and the interests of our stockholders. Conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.

Various conflicts of interest between us and IAC could arise. As of the date of this report, five of our ten directors are current members of the board of directors or executive officers of IAC. Ownership interests of directors or officers of IAC in our stock and ownership interests of our directors and officers in the stock of IAC, or a person's service as either a director or officer of both companies, could create or appear to create potential conflicts of interest when those directors and officers are faced with decisions relating to our company. These decisions could include:

- corporate opportunities;

- the impact that operating decisions for our business may have on IAC's consolidated financial statements;

- the impact that operating or capital decisions (including the incurrence of indebtedness) for our business may have on IAC's current or future indebtedness or the covenants under that indebtedness;

- business combinations involving us;

- our dividend policy;

- management stock ownership; and

- the intercompany services and agreements between IAC and us.

Potential conflicts of interest could also arise if we decide to enter into any new commercial arrangements with IAC in the future or in connection with IAC's desire to enter into new commercial arrangements with third parties.

20

Furthermore, disputes may arise between IAC and us relating to our past and ongoing relationships, and these potential conflicts of interest may make it more difficult for us to favorably resolve such disputes, including those related to:

- tax, employee benefit, indemnification and other matters;

- the nature, quality and pricing of services IAC agrees to provide to us;

- sales or other disposal by IAC of all or a portion of its ownership interest in us; and

- business combinations involving us.

We may not be able to resolve any potential conflicts with IAC, and even if we do, the resolution may be less favorable to us than if we were dealing with an unaffiliated party. While we are controlled by IAC, we may not have the leverage to negotiate amendments to these agreements, if required, on terms as favorable to us as those we would negotiate with an unaffiliated third party.

***We are a "controlled company" as defined in the NASDAQ rules, and rely on exemptions from certain corporate governance requirements that provide protection to stockholders of other companies.***

As a result of IAC owning more than 50% of the combined voting power of our share capital, we are a "controlled company" under the Marketplace Rules of the NASDAQ Stock Market, or the Marketplace Rules. As a "controlled company," we are exempt from the obligation to comply with certain Marketplace Rules related to corporate governance, including the following requirements:

- that a majority of our board of directors consists of "independent directors," as defined under the Marketplace Rules; and

- that we have a nominating/governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities.

Accordingly, for so long as we are a "controlled company," our stockholders will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the Marketplace Rules.

***In order to preserve the ability of IAC to distribute its shares of our capital stock on a tax-free basis, we may be prevented from pursuing opportunities to raise capital, to effectuate acquisitions or to provide equity incentives to our employees, which could hurt our ability to grow.***

Under current laws, IAC must retain beneficial ownership of at least 80% of our combined voting power and 80% of each class of our nonvoting capital stock (if any is outstanding) in order to effect a tax-free distribution of our shares held by IAC to its stockholders. As of the date of this annual report, IAC has advised us that it does not have any present intention or plans to undertake such a tax-free distribution. However, IAC does currently intend to use its majority voting interest to retain its ability to engage in such a transaction. This intention may cause IAC to not support transactions we wish to pursue that involve issuing shares of our common stock, including for capital raising purposes, as consideration for an acquisition or as equity incentives to our employees. The inability to pursue such transactions, if it occurs, may adversely affect our company. See "—IAC controls our company and will have the ability to control the direction of our business" and "—IAC's interests may conflict with our interests and the interests of our stockholders." Conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.

***Our agreements with IAC will require us to indemnify IAC for certain tax liabilities and may limit our ability to engage in desirable strategic or capital raising transactions, including following any distribution by IAC of our capital stock to its stockholders.***

Under a tax sharing agreement between us and IAC, we generally are responsible and are required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes us or any of our subsidiaries to the extent attributable to us or any of our subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any consolidated, combined, unitary or separate tax returns of us or any of our subsidiaries. To the extent IAC failed to pay taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its

21

App. 151

subsidiaries that includes us or any of our subsidiaries, the relevant taxing authority could seek to collect such taxes (including taxes for which IAC is responsible under the tax sharing agreement) from us or our subsidiaries.

Under the tax sharing agreement, we generally will be responsible for any taxes and related amounts imposed on IAC or us that arise from the failure of a future spin-off of IAC's interest in us to qualify as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Internal Revenue Code of 1986, as amended, or the Code, to the extent that the failure to so qualify is attributable to: (i) a breach of the relevant representations and covenants made by us in the tax sharing agreement or any representation letter provided in support of any tax opinion or ruling obtained by IAC with respect to the U.S. federal income tax treatment of such spin-off, or (ii) an acquisition of our equity securities.

To preserve the tax-free treatment of any potential future spin-off by IAC of its interest in us, and in addition to our indemnity obligation described above, the tax sharing agreement will restrict us, for the two-year period following any such spin-off, except in specific circumstances, from: (i) entering into any transaction pursuant to which all or a portion of shares of our stock would be acquired, whether by merger or otherwise, (ii) issuing equity securities beyond certain thresholds, (iii) repurchasing our shares other than in certain open-market transactions, (iv) ceasing to actively conduct our businesses or (v) taking or failing to take any other action that prevents the distribution and related transactions from qualifying as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Code.

These indemnity obligations and other limitations could have an adverse effect on our business, financial condition and results of operations.

### Future sales or distributions of our shares by IAC could depress our common stock price.

IAC has the right to sell or distribute to its stockholders all or a portion of the shares of our capital stock that it holds (15,813,277 shares of our common stock and 209,919,402 shares of our Class B common stock, representing all of our outstanding Class B common stock, as of February 1, 2019). As of the date of this annual report, IAC has advised us that it does not have any present intention or plans to undertake such a sale or distribution; however, any sales by IAC in the public market or distributions to its stockholders of substantial amounts of our stock in the form of common stock or Class B common stock, or the filing by IAC of a registration statement relating to a substantial amount of our stock, could depress the price of our common stock.

In addition, IAC has the right, subject to certain conditions, to require us to file registration statements covering the sale of its shares or to include its shares in other registration statements that we may file. In the event IAC exercises its registration rights and sells all or a portion of its shares of our capital stock, the price of our common stock could decline.

### The services that IAC provides to us may not be sufficient to meet our needs, which may result in increased costs and otherwise adversely affect our business.

IAC currently provides (and is expected to continue to provide) us with corporate and shared services related to certain corporate functions, including tax and other services, for a fee provided in the services agreement described in "Item 1—Business-Relationship with IAC." IAC is not obligated to provide these services in a manner that differs from the nature of the service when we were a wholly-owned subsidiary of IAC, and thus we may not be able to modify these services in a manner desirable to us as a stand-alone public company. Further, if we no longer receive these services from IAC, we may not be able to perform these services ourselves, or find appropriate third-party arrangements at a reasonable cost, and the cost may be higher than that charged by IAC.

### Risks related to our indebtedness

### Our indebtedness may affect our ability to operate our business, which could have a material adverse effect on our financial condition and results of operations. We and our subsidiaries may incur additional indebtedness, including secured indebtedness.

As of December 31, 2018, we had total debt outstanding of approximately $1.5 billion and borrowing availability of $240 million under our revolving credit facility.

22

Table of Contents

Our indebtedness could have important consequences, such as:

- limiting our ability to obtain additional financing to fund our working capital needs, acquisitions, capital expenditures or other debt service requirements or for other purposes;

- limiting our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to service debt;

- limiting our ability to compete with other companies who are not as highly leveraged, as we may be less capable of responding to adverse economic and industry conditions;

- restricting us from making strategic acquisitions, developing properties or exploiting business opportunities;

- restricting the way in which we conduct our business because of financial and operating covenants in the agreements governing our and certain of our subsidiaries' existing and future indebtedness, including, in the case of certain indebtedness of subsidiaries, certain covenants that restrict the ability of subsidiaries to pay dividends or make other distributions to us;

- exposing us to potential events of default (if not cured or waived) under financial and operating covenants contained in our or our subsidiaries' debt instruments that could have a material adverse effect on our business, financial condition and operating results; increasing our vulnerability to a downturn in general economic conditions or in pricing of our products; and

- limiting our ability to react to changing market conditions in our industry and in our customers' industries.

In addition to our debt service obligations, our operations require substantial investments on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance, which, in turn, is subject to prevailing economic conditions and financial, business, competitive, legal and other factors.

Subject to the restrictions in our credit agreement (which includes our revolving credit facility and term loan) and the restrictions included in the indentures related to our 6.375% Senior Notes due 2024, 5.00% Senior Notes due 2027, and 5.625% Senior Notes due 2029 (the "Match Group Senior Notes"), we and our subsidiaries may incur significant additional indebtedness, including additional secured indebtedness. Although the terms of our credit agreement and the indentures related to the Match Group Senior Notes contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and additional indebtedness incurred in compliance with these restrictions could be significant. If new debt is added to our and our subsidiaries' current debt levels, the risks described above could increase.

***We may not be able to generate sufficient cash to service all of our current and planned indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.***

Our ability to satisfy our debt obligations will depend upon, among other things:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control; and

- our future ability to borrow under our revolving credit facility, the availability of which will depend on, among other things, our complying with the covenants in the then-existing agreements governing our indebtedness.

We cannot assure you that our business will generate sufficient cash flow from operations, or that we will be able to draw under our revolving credit facility or otherwise, in an amount sufficient to fund our liquidity needs.

If our cash flows and capital resources are insufficient to service our indebtedness, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or restructure or refinance our indebtedness. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest

23

App. 153

rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. In the absence of such operating results and resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations, sell equity, and/or negotiate with our lenders to restructure the applicable debt, in order to meet our debt service and other obligations. We may not be able to consummate those dispositions for fair market value or at all. Our credit agreement and the indentures related to the Match Group Senior Notes may restrict, or market or business conditions may limit, our ability to avail ourselves of some or all of these options.

Furthermore, any proceeds that we could realize from any such dispositions may not be adequate to meet our debt service obligations then due.

***Our debt agreements contain restrictions that will limit our flexibility in operating our business.***

Our credit agreement and the indentures related to the Match Group Senior Notes contain, and any instruments governing future indebtedness of ours would likely contain, a number of covenants that will impose significant operating and financial restrictions on us, including restrictions on our ability to, among other things:

- create liens on certain assets;

- incur additional debt;

- make certain investments and acquisitions;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- sell certain assets;

- pay dividends on or make distributions in respect of our capital stock or make restricted payments;

- enter into certain transactions with our affiliates; and

- place restrictions on distributions from subsidiaries.

Any of these restrictions could limit our ability to plan for or react to market conditions and could otherwise restrict corporate activities. Any failure to comply with these covenants could result in a default under our credit agreement and/or the indentures related to the Match Group Senior Notes or any instruments governing future indebtedness of ours. Upon a default, unless waived, the lenders under our credit agreement could elect to terminate their commitments, cease making further loans, foreclose on our assets pledged to such lenders to secure our obligations under our credit agreement and force us into bankruptcy or liquidation. Holders of the Match Group Senior Notes also have the ability to force us into bankruptcy or liquidation in certain circumstances, subject to the terms of the related indentures. In addition, a default under our credit agreement or the indentures related to the Match Group Senior Notes may trigger a cross default under our other agreements and could trigger a cross default under the agreements governing our future indebtedness. Our operating results may not be sufficient to service our indebtedness or to fund our other expenditures and we may not be able to obtain financing to meet these requirements.

***Variable rate indebtedness that we have incurred or may incur under our credit agreement will subject us to interest rate risk, which could cause our debt service obligations to increase significantly.***

We currently have $260 million and $425 million of indebtedness outstanding under our revolving credit facility and term loan, respectively. Borrowings under the revolving credit facility and term loan are at variable rates of interest. Indebtedness that bears interest at variable rates exposes us to interest rate risk. Our revolving credit facility and term loan bear interest at LIBOR plus 1.50% and LIBOR plus 2.50%, respectively. As of December 31, 2018, the rate in effect was 3.97% and 5.09%, respectively. If LIBOR were to increase or decrease by 100 basis points, then the annual interest and expense payments on the outstanding balance as of December 31, 2018 on the term loan and revolving credit facility would increase or decrease by $2.6 million and $4.3 million, respectively. See also "Item 7A—Quantitative and Qualitative Disclosures About Market Risk."

24

App. 154

Table of Contents

**Risks related to ownership of our common stock**

***The multi-class structure of our capital stock has the effect of concentrating voting control with holders of our Class B common stock and limiting the ability of holders of our common stock to influence corporate matters.***

Our publicly held common stock has one vote per share and our Class B common stock has ten votes per share. As of February 1, 2019, IAC owned all of the shares of our outstanding Class B common stock and 15,813,277 shares of our common stock, collectively representing approximately 81.1% of our outstanding shares of capital stock and approximately 97.6% of the combined voting power of our outstanding capital stock. Due to the ten-to-one voting ratio between our Class B common stock and common stock, the holders of our Class B common stock collectively will continue to control a majority of the combined voting power of our capital stock, even when the outstanding shares of Class B common stock represent a small minority of our outstanding capital stock, and such voting control will be concentrated with IAC. This concentrated control will significantly limit your ability to influence corporate matters.

***The difference in the voting rights of our common stock and our Class B common stock may harm the value and liquidity of our common stock.***

Holders of our Class B common stock are entitled to ten votes per share and holders of our common stock are entitled to one vote per share. The difference in the voting rights of our common stock and Class B common stock could harm the value of our common stock to the extent that any investor or potential future purchaser of our common stock ascribes value to the right of the holders of our Class B common stock to ten votes per share. The existence of two classes of common stock with different voting rights could result in less liquidity for either class of stock than if there were only one class of our common stock.

***The price of our common stock has been and may continue to be volatile or may decline regardless of our operating performance, and you could lose all or part of your investment.***

During 2018, our common stock traded as high as $60.05 and as low as $31.40 and on February 27, 2019, the closing price of our common stock was $55.78. The market price of our common stock has been and may continue to be subject to wide fluctuations in response to various factors, many of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose part of your investment in our common stock since you might be unable to sell your shares at or above the price you paid. Factors that could cause fluctuations in the market price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the market prices and trading volumes of technology stocks generally, or those in our industry in particular;

- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;

- volatility in the market price of our common stock due to the limited number of shares of our common stock held by the public;

- sales of shares of our stock by us and/or our directors, executive officers, employees and stockholders;

- the failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, and any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new brands, products or services;

- the public's reaction to our earnings releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our operating results or fluctuations in our operating results;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

25

App. 155

Table of Contents

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses or technologies by us or our competitors;

- new laws or regulations or new interpretations of (or changes to) existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth in any of our significant markets.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. We currently are, and in the future may be, the target of this type of litigation. See "Item 3—Legal Proceedings." Securities litigation against us could result in substantial costs and a diversion of our management's attention and resources.

***You may experience dilution due to the issuance of additional securities in the future***.

Our dilutive securities consist of vested and unvested options to purchase shares of our common stock, restricted stock unit awards, shares of our common stock issuable to IAC as reimbursement for the cost of vested and unvested IAC equity awards held by our employees and stock appreciation rights settled in IAC stock.

These dilutive securities are reflected in our share calculations underlying our dilutive earnings per share calculation contained in our financial statements for fiscal years ended December 31, 2018, 2017 and 2016. For more information, see "Note 10—Earnings per Share" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data." Intra-quarter movements in our stock price, could lead to more or less dilution than reflected in these calculations.

At the option of IAC, the shares Match Group issues in connection with former subsidiary equity awards, which were converted into Match Group equity awards in 2017, will either be issued to holders of such awards or to IAC. In the event they are issued to IAC, IAC would in turn provide the equity holders with IAC shares of equivalent value to the Match Group shares issued to it. In cases where Match Group shares are issued directly to equity holders, recipients may sell such stock into the open market. If sales are significant and concentrated, these sales could have a temporary impact on the trading value of our stock.

***Our quarterly results or operating metrics could fluctuate significantly, which could cause the trading price of our common stock to decline.***

Our quarterly results and operating metrics have fluctuated historically, and we expect that they could continue to fluctuate in the future as a result of a number of factors, many of which are outside of our control and may be difficult to predict, including:

- the timing, size and effectiveness of our marketing efforts;

- fluctuations in the rate at which we attract new users, the level of engagement of such users and the propensity of such users to subscribe to our brands or to purchase à la carte features;

- increases or decreases in our revenues and expenses caused by fluctuations in foreign currency exchange rates;

- the timing, size and effectiveness of non-marketing operating expenses that we may incur to grow and expand our operations, develop new products and remain competitive;

- the performance, reliability and availability of our technology, network systems and infrastructure and data centers;

- operational and financial risks we may experience in connection with historical and potential future acquisitions and investments; and

26

App. 156

- general economic conditions in either domestic or international markets.

The occurrence of any one of these factors, as well as other factors, or the cumulative effect of the occurrence of one or more of such factors could cause our quarterly results and operating metrics to fluctuate significantly. As a result, quarterly comparisons of results and operating metrics may not be meaningful.

In addition, the variability and unpredictability of our quarterly results or operating metrics could result in our failure to meet our expectations, or those of any of our investors or of analysts that cover our company, with respect to revenues or other operating results for a particular period. If we fail to meet or exceed such expectations for these or any other reasons, the market price of our common stock could fall substantially.

### *We do not expect to declare any regular cash dividends in the foreseeable future.*

We paid a special cash dividend in December 2018; however, we have no current plans to pay cash dividends on our common stock and Class B common stock. Instead, we anticipate that all of our future earnings will be retained to support our operations and to finance the growth and development of our business. Any future determination relating to our dividend policy will be made by our board of directors and will depend on a number of factors, including:

- our historic and projected financial condition, liquidity and results of operations;

- our capital levels and needs;

- tax considerations;

- any acquisitions or potential acquisitions that we may consider;

- statutory and regulatory prohibitions and other limitations;

- the terms of any credit agreements or other borrowing arrangements that restrict our ability to pay cash dividends, including the Match Group Credit Agreement and the indenture relating to the Match Group Senior Notes;

- general economic conditions; and

- other factors deemed relevant by our board of directors.

We are not obligated to pay dividends on our common stock or Class B common stock. Consequently, investors may need to rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment. Investors seeking regular cash dividends should not purchase our common stock.

### *Provisions in our certificate of incorporation and bylaws or Delaware law may discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.*

Delaware corporate law and our certificate of incorporation and bylaws contain provisions that could discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous, including provisions which:

- authorize the issuance of "blank check" preferred stock that our board could issue to increase the number of outstanding shares and to discourage a takeover attempt;

- limit the ability of our stockholders to call special meetings of stockholders;

- provide that certain litigation against us can only be brought in Delaware; and

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws.

Any provision of our certificate of incorporation, our bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

27

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

Match Group's corporate headquarters consists of approximately 73,000 square feet of office space in Dallas, Texas. This office space, which also houses offices for the Match and Match Affinity brands, is leased pursuant to a lease agreement that expires on March 31, 2027. We do not own any real property.

The facilities for our various businesses, which we lease (in some cases, from IAC) both in the United States and abroad, consist of executive and administrative offices and data centers. We lease space in five data centers: three for our North American, Latin American and Asian operations (one in Dallas, Texas, one in Waco, Texas and one in Vancouver, British Columbia), and two for our European operations (one in Paris, France and another in Zaventem, Belgium).

We believe that our current facilities are adequate to meet our ongoing needs. We also believe that, if we require additional space, we will be able to lease additional facilities on commercially reasonable terms.

**Item 3. Legal Proceedings**

**Overview**

We are, and from time to time may become, involved in various legal proceedings arising in the normal course of our business activities, such as patent infringement claims, trademark oppositions and consumer or advertising complaints, as well as stockholder derivative actions, class action lawsuits and other matters. The amounts that may be recovered in such matters may be subject to insurance coverage. The litigation matters described below involve issues or claims that may be of particular interest to our stockholders, regardless of whether any of these matters may be material to our financial position or results of operations based upon the standard set forth in the SEC's rules.

**Consumer Class Action Challenging Tinder's Age-Tiered Pricing**

On May 28, 2015, a putative state-wide class action was filed against Tinder in state court in California.  See *Allan Candelore v. Tinder, Inc.*, No. BC583162 (Superior Court of California, County of Los Angeles).  The complaint principally alleged that Tinder violated California's Unruh Civil Rights Act by offering and charging users age 30 and over a higher price than younger users for subscriptions to its premium Tinder Plus service.  The complaint sought certification of a class of California Tinder Plus subscribers age 30 and over and damages in an unspecified amount.  On September 21, 2015, Tinder filed a demurrer seeking dismissal of the complaint.  On October 26, 2015, the court issued an opinion sustaining Tinder's demurrer to the complaint without leave to amend, ruling that the age-based pricing differential for Tinder Plus subscriptions did not violate California law in essence because offering a discount to users under age 30 was neither invidious nor unreasonable in light of that age group's generally more limited financial means.  On December 29, 2015, in accordance with its ruling, the court entered judgment dismissing the action.  On February 1, 2016, the plaintiff filed a notice of appeal from the judgment, and the parties thereafter briefed the appeal.  On January 29, 2018, the California Court of Appeal (Second Appellate District, Division Three) issued an opinion reversing the judgment of dismissal, ruling that the lower court had erred in sustaining Tinder's demurrer because the complaint, as pleaded, stated a cognizable claim for violation of the Unruh Act.  Because we believe that the appellate court's reasoning was flawed as a matter of law and runs afoul of binding California precedent, on March 12, 2018, Tinder filed a petition with the California Supreme Court seeking interlocutory review of the Court of Appeal's decision.  On May 9, 2018, the California Supreme Court denied the petition. The case has been returned to the trial court for further proceedings and is currently in discovery. We believe that the allegations in this lawsuit are without merit and will continue to defend vigorously against it.

**Bumble Claims against Match Group, LLC**

On March 28, 2018, Bumble and its parent company filed a lawsuit against Match Group, LLC ("Match") in state court in Texas. *See Bumble Trading, Inc. and Bumble Holding, Ltd. v. Match Group, LLC*, No. DC-18-04140 (160th Judicial District Court of Texas, County of Dallas). The petition alleged that Match wrongfully obtained confidential information from the plaintiffs in connection with a potential Bumble sale process and filed an intellectual property lawsuit against Bumble in bad faith to undermine that process. The petition asserts claims for

28

App. 158

tortious interference with business relationships, fraud, misappropriation of trade secrets, unfair competition, promissory estoppel, and disparagement. The petition seeks damages in excess of $400 million and an injunction against interference with the plaintiffs' prospective business relationships or use of their confidential information. On September 26, 2018, Match filed its answer and counterclaims, a notice of removal of the case to the U.S. District Court for the Northern District of Texas, and a motion to transfer the case to the U.S. District Court for the Western District of Texas, where Match's intellectual property lawsuit against Bumble is pending. On October 18, 2018, Bumble filed a motion to dismiss its own petition without prejudice. On November 1, 2018, Match opposed the motion as an attempt to circumvent the federal court's jurisdiction and also amended its counterclaims to seek declaratory judgments of non-liability on the claims asserted in Bumble's petition. On November 15, 2018, Bumble filed a motion to dismiss those counterclaims, which motion Match has opposed. On November 29, 2018, the court granted Match's motion to transfer the case to the Western District of Texas. On January 15, 2019, Bumble filed a motion for leave to file another petition, this one against Match and IAC/InterActiveCorp, in state court in Dallas County. Bumble's proposed claims are for fraud, negligent misrepresentation, unfair competition, promissory estoppel, and interference with prospective business relations and are based upon the allegation that Match and IAC misled Bumble in its sale process by falsely representing they would make a higher offer to purchase Bumble. On January 22, 2019, Match filed its opposition to Bumble's motion for leave. In response to Match's original intellectual property lawsuit (18-cv-80), Bumble also answered and counterclaimed on January 25, 2019. Bumble's counterclaims ask the district court to cancel Match's trademark registration for its SWIPE trademark and to deny registration of a number of pending applications for which Match seeks trademark registration. On February 15, 2019, Bumble amended those counterclaims to also seek declarations that Bumble does not infringe the patents asserted in Match's complaint and that those patents are invalid. We believe that the plaintiffs' allegations in both the pending and the proposed lawsuits are without merit and will continue to vigorously defend against them.

**Tinder Optionholder Litigation against IAC and Match Group**

On August 14, 2018, ten then-current and former employees of Match Group, LLC or Tinder, Inc. ("Tinder"), an operating business of Match Group, filed a lawsuit in New York state court against IAC and Match Group. *See Sean Rad et al. v. IAC/InterActiveCorp and Match Group, Inc.*, No. 654038/2018 (Supreme Court, New York County). The complaint alleges that in 2017, the defendants: (i) wrongfully interfered with a contractually established process for the independent valuation of Tinder by certain investment banks, resulting in a substantial undervaluation of Tinder and a consequent underpayment to the plaintiffs upon exercise of their Tinder stock options, and (ii) then wrongfully merged Tinder into Match Group, thereby depriving one of the plaintiffs (Mr. Rad) of his contractual right to later valuations of Tinder on a stand-alone basis. The complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, interference with contractual relations (as against Match Group only), and interference with prospective economic advantage, and seeks compensatory damages in the amount of at least $2 billion, as well as punitive damages. On August 31, 2018, four plaintiffs who were still employed by Match Group filed a notice of discontinuance of their claims without prejudice, leaving the six former employees as the remaining plaintiffs. On October 9, 2018, the defendants filed a motion to dismiss the complaint on various grounds, including that the 2017 valuation of Tinder by the investment banks was an expert determination any challenge to which is both time-barred under applicable law and available only on narrow substantive grounds that the plaintiffs have not pleaded in their complaint. On December 17, 2018, Plaintiffs filed their opposition to the motion to dismiss. On January 15, 2019, the defendants filed their reply brief. A hearing on the motion is scheduled for March 6, 2019, and discovery in the case is proceeding. IAC and Match Group believe that the allegations in this lawsuit are without merit and will continue to defend vigorously against it.

**FTC Investigation of Certain Match.com Business Practices**

In March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com.  In November 2018, the FTC proposed to resolve its potential claims relating to Match.com's marketing, chargeback and online cancellation practices via a consent judgment mandating certain changes in the company's business practices, as well as a payment in the amount of $60 million.  Match Group believes that the FTC's legal challenges to Match.com's practices, policies, and procedures are without merit and is prepared to vigorously defend against them.

**Item 4. Mine Safety Disclosure**

Not applicable.

29

Table of Contents

# PART II

**Item 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market for Registrant's Common Equity and Related Stockholder Matters**

Our common stock is quoted on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MTCH." There is no established public trading market for our Class B common stock. As of February 27, 2019, the closing price of our common stock on NASDAQ was $55.78.

As of February 1, 2019, there were 22 holders of record of the Company's common stock and one holder of record of the Company's Class B common stock. Because the substantial majority of the outstanding shares of our common stock are held by brokers and other institutions on behalf of shareholders, we are not able to estimate the total number of beneficial shareholders represented by these record holders.

**Unregistered Sales of Equity Securities**

Under the terms of the Employee Matters Agreement dated as of November 24, 2015, by and between IAC/InterActiveCorp ("IAC") and Match Group, Inc. (the "Company"), as amended effective as of April 13, 2016 (the "Employee Matters Agreement"), IAC may cause certain equity awards of the Company to be settled in shares of IAC common stock, par value $0.001 ("IAC Common Stock") and cause the Company to reimburse IAC for the cost of such shares of IAC Common Stock by issuing shares of Company common stock, par value $0.001 ("Company Common Stock") to IAC. The Employee Matters Agreement also provides that the Company will reimburse IAC for the cost of any IAC equity awards held by the Company's employees and former employees and that IAC may elect to receive payment either in cash or Company Common Stock.

On December 31, 2018, 94,351 shares of Company Common Stock were issued to IAC as reimbursement for shares of IAC Common Stock issued in connection with the exercise of IAC stock options held by Match Group employees.

On December 3, 2018 and December 31, 2018, 306,131 and 15,294 shares, respectively, of Company Common Stock were issued to IAC as reimbursement for shares of IAC Common Stock issued in connection with the exercise and settlement of equity shares of a subsidiary of the Company pursuant to the Employee Matters Agreement.

The issuances of Company Common Stock described above did not involve any underwriters or public offerings and the Company believes that such issuances were exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(a)(2) of such act.

**Issuer Purchases of Equity Securities**

The following table sets forth purchases by the Company of its common stock during the quarter ended December 31, 2018:

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid Per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[1] | (d) Maximum Number of Shares that May Yet Be Purchased Under Publicly Announced Plans or Programs[2] |
|---|---|---|---|---|
| October 2018 | 369,658 | $ 50.41 | 369,658 | 3,617,742 |
| November 2018 | 670,266 | $ 42.64 | 670,266 | 2,947,476 |
| December 2018 | — | $ — | — | 2,947,476 |
| Total | 1,039,924 | $ 45.40 | 1,039,924 | 2,947,476 |

_____

(1)   Reflects repurchases made pursuant to the 6 million share repurchase authorization previously announced in May 2017, which has no expiration.

(2)   Represents the total number of shares of common stock that remained available for repurchase pursuant to the May 2017 repurchase authorization. The timing and actual number of any shares repurchased will

30

Table of Contents

depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities. The Company is not obligated to purchase any shares under the repurchase program, and repurchases may be commenced, suspended or discontinued from time to time without prior notice.

31

App. 161

## Item 6.    Selected Financial Data

The selected financial data set forth in the table below as of December 31, 2018, 2017, 2016, and 2015 and for the years then ended were derived from our audited consolidated and combined financial statements. The selected financial data set forth in the table below as of December 31, 2014 and for the year then ended were derived from our audited combined financial statements. This selected financial data should be read in conjunction with the consolidated financial statements and accompanying notes included herein.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | (Dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 1,729,850 | $ 1,330,661 | $ 1,118,110 | $ 909,705 | $ 836,458 |
| Earnings from continuing operations | 472,969 | 355,977 | 178,341 | 133,163 | 165,091 |
| Loss from discontinued operations | (378) | (5,650) | (6,328) | (12,676) | (16,732) |
| Net earnings attributable to Match Group, Inc. shareholders | 477,939 | 350,148 | 171,451 | 120,383 | 147,764 |
| Earnings per share from continuing operations attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.73 | $ 1.35 | $ 0.71 | $ 0.76 | $ 1.02 |
| Diluted | $ 1.61 | $ 1.20 | $ 0.66 | $ 0.72 | $ 0.98 |
| Earnings per share attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.73 | $ 1.33 | $ 0.68 | $ 0.69 | $ 0.92 |
| Diluted | $ 1.61 | $ 1.18 | $ 0.64 | $ 0.65 | $ 0.88 |
| Dividend declared per share | $ 2.00 | $ — | $ — | $ — | $ — |

| | December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2018 | 2017 | 2016 | 2015 | 2014 |
| | (In thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 2,053,061 | $ 2,130,146 | $ 2,048,678 | $ 1,909,392 | $ 1,302,109 |
| Long-term debt, net including current maturities | 1,515,911 | 1,252,696 | 1,176,493 | 1,216,871 | — |
| Long-term debt, related party | — | — | — | — | 190,586 |

32

Table of Contents

**Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Key Terms:**

<u>**Operating metrics:**</u>

- **North America** - consists of the financial results and metrics associated with users located in the United States and Canada.

- **International** - consists of the financial results and metrics associated with users located outside of the United States and Canada.

- **Direct Revenue** - is revenue that is received directly from end users of our products and includes both subscription and à la carte revenue.

- **Indirect Revenue** - is revenue that is not received directly from an end user of our products, substantially all of which is advertising revenue.

- **Subscribers** - are users who purchase a subscription to one of our products. Users who purchase only à la carte features are not included in Subscribers.

- **Average Subscribers** - is the number of Subscribers at the end of each day in the relevant measurement period divided by the number of calendar days in that period.

- **Average Revenue per Subscriber ("ARPU")** - is Direct Revenue from Subscribers in the relevant measurement period (whether in the form of subscription or à la carte revenue) divided by the Average Subscribers in such period and further divided by the number of calendar days in such period. Direct Revenue from users who are not Subscribers and have purchased only à la carte features is not included in ARPU.

<u>**Operating costs and expenses:**</u>

- **Cost of revenue -** consists primarily of the amortization of in-app purchase fees, compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in data center and customer care functions, credit card processing fees, hosting fees, and data center rent, energy and bandwidth costs. In-app purchase fees are monies paid to Apple and Google in connection with the processing of in-app purchases of subscriptions and product features through the in-app payment systems provided by Apple and Google.

- **Selling and marketing expense -** consists primarily of advertising expenditures and compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in selling and marketing, and sales support functions. Advertising expenditures includes online marketing, including fees paid to search engines and social media sites, offline marketing (which is primarily television advertising), and payments to partners that direct traffic to our brands.

- **General and administrative expense -** consists primarily of compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in executive management, finance, legal, tax and human resources, acquisition-related contingent consideration fair value adjustments (described below), fees for professional services (including transaction-related costs for acquisitions) and facilities costs.

- **Product development expense -** consists primarily of compensation expense (including stock-based compensation expense) and other employee-related costs that are not capitalized for personnel engaged in the design, development, testing and enhancement of product offerings and related technology.

- **Acquisition-related contingent consideration fair value adjustments** - relate to the portion of the purchase price of certain acquisitions that is contingent upon the future earnings performance and/or operating metrics of the acquired company.  The fair value of the liability is estimated at the date of acquisition and adjusted each reporting period until the liability is settled.  Significant changes in forecasted earnings and/or operating metrics will result in a significantly higher or lower fair value measurement. The changes in the estimated fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount if the arrangement is longer than

33

one year, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations.

**Long-term debt:**

- **Credit Facility** - On December 7, 2018, the Company's $500 million revolving credit facility was amended to, among other things, modify the leverage ratio levels in the pricing grid used to calculate the applicable rate and extend its maturity to December 7, 2023. The Credit Facility currently bears interest at LIBOR plus 1.50%, based on a pricing grid included in the credit agreement. At December 31, 2018, $260 million is outstanding.

- **Term Loan** - The Company's seven-year term loan due November 16, 2022. The Term Loan bears interest at LIBOR plus 2.50% and has a LIBOR floor of 0.00%. At December 31, 2018, $425 million is outstanding.

- **6.75% Senior Notes** - The Company's previously outstanding 6.75% Senior Notes issued on November 16, 2015 which were redeemed in full on December 17, 2017 using the proceeds from the 5.00% Senior Notes and cash on hand.

- **6.375% Senior Notes** - The Company's 6.375% Senior Notes due June 1, 2024, with interest payable each June 1 and December 1, which were issued on June 1, 2016. The proceeds were used to prepay a portion of the indebtedness outstanding under the Term Loan. At December 31, 2018, $400 million is outstanding.

- **5.00% Senior Notes** - The Company's 5.00% Senior Notes due December 15, 2027, with interest payable each June 15 and December 15, which were issued on December 4, 2017. The proceeds, along with cash on hand, were used to redeem the 6.75% Senior Notes and pay the related call premium. At December 31, 2018, $450 million is outstanding.

- **5.625% Senior Notes** - The Company's 5.625% Senior Notes due February 15, 2029, with interest payable each February 15 and August 15, commencing on August 15, 2019, which were issued on February 15, 2019. The proceeds were used to repay outstanding borrowings under our Credit Facility, to pay expenses associated with the offering, and for general corporate purposes.

**Non-GAAP financial measure:**

- **Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")** - is a Non-GAAP financial measure. See "Principles of Financial Reporting" for the definition of Adjusted EBITDA and a reconciliation of net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA for the years ended December 31, 2018, 2017, and 2016.

## MANAGEMENT OVERVIEW

Match Group is a leading provider of dating products available in over 40 languages to our users all over the world through applications and websites we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, Pairs, and Hinge, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users.

**Sources of Revenue**

All our products provide the use of certain features for free, and then offer a variety of additional features to Subscribers. Our revenue is primarily derived directly from users in the form of recurring subscription fees.

Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by using a credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, all purchases are final and nonrefundable. Fees collected, or contractually due, in advance for subscriptions are deferred and recognized as revenue using the straight-line method over the term of the applicable subscription period, which primarily ranges from one to six months, and corresponding mobile app store fees incurred on such transactions, if any, are deferred and expensed over the same period. We also earn revenue from online advertising, the purchase of à la carte features and offline events. Online advertising revenue is recognized every time an ad is displayed. Revenue from the purchase of à la carte features is recognized based

34

Table of Contents

on usage. Revenue and the related expenses associated with offline events are recognized when each event occurs.

**Trends affecting our business**

Over the last several years, we have seen significant changes in our business. Tinder has grown from incubation to the largest contributing brand in our portfolio and our other brands remain generally stable in the aggregate. This in turn has allowed us to invest in or acquire brands such as Hinge and incubate new brands such as Chispa, BLK, and Ship, where we see significant potential future growth opportunities. With our evolving portfolio of brands, we have seen a number of significant trends in our business including the following:

*Lower cost users.* All of our brands rely on word-of-mouth, or free, customer acquisition to varying degrees. Word-of-mouth acquisition is typically a function of scale (with larger communities driving greater numbers of referrals), youthfulness (with the viral effect being more pronounced in younger populations due, in part, to a significantly higher concentration of single people in any given social circle and the increased adoption of social media and similar platforms among such populations) and monetization rate (with people generally more likely to talk openly about using online dating products that are less heavily monetized). Additionally, some, but not all, of our brands spend meaningfully on paid marketing. Accordingly, the average amount we spend to acquire a user differs significantly across brands based in large part on each brand's mix of paid and free acquisition channels. As our mix has shifted toward younger users, our mix of acquisition channels has shifted toward free channels, driving a significant decline over the past several years in the average amount we spend to acquire a new user across our portfolio. As a percentage of revenue, our costs of acquiring Subscribers have declined. We expect the dynamics that have led to the growth in word-of-mouth user acquisition to continue going forward and for our brands to continue to acquire significant numbers of users through low-cost means.

*Changing paid acquisition dynamics.* Even as our acquisition of lower cost users increases, paid acquisition of users remains an important driver of our business. The channels through which we market our brands are always evolving, but we are currently in a period of rapid change as TV and video consumption patterns evolve and internet consumption occurs regularly on mobile devices. As we adapt our paid marketing activities to maximize user engagement with our brands, we may increase our use of paid advertising at brands where we traditionally relied on word-of-mouth engagement to leverage these shifts in media consumption patterns and fuel international growth. Other brands in our portfolio may reduce paid marketing activities to reflect the change in audience engagement.

*Increase in acceptance and growth of dating products globally.* Similar to the recent growth in dating product usage in North America and Western Europe, we see the potential for similar growth in the rest of the world. As more internet-connected singles utilize online dating products and the stigma around online dating continues to erode, we believe that there is potential for accelerating growth in the use of dating products globally.

**Other factors affecting the comparability of our results**

*Advertising spend.* Our advertising spend, which is included in our selling and marketing expense, has consistently been our largest operating expense. Generally, we focus our advertising spend on display, mobile, television, social media and search channels. We seek to optimize for total return on advertising spend by frequently analyzing and adjusting this spend to focus on marketing channels and markets that generate a high return. Our data-driven approach provides us the flexibility to scale and optimize our advertising spend. We spend marketing dollars against an expected lifetime value of a Subscriber that is realized by us over a multi-year period; and while this marketing is intended to be profitable on that basis, it is nearly always negative during the period in which the expense is incurred. Accordingly, our operating results, in particular our profit measures, for a particular period may be meaningfully impacted by the timing, size, number or effectiveness of our advertising campaigns in that period. Additionally, advertising spend is typically higher during the first quarter of our fiscal year, and lower during the fourth quarter. See "Seasonality" below.

*Seasonality.* Historically, our business has experienced seasonal fluctuations in quarterly operating results, particularly with respect to our profit measurements. This is driven primarily by a higher concentration of advertising spend in the first quarter, when advertising prices are lowest and demand for our products is highest, and a lower concentration of advertising spend in the fourth quarter, when advertising costs are highest and demand for our products is lowest.

35

Table of Contents

*International markets.* Our products are available across the world. Our international revenue represented 50% and 46% of our total revenue for the years ended December 31, 2018 and 2017, respectively. We vary our pricing to align with local market conditions and our international businesses typically earn revenue in local currencies. As foreign currency exchange rates change, translation of the statement of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results.

## 2018 Developments

On December 7, 2018, we amended the Company's credit agreement to extend the maturity date of the Credit Facility to December 7, 2023 and modify the leverage ratio levels in the pricing grid used to calculate the applicable interest rate under the Credit Facility.

On December 19, 2018, we paid a special dividend of $2.00 per share on Match Group common stock and Class B common stock, to stockholders of record as of the close of business on December 5, 2018, in the aggregate amount equal to $556.4 million, which was funded with cash on hand and borrowings under the Credit Facility.

## 2018 Consolidated Results

In 2018, revenue, operating income and Adjusted EBITDA grew 30%, 53% and 39%, respectively. Revenue growth was primarily due to strong growth at Tinder and additional contributions from certain other brands. The growth in operating income and Adjusted EBITDA was due to higher revenue and lower selling and marketing expense as a percentage of revenue due to the continued product mix shift toward brands with lower marketing spend as a percentage of revenue, partially offset by an increase in cost of revenue expense primarily due to higher in-app purchase fees as a result of growing revenue from mobile app stores.

36

Table of Contents

**Results of Operations for the years ended December 31, 2018, 2017 and 2016**

*Revenue*

| | Years Ended December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | (Amounts in thousands, except ARPU) | | | | | | |
| Direct Revenue: | | | | | | | |
| North America | $ 902,478 | $ 161,144 | 22% | $ 741,334 | $ 67,390 | 10% | $ 673,944 |
| International | 774,693 | 234,778 | 43% | 539,915 | 146,495 | 37% | 393,420 |
| Total Direct Revenue | 1,677,171 | 395,922 | 31% | 1,281,249 | 213,885 | 20% | 1,067,364 |
| Indirect Revenue | 52,679 | 3,267 | 7% | 49,412 | (1,334) | (3)% | 50,746 |
| Total Revenue | $ 1,729,850 | $ 399,189 | 30% | $ 1,330,661 | $ 212,551 | 19% | $ 1,118,110 |
| | | | | | | | |
| **Direct Revenue** | | | | | | | |
| Tinder | $ 805,316 | $ 402,100 | 100% | $ 403,216 | $ 234,694 | 139% | $ 168,522 |
| Other brands | 871,855 | (6,178) | (1)% | 878,033 | (20,809) | (2)% | 898,842 |
| Total Direct Revenue | $ 1,677,171 | $ 395,922 | 31% | $ 1,281,249 | $ 213,885 | 20% | $ 1,067,364 |
| | | | | | | | |
| **Percentage of Total Revenue:** | | | | | | | |
| Direct Revenue: | | | | | | | |
| North America | 52% | | | 56% | | | 60% |
| International | 45% | | | 40% | | | 35% |
| Total Direct Revenue | 97% | | | 96% | | | 95% |
| Indirect Revenue | 3% | | | 4% | | | 5% |
| Total Revenue | 100% | | | 100% | | | 100% |
| | | | | | | | |
| **Average Subscribers:** | | | | | | | |
| North America | 4,161 | 592 | 17% | 3,569 | 301 | 9% | 3,268 |
| International | 3,712 | 873 | 31% | 2,839 | 699 | 33% | 2,140 |
| Total | 7,873 | 1,465 | 23% | 6,408 | 1,000 | 18% | 5,408 |
| | | | | | | | |
| *(Change calculated using non-rounded numbers)* | | | | | | | |
| **ARPU:** | | | | | | | |
| North America | $ 0.59 | | 4% | $ 0.56 | | —% | $ 0.56 |
| International | $ 0.56 | | 10% | $ 0.51 | | 3% | $ 0.50 |
| Total | $ 0.57 | $ 0.03 | 6% | $ 0.54 | $ — | 1% | $ 0.54 |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

International Direct Revenue grew $234.8 million, or 43%, in 2018 versus 2017, driven by 31% growth in Average Subscribers, and a 10% increase in ARPU. North America Direct Revenue grew $161.1 million, or 22%, in 2018 versus 2017, driven by 17% growth in Average Subscribers, and a 4% increase in ARPU.

Growth in International and North America Average Subscribers was primarily driven by Tinder. International and North America ARPU increased primarily due to increases in ARPU at Tinder as Subscribers purchased premium subscriptions, such as Tinder Gold, as well as additional à la carte features.

App. 167

Indirect Revenue increased $3.3 million primarily due to increased advertising revenue at Tinder, partially offset by lower impressions at brands excluding Tinder.

37

Table of Contents

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

North America Direct Revenue grew $67.4 million, or 10%, in 2017 versus 2016, driven by 9% growth in Average Subscribers. International Direct Revenue grew $146.5 million, or 37%, in 2017 versus 2016, driven by 33% growth in Average Subscribers and a 3% increase in ARPU.

Growth in North America Average Subscribers was primarily due to Tinder, partially offset by declines at our Match Affinity brands as marketing spend was reduced to better align with the expected lifetime value of a Subscriber. North America ARPU was flat as the continuing mix shift towards lower ARPU brands with lower price points compared to most of our other brands, was offset by increases in ARPU at Tinder and PlentyOfFish, as these brands are offering premium and multi-tiered subscriptions, such as Tinder Gold.

Growth in International Average Subscribers was primarily due to Tinder and additional contributions from Pairs. Growth in International ARPU was primarily due to rate increases at Tinder and Meetic, partially offset by the continued mix shift towards lower ARPU brands.

### *Cost of revenue (exclusive of depreciation)*

| | | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | | | (Dollars in thousands) | | | | |
| Cost of revenue | $410,000 | $130,501 | 47% | $279,499 | $83,851 | 43% | $195,648 |
| Percentage of revenue | 24% | | | 21% | | | 17% |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Cost of revenue increased due primarily to an increase in in-app purchase fees of $123.8 million as our revenues are increasingly sourced through mobile app stores.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Cost of revenue increased, outpacing revenue growth, primarily due to an increase in in-app purchase fees of $75.4 million and an increase in hosting fees of $5.9 million, both as a result of growth at Tinder.

### *Selling and marketing expense*

| | | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | | | (Dollars in thousands) | | | | |
| Selling and marketing expense | $419,954 | $44,344 | 12% | $375,610 | $26,491 | 8% | $349,119 |
| Percentage of revenue | 24% | | | 28% | | | 31% |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Selling and marketing expense increased in total but declined as a percentage of revenue. The increase in selling and marketing expense is primarily due to $45.6 million of increased marketing expense as a result of marketing initiatives at Tinder, Pairs, PlentyOfFish, OkCupid, and Meetic and the acquisition of Hinge, partially offset by lower offline marketing spend at Match and Match Affinity brands.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Selling and marketing expense increased with the growth in the business but continued to decline as a percentage of revenue. The increase in total selling and marketing expense is primarily due to an increase of $15.3 million in marketing spend primarily at Tinder related to strategic investments in certain international markets and increased marketing related to the launch of a new brand in Europe, partially offset by a reduction in marketing spend at our Match Affinity brands. Additionally, compensation increased $9.1 million primarily related to increased headcount at Tinder and the employer portion of payroll taxes paid upon the exercise of Match Group

App. 169

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 174 of 451    PageID 697

options. The decline as a percentage of revenue is due to a continued shift towards brands with lower marketing spend as a percentage of revenue and reductions in marketing spend at our Match Affinity brands.

38

App. 170

### General and administrative expense

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | (Dollars in thousands) | | | | | | |
| General and administrative expense | $180,286 | $482 | —% | $179,804 | $44,785 | 33% | $135,019 |
| Percentage of revenue | 10% | | | 14% | | | 12% |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

General and administrative expense increased, driven primarily by an increase of $6.9 million in compensation expense, excluding stock-based compensation expense, primarily due to an increase in headcount, an increase in professional fees of $3.7 million primarily related to increased litigation costs, and an increase in other miscellaneous expenses of $5.9 million. Partially offsetting these increases is a decrease of $10.5 million in stock-based compensation expense due primarily to a decrease in expense related to a subsidiary denominated equity award issued to a non-employee (which was settled in 2017) and a decrease in acquisition-related contingent consideration expense of $4.9 million.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

General and administrative expense increased, driven primarily by an increase of $20.6 million in compensation, an increase of $14.5 million in acquisition-related contingent consideration fair value adjustments (expense of $5.3 million in 2017 versus income of $9.2 million in 2016) and an increase of $6.8 million in professional fees in 2017 primarily related to the settlement of the Tinder equity plan. The increase in compensation expense is due to a $9.1 million increase in stock-based compensation expense primarily related to a subsidiary denominated equity award held by a non-employee, which was settled in the third quarter of 2017, the employer portion of payroll taxes paid upon the exercise of Match Group options and an increase in headcount from business growth.

### Product development expense

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | (Dollars in thousands) | | | | | | |
| Product development expense | $132,030 | $30,880 | 31% | $101,150 | $23,033 | 29% | $78,117 |
| Percentage of revenue | 8% | | | 8% | | | 7% |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Product development expense increased, driven primarily by an increase of $28.8 million in compensation expense primarily related to higher headcount at Tinder.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Product development expense increased, driven primarily by an increase of $20.7 million in compensation expense, of which $14.4 million relates primarily to 1) higher headcount and 2) the employer portion of payroll taxes paid upon the exercise of Match Group options and $6.3 million of stock-based compensation expense due primarily to new grants issued since 2016.

39

App. 171

Table of Contents

### *Depreciation*

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **$ Change** | **% Change** | **2017** | **$ Change** | **% Change** | **2016** |
| | (Dollars in thousands) | | | | | | |
| Depreciation | $32,968 | $355 | 1% | $32,613 | $4,887 | 18% | $27,726 |
| Percentage of revenue | 2% | | | 2% | | | 2% |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Depreciation was relatively flat during the period increasing $0.4 million, or 1%.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Depreciation increased $4.9 million, or 18%, driven by an increase in computer hardware, internally developed software and leasehold improvements.

### *Operating Income and Adjusted EBITDA*

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **$ Change** | **% Change** | **2017** | **$ Change** | **% Change** | **2016** |
| | (Dollars in thousands) | | | | | | |
| Operating income | $553,294 | $192,777 | 53% | $360,517 | $44,968 | 14% | $315,549 |
| Percentage of revenue | 32% | | | 27% | | | 28% |
| Adjusted EBITDA | $653,931 | $184,990 | 39% | $468,941 | $65,561 | 16% | $403,380 |
| Percentage of revenue | 38% | | | 35% | | | 36% |

For a reconciliation of net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA, see "Principles of Financial Reporting."

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Operating income and Adjusted EBITDA increased $192.8 million, or 53%, and $185.0 million, or 39%, respectively, primarily as a result of the increase in revenue of $399.2 million and lower selling and marketing expense as a percentage of revenue due to the ongoing product mix shift toward brands with lower marketing spend as a percentage of revenue and a reduction in marketing spend at our Match Affinity brands, partially offset by an increase in cost of revenue primarily due to higher in-app purchase fees. Operating income was further impacted by lower stock-based compensation expense as a percentage of revenue resulting in increased growth compared to Adjusted EBITDA.

At December 31, 2018, there was $119.3 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.4 years.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Operating income and Adjusted EBITDA increased $45.0 million, or 14%, and $65.6 million, or 16%, respectively, primarily as a result of the increase in revenue of $212.6 million and lower selling and marketing expense as a percentage of revenue due to the ongoing product mix shift toward brands with lower marketing spend as a percentage of revenue and a reduction in marketing spend at our Match Affinity brands, partially offset by an increase in cost of revenue primarily due to higher in-app purchase fees. Operating income was further impacted by an increase in stock-based compensation expense of $16.7 million, an increase in acquisition-related contingent consideration fair value adjustments of $14.5 million, and an increase in depreciation of $4.9 million due to growth in our business, partially offset by a $15.5 million decrease in amortization of intangibles as a significant portion of our scheduled amortization from the acquisition of PlentyOfFish concluded at the end of 2016.

40

Table of Contents

*Interest expense*

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **$ Change** | **% Change** | **2017** | **$ Change** | **% Change** | **2016** |
| | (Dollars in thousands) | | | | | | |
| Interest expense | $73,417 | $(4,148) | (5)% | $77,565 | $(4,634) | (6)% | $82,199 |

*For the year ended December 31, 2018 compared to the year ended December 31, 2017*

Interest expense decreased primarily due to the issuance of the 5.00% Senior Notes which replaced the 6.75% Senior Notes, partially offset by an increase in the weighted average interest rate of the Term Loan and an increase in the outstanding balance of the Term Loan beginning with the third quarter of 2017.

*For the year ended December 31, 2017 compared to the year ended December 31, 2016*

Interest expense decreased primarily due to the reduction of the average outstanding balance in the Term Loan and the December 2016 and August 2017 repricings of the Term Loan, which reduced the contractual interest rates, partially offset by the issuance of the 6.375% Senior Notes in June 2016, which replaced a corresponding amount outstanding on the Term Loan with debt at a higher interest rate.

*Other income (expense), net*

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2018** | **$ Change** | **% Change** | **2017** | **$ Change** | **% Change** | **2016** |
| | (Dollars in thousands) | | | | | | |
| Other income (expense), net | $7,765 | $38,592 | NM | $(30,827) | $(38,693) | NM | $7,866 |

————————————

NM = not meaningful

Other income, net, in 2018 includes $5.3 million in net foreign currency exchange gains due primarily to a strengthening of the U.S. dollar relative to the British Pound in the period and $4.9 million of interest income, partially offset by impairments of certain equity investments of $2.1 million and $0.7 million of expense related to a mark-to-market adjustment pertaining to a subsidiary denominated equity instrument.

Other expense, net, in 2017 includes expenses of $15.4 million related to the extinguishment of our 6.75% Senior Notes and repricing of the Term Loan, $13.0 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $10.3 million in net foreign currency exchange losses primarily due to the strengthening of the British Pound relative to the dollar, and a $2.3 million other-than-temporary impairment charge related to a cost method investment resulting from our assessment of the near-term prospects and financial condition of the investee. These expenses were partially offset by a gain on the sale of a cost method investment of $9.1 million.

Other income, net in 2016 includes $20.0 million in foreign currency exchange gains due to strengthening of the dollar relative to the British Pound and Euro and a $3.1 million gain related to the sale of a marketable equity security, partially offset by a non-cash charge of $12.1 million related to the write-off of a proportionate share of original issue discount and deferred financing costs associated with prepayments of $440 million of the Term Loan, $2.1 million of expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $1.5 million repricing fees related to the Term Loan, and a $0.7 million other-than-temporary impairment charge related to a certain cost method investment.

41

Table of Contents

*Income tax (provision) benefit*

| | Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | $ Change | % Change | 2017 | $ Change | % Change | 2016 |
| | (Dollars in thousands) | | | | | | |
| Income tax (provision) benefit | $(14,673) | $(118,525) | NM | $103,852 | $166,727 | NM | $(62,875) |
| Effective income tax rate | 3% | | | NM | | | 26% |

For discussion of income taxes, see "Note 3—Income Taxes" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

For the year ended December 31, 2018, the Company recorded an income tax provision of $14.7 million, which represents an effective tax rate of 3%, which is lower than the statutory rate of 21% due primarily to excess tax benefits generated by the exercise and vesting of stock-based awards.

In 2017, the Company recorded an income tax benefit of $103.9 million, which was due primarily to the effect of adopting the provisions of the Financial Accounting Standards Board issued Accounting Standards Update ("ASU") No. 2016-09, *Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*, on January 1, 2017, partially offset by the effect of the Tax Cuts and Jobs Act ("Tax Act") discussed below. Under ASU No. 2016-09, excess tax benefits generated by the exercise, purchase or settlement of stock-based awards of $279.7 million in 2017 are recognized as a reduction to the income tax provision rather than additional paid-in capital.

The Tax Act, enacted on December 22, 2017, subjected to U.S. taxation certain previously deferred earnings of foreign subsidiaries as of December 31, 2017 ("Transition Tax") and implemented a number of changes that took effect on January 1, 2018, including but not limited to, a reduction of the U.S. federal corporate tax rate from 35% to 21% and a new minimum tax on global intangible low-taxed income ("GILTI") earned by foreign subsidiaries. The Company was able to make a reasonable estimate of the Transition Tax and recorded a provisional tax expense in the fourth quarter of 2017. In 2018, the Company finalized this calculation, which resulted in a $3.2 million reduction in the Transition Tax. The net reduction in the Transition Tax was due primarily to the utilization of additional foreign tax credits, partially offset by additional taxable earnings and profits of our foreign subsidiaries based on IRS guidance. The adjustment of the Company's provisional tax expense was recorded as a change in estimate in accordance with Staff Accounting Bulletin No. 118, *Income Tax Accounting Implications of the Tax Cuts and Jobs Act*, which was also included in ASU No. 2018-05, *Income Taxes (Topic 740), Amendments to SEC Paragraphs Pursuant to SEC Staff Accounting Bulletin No. 118 ("SAB 118")*, which was adopted by the Company upon issuance in March 2018. Despite the completion of the Company's accounting for the Tax Act under SAB 118, many aspects of the law remain unclear and we expect ongoing guidance to be issued at both the federal and state levels. We will continue to monitor and assess the impact of any new developments.

For the year ended December 31, 2016, the Company recorded an income tax provision of $62.9 million, which represents an effective income tax rate of 26%, which was lower than the statutory rate of 35% due primarily to foreign income taxed at lower rates, including non-taxable foreign currency exchange gains, and a reduction in deferred tax liabilities for a foreign tax law change.

*Related party transactions*

For discussion of related party transactions, see "Note 15—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

42

App. 174

## PRINCIPLES OF FINANCIAL REPORTING

Match Group reports Adjusted EBITDA, which is a supplemental measure to U.S. generally accepted accounting principles ("GAAP"). Adjusted EBITDA is among the primary metrics by which we evaluate the performance of our business, on which our internal budget is based and by which management is compensated. We believe that investors should have access to, and we are obligated to provide, the same set of tools that we use in analyzing our results. This non-GAAP measure should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. Match Group endeavors to compensate for the limitations of the non-GAAP measure presented by providing the comparable GAAP measure with equal or greater prominence to and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure. We encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measure, which we discuss below.

### Adjusted EBITDA

*Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")* is defined as operating income excluding: (1) stock-based compensation expense; (2) depreciation; and (3) acquisition-related items consisting of (i) amortization of intangible assets and impairments of goodwill and intangible assets, if applicable, and (ii) gains and losses recognized on changes in the fair value of contingent consideration arrangements. We believe this measure is useful for analysts and investors as this measure allows a more meaningful comparison between our performance and that of our competitors. The above items are excluded from our Adjusted EBITDA measure because they are non-cash in nature. Adjusted EBITDA has certain limitations in that it does not take into account the impact to our consolidated statement of operations of certain expenses.

*Non-Cash Expenses That Are Excluded From Non-GAAP Measure*

*Stock-based compensation* expense consists principally of expense associated with the grants of stock options, restricted stock units ("RSUs"), performance-based RSUs and market-based awards. These expenses are not paid in cash, and we include the related shares in our fully diluted shares outstanding using the treasury stock method. Performance-based RSUs and market-based awards are included only to the extent the applicable performance or market condition(s) have been met (assuming the end of the reporting period is the end of the contingency period). To the extent that stock-based awards are settled on a net basis, the Company remits the required tax-withholding amounts in cash from its current funds. Certain awards provide the employee the option to pay the applicable strike price and withholding taxes or to allow for the award to be net settled.

*Depreciation* is a non-cash expense relating to our property and equipment and is computed using the straight-line method to allocate the cost of depreciable assets to operations over their estimated useful lives, or, in the case of leasehold improvements, the lease term, if shorter.

*Amortization of intangible assets and impairments of goodwill and intangible assets* are non-cash expenses. At the time of acquisition, identifiable definite-lived intangible assets, such as customer lists, trade names, and technology are valued and amortized over their estimated lives. Value is also assigned to acquired indefinite-lived intangible assets, which comprise trade names and trademarks, and, in the case of an acquired company, goodwill, all of which are not subject to amortization. An impairment is recorded when the carrying value of an intangible asset or goodwill exceeds its fair value. We believe that intangible assets represent costs incurred by the acquired company to build value prior to its acquisition and the related amortization and impairment charges of intangible assets or goodwill, if applicable, are not ongoing costs of doing business.

*Acquisition-related gains and losses recognized on changes in the fair value of contingent consideration arrangements* are accounting adjustments to report contingent consideration liabilities at fair value. These adjustments can be highly variable and are excluded from our assessment of performance because they are considered non-operational in nature and, therefore, are not indicative of current or future performance or the ongoing cost of doing business.

43

The following table reconciles net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| | | (In thousands) | | | | |
| **Net earnings attributable to Match Group, Inc. shareholders** | $ | 477,939 | $ | 350,148 | $ | 171,451 |
| Add back: | | | | | | |
| Net (loss) earnings attributable to noncontrolling interests | | (5,348) | | 179 | | 562 |
| Loss from discontinued operations, net of tax | | 378 | | 5,650 | | 6,328 |
| Income tax provision (benefit) | | 14,673 | | (103,852) | | 62,875 |
| Other (income) expense, net | | (7,765) | | 30,827 | | (7,866) |
| Interest expense | | 73,417 | | 77,565 | | 82,199 |
| **Operating Income** | | 553,294 | | 360,517 | | 315,549 |
| Stock-based compensation expense | | 66,031 | | 69,090 | | 52,370 |
| Depreciation | | 32,968 | | 32,613 | | 27,726 |
| Amortization of intangibles | | 1,318 | | 1,468 | | 16,932 |
| Acquisition-related contingent consideration fair value adjustments | | 320 | | 5,253 | | (9,197) |
| **Adjusted EBITDA** | $ | 653,931 | $ | 468,941 | $ | 403,380 |

44

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

**Financial Position**

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| | (In thousands) | |
| Cash and cash equivalents: | | |
| United States | $ 83,851 | $ 203,452 |
| All other countries (a) | 103,096 | 69,172 |
| Total cash and cash equivalents | $ 186,947 | $ 272,624 |
| | | |
| Long-term debt, net: | | |
| Credit Facility due December 7, 2023 | $ 260,000 | $ — |
| Term Loan due November 16, 2022 | 425,000 | 425,000 |
| 6.375% Senior Notes | 400,000 | 400,000 |
| 5.00% Senior Notes | 450,000 | 450,000 |
| Total long-term debt | 1,535,000 | 1,275,000 |
| Less: unamortized original issue discount and original issue premium, net | 7,352 | 8,668 |
| Less: unamortized debt issuance costs | 11,737 | 13,636 |
| Total long-term debt, net | $ 1,515,911 | $ 1,252,696 |

———————————————

(a)     At December 31, 2018, all of the Company's international cash can be repatriated without significant tax consequences. During the year ended December 31, 2018, foreign cash of $25.2 million was repatriated to the U.S.

*Senior Notes:*

On December 4, 2017, we issued $450 million of 5.00% Senior Notes due December 15, 2027. The notes were issued at 99.027% of par. The proceeds, along with cash on hand, were used to redeem the 6.75% Senior Notes and pay the related call premium.

On June 1, 2016, we issued $400 million aggregate principal amount of 6.375% Senior Notes due June 1, 2024. The proceeds were used to prepay a portion of indebtedness outstanding under the Term Loan.

The indentures governing the 5.00% and 6.375% Senior Notes contain covenants that would limit the Company's ability to pay dividends or to make distributions and repurchase or redeem Match Group stock in the event a default has occurred or Match Group's leverage ratio (as defined in the indentures) exceeds 5.0 to 1.0. As of December 31, 2018, Match Group was in compliance with all applicable covenants and was below the 5.0 to 1.0 leverage ratio.

*Term Loan and Credit Facility:*

On November 16, 2015, the Company entered into a credit agreement (the "Credit Agreement") under which the Company has a Term Loan. At both December 31, 2018 and 2017, the outstanding balance on the Term Loan was $425 million. The Term Loan bears interest at LIBOR plus 2.50% and includes a LIBOR floor of 0.00%. The interest rate at December 31, 2018 and 2017 was 5.09% and 3.85%, respectively. Interest payments are due at least quarterly through the term of the loan. The Term Loan provides for additional annual principal payments as part of an excess cash flow sweep provision, the amount of which, if any, is governed by the secured net leverage ratio set forth in the Credit Agreement.

Additionally, the Company has a $500 million revolving credit facility. On December 7, 2018, the Company amended the Credit Facility to extend the maturity to December 7, 2023 and modify the pricing grid used to calculate the applicable interest rate for revolving loans. At December 31, 2018, the outstanding balance

App. 177

was $260 million. At December 31, 2017, there were no outstanding borrowings under the Credit Facility. Borrowings under the Credit Facility bear interest, at the Company's option, at a base rate or LIBOR, in each case plus an applicable margin, which is determined by reference to a pricing grid based on the Company's consolidated net leverage ratio. At December 31, 2018, borrowings under the Credit Facility bear interest at LIBOR plus 1.50%. The weighted average interest rate at December 31, 2018 is 3.97%. The annual commitment fee on undrawn funds based on the current leverage ratio is 25 basis points. The terms of the Credit Facility require the Company to maintain a consolidated net leverage ratio of not more than 5.0 to 1.0 and a minimum interest coverage ratio of not less than 2.0 to 1.0 (in each case as defined in the Credit Agreement). Borrowings under the Credit Facility were repaid with proceeds from the 5.625% Senior Notes issued on February 15, 2019.

There are additional covenants under the Credit Facility and the Term Loan that limit the ability of the Company and its subsidiaries to, among other things, incur indebtedness, pay dividends or make distributions. While the Term Loan remains outstanding, these same covenants under the Credit Agreement are more restrictive than the covenants that are applicable to the Credit Facility. Obligations under the Credit Facility and Term Loan are unconditionally guaranteed by certain Match Group wholly-owned domestic subsidiaries and are secured by the stock of certain Match Group domestic and foreign subsidiaries. The Term Loan and outstanding borrowings under the Credit Facility rank equally with each other and have priority over the 5.00% and 6.375% Senior Notes to the extent of the value of the assets securing the borrowings under the Credit Agreement.

*IAC Subordinated Loan Facility:*

The Company has an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allows the Company to make one or more requests to IAC to borrow funds from it. If IAC agrees to fulfill any such borrowing request from the Company, such borrowing will be incurred in accordance with the terms of the IAC Subordinated Loan Facility. Any indebtedness outstanding under the IAC Subordinated Loan Facility will be by its terms subordinated in right of payment to the obligations under the Credit Facility, the Term Loan and the 5.00% and 6.375% Senior Notes. The IAC Subordinated Loan Facility has a scheduled final maturity date of no earlier than 90 days after the maturity date of the Credit Facility or the latest maturity date in respect of any Term Loan outstanding under the Credit Agreement. At December 31, 2018, the Company has no indebtedness outstanding under the IAC Subordinated Loan Facility.

## Cash Flow Information

In summary, the Company's cash flows are as follows:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (In thousands) | | |
| Net cash provided by operating activities attributable to continuing operations | $ 603,455 | $ 321,108 | $ 259,549 |
| Net cash (used in) provided by investing activities attributable to continuing operations | (37,761) | 118,188 | (27,199) |
| Net cash used in financing activities attributable to continuing operations | (649,555) | (423,714) | (61,194) |

## 2018

Net cash provided by operating activities attributable to continuing operations in 2018 includes adjustments to earnings consisting primarily of $66.0 million of stock-based compensation expense, $33.0 million of depreciation, and $1.3 million of amortization of intangibles. Partially offsetting these adjustments was deferred income tax of $19.6 million primarily related to an increase in tax credit carryforwards, partially offset by the utilization of net operating losses. The increase in cash from changes in working capital primarily consists of an increase in accounts payable and accrued expenses and other current liabilities of $20.8 million due to the timing of payments; a decrease in accounts receivable of $17.3 million primarily related to an accelerated cash receipt from a mobile app store provider; an increase in deferred revenue of $13.1 million, due mainly to growth in subscription sales; and an increase from income taxes payable and receivable of $12.8 million due primarily to the timing of tax payments. These increases in cash were partially offset by an increase in other assets of $14.6 million primarily related to an increase in capitalized mobile app fees.

46

Net cash used in investing activities attributable to continuing operations in 2018 consists primarily of capital expenditures of $31.0 million that are primarily related to computer hardware and internal development of software to support our products and services and purchases of investments of $3.8 million, partially offset by net cash acquired in a business combination of $1.1 million.

Net cash used in financing activities attributable to continuing operations in 2018 is primarily due to a cash dividend payment of $556.4 million, withholding taxes paid on behalf of employees for net settled stock awards of $207.7 million, purchases of treasury stock of $133.5 million, purchases of non-controlling interests of $10.0 million, and debt issuance costs of $1.3 million. Partially offsetting these payments were proceeds of $260 million from a draw on the Credit Facility.

**2017**

Net cash provided by operating activities attributable to continuing operations in 2017 includes adjustments to earnings consisting primarily of deferred income tax benefits of $118.3 million primarily related to the net operating loss created by tax deductions created from stock-based awards. Partially offsetting this adjustment was $69.1 million of stock-based compensation expense, $32.6 million of depreciation, $5.3 million of acquisition-related contingent consideration fair value adjustments, $1.5 million of amortization of intangibles, and $22.1 million in other adjustments that consist primarily of non-cash loss on extinguishment of debt of $15.4 million, net foreign currency losses of $9.0 million, non-cash interest expenses of $4.1 million, and a non-cash other-than-temporary impairment on a cost method investment of $2.3 million, partially offset by a gain on the sale of a cost method investment of $9.1 million. The decrease in cash from changes in working capital primarily consists of increases in accounts receivable of $51.6 million primarily related to timing of cash receipts and revenue increasingly sourced through mobile app stores, which are settled with the Company more slowly than traditional credit cards; a decrease in accounts payable and accrued expenses and other current liabilities of $16.8 million, due primarily to the cash settlement of a former subsidiary denominated equity award held by a non-employee; and decreases in cash from other assets of $10.6 million primarily related to the prepayment of certain expenses. These uses of cash were partially offset by an increase in deferred revenue of $32.8 million, due mainly to growth in subscription sales.

Net cash provided by investing activities attributable to continuing operations in 2017 consists primarily of net proceeds of $96.1 million from the sale of a business and net proceeds of $60.2 million from the sale of a cost method investment, partially offset by capital expenditures of $28.8 million that are primarily related to development of capitalized software to support our products and services and the purchase of investments of $9.1 million.

Net cash used in financing activities attributable to continuing operations in 2017 is primarily due to cash payments of $272.5 million for the purchase of certain fully vested stock-based awards, $254.2 million for withholding taxes paid on behalf of employees for net settled stock awards, a $23.4 million payment related to an acquisition-related contingent consideration agreement, and debt issuance costs of $12.3 million. Offsetting these payments were proceeds of $75.0 million from the increase in the Term Loan; proceeds from the issuance of common stock pursuant to stock-based awards of $59.4 million; and net Senior Notes increase of $4.8 million as $445.2 million of 6.75% Senior Notes were redeemed with the proceeds from the issuance of $450.0 million of 5.00% Senior Notes.

**2016**

Net cash provided by operating activities attributable to continuing operations in 2016 includes adjustments to earnings consisting primarily of $52.4 million of stock-based compensation expense, $27.7 million of depreciation, $16.9 million of amortization of intangibles, $9.2 million in gains from acquisition-related contingent consideration fair value adjustments and $4.8 million in other adjustments that consist primarily of a non-cash charge on the prepayment of $400 million of the Term Loan, partially offset by foreign currency exchange gains on intercompany loans. The increase in cash from changes in working capital primarily consists of an increase in deferred revenue of $19.2 million, due mainly to growth in subscription revenue, and an increase of the income tax payable as accruals exceeded payments, partially offset by an increase from accounts receivable and a decrease in accounts payable and accrued expenses and other current liabilities.

Net cash used in investing activities attributable to continuing operations in 2016 consists primarily of capital expenditures of $46.1 million that are related to the development of software capitalized to support our

47

Table of Contents

products and services, as well as computer equipment and leasehold improvements as we continue to grow and expand our operations, partially offset by the proceeds of $11.7 million from the sale of a marketable security.

Net cash used in financing activities attributable to continuing operations in 2016 mainly relates to the prepayment of $450.0 million of the Term Loan, of which $400.0 million was financed by the issuance of the 6.375% Senior Notes.

**Liquidity and Capital Resources**

The Company's principal sources of liquidity are its cash flows generated from operations as well as cash and cash equivalents. The Company has a $500 million Credit Facility that expires on December 7, 2023. At December 31, 2018, there were outstanding borrowings of $260 million under the Credit Facility. Borrowings under the Credit Facility were repaid with proceeds from the 5.625% Senior Notes issued on February 15, 2019.

The Company anticipates that it will need to make capital and other expenditures in connection with the development and expansion of its operations. The Company expects that 2019 capital expenditures will be between $35 million and $40 million, an increase from 2018 capital expenditures primarily related to additional leasehold improvements as Tinder expands office space.

The Company believes its expected positive cash flows generated from operations together with its existing cash and cash equivalents and available borrowing capacity under the Credit Facility will be sufficient to fund its normal operating requirements, including the payment of withholding taxes on behalf of employees for net-settled equity plans, capital expenditures, debt service, investing, and other commitments for the foreseeable future. The Company's liquidity could be negatively affected by a decrease in demand for our products and services.

On November 6, 2018, the Board of Directors declared a special dividend of $2.00 per share on Match Group common stock and Class B common stock, which was paid on December 19, 2018, to stockholders of record as of the close of business on December 5, 2018.  The total amount of the dividend was $556.4 million. The special dividend was funded with cash on hand and borrowings under the Credit Facility.

In May 2017, the Board of Directors of the Company authorized Match Group to repurchase up to 6 million shares of its common stock. The timing and actual number of any shares repurchased will depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities. The Company is not obligated to purchase any shares under the repurchase program, and repurchases may be commenced, suspended or discontinued from time to time without prior notice. We purchased 3.1 million shares related to this repurchase authorization through December 31, 2018 for $133.5 million. A total of 2.9 million shares remain available for repurchase.

The Company settles substantially all equity awards on a net basis.  Assuming all equity awards outstanding on February 1, 2019 were net settled, we would issue 10.2 million common shares (of which 2.0 million are related to vested shares and 8.1 million are related to unvested shares) and, assuming a 50% withholding rate, would remit $556.2 million in cash for withholding taxes (of which $110.7 million is related to vested shares and $445.4 million is related to unvested shares). If we decided to issue a sufficient number of shares to cover the $556.2 million employee withholding tax obligation, 10.2 million additional shares would be issued by the Company.

The Company does not currently expect to be a material U.S. federal cash income tax payer until 2021. The ultimate timing is dependent primarily on the performance of the Company and the amount and timing of tax deductions related to stock-based awards.

All of the Company's international cash can be repatriated without significant tax consequences. During the year ended December 31, 2018, foreign cash of $25.2 million was repatriated to the U.S.

Our indebtedness could limit our ability to: (i) obtain additional financing to fund working capital needs, acquisitions, capital expenditures, debt service or other requirements; and (ii) use operating cash flow to pursue acquisitions or invest in other areas, such as developing properties and exploiting business opportunities. As of December 31, 2018, IAC owns 81.1% of our outstanding shares of capital stock and has 97.6% of the combined voting power of our outstanding capital stock. As a result of IAC's ability to control the election and removal of our board of directors, IAC effectively has the ability to control our financing activities, including the issuance of additional debt and equity securities, the incurrence of other indebtedness, or distributions to shareholders. While

48

Table of Contents

the Company believes we will have the ability to access debt and equity markets if needed, such transactions may require the concurrence of IAC.

49

App. 181

## CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

| Contractual Obligations[a] | Payments Due by Period | | | | |
| --- | --- | --- | --- | --- | --- |
| | Less Than 1 Year | 1–3 Years | 3–5 Years | More Than 5 Years | Total |
| | (In thousands) | | | | |
| Long-term debt[b][c] | $ 78,271 | $ 164,546 | $ 827,699 | $ 952,750 | $ 2,023,266 |
| Operating leases[d] | 11,559 | 25,570 | 12,833 | 17,471 | 67,433 |
| Purchase obligation[e] | 27,153 | 23,897 | — | — | 51,050 |
| Total contractual obligations | $ 116,983 | $ 214,013 | $ 840,532 | $ 970,221 | $ 2,141,749 |

[a]   The Company has excluded $35.6 million in unrecognized tax benefits and related interest from the table above as we are unable to make a reasonably reliable estimate of the period in which these liabilities might be paid. For additional information on income taxes, see "Note 3—Income Taxes" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[b]   Represents contractual amounts due including interest on both fixed and variable rate instruments. Long-term debt at December 31, 2018 consists of the 6.375% and 5.00% Senior Notes of $400 million and $450 million, respectively, which bear interest at fixed rates, and the Credit Facility and Term Loan balances of $260 million and $425 million, respectively, which both bear interest at a variable rate. The Credit Facility and the Term Loan bear interest at LIBOR plus 1.50%, or 3.97%, and LIBOR plus 2.50%, or 5.09%, respectively, at December 31, 2018. The amount of interest ultimately paid on the Credit Facility and Term Loan may differ based on changes in interest rates and outstanding balances. For additional information on long-term debt, see "Note 7—Long-term Debt, net" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[c]   Subsequent to December 31, 2018, the Credit Facility was repaid in full with the issuance of the 5.625% Senior Notes. The interest and principal related to the 5.625% Senior Notes are not reflected in the table above.

[d]   The Company leases office space, data center facilities and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company is also committed to pay a portion of the related operating expenses under certain lease agreements. These operating expenses are not included in the table above. For additional information on operating leases, see "Note 13—Commitments and Contingencies" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[e]   The purchase obligations consist primarily of a web hosting commitment.

We also had $0.4 million of letters of credit and surety bonds outstanding as of December 31, 2018 that could potentially require performance by the Company in the event of demands by third parties or contingent events.

### Off-Balance Sheet Arrangements

Other than the items described above, the Company does not have any off-balance sheet arrangements as of December 31, 2018.

50

App. 182

Table of Contents

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The following disclosure is provided to supplement the descriptions of Match Group's accounting policies contained in "Note 2 —Summary of Significant Accounting Policies" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data" in regard to significant areas of judgment. Management of the Company is required to make certain estimates, judgments and assumptions during the preparation of its consolidated financial statements in accordance with U.S. generally accepted accounting principles. These estimates, judgments and assumptions impact the reported amount of assets, liabilities, revenue and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. What follows is a discussion of some of our more significant accounting policies and estimates.

### Business Combinations and Contingent Consideration Arrangements

Acquisitions have been, and will continue to be, an important part of the Company's growth strategy. The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The fair value of these intangible assets is based on valuations that use information and assumptions provided by management. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is initially recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. The contingent consideration arrangements are generally based upon earnings performance and/or operating metrics. The Company determines the fair value of the contingent consideration arrangements by using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement. The changes in the remeasured fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations.

### Recoverability of Goodwill and Indefinite-Lived Intangible Assets

Goodwill is the Company's largest asset with a carrying value of $1.2 billion at both December 31, 2018 and 2017, representing 61% and 59%, respectively, of the Company's total assets. Indefinite-lived intangible assets, which consist of the Company's acquired trade names and trademarks, have a carrying value of $230.7 million and $228.3 million at December 31, 2018 and 2017, respectively.

Goodwill and indefinite-lived intangible assets are assessed annually for impairment as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value. In performing its annual assessment, the Company has the option to qualitatively assess whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. The 2018 and 2017 annual assessments did not identify any material impairments.

For the Company's annual goodwill test at October 1, 2018, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of its single reporting unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were that its market capitalization of $15.7 billion exceeded the carrying value by approximately $15.1 billion and the Company's strong operating performance.

The Company tests goodwill for impairment when it concludes that it is more likely than not that there may be an impairment. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of each reporting unit to its carrying value, including goodwill. If the

51

App. 183

Table of Contents

estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair value of its indefinite-lived intangible assets is less than their carrying values, the Company's policy is to determine the fair value of each of its indefinite-lived intangible assets annually as of October 1. The Company determines the fair value of indefinite-lived intangible assets using an avoided royalty DCF valuation analysis. Significant judgments inherent in these analyses include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. Assumptions used in the avoided royalty DCF analyses, including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2018 and 2017, and the royalty rates used ranged from 3% to 8% in 2018 and 3% to 7% in 2017. The aggregate indefinite-lived intangible asset balance for which the most recent estimate of fair value is less than 110% of their carrying values is approximately $101.7 million.

### Recoverability and Estimated Useful Lives of Long-Lived Assets

We review the carrying value of all long-lived assets, comprising property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. In addition, the Company reviews the useful lives of its long-lived assets whenever events or changes in circumstances indicate that these lives may be changed. The carrying value of property and equipment and definite-lived intangible assets is $65.3 million and $63.7 million, at December 31, 2018 and 2017, respectively.

### Income Taxes

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings.  In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis.  The Company's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statement of cash flows. The tax sharing agreement between the Company and IAC governs the parties' respective rights, responsibilities and obligations with respect to tax matters, including responsibility for taxes attributable to the Company, entitlement to refunds, allocation of tax attributes and other matters.

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. At December 31, 2018 and 2017, the balance of the Company's net deferred tax asset is $114.2 million and $94.7 million, respectively.

We evaluate and account for uncertain tax positions using a two-step approach. Recognition (step one) occurs when we conclude that a tax position, based solely on its technical merits, is more-likely-than-not to be sustained upon examination. Measurement (step two) determines the amount of benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the

52

App. 184

probability of various possible outcomes. At December 31, 2018 and 2017, the Company has unrecognized tax benefits of $37.6 million and $26.8 million, including interest and penalties, respectively. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustment, and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

The ultimate amount of deferred income tax assets realized and the amounts paid for deferred income tax liabilities and uncertain tax positions may vary from our estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the various tax authorities, as well as actual operating results of the Company that vary significantly from anticipated results.

At December 31, 2018, the Company has $103.1 million in foreign cash that can be repatriated without any significant tax consequences. The Company has not provided for approximately $1.0 million of deferred taxes as the foreign cash earnings are indefinitely reinvested outside the U.S. The Company reassess its intention to remit or permanently reinvest these cash earnings each reporting period; any required adjustment to the income tax provision would be reflected in the period that the Company changes this intention.

On December 22, 2017, the U.S. enacted the Tax Act. The Tax Act imposes a new minimum tax on GILTI earned by foreign subsidiaries beginning in 2018. The Financial Accounting Standards Board Staff Q&A, Topic 740 No. 5, Accounting for Global Intangible Low-Taxed Income, states that an entity can make an accounting policy election to either recognize deferred taxes for temporary differences expected to reverse as GILTI in future years or provide for the tax expense related to GILTI in the year the tax is incurred. The Company elects to recognize the tax on GILTI as a period expense in the period the tax is incurred.

### Stock-Based Compensation

The Company recorded stock-based compensation expense of $66.0 million, $69.1 million and $52.4 million for the years ended December 31, 2018, 2017 and 2016, respectively. The Company estimated the fair value of stock options issued in 2018, 2017 and 2016 using a Black-Scholes option pricing model measured at the grant date and is expensing this fair value over the vesting term. The impact on stock-based compensation expense for the year ended December 31, 2018, assuming a 1% increase in the risk-free interest rate, a 10% increase in the volatility factor and a one-year increase in the weighted average expected term of the outstanding options would be an increase of $0.9 million, $7.6 million and $2.5 million, respectively. The Company also issues RSUs. For RSUs issued, the value of the instrument is measured at the grant date as the fair value of Match Group common stock and, for those with a market condition, the fair value is estimated using a lattice model, and expensed as stock-based compensation expense over the vesting term.

### Recent Accounting Pronouncements

For a discussion of recent accounting pronouncements, see "Note 2—Summary of Significant Accounting Policies" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

53

App. 185

Table of Contents

## Item 7A.   Quantitative and Qualitative Disclosures About Market Risk

### Interest Rate Risk

The Company's exposure to market risk for changes in interest rates relates primarily to the Company's long-term debt.

At December 31, 2018, the Company's outstanding long-term debt was $1.5 billion, of which $850 million of Senior Notes bear interest at fixed rates. If market rates decline, the Company runs the risk that the required payments on the fixed rate debt will exceed those based on market rates. A 100 basis point increase or decrease in the level of interest rates would, respectively, decrease or increase the fair value of the fixed-rate debt by $49.8 million. Such potential increase or decrease in fair value is based on certain simplifying assumptions, including a constant level and rate of fixed-rate debt for all maturities and an immediate across-the-board increase or decrease in the level of interest rates with no other subsequent changes for the remainder of the period. The $260 million Credit Facility and the $425 million Term Loan bear interest at variable rates, LIBOR plus 1.50% and LIBOR plus 2.50%, respectively. As of December 31, 2018, the rates in effect were 3.97% and 5.09%, respectively. If LIBOR were to increase or decrease by 100 basis points, then the annual interest expense and payments on the Credit Facility and the Term Loan would increase or decrease by $2.6 million and $4.3 million, respectively, based upon the outstanding balances on each at December 31, 2018.

### Foreign Currency Exchange Risk

The Company conducts business in certain foreign markets, primarily in various jurisdictions within the European Union ("EU") and Asia. We are primarily exposed to foreign exchange risk for both the Euro and British Pound ("GBP").

For the years ended December 31, 2018, 2017 and 2016, international revenue accounted for 50%, 46% and 40%, respectively, of our consolidated revenue. We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar. As foreign currency exchange rates change, translation of the statement of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results. The average GBP and Euro exchange rates strengthened against the U.S. Dollar by 4% and 5%, respectively, in 2018 compared to 2017. Additionally, the announcement of the United Kingdom ("UK") referendum in which voters approved an exit from the EU, commonly referred to as "Brexit," and the subsequent negotiations between the UK and EU, has previously caused, and may continue to cause, significant volatility in currency exchange rates between the U.S. dollar and the GBP. Foreign currency exchange rate changes during the years ended December 31, 2018 and 2017 did not have a material impact on revenue.

Foreign currency exchange gains and losses included in the Company's earnings for the years ended December 31, 2018, 2017 and 2016 are gains and (losses) of $5.3 million, $(10.3) million and $20.0 million, respectively. Historically, foreign currency exchange gains and losses have not been material to the Company. The loss in 2017 is primarily related to a U.S. dollar denominated intercompany loan in which the receivable is held by a foreign subsidiary with a GBP functional currency. As the GBP strengthened against the U.S. Dollar during the year, the intercompany loan incurred losses. The gain in 2016 is primarily related to the significant decline in the GBP in 2016 following the Brexit vote on June 23, 2016.

Foreign currency exchange gains or losses historically have not been material to the Company. As a result, historically, we have not hedged any foreign currency exposures. The continued growth and expansion of our international operations into new countries increases our exposure to foreign exchange rate fluctuations. Significant foreign exchange rate fluctuations, in the case of one currency or collectively with other currencies, could adversely affect our future results of operations.

54

App. 186

**Item 8.    Consolidated Financial Statements and Supplementary Data**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Match Group, Inc. and subsidiaries (the Company) as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive operations, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2018, and the related notes and the financial statement schedule listed in the Index at Item 15(a) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 28, 2019 expressed an unqualified opinion thereon.

**Adoption of ASU No. 2016-09**

As discussed in Note 11 to the consolidated financial statements, the Company changed its method of accounting for stock compensation in 2017 due to the adoption of ASU No. 2016-09, *Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.

New York, New York
February 28, 2019

55

App. 187

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET**

| | December 31, | |
|---|---|---|
| | 2018 | 2017 |
| | (In thousands, except share data) | |

**ASSETS**

| | | | | |
|---|---|---|---|---|
| Cash and cash equivalents | $ | 186,947 | $ | 272,624 |
| Accounts receivable, net of allowance of $724 and $778, respectively | | 99,052 | | 116,751 |
| Other current assets | | 57,766 | | 55,369 |
| Total current assets | | 343,765 | | 444,744 |
| Property and equipment, net | | 58,351 | | 61,620 |
| Goodwill | | 1,244,758 | | 1,247,644 |
| Intangible assets, net | | 237,640 | | 230,345 |
| Deferred income taxes | | 134,347 | | 123,199 |
| Long-term investments | | 9,076 | | 11,137 |
| Other non-current assets | | 25,124 | | 11,457 |
| TOTAL ASSETS | $ | 2,053,061 | $ | 2,130,146 |

**LIABILITIES AND SHAREHOLDERS' EQUITY**

**LIABILITIES**

| | | | | |
|---|---|---|---|---|
| Accounts payable | $ | 9,528 | $ | 10,112 |
| Deferred revenue | | 209,935 | | 198,095 |
| Accrued expenses and other current liabilities | | 135,971 | | 110,566 |
| Total current liabilities | | 355,434 | | 318,773 |
| Long-term debt, net | | 1,515,911 | | 1,252,696 |
| Income taxes payable | | 13,918 | | 8,410 |
| Deferred income taxes | | 20,174 | | 28,478 |
| Other long-term liabilities | | 21,760 | | 14,484 |
| | | | | |
| Redeemable noncontrolling interests | | — | | 6,056 |
| | | | | |
| Commitments and contingencies | | | | |

**SHAREHOLDERS' EQUITY**

| | | | | |
|---|---|---|---|---|
| Common stock; $0.001 par value; authorized 1,500,000,000 shares; 71,513,087 and 64,370,470 shares issued; and 68,460,563 and 64,370,470 shares outstanding at December 31, 2018 and December 31, 2017, respectively | | 72 | | 64 |
| Class B convertible common stock; $0.001 par value; authorized 1,500,000,000 shares; 209,919,402 shares issued and outstanding | | 210 | | 210 |
| Class C common stock; $0.001 par value; authorized 1,500,000,000 shares; no shares issued and outstanding | | — | | — |
| Preferred stock; $0.001 par value; authorized 500,000,000 shares; no shares issued and outstanding | | — | | — |
| Additional paid-in capital | | (57,575) | | 81,082 |
| Retained earnings | | 453,778 | | 532,211 |
| Accumulated other comprehensive loss | | (137,166) | | (112,318) |
| Treasury stock; 3,052,524 and 0 shares, respectively | | (133,455) | | — |
| Total Match Group, Inc. shareholders' equity | | | | |

App. 188

|                                             |    | 125,864   |    | 501,249   |
| ------------------------------------------- | -- | --------- | -- | --------- |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ | 2,053,061 | $ | 2,130,146 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

56

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF OPERATIONS**

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 |
| | | (In thousands, except per share data) | | | | |
| Revenue | $ | 1,729,850 | $ | 1,330,661 | $ | 1,118,110 |
| Operating costs and expenses: | | | | | | |
| Cost of revenue (exclusive of depreciation shown separately below) | | 410,000 | | 279,499 | | 195,648 |
| Selling and marketing expense | | 419,954 | | 375,610 | | 349,119 |
| General and administrative expense | | 180,286 | | 179,804 | | 135,019 |
| Product development expense | | 132,030 | | 101,150 | | 78,117 |
| Depreciation | | 32,968 | | 32,613 | | 27,726 |
| Amortization of intangibles | | 1,318 | | 1,468 | | 16,932 |
| Total operating costs and expenses | | 1,176,556 | | 970,144 | | 802,561 |
| Operating income | | 553,294 | | 360,517 | | 315,549 |
| Interest expense | | (73,417) | | (77,565) | | (82,199) |
| Other income (expense), net | | 7,765 | | (30,827) | | 7,866 |
| Earnings from continuing operations, before tax | | 487,642 | | 252,125 | | 241,216 |
| Income tax (provision) benefit | | (14,673) | | 103,852 | | (62,875) |
| **Net earnings from continuing operations** | | 472,969 | | 355,977 | | 178,341 |
| Loss from discontinued operations, net of tax | | (378) | | (5,650) | | (6,328) |
| **Net earnings** | | 472,591 | | 350,327 | | 172,013 |
| Net loss (earnings) attributable to noncontrolling interests | | 5,348 | | (179) | | (562) |
| **Net earnings attributable to Match Group, Inc. shareholders** | $ | 477,939 | $ | 350,148 | $ | 171,451 |
| | | | | | | |
| **Net earnings per share from continuing operations:** | | | | | | |
| Basic | $ | 1.73 | $ | 1.35 | $ | 0.71 |
| Diluted | $ | 1.61 | $ | 1.20 | $ | 0.66 |
| | | | | | | |
| **Net earnings per share attributable to Match Group, Inc. shareholders:** | | | | | | |
| Basic | $ | 1.73 | $ | 1.33 | $ | 0.68 |
| Diluted | $ | 1.61 | $ | 1.18 | $ | 0.64 |
| | | | | | | |
| **Dividend declared per share** | $ | 2.00 | $ | — | $ | — |
| | | | | | | |
| **Stock-based compensation expense by function:** | | | | | | |
| Cost of revenue | $ | 2,287 | $ | 1,701 | $ | 1,447 |
| Selling and marketing expense | | 3,599 | | 4,545 | | 3,426 |
| General and administrative expense | | 32,346 | | 42,840 | | 33,784 |
| Product development expense | | 27,799 | | 20,004 | | 13,713 |
| Total stock-based compensation expense | $ | 66,031 | $ | 69,090 | $ | 52,370 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

57

App. 190

App. 191

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF COMPREHENSIVE OPERATIONS**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | (In thousands) | | |
| Net earnings | $ 472,591 | $ 350,327 | $ 172,013 |
| Other comprehensive (loss) income, net of tax | | | |
|    Change in foreign currency translation adjustment | (24,967) | 64,588 | (36,239) |
|    Change in fair value of available-for-sale securities | — | — | (2,964) |
| Total other comprehensive (loss) income | (24,967) | 64,588 | (39,203) |
| Comprehensive income | 447,624 | 414,915 | 132,810 |
| Comprehensive loss (income) attributable to noncontrolling interests | 5,467 | (701) | (923) |
| Comprehensive income attributable to Match Group, Inc. shareholders | $ 453,091 | $ 414,214 | $ 131,887 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

58

# MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY

### Years Ended December 31, 2018, 2017 and 2016

| | Redeemable Noncontrolling Interests | Common Stock $0.001 Par Value | | Class B Convertible Common Stock $0.001 Par Value | | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Treasury Stock | Total Match Group, Inc. Shareholders' Equity | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $ | Shares | $ | Shares | | | | | | | |
| **Balance as of December 31, 2015** | $ 5,907 | $ 38 | 38,343 | $ 210 | 209,919 | $404,771 | $ 10,612 | $ (136,820) | $ — | $ 278,811 | $ — | $ 278,811 |
| Net earnings for the year ended December 31, 2016 | 562 | — | — | — | — | — | 171,451 | — | — | 171,451 | — | 171,451 |
| Other comprehensive income (loss), net of tax | 361 | — | — | — | — | — | — | (39,564) | — | (39,564) | — | (39,564) |
| Stock-based compensation expense | — | — | — | — | — | 44,524 | — | — | — | 44,524 | — | 44,524 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 7 | 6,495 | — | — | 10,224 | — | — | — | 10,231 | — | 10,231 |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 1 | 959 | — | — | — | — | — | — | 1 | — | 1 |
| Income tax benefit related to stock-based awards and other | — | — | — | — | — | 27,407 | — | — | — | 27,407 | — | 27,407 |
| Purchase of redeemable noncontrolling interests | (1,129) | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | 361 | — | — | — | — | (361) | — | — | — | (361) | — | (361) |
| Other | — | — | — | — | — | 4,022 | — | — | — | 4,022 | — | 4,022 |
| **Balance as of December 31, 2016** | 6,062 | 46 | 45,797 | 210 | 209,919 | 490,587 | 182,063 | (176,384) | — | 496,522 | — | 496,522 |
| Net earnings for the year ended December 31, 2017 | 179 | — | — | — | — | — | 350,148 | — | — | 350,148 | — | 350,148 |
| Other comprehensive income, net of tax | 522 | — | — | — | — | — | — | 64,066 | — | 64,066 | — | 64,066 |
| Stock-based compensation expense | — | — | — | — | — | 54,604 | — | — | — | 54,604 | — | 54,604 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 6 | 6,688 | — | — | (248,787) | — | — | — | (248,781) | — | (248,781) |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 12 | 11,885 | — | — | (215,429) | — | — | — | (215,417) | — | (215,417) |
| Purchase of redeemable noncontrolling interests | (436) | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | (107) | — | — | — | — | 107 | — | — | — | 107 | — | 107 |
| Other | (164) | — | — | — | — | — | — | — | — | — | — | — |
| **Balance as of December 31, 2017** | 6,056 | 64 | 64,370 | 210 | 209,919 | 81,082 | 532,211 | (112,318) | — | 501,249 | — | 501,249 |
| Net earnings (loss) for the year ended December 31, 2018 | 108 | — | — | — | — | — | 477,939 | — | — | 477,939 | (5,456) | 472,483 |
| Other comprehensive loss, net of tax | (119) | — | — | — | — | — | — | (24,848) | — | (24,848) | — | (24,848) |
| Stock-based compensation expense | — | — | — | — | — | 66,031 | — | — | — | 66,031 | — | 66,031 |
| Issuance of common stock pursuant to stock- | — | 5 | 4,173 | — | — | (207,950) | — | — | — | (207,945) | — | (207,945) |

App. 193

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| based awards, net of withholding taxes | | | | | | | | | | | | |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 3 | 2,970 | — | — | (3) | — | — | — | — | — | — |
| Dividends ($2.00 per share of Common Stock and Class B Convertible Common Stock) | — | — | — | — | — | — | (556,372) | — | — | (556,372) | — | (556,372) |
| Purchase of treasury stock | — | — | — | — | — | — | — | — | (133,455) | (133,455) | — | (133,455) |
| Purchase of redeemable noncontrolling interests | (3,503) | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | (2,542) | — | — | — | — | 2,542 | — | — | — | 2,542 | — | 2,542 |
| Noncontrolling interests created in an acquisition | — | — | — | — | — | — | — | — | — | — | 14,307 | 14,307 |
| Adjustment to noncontrolling interests related to business acquisition | — | — | — | — | — | 723 | — | — | — | 723 | (723) | — |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (8,128) | (8,128) |
| **Balance as of December 31, 2018** | $ — | $ 72 | 71,513 | $ 210 | 209,919 | $ (57,575) | $453,778 | $ (137,166) | $(133,455) | $ 125,864 | $ — | $ 125,864 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

59

## MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CASH FLOWS

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (In thousands) | | |
| **Cash flows from operating activities attributable to continuing operations:** | | | |
| **Net earnings from continuing operations** | $ 472,969 | $ 355,977 | $ 178,341 |
| Adjustments to reconcile net earnings from continuing operations to net cash provided by operating activities attributable to continuing operations: | | | |
| Stock-based compensation expense | 66,031 | 69,090 | 52,370 |
| Depreciation | 32,968 | 32,613 | 27,726 |
| Amortization of intangibles | 1,318 | 1,468 | 16,932 |
| Deferred income taxes | (19,639) | (118,251) | (10,298) |
| Acquisition-related contingent consideration fair value adjustments | 320 | 5,253 | (9,197) |
| Other adjustments, net | 230 | 22,142 | (4,797) |
| Changes in assets and liabilities, net of effects of acquisitions and dispositions: | | | |
| Accounts receivable | 17,272 | (51,587) | (10,731) |
| Other assets | (14,606) | (10,547) | (5,327) |
| Accounts payable and other liabilities | 20,769 | (16,801) | (24,346) |
| Income taxes payable and receivable | 12,765 | (1,002) | 29,641 |
| Deferred revenue | 13,058 | 32,753 | 19,235 |
| **Net cash provided by operating activities attributable to continuing operations** | 603,455 | 321,108 | 259,549 |
| **Cash flows from investing activities attributable to continuing operations:** | | | |
| Net cash acquired (used) in business combinations | 1,136 | (280) | (686) |
| Capital expenditures | (30,954) | (28,833) | (46,098) |
| Proceeds from the sale of a business, net | — | 96,144 | — |
| Proceeds from the sale of a long-term investment | — | 60,163 | — |
| Proceeds from sale of a marketable security | — | — | 11,716 |
| Purchases of investments | (3,800) | (9,076) | (500) |
| Other, net | (4,143) | 70 | 8,369 |
| **Net cash (used in) provided by investing activities attributable to continuing operations** | (37,761) | 118,188 | (27,199) |
| Cash flows from financing activities attributable to continuing operations: | | | |
| Borrowings under the Credit Facility | 260,000 | — | — |
| Term Loan borrowings | — | 75,000 | — |
| Proceeds from bond offering | — | 450,000 | 400,000 |
| Principal payment on Senior Notes | — | (445,172) | — |
| Principal payments on Term Loan | — | — | (450,000) |
| Debt issuance costs | (1,281) | (12,285) | (7,811) |
| Purchase of treasury stock | (133,455) | — | — |
| Dividends | (556,372) | — | — |
| Proceeds from issuance of common stock pursuant to stock-based awards | 12 | 59,442 | 39,378 |
| Withholding taxes paid on behalf of employees on net settled stock-based awards | (207,720) | (254,210) | (29,830) |
| Purchase of noncontrolling interests | (9,980) | (436) | (1,129) |
| Purchase of stock-based awards | — | (272,459) | — |
| Acquisition-related contingent consideration payments | (185) | (23,429) | — |
| Other, net | (574) | (165) | (11,802) |

App. 195

Case 3:19-cv-02356-S Document 39 Filed 06/12/20 Page 200 of 451 PageID 723

| | | | |
|---|---|---|---|
| Net cash used in financing activities attributable to continuing operations | (699,553) | (423,714) | (61,194) |
| | | | |
| Total cash (used in) provided by continuing operations | (83,861) | 15,582 | 171,156 |

60

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CASH FLOWS (continued)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2018** | **2017** | **2016** |
| | (In thousands) | | |
| Net cash (used in) provided by operating activities attributable to discontinued operations | — | (6,061) | 4,231 |
| Net cash used in investing activities attributable to discontinued operations | — | (471) | (4,152) |
| Total cash (used in) provided by discontinued operations | — | (6,532) | 79 |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | (1,760) | 9,940 | (5,763) |
| **Net (decrease) increase in cash, cash equivalents, and restricted cash** | (85,621) | 18,990 | 165,472 |
| Cash, cash equivalents, and restricted cash at beginning of period | 272,761 | 253,771 | 88,299 |
| **Cash, cash equivalents, and restricted cash at end of period** | $ 187,140 | $ 272,761 | $ 253,771 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

61

App. 197

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 1—ORGANIZATION

Match Group, Inc. is a leading provider of dating products available in over 40 languages to our users all over the world through applications and websites that we own and operate. We operate a portfolio of brands, including Tinder, Match, PlentyOfFish, Meetic, OkCupid, OurTime, Pairs, and Hinge, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users. Following the sale of our Non-dating segment in March 2017, Match Group has one operating segment, Dating, which is managed as a portfolio of dating brands.

As used herein, "Match Group," the "Company," "we," "our," "us," and similar terms refer to Match Group, Inc. and its subsidiaries, unless the context indicates otherwise.

As of December 31, 2018, IAC/InterActiveCorp's ("IAC") economic ownership interest and voting interest in Match Group were 81.1% and 97.6%, respectively.

## NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation and Consolidation

The Company prepares its consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"). The consolidated financial statements include the accounts of the Company, all entities that are wholly-owned by the Company and all entities in which the Company has a controlling financial interest. Intercompany transactions and accounts have been eliminated.

For the purposes of these consolidated financial statements, income taxes have been computed for Match Group on an as if stand-alone, separate tax return basis.

### Accounting for Investments in Equity Securities

Investments in equity securities, other than those of our consolidated subsidiaries, are accounted for at fair value or under the measurement alternative of Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities*, upon its adoption on January 1, 2018, with any changes to fair value recognized within other income (expense), net each reporting period. Under the measurement alternative, equity investments without readily determinable fair values are carried at cost minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer and value is generally determined based on a market approach as of the transaction date. An investment will be considered identical or similar if it has identical or similar rights to the equity investments held by the Company. The Company reviews its equity securities for impairment each reporting period when there are qualitative factors or events that indicate possible impairment. Factors we consider in making this determination include negative change in industry and market conditions, financial performance, business prospects, and other relevant events and factors. When indicators of impairment exist, the Company prepares quantitative assessments of the fair value of our equity securities, which require judgment and the use of estimates. When our assessment indicates that the fair value of the security is below the carrying value, the Company writes down the security to its fair value and records the corresponding charge within other income (expense), net. See "*Accounting Pronouncements adopted by the Company*" below for further information.

### Accounting Estimates

Management of the Company is required to make certain estimates, judgments and assumptions during the preparation of its consolidated financial statements in accordance with GAAP. These estimates, judgments and assumptions impact the reported amounts of assets, liabilities, revenue and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates.

On an ongoing basis, the Company evaluates its estimates and judgments, including those related to: the recoverability of goodwill and indefinite-lived intangible assets; the useful lives and recoverability of definite-

62

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

lived intangible assets and property and equipment; the fair values of equity securities without readily determinable fair values; the carrying value of accounts receivable, including the determination of the allowance for doubtful accounts; the determination of revenue reserves; the fair value of acquisition-related contingent consideration arrangements; unrecognized tax benefits; the valuation allowance for deferred income tax assets; and the fair value of and forfeiture rates for stock-based awards, among others. The Company bases its estimates and judgments on historical experience, its forecasts and budgets and other factors that the Company considers relevant.

**Revenue Recognition**

The Company adopted the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers,* effective January 1, 2018 using the modified retrospective transition method for open contracts as of the date of initial application. See "*Accounting Pronouncements adopted by the Company"* below for further information.

The Company accounts for a contract with a customer when it has approval and commitment from all parties, the rights of the parties and payment terms are identified, the contract has commercial substance and collectability of consideration is probable. Revenue is recognized when control of the promised services is transferred to our customers, and in an amount that reflects the consideration the Company is contractually due in exchange for those services.

The Company's revenue is primarily derived directly from users in the form of recurring subscriptions. Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, generally all purchases are final and nonrefundable. Revenue is initially deferred and is recognized using the straight-line method over the term of the applicable subscription period, which generally ranges from one to six months. Revenue is also earned from online advertising, the purchase of à la carte features and offline events. Online advertising revenue is recognized when an advertisement is displayed. Revenue from the purchase of à la carte features is recognized based on usage. Revenue associated with offline events is recognized when each event occurs.

As permitted under the practical expedient available under ASU No. 2014-09, the Company does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less, (ii) contracts with variable consideration that is allocated entirely to unsatisfied performance obligations or to a wholly unsatisfied promise accounted for under the series guidance, and (iii) contracts for which the Company recognizes revenue at the amount which we have the right to invoice for services performed.

*Transaction Price*

The objective of determining the transaction price is to estimate the amount of consideration the Company is due in exchange for services, including amounts that are variable. The Company determines the total transaction price, including an estimate of any variable consideration, at contract inception and reassesses this estimate each reporting period.

The Company excludes from the measurement of transaction price all taxes assessed by governmental authorities that are both (i) imposed on and concurrent with a specific revenue-producing transaction and (ii) collected from customers. Accordingly, such tax amounts are not included as a component of revenue or cost of revenue.

For contracts that have an original duration of one year or less, the Company uses the practical expedient available under ASU No. 2014-09 applicable to such contracts and does not consider the time value of money.

*Assets Recognized from the Costs to Obtain a Contract with a Customer*

The Company has determined that certain costs, primarily mobile app store fees, meet the requirements to be capitalized as a cost of obtaining a contract. The Company recognizes an asset for these costs if we expect to recover those costs. Mobile app store fees are amortized over the period of contract performance. Specifically, the Company capitalizes and amortizes mobile app store fees over the term of the applicable subscription. During the year ended December 31, 2018, the Company recognized expense of $284.7 million related to the

63

App. 199

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

amortization of these costs. The contract asset balance at December 31, 2018 related to costs to obtain a contract is $29.2 million and included in "Other current assets" in the accompanying consolidated balance sheet.

*Accounts Receivables, net of allowance for doubtful accounts and revenue reserves*

Accounts receivable include amounts billed and currently due from customers. The Company maintains an allowance for doubtful accounts to provide for the estimated amount of accounts receivable that will not be collected. The allowance for doubtful accounts is based upon a number of factors, including the length of time accounts receivable are past due, the Company's previous loss history, and the specific customer's ability to pay its obligation. The time between the Company issuance of an invoice and payment due date is not significant; customer payments that are not collected in advance of the transfer of promised services are generally due no later than 30 days from invoice date. The Company also maintains allowances to reserve for potential credits issued to consumers or other revenue adjustments. The amounts of these reserves are based primarily upon historical experience.

*Deferred Revenue*

Deferred revenue consists of advance payments that are received or are contractually due in advance of the Company's performance. The Company's deferred revenue is reported on a contract by contract basis at the end of each reporting period. The Company classifies deferred revenue as current when the term of the applicable subscription period or expected completion of our performance obligation is one year or less. The deferred revenue balance as of January 1, 2018 was $198.3 million. During the year ended December 31, 2018, the Company recognized $198.3 million of revenue that was included in the deferred revenue balance as of January 1, 2018. The current deferred revenue balance at December 31, 2018 is $209.9 million. At December 31, 2018, there is no non-current portion of deferred revenue.

*Disaggregation of Revenue*

The following table presents disaggregated revenue:

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| **Direct Revenue:** | | | | | | |
| North America | $ | 902,478 | $ | 741,334 | $ | 673,944 |
| International | | 774,693 | | 539,915 | | 393,420 |
| Total Direct Revenue | | 1,677,171 | | 1,281,249 | | 1,067,364 |
| Indirect Revenue (principally advertising revenue) | | 52,679 | | 49,412 | | 50,746 |
| Total Revenue | $ | 1,729,850 | $ | 1,330,661 | $ | 1,118,110 |
| | | | | | | |
| **Direct Revenue** | | | | | | |
| Tinder | $ | 805,316 | $ | 403,216 | $ | 168,522 |
| Other brands | | 871,855 | | 878,033 | | 898,842 |
| Total Direct Revenue | $ | 1,677,171 | $ | 1,281,249 | $ | 1,067,364 |

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and short-term investments, with maturities of less than 91 days from the date of purchase. Domestically, cash equivalents include AAA rated government money market funds. Internationally, cash equivalents include money market funds.

App. 200

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost. Repairs and maintenance costs are expensed as incurred. Depreciation is computed using the straight-line method over the estimated useful lives of the assets or, in the case of leasehold improvements, the lease term, if shorter.

| Asset Category | Estimated Useful Lives |
|---|---|
| Computer equipment and capitalized software | 2 to 3 years |
| Furniture and other equipment | 5 years |
| Leasehold improvements | 6 to 10 years |

The Company capitalizes certain internal use software costs including external direct costs utilized in developing or obtaining the software and compensation for personnel directly associated with the development of the software. Capitalization of such costs begins when the preliminary project stage is complete and ceases when the project is substantially complete and ready for its intended purpose. The net book value of capitalized internal use software is $19.5 million and $20.9 million at December 31, 2018 and 2017, respectively.

**Business Combinations**

The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The fair value of these intangible assets is based on valuations that use information and assumptions provided by management. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is initially recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. The contingent consideration arrangements are generally based upon earnings performance and/or operating metrics. The Company determines the fair value of the contingent consideration arrangements using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement. The changes in the remeasured fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations. See "Note 6—Financial Instruments" for a discussion of contingent consideration arrangements.

**Goodwill and Indefinite-Lived Intangible Assets**

The Company assesses goodwill on its one reporting unit and indefinite-lived intangible assets for impairment annually as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value.

When the Company elects to perform a qualitative assessment and concludes it is not more likely than not that the fair value of the reporting unit is less than its carrying value, no further assessment of that reporting unit's goodwill is necessary; otherwise, a quantitative assessment is performed and the fair value of the reporting unit is determined. If the carrying value of the reporting unit exceeds its fair value an impairment loss equal to the excess is recorded.

For the Company's annual goodwill test at October 1, 2018, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of its single reporting

65

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were that its market capitalization of $15.7 billion exceeded its carrying value by approximately $15.1 billion and the Company's strong operating performance. A qualitative assessment was also performed for 2017 and the Company concluded it was more likely than not that the fair value of the reporting unit was in excess of its carrying value.

The Company foregoes a qualitative assessment and tests the goodwill for impairment when it concludes that it is more likely than not that there may be an impairment. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of the Company's reporting unit to its carrying value, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair value of its indefinite-lived intangible assets is less than their carrying values, the Company's policy is to determine the fair value of each of its indefinite-lived intangible assets annually as of October 1. The Company determines the fair value of its indefinite-lived intangible assets using an avoided royalty DCF valuation analyses. Significant judgments inherent in these analyses include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. Assumptions used in the avoided royalty DCF analyses, including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2018 and 2017, and the royalty rates used ranged from 3% to 8% in 2018 and 3% to 7% in 2017. The aggregate indefinite-lived intangible asset balance for which the most recent estimate of fair value is less than 110% of their carrying values is approximately $101.7 million.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets, which consist of property and equipment and intangible assets with definite lives, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. Amortization of definite-lived intangible assets is computed either on a straight-line basis or based on the pattern in which the economic benefits of the asset will be realized.

**Fair Value Measurements**

The Company categorizes its financial instruments measured at fair value into a fair value hierarchy that prioritizes the inputs used in pricing the asset or liability. The three levels of the fair value hierarchy are:

- Level 1: Observable inputs obtained from independent sources, such as quoted market prices for identical assets and liabilities in active markets.

- Level 2: Other inputs, which are observable directly or indirectly, such as quoted market prices for similar assets or liabilities in active markets, quoted market prices for identical or similar assets or liabilities in markets that are not active, and inputs that are derived principally from or corroborated by observable market data. The fair values of the Company's Level 2 financial assets are primarily obtained from observable market prices for identical underlying securities that may not be actively traded. Certain of these securities may have different market prices from multiple market data sources, in which case an average market price is used.

- Level 3: Unobservable inputs for which there is little or no market data and require the Company to develop its own assumptions, based on the best information available in the circumstances, about the

66

App. 202

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

assumptions market participants would use in pricing the assets or liabilities. See "Note 6—Financial Instruments" for a discussion of fair value measurements made using Level 3 inputs.

The Company's non-financial assets, such as goodwill, intangible assets, and property and equipment, are adjusted to fair value only when an impairment is recognized. The Company's financial assets, consisting of equity securities without readily determinable fair values, are adjusted to fair value when observable price changes are identified or an impairment is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

**Advertising Costs**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and represent online marketing, including fees paid to search engines and social media sites, offline marketing, which is primarily television advertising, and partner-related payments to those who direct traffic to our websites. Advertising expense is $386.0 million, $340.4 million and $325.0 million for the years ended December 31, 2018, 2017 and 2016, respectively.

**Legal Costs**

Legal costs are expensed as incurred.

**Income Taxes**

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis.

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. The Company records interest, net of any applicable related income tax benefit, on potential income tax contingencies as a component of income tax expense.

The Company evaluates and accounts for uncertain tax positions using a two-step approach. Recognition (step one) occurs when the Company concludes that a tax position, based on its technical merits, is more-likely-than-not to be sustainable upon examination. Measurement (step two) determines the amount of the benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained.

On December 22, 2017, the U.S. enacted the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act imposes a new minimum tax on global intangible low taxed income ("GILTI") earned by foreign subsidiaries beginning in 2018. The FASB Staff Q&A, Topic 740 No. 5, Accounting for Global Intangible Low-Taxed Income, states that an entity can make an accounting policy election to either recognize deferred taxes for temporary differences expected to reverse as GILTI in future years or provide for the tax expense related to GILTI in the year the tax is incurred. The Company elects to recognize the tax on GILTI as a period expense in the period the tax is incurred.

**Earnings Per Share**

Basic earnings per share is computed by dividing net earnings attributable to Match Group shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share reflects the potential dilution that could occur if stock options and other commitments to issue common stock were exercised or equity awards vested resulting in the issuance of common stock that could share in the earnings of the Company.

67

App. 203

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Foreign Currency Translation and Transaction Gains and Losses**

The financial position and operating results of foreign entities whose primary economic environment is based on their local currency are consolidated using the local currency as the functional currency. These local currency assets and liabilities are translated at the rates of exchange as of the balance sheet date, and local currency revenue and expenses of these operations are translated at average rates of exchange during the period. Translation gains and losses are included in accumulated other comprehensive income as a component of shareholders' equity. Transaction gains and losses resulting from assets and liabilities denominated in a currency other than the functional currency are included in the consolidated statement of operations as a component of "Other income (expense), net."

Translation gains and losses relating to foreign entities that are liquidated or substantially liquidated are reclassified out of accumulated other comprehensive loss into earnings. Losses of $0.7 million during the year ended December 31, 2017 are included in "Other income (expense), net" in the accompanying consolidated statement of operations.

**Stock-Based Compensation**

Stock-based compensation is measured at the grant date based on the fair value of the award and is generally expensed over the requisite service period. See "Note 11—Stock-based Compensation" for a discussion of the Company's stock-based compensation plans.

**Redeemable Noncontrolling Interests**

Noncontrolling interests in the consolidated subsidiaries of the Company are ordinarily reported on the consolidated balance sheet within shareholders' equity, separately from the Company's equity. However, securities that are redeemable at the option of the holder and not solely within the control of the issuer must be classified outside of shareholders' equity. Accordingly, all noncontrolling interests that are redeemable at the option of the holder are presented outside of shareholders' equity in the accompanying consolidated balance sheet.

In connection with the acquisition of certain subsidiaries, current and former senior management of these businesses has retained an ownership interest. The Company is party to fair value put and call arrangements with respect to these interests. These put and call arrangements allow management of these businesses to require the Company to purchase these interests or allow the Company to acquire such interests at fair value, respectively. The put arrangements do not meet the definition of a derivative instrument as the put agreements do not provide for net settlement. No put and call arrangements were exercised during 2018, 2017 or 2016. These put arrangements are exercisable by the counter-party outside the control of the Company. Accordingly, to the extent that the fair value of these interests exceeds the value determined by normal noncontrolling interest accounting, the value of such interests is adjusted to fair value with a corresponding adjustment to additional paid-in capital. During the years ended December 31, 2018, 2017 and 2016, the Company recorded adjustments of $(2.5) million, $(0.1) million and $0.4 million, respectively, to (decrease) increase these interests to fair value. Fair value determinations require high levels of judgment and are based on various valuation techniques, including market comparables and discounted cash flow projections. At December 31, 2018, no redeemable noncontrolling interest remained outstanding.

**Certain Risks and Concentrations**

The Company's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject the Company to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are principally maintained with financial institutions that are not covered by deposit insurance.

68

App. 204

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### Recent Accounting Pronouncements

*Accounting Pronouncements adopted by the Company*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*. ASU No. 2014-09 superseded nearly all previous revenue recognition guidance. The Company adopted ASU No. 2014-09 as of January 1, 2018 using the modified retrospective transition method for open contracts as of the date of initial application. There is no cumulative impact to the Company's retained earnings at January 1, 2018.

In January 2016, the FASB issued ASU No. 2016-01, which updates certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. Under ASU No. 2016-01, equity securities, other than those of our consolidated subsidiaries, will be measured at fair value with changes in fair value recognized in the statement of operations each reporting period. ASU No. 2016-01 is effective for reporting periods beginning after December 15, 2017. The Company's adoption of ASU No. 2016-01 effective January 1, 2018 did not have a material effect on its consolidated financial statements. The adoption of ASU No. 2016-01 may increase the volatility of our results of operations as a result of the remeasurement of these investments.

In November 2016, the FASB issued ASU No. 2016-18, *Restricted Cash,* which requires companies to explain the changes in the total of cash, cash equivalents, restricted cash and restricted cash equivalents in the statement of cash flows. Therefore, amounts generally described as restricted cash or restricted cash equivalents are combined with unrestricted cash and cash equivalents when reconciling the beginning and end of period balances on the statement of cash flows. Additionally, when cash, cash equivalents, restricted cash, and restricted cash equivalents are presented within different captions on the balance sheet, a reconciliation of the totals in the statement of cash flows to the related captions in the balance sheet is required. ASU No. 2016-18 is effective for reporting periods beginning after December 15, 2017. The Company's adoption of ASU No. 2016-18 effective January 1, 2018, on a retrospective basis, did not have a material effect on its consolidated financial statements. See "Note 14—Supplemental Cash Flow Information" for a reconciliation of cash, cash equivalents, and restricted cash included in the consolidated statement of cash flows.

In June 2018, the FASB issued ASU No. 2018-07, *Improvements to Nonemployee Share-Based Payment Accounting*, which largely aligns the measurement and classification guidance for share-based payments granted to non-employees with the guidance for share-based payments granted to employees. The new guidance supersedes Subtopic 505-50, *Equity - Equity-Based payments to Nonemployees*. ASU No. 2018-07 is effective for reporting periods beginning after December 15, 2018, with early adoption permitted. The Company adopted ASU No. 2018-07 effective April 1, 2018 and its adoption did not have a material effect on its consolidated financial statements. The effect of the adoption of ASU No. 2018-07 will be to minimize the volatility of expense related to stock-based awards to non-employees in the future.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles - Goodwill and Other - Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*, which clarifies the accounting for implementation costs in a cloud computing arrangement that is a services contract to follow the internal-use software guidance of ASC 350-40, *Intangibles - Goodwill and Other, Internal-use Software*. The provisions of ASU No. 2018-15 are effective for reporting periods beginning after December 15, 2019, including interim periods and early adoption is permitted, including adoption in any interim period. The provisions of ASU No. 2018-15 may be adopted prospectively to all implementation costs incurred after the date of adoption or retrospectively. The Company early adopted the provisions of ASU No. 2018-15 on October 1, 2018 prospectively and the adoption of this standard did not have material impact on its consolidated financial statements.

*Accounting Pronouncements not yet adopted by the Company*

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*, which supersedes existing guidance on accounting for leases and generally requires all leases to be recognized in the statement of financial position. The provisions of ASU No. 2016-02 are effective for reporting periods beginning after December 15, 2018. The Company will adopt the new lease guidance effective January 1, 2019. In July 2018, the FASB issued ASU No. 2018-11, *Leases (Topic 842): Targeted Improvements,* which provides the option of an additional transition method that allows entities to initially apply the new lease guidance at the adoption date and recognize a

69

App. 205

## MATCH GROUP, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. The Company expects to implement the transition method option provided by ASU No. 2018-11.

The Company is not a lessor, has no capitalized leases, and does not expect to enter into any capitalized leases prior to the adoption of ASU No. 2016-02. Accordingly, the Company does not expect the amount or classification of rent expense in its statement of operations to be affected by the adoption of ASU No. 2016-02. The primary effect of the adoption of ASU No. 2016-02 will be the recognition of a right of use asset and related lease liability to reflect the Company's rights and obligations under its operating leases. The Company will also be required to provide the additional disclosures stipulated in ASU No. 2016-02.

The adoption of ASU No. 2016-02 will not have an impact on the leverage calculation set forth in any of the agreements governing the outstanding debt of the Company, or our credit agreement, because in each circumstance, the leverage calculations are not affected by the lease liability that will be recorded upon adoption of the new standard.

While the Company's evaluation of the impact of the adoption of ASU No. 2016-02 on its consolidated financial statements continues, outlined below is a summary of the status of the Company's progress:

- the Company has selected a software solution to implement ASU No. 2016-02;

- the Company has input lease summaries into the software solution;

- the Company is assessing the other inputs required in connection with the adoption of ASU No. 2016-02; and

- the Company is developing its accounting policy, procedures and internal controls related to the new standard.

Development of the selected software solution by the third-party vendor is ongoing.  While significant progress has been made, certain key deliverables remain, which the Company expects to be delivered in March 2019.  The Company's ability to adopt ASU No. 2016-02 in an efficient and effective manner is contingent upon the delivery and testing of these remaining deliverables.  The Company has been able to develop a preliminary estimate of the impact of the adoption of ASU No. 2016-02 through the use of the third-party software solution, supplemented by our user acceptance testing.  This preliminary estimate is that a $55 million right-of-use asset and related lease liability will be recognized on the Company's consolidated balance sheet upon adoption. The Company does not expect a material impact on its consolidated statement of operations or its consolidated statement of cash flows.

**Reclassifications**

Certain prior year amounts have been reclassified to conform to the current year presentation.

70

App. 206

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 3—INCOME TAXES

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis. Match Group's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statement of cash flows.

U.S. and foreign earnings before income taxes are as follows:

|  | Years Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|  | (In thousands) | | |
| U.S. | $ 392,798 | $ 143,286 | $ 109,457 |
| Foreign | 94,844 | 108,839 | 131,759 |
| Total | $ 487,642 | $ 252,125 | $ 241,216 |

The components of the provision (benefit) for income taxes are as follows:

|  | Years Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|  | (In thousands) | | |
| **Current income tax provision (benefit):** | | | |
| Federal | $ (688) | $ (11,533) | $ 44,782 |
| State | 341 | (512) | 4,427 |
| Foreign | 34,659 | 26,444 | 23,964 |
| Current income tax provision | 34,312 | 14,399 | 73,173 |
| **Deferred income tax benefit:** | | | |
| Federal | (11,158) | (102,337) | (2,119) |
| State | (1,846) | (15,731) | (280) |
| Foreign | (6,635) | (183) | (7,899) |
| Deferred income tax benefit | (19,639) | (118,251) | (10,298) |
| Income tax provision (benefit) | $ 14,673 | $ (103,852) | $ 62,875 |

For the year ended December 31, 2018, the current income tax payable was reduced by $94.7 million for excess tax deductions attributable to stock-based compensation and the related income tax benefit was recorded as a decrease to the current income tax provision. For the year ended December 31, 2017, the deferred tax asset for net operating losses ("NOLs") was increased by $279.7 million for excess tax deductions attributable to stock-based compensation and the related income tax benefit was recorded as a component of the deferred income tax benefit. For the year ended December 31, 2016, the current income tax payable was reduced by $29.7 million for excess tax deductions attributable to stock-based compensation and the related income tax benefit was recorded as an increase to additional paid-in capital.

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below. The valuation allowance is primarily related to deferred tax assets for tax credits and net operating losses.

71

App. 207

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, | | |
|---|---|---|---|
|  | 2018 | | 2017 |
|  | (In thousands) | | |
| **Deferred tax assets:** | | | |
| Net operating loss carryforwards | $ | 127,630 | $ 143,474 |
| Tax credit carryforwards | | 43,501 | 6,629 |
| Stock-based compensation | | 12,684 | 13,236 |
| Other | | 26,770 | 12,423 |
| Total deferred tax assets | | 210,585 | 175,762 |
| Less valuation allowance | | (47,448) | (24,795) |
| Net deferred tax assets | | 163,137 | 150,967 |
| **Deferred tax liabilities:** | | | |
| Intangible assets | | (45,363) | (52,838) |
| Fixed assets | | (2,686) | (3,164) |
| Other | | (915) | (244) |
| Total deferred tax liabilities | | (48,964) | (56,246) |
| Net deferred tax assets | $ | 114,173 | $ 94,721 |

At December 31, 2018, the Company has federal and state net operating losses ("NOLs") of $458.4 million and $169.8 million, respectively. If not utilized, $10.3 million of the federal NOLs can be carried forward indefinitely, and $448.1 million will expire at various times primarily between 2031 and 2037. The state NOLs will expire at various times primarily between 2032 and 2037. Federal and state NOLs of $434.3 million and $148.5 million, respectively, can be used against future taxable income without restriction and the remaining NOLs will be subject to limitations under Section 382 of the Internal Revenue Code, separate return limitations, and applicable state law. At December 31, 2018, the Company has foreign NOLs of $79.0 million available to offset future income. Of these foreign NOLs, $74.2 million can be carried forward indefinitely and $4.8 million will expire at various times between 2019 and 2028. During 2018, the Company recognized tax benefits related to NOLs of $6.7 million. At December 31, 2018, the Company has federal capital losses of $12.2 million. If not utilized, the capital losses will expire during 2021 and 2022. Utilization of capital losses will be limited to the Company's ability to generate future capital gains.

At December 31, 2018, the Company has tax credit carryforwards of $51.1 million. Of this amount, $29.0 million relates to foreign tax credits, $21.5 million relates to federal and state tax credits for research activities, and $0.6 million to various other credits. Of these credit carryforwards, $8.4 million can be carried forward indefinitely and $42.7 million will expire at various times primarily between 2021 and 2038.

The Company regularly assesses the realizability of deferred tax assets considering all available evidence, including, to the extent applicable, the nature, frequency and severity of prior cumulative losses, forecasts of future taxable income, tax filing status, the duration of statutory carryforward periods, available tax planning and historical experience.

During 2018, the Company's valuation allowance increased by $22.7 million primarily due to an increase in foreign tax credits, and foreign interest deduction carryforwards. At December 31, 2018, the Company has a valuation allowance of $47.4 million related to the portion of credits, NOLs, and other items for which it is more likely than not that the tax benefit will not be realized.

72

App. 208

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

A reconciliation of the income tax provision (benefit) to the amounts computed by applying the statutory federal income tax rate to earnings before income taxes is shown as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (In thousands) | | |
| Income tax provision at the federal statutory rate of 21% (35% for 2017 and 2016) | $ 102,405 | $ 88,244 | $ 84,425 |
| State income taxes, net of effect of federal tax benefit | 7,742 | 2,471 | 2,804 |
| Foreign income taxed at a different statutory rate | 13,129 | (15,014) | (13,761) |
| Foreign rate change | 278 | (1,523) | (4,454) |
| Transition tax | (3,178) | 23,748 | — |
| Deferred tax adjustment for enacted changes in tax laws and rates | (142) | 68,594 | — |
| Equity compensation | (92,140) | (278,343) | 3,247 |
| Non-taxable foreign currency exchange gains and losses | (2,086) | 6,231 | (6,837) |
| Other, net | (11,335) | 1,740 | (2,549) |
| Income tax provision (benefit) | $ 14,673 | $ (103,852) | $ 62,875 |

A reconciliation of the beginning and ending amount of unrecognized tax benefits, including penalties but excluding interest, is as follows:

| | December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | (In thousands) | | |
| Balance at January 1 | $ 25,063 | $ 25,913 | $ 24,908 |
| Additions based on tax positions related to the current year | 8,589 | 697 | 1,706 |
| Additions for tax positions of prior years | 3,901 | 1,104 | 1,414 |
| Reductions for tax positions of prior years | (134) | (1,233) | (783) |
| Settlements | — | — | (258) |
| Expiration of applicable statute of limitations | (1,740) | (1,418) | (1,074) |
| Balance at December 31 | $ 35,679 | $ 25,063 | $ 25,913 |

The Company recognizes interest and, if applicable, penalties related to unrecognized tax benefits in the income tax provision. At December 31, 2018 and 2017, the Company had accrued $1.9 million and $1.8 million, respectively, for the payment of interest. At December 31, 2018 and 2017, the Company had accrued $1.2 million and $1.5 million, respectively, for penalties.

Match Group is routinely under audit by federal, state, local and foreign authorities in the area of income tax as a result of previously filed separate company tax returns and consolidated tax returns with IAC. These audits include questioning the timing and the amount of income and deductions and the allocation of income and deductions among various tax jurisdictions. The Internal Revenue Service ("IRS") is currently auditing IAC's federal income tax returns for the years ended December 31, 2010 through 2016, which includes the operations of Match Group. The statute of limitations for the years 2010 through 2015 have been extended to December 31, 2019. Various other jurisdictions are open to examination for tax years beginning with 2009. Income taxes payable include reserves considered sufficient to pay assessments that may result from examination of prior year tax returns. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustment, and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact

App. 209

App. 210

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

At December 31, 2018 and 2017, unrecognized tax benefits, including interest, were $37.6 million and $26.8 million, respectively. At December 31, 2018 and 2017, approximately $22.6 million and $17.6 million, respectively, were included in unrecognized tax benefits for tax positions included in IAC's consolidated tax return filings. If unrecognized tax benefits at December 31, 2018 are subsequently recognized, $35.6 million, net of related deferred tax assets and interest, would reduce income tax expense. The comparable amount as of December 31, 2017 was $25.3 million. The Company believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $16.8 million by December 31, 2019, primarily due to settlements and expirations of statutes of limitations.

On December 22, 2017, the U.S. enacted the Tax Act, which subjected to U.S. taxation certain previously deferred earnings of foreign subsidiaries as of December 31, 2017 ("Transition Tax") and implemented a number of changes that take effect on January 1, 2018, including but not limited to, a reduction of the U.S. federal corporate tax rate from 35% to 21% and a new minimum tax on GILTI earned by foreign subsidiaries. The Company was able to make a reasonable estimate of the Transition Tax and recorded a provisional transition tax expense in 2017. During 2018, the Company finalized this calculation, which resulted in a $3.2 million reduction in the Transition Tax. The net reduction in the Transition Tax was due primarily to the utilization of additional foreign tax credits, partially offset by additional taxable earnings and profits of our foreign subsidiaries based on recently issued IRS guidance. The adjustment of the Company's provisional tax expense was reflected as a change in estimate in its results in the period in which the change in estimate is made in accordance with Staff Accounting Bulletin No. 118, *Income Tax Accounting Implications of the Tax Cuts and Jobs Act*. Despite the completion of the Company's accounting for the Tax Act under SAB 118, many aspects of the law remain unclear and we expect ongoing guidance to be issued at both the federal and state levels. We will continue to monitor and assess the impact of any new developments.

At December 31, 2018, the Company has $103.1 million in foreign cash that can be repatriated without any significant tax consequences. The Company has not provided for approximately $1.0 million of deferred taxes as the foreign cash earnings are indefinitely reinvested outside the U.S. The Company reassesses its intention to remit or permanently reinvest these cash earnings each reporting period; any required adjustment to the income tax provision would be reflected in the period that the Company changes this intention.

74

App. 211

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 4—DISCONTINUED OPERATIONS

On March 31, 2017, Match Group sold its Non-dating business, which operated under the umbrella of The Princeton Review, to ST Unitas, a global education technology company. We recognized a loss on the sale of the business in the years ended December 31, 2018 and 2017 of $0.4 million (reflecting an adjustment to the loss on sale recorded in 2017), and $2.1 million, respectively, which is reported within discontinued operations.

The key components of loss from discontinued operations for the years ended December 31, 2018, 2017 and 2016 consist of the following:

| | For the years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2016 | |
| | (In thousands) | | | | | |
| Revenue | $ | — | $ | 23,980 | $ | 104,416 |
| Operating costs and expenses | | — | | (29,601) | | (114,057) |
| Operating loss | | — | | (5,621) | | (9,641) |
| Other (expense) income | | (378) | | (2,136) | | 11 |
| Income tax benefit | | — | | 2,107 | | 3,302 |
| Loss from discontinued operations | $ | (378) | $ | (5,650) | $ | (6,328) |

## NOTE 5—GOODWILL AND INTANGIBLE ASSETS

Goodwill and intangible assets, net, are as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (In thousands) | | | |
| Goodwill | $ | 1,244,758 | $ | 1,247,644 |
| Intangible assets with indefinite lives | | 230,684 | | 228,296 |
| Intangible assets with definite lives, net | | 6,956 | | 2,049 |
| Total goodwill and intangible assets, net | $ | 1,482,398 | $ | 1,477,989 |

The following table presents the balance of goodwill, including the changes in the carrying value of goodwill, for the years ended December 31, 2018 and 2017:

| | December 31, | | | |
|---|---|---|---|---|
| | 2018 | | 2017 | |
| | (In thousands) | | | |
| Balance at January 1 | $ | 1,247,644 | $ | 1,206,447 |
| Additions | | 11,187 | | 120 |
| Deductions | | — | | (29) |
| Foreign Exchange Translation | | (14,073) | | 41,106 |
| Balance at December 31 | $ | 1,244,758 | $ | 1,247,644 |

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Intangible assets with indefinite lives are trade names and trademarks acquired in various acquisitions. At December 31, 2018 and 2017, intangible assets with definite lives are as follows:

| | December 31, 2018 | | | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
| | (In thousands) | | | |
| Patent and technology | $ 10,715 | $ (4,859) | $ 5,856 | 8.5 |
| Trade names | 4,814 | (4,814) | — | — |
| Customer lists | 270 | (270) | — | — |
| Other | 3,000 | (1,900) | 1,100 | 5.0 |
| Total | $ 18,799 | $ (11,843) | $ 6,956 | 7.9 |

| | December 31, 2017 | | | |
|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
| | (In thousands) | | | |
| Trade names | $ 5,830 | $ (5,765) | $ 65 | 3.0 |
| Technology | 4,592 | (4,588) | 4 | 2.0 |
| Other | 3,280 | (1,300) | 1,980 | 4.4 |
| Total | $ 13,702 | $ (11,653) | $ 2,049 | 4.4 |

At December 31, 2018, amortization of intangible assets with definite lives is estimated to be as follows:

| | (In thousands) |
|---|---|
| 2019 | $ 1,645 |
| 2020 | 1,245 |
| 2021 | 645 |
| 2022 | 645 |
| 2023 and thereafter | 2,776 |
| Total | $ 6,956 |

## NOTE 6—FINANCIAL INSTRUMENTS

**Marketable Securities**

During the second quarter of 2016, the Company sold its marketable security in its entirety. Proceeds and gross realized gains from the sale of the available-for-sale marketable security were $11.7 million and $3.1 million, respectively, for the year ended December 31, 2016.

**Long-term investments**

At December 31, 2018, the carrying value of the Company's investments in equity securities without readily determinable fair values totaled $9.1 million and at December 31, 2017, the carrying value of the Company's cost method investments totaled $11.1 million, both of which are included in "Long-term investments" in the accompanying consolidated balance sheet.

76

App. 213

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Equity securities without readily determinable fair values*

For all equity securities without readily determinable fair values as of December 31, 2018, the Company has elected the measurement alternative. As of December 31, 2018, under the measurement alternative election, the Company did not identify any fair value adjustments using observable price changes in orderly transactions or an identical or similar investment of the same issuer.

During the year ended December 31, 2018, we recognized an impairment charge of $2.1 million, which is included in "Other income (expense), net" in the accompanying consolidated statement of operations.

*Cost method investments (prior to the adoption of ASU No. 2016-01)*

During the year ended December 31, 2017, we recognized an other-than-temporary impairment charge of $2.3 million related to certain cost method investments as a result of our assessment of the near-term prospects and financial condition of the investees.

On October 23, 2017, a cost method investment with a carrying value of $51.1 million was sold for net proceeds of $60.2 million resulting in a pre-tax gain of $9.1 million, which is included in "Other income (expense), net" in the accompanying consolidated statement of operations.

**Fair Value Measurements**

The following tables present the Company's financial instruments that are measured at fair value on a recurring basis:

| | December 31, 2018 | | | |
|---|---|---|---|---|
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 72,546 | $ — | $ — | $ 72,546 |
| **Liabilities:** | | | | |
| Contingent consideration arrangements | $ — | $ — | $ (1,974) | $ (1,974) |

| | December 31, 2017 | | | |
|---|---|---|---|---|
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 71,197 | $ — | $ — | $ 71,197 |
| Time deposits | — | 35,023 | — | 35,023 |
| Total | $ 71,197 | $ 35,023 | $ — | $ 106,220 |
| **Liabilities:** | | | | |
| Contingent consideration arrangements | $ — | $ — | $ (2,647) | $ (2,647) |

77

App. 214

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table presents the changes in the Company's financial instruments that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| | **Contingent Consideration Arrangements** | |
| | **(In thousands)** | |
| Balance at January 1 | $ (2,647) | $ (19,418) |
| Total net (losses): | | |
|    Fair value adjustments | (320) | (5,253) |
| Included in other comprehensive income (loss) | 45 | (1,405) |
| Settlements | 948 | 23,429 |
| Balance at December 31 | $ (1,974) | $ (2,647) |

**Contingent consideration arrangements**

As of December 31, 2018, there is one contingent consideration arrangement, related to a business acquisition, for $2.0 million. This arrangement has been earned in full as of December 31, 2018 and will be paid by the Company in the first quarter of 2019.

The current contingent consideration arrangement is based upon earnings performance. Contingent consideration arrangements related to other previous acquisitions were based upon earnings performance and/or operating metrics. The Company determined the fair values of contingent consideration arrangements using probability-weighted analyses to determine the amounts of the gross liability, and, for arrangements that are long-term in nature, applying a discount rate, that appropriately captures the risks associated with the obligation to determine the net amount reflected in the consolidated financial statements. The fair values of the current contingent consideration arrangement at both December 31, 2018 and 2017 reflect a discount rate of 12%.

The fair value of the contingent consideration arrangements is sensitive to changes in the forecasts of earnings and changes in discount rates. The Company remeasures the fair value of the contingent consideration arrangements each reporting period, including the accretion of the discount, if applicable, and changes are recognized in "General and administrative expense" in the accompanying consolidated statement of operations. The contingent consideration arrangement liability at December 31, 2018 and 2017 includes a current portion of $2.0 million and $0.6 million, respectively, which is included in "Accrued expenses and other current liabilities" and a non-current portion of $2.0 million at December 31, 2017, which is included in "Other long-term liabilities" in the accompanying consolidated balance sheet. At December 31, 2018, there is no non-current portion of the contingent consideration liability.

78

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Financial instruments measured at fair value only for disclosure purposes**

The following table presents the carrying value and the fair value of financial instruments measured at fair value only for disclosure purposes.

|  | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
|  | Carrying Value | Fair Value | Carrying Value | Fair Value |
|  | (In thousands) | | | |
| Long-term debt, net [a] | $ (1,515,911) | $ (1,513,683) | $ (1,252,696) | $ (1,320,289) |

[a]  At December 31, 2018 and December 31, 2017, the carrying value of long-term debt, net includes unamortized original issue discount and debt issuance costs of $19.1 million and $22.3 million, respectively.

The fair value of long-term debt, net, excluding the revolving credit facility (the "Credit Facility"), is estimated using observable market prices or indices for similar liabilities, which are Level 2 inputs. We consider the Credit Facility, which has a variable interest rate, to have a fair value equal to its carrying value.

**NOTE 7—LONG-TERM DEBT, NET**

Long-term debt, net consists of:

|  | December 31, | |
|---|---|---|
|  | 2018 | 2017 |
|  | (In thousands) | |
| Credit Facility due December 7, 2023 | $ 260,000 | $ — |
| Term Loan due November 16, 2022 | 425,000 | 425,000 |
| 6.375% Senior Notes due June 1, 2024 (the "6.375% Senior Notes"); interest payable each June 1 and December 1 | 400,000 | 400,000 |
| 5.00% Senior Notes due December 15, 2027 (the "5.00% Senior Notes"); interest payable each June 15 and December 15 | 450,000 | 450,000 |
| Total long-term debt | 1,535,000 | 1,275,000 |
| Less: Unamortized original issue discount and original issue premium, net | 7,352 | 8,668 |
| Less: Unamortized debt issuance costs | 11,737 | 13,636 |
| Total long-term debt, net | $ 1,515,911 | $ 1,252,696 |

79

App. 216

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Senior Notes*:

We issued the 5.00% Senior Notes on December 4, 2017. These notes were issued at 99.027% of par. The proceeds of $445.6 million, along with cash on hand, were used to redeem the $445.2 million of outstanding senior notes due in 2022 (the "6.75% Senior Notes") and pay the related call premium. At any time prior to December 15, 2022, these notes may be redeemed at a redemption price equal to the sum of the principal amount, plus accrued and unpaid interest and a make-whole premium set forth in the indenture governing the notes. Thereafter, these notes may be redeemed at the redemption prices set forth below, together with accrued and unpaid interest thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on December 15 of the years indicated below:

| Beginning December 15, | Percentage |
|---|---|
| 2022 | 102.500% |
| 2023 | 101.667% |
| 2024 | 100.833% |
| 2025 and thereafter | 100.000% |

The 6.375% Senior Notes were issued on June 1, 2016. The proceeds of $400 million were used to prepay a portion of indebtedness outstanding under the Term Loan. At any time prior to June 1, 2019, these notes may be redeemed at a redemption price equal to the sum of the principal amount thereof, plus accrued and unpaid interest and a make-whole premium set forth in the indenture governing the notes. Thereafter, these notes may be redeemed at the redemption prices set forth below, together with accrued and unpaid interest thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on June 1 of the years indicated below:

| Beginning June 1, | Percentage |
|---|---|
| 2019 | 104.781% |
| 2020 | 103.188% |
| 2021 | 101.594% |
| 2022 and thereafter | 100.000% |

The 6.75% Senior Notes were redeemed on December 17, 2017 with proceeds from the 5.00% Senior Notes and cash on hand. The related call premium of $10.6 million is included in "Other (expense) income, net" in the consolidated financial statements.

The indentures governing the 5.00% and 6.375% Senior Notes contain covenants that would limit the Company's ability to pay dividends or to make distributions and repurchase or redeem Match Group stock in the event a default has occurred or Match Group's leverage ratio (as defined in the indentures) exceeds 5.0 to 1.0. The 5.00% and 6.375% Senior Notes rate equally in right of payment. At December 31, 2018, there were no limitations pursuant thereto. There are additional covenants that limit the ability of the Company and its subsidiaries to, among other things, (i) incur indebtedness, make investments, or sell assets in the event the Company is not in compliance with certain ratios set forth in the indenture, and (ii) incur liens, enter into agreements restricting the ability of the Company's subsidiaries to pay dividends, enter into transactions with affiliates and consolidate, merge or sell substantially all of their assets.

*Term Loan and Credit Facility*:

At both December 31, 2018 and 2017, the outstanding balance on the Term Loan was $425 million. The Term Loan bears interest at LIBOR plus 2.50% and has a LIBOR floor to 0.00%. The interest rate at December 31, 2018 and 2017 is 5.09% and 3.85%, respectively. Interest payments are due at least quarterly through the term of the loan. The Term Loan provides for additional annual principal payments as part of an excess cash flow sweep provision, the amount of which, if any, is governed by the secured net leverage ratio contained in the Credit Agreement.

80

App. 217

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

On December 7, 2018, the $500 million Credit Facility was amended to, among other things, modify the leverage ratio levels in the pricing grid used to calculate the applicable rate and extend its maturity to December 7, 2023. At December 31, 2018, there were outstanding borrowings of $260 million under the Credit Facility, bearing interest at LIBOR plus 1.50%, or 3.97%. At December 31, 2017, there was no outstanding borrowings under the Credit Facility. Borrowings under the Credit Facility bear interest, at the Company's option, at a base rate or LIBOR, in each case plus an applicable margin, which is determined by reference to a pricing grid based on the Company's consolidated net leverage ratio. The annual commitment fee on undrawn funds, based on the current leverage ratio, is 25 basis points and 30 basis points at December 31, 2018 and 2017, respectively. The terms of the Credit Facility require the Company to maintain a consolidated net leverage ratio of not more than 5.0 to 1.0 and a minimum interest coverage ratio of not less than 2.0 to 1.0 (in each case as defined in the agreement).

The Credit Facility and Term Loan contain covenants that would limit our ability to pay dividends, make distributions or repurchase stock in the event the secured net leverage ratio exceeds 2.0 to 1.0, while the Term Loan remains outstanding and, thereafter, if the consolidated net leverage ratio exceeds 4.0 to 1.0, or in the event a default has occurred. There are additional covenants under the Credit Facility and the Term Loan that limit the ability of the Company and its subsidiaries to, among other things, incur indebtedness, pay dividends or make distributions. Obligations under the Credit Facility and Term Loan are unconditionally guaranteed by certain Match Group wholly-owned domestic subsidiaries and are secured by the stock of certain Match Group domestic and foreign subsidiaries. The Term Loan and outstanding borrowings, if any, under the Credit Facility rank equally with each other, and have priority over the 5.00% and 6.375% Senior Notes to the extent of the value of the assets securing the borrowings under the Credit Agreement.

*Long-term debt maturities:*

| Years Ending December 31, | (In thousands) |
|---|---:|
| 2022 | $ 425,000 |
| 2023 | 260,000 |
| 2024 | 400,000 |
| 2027 | 450,000 |
| Total | 1,535,000 |
| Less: Unamortized original issue discount | 7,352 |
| Less: Unamortized debt issuance costs | 11,737 |
| Total long-term debt, net | $ 1,515,911 |

**NOTE 8—SHAREHOLDERS' EQUITY**

**Description of Common Stock, Class B Convertible Common Stock and Class C Common Stock**

The rights of holders of Match Group common stock, Class B common stock and Class C common stock are identical, except for voting rights, conversion rights and dividend rights. Holders of common stock are entitled to one vote per share on all matters to be voted upon by the stockholders. Holders of Class B common stock are entitled to ten votes per share on all matters to be voted upon by stockholders. Holders of Class C common stock have no voting rights, except as otherwise required by the laws of the State of Delaware, in which case holders of Class C common stock are entitled to one one-hundredth (1/100) of a vote per share. Holders of the Company's common stock, Class B common stock and Class C common stock do not have cumulative voting rights in the election of directors.

Shares of Match Group's Class B common stock are convertible into shares of our common stock at the option of the holder at any time on a share for share basis. Such conversion ratio will in all events be equitably preserved in the event of any recapitalization of Match Group by means of a stock dividend on, or a stock split or combination of, our outstanding common stock or Class B common stock, or in the event of any merger, consolidation or other reorganization of Match Group with another corporation. Upon the conversion of a share of our Class B common stock into a share of our common stock, the applicable share of Class B common stock

81

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

will be retired and will not be subject to reissue. Shares of common stock and Class C common stock have no conversion rights.

The holders of shares of Match Group common stock, Class B common stock and Class C common stock are entitled to receive, share for share, such dividends as may be declared by Match Group's Board of Directors out of funds legally available therefor. In the event of a liquidation, dissolution or winding up, holders of the Company's common stock, Class B common stock and Class C common stock are entitled to receive ratably the assets available for distribution to the stockholders after payment of all liabilities and accrued but unpaid dividends and liquidation preferences on any outstanding preferred stock.

At December 31, 2018, IAC holds 209.9 million shares of our Class B common stock, representing 100% of our outstanding Class B common stock, and 15.8 million shares of our common stock, representing 23.1% of our outstanding common stock. IAC's ownership interest is 81.1% and IAC holds 97.6% of the outstanding total voting power of the Company.

In the event that Match Group issues or proposes to issue any shares of Match Group common stock, Class B common stock or Class C common stock (with certain limited exceptions), including shares issued upon the exercise, conversion or exchange of options, warrants and convertible securities, IAC will generally have a purchase right that permits it to purchase for fair market value, as defined in an investor rights agreement, up to such number of shares of the same class as the issued shares as would (i) enable IAC to maintain the same ownership interest in the Company that it had immediately prior to such issuance or proposed issuance, with respect to issuances of our voting capital stock, or (ii) enable IAC to maintain ownership of at least 80.1% of each class of the Company's non-voting capital stock, with respect to issuances of our non-voting capital stock.

**Special Dividend**

On December 19, 2018, we paid a special dividend of $2.00 per share on Match Group common stock and Class B common stock, to stockholders of record as of the close of business on December 5, 2018, in the aggregate amount equal to $556.4 million, which was funded with cash on hand and borrowings under our revolving credit facility.

**Reserved Common Shares**

In connection with equity compensation plans, 55.1 million shares of Match Group common stock are reserved at December 31, 2018.

**Common Stock Repurchases**

During 2018, the Company repurchased 3.1 million shares of Match Group common stock for aggregate consideration, on a trade date basis, of $133.5 million. No repurchases were made during 2017 or 2016.

In May 2017, Match Group's Board of Directors authorized the repurchase of 6.0 million shares of Match Group common stock. At December 31, 2018, the Company has approximately 2.9 million shares remaining in its share repurchase authorization.

82

App. 219

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 9—ACCUMULATED OTHER COMPREHENSIVE LOSS

The following tables present the components of accumulated other comprehensive loss and items reclassified out of accumulated other comprehensive loss into earnings:

| | Year Ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Foreign Currency Translation Adjustment | | Accumulated Other Comprehensive Loss | |
| | (In thousands) | | | |
| Balance at January 1 | $ | (112,318) | $ | (112,318) |
| Other comprehensive loss | | (24,848) | | (24,848) |
| Balance at December 31 | $ | (137,166) | $ | (137,166) |

| | Year Ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Foreign Currency Translation Adjustment | | Accumulated Other Comprehensive (Loss) Income | |
| | (In thousands) | | | |
| Balance at January 1 | $ | (176,384) | $ | (176,384) |
| Other comprehensive income before reclassifications | | 63,352 | | 63,352 |
| Amounts reclassified into earnings | | 714 | | 714 |
| Net period other comprehensive income | | 64,066 | | 64,066 |
| Balance at December 31 | $ | (112,318) | $ | (112,318) |

| | Year Ended December 31, 2016 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Foreign Currency Translation Adjustment | | Unrealized Gain (Loss) on Available-For-Sale Security | | Accumulated Other Comprehensive Loss | |
| | (In thousands) | | | | | |
| Balance at January 1 | $ | (139,784) | $ | 2,964 | $ | (136,820) |
| Other comprehensive (loss) income before reclassifications | | (36,600) | | 94 | | (36,506) |
| Gain on sale of available-for-sale security reclassified into earnings | | — | | (3,058) | | (3,058) |
| Net period other comprehensive loss | | (36,600) | | (2,964) | | (39,564) |
| Balance at December 31 | $ | (176,384) | $ | — | $ | (176,384) |

At December 31, 2018, 2017 and 2016, there was no tax benefit or provision on the accumulated other comprehensive loss.

83

App. 220

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 10—EARNINGS PER SHARE

The following table sets forth the computation of the basic and diluted earnings per share attributable to Match Group shareholders:

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | |
| | **Basic** | **Diluted** | **Basic** | **Diluted** | **Basic** | **Diluted** |
| | (In thousands, except per share data) | | | | | |
| **Numerator** | | | | | | |
| Net earnings from continuing operations | $ 472,969 | $ 472,969 | $ 355,977 | $ 355,977 | $ 178,341 | $ 178,341 |
| Net loss (earnings) attributable to noncontrolling interests | 5,348 | 5,348 | (179) | (179) | (562) | (562) |
| Net earnings from continuing operations attributable to Match Group, Inc. shareholders | 478,317 | 478,317 | 355,798 | 355,798 | 177,779 | 177,779 |
| Loss from discontinued operations, net of tax | (378) | (378) | (5,650) | (5,650) | (6,328) | (6,328) |
| Net earnings attributable to Match Group, Inc. shareholders | $ 477,939 | $ 477,939 | $ 350,148 | $ 350,148 | $ 171,451 | $ 171,451 |
| | | | | | | |
| **Denominator** | | | | | | |
| Basic weighted average common shares outstanding | 277,005 | 277,005 | 264,014 | 264,014 | 251,522 | 251,522 |
| Dilutive securities including stock options, RSUs, and subsidiary denominated equity awards [(a)(b)] | — | 19,770 | — | 32,062 | — | 18,203 |
| Dilutive weighted average common shares outstanding | 277,005 | 296,775 | 264,014 | 296,076 | 251,522 | 269,725 |
| | | | | | | |
| **Earnings (loss) per share:** | | | | | | |
| Earnings per share from continuing operations | $ 1.73 | $ 1.61 | $ 1.35 | $ 1.20 | $ 0.71 | $ 0.66 |
| Loss per share from discontinued operations, net of tax | $ — | $ — | $ (0.02) | $ (0.02) | $ (0.03) | $ (0.02) |
| Earnings per share attributable to Match Group, Inc. shareholders | $ 1.73 | $ 1.61 | $ 1.33 | $ 1.18 | $ 0.68 | $ 0.64 |

App. 221

(a)    If the effect is dilutive, weighted average common shares outstanding include the incremental shares that would be issued upon the assumed exercise of stock options and subsidiary denominated equity and the vesting of restricted stock units ("RSUs"). For the years ended December 31, 2018, 2017, and 2016, 0.2

84

App. 222

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

million, 4.7 million and 6.1 million potentially dilutive securities, respectively, are excluded from the calculation of diluted earnings per share because their inclusion would have been anti-dilutive.

(b)   Market-based awards and performance-based stock options ("PSOs") and restricted stock units ("PSUs") are considered contingently issuable shares. Market-based awards, PSOs and PSUs are included in the denominator for earnings per share if (i) the applicable market or performance condition(s) has been met and (ii) the inclusion of the market-based award, PSOs and PSUs are dilutive for the respective reporting periods. For the years ended December 31, 2018, 2017, and 2016, 0.7 million, 3.8 million, and 2.5 million market-based awards, PSOs and PSUs, respectively, were excluded from the calculation of diluted earnings per share because the market or performance conditions had not been met.

## NOTE 11—STOCK-BASED COMPENSATION

The Company currently has two active stock and annual incentive plans, one which became effective in 2015 upon the completion of the IPO and another plan approved by shareholders in 2017. The 2015 plan replaced two historical plans that governed equity awards granted prior to the IPO. The 2015 plan covers stock options to acquire shares of Match Group common stock and RSUs granted pursuant to the historical plans and stock options and stock settled stock appreciation rights denominated in the equity of certain of our subsidiaries granted prior to the IPO, as well as provides for the future grant of these and other equity awards. The 2015 and 2017 plans authorize the Company to grant awards to its employees, officers, directors and consultants. At December 31, 2018, there were 28.1 million shares available for the future grant of equity awards under the 2015 and 2017 plans collectively.

The 2015 and 2017 plans have a stated term of ten years and provide that the exercise price of stock options granted will not be less than the market price of the Company's common stock on the grant date. Neither plan specifies grant dates or vesting schedules of awards as those determinations have been delegated to the Compensation and Human Resources Committee of Match Group's Board of Directors (the "Committee"). Each grant agreement reflects the vesting schedule for that particular grant as determined by the Committee. Stock options granted subsequent to September 1, 2015 will generally vest in four equal annual installments over a four-year period. RSU awards outstanding generally vest over a three- or four-year period. Market-based awards outstanding generally vest over a two- to four-year period.

Stock-based compensation expense recognized in the consolidated statement of operations includes expense related to the Company's stock options and RSUs, performance-based stock options, market-based RSUs and PSUs for which vesting is considered probable, equity instruments denominated in shares of subsidiaries, and IAC denominated stock options, RSUs and market-based awards held by Match Group employees. The amount of stock-based compensation expense recognized is net of estimated forfeitures, as the expense recorded is based on awards that are ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if actual forfeitures differ from the estimated rate. At December 31, 2018, there is $119.3 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.4 years.

The total income tax benefit recognized in the accompanying consolidated statement of operations for the years ended December 31, 2018, 2017 and 2016 related to all stock-based compensation is $107.2 million, $295.1 million and $16.4 million, respectively. The increase in total income tax benefit recognized in the consolidated statement of operations during 2017 relative to 2016 is due to the adoption of ASU 2016-09, effective January 1, 2017, which required the associated recognition of excess tax benefits attributable to stock-based compensation to be included as a component of the current year provision for income taxes rather than recognized as an adjustment to additional paid-in capital. The aggregate income tax benefit recognized related solely to stock-based compensation for the years ended December 31, 2018, 2017, and 2016, including the portion recognized as a component of equity in 2016 is $103.3 million, $310.9 million, and $40.1 million, respectively.

As the Company is currently in a NOL position there will be some delay in the timing of the realization of cash benefits of income tax deductions related to stock-based compensation because it will be dependent upon the amount and timing of future taxable income and the timing of estimated income tax payments.

85

App. 223

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Adjustment for Special Dividend**

On November 6, 2018, the Board of Directors declared a special dividend of $2.00 per share on Match Group common stock and Class B common stock. See "Note 8—Shareholders' Equity" for additional information on the dividend. As required by our equity incentive plans, an adjustment was made to outstanding awards to prevent dilution of their value resulting from the special dividend. These adjustments did not result in incremental stock-based compensation expense as the anti-dilutive adjustments were required by our equity incentive plans. The adjustments to awards included increasing the number of outstanding stock options and RSUs, performance-based stock options, and market-based RSUs, as well as reducing the exercise prices of outstanding stock options. The impact of these adjustments is reflected in the disclosures below.

**Stock Options**

Stock options outstanding at December 31, 2018 and changes during the year ended December 31, 2018 are as follows:

|  | December 31, 2018 | | | |
|---|---|---|---|---|
|  | Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (In Years) | Aggregate Intrinsic Value |
|  | (Shares and intrinsic value in thousands) | | | |
| Outstanding at January 1, 2018 | 35,878 | $ 13.50 | | |
| Granted | 580 | 33.45 | | |
| Adjustment for special dividend | 953 | N/A | | |
| Exercised | (14,160) | 11.61 | | |
| Forfeited | (3,750) | 13.97 | | |
| Expired | (6) | 12.07 | | |
| Outstanding at December 31, 2018 [(a)] | 19,495 | $ 14.72 | 7.6 | $ 546,911 |
| Options exercisable | 5,143 | $ 13.60 | 6.9 | $ 150,033 |

_____

[(a)] Included in the outstanding balance at December 31, 2018 are 0.6 million performance-based stock options, which vest in varying amounts and years depending upon certain performance conditions. The Company does not expect any shares to vest based on our current assessment of the performance conditions. The table above includes these awards at their maximum potential payout.

The aggregate intrinsic value in the table above represents the difference between Match Group's closing stock price on the last trading day of 2018 and the exercise price, multiplied by the number of in-the-money options that would have been exercised had all option holders exercised their options on December 31, 2018. The total intrinsic value of stock options exercised during the years ended December 31, 2018, 2017 and 2016 is $455.1 million, $533.8 million and $37.3 million, respectively.

86

App. 224

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following table summarizes the information about stock options outstanding and exercisable at December 31, 2018:

| | Options Outstanding | | | Options Exercisable | | |
|---|---|---|---|---|---|---|
| Range of Exercise Prices | Outstanding at December 31, 2018 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price | Exercisable at December 31, 2018 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price |
| | (Shares in thousands) | | | | | |
| $0.01 to $5.00 | 156 | 6.4 | $ 4.32 | 92 | 6.4 | $ 4.36 |
| $5.01 to $10.00 | 4,723 | 7.4 | 8.97 | 894 | 7.3 | 8.72 |
| $10.01 to $15.00 | 7,075 | 6.7 | 12.61 | 3,073 | 6.2 | 12.95 |
| $15.01 to $20.00 | 4,368 | 8.1 | 17.08 | 532 | 8.0 | 17.00 |
| $20.01 to $25.00 | 1,744 | 8.7 | 22.53 | 402 | 8.7 | 22.40 |
| $25.01 to $30.00 | 1,050 | 8.9 | 26.89 | 150 | 8.9 | 26.12 |
| $30.01 to $35.00 | 274 | 9.1 | 30.75 | — | — | — |
| $35.01 to $40.00 | 105 | 9.1 | 38.98 | — | — | — |
| | 19,495 | 7.6 | $ 14.72 | 5,143 | 6.9 | $ 13.60 |

The fair value of stock option awards, with the exception of market-based awards, is estimated on the grant date using the Black-Scholes option pricing model. The Black-Scholes option pricing model incorporates various assumptions, including expected volatility and expected term. At December 31, 2018, the Company uses a blend of Match Group's historical volatility and IAC's historical volatility. The risk-free interest rates are based on U.S. Treasuries with comparable terms as the awards, in effect at the grant date. The expected term is based upon the combination of the initial vesting term and the historical exercise behavior of our employees after vest. The following are the weighted average assumptions used in the Black-Scholes option pricing model:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| Expected volatility | 29% | 27% | 27% |
| Risk-free interest rate | 2.5% | 1.9% | 1.3% |
| Expected term | 5.3 years | 5.0 years | 4.8 years |
| Dividend yield | —% | —% | —% |

Approximately 0.6 million, 8.2 million and 8.7 million stock options were granted by the Company during the years ended December 31, 2018, 2017 and 2016, respectively. The weighted average fair value of stock options granted during the years ended December 31, 2018, 2017 and 2016 is $10.63, $5.67 and $2.98, respectively.

Cash received from stock option exercises for the years ended December 31, 2018, 2017, and 2016 is less than $0.1 million, $59.4 million, and $39.4 million respectively. The decrease in cash received from stock option exercises in 2018 compared to prior years is due to substantially all options being net settled for the exercise price beginning in late 2017.

87

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Restricted Stock Units and Performance-based Stock Units**

RSUs and PSUs are awards in the form of phantom shares or units denominated in a hypothetical equivalent number of shares of Match Group common stock and with the value of each RSU and PSU equal to the fair value of Match Group common stock at the date of grant. Each RSU and PSU grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. PSUs also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests. For RSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term. For PSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term if the performance targets are considered probable of being achieved.

All outstanding PSUs were forfeited during the year ended December 31, 2017 and no additional PSUs were granted in 2018. Unvested RSUs outstanding at December 31, 2018 and changes during the year ended December 31, 2018 are as follows:

|  | RSUs | |
| --- | --- | --- |
|  | Number of shares | Weighted Average Grant Date Fair Value |
|  | (Shares in thousands) | |
| Unvested at January 1, 2018 | 2,214 | $ 18.65 |
| Granted | 1,389 | 42.24 |
| Adjustment for special dividend | 136 | N/A |
| Vested | (493) | 18.21 |
| Forfeited | (487) | 20.75 |
| Unvested at December 31, 2018 | 2,759 | $ 29.38 |

The weighted average fair value of RSUs and PSUs granted during the years ended December 31, 2018, 2017, and 2016, based on market prices of Match Group's common stock on the grant date, was $42.24, $19.21 and $12.65, respectively. The total fair value of RSUs that vested during the years ended December 31, 2018, 2017, and 2016 was $9.0 million, $6.7 million and $1.1 million, respectively.

**Market-based Awards**

During 2018, 2017, and 2016, the Company granted market-based awards to certain employees. The number of awards that ultimately vest for certain awards is dependent upon Match Group's stock price and for other awards on the valuation of a wholly-owned business. The grant date fair value of each market-based award is estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price and, as necessary, the valuation of the subsidiary. Each market-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests in addition to the market condition.

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Market-based awards outstanding at December 31, 2018 and changes during the year ended December 31, 2018 are as follows:

| | Market-based awards | |
| --- | --- | --- |
| | Number of shares | Weighted Average Grant Date Price |
| | (Shares in thousands) | |
| Unvested at January 1, 2018 | 6,107 | $ 19.41 |
| Granted | 527 | 26.91 |
| Adjustment for special dividend | 225 | N/A |
| Vested | (343) | 14.20 |
| Forfeited | (1,907) | 19.26 |
| Unvested at December 31, 2018 | 4,609 | $ 18.28 |

The weighted average fair value of market-based awards granted during the years ended December 31, 2018, 2017, and 2016, based on the valuation model, was $6.88, $7.50 and $1.77, respectively. The total fair value of market-based awards that vested during the years ended December 31, 2018, 2017, and 2016 was $4.9 million, $3.1 million and $0.1 million, respectively.

**Net Settlement of Awards**

We settle substantially all equity awards on a net basis. Assuming all equity awards outstanding on December 31, 2018 were net settled on that date, we would have issued 9.7 million common shares (of which 1.7 million are related to vested shares and 8.0 million are related to unvested shares) and, assuming a 50% withholding rate, would have remitted $416.2 million in cash for withholding taxes (of which $75.0 million is related to vested shares and $341.2 million is related to unvested shares). If we decided to issue a sufficient number of shares to cover the $416.2 million employee withholding tax obligation, 9.7 million additional shares would be issued by the Company.

**Converted Tinder Options**

In July 2017, the Company elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options at a value determined through a process involving two investment banks. These converted Match Group options are included in the option tables above.

These former subsidiary denominated awards, when exercised, can be settled by Match Group issuing shares of its common stock equal in value to the intrinsic value of the award being settled, net of shares with a value equal to the withholding taxes due, which taxes are remitted by Match Group to the government on behalf of the employees or the employee can pay the exercise price and applicable withholding taxes and receive the number of Match Group shares equal to the number of options exercised. At the time of settlement, IAC has the option to issue its own shares directly to the award holders, in which case Match Group would in turn issue its shares to IAC as reimbursement. In either settlement scenario, the same number of Match Group shares would be issued.

During the year ended December 31, 2017, we made cash payments totaling $272.5 million to purchase certain fully vested options.

**Equity Instruments Formerly Denominated in the Shares of Certain Subsidiaries**

The Company issued 1.7 million Match Group common shares, and paid $22.8 million of withholding taxes, to settle awards granted to current and former employees who exercised their subsidiary options during the year ended December 31, 2016.

During 2014, the Company granted an equity award denominated in shares of a subsidiary of the Company to a non-employee, which was marked to market each reporting period. In the third quarter of 2016, the Company

89

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

settled the vested portion of the award for cash of $13.4 million. In the third quarter of 2017, the award was modified and the Company settled the remaining portion of the award for cash of $33.9 million.

**IAC Denominated Stock Options**

There were no IAC stock options granted by IAC under its equity incentive plans to employees of Match Group during the years ended December 31, 2018 and 2017. During the year ended December 31, 2016, there were less than 0.1 million IAC stock options granted by IAC under its equity incentive plans to employees of Match Group. Approximately 0.2 million IAC stock options remain outstanding to employees of Match Group as of December 31, 2018. The fair value of each stock option award was estimated on the grant date using the Black–Scholes option pricing model. IAC stock options were granted with exercise prices at least equal to the fair value on the date of grant, vest ratably in annual installments over a four-year period and expire ten years from the date of grant.

**IAC Denominated RSUs and Market-based Awards**

During both the years ended December 31, 2018 and 2016, less than 0.1 million IAC RSUs and market-based awards were granted by IAC to employees of Match Group. There were no IAC RSUs or market-based awards granted by IAC to employees of Match Group during the year ended December 31, 2017. RSUs are awards in the form of phantom shares or units, denominated in a hypothetical equivalent number of shares of IAC common stock and with the value of each RSU equal to the fair value of IAC common stock at the date of grant. Each RSU grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. The number of market-based awards that ultimately vest is dependent upon Match Group's stock price. The grant date fair value of each market-based award is estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price. Each market-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. Some of the market-based awards contain performance targets set at the time of grant that must be achieved before an award vests.

**NOTE 12—GEOGRAPHIC INFORMATION**

Revenue by geography is based on where the customer is located. Geographic information about revenue and long-lived assets is presented below:

|  | Years Ended December 31, | | |
|  | 2018 | 2017 | 2016 |
|  | (In thousands) | | |
| **Revenue** | | | |
| United States | $ 872,977 | $ 722,446 | $ 668,699 |
| All other countries | 856,873 | 608,215 | 449,411 |
| Total | $ 1,729,850 | $ 1,330,661 | $ 1,118,110 |

The United States is the only country from which revenue is greater than 10 percent of total revenue.

90

App. 228

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2018 | | 2017 | |
|  | (In thousands) | | | |
| **Long-lived assets (excluding goodwill and intangible assets)** | | | | |
| United States | $ | 35,004 | $ | 37,547 |
| France |  | 11,591 |  | 13,635 |
| Canada |  | 8,927 |  | 6,738 |
| All other countries |  | 2,829 |  | 3,700 |
| Total | $ | 58,351 | $ | 61,620 |

## NOTE 13—COMMITMENTS AND CONTINGENCIES

### Commitments

The Company leases office space, data center facilities and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company is also committed to pay a portion of the related operating expenses under certain lease agreements. These operating expenses are not included in the table below.

Future minimum payments under operating lease agreements are as follows:

|  | (In thousands) | |
|---|---|---|
| 2019 | $ | 11,559 |
| 2020 |  | 13,470 |
| 2021 |  | 12,100 |
| 2022 |  | 6,812 |
| 2023 |  | 6,021 |
| Thereafter |  | 17,471 |
| Total | $ | 67,433 |

Expenses charged to operations under these agreements were $18.0 million, $16.0 million and $15.5 million for the years ended December 31, 2018, 2017 and 2016, respectively. See "Note 15—Related Party Transactions" for additional information related to related party transactions associated with operating leases.

The Company also has funding commitments in the form of a purchase obligation and surety bonds. The purchase obligations due in less than one year are $27.2 million and the purchase obligations due between one and three years are $23.9 million for a total of $51.1 million in purchase obligations. The purchase obligations primarily relate to web hosting services with $20.0 million due for both the years ended December 31, 2019 and 2020. Letters of credit and surety bonds totaling $0.4 million expire within twelve months of December 31, 2018.

### Contingencies

In the ordinary course of business, the Company is a party to various lawsuits. The Company establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where we believe an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that resolving claims against us, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. The Company also evaluates other contingent matters, including income and non-income tax contingencies, to assess the likelihood of an unfavorable outcome and estimated extent of potential loss. It is possible that an unfavorable outcome of one or more of these lawsuits or other contingencies could have a material impact on the

App. 230

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

liquidity, results of operations, or financial condition of the Company. See "Note 3—Income Taxes" for additional information related to income tax contingencies.

*Tinder Optionholder Litigation against IAC and Match Group*

On August 14, 2018, ten then-current and former employees of Match Group, LLC or Tinder, Inc. ("Tinder"), an operating business of Match Group, filed a lawsuit in New York state court against IAC and Match Group. *See Sean Rad et al. v. IAC/InterActiveCorp and Match Group, Inc.*, No. 654038/2018 (Supreme Court, New York County). The complaint alleges that in 2017, the defendants: (i) wrongfully interfered with a contractually established process for the independent valuation of Tinder by certain investment banks, resulting in a substantial undervaluation of Tinder and a consequent underpayment to the plaintiffs upon exercise of their Tinder stock options, and (ii) then wrongfully merged Tinder into Match Group, thereby depriving one of the plaintiffs (Mr. Rad) of his contractual right to later valuations of Tinder on a stand-alone basis. The complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, interference with contractual relations (as against Match Group only), and interference with prospective economic advantage, and seeks compensatory damages in the amount of at least $2 billion, as well as punitive damages. On August 31, 2018, four plaintiffs who were still employed by Match Group filed a notice of discontinuance of their claims without prejudice, leaving the six former employees as the remaining plaintiffs. On October 9, 2018, the defendants filed a motion to dismiss the complaint on various grounds, including that the 2017 valuation of Tinder by the investment banks was an expert determination any challenge to which is both time-barred under applicable law and available only on narrow substantive grounds that the plaintiffs have not pleaded in their complaint. On December 17, 2018, Plaintiffs filed their opposition to the motion to dismiss. On January 15, 2019, the defendants filed their reply brief. A hearing on the motion is scheduled for March 6, 2019, and discovery in the case is proceeding. IAC and Match Group believe that the allegations in this lawsuit are without merit and will continue to defend vigorously against it.

*FTC Investigation of Certain Match.com Business Practices*

In March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com. In November 2018, the FTC proposed to resolve its potential claims relating to Match.com's marketing, chargeback and online cancellation practices via a consent judgment mandating certain changes in the company's business practices, as well as a payment in the amount of $60 million. Match Group believes that the FTC's legal challenges to Match.com's practices, policies, and procedures are without merit and is prepared to vigorously defend against them.

## NOTE 14—SUPPLEMENTAL CASH FLOW INFORMATION

**Supplemental Disclosure of Non-Cash Transactions:**

The Company recorded an acquisition-related contingent consideration liability of $0.2 million during the year ended December 31, 2016. There were no acquisition-related contingent consideration liabilities recorded for the years ended December 31, 2018 and 2017. See "Note 6—Financial Instruments" for additional information on contingent consideration arrangements.

**Supplemental Disclosure of Cash Flow Information:**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | **(In thousands)** | | |
| Cash paid (received) during the year for: | | | |
| Interest | $ 71,308 | $ 71,893 | $ 82,494 |
| Income tax payments, including amounts paid to IAC for Match Group's share of IAC's consolidated tax liability | 39,267 | 28,938 | 44,733 |
| Income tax refunds | (17,720) | (13,537) | (962) |

92

App. 231

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | 2018 | | 2017 | | 2016 | | 2015 |
|  | (In thousands) | | | | | | |
| Cash and cash equivalents | $ | 186,947 | $ | 272,624 | $ | 253,651 | $ | 88,173 |
| Restricted cash included in other current assets |  | 193 |  | 137 |  | 120 |  | 126 |
| Total cash, cash equivalents and restricted cash as shown on the consolidated statement of cash flow | $ | 187,140 | $ | 272,761 | $ | 253,771 | $ | 88,299 |

## NOTE 15—RELATED PARTY TRANSACTIONS

### Relationship with IAC

In connection with the IPO in 2015, the Company entered into certain agreements relating to our relationship with IAC. These agreements include a master transaction agreement; an investor rights agreement; a tax sharing agreement; a services agreement; an employee matters agreement and a subordinated loan agreement.

For the years ended December 31, 2018, 2017 and 2016, the Company incurred $7.6 million, $9.9 million, and $11.8 million, respectively, pursuant to the services agreement. Included in these amounts are $5.2 million, $5.1 million and $4.3 million, respectively, for leasing of office space for certain of our businesses at properties owned by IAC. Additionally, the Company paid an IAC subsidiary $1.2 million for the sublease of space in a data center for the year ended December 31, 2016, and discontinued subleasing as of December 31, 2016. In December 2017, certain international subsidiaries of the Company agreed to sell net operating losses that were not expected to be utilized to an IAC subsidiary for $0.9 million. All amounts were paid in full by the Company at December 31, 2018, 2017 and 2016, respectively.

### Master Transaction Agreement

The master transaction agreement sets forth the agreements between IAC and the Company regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC post IPO. Under the master transaction agreement, the Company agrees to assume all of the assets and liabilities related to its business and agrees to indemnify IAC against any losses arising out of any breach by the Company of the master transaction agreement or the other transaction related agreements described below. IAC also agrees to indemnify the Company against losses arising out of any breach by IAC of the master transaction agreement or any of the other transaction related agreements.

### Investor Rights Agreement

Under the investor rights agreement, the Company provides IAC with (i) specified registration and other rights relating to its shares of our common stock and (ii) anti-dilution rights. See "Note 8—Shareholders' Equity" for additional information on the anti-dilution rights.

### Tax Sharing Agreement

The tax sharing agreement governs the rights, responsibilities, and obligations of the Company and IAC with respect to tax liabilities and benefits, entitlements to refunds, preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes. Under the tax sharing agreement, the Company is generally responsible and required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes the Company or any of its subsidiaries to the extent attributable to the Company or any of its subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any of the Company's subsidiaries' consolidated, combined, unitary or separate tax returns.

At December 31, 2017, the Company had tax receivables of $7.3 million due from IAC pursuant to the tax sharing agreement, which is included in "Other current assets" in the accompanying consolidated balance sheet. Refunds from IAC during 2018 and 2017 pursuant to this agreement were $7.0 million and $10.9 million,

93

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

respectively. There were no outstanding receivables or payables pursuant to the tax sharing agreement as of December 31, 2018.

*Services Agreement*

The services agreement governs services that IAC provides to the Company including, among others: (i) assistance with certain legal, finance, internal audit, treasury, information technology support, insurance and tax matters, including assistance with certain public company reporting obligations; (ii) payroll processing services; (iii) tax compliance services; and (iv) such other services as to which IAC and the Company may agree. In addition, under the services agreement the Company provides IAC informational technology services and such other services as to which IAC and the Company may agree. The services agreement had an initial term of one year from the date of the IPO, and provides for automatic renewals for additional one-year periods, subject to IAC's continued ownership of a majority of the combined voting power of the Company's voting stock.

*Employee Matters Agreement*

The employee matters agreement covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. Under the employee matters agreement, the Company's employees participate in IAC's U.S. health and welfare plans, 401(k) plan and flexible benefits plan and the Company reimburses IAC for the costs of such participation. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of the Company's Board of Directors, Match Group will no longer participate in IAC's employee benefit plans, but will establish its own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

The employee matters agreement also requires the Company to reimburse IAC for the cost of any IAC equity awards held by Match Group's employees and former employees and that IAC may elect to receive payment either in cash or Company common stock. With respect to equity awards originally denominated in shares of the Company's subsidiaries, IAC may require those awards to be settled in either shares of IAC's common stock or in shares of the Company's common stock and, to the extent shares of IAC common stock are issued in settlement, the Company will reimburse IAC for the cost of those shares by issuing to IAC additional shares of the Company's common stock.

During the years ended December 31, 2018, 2017 and 2016, 3.0 million, 11.9 million and 1.0 million shares, respectively, of Company common stock were issued to IAC pursuant to the employee matters agreement; 2.5 million, 11.3 million and 0.5 million, respectively, of which were issued as reimbursement for shares of IAC common stock issued in connection with the exercise and settlement of equity awards originally denominated in shares of a subsidiary of the Company; and 0.5 million, 0.6 million and 0.5 million, respectively, of which were issued as reimbursement for shares of IAC common stock issued in connection with the exercise and vesting of IAC equity awards held by Company employees.

*IAC Subordinated Loan Facility*

Prior to the IPO, the Company entered into an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allows the Company to make one or more requests to IAC to borrow funds. If IAC agrees to fulfill any such borrowing request, the related indebtedness will be incurred in accordance with the terms of the IAC Subordinated Loan Facility. Any indebtedness outstanding under the IAC Subordinated Loan Facility will be by its terms subordinated in right of payment to the obligations under the Match Group Credit Agreement and the Match Group Senior Notes, and will bear interest at the applicable rate set forth in the pricing grid in the Match Group Credit Agreement, which rate is based on the Company's consolidated net leverage ratio at the time of borrowing, plus an additional amount to be agreed upon. The IAC Subordinated Loan Facility has a scheduled final maturity date of no earlier than 90 days after the maturity date of the Match Group Credit Facility or the latest maturity date in respect of any class of Term Loans outstanding under the Match Group Credit Agreement. At December 31, 2018, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility.

94

App. 233

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Other Related Party Transactions**

On August 10, 2018, Gregory R. Blatt resigned as a director of the Company and entered into an advisory agreement with the Company, pursuant to which he will advise the Company on matters relating to its business, strategy and operations. The term of the advisory agreement will end on February 29, 2020. Pursuant to their terms, Mr. Blatt's outstanding stock options will remain exercisable and continue to vest, as applicable, as long as he continues to perform services for the Company.

**NOTE 16—BENEFIT PLANS**

Match Group employees are eligible to participate in a retirement savings plan sponsored by IAC in the United States, which is qualified under Section 401(k) of the Internal Revenue Code. Under the IAC/InterActiveCorp Retirement Savings Plan (the "Plan"), participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits. The employer match under the Plan is fifty cents for each dollar a participant contributes in this Plan, with a maximum contribution of 3% of a participant's eligible earnings. Matching contributions under the Plan for the years ended December 31, 2018, 2017 and 2016 were $2.8 million, $2.2 million and $1.6 million, respectively. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the Plan. An investment option in the Plan is IAC common stock, but neither participant nor matching contributions are required to be invested in IAC common stock. The increase in matching contributions in 2018 and 2017 is due primarily to an increase in participation in the Plan due to increased headcount.

Internationally, Match Group also has or participates in various benefit plans, primarily defined contribution plans. The Company's contributions for these plans for the years ended December 31, 2018, 2017 and 2016 were $2.8 million, $2.2 million and $1.9 million, respectively.

**NOTE 17—CONSOLIDATED FINANCIAL STATEMENT DETAILS**

|  | December 31, | | |
| --- | --- | --- | --- |
|  | 2018 | | 2017 |
|  | (In thousands) | | |
| **Other current assets:** |  |  |  |
| Capitalized mobile app fees | $ | 29,216 | $ | 22,070 |
| Prepaid expenses |  | 19,476 |  | 16,374 |
| Other |  | 9,074 |  | 16,925 |
| Other current assets | $ | 57,766 | $ | 55,369 |

|  | December 31, | | |
| --- | --- | --- | --- |
|  | 2018 | | 2017 |
|  | (In thousands) | | |
| **Property and equipment, net:** |  |  |  |
| Computer equipment and capitalized software | $ | 136,083 | $ | 134,757 |
| Leasehold improvements |  | 24,529 |  | 22,390 |
| Furniture and other equipment |  | 7,395 |  | 7,216 |
| Projects in progress |  | 3,369 |  | 6,117 |
|  |  | 171,376 |  | 170,480 |
| Accumulated depreciation and amortization |  | (113,025) |  | (108,860) |
| Property and equipment, net | $ | 58,351 | $ | 61,620 |

95

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2018** | | **2017** | |
|  | (In thousands) | | | |
| **Accrued expenses and other current liabilities:** | | | | |
| Accrued advertising expense | $ | 40,894 | $ | 28,878 |
| Accrued employee compensation and benefits | | 38,378 | | 30,375 |
| Other | | 56,699 | | 51,313 |
| Accrued expenses and other current liabilities | $ | 135,971 | $ | 110,566 |

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | **2018** | | **2017** | | **2016** |
|  | (In thousands) | | | | |
| **Other income (expense), net** | $ 7,765 | $ | (30,827) | $ | 7,866 |

Other income, net in 2018 includes $5.3 million in net foreign currency exchange gains due primarily to a strengthening of the U.S. dollar relative to the British Pound in the period and $4.9 million of interest income, partially offset by $2.1 million related to impairments of certain equity investments and $0.7 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity instrument.

Other expense, net, in 2017 includes expenses of $15.4 million related to the redemption of our 6.75% Senior Notes and repricing of the Term Loan, $13.0 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $10.3 million in net foreign currency exchange losses, and a $2.3 million other-than-temporary impairment charge related to a cost method investment resulting from of our assessment of the near-term prospects and financial condition of the investee. These expenses were partially offset by a gain on the sale of a cost method investment of $9.1 million.

Other income, net in 2016 includes $20.0 million in foreign currency exchange gains due to strengthening of the dollar relative to the British Pound and Euro and a $3.1 million gain related to the sale of a marketable equity security, partially offset by a non-cash charge of $12.1 million related to the write-off of a proportionate share of original issue discount and deferred financing costs associated with prepayments of $440 million of the Term Loan, $2.1 million of expense related to mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $1.5 million repricing fees related to the Term Loan, and a $0.7 million other-than-temporary impairment charge related to a certain cost method investment.

96

App. 235

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 18—QUARTERLY RESULTS (UNAUDITED)**

| | Quarter Ended March 31 | Quarter Ended June 30 | Quarter Ended September 30 [a] | Quarter Ended December 31 [b] |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| **Year Ended December 31, 2018** | | | | |
| Revenue | $ 407,367 | $ 421,196 | $ 443,943 | $ 457,344 |
| Cost of revenue | 93,944 | 97,334 | 107,512 | 111,210 |
| Operating income | 112,233 | 150,165 | 139,895 | 151,001 |
| Earnings from continuing operations | 99,678 | 131,358 | 127,950 | 113,983 |
| Loss from discontinued operations, net of tax | — | — | (378) | — |
| Net earnings attributable to Match Group, Inc. shareholders | 99,736 | 132,500 | 130,159 | 115,544 |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.36 | $ 0.48 | $ 0.47 | $ 0.42 |
| Diluted [c] | $ 0.33 | $ 0.45 | $ 0.44 | $ 0.39 |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.36 | $ 0.48 | $ 0.47 | $ 0.42 |
| Diluted [c] | $ 0.33 | $ 0.45 | $ 0.44 | $ 0.39 |
| | | | | |
| **Year Ended December 31, 2017** | | | | |
| Revenue | $ 298,764 | $ 309,572 | $ 343,418 | $ 378,907 |
| Cost of revenue | 58,848 | 62,665 | 72,044 | 85,942 |
| Operating income | 58,871 | 82,975 | 91,008 | 127,663 |
| Earnings (loss) from continuing operations | 24,555 | 51,544 | 287,771 | (7,893) |
| (Loss) earnings from discontinued operations, net of tax | (4,491) | (71) | (85) | (1,003) |
| Net earnings (loss) attributable to Match Group, Inc. shareholders | 20,053 | 51,430 | 287,688 | (9,023) |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.10 | $ 0.20 | $ 1.08 | $ (0.03) |
| Diluted [c] | $ 0.08 | $ 0.17 | $ 0.98 | $ (0.03) |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [c] | $ 0.08 | $ 0.20 | $ 1.08 | $ (0.03) |
| Diluted [c] | $ 0.07 | $ 0.17 | $ 0.98 | $ (0.03) |

———————

[a] Net earnings for the third quarter of 2017 was impacted by an income tax benefit of $226.2 million primarily due to excess tax deductions attributable to stock-based compensation.

[b] Net loss for the fourth quarter of 2017 was impacted by an incremental income tax provision of $92.3 million related to the Tax Act, of which, $23.7 million relates to the Transition Tax and a $68.6 million relates to the remeasurement of U.S. net deferred tax assets due to the reduction in the corporate income tax rate.

[c] Quarterly per share amounts may not add to the related annual per share amount because of differences in the average common shares outstanding during each period.

App. 236

App. 237

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 19—SUBSEQUENT EVENT (UNAUDITED)**

On February 15, 2019, we completed a private offering of $350 million aggregate principal amount of 5.625% Senior Notes due 2029.  The proceeds from these notes were used to repay outstanding borrowings under our existing Credit Facility, to pay expenses associated with the offering, and for general corporate purposes.

98

App. 238

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.


**Item 9A.    Controls and Procedures**

**Conclusion Regarding the Effectiveness of the Company's Disclosure Controls and Procedures**

The Company monitors and evaluates on an ongoing basis its disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant.

As required by Rule 13a-15(b) of the Exchange Act, Match Group management, including the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), conducted an evaluation, as of the end of the period covered by this report, of the effectiveness of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Based on this evaluation, the CEO and the CFO concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control Over Financial Reporting**

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) for the Company. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control— Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on this assessment, management has determined that, as of December 31, 2018, the Company's internal control over financial reporting is effective. The effectiveness of our internal control over financial reporting as of December 31, 2018 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their attestation report, included herein.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Changes in Internal Control Over Financial Reporting**

The Company monitors and evaluates on an ongoing basis its internal control over financial reporting in order to improve its overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant. As required by Rule 13a-15(d), Match Group management, including the CEO and the CFO, also conducted an evaluation of the Company's internal control over financial reporting to determine whether any changes occurred during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. Based on that evaluation, there has been no such change during the quarter ended December 31, 2018.

99

Table of Contents

<h3 align="center">Report of Independent Registered Public Accounting Firm</h3>

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Match Group, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Match Group, Inc. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Company as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2018, and the related notes and the financial statement schedule listed in the Index at Item 15(a), and our report dated February 28, 2019 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP
New York, New York
February 28, 2019

100

Table of Contents

**Item 9B.    Other Information**

Not applicable.

101

Table of Contents

## PART III

The information required by Part III (Items 10, 11, 12, 13 and 14) has been incorporated by reference to Match Group's definitive Proxy Statement to be used in connection with its 2019 Annual Meeting of Stockholders (the "2019 Proxy Statement"), as set forth below in accordance with General Instruction G(3) of Form 10-K.

### Item 10. Directors, Executive Officers and Corporate Governance

The information required by Items 401 and 405 of Regulation S-K relating to directors and executive officers of Match Group and their compliance with Section 16(a) of the Exchange Act is set forth in the sections entitled "Information Concerning Director Nominees" and "Information Concerning Match Group Executive Officers Who Are Not Directors," and "Section 16(a) Beneficial Ownership Reporting Compliance," respectively, in the 2019 Proxy Statement and is incorporated herein by reference. The information required by Item 406 of Regulation S-K relating to Match Group's Code of Ethics is set forth under the caption "Part I-Item 1-Business-Additional Information-Code of ethics" of this annual report and is incorporated herein by reference. The information required by subsections (c)(3), (d)(4) and (d)(5) of Item 407 of Regulation S-K is set forth in the sections entitled "Corporate Governance" and "The Board and Board Committees" in the 2019 Proxy Statement and is incorporated herein by reference.

### Item 11. Executive Compensation

The information required by Item 402 of Regulation S-K relating to executive and director compensation is set forth in the sections entitled "Executive Compensation" and "Director Compensation" in the 2019 Proxy Statement and is incorporated herein by reference. The information required by subsections (e)(4) and (e)(5) of Item 407 of Regulation S-K relating to certain compensation committee matters is set forth in the sections entitled "The Board and Board Committees," "Compensation Committee Report" and "Compensation Committee Interlocks and Insider Participation" in the 2019 Proxy Statement and is incorporated herein by reference; provided, that the information set forth in the section entitled "Compensation Committee Report" shall be deemed furnished herein and shall not be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information regarding ownership of Match Group common stock and Class B common stock required by Item 403 of Regulation S-K and securities authorized for issuance under Match Group's various equity compensation plans required by Item 201(d) of Regulation S-K is set forth in the sections entitled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information," respectively, in the 2019 Proxy Statement and is incorporated herein by reference.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information regarding certain relationships and related transactions involving Match Group required by Item 404 of Regulation S-K and director independence determinations required by Item 407(a) of Regulation S-K is set forth in the sections entitled "Certain Relationships and Related Person Transactions" and "Corporate Governance," respectively, in the 2019 Proxy Statement and is incorporated herein by reference.

### Item 14. Principal Accounting Fees and Services

Information required by Item 9(e) of Schedule 14A regarding the fees and services of Match Group's independent registered public accounting firm and the pre-approval policies and procedures applicable to services provided to Match Group by such firm is set forth in the sections entitled "Fees Paid to Our Independent Registered Public Accounting Firm" and "Audit and Non-Audit Services Pre-Approval Policy," respectively, in the 2019 Proxy Statement and is incorporated herein by reference.

102

App. 242

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

*(a)  List of documents filed as part of this Report:*

**(1)  Consolidated Financial Statements of Match Group, Inc.**

Report of Independent Registered Public Accounting Firm: Ernst & Young LLP.

Consolidated Balance Sheet as of December 31, 2018 and 2017.

Consolidated Statement of Operations for the Years Ended December 31, 2018, 2017 and 2016.

Consolidated Statement of Comprehensive Operations for the Years Ended December 31, 2018, 2017 and 2016.

Consolidated Statement of Shareholders' Equity for the Years Ended December 31, 2018, 2017 and 2016.

Consolidated Statement of Cash Flows for the Years Ended December 31, 2018, 2017 and 2016.

Notes to Consolidated Financial Statements.

**(2)  Consolidated Financial Statement Schedule of Match Group, Inc.**

| Schedule Number | |
|---|---|
| II | Valuation and Qualifying Accounts. |

All other financial statements and schedules not listed have been omitted since the required information is either included in the Consolidated Financial Statements or the notes thereto, is not applicable or is not required.

103

App. 243

Table of Contents

## EXHIBIT INDEX

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith, incorporated by reference herein by reference to the location indicated, or furnished herewith.

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
|---|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 2.1 | Stock Purchase Agreement, dated as of July 13, 2015, by and among Match.com Inc., Plentyoffish Media Inc., Markus Frind, Markus Frind Family Trust No. 2, and Frind Enterprises Ltd. | 8-K | 000-20570 | 2.1 | 7/17/2015 | |
| 3.1 | Amended and Restated Certificate of Incorporation of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 11/24/2015 | |
| 3.2 | Amended and Restated By-laws of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 12/7/2017 | |
| 4.1 | Indenture, dated June 1, 2016, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 6/2/2016 | |
| 4.2 | Investor Rights Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 4.1 | 11/24/2015 | |
| 4.3 | Indenture, dated December 4, 2017, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 12/4/2017 | |
| 10.1 | Master Transaction Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.1 | 11/24/2015 | |
| 10.2 | Employee Matters Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.2 | 11/24/2015 | |
| 10.3 | Amendment No. 1 to the Employee Matters Agreement, dated as of April 13, 2016, by and between Match Group, Inc. and IAC/InterActiveCorp. | 10-Q | 001-37636 | 10.1 | 5/10/2016 | |
| 10.4 | Tax Sharing Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.3 | 11/24/2015 | |
| 10.5 | Services Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.4 | 11/24/2015 | |
| 10.6 | Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.5 | 11/24/2015 | |
| 10.7 | First Amendment to the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 8/4/2017 | |
| 10.8 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.7 | 2/28/2017 | |
| 10.9 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.8 | 2/28/2017 | |
| 10.10 | Match Group, Inc. Amended and Restated 2017 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.1 | 6/21/2018 | |
| 10.11 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 11/9/2017 | |
| 10.12 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.2 | 11/9/2017 | |
| 10.13 | Summary of Non-Employee Director Compensation Arrangements.(1) | 10-K | 001-37636 | 10.9 | 3/28/2016 | |
| 10.14 | Amended and Restated Credit Agreement, dated as of November 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 10-K | 001-37636 | 10.11 | 3/28/2016 | |

104

App. 244

Table of Contents

| Exhibit No. | Exhibit Description | Form | SEC File No. | Exhibit | Filing Date | Filed (†) or Furnished (‡) Herewith (as indicated) |
|---|---|---|---|---|---|---|
| | | | **Incorporated by Reference** | | | |
| 10.15 | Amendment No. 3, dated as of December 8, 2016, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 12/8/2016 | |
| 10.16 | Amendment No. 4, dated as of August 14, 2017, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, as further amended as of December 8, 2016, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 8/17/2017 | |
| 10.17 | Amendment No. 5 dated as of December 7, 2018 to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, as further amended as of December 8, 2016, and as further amended as of August 14, 2017, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other parties thereto. | 8-K | 001-37636 | 10.1 | 12/13/2018 | |
| 10.18 | Employment Agreement between Amanda W. Ginsberg and Match Group, Inc. dated as of July 20, 2018.(1) | 8-K | 001-37636 | 10.1 | 7/26/2018 | |
| 10.19 | Employment Agreement between Gary Swidler and Match Group, Inc. dated as of August 8, 2018.(1) | 8-K | 001-37636 | 10.1 | 8/14/2018 | |
| 10.20 | Employment Agreement between Jared Sine and Match Group, Inc. dated as of August 8, 2018.(1) | 8-K | 001-37636 | 10.2 | 8/14/2018 | |
| 10.21 | Employment Agreement between Sharmistha Dubey and Match Group, Inc. dated as of August 8, 2018.(1) | 10-Q | 001-37636 | 10.5 | 11/9/2018 | |
| 10.22 | Advisory Agreement between Gregory R. Blatt and Match Group, Inc. dated as of August 10, 2018.(1) | 8-K | 001-37636 | 10.1 | 8/10/2018 | |
| 21.1 | Subsidiaries of the Registrant as of December 31, 2018. | | | | | † |
| 23.1 | Consent of Ernst & Young LLP. | | | | | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 101.INS | XBRL Instance Document | | | | | ‡ |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | ‡ |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | ‡ |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | ‡ |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | ‡ |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | ‡ |

_____

(1)   Reflects management contracts and management and director compensatory plans.

App. 245

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

February 28, 2019                 **MATCH GROUP, INC.**

By:                 /s/ GARY SWIDLER

Gary Swidler
*Chief Financial Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 28, 2019:

| <u>Signature</u> | <u>Title</u> |
|---|---|
| /s/ JOSEPH LEVIN<br>Joseph Levin | Chairman of the Board |
| /s/ AMANDA W. GINSBERG<br>Amanda W. Ginsberg | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ GARY SWIDLER<br>Gary Swidler | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ PHILIP D. EIGENMANN<br>Philip D. Eigenmann | Senior Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) |
| /s/ ANN L. McDANIEL<br>Ann L. McDaniel | Director |
| /s/ THOMAS J. McINERNEY<br>Thomas J. McInerney | Director |
| /s/ GLENN H. SCHIFFMAN<br>Glenn H. Schiffman | Director |
| /s/ PAMELA S. SEYMON<br>Pamela S. Seymon | Director |
| /s/ ALAN G. SPOON<br>Alan G. Spoon | Director |
| /s/ MARK STEIN<br>Mark Stein | Director |
| /s/ GREGG WINIARSKI<br>Gregg Winiarski | Director |
| /s/ SAM YAGAN<br>Sam Yagan | Director |

App. 246

App. 247

Schedule II

**MATCH GROUP, INC. AND SUBSIDIARIES**

**VALUATION AND QUALIFYING ACCOUNTS**

| Description | Balance at Beginning of Period | | Charges to Earnings | | Charges to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | | | |
| **2018** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 778 | $ | 83 (a) | $ | (15) | $ | (122) (d) | $ 724 |
| Deferred tax valuation allowance | | 24,795 | | 22,675 (b) | | (22) (c) | | — | 47,448 |
| Other reserves | | 2,544 | | | | | | | 3,008 |
| **2017** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 676 | $ | 427 (a) | $ | (47) | $ | (278) (d) | $ 778 |
| Deferred tax valuation allowance | | 23,411 | | 1,157 (e) | | 227 (f) | | — | 24,795 |
| Other reserves | | 2,822 | | | | | | | 2,544 |
| **2016** | | | | | | | | | |
| Allowance for doubtful accounts | $ | 902 | $ | 136 (a) | $ | 23 | $ | (385) (d) | $ 676 |
| Deferred tax valuation allowance | | 22,945 | | (593) (g) | | 1,059 (h) | | — | 23,411 |
| Other reserves | | 2,514 | | | | | | | 2,822 |

———————————

(a)  Additions to the allowance for doubtful accounts are charged to expense.

(b)  Amount is primarily related to foreign tax credits and foreign interest deduction carryforwards.

(c)  Amount is related to currency translation adjustments on foreign net operating losses.

(d)  Write-off of fully reserved accounts receivable.

(e)  Amount is primarily related to an other-than-temporary impairment charge for a certain cost method investment and an increase in foreign tax loss carryforwards.

(f)  Amount is related to currency translation adjustments on foreign net operating losses.

(g)  Amount is primarily related to an other-than-temporary impairment charge for a certain cost method investment and an increase in foreign tax credits.

(h)  Amount is related to the realization of previously unbenefited losses on an available-for-sale marketable equity security included in accumulated other comprehensive loss.

107

# Exhibit 3

# Match Responds to FTC lawsuit



NEWS PROVIDED BY
**Match Group →**
Sep 25, 2019, 13:45 ET

DALLAS, Sept. 25, 2019 /PRNewswire/ -- As we've previously disclosed in Match Group (NASDAQ: MTCH)'s Annual Report, in March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com. The FTC raised certain potential claims relating to Match.com's marketing, chargeback and online cancellation practices. The FTC's investigation pertains to the Match.com brand. In November 2018, the FTC offered to resolve its potential claims via a consent judgment mandating certain changes in the company's business practices, as well as a payment in the amount of $60 million. Discussions between Match Group and the FTC ensued but no resolution was reached. On August 7, 2019, the FTC voted to assert claims against the Company and referred the matter to the U.S. Department of Justice ("DOJ").

The DOJ opted not to pursue the civil case and referred it back to the FTC who then filed a lawsuit against us today making completely meritless allegations supported by consciously misleading figures.

Fraud isn't good for business. That's why we fight it. We catch and neutralize 85% of potentially improper accounts in the first four hours, typically before they are even active on the site, and 96% of improper accounts within a day.

For nearly 25 years Match.com has been focused on helping people find love and fighting the criminals that try to take advantage of users. We've developed industry leading tools and AI that block 96% of bots and fake accounts from our site within a day and are relentless in our

pursuit to rid our site of these malicious accounts. The FTC has misrepresented internal emails and relied on cherry-picked data to make outrageous claims and we intend to vigorously defend ourselves against these claims in court.

**About Match Group, Inc.**

Match Group, Inc. is a leading provider of dating products available in over 40 languages to our users all over the world through applications and websites we own and operate. We operate a portfolio of brands, including Tinder, Hinge, Match, PlentyOfFish, Meetic, OkCupid, OurTime, and Pairs, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio of trusted brands, we provide tailored products to meet the varying preferences of our users.

SOURCE Match Group

Related Links

http://www.matchgroupinc.com

App. 251

/

# Exhibit 4



# Tinder Lets Known Sex Offenders Use the App. It's Not the Only One.

Match Group, which owns most major online dating services, screens for sexual predators on Match — but not on Tinder, OkCupid or PlentyofFish. A spokesperson said, "There are definitely registered sex offenders on our free products."

by Hillary Flynn, Keith Cousins and Elizabeth Naismith Picciani, Columbia Journalism Investigations, Dec. 2, 2019, 5 a.m. EST

*Above: Nicole Xu, special to ProPublica*

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

*This article is co-published with Columbia Journalism Investigations and BuzzFeed.*

Susan Deveau saw Mark Papamechail's online dating profile on PlentyofFish in late 2016. Scrolling through his pictures, she saw a 54-year-old man, balding and broad, dressed in a T-shirt. Papamechail lived near her home in a suburb of Boston and, like Deveau, was divorced. His dating app profile said he wanted "to find someone to marry."

Deveau had used dating websites for years, but she told her adult daughter the men she met were "dorky." She joked about how she could get "catfished" if a date looked nothing like his picture. Still Deveau, 53, wanted to grow old with someone. The two were — in the popular dating platform's jargon — "matched."

A background check would have revealed that Papamechail was a three-time convicted rapist. It would have shown that Massachusetts designated him a dangerous registered sex offender. So how did PlentyofFish allow such a man to use its service?

PlentyofFish "does not conduct criminal background or identity verification checks on its users or otherwise inquire into the background of its users," the dating app states in its terms of use. It puts responsibility for policing its users on users themselves. Customers who sign its service agreement promise they haven't commited "a felony or indictable offense (or crime of similar severity), a sex crime, or any crime involving violence," and aren't "required to register as a sex offender with any state, federal or local sex offender registry." PlentyofFish doesn't attempt to verify whether its users tell the truth, according to the company.

Papamechail didn't scare Deveau at first. They chatted online and eventually arranged a date. They went on a second date and a third. But months after their PlentyofFish match, Deveau became the second woman to report to police that Papamechail raped her after they had met through a dating app.

PlentyofFish is among 45 online dating brands now owned by Match Group, the Dallas-based corporation that has revenues of $1.7 billion and that dominates the industry in the U.S. Its top dating app, Tinder, has 5.2 million subscribers, surpassing such popular rivals as Bumble.

For nearly a decade, its flagship website, Match, has issued statements and signed agreements promising to protect users from sexual predators. The

App. 254

site has a policy of screening customers against government sex offender registries. But over this same period, as Match evolved into the publicly traded Match Group and bought its competitors, the company hasn't extended this practice across its platforms — including PlentyofFish, its second most popular dating app. The lack of a uniform policy allows convicted and accused perpetrators to access Match Group apps and leaves users vulnerable to sexual assault, a 16-month investigation by Columbia Journalism Investigations found.

Match first agreed to screen for registered sex offenders in 2011 after Carole Markin made it her mission to improve its safety practices. The site had connected her with a six-time convicted rapist who, she told police, had raped her on their second date. Markin sued the company to push for regular registry checks. The Harvard-educated entertainment executive held a high-profile press conference to unveil her lawsuit. Within months, Match's lawyers told the judge that "a screening process has been initiated," records show. After the settlement, the company's attorneys declared the site was "checking subscribers against state and national sex offender registries."



*After Match connected Carole Markin with a six-time convicted rapist, she sued the company to push for regular registry checks. (Kendrick Brinson for ProPublica)*

The next year, Match made similar assurances to then-California Attorney General Kamala Harris. In a 2012 agreement on best industry practices between the attorney general's office and the dating site, among others, the company again agreed to "identify sexual predators" and examine sex offender registries. It pledged to go further and respond to users' rape complaints with an additional safety tool: "a rapid abuse reporting system."

App. 255

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 260 of 451    PageID 783

Today, Match Group checks the information of its paid subscribers on Match against state sex offender lists. But it doesn't take that step on Tinder, OkCupid or PlentyofFish — or any of its free platforms. A Match Group spokesperson told CJI the company cannot implement a uniform screening protocol because it doesn't collect enough information from its free users — and some paid subscribers — even when they pay for premium features. Acknowledging the limitations, the spokesperson said, "There are definitely registered sex offenders on our free products."

CJI analyzed more than 150 incidents of sexual assault involving dating apps, culled from a decade of news reports, civil lawsuits and criminal records. Most incidents occurred in the past five years and during the app users' first in-person meeting, in parking lots, apartments and dorm rooms. Most victims, almost all women, met their male attackers through Tinder, OkCupid, PlentyofFish or Match. Match Group owns them all.

In 10% of the incidents, dating platforms matched their users with someone who had been accused or convicted of sexual assault at least once, the analysis found. Only a fraction of these cases involved a registered sex offender. Yet the analysis suggests that Match's screening policy has helped to prevent the problem: Almost all of these cases implicated Match Group's free apps; the only service that scours sex offender registries, Match, had none.

In 2017, Tinder matched Massachusetts registered sex offender Michael Durgin with a woman, and she later told police he had raped her on their first date; Durgin's two rape charges were dropped after the woman "indicated that she does not wish for the Commonwealth to proceed to trial," records show. (Durgin didn't respond to requests for comment.) OkCupid allowed another registered sex offender, Michael Miller, of Colorado, to create a new account after his 2015 conviction for raping a woman he met through the site. For months, Miller remained on the platform despite appearing on the registries Match screens. Even Pennsylvania registered sex offender Seth Mull, whose 17-year history of sex crimes convictions began as a teen, used Match Group's dating sites; in 2017, PlentyofFish didn't flag his eight-year registry status before matching him with a woman who later accused him of rape. Mull is now serving life in prison for her rape and two more rapes, among other sex crimes.

Asked about the CJI data, Match Group's spokesperson said the 157 cases "need to be put in perspective with the tens of millions of people that have used our dating products."

The company declined multiple requests to interview executives and other key employees familiar with its protocols for addressing online dating sexual assault. The spokesperson described the steps the company takes to ensure customer safety on its platforms — from blocking users accused of sexual assault to checking across its apps for accused users' accounts and

App. 256

flagging them on a companywide distribution list. Other response protocols aren't standardized across Match Group apps.

In a brief statement, the company said it "takes the safety, security and well-being of our users very seriously." Match Group said "a relatively small amount of the tens of millions of people using one of our dating services have fallen victim to criminal activity by predators." It added, "We believe any incident of misconduct or criminal behavior is one too many."

Interviews with more than a dozen former Match Group employees — from customer service representatives and security managers at OkCupid to senior executives at Tinder — paint a different picture. Most left on good terms; indeed, many told CJI they're proud of the successful relationships their platforms have facilitated. But they criticize the lack of companywide protocols. Some voice frustration over the scant training and support they received for handling users' rape complaints. Others describe having to devise their own ad hoc procedures. Often, the company's response fails to prevent further harm, according to CJI interviews with more than 100 dating app users, lawmakers, industry experts, former employees and police officers; reviews of hundreds of records; and a survey of app users.

Even the screening policy on the one site that checks registries, Match, is limited. The company's spokesperson acknowledges that the website doesn't screen all paid subscribers. The site has argued in court for years that it has no legal obligation to conduct background checks, and it fought state legislation that would require it to disclose whether it does so.

Markin, whose civil suit led to the registry policy, cannot help but feel the company has failed to deliver. Calling registry screenings "the easiest kind of cross-checking," she said she had expected Match Group to embrace the practice.

"I did something to help other women," she told CJI. "It's disappointing to see Match did not."

---

Susan Flaherty grew up in the 1960s outside Hoboken, New Jersey, where she developed a style that her daughter describes simply as "Jersey": "big-haired, blonde, blue-eyed and loud." With a head for numbers, she got a degree in finance and spent most of her adult life working as a mortgage broker.

In the mid-1990s, she walked into a bar near Naples, Maine, and came face to face with Denie Deveau, a bartender. They got married and had two children. Seven years later, they divorced. Susan kept her husband's last name. She bounced from relationship to relationship after that. She always thought she "needed a man to come take care of her," her 24-year-old daughter, Jackie, said.

App. 257

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 262 of 451    PageID 785

Papamechail grew up in the 1960s in Peabody, Massachusetts, just north of Boston. He came from a prominent family that owns a construction company. Since the late 1980s, Papamechail has built a rap sheet consisting of eight criminal convictions, four of them sex crimes. He has pleaded guilty to three separate rapes.

His first rape conviction in 1987 involved a neighbor and resulted in an eight-year prison sentence and a 10-year probationary period "with special conditions to undergo sex offender treatment." Court records show Papamechail served one year in prison and later violated his probation. Within four years, he was convicted of rape again for two more incidents. During that case, he told police he had a "problem" and needed "help," court records show. He spent another four years behind bars. By 1994, he had spent yet another year in prison after his second conviction for indecent assault and battery, a sex crime in Massachusetts. Court records show Papamechail has served a total of at least eight years in prison. The state officially designated him a sex offender.

Papamechail declined to comment for this article. He told a CJI reporter over Facebook that "if you ever contact me or my family again I will reach out to the Massachusetts courts."

In 2014, Papamechail became familiar to sex crimes detectives again. This time, a woman he met through PlentyofFish accused him of raping her on their first date. The claim put him in county jail without bail for two years; he was eventually acquitted after a weeklong jury trial. Still, law enforcement officials raised his sex offender status to the state's most dangerous category, Level III, deeming him highly likely to offend again.



*Nicole Xu, special to ProPublica*

App. 258

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 263 of 451    PageID 786

By the time PlentyofFish matched him with Deveau, Papamechail's heightened status meant he would have already appeared on the state's sex offender registry — something that PlentyofFish didn't check, the company confirms. At the time, Deveau, a recovering alcoholic, was living in a sober house near Papamechail's home. Over the ensuing months, the pair chatted online. They texted and spoke on the phone. They met in person; she went to his apartment twice.

Then, in October 2017, Papamechail picked up Deveau for what would be their final date, court records show. They went for dinner and returned to his home. She "expected to just hang out together," court records note she told the grand jury, but he had "other plans." They got into a fight. "He wanted her in the bedroom," according to her testimony, "but she said no." Around 7:40 p.m., court records show, she called the Peabody emergency dispatch service for help.

Deveau told the 911 dispatcher "a man was trying to rape her and had threatened her," the court records state. "He's coming," she told the dispatcher, dropping the phone.

---

Susan Deveau is among the users in CJI's data who reported being victimized by someone they met through a dating platform. The analysis suggests the problem has grown as the popularity of online dating has soared — in 2015, 12% of American adults were on a dating site, compared with 3% in 2008. Other studies reinforce this trend. In 2016, the U.K. National Crime Agency reviewed police reports over a five-year period and found online-dating sexual assault had increased as much as 450% — from 33 to 184 cases.

Because no one collects official statistics on online dating sexual assault in the U.S., CJI surveyed more than 1,200 women who said they had used a dating platform in the past 15 years. It is a non-scientific questionnaire about an underreported crime, and the results represent only CJI's specific group. They are not generalizable and cannot be extrapolated to all online dating subscribers. (Read the survey's methodology at the end of this story.) Among this small group, more than a third of the women said they were sexually assaulted by someone they had met through a dating app. Of these women, more than half said they were raped.

If such results are confirmed by further studies, the numbers would be alarming, said Bethany Backes, an assistant professor in the Violence Against Women Faculty Cluster Initiative at the University of Central Florida. Backes, who reviewed CJI's questionnaire, noted that this one group of dating app users reported a higher rate of sexual assault than women in the general population do. Backes speculated that's because the

App. 259

users sampled were actively dating. The results, she added, suggest a need for the platforms to protect their users not just online but offline as well.

"I think anyone has a moral responsibility to do something about it," Backes said, "whether they think they have a legal or business responsibility."

Match Group declined to comment on CJI's survey. Its spokesperson noted that Match Group CEO Mandy Ginsberg has prioritized customer safety. "I'm a woman and a mom of a 20-year-old who uses dating apps," the executive said in an interview in 2018 with The Wall Street Journal. "I think a lot about the safety and security, in particular, of our female users."

In 2018, Ginsberg launched a safety council made up of leading victim advocates and other experts. Interviews with its members show that the council has focused on getting users to take action themselves rather than having the company act.

Match has long argued that such checks were too incomplete or costly for its users. Markham Erickson, a lawyer specializing in internet law who worked with Match to lobby against background checks, told CJI it was "incredibly hard" to screen online dating users. "It's not like you're getting the fingerprint of an individual," he said. All a sex offender "had to do was give a false name."

A Match Group spokesperson contends that background checks do little more than create what she calls "a false sense of security" among users. "Our checks of the sex offender registry can only be as good as the information we receive," she said, explaining that the government databases can lack data, have old pictures or include partial information on sex offenders.

But some in the industry have argued that the onus should be on the dating app companies to check users' backgrounds to protect their customers from predators. Herb Vest, a Texas entrepreneur who made a legislative crusade out of the issue in the 2000s, launched his own dating platform in 2003. Dubbed True.com, the company's name reflected its policy of screening users for sex crimes and other felonies, Vest said. It paid approximately $1 million a year for third-party services like rapsheets.com and backgroundchecks.com, partly because public registries were scattershot at first, and partly because the vendors could do a more comprehensive check.

The contracts allowed the company to screen an unlimited number of subscribers each month, former True president Reuben Bell said, an expense it incorporated into membership fees totaling $50 a month. By contrast, Match charged a similar monthly rate — $60 at the time — without conducting any form of background check.

App. 260

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 265 of 451    PageID 788

True even warned subscribers that the company would sue if they misrepresented their pasts. "If you are a felon, sex offender or married, DO NOT use our website," it stated on its site. In 2005, the company took one registered sex offender to court after discovering he had lied about his status. The lawsuit settled. According to Vest, the man agreed to stop using dating platforms. True ultimately folded in 2013.

Another Match Group rival, a free dating app called Gatsby that operated from 2017 until this year, used government databases to screen its 20,000 users. Gatsby's founder, Joseph Penora, told CJI in an email he was inspired to create what he calls "a creepy guy filter" after reading about a woman who was assaulted by a sex offender she had met through Match. "Our users are the backbone of our success," Penora wrote. "Let's do something proactive to keep them safe."

Even former Match Group insiders agree the registries are more accessible and have fewer blind spots today. Several former security executives told CJI that such screenings would be a feasible way to help prevent online dating sexual assault — if the company invested the resources. For example, they and other experts say Match Group, which expects to make around $800 million in profits this year by one measure, could purchase an application program interface, or API, from a third-party vendor to allow it to check its users against the nearly 900,000 registered sex offenders in the U.S.

Vest still cannot understand why the industry has resisted such measures. He insists the cost of doing background checks didn't play a role in his company's closing. True's bankruptcy records blame its subscription losses on banking reforms after the recession that left consumers with limited or no credit.

The company's background-checking policy wasn't mentioned in the thousands of pages of filings. Nor did True report owing money to its screening vendors.

"People can't rely 100% on the sites," Vest said. "But as an industry, we could have done much better."

---

Peabody police officers responded to Deveau's 911 call on Oct. 28, 2017, arriving at a multifamily complex with a purple door. The officers found her and Papamechail outside, court records show. There, she told the police that he had demanded sex. When she refused, she said, he pushed her against the wall and yelled, "I am going to have you one way or another."

Peabody police had come there before. In March 2014, Janine Dunphy reported that Papamechail had raped her at his home after the two had

Case 3:19-cv-02356-S     Document 39     Filed 06/12/20     Page 266 of 451     PageID 789

met through PlentyofFish, which Match Group would buy within the year.



*Janine Dunphy at her family cabin. In 2014, Dunphy reported that Mark Papamechail, a registered sex offender, had raped her at his home after the two had met through PlentyofFish. Dunphy saw Papamechail back on the app in 2016. (Sarah Rice, special to ProPublica)*

Dunphy's allegations sounded strikingly similar to those of Deveau, court records show. Both said he invited them to his home after a date. When they refused his sexual advances, their victim testimonies state, Papamechail — he is 6 feet, 2 inches tall and weighs 260 pounds, according to the state sex offender registry — threw them on the floor or the bed, restrained them with his arms and raped them.

Papamechail pleaded not guilty to Dunphy's rape charge; at the 2016 trial, his defense attorney claimed the incident was consensual and questioned the influence of her medical prescriptions and financial motivations. "Her story changes," his lawyer said at the time. "And the truth never changes."

Dunphy never knew Papamechail was a registered sex offender when PlentyofFish had matched them, she said. During the criminal case, she told a detective that Papamechail had confided that he was kicked off the Match dating site but didn't say why, the police report shows. Match Group declined to confirm or deny whether its flagship platform has ever blocked Papamechail. Prosecutors tried to subpoena PlentyofFish for records of his correspondence with her. Dunphy remembers that the company, which is based in Canada, refused, saying it didn't have to comply with U.S. subpoenas.

By 2016, the registry board had raised Papamechail's sex offender status to the highest level, indicating what the board considers "a high degree of danger to the public." Papamechail's listing, including a photo, appeared on the registry's public website, where it remains today. The

App. 262

Massachusetts board declined to comment on Papamechail's sex offender history, citing state laws.

"He's going to do it over and over again," said Dunphy, who has a lifetime restraining order barring Papamechail from contacting or abusing her. In the winter of 2016, she remembers seeing him back on PlentyofFish, which by then was owned by Match Group.

Ten months later, the Peabody detective responded to the 911 call at Papamechail's house. Deveau reported he had raped her in a follow-up interview. "She did not tell police on the date of the incident because she stated she was afraid and she wanted to leave," court records note. By January 2018, a grand jury had found enough evidence to indict him for rape. Papamechail pleaded not guilty. He told police that he and Deveau had been in an off-and-on sexual relationship. He maintained that he didn't try to have sex with Deveau, and that she "woke up abruptly and was screaming at him, calling him a sex offender and a rapist," the police report states.

In a February 2018 decision ordering his temporary detention as a "habitual offender," Superior Court Judge Timothy Feeley ruled that Papamechail's "propensity for sexual violence against women is uncontrollable." The judge found that "even house arrest would not in this court's view protect future potential victims of Papamechail's sexual violence." One of the reasons Feeley cited was Papamechail's online activities.

---

Papamechail stands out among the convicted and alleged perpetrators in CJI's data. Most dating app users accused of assaulting another user weren't registered sex offenders at the time. Some had past sex crime convictions. Others were subjects of prior police complaints. But most of the time checking users' criminal backgrounds alone would not have prevented the problem, the analysis found.

Match Group presents its rapid abuse reporting system as crucial for protecting customers from sexual assault. "Our brands also depend on our users to report any profiles engaged in concerning behavior so that we can investigate and take appropriate action," the company states on its website. Any user can log a complaint online or through its apps. Moderators and security agents try to identify the accused user and block his account, according to the company. They check across platforms for other associated accounts.

"If there's bad behavior on one app," Match Group CEO Ginsberg has said, describing the company's response protocols, "we can identify that user, we'll kick him off all the apps."

App. 263

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 268 of 451    PageID 791

But some users who reported their rape claims to the company describe a different outcome. Brittney Westphal, 31, who lives outside Aspen, Colorado, said she informed Tinder in 2015 that another user had raped her on their first date. She asked the dating app how she could get a record of her conversations with the accused when he "unmatched" her — which instantly deletes the history of communication between two users — leaving her unable to give his information or a record of their conversations to police.

Tinder never replied, she said, and local authorities declined to press charges. "I made it clear to them [Tinder] like how serious this was," Westphal said, "and then I never heard anything." Within months, she said she spotted her alleged attacker on the app again.

A Utah college student, Madeline MacDonald, told Tinder in a December 2014 email that she "was sexually assaulted (or something very similar)," records show. She provided the app with pertinent information, including the accused's name, age and physical description. The next day, their email correspondence shows, a Tinder employee asked for screen shots of his app profile, adding that a link to the accused's Facebook profile "could help as well." MacDonald offered screenshots of his Facebook page, which included his employer, town, high school and phone number. An employee responded by asking for a link to the Facebook page. MacDonald said she gave up. Eventually, she said she saw her alleged assailant back on Tinder.

Three years later, according to Dixie State University Police Chief Blair Barfuss, a detective in his unit informed MacDonald that the man she had accused had allegedly assaulted three other women he met through dating apps. Two were Match Group platforms.

And then there's Kerry Gaude, 31, of Golden, Colorado, whose experience after Michael Miller raped her on their first date illustrates the shortcomings of Match Group's protocols. When OkCupid matched the two in May 2014, Miller, then 28 and using the handle mike22486, was not yet a registered sex offender. Two women who had met him online told police he sexually assaulted them, but their claims didn't lead to criminal charges. Gaude reported her rape to police, and then she emailed OkCupid and PlentyofFish. She remembers warning the platforms that a rapist was using their services to meet women.

App. 264

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 269 of 451    PageID 792

*Kerry Gaude was raped by Michael Miller after the two met on OkCupid. Miller pleaded guilty to sexual exploitation and assault charges. Gaude said she frequently saw Miller on OkCupid after the sentencing. (Rachel Woolf for ProPublica)*

The following year, Miller pleaded guilty to sexual exploitation and assault charges stemming from Gaude's claim. He got 10 years' probation with sex offender stipulations prohibiting him from using "any applications to communicate with women in any way about sex," court records state. He also appeared on the state's public sex offender registry two days after his sentencing in May 2015, state officials confirm.

Yet Gaude said she frequently saw Miller on OkCupid after the sentencing. Within three months, in fact, he was charged with probation violations after admitting to using an unapproved cellphone to access the app, records show. The violations put him in a Cañon City, Colorado, prison for four years.

During the proceedings, Gaude went on local TV and warned people that Miller could victimize other OkCupid users.

Three women contacted police about their exchanges with Miller on the dating app throughout 2015. Police records show one 25-year-old got a message on OkCupid from a man with the handle lucky4me123. On his profile, the man presented himself as an "independent yet naturally caring" person who lived alone and hoped to "find that special someone." He was, OKCupid said, a "67% match" in compatibility for the woman. She recognized Miller's mugshot from a news article about Gaude's warnings.

By then, Miller had been listed in the state's online sex offender database for almost seven months. The Colorado bureau that administers the registry had no record of Match Group employees requesting information about individuals on its offender list during this time. A Match Group spokesperson confirms OkCupid never checked his registry status.

App. 265

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 270 of 451    PageID 793

"It's the after the fact that bothers me," Gaude said of Miller's ability to keep using OkCupid. "How is that not aiding and abetting?"

Match Group's spokesperson said the company uses "industry-leading automated and manual moderation and review tools," and spends millions every year to "prevent, monitor and remove people who engage in inappropriate behavior from our apps."

Several former OkCupid employees familiar with the company's complaint process say it is easy for banned individuals, like Miller, to get back on the app. The company's moderators adopt a general "ban first" mentality for any accused user, the employees said, but once blocked, they have little ability to stop the accused from using different identifying information, or signing up for new accounts. Some say they complained about this issue to OkCupid supervisors, only to be ignored. Others say they found themselves searching public offender lists on their own.

Match Group, for its part, declined to comment.

Miller didn't respond to repeated interview requests, and nobody answered the door when a CJI reporter visited his house. While on probation, Miller wrote to one woman on OkCupid, apologizing for his crime and pleading for "the opportunity to prove myself that im not a bad indiviual."

Now on parole, he is subject to intensive supervision. One condition prohibits him from using online dating sites.

---

Some time after Deveau had reported her rape allegation to police, her daughter, Jackie, remembers being on a lunch break when she got a phone call from the assistant district attorney handling the Papamechail criminal case. Her mother had returned to drinking by then, Jackie said, and shut herself off from family.

Jackie knew her mother had experienced something bad with a date, but she didn't know anything more until a prosecutor told her. She recalls hearing Papamechail's litany of sex crime convictions. Still on the phone, Jackie looked him up on the internet and scrolled through news articles on Dunphy's case. She learned about his registry status. "It was just horrifying," Jackie said.

Jackie dialed her mother right away. Deveau sounded drunk and incoherent, so Jackie didn't broach the criminal case. Her mother's behavior seemed to be unraveling from the ordeal, Jackie said.

In April 2018, Jackie got another phone call about her mother. This time, she learned Deveau was in the hospital, admitted after a drinking binge,

App. 266

her vitals unstable. Jackie arrived at the hospital; within days, doctors were putting her mother on life support.

Deveau died on April 27, 2018, from "acute kidney failure," her death certificate states.

By May, the Middlesex County District Attorney's Office was forced to drop the criminal case it was building against Papamechail. It filed a formal notice ceasing prosecution on two counts of rape, citing Deveau's death. "Without the testimony of the alleged victim in this sexual assault case," it stated in its filing, "the Commonwealth is unable to meet its burden at trial to prove the defendant guilty beyond reasonable doubt."

Papamechail was released from jail again but remained on the state's registry. Once again, he would be spotted on a Match Group app.

---

When Jackie learned her mother had met Papamechail through PlentyofFish, she considered suing. The dating app could have prevented what happened, she said, especially considering "how severe he is as a sex offender." Intimidated by the well-resourced company, she never did file a civil lawsuit.

Even if Jackie had gone to court, though, the Communications Decency Act would have rendered legal action practically futile. The act, passed in 1996, when internet companies were nascent and viewed as needing protection, contains a provision, known as CDA Section 230, that was originally intended to protect websites from being held liable for their users' speech.

Companies, including Match Group, have successfully invoked CDA 230 to shield themselves from liability in incidents involving users harmed by other users, including victims of sexual assault. Internet regulation experts say the measure effectively allows online dating companies to avoid legal repercussions. In the few civil suits accusing Match Group platforms of negligence for online dating sexual assaults, its lawyers have cited CDA 230 to try to dismiss nearly every one, records show.

Olivier Sylvain, a Fordham University law professor who specializes in the ethics of media and technology, believes judges have been so overly generous in interpreting CDA 230 that they dismiss cases before an aggrieved party can even obtain information about the company's response. "That speaks to how these companies are held unaccountable," he said.

Only one civil suit, filed against Match in an Illinois county courthouse in 2011, has gotten around CDA 230. The case ended in an undisclosed settlement in April 2016. Over its five-year history, it pried open internal

App. 267

Case 3:19-cv-02356-S     Document 39     Filed 06/12/20     Page 272 of 451     PageID 795

Match documents shedding light on how the site has handled online dating sexual assault.



*Nicole Xu, special to ProPublica*

The case dates back to December 2009, when Match connected Ryan Logan, then 33, a Chicago technology consultant, with a 31-year-old baker identified as Jane Doe. The woman, whose name has never been made public, asked to remain anonymous for this article. She told police Logan had raped her on their first date, spurring a chain of events that would lead him to be convicted of sexual assault in 2011. Around the time of his criminal trial, she learned another woman had previously accused Logan of rape and had alerted Match.

Logan "proceeded to date rape me," the woman wrote the site in a 2007 complaint. She warned Match he could use its service to attack others.

Logan didn't respond to multiple requests for comment for this article. Currently an Illinois registered sex offender, he was ordered to pay more than $6 million in damages to Doe as a result of her civil suit. The judge in his criminal case barred Logan from using online dating services.

Company documents obtained during the discovery process show Match's customer service team treated the sex assault complaint as it would any other at the time: It sent the complaint to a security agent, who created an incident case file. But Match's response ended there. "The employee who was to handle the case did not follow internal procedure and closed the case without taking action," the documents state. The site didn't take down Logan's profile at the time, nor did it acknowledge the woman's complaint.

App. 268

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 273 of 451    PageID 796

During the civil proceedings, Match attempted to dismiss the negligence claims, citing CDA 230. In December 2013 — a year after it promised to implement registry screenings and response protocols — the dating site used the law to argue against any obligation to remove users who become subjects of sex assault complaints.

"Whatever Match does, whether they leave the profile on or take it off, even if they had knowledge, is a protected act," James Gardner, its lawyer, claimed in court. He maintained the site shouldn't be responsible for taking action against accused users even if it failed to remove a user after being warned about him. "Why shouldn't they be responsible for that?" Gardner asked rhetorically. "The law says they are not. And the reason the law says they are not is because we understand that the larger purpose of internet commerce is more important."

Circuit Court Judge Moira Johnson rejected that argument, finding "the allegations do not support conduct that is immune" under CDA 230, which covers third-party content, a hearing transcript states.

Discovery documents offered a rare window into Match's response system. As of November 2007, court filings show, the site was keeping track of users accused of sexual assault in a spreadsheet detailing their identification numbers, handles and full names. The site handed over nearly 1,300 complaints of physical and sexual violence filed by users against other users during the two years preceding Doe's rape. The judge ruled the spreadsheet's contents could be redacted and the complaints sealed, making it impossible to glean whether or not Match could identify repeat offenders among its subscribers and, if so, how it responded.

Match Group declined to comment on the redacted spreadsheet's numbers, or to release its own numbers of sex assault complaints filed with its apps.

Doe thought Match executives would be outraged that an accused rapist had been allowed back on their site, she said, but she soon learned otherwise. The site discouraged her from speaking publicly about her case, and it has yet to implement her policy recommendation for a user assault hotline. The Match Group spokesperson notes the company's safety pages list support services for sex assault victims. But the company doesn't sponsor its own hotline for its users.

Its lawyers pointed out in court records that Match's "common sense recommendations" for offline user conduct advise never meeting in a private location. "We're not going to say, 'Oh my gosh, it was her fault that he raped her," Gardner said during a hearing, "but she has to take some responsibility."

Doe still tears up when she remembers how Match treated her in court. "You are not a victim," she told CJI. "You are enemy No. 1."

App. 269

Janine Dunphy had learned, through a local newspaper article in early 2018, that Papamechail had allegedly assaulted another woman whom he met through a dating app. Then, in May last year, Dunphy got a phone call from an assistant district attorney, the same one who had handled the case involving Papamechail and Dunphy. "I have some really bad news," she recalls the prosecutor saying. The woman had died. The rape charges had been dropped.

The news sent Dunphy on a quest to find Papamechail on PlentyofFish. She had made fake profiles to try to track him down on the platform before. She created a male profile once and posted some of his photos alongside warnings of his sex-offender status to see if the website would react. Another time she used a fake female profile without pictures to see if the app would connect them. Sometimes, she searched for his dating profiles for hours.

"I lost so much of my life," said Dunphy, whose health has deteriorated in the years since her rape claim. Doctors have diagnosed her with blood clots from stress, therapists have treated her for post-traumatic stress disorder. Of her Papamechail date, she said, "It's in my head every day."



*Dunphy said she continued to see Papamechail on PlentyofFish until she stopped searching last fall. (Sarah Rice, special to ProPublica)*

Dunphy recalls finding his profile on PlentyofFish less than a month after she had heard about Deveau's death. She recognized Papamechail's pictures — a photo of himself in a car, another of an orange cat. His username was Deadbolt56. He described himself as a "coffee snob." She took screenshots of his profile, she said, and notified PlentyofFish. She never heard back.

Match Group would not confirm or deny whether PlentyofFish ever received a complaint about Papamechail. Its spokesperson said the company's team of security agents removed him from its platforms more than a year ago — around the time Dunphy would have filed her complaint — but didn't answer questions about why he was barred, how many times he's been barred or how often he's gotten back on the apps. According to Match Group, there are no accounts associated with Papamechail on its platforms.

App. 270

Dunphy said she continued to see him on PlentyofFish until she stopped searching last fall. She got tired of trying to keep Papamechail off the site, she says. She felt like she was doing the work the app should've been doing.

---

Over the past 15 years, as online dating has emerged as the most popular matchmaker among Americans, state legislators have tried to address its potential for real-world harm. The earliest proposals would have required platforms to conduct full background checks. But since online dating companies do business nationwide, and only the federal government can regulate interstate operations, they went nowhere.

State lawmakers then took a different tack and pushed to mandate that apps disclose whether or not they conduct background checks. These laws, typically enforced by state attorneys general or consumer affairs departments, fine companies if they don't disclose. These measures explain why Match Group platforms adopted the no-check warnings buried in their Terms of Use in the first place.

In 2005, legislators — from Virginia to California, and Michigan to Florida — were debating disclosure bills championed by True.com. Vest, True's founder, considered the company's legislative campaign a form of marketing that would inspire brand loyalty. Generally opposed to government intervention, he saw an exception in this case. "We have a legislative branch intended to protect the citizenry," Vest said.

Among the most vocal critics of the bills was Match. In Michigan, for example, Marshall Dye, then assistant general counsel for the website, testified at a hearing on that state's bill. Match opposed the bill, Dye testified, on the grounds that it would give users a false sense of security. Consumers might assume that everyone on the platform had a spotless record, she argued. But no one convicted of a crime would give his real name. (Dye declined a request to comment on her testimony.)

"It's just a buyer beware statement," said Alan Cropsey, a Michigan state senator at the time who sponsored the failed bill because he figured industry support would be a no-brainer. Of the platforms, he said, "They don't want the buyer to beware."

New Jersey became the first state in 2008 to pass an online dating disclosure statute, which also required the platforms to publish safety tips — such as "Tell friends and family about your plans," and "Meet in public and stay in public." Legislatures in Illinois, New York and Texas soon followed suit. At times, Match lobbyists led the industry opposition in the debates.

App. 271

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 276 of 451    PageID 799

Match Group didn't soften its stance until 2017, when the company helped to push a measure that would lead to California's first — albeit limited — online dating rules. State lawmakers say the #MeToo movement's momentum drove passage of provisions that require dating platforms to offer California users the same safety tips and reporting processes already required elsewhere. The regulations don't mandate any form of background check.

Today, just five states have regulations aimed at improving online dating customer safety. Records requests filed in those states have yielded hundreds of complaints about the industry involving contract disputes or romance scams. None involve online dating sexual assault. No state regulators have taken action against a platform for violating disclosure rules.

Former Texas State Sen. Leticia Van de Putte, who sponsored that state's 2011 legislation, said states can only do so much to protect dating app users. "We really do need to have some sort of national framework," she said.

---

Last May, Jackie sat in a conference room at her employer's office in Portland, Maine, taking in a photograph of Deveau. It was three weeks after the first anniversary of her mother's death, and her grief was palpable. "I need my Mom more than anything," she wrote on her Facebook page weeks earlier. The photograph in her hand depicts Jackie as an infant, sitting in Deveau's lap. Jackie, sucking on her mother's finger, wears an oversized floppy pink hat. Deveau wears a wide grin.

Jackie remembers small moments growing up with her mother: a look the two would share when a snack craving overcame them. Deveau would drive Jackie to a local convenience store to order big salted pretzels. Or the pool parties her mother hosted at their home, where she always put out a good spread and welcomed everyone with open arms.

Deveau spoke constantly on the phone with Jackie as an adult — until she stopped.

Jackie wore a V-neck striped shirt, a tattoo peeking out from underneath. It depicts the jagged line of a heart monitor before Deveau's last heartbeat. Jackie got it etched over her own heart to commemorate her mother.

Reflecting on her mother's last months, Jackie portrayed Deveau like so many women who use online dating apps: vulnerable, at risk of assault. She doubted Deveau would have thought about registry screenings and response protocols. She finds it "disgusting" that online dating companies like Match Group would expect its female users to check sex offender lists themselves.

App. 272

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 277 of 451    PageID 800

They may be looking for the man of their dreams on these dating apps, Jackie said, but they "can't do that if these predators are on there."

## Share Your Story

**Name** *

**Email** *

**What would you like to tell us about?** *

○ I used a dating service and have a story to tell.

○ I have a story from a friend or family member who used a dating service.

○ I am or was an employee or contractor for Match or another dating service.

○ I work in law or law enforcement and have insight into how such reports are handled.

○ Other

**Do you have documents (emails, PowerPoint presentations, memos, spreadsheets, etc.) that highlight what you're sharing with us? If so, we would love to see them. You can upload them here or get in touch with us at datingapps@propublica.org**

**UPLOAD A FILE**

**State of residence**

Alabama

**City or town of residence**

**Thanks so much for your help. The more examples we can verify, the better our reporting will be. We hope to compile enough examples to potentially share with dating app companies, in order to to bring any patterns we find to their attention. If that happens, can we use your story in our dataset with identifying information redacted?**

○ Yes

○ No

○ Please talk to me first

App. 273

**OUR COMMITMENT TO YOUR PRIVACY**

We appreciate you sharing your story and we take your privacy seriously. We are gathering these stories for the purposes of our reporting, and will not share your information with third-parties without your express permission.

NOTE: A journalist in our reporting network may be in touch with further questions.

---

**We may have follow-up questions. What's the best way to reach you?**

☐ Email

☐ Phone

☐ Either email or phone

☐ Other

*Select all that apply*

**What time of day tends to work best for you?**

☐ Morning

☐ Afternoon

☐ Evening

☐ It doesn't matter

☐ Other

*Select all that apply*

**SPREAD THE WORD.**

Thank you for sharing with us. Help us reach as many people as possible in order to better understand this topic.

---

**How did you find this form? I saw it on/in:**

☐ ProPublica

☐ Columbia Journalism School newsletter or social media

☐ Buzzfeed News

☐ Facebook

☐ Twitter

☐ Reddit

☐ Instagram

App. 274

Case 3:19-cv-02356-S　　Document 39　　Filed 06/12/20　　　Page 279 of 451　　　PageID 802

☐ Someone sent it to me directly

☐ An article

☐ A ProPublica newsletter

☐ Another forum, newsletter, blog, group I subscribe to

☐ Other

**Do you have ideas for getting the word out? Who else should we talk to?**

**Do you want to be notified when ProPublica publishes big investigations?** *

◉ Yes

◯ No

Saved　　　　　　　　　　　　　　　　　　　　**SUBMIT**

*Powered by <u>Screendoor</u>.*

## Methodology

Columbia Journalism Investigations worked with subject matter experts primarily at Columbia University — from public health researchers to sociologists and statisticians — to craft and vet our questionnaire for dating app users. No government agency in the United States has data on online dating sexual violence, and the questionnaire was meant to initiate a larger reporting effort, bringing us leads and directions to follow. It is not a formal survey. Respondents were not selected at random from a population but instead volunteered to fill in the questionnaire. For that reason, we do not claim that our results represent the general experience of dating app users.

We relied on the online survey platform Amazon Mechanical Turk (MTurk) to distribute an initial questionnaire to identify women living in the U.S. who had used an online dating site over the past 15 years. Some researchers have used this platform to ask participants — who receive compensation for their time — about traumatic events and experiences. Following MTurk's guidelines, we made our questionnaire available to

App. 275

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 280 of 451    PageID 803

potential respondents in all regions of the country, and we screened out anyone who had a poor record of taking questionnaires.

In all, 2,151 women responded to the initial questions establishing that they live in the U.S. and have used dating apps. Of these, 1,244 volunteered to complete our full questionnaire. Our questions included general inquiries into demographic information, online dating experiences and consensual sexual behavior. Respondents also answered five questions meant to describe acts of sexual assault and rape. These questions, developed in consultation with our experts, followed professional standards for sexual violence surveys. We eliminated results that could be classified as "bad data," such as those from people who started but did not finish the questionnaire.

Overall, 31% of the women in the survey reported being sexually assaulted or raped by someone they had met through an online dating site.

Our database of incidents of sexual assault involving online dating platforms was created from a web scrape of a decade of news reports and civil lawsuits that CJI reporters vetted and analyzed. Most of the 157 cases took place during the past five years. We then corroborated these cases through court and police records, as well as interviews with officials and additional media reports.

---

*We want to learn more about what actions dating platforms are and are not taking when users report episodes of sexual violence. We need to collect as many stories as possible for further reporting.*

*If you or someone you know has reported an incident to Match, OKCupid, Tinder, or any other dating app, please fill out our confidential survey.*

*If you or someone you care about has been affected by sexual assault and would like confidential help and support, please call the National Sexual Assault Hotline at 800-656-4673 to talk to a trained staff member from a nearby sexual assault service provider.*

*Hillary Flynn, Keith Cousins and Elizabeth Naismith Picciani are reporting fellows for Columbia Journalism Investigations, an investigative reporting unit at the Columbia Journalism School. CJI research assistant Andrea Salcedo contributed reporting to this story. Funding for CJI is provided by the school's Investigative Reporting Resource and the Stabile Center for Investigative Journalism.*

App. 276

# Exhibit 5

As filed with the Securities and Exchange Commission on February 27, 2020

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☑   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2019**

**Or**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from_____to_____

**Commission File No. 001-37636**

## matchgroup
# Match Group, Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **26-4278917** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**8750 North Central Expressway, Suite 1400, Dallas, Texas 75231**
(Address of Registrant's principal executive offices and zip code)

**(214) 576-9352**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading Symbol** | **Name of exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.001 | MTCH | The Nasdaq Global Market LLC |
| | | (Nasdaq Global Select Market) |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☑ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |
|---|---|---|---|---|

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

As of January 31, 2020, the following shares of the Registrant's Common Stock were outstanding:

| | |
|---|---:|
| Common Stock | 72,834,065 |
| Class B Common Stock | 209,919,402 |
| Class C Common Stock | — |
| Total | 282,753,467 |

The aggregate market value of the voting common stock held by non-affiliates of the registrant as of June 28, 2019 was $3,657,298,765. For the purpose of the foregoing calculation only, shares held by IAC/InterActiveCorp and all directors and executive officers of the registrant are assumed to be affiliates of the registrant.

**Documents Incorporated By Reference:**

App. 278

Case 3:19-cv-02356-S Document 39 Filed 06/12/20 Page 283 of 451 PageID 806

Portions of Part III of this Annual Report are incorporated by reference to the Registrant's proxy statement for its 2020 Annual Meeting of Stockholders or will be provided in an amendment filed on Form 10-K/A.

App. 279

# TABLE OF CONTENTS

|  |  | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 34 |
| Item 3. | Legal Proceedings | 34 |
| Item 4. | Mine Safety Disclosure | 37 |
| **PART II** | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 38 |
| Item 6. | Selected Financial Data | 40 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 59 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 60 |
|  | Note 1—Organization | 69 |
|  | Note 2—Summary of Significant Accounting Policies | 70 |
|  | Note 3—Income Taxes | 77 |
|  | Note 4—Discontinued Operations | 81 |
|  | Note 5—Goodwill and Intangible Assets | 82 |
|  | Note 6—Financial Instruments | 83 |
|  | Note 7—Long-term Debt, net | 85 |
|  | Note 8—Shareholders' Equity | 87 |
|  | Note 9—Accumulated Other Comprehensive Loss | 89 |
|  | Note 10—Earnings per Share | 90 |
|  | Note 11—Stock-based Compensation | 91 |
|  | Note 12—Geographic Information | 95 |
|  | Note 13—Leases | 95 |
|  | Note 14—Commitments and Contingencies | 97 |
|  | Note 15—Supplemental Cash Flow Information | 99 |
|  | Note 16—Related Party Transactions | 99 |
|  | Note 17—Benefit Plans | 101 |
|  | Note 18—Consolidated Financial Statement Details | 101 |
|  | Note 19—Quarterly Results (Unaudited) | 103 |
|  | Note 20—Subsequent Events | 103 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 105 |
| Item 9A. | Controls and Procedures | 105 |
| Item 9B. | Other Information | 107 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 108 |
| Item 11. | Executive Compensation | 108 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 108 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 108 |
| Item 14. | Principal Accounting Fees and Services | 108 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 109 |
| Item 16. | Form 10-K Summary | 109 |

App. 280

https://www.sec.gov/Archives/edgar/data/1575189/000157518920000018/mtch-20191231.htm     3/144

Table of Contents

**PART I**

### Item 1. Business

#### Who we are

Match Group, Inc., through its portfolio companies, is a leading provider of dating products available globally. Our portfolio of brands includes Tinder®, Match®, Meetic®, OkCupid®, Hinge®, Pairs™, PlentyOfFish®, and OurTime®, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio companies and their trusted brands, we provide tailored products to meet the varying preferences of our users. Our products are available in over 40 languages to our users all over the world.

As used herein, "Match Group," the "Company," "we," "our," "us," and similar terms refer to Match Group, Inc. and its subsidiaries, unless the context indicates otherwise.

Consumers' dating preferences vary significantly, influenced in part by demographics, geography, cultural norms, religion, and intent (for example, casual dating or more serious relationships). As a result, the market for dating products is fragmented, and no single product has been able to effectively serve the dating category as a whole.

Given these varying consumer preferences, we have adopted a brand portfolio approach, through which we attempt to offer dating products that collectively appeal to the broadest spectrum of consumers. We believe that this approach maximizes our ability to capture additional users. We work to apply a centralized discipline to our collection of brands, by sharing best practices and technologies across our brands in order to increase growth, reduce costs, improve user safety, and maximize profitability. Additionally, we centralize certain other administrative functions, such as legal, trust and safety, human resources, accounting, finance, and tax. This approach allows us to quickly introduce new products and features, optimize marketing strategies, and more effectively deploy talent across our organization.

#### Enabling dating in a digital world

Prior to the proliferation of mobile devices and computers, human connections traditionally were limited by social circles, geography, and time. People met through work colleagues, friends and family, in school, at church, or in bars and restaurants. Today, the adoption of mobile technology and the internet has significantly expanded the ways in which people can build relationships, create new interactions, and develop romantic connections. Additionally, the ongoing adoption of technology into more aspects of daily life continues to further erode biases and stigmas across the world that previously prevented individuals from using technology to help find and develop those connections.

We believe that dating products serve as a natural extension of the traditional means of meeting people and provide a number of benefits for their users, including:

- *Expanded options*: Dating products provide users access to a large number of people they otherwise would not have a chance to meet.

- *Efficiency*: The search and matching features, as well as the profile information available on dating products, allow users to filter a large number of options in a short period of time, increasing the likelihood that users will make a connection with someone.

- *More comfort and control*: Compared to the traditional ways that people meet, dating products provide an environment that reduces the awkwardness around the process of reaching out to new people. This leads to many people who would otherwise be passive participants in the dating process taking a more active role.

- *Convenience*: The nature of the internet and the proliferation of mobile devices allow users to connect with new people at any time, regardless of where they are.

3

Table of Contents

Depending on a person's circumstances at any given time, dating products can act as a supplement to, or substitute for, traditional means of meeting people. When selecting a dating product, we believe that users consider the following attributes:

- *Brand recognition*: Brand is very important. Users generally associate strong dating brands with a higher likelihood of success and a higher level of safety and security. Generally, successful dating brands depend on large, active communities of users, strong algorithmic filtering technology, and awareness of successful usage among similar users.

- *Successful experiences*: Demonstrated success of other users attracts new users through word-of-mouth recommendations. Successful experiences also drive repeat usage.

- *Community identification*: Users typically look for dating products that offer a community or communities with which the user can associate. By selecting a dating product that is focused on a particular demographic, religion, geography, or intent, users can increase the likelihood that they will make a connection with someone with whom they identify.

- *Product features and user experience*: Users tend to gravitate towards dating products that offer features and user experiences that resonate with them, such as question-based matching algorithms, location-based features, offline events, or search capabilities. User experience is also driven by the type of user interface (for example, using a Swipe® gesture versus scrolling), a particular mix of free and paid features, ease of use, privacy, and security. Users expect every interaction with a dating product to be seamless and intuitive.

**Our portfolio**

Dating is a highly personal endeavor and consumers have a wide variety of preferences that determine what type of dating product they choose. As a result, our strategy focuses on a portfolio approach of various brands in order to reach a broad range of users. The following is a list of our key brands:

*Tinder.* Tinder was launched in 2012 and has since risen to scale and popularity faster than any other product in the online dating category, growing to over 5.9 million average subscribers as of the fourth quarter of 2019. Tinder's distinctive Swipe feature has led to significant adoption, particularly among the millennial and younger generations, which was previously underserved by the online dating category. Tinder employs a freemium model, through which users are allowed to enjoy many of the core features of Tinder for free, including limited use of the Swipe Right® feature with unlimited communication with other users. However, to enjoy premium features, such as unlimited use of the Swipe Right feature, a Tinder user must subscribe to either Tinder Plus®, launched in early 2015, or Tinder Gold™, which was launched in late summer 2017. Tinder users and subscribers may also pay for certain premium features, such as Super Likes™ and Boosts, on a pay-per-use basis.

*Match.* Match was launched in 1995 and helped create the online dating category. Among its distinguishing features are the ability to search profiles, receive algorithmic matches, and attend live events, promoted by Match, with other Subscribers. Additionally, Match offers its customers a higher level of service than most other brands, including access to date coaching services. Match is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Match relies heavily on word-of-mouth traffic, repeat usage, and paid marketing.

*Meetic.* Meetic, a leading European online dating brand based in France, was launched in 2001. Similar to Match, among its distinguishing features are the ability to search profiles, receive algorithmic matches, and attend live events, promoted by Meetic, with other Subscribers and non-Subscribers from time to time. Also, similar to Match, Meetic is a brand that focuses on users with a higher level of intent to enter into a relationship and its product and marketing are designed to reinforce that approach. Meetic relies heavily on word-of-mouth traffic, repeat usage, and paid marketing.

*OkCupid.* OkCupid was launched in 2004 and has attracted users through Q&A approach to the dating category. Similar to Tinder, OkCupid relies on a freemium model. OkCupid has a loyal, highly educated user base predominately located in major cities in the United States and the United Kingdom, with an increasing presence in other global markets such as India.

4

App. 282

*Hinge.* Hinge was launched in 2012 and has grown to be a popular app for the relationship-minded, particularly among the millennial and younger generations, in the United States and the United Kingdom. Following a series of primary investments, Match Group took a controlling stake in Hinge in June 2018 and purchased all of the remaining outstanding equity in December 2018. Hinge is a mobile-only experience and employs a freemium model. Hinge focuses on users with a higher level of intent to enter into a relationship and its product is designed to reinforce that approach.

*Pairs.* Pairs was launched in 2012 and is a leading provider of dating products in Japan, with a presence in Taiwan and South Korea. Pairs is a dating app that was specifically designed to address social barriers generally associated with the use of dating products in Eastern Asian countries, particularly Japan.

*PlentyOfFish.* PlentyOfFish was launched in 2003. Similar to Match, among its distinguishing features is the ability to both search profiles and receive algorithmic matches. Similar to Tinder, PlentyOfFish has grown in popularity over the years and relies on a freemium model. PlentyOfFish has broad appeal in the central United States, Canada, the United Kingdom, and a number of other international markets.

*OurTime.* OurTime is the largest community of singles over age 50 of any dating product. We offer this product in the United States and a number of European markets.

All our products enable users to establish a profile and review other users' profiles without charge. Each product also offers additional features, some of which are free, and some of which require payment depending on the particular product. In general, access to premium features requires a subscription, which is typically offered in packages (primarily ranging from one month to six months), depending on the product and circumstance. Prices differ meaningfully within a given brand by the duration of a subscription purchased, the bundle of paid features that a user chooses to access, and whether or not a Subscriber is taking advantage of any special offers. In addition to subscriptions, many of our products offer the user certain features, such as the ability to promote themselves for a given period of time, or to review certain profiles without any signaling to the other users, and these features are offered on a pay-per-use, or à la carte, basis. The precise mix of paid and premium features is established over time on a brand-by-brand basis and is constantly subject to iteration and evolution.

The brands in our portfolio both compete and collaborate with each other. We attempt to empower individual brand leaders with the authority and incentives to grow their respective brand. Our brands compete with each other and with third-party dating businesses on brand characteristics, product features, and business model. We also attempt to centrally facilitate excellence and efficiency across the entire portfolio by:

- centralizing operational functions across certain brands where we have strength in personnel and sufficient commonality of business interest (for example, ad sales, online marketing, and technology centralized across some, but not all, brands);

- developing talent across the portfolio to allow for expertise development and career advancement while giving us the ability to deploy the best talent in the most critical positions across the company at any given time;

- sharing analytics and similar data to leverage product and marketing successes across our businesses rapidly for competitive advantage; and

- centralizing certain administrative functions, like legal, trust and safety, privacy, human resources, accounting, and finance, across the entire portfolio to enable each brand to focus more on growth.

**Revenue**

Our direct revenue is primarily derived from users in the form of recurring subscriptions, which typically provide unlimited access to a bundle of features for a specific period of time, and the balance from à la carte features, where users pay a non-recurring fee for a specific benefit or feature. Each of our brands offers a combination of free and paid features targeted to its unique community. In addition to direct revenue from our users, we generate indirect revenue from advertising, which makes up a much smaller percentage of our overall revenue as compared to direct revenue.

5

App. 283

Table of Contents

**Sales and marketing**

Certain of our brands attract the majority of their users through word-of-mouth and other free channels. Other brands rely on paid user acquisition for a significant percentage of their users. Our online marketing activities generally consist of purchasing social media advertising, banner, and other display advertising, search engine marketing, email campaigns, video advertising, business development or partnership deals, creating content, and hiring influencers to promote our products. Our offline marketing activities generally consist of television advertising and related public relations efforts.

**Technology**

Consistent with our general operating philosophy, each of our brands tends to develop its own technology systems to support its product, leveraging both open-source and vendor supported software technology. Each of our various brands has dedicated engineering teams responsible for software development and creation of new features to support our products across the full range of devices, from native mobile applications to desktop and mobile-web. Our engineering teams use an agile development process, allowing us to deploy frequent iterative releases of product features.

Brands such as Tinder, Pairs, and Hinge utilize hosted web services, primarily Amazon Web Services, to support their infrastructure. Other brands host through leased data centers located within the general geography served by the brand.

**Competition**

The dating industry is competitive and has no single, dominant brand globally. We compete with a number of other companies that provide similar dating and matchmaking products.

In addition to other online dating brands, we compete with social media platforms and offline dating services, such as in-person matchmakers. Arguably, our biggest competition comes from the traditional ways that people meet each other, and the choices some people make to not utilize dating products or services.

We believe that our ability to compete successfully will depend primarily upon the following factors:

- our ability to continue to increase consumer acceptance and adoption of dating products, particularly in emerging markets and other parts of the world where the stigma is beginning to erode;

- continued growth in internet access and smart phone adoption in certain regions of the world, particularly emerging markets;

- the continued strength of our brands;

- the breadth and depth of our active communities of users relative to those of our competitors;

- our ability to evolve our products and develop new products in response to our competitors' offerings, user requirements, social trends, the ever-evolving technological landscape, and the ever-changing regulatory landscape, in particular, as it relates to the regulation of consumer digital media platforms;

- our ability to efficiently acquire new users for our products;

- our ability to continue to optimize our monetization strategies; and

- the design and functionality of our products.

A large portion of dating customers use multiple products over a given period of time, either concurrently or sequentially, making our broad portfolio of brands a competitive advantage.

**Intellectual property**

We regard our intellectual property rights, including trademarks, domain names and other intellectual property, as critical to our success.

For example, we rely heavily upon the use of trademarks (primarily Tinder, Match, PlentyOfFish, OkCupid, Meetic, OurTime, Pairs, and Hinge, and associated domain names, taglines and logos) to market our products and applications and build and maintain brand loyalty and recognition. We have an ongoing trademark and service

App. 284

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 289 of 451    PageID 812

App. 285

mark registration program, pursuant to which we register our brand names, product names, taglines and logos and renew existing trademark and service mark registrations in the United States and other jurisdictions to the extent we determine it to be necessary or otherwise appropriate and cost-effective. In addition, we have a trademark and service mark monitoring policy pursuant to which we monitor applications filed by third parties to register trademarks and service marks that may be confusingly similar to ours, as well as potential unauthorized use of our material trademarks and service marks. Our enforcement of this policy affords us valuable protection under current laws, rules and regulations. We also reserve and file registrations (to the extent available) and renew existing registrations for domain names that we believe are material to our business.

We also rely upon a combination of in-licensed third-party and proprietary trade secrets, including proprietary algorithms, and upon patented and patent-pending technologies, processes, and features relating to our matching process systems or related features, products, and services with expiration dates from 2023 to 2036. We have an ongoing invention recognition program pursuant to which we apply for patents to the extent we determine it to be core to our product or businesses or otherwise appropriate and cost-effective.

We rely on a combination of internal and external controls, including applicable laws, rules and regulations, and contractual restrictions with employees, contractors, customers, suppliers, affiliates and others, to establish, protect and otherwise control access to our various intellectual property rights.

## Government regulation

We are subject to foreign and domestic laws and regulations that affect companies conducting business on the internet generally, including laws relating to the liability of providers of online services for their operations and the activities of their users. As a result, we could be subject to actions based on negligence, various torts, and trademark and copyright infringement, among other actions. See "Risk factors—Risks relating to our business—Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business" and "—Risks relating to our business—We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties."

Because we receive, store, and use a substantial amount of information received from or generated by our users, we are also impacted by laws and regulations governing privacy; the storage, sharing, use, processing, disclosure, and protection of personal data; and data breaches, primarily in the case of our operations in the United States and the European Union and our handling of personal data of users located in the United States and European Union, respectively. As a result, we could be subject to various private and governmental claims and actions. See "Risk factors—Risks relating to our business—The varying and rapidly-evolving regulatory framework on privacy and data protection across jurisdictions could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business."

As the provider of dating products with a subscription-based element, we are also subject to laws and regulations in certain U.S. states and other countries that apply to our automatically-renewing subscription payment models. Finally, certain U.S. states and certain countries in Asia have laws that specifically govern dating services.

## Employees

As of December 31, 2019, we had approximately 1,700 full-time employees and approximately 100 part-time employees worldwide.

## Additional Information

*Corporate information.* We were incorporated in the State of Delaware on February 12, 2009 as a wholly-owned subsidiary of IAC/InterActiveCorp ("IAC").

*Company website and public filings.* Investors and others should note that we announce material financial and operational information to our investors using our investor relations website at *https://ir.mtch.com*, Securities and Exchange Commission ("SEC") filings, press releases, and public conference calls. We use these channels as well as social media to communicate with our users and the public about our company, our services, and other issues. It is possible that the information we post on social media could be deemed to be material information.

7

App. 286

Table of Contents

Accordingly, investors, the media, and others interested in our company should monitor the social media channels listed on our investor relations website in addition to following our SEC filings, press releases, and public conference calls. Neither the information on our website, nor the information on the website of any Match Group business, is incorporated by reference into this report, or into any other filings with, or into any other information furnished or submitted to, the SEC.

The Company makes available, free of charge through its website, its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K (including related amendments) as soon as reasonably practicable after they have been electronically filed with (or furnished to) the SEC.

*Code of ethics.* The Company's code of ethics applies to all employees (including Match Group's principal executive officer, principal financial officer and principal accounting officer) and directors and is posted on the Company's website at *https://ir.mtch.com* under the heading of "Corporate Governance." This code of ethics complies with Item 406 of SEC Regulation S-K and the rules of The Nasdaq Stock Market LLC. Any changes to the code of ethics that affect the provisions required by Item 406 of Regulation S-K, and any waivers of such provisions of the code of ethics for Match Group's executive officers, senior financial officers or directors, will also be disclosed on Match Group's website.

**Relationship with IAC**

*Relationship prior to Separation*

*Equity ownership and vote.* Match Group has outstanding shares of common stock, with one vote per share, and shares of Class B common stock, with ten votes per share and which are convertible into common stock on a share for share basis. As of January 31, 2020, IAC owned 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock and 18,160,609 shares of common stock. These holdings collectively represent approximately 80.7% of our outstanding shares of capital stock and approximately 97.5% of the combined voting power of our outstanding capital stock.

*Intercompany agreements.* In connection with the initial public offering of our common stock in November 2015, we entered into certain agreements relating to our relationship with IAC after the offering. These agreements include, among others, the six agreements described below.

*Master transaction agreement.* The master transaction agreement sets forth the agreements between us and IAC regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC.

*Investor rights agreement.* Under the investor rights agreement, we are obligated to provide IAC with certain registration and other rights relating to the shares of our common stock held by it and anti-dilution rights.

*Tax sharing agreement.* The tax sharing agreement governs our and IAC's rights, responsibilities, and obligations with respect to tax liabilities and benefits, entitlements to refunds, the preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes.

*Services agreement.* The services agreement currently governs services that IAC has agreed to provide through November 24, 2020, with automatic renewal for successive one-year terms, subject to IAC's continued ownership of a majority of the combined voting power of our voting stock and any subsequent extension or truncation agreed to by us and IAC.

*Employee matters agreement.* The employee matters agreement, as amended, covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of our board of directors, we will no longer participate in IAC's employee benefit plans, but will establish our own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

*Subordinated loan credit facility.* The subordinated loan facility with IAC (the "IAC Subordinated Loan Facility") allowed the Company to make requests to IAC to borrow funds. At December 31, 2019, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility. The IAC Subordinated Loan Facility was terminated February 26, 2020.

App. 287

Table of Contents

For additional information regarding these agreements, see "Note 16—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements."

*Separation*

On December 19, 2019, Match Group and IAC entered into a Transaction Agreement (the "Transaction Agreement") pursuant to which, following the satisfaction of certain closing conditions, including IAC and Match Group stockholder approval, the businesses of Match Group will be separated from the remaining businesses of IAC through a series of transactions (the "Transactions") that will result in two, separate public companies—(1) IAC, which will be re-named "Match Group, Inc." (referred to herein as "New Match") and which will own the businesses of Match Group and certain IAC financing subsidiaries, and (2) IAC Holdings, Inc. (which we refer to as "New IAC"), which will be re-named "IAC/InterActiveCorp" and which will own IAC's other businesses—and the pre-transaction stockholders of Match Group (other than IAC) and of IAC owning shares in New Match (the "Separation"). Completion of the Separation is expected to occur in mid-second quarter of 2020.

Under the terms of the Transaction Agreement, if the closing of the Transactions occurs, Match Group will merge with and into an indirect wholly-owned subsidiary of IAC ("New Match Merger Sub"), with New Match Merger Sub surviving the merger as an indirect wholly-owned subsidiary of New Match. Match Group stockholders (excluding shares owned by IAC, Match Group, or any of their respective wholly owned subsidiaries) will receive, through the merger, in exchange for each outstanding share of Match Group common stock that they hold, one share of New Match common stock and, at the holder's election, either (i) $3.00 in cash or (ii) a fraction of a share of New Match common stock with a value of $3.00 (calculated pursuant to the Transaction Agreement) (an "additional stock election"). In the event the holder fails to make a valid election, the holder will be treated as if such holder made an additional stock election. As a result of the merger and other transactions contemplated by the Transaction Agreement, Match Group stockholders (other than IAC) will become stockholders of New Match, which will hold the businesses of Match Group and certain IAC financing subsidiaries and be separate from the other business of IAC.

Following the Separation, Match Group will be a wholly-owned subsidiary of New Match and New Match will continue to own certain IAC financing subsidiaries that are the issuers of approximately $1.7 billion aggregate principal amount of currently outstanding exchangeable notes. If the Separation is not completed, Match Group will remain a majority-owned subsidiary of IAC, and IAC may pursue other options with respect to its ownership interest in Match Group.

Under the terms of the Transaction Agreement, Match Group has agreed to make a loan (the "Intercompany Loan") to IAC, in an aggregate principal amount equal to the product of $3.00 and the number of shares of Match Group capital stock outstanding immediately prior to the effective time of the Separation. IAC will contribute the proceeds of the loan, less an amount necessary to fund all valid cash elections, to New IAC as part of the closing of the Transactions. Following the Separation, the Intercompany Loan will be the obligation of New Match payable to Match Group and may be eliminated during certain intercompany transactions between New Match and Match Group. In the event that the Separation is not consummated, we do not intend to make the Intercompany Loan.

*Relationship after the Separation*

*Transition services agreement.* At or prior to the closing of the Separation, New Match and New IAC will enter into a transition services agreement, pursuant to which New IAC will provide certain of the services to New Match following the closing that IAC has historically provided to Match Group. New Match will also provide certain services to New IAC following the closing that Match employees are currently providing to IAC. The costs charged to the recipient party of services will generally be determined based on the actual costs incurred by the service provider in providing such services.

*Employee matters agreement.* At or prior to the closing of the Separation, New Match and New IAC will enter into an employee matters agreement, which will cover compensation and benefits matters related to the Separation. Following the Separation, New Match employees will continue to participate in New IAC's U.S. health and welfare plans, 401(k) plan and flexible benefits plan until December 31, 2020 (or such earlier date as requested by New Match upon 120 days' notice), following which time, New Match will have established its own employee benefit plans. New Match will reimburse New IAC for the costs of such participation.

App. 288

*Tax matters agreement.* At or prior to the closing of the Separation, IAC and New IAC will enter into a tax matters agreement pursuant to which, among other things, each of IAC and New IAC will be responsible for certain tax liabilities and obligations following the Separation. Under the tax matters agreement, New IAC generally will be responsible for, and will indemnify New Match against, any liabilities incurred as a result of the failure of the Separation to qualify for the intended tax-free treatment unless, subject to certain exceptions, the failure to so qualify is attributable to Match Group's (or, after the merger, New Match's) actions or failure to act, Match Group's breach of certain representations or covenants or certain acquisitions of equity securities of New Match, in each case, described in the tax matters agreement, (a "Match fault-based action"). If the failure to so qualify is attributable to a Match fault-based action, New Match will be responsible for liabilities incurred as a result of such failure and will indemnify New IAC against such liabilities so incurred by New IAC or its affiliates.

*Contribution Agreement*

On December 19, 2019, in connection with the execution of the Transaction Agreement, TMC Realty, L.L.C. and 8831-8833 Sunset, LLC (each an affiliate of IAC, and together the "Contributors") and Match Group entered into a Contribution Agreement providing for the contribution of 8800 West Sunset Boulevard and 8833 West Sunset Boulevard by the Contributors to two wholly-owned subsidiaries of Match Group (the "Contribution"). On January 31, 2020, the Contributors completed the Contribution for aggregate consideration of 1,378,371 shares of Match Group common stock.

10

Table of Contents

**Item 1A. Risk Factors**

**Cautionary Statement Regarding Forward-Looking Information**

This annual report on Form 10-K contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. The use of words such as "anticipates," "estimates," "expects," "plans" and "believes," among others, generally identify forward-looking statements. These forward-looking statements include, among others, statements relating to: Match Group's future financial performance, Match Group's business prospects and strategy, anticipated trends and prospects in the industries in which Match Group's businesses operate and other similar matters. These forward-looking statements are based on Match Group management's current expectations and assumptions about future events as of the date of this annual report, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict.

Actual results could differ materially from those contained in these forward-looking statements for a variety of reasons, including, among others: the risk factors set forth below. Other unknown or unpredictable factors that could also adversely affect Match Group's business, financial condition and results of operations may arise from time to time. In light of these risks and uncertainties, these forward-looking statements discussed in this annual report may not prove to be accurate. Accordingly, you should not place undue reliance on these forward-looking statements, which only reflect the views of Match Group management as of the date of this annual report. Match Group does not undertake to update these forward-looking statements.

**Risks relating to our business**

***The dating industry is competitive, with low switching costs and a consistent stream of new products and entrants, and innovation by our competitors may disrupt our business.***

The dating industry is competitive, with a consistent stream of new products and entrants. Some of our competitors may enjoy better competitive positions in certain geographical regions, user demographics or other key areas that we currently serve or may serve in the future. These advantages could enable these competitors to offer products that are more appealing to users and potential users than our products or to respond more quickly and/or cost-effectively than us to new or changing opportunities.

In addition, within the dating industry generally, costs for consumers to switch between products are low, and consumers have a propensity to try new approaches to connecting with people and to use multiple dating products at the same time. As a result, new products, entrants and business models are likely to continue to emerge. It is possible that a new product could gain rapid scale at the expense of existing brands through harnessing a new technology or a new or existing distribution channel, creating a new or different approach to connecting people or some other means.

Potential competitors include larger companies that could devote greater resources to the promotion or marketing of their products and services, take advantage of acquisition or other opportunities more readily or develop and expand their products and services more quickly than we do. Potential competitors also include established social media companies that may develop products, features, or services that may compete with ours. For example, Facebook has introduced a dating feature on its platform, which it has rolled out in North America and other markets and has stated it plans to roll out globally. These social media competitors could use strong or dominant positions in one or more markets, and ready access to existing large pools of potential users and personal information regarding those users, to gain competitive advantages over us, including by offering different product features or services that users may prefer or offering their products and services to users at no charge, which may enable them to acquire and engage users at the expense of our user growth or engagement.

If we are not able to compete effectively against our current or future competitors and products that may emerge, the size and level of engagement of our user base may decrease, which could have an adverse effect on our business, financial condition and results of operations.

***The limited operating history of our newer dating brands and products makes it difficult to evaluate our current business and future prospects.***

We seek to tailor each of our dating brands and products to meet the preferences of specific communities of users. Building a given brand or product is generally an iterative process that occurs over a meaningful period of time and involves considerable resources and expenditures. Although certain of our newer brands and products

11

App. 290

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 295 of 451    PageID 818

App. 291

have experienced significant growth over relatively short periods of time, the historical growth rates of these brands and products may not be an indication of future growth rates for such products or our newer brands and products generally. We have encountered, and may continue to encounter, risks and difficulties as we build our newer brands and products. The failure to successfully address these risks and difficulties could adversely affect our business, financial condition and results of operations.

***Each of our dating products monetizes users at different rates. If a meaningful migration of our user base from our higher monetizing dating products to our lower monetizing dating products were to occur, it could adversely affect our business, financial condition and results of operations.***

Our portfolio companies own, operate, and manage a diverse variety of dating products. Each dating product has its own mix of free and paid features designed to optimize the user experience and revenue generation from that product's community of users. In general, the mix of features for the various dating products within our more established brands leads to higher monetization rates per user than the mix of features for the various dating products within our newer brands. Over time, users of our newer brands with lower monetization rates per user comprise an increasingly larger percentage of our user base. If this trend leads to a significant portion of users of our brands with higher monetization rates migrating to our less profitable brands, our business, financial condition and results of operations could be adversely affected. See "Item 7—Management's discussion and analysis of financial condition and results of operations—Management overview—Trends affecting our business."

***Our growth and profitability rely, in part, on our ability to attract and retain users through cost-effective marketing efforts. Any failure in these efforts could adversely affect our business, financial condition and results of operations.***

Attracting and retaining users for certain of our dating products involve considerable expenditures for online and offline marketing. Historically, we have had to increase our marketing expenditures over time in order to attract and retain users and sustain our growth.

Evolving consumer behavior can affect the availability of profitable marketing opportunities. For example, as traditional television viewership declines and as consumers spend more time on mobile devices rather than desktop computers, the reach of many of our traditional advertising channels is contracting. Similarly, as consumers communicate less via email and more via text messaging and other virtual means, the reach of email campaigns designed to attract new and repeat users (and retain current users) for our dating products is adversely impacted. To continue to reach potential users and grow our businesses, we must identify and devote more of our overall marketing expenditures to newer advertising channels, such as mobile and online video platforms, as well as targeted campaigns in which we communicate directly with potential, former and current users via new virtual means. Generally, the opportunities in and sophistication of newer advertising channels are relatively undeveloped and unproven, making it difficult to assess returns on investment associated with such advertising channels, and there can be no assurance that we will be able to continue to appropriately manage and fine-tune our marketing efforts in response to these and other trends in the advertising industry. Any failure to do so could adversely affect our business, financial condition and results of operations.

***Communicating with our users via email is critical to our success, and any erosion in our ability to communicate in this fashion that is not sufficiently replaced by other means could adversely affect our business, financial condition and results of operations.***

Historically, one of our primary means of communicating with our users and keeping them engaged with our products has been via email communication. Our ability to communicate via email enables us to keep our users updated on activity with respect to their profile, present or suggest new or interesting users from the community, invite users to offline events and present discount and promotional offers, among other things. As consumer habits evolve in the era of web-enabled mobile devices and messaging/social networking apps, usage of email, particularly among our younger users, has declined. In addition, deliverability and other restrictions imposed by third party email providers and/or applicable law could limit or prevent our ability to send emails to our users. A continued and significant erosion in our ability to communicate successfully with our users via email could have an adverse impact on user experience, levels of user engagement and the rate at which non-paying users become subscribers.

While we continually work to find new means of communicating and connecting with our users (for example, through push notifications), there is no assurance that such alternative means of communication will be

12

App. 292

as effective as email has been. Any failure to develop or take advantage of new means of communication or limitations on those means of communications imposed by laws, device manufacturers or other sources could have an adverse effect on our business, financial condition and results of operations.

***Foreign currency exchange rate fluctuations could adversely affect our results of operations.***

We operate in various international markets, primarily in various jurisdictions within the European Union and Asia. During the fiscal years ended December 31, 2019 and 2018, 53% and 50% of our total revenues, respectively, were international revenues. We translate international revenues into U.S. dollar-denominated operating results and during periods of a strengthening U.S. dollar, our international revenues will be reduced when translated into U.S. dollars. In addition, as foreign currency exchange rates fluctuate, the translation of our international revenues into U.S. dollar-denominated operating results affects the period-over-period comparability of such results and can result in foreign currency exchange gains and losses.

We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar. Our exposure is primarily related to the Euro, and to a lesser extent, the British Pound ("GBP"). The average GBP and Euro exchange rates strengthened against the U.S. Dollar by 4% and 5%, respectively, in 2019 compared to 2018. See "Item 7A—Quantitative and Qualitative Disclosures About Market Risk—Foreign Currency Exchange Risk."

The departure of the United Kingdom from the European Union, commonly referred to as "Brexit," has caused, and may continue to cause, volatility in currency exchange rates between the U.S. dollar and the GBP and the full impact of Brexit remains uncertain. To the extent that the U.S. dollar strengthens relative to either the Euro, the GBP or both, the translation of our international revenues into U.S. dollars will reduce our U.S. dollar denominated operating results and will affect their period-over-period comparability.

Historically, we have not hedged any foreign currency exposures. The continued growth and expansion of our international operations into new countries increases our exposure to foreign exchange rate fluctuations. Significant foreign exchange rate fluctuations, in the case of one currency or collectively with other currencies, could adversely affect our future results of operations.

***Distribution and marketing of, and access to, our dating products depends, in significant part, on a variety of third-party publishers, platforms and mobile app stores. If these third parties limit, prohibit or otherwise interfere with or change the terms of the distribution, use or marketing of our dating products in any material way, it could adversely affect our business, financial condition and results of operations.***

We market and distribute our dating products (including related mobile applications) through a variety of third-party publishers and distribution channels, including Facebook, which has rolled out its own dating product. Our ability to market our brands on any given property or channel is subject to the policies of the relevant third party. Certain publishers and channels have, from time to time, limited or prohibited advertisements for dating products for a variety of reasons, including poor behavior by other industry participants. There is no assurance that we will not be limited or prohibited from using certain current or prospective marketing channels in the future. If this were to happen in the case of a significant marketing channel and/or for a significant period of time, our business, financial condition and results of operations could be adversely affected.

Additionally, our mobile applications are almost exclusively accessed through the Apple App Store and the Google Play Store. Both Apple and Google have broad discretion to change their respective terms and conditions applicable to the distribution of our applications, including the amount of, and requirement to pay, certain fees associated with purchases facilitated by Apple and Google through our applications, and to interpret their respective terms and conditions in ways that may limit, eliminate or otherwise interfere with our ability to distribute our applications through their stores, the features we provide, the manner in which we market our in-app products, and our ability to access information about our users and subscribers that they collect. Apple or Google could also make changes to their operating systems or payment services that could negatively impact our business. There is no assurance that Apple or Google will not limit, eliminate or otherwise interfere with the distribution of our products, the features we provide, the manner in which we market our in-app products within our applications or through other applications and services, and our ability to access information about our users and subscribers that they collect. To the extent either or both of them do so, our business, financial condition and results of operations could be adversely affected.

13

Table of Contents

Lastly, in the case of Tinder, Hinge, and certain of our other products, many users historically registered for (and logged into) the application exclusively through their Facebook profiles. While we have launched an alternate authentication method that allows users to register for (and log into) Tinder, Hinge, and our other products using their mobile phone number, no assurances can be provided that users will no longer register for (and log into) these products through their Facebook profiles. Facebook has broad discretion to change its terms and conditions applicable to the data collected by its platform and its use thereof and to interpret its terms and conditions in ways that could limit, eliminate or otherwise interfere with our ability to use Facebook as an authentication method or to allow Facebook to use such data to gain a competitive advantage. If Facebook did so, our business, financial condition and results of operations could be adversely affected.

***The success of our products will depend, in part, on our ability to access, collect, and use personal data about our users and subscribers.***

We depend on mobile app stores, in particular, the Apple App Store and Google Play Store, to market, distribute and monetize our mobile applications. Our users and subscribers engage with these platforms directly and may be subject to requirements regarding the use of their payment systems for various transactions. As a result, these platforms may receive personal data about our users and subscribers that we would otherwise receive if we transacted with our users and subscribers directly. These platforms have restricted our access to personal data about our users and subscribers obtained through their platforms. If these platforms continue to limit or increasingly limit, eliminate, or otherwise interfere with our ability to access, collect, and use personal data about our users and subscribers that they have collected, the ability of our products to identify and communicate with a meaningful portion of our users and subscriber bases may be adversely impacted. If so, our customer relationship management efforts, our ability to identify, target, and reach new segments of our user and subscriber bases and the population generally, the efficiency of our paid marketing efforts, the rates we are able to charge advertisers seeking to reach users and subscribers on our various properties, and our ability to identify and exclude users and subscribers whose access would violate applicable terms and conditions, including registered sex offenders, may be negatively impacted. There is no assurance that the mobile app stores upon which we rely will not limit or increasingly limit, eliminate, or otherwise interfere with our ability to access, collect, and use personal data about our users and subscribers that they have collected. To the extent that they do so, our business, financial condition, and results of operations could be adversely affected.

***As the distribution of our dating products through app stores increases, in order to maintain our profit margins, we may need to offset increasing app store fees by decreasing traditional marketing expenditures, increasing user volume or monetization per user or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected.***

We increasingly rely on the Apple App Store and the Google Play Store to distribute our mobile applications and related in-app products. While our mobile applications are generally free to download from these stores, we offer our users the opportunity to purchase subscriptions and certain à la carte features through these applications. We determine the prices at which these subscriptions and features are sold; however, purchases of these subscriptions and features are required to be processed through the in-app payment systems provided by Apple and, to a lesser degree, Google. Due to these requirements, we pay Apple and Google, as applicable, a meaningful share (generally 30%) of the revenue we receive from these transactions. While we are constantly innovating on and creating our own payment systems and methods, given the increase of the distribution of our dating products through app stores and the strict requirements to use the in-app payments systems tied into Apple's, and to a lesser degree, Google's distribution services, we may need to offset these increased app store fees by decreasing traditional marketing expenditures as a percentage of revenue, increasing user volume or monetization per user, or by engaging in other efforts to increase revenue or decrease costs generally, or our business, financial condition and results of operations could be adversely affected. Additionally, to the extent Google changes its terms and conditions or practices to require us to process purchases of subscriptions and features through their in-app payment system, our business, financial condition and results of operations could be adversely affected.

***We depend on our key personnel.***

Our future success will depend upon our continued ability to identify, hire, develop, motivate and retain highly skilled individuals across the globe, with the continued contributions of our senior management being especially critical to our success. Competition for well-qualified employees across Match Group and its various

14

businesses is intense and our continued ability to compete effectively depends, in part, upon our ability to attract new employees. While we have established programs to attract new employees and provide incentives to retain existing employees, particularly our senior management, we cannot guarantee that we will be able to attract new employees or retain the services of our senior management or any other key employees in the future. Effective succession planning is also important to our future success. If we fail to ensure the effective transfer of senior management knowledge and smooth transitions involving senior management across our various businesses, our ability to execute short and long term strategic, financial and operating goals, as well as our business, financial condition and results of operations generally, could be adversely affected.

***Our success depends, in part, on the integrity of our systems and infrastructures and on our ability to enhance, expand and adapt these systems and infrastructures in a timely and cost-effective manner.***

In order for us to succeed, our systems and infrastructures must perform well on a consistent basis. We have in the past, and we may from time to time in the future, experience system interruptions that make some or all of our systems or data unavailable and prevent our products from functioning properly for our users; any such interruption could arise for any number of reasons. Further, our systems and infrastructures are vulnerable to damage from fire, power loss, telecommunications failures, acts of God and similar events. While we have backup systems in place for certain aspects of our operations, not all of our systems and infrastructures are fully redundant, disaster recovery planning is not sufficient for all eventualities and our property and business interruption insurance coverage may not be adequate to compensate us fully for any losses that we may suffer. Any interruptions or outages, regardless of the cause, could negatively impact our users' experiences with our products, tarnish our brands' reputations and decrease demand for our products, any or all of which could adversely affect our business, financial condition and results of operations.

We also continually work to expand and enhance the efficiency and scalability of our technology and network systems to improve the experience of our users, accommodate substantial increases in the volume of traffic to our various products, ensure acceptable load times for our products and keep up with changes in technology and user preferences. Any failure to do so in a timely and cost-effective manner could adversely affect our users' experience with our various products and thereby negatively impact the demand for our products, and could increase our costs, either of which could adversely affect our business, financial condition and results of operations.

***We may not be able to protect our systems and infrastructures from cyberattacks and may be adversely affected by cyberattacks experienced by third parties.***

We are regularly under attack by perpetrators of random or targeted malicious technology-related events, such as cyberattacks, computer viruses, worms, bot attacks or other destructive or disruptive software, distributed denial of service attacks and attempts to misappropriate customer information, including credit card information and account login credentials. While we have invested (and continue to invest) in the protection of our systems and infrastructures, in related personnel and training and in employing a strategy of data minimization, where appropriate, there can be no assurance that our efforts will prevent significant breaches in our systems or other such events from occurring. Some of our systems have experienced past security incidents, and, although they did not have a material adverse effect on our operating results, there can be no assurance of a similar result in the future. Any cyber or similar attack we are unable to protect ourselves against could damage our systems and infrastructures, prevent us from providing our products, erode our reputation and brands, result in the disclosure of confidential or sensitive information of our users and/or be costly to remedy, as well as subject us to investigations by regulatory authorities and/or litigation that could result in liability to third parties.

The impact of cyber security events experienced by third parties with whom we do business (or upon whom we otherwise rely in connection with our day-to-day operations) could have a similar effect on us. Moreover, even cyber or similar attacks that do not directly affect us or third parties with whom we do business may result in widespread access to user account login credentials that such users have used across multiple internet sites, including our sites, or a loss of consumer confidence generally, which could make users less likely to use or continue to use online products generally, including our products. The occurrence of any of these events could have an adverse effect on our business, financial condition and results of operations.

15

Table of Contents

***Our success depends, in part, on the integrity of third-party systems and infrastructures.***

We rely on third parties, primarily data center service providers and cloud-based, hosted web service providers, such as Amazon Web Services, as well as third party computer systems, broadband and other communications systems and service providers, in connection with the provision of our products generally, as well as to facilitate and process certain transactions with our users. We have no control over any of these third parties or their operations.

Problems experienced by third-party data center service providers and cloud-based, hosted web service providers, such as Amazon Web Services, upon whom we rely, the telecommunications network providers with whom we or they contract or with the systems through which telecommunications providers allocate capacity among their customers could also adversely affect us. Any changes in service levels at our data centers or hosted web service providers, such as Amazon Web Services, or any interruptions, outages or delays in our systems or those of our third party providers, or deterioration in the performance of these systems, could impair our ability to provide our products or process transactions with our users, which would adversely impact our business, financial condition and results of operations.

***If the security of personal and confidential or sensitive user information that we maintain and store is breached or otherwise accessed by unauthorized persons, it may be costly to mitigate the impact of such an event and our reputation could be harmed.***

We receive, process, store, and transmit a significant amount of personal user and other confidential or sensitive information, including credit card information and member-to-member communications, and enable our users to share their personal information with each other. In some cases, we engage third party vendors to store this information. We continuously develop and maintain systems to protect the security, integrity and confidentiality of this information, but cannot guarantee that inadvertent or unauthorized use or disclosure will not occur or that third parties will not gain unauthorized access to this information despite our efforts. When such events occur, we may not be able to remedy them, we may be required by law to notify regulators and individuals whose personal information was used or disclosed without authorization, and we may have to expend significant capital and other resources to mitigate the impact of such events, including developing and implementing protections to prevent future events of this nature from occurring. When breaches of security (or the security of our vendors and partners) occur, the perception of the effectiveness of our security measures, the security measures of our partners and our reputation may be harmed, we may lose current and potential users and the recognition of our various brands and their competitive positions may be diminished, any or all of which might adversely affect our business, financial condition and results of operations.

***Our business is subject to complex and evolving U.S. and international laws and regulations. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are subject to a variety of laws and regulations in the United States and abroad that involve matters that are important to or may otherwise impact our business, including, among others, broadband internet access, online commerce, advertising, user privacy, data protection, intermediary liability, protection of minors, consumer protection, sex-trafficking, taxation and securities law compliance. The introduction of new products, expansion of our activities in certain jurisdictions, or other actions that we may take may subject us to additional laws, regulations or other government scrutiny. In addition, foreign laws and regulations can impose different obligations or be more restrictive than those in the United States.

These U.S. federal, state, and municipal and foreign laws and regulations, which in some cases can be enforced by private parties in addition to government entities, are constantly evolving and can be subject to significant change. As a result, the application, interpretation, and enforcement of these laws and regulations are often uncertain, particularly in the new and rapidly evolving industry in which we operate, and may be interpreted and applied inconsistently from state to state and country to country and inconsistently with our current policies and practices. These laws and regulations, as well as any associated inquiries or investigations or any other government actions, may be costly to comply with and may delay or impede the development of new products, require that we change or cease certain business practices, result in negative publicity, increase our operating costs, require significant management time and attention, and subject us to remedies that may harm our business, including fines or demands or orders that we modify or cease existing business practices.

16

https://www.sec.gov/Archives/edgar/data/1575189/000157518920000018/mtch-20191231.htm                           19/144

Table of Contents

Specifically, in the case of tax laws, positions that we have taken or will take are subject to interpretation by the relevant taxing authorities. While we believe that the positions we have taken to date comply with applicable law, there can be no assurances that the relevant taxing authorities will not take a contrary position, and if so, that such positions will not adversely affect us. Any events of this nature could adversely affect our business, financial condition and results of operations.

Proposed or new legislation and regulations could also adversely affect our business. For example, the European Commission and several countries have recently adopted, or intend to adopt, proposals that would change various aspects of the current tax framework under which we are taxed, including proposals to change or impose new types of non-income taxes, including taxes based on a percentage of revenue. For example, France enacted a Digital Services Tax in 2019 retroactive to January 1, 2019, which is applicable to our business. The United Kingdom has also proposed a similar tax applicable to digital services, which includes business activities on social media platforms, and would likely apply to our business. One or more of these or similar proposals could adversely affect our business, financial condition and results of operations.

The promulgation of new laws or regulations, or the new interpretation of existing laws and regulations, in each case that restrict or otherwise unfavorably impact the ability or manner in which we provide our services could require us to change certain aspects of our business and operations to ensure compliance, which could decrease demand for services, reduce revenues, increase costs and subject us to additional liabilities. For example, in February 2019, the Secretary of State for Digital, Culture, Media and Sport of the United Kingdom, indicated in public comments that his office intends to inquire as to the measures utilized by online dating platforms, including Tinder, to prevent access by underage users. In addition, in April 2019, the United Kingdom published proposed legislation, which would establish a new regulatory body to establish duties of care for internet companies and to assess compliance with these duties of care. Under the proposed law, failure to comply could result in fines, blocking of services and personal liability for senior management. There have also been calls for legislation to limit or remove the protections afforded technology platforms under the Communications Decency Act in the United States and under the e-Commerce Directive in the European Union. To the extent such new or more stringent measures are required to be implemented, or existing protections are limited or removed, our business, financial condition and results of operations could be adversely affected.

The adoption of any laws or regulations that adversely affect the popularity or growth in use of the internet or our services, including laws or regulations that undermine open and neutrally administered internet access, could decrease user demand for our service offerings and increase our cost of doing business. For example, in December 2017, the Federal Communications Commission adopted an order reversing net neutrality protections in the United States, including the repeal of specific rules against blocking, throttling or "paid prioritization" of content or services by internet service providers. To the extent internet service providers engage in such blocking, throttling, "paid prioritization" of content or similar actions as a result of this order and the adoption of similar laws or regulations, our business, financial condition and results of operations could be adversely affected.

***The varying and rapidly-evolving regulatory framework on privacy and data protection across jurisdictions could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

There are numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of this kind of information, the scope of which are constantly changing, and in some cases, inconsistent and conflicting and subject to differing interpretations, as new laws of this nature are proposed and adopted. For example, in 2016, the European Commission adopted the General Data Protection Act ("GDPR"), a comprehensive European Union ("EU") privacy and data protection reform that became effective in May 2018. The act applies to companies established in the European Union or otherwise providing services or monitoring the behavior of people located in the European Union and provides for significant penalties in case of non-compliance as well as a private right of action for individual claimants. GDPR will continue to be interpreted by EU data protection regulators, which may require that we make changes to our business practices, and could generate additional risks and liabilities. The European Union is also considering an update to the EU's Privacy and Electronic Communications (so-called "e-Privacy") Directive, notably to amend rules on the use of cookies. In addition, Brexit could result in the application of new and conflicting data privacy and protection laws and standards to our operations in the United Kingdom and our handling of personal data of users located in the United Kingdom. At the same time, many countries in which we do business have already adopted or are also currently considering adopting privacy and data protection laws and regulations. Multiple legislative proposals

17

https://www.sec.gov/Archives/edgar/data/1575189/000157518920000018/mtch-20191231.htm                    20/144

Table of Contents

concerning privacy and the protection of user information are being considered by the U.S. Congress. Various U.S. state legislatures, including those in New York, Washington, Virginia, and Illinois, intend to consider privacy legislation in 2020. Other U.S. state legislatures have already passed and enacted privacy legislation, most prominent of which is the California Consumer Privacy Act of 2018, which was signed into law in June 2018 and came into effect on January 1, 2020. A ballot initiative to address privacy concerns has also been filed with the Office of the California Attorney General and, provided it meets appropriate legal requirements, is expected to be presented to California voters on the November 2020 ballot. Additionally, the Federal Trade Commission has increased its focus on privacy and data security practices at digital companies, as evidenced by its levying, in July 2019, of a first-of-its kind, $5 billion fine against Facebook for privacy violations.

While we believe that we comply with industry standards and applicable laws and industry codes of conduct relating to privacy and data protection in all material respects, there is no assurance that we will not be subject to claims that we have violated applicable laws or codes of conduct, that we will be able to successfully defend against such claims or that we will not be subject to significant fines and penalties in the event of non-compliance. Additionally, to the extent multiple state-level laws are introduced with inconsistent or conflicting standards and there is no federal law to preempt such laws, compliance with such laws could be difficult to achieve and we could be subject to fines and penalties in the event of non-compliance.

Any failure or perceived failure by us (or the third parties with whom we have contracted to process such information) to comply with applicable privacy and security laws, policies or related contractual obligations, or any compromise of security that results in unauthorized access, or the use or transmission of, personal user information, could result in a variety of claims against us, including governmental enforcement actions, significant fines, litigation, claims of breach of contract and indemnity by third parties, and adverse publicity. When such events occur, our reputation may be harmed, we may lose current and potential users and the competitive positions of our various brands might be diminished, any or all of which could adversely affect our business, financial condition and results of operations.

Lastly, compliance with the numerous laws in the countries in which we operate regarding privacy and the storage, sharing, use, processing, disclosure and protection of personal data could be costly, as well as result in delays in the development of new products and features as resources are allocated to these compliance projects, particularly as these laws become more comprehensive in scope, more commonplace and continue to evolve. In addition, the varying and rapidly-evolving regulatory frameworks across jurisdictions may result in decisions to introduce products in certain jurisdictions but not others or to cease providing certain services or features to users located in certain jurisdictions. If these costs or other impacts are significant, our business, financial condition and results of operations could be adversely affected.

***We are subject to a number of risks related to credit card payments, including data security breaches and fraud that we or third parties experience or additional regulation, any of which could adversely affect our business, financial condition and results of operations.***

We accept payment from our users primarily through credit card transactions and certain online payment service providers. The ability to access credit card information on a real-time basis without having to proactively reach out to the consumer each time we process an auto-renewal payment or a payment for the purchase of a premium feature on any of our dating products is critical to our success and a seamless experience for our users.

When we or a third party experiences a data security breach involving credit card information, affected cardholders will often cancel their credit cards. In the case of a breach experienced by a third party, the more sizable the third party's customer base and the greater the number of credit card accounts impacted, the more likely it is that our users would be impacted by such a breach. To the extent our users are ever affected by such a breach experienced by us or a third party, affected users would need to be contacted to obtain new credit card information and process any pending transactions. It is likely that we would not be able to reach all affected users, and even if we could, some users' new credit card information may not be obtained and some pending transactions may not be processed, which could adversely affect our business, financial condition and results of operations.

Even if our users are not directly impacted by a given data security breach, they may lose confidence in the ability of service providers to protect their personal information generally, which could cause them to stop using their credit cards online and choose alternative payment methods that are not as convenient for us or restrict our ability to process payments without significant cost or user effort.

18

App. 298

Table of Contents

Additionally, if we fail to adequately prevent fraudulent credit card transactions, we may face litigation, fines, governmental enforcement action, civil liability, diminished public perception of our security measures, significantly higher credit card-related costs and substantial remediation costs, or refusal by credit card processors to continue to process payments on our behalf, any of which could adversely affect our business, financial condition and results of operations.

Finally, the passage or adoption of any legislation or regulation affecting the ability of service providers to periodically charge consumers for recurring subscription payments may adversely affect our business, financial condition and results of operations. For example, the European Union's Payment Services Directive (PSD2), which became effective in 2018, could impact our ability to process auto-renewal payments or offer promotional or differentiated pricing for users in the EU. Similar legislation or regulation, or changes to existing legislation or regulation governing subscription payments, are being considered in many U.S. states.

*Inappropriate actions by certain of our users could be attributed to us and damage our brands' reputations, which in turn could adversely affect our business.*

It is possible that a user of our products could be physically, financially, emotionally or otherwise harmed by an individual that such user met through the use of one of our products. If one or more of our users suffers or alleges to have suffered any such harm, we could experience negative publicity or legal action that could damage our reputation and our brands. Similar events affecting users of our competitors' products could result in negative publicity for the dating industry generally, which could in turn negatively affect our business.

In addition, the reputations of our brands may be adversely affected by the actions of our users that are deemed to be hostile, offensive, defamatory, inappropriate, untrue or unlawful. While we have systems and processes in place that aim to monitor and review the appropriateness of the content accessible through our products, which include, in particular, reporting tools through which users can inform us of such behavior on the platform, and have adopted policies regarding illegal, offensive or inappropriate use of our products, our users could nonetheless engage in activities that violate our policies. These safeguards may not be sufficient to avoid harm to our reputation and brands, especially if such hostile, offensive or inappropriate use is well-publicized.

Concerns about harms and the use of dating products and social networking platforms for illegal conduct, such as romance scams, promotion of false or inaccurate information, financial fraud, and sex-trafficking, have produced and could continue to produce future legislation or other governmental action. For example, in April 2018, the Allow States and Victims to Fight Online Sex Trafficking Act became effective in the United States and allows victims of sex trafficking crimes, as well as other state and local authorities, to seek redress from platforms in certain circumstances in connection with sex trafficking of individuals online. The European Union and the United Kingdom have also launched consultations, and the United Kingdom has released its Online Harms White Paper, which proposed legislation that would expose platforms to similar or more expansive liability. There have also been calls for legislation to limit or remove the protections afforded technology platforms under the Communications Decency Act in the United States and under the e-Commerce Directive in the European Union. If these proposed laws are passed, or if future legislation or governmental action is proposed or taken to address concerns regarding such harms, changes could be required to our products that could restrict or impose additional costs upon the conduct of our business generally or cause users to abandon our products.

*We may fail to adequately protect our intellectual property rights or may be accused of infringing the intellectual property rights of third parties.*

We rely heavily upon our trademarks and related domain names and logos to market our brands and to build and maintain brand loyalty and recognition. We also rely upon patented and patent-pending proprietary technologies and trade secrets relating to matching process systems and related features and products.

We also rely on a combination of laws, and contractual restrictions with employees, customers, suppliers, affiliates and others, to establish and protect our various intellectual property rights. For example, we have generally registered and continue to apply to register and renew, or secure by contract where appropriate, trademarks and service marks as they are developed and used, and reserve, register and renew domain names as we deem appropriate. Effective trademark protection may not be available or may not be sought in every country in which our products are made available, and contractual disputes may affect the use of marks governed by private contract. Similarly, not every variation of a domain name may be available or be registered, even if available.

19

App. 299

We also generally seek to apply for patents or for other similar statutory protections as and if we deem appropriate, based on then-current facts and circumstances, and will continue to do so in the future. No assurances can be given that any patent application we have filed or will file will result in a patent being issued, or that any existing or future patents will afford adequate protection against competitors and similar technologies. In addition, no assurances can be given that third parties will not create new products or methods that achieve similar results without infringing upon patents we own.

Despite these measures, our intellectual property rights may still not be protected in a meaningful manner, challenges to contractual rights could arise, third parties could copy or otherwise obtain and use our intellectual property without authorization, or laws and interpretations of laws regarding the enforceability of existing intellectual property rights may change over time in a manner that provides less protection. The occurrence of any of these events could result in the erosion of our brands and limit our ability to market our brands using our various domain names, as well as impede our ability to effectively compete against competitors with similar technologies, any of which could adversely affect our business, financial condition and results of operations.

From time to time, we have been subject to legal proceedings and claims, including claims of alleged infringement of trademarks, copyrights, patents and other intellectual property rights held by third parties. In addition, litigation may be necessary in the future to enforce our intellectual property rights, protect our trade secrets and patents or to determine the validity and scope of proprietary rights claimed by others. For example, in March 2018, we filed a lawsuit against Bumble Trading Inc., which operates and markets the online dating application Bumble in the United States, for patent and trademark infringement, as well as trade secret misappropriation. Bumble's counterclaims request that our trademark registration for our SWIPE trademark be cancelled and that a number of our pending applications for trademark registration be denied. This case is currently pending in Federal Court in the Western District of Texas. Any litigation of this nature, regardless of outcome or merit, could result in substantial costs and diversion of management and technical resources, any of which could adversely affect our business, financial condition and results of operations.

***We operate in various international markets, including certain markets in which we have limited experience. As a result, we face additional risks in connection with certain of our international operations.***

Our brands are available in over 40 different languages all over the world. Our international revenue represented 53% and 50% of our total revenue for the fiscal years ended December 31, 2019 and 2018, respectively.

Operating internationally, particularly in countries in which we have limited experience, exposes us to a number of additional risks, including:

- operational and compliance challenges caused by distance, language and cultural differences;

- difficulties in staffing and managing international operations;

- differing levels of social and technological acceptance of our dating products or lack of acceptance of them generally;

- foreign currency fluctuations;

- restrictions on the transfer of funds among countries and back to the United States and costs associated with repatriating funds to the United States;

- differing and potentially adverse tax laws;

- multiple, conflicting and changing laws, rules and regulations, and difficulties understanding and ensuring compliance with those laws by both our employees and our business partners, over whom we exert no control;

- compliance challenges due to different laws and regulatory environments, particularly in the case of privacy, data security, and intermediary liability;

- competitive environments that favor local businesses;

- limitations on the level of intellectual property protection; and

- trade sanctions, political unrest, terrorism, war and epidemics or the threat of any of these events.

20

App. 300

Table of Contents

The occurrence of any or all of the events described above could adversely affect our international operations, which could in turn adversely affect our business, financial condition and results of operations.

*We may experience operational and financial risks in connection with acquisitions.*

We have made numerous acquisitions in the past and we continue to seek potential acquisition candidates. We may experience operational and financial risks in connection with historical and future acquisitions if we are unable to:

- properly value prospective acquisitions, especially those with limited operating histories;

- accurately review acquisition candidates' business practices against applicable laws and regulations and, where applicable, implement proper remediation controls, procedures, and policies;

- successfully integrate the operations, as well as the accounting, financial controls, management information, technology, human resources and other administrative systems, of acquired businesses with our existing operations and systems;

- successfully identify and realize potential synergies among acquired and existing businesses;

- fully identify potential risks and liabilities associated with acquired businesses;

- retain or hire senior management and other key personnel at acquired businesses; and

- successfully manage acquisition-related strain on our management, operations and financial resources and those of the various brands in our portfolio.

Furthermore, we may not be successful in addressing other challenges encountered in connection with our acquisitions. The anticipated benefits of one or more of our acquisitions may not be realized or the value of goodwill and other intangible assets acquired could be impacted by one or more continuing unfavorable events or trends, which could result in significant impairment charges. In addition, such acquisitions can result in material diversion of management's attention or other resources from our existing businesses. The occurrence of any these events could have an adverse effect on our business, financial condition and results of operations.

*We are subject to litigation and adverse outcomes in such litigation could have an adverse effect on our financial condition.*

We are, and from time to time may become, subject to litigation and various legal proceedings, including litigation and proceedings related to intellectual property matters, privacy and consumer protection laws, as well as stockholder derivative suits, class action lawsuits and other matters, that involve claims for substantial amounts of money or for other relief or that might necessitate changes to our business or operations. The defense of these actions is time consuming and expensive. We evaluate these litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, we may establish reserves and/or disclose the relevant litigation claims or legal proceedings, as and when required or appropriate. These assessments and estimates are based on information available to management at the time of such assessment or estimation and involve a significant amount of judgment. As a result, actual outcomes or losses could differ materially from those envisioned by our current assessments and estimates. Our failure to successfully defend or settle any of these litigations or legal proceedings could result in liability that, to the extent not covered by our insurance, could have an adverse effect on our business, financial condition and results of operations.

**Risks related to our ongoing relationship with IAC prior to the Separation**

*IAC controls our company and has the ability to control the direction of our business.*

As of January 31, 2020, IAC owned 18,160,609 shares of our common stock and 209,919,402 shares of Class B common stock representing 100% of our outstanding Class B common stock. IAC's ownership of our outstanding common stock and Class B common stock represents approximately 80.7% of our outstanding shares of capital stock and approximately 97.5% of the combined voting power of our outstanding capital stock. As long as IAC owns shares of our capital stock representing a majority of the combined voting power of our outstanding capital stock, it will be able to control any corporate action that requires a stockholder vote, regardless of the vote

21

App. 301

Table of Contents

of any other stockholder. As a result, prior to the Separation, IAC has the ability to control significant corporate activities, including:

- the election of our board of directors and, through our board of directors, decision-making with respect to our business direction and policies, including the appointment and removal of our officers;

- acquisitions or dispositions of businesses or assets, mergers or other business combinations;

- issuances of shares of our common stock, Class B common stock, Class C common stock and our capital structure;

- corporate opportunities that may be suitable for us and IAC, subject to the corporate opportunity provisions in our certificate of incorporation, as described below;

- our financing activities, including the issuance of additional debt and equity securities, or the incurrence of other indebtedness generally;

- the payment of dividends; and

- the number of shares available for issuance under our equity incentive plans for our prospective and existing employees.

This voting control will limit the ability of other stockholders to influence corporate matters and, as a result, we may take actions that stockholders other than IAC do not view as beneficial. This voting control may also discourage transactions involving a change of control of our company, including transactions in which holders of our common stock might otherwise receive a premium for the holders' shares. Furthermore, IAC generally has the right at any time to sell or otherwise dispose of the shares of our capital stock that it owns, including the ability to transfer a controlling interest in us to a third party, without the approval of the holders of our common stock and without providing for the purchase of shares of common stock.

Even if IAC owns shares of our capital stock representing less than a majority of the combined voting power of our outstanding capital stock, so long as IAC retains shares representing a significant percentage of our combined voting power, IAC will have the ability to substantially influence these significant corporate activities.

In addition, pursuant to an investor rights agreement between us and IAC, prior to the Separation and in the event the Separation is not consummated, IAC has the right to maintain its level of ownership in us to the extent we issue additional shares of our capital stock in the future and, pursuant to an employee matters agreement between us and IAC, IAC may receive payment for certain compensation expenses through the receipt of additional shares of our capital stock. For a more complete summary of our agreements with IAC, see "Note 16—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements."

In addition, because of our relationship with IAC, credit rating agencies have considered, and prior to the Separation and in the event the Separation is not consummated, could continue to consider, IAC's creditworthiness when determining a corporate credit rating for us or credit ratings for our debt. Accordingly, prior to the Separation and in the event the Separation is not consummated, the activities of, or developments at, IAC that are outside of our control could have a negative impact on such credit ratings. A lowering of our corporate credit ratings or the credit ratings assigned to our debt could harm our ability to incur additional debt on acceptable terms. Until such time as IAC no longer controls or has the ability to substantially influence us, we will continue to face the risks described in this "Risk factors" section relating to IAC's control of us and the potential conflicts of interest between IAC and us.

***Prior to the Separation, our certificate of incorporation could prevent us from benefiting from corporate opportunities that might otherwise have been available to us.***

Our certificate of incorporation has a "corporate opportunity" provision in which we renounce any interests or expectancy in corporate opportunities which become known to: (i) any of our directors or officers who are also officers, directors, employees or other affiliates of IAC or its affiliates (except that we and our subsidiaries shall not be deemed affiliates of IAC or its affiliates for the purposes of the provision) or (ii) IAC itself, and which relate to the business of IAC or may constitute a corporate opportunity for both IAC and us. Generally, neither IAC nor our officers or directors who are also officers or directors of IAC or its affiliates will be liable to us or our stockholders for breach of any fiduciary duty by reason of the fact that any such person pursues or acquires any

22

corporate opportunity for the account of IAC or its affiliates, directs or transfers such corporate opportunity to IAC or its affiliates, or does not communicate information regarding such corporate opportunity to us. The corporate opportunity provision may exacerbate conflicts of interest between IAC and us because the provision effectively permits any of our directors or officers who also serves as an officer or director of IAC to choose to direct a corporate opportunity to IAC instead of to us.

***IAC's interests may conflict with our interests and the interests of our stockholders. Prior to the Separation and in the event the Separation is not consummated, conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.***

Various conflicts of interest between us and IAC could arise. As of the date of this report, five of our ten directors are current members of the board of directors or executive officers of IAC. Ownership interests of directors or officers of IAC in our stock and ownership interests of our directors and officers in the stock of IAC, or a person's service as either a director or officer of both companies, could create or appear to create potential conflicts of interest when those directors and officers are faced with decisions relating to our company. These decisions could include:

- corporate opportunities;

- the impact that operating decisions for our business may have on IAC's consolidated financial statements;

- the impact that operating or capital decisions (including the incurrence of indebtedness) for our business may have on IAC's current or future indebtedness or the covenants under that indebtedness;

- business combinations involving us;

- our dividend policy;

- management stock ownership; and

- the intercompany services and agreements between IAC and us.

Potential conflicts of interest could also arise if we decide to enter into any new commercial arrangements with IAC in the future or in connection with IAC's desire to enter into new commercial arrangements with third parties.

Furthermore, prior to the Separation and in the event the Separation is not consummated, disputes may arise between IAC and us relating to our past and ongoing relationships, and these potential conflicts of interest may make it more difficult for us to favorably resolve such disputes, including those related to:

- tax, employee benefit, indemnification and other matters;

- the nature, quality and pricing of services IAC agrees to provide to us;

- sales or other disposal by IAC of all or a portion of its ownership interest in us; and

- business combinations involving us.

We may not be able to resolve any potential conflicts with IAC, and even if we do, the resolution may be less favorable to us than if we were dealing with an unaffiliated party. While we are controlled by IAC, we may not have the leverage to negotiate amendments to these agreements, if required, on terms as favorable to us as those we would negotiate with an unaffiliated third party.

***We are currently a "controlled company" as defined in the NASDAQ rules, and rely on exemptions from certain corporate governance requirements that provide protection to stockholders of other companies.***

As a result of IAC owning more than 50% of the combined voting power of our share capital, we are currently a "controlled company" under the Marketplace Rules of the NASDAQ Stock Market, or the Marketplace Rules. As a "controlled company," we are exempt from the obligation to comply with certain Marketplace Rules related to corporate governance, including the following requirements:

- that a majority of our board of directors consists of "independent directors," as defined under the Marketplace Rules; and

23

App. 303

Table of Contents

- that we have a nominating/governance committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities.

Accordingly, prior to the Separation and for so long as we are a "controlled company," our stockholders will not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the Marketplace Rules.

***Prior to the Separation and in the event the Separation is not consummated, in order to preserve the ability of IAC to distribute its shares of our capital stock on a tax-free basis, and to maintain tax consolidation with IAC for U.S. federal income tax purposes, we may be prevented from pursuing opportunities to raise capital, effectuate acquisitions or provide equity incentives to our employees, and our ability to manage our capital structure may also be adversely impacted, all of which could hurt our ability to grow.***

Under current laws, IAC must retain beneficial ownership of at least 80% of our combined voting power and 80% of each class of our nonvoting capital stock (if any is outstanding) in order to effect a tax-free distribution of our shares held by IAC to its stockholders. IAC has advised us that it intends to use its majority voting interest to retain its ability to engage in such a transaction. In addition, IAC must maintain ownership of at least 80% of our outstanding capital stock in order to maintain tax consolidation with us for U.S. federal income tax purposes. As of the date of this report, IAC has advised us that it currently intends to take such actions, or cause Match Group to take such actions, as may be necessary in order to preserve tax consolidation. Each of these intentions may cause IAC to not support transactions we wish to pursue that involve issuing shares of our capital stock, including for capital raising purposes, as consideration for an acquisition or as equity incentives to our employees, and may also otherwise impact our overall capital management strategy. The inability to pursue any such transactions or any reduced flexibility in the management of our capital structure, may adversely affect our business, financial condition and results of operations. See "—IAC controls our company and will have the ability to control the direction of our business" and "—IAC's interests may conflict with our interests and the interests of our stockholders." Conflicts of interest between IAC and us could be resolved in a manner unfavorable to us and our public stockholders.

***Prior to the Separation and in the event the Separation is not consummated, our agreements with IAC will require us to indemnify IAC for certain tax liabilities and may limit our ability to engage in desirable strategic or capital raising transactions, including following any distribution by IAC of our capital stock to its stockholders.***

Under a tax sharing agreement between us and IAC, we generally are responsible and are required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes us or any of our subsidiaries to the extent attributable to us or any of our subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any consolidated, combined, unitary or separate tax returns of us or any of our subsidiaries. To the extent IAC failed to pay taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes us or any of our subsidiaries, the relevant taxing authority could seek to collect such taxes (including taxes for which IAC is responsible under the tax sharing agreement) from us or our subsidiaries.

Under the tax sharing agreement, we generally will be responsible for any taxes and related amounts imposed on IAC or us that arise from the failure of a future spin-off of IAC's interest in us to qualify as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Internal Revenue Code of 1986, as amended, of the Code, to the extent that the failure to so qualify is attributable to: (i) a breach of the relevant representations and covenants made by us in the tax sharing agreement or any representation letter provided in support of any tax opinion or ruling obtained by IAC with respect to the U.S. federal income tax treatment of such spin-off, or (ii) an acquisition of our equity securities.

To preserve the tax-free treatment of any potential future spin-off by IAC of its interest in us, and in addition to our indemnity obligation described above, the tax sharing agreement will restrict us, for the two-year period following any such spin-off, except in specific circumstances, from: (i) entering into any transaction pursuant to which all or a portion of shares of our stock would be acquired, whether by merger or otherwise, (ii) issuing equity securities beyond certain thresholds, (iii) repurchasing our shares other than in certain open-market transactions, (iv) ceasing to actively conduct our businesses or (v) taking or failing to take any other action that prevents the distribution and related transactions from qualifying as a transaction that is generally tax-free, for U.S. federal income tax purposes, under Section 368(a)(1)(D) and/or Section 355 of the Code. In addition, the tax

24

App. 304

Table of Contents

sharing agreement provides that, without IAC's prior written consent, we may not take any action that could reasonably be expected to (i) cause IAC to cease to have "control" of us within the meaning of Section 386(c) of the Code or (ii) result in the loss of IAC's tax consolidation with us for U.S. federal income tax purposes.

These indemnity obligations and other limitations could have an adverse effect on our business, financial condition and results of operations.

### Future sales or distributions of our shares by IAC could depress our common stock price.

IAC has the right to sell or distribute to its stockholders all or a portion of the shares of our capital stock that it holds (18,160,609 shares of our common stock and 209,919,402 shares of our Class B common stock, representing all of our outstanding Class B common stock, as of January 31, 2020). Any sales by IAC in the public market or distributions to its stockholders of substantial amounts of our stock in the form of common stock or Class B common stock, or the filing by IAC of a registration statement relating to a substantial amount of our stock, could depress the price of our common stock.

In addition, prior to the Separation and in the event the Separation is not consummated, IAC has the right, subject to certain conditions, to require us to file registration statements covering the sale of its shares or to include its shares in other registration statements that we may file. In the event IAC exercises its registration rights and sells all or a portion of its shares of our capital stock, the price of our common stock could decline.

### Prior to the Separation and in the event the Separation is not consummated, the services that IAC provides to us may not be sufficient to meet our needs, which may result in increased costs and otherwise adversely affect our business.

IAC currently provides (and, in the event the Separation is not consummated, is expected to continue to provide) us with corporate and shared services related to certain corporate functions, including tax and other services, for a fee provided in the services agreement described in "Item 1—Business-Relationship with IAC." IAC is not obligated to provide these services in a manner that differs from the nature of the service when we were a wholly-owned subsidiary of IAC, and thus we may not be able to modify these services in a manner desirable to us as a stand-alone public company. Further, if we no longer receive these services from IAC, we may not be able to perform these services ourselves, or find appropriate third-party arrangements at a reasonable cost, and the cost may be higher than that charged by IAC.

### Risks relating to our indebtedness

### Our indebtedness may affect our ability to operate our business, which could have a material adverse effect on our financial condition and results of operations. We and our subsidiaries may incur additional indebtedness, including secured indebtedness.

As of December 31, 2019, we had total debt outstanding of approximately $1.6 billion and borrowing availability of $500 million under our revolving credit facility. In February 2020, we issued an additional $500 million of senior notes and increased the borrowing availability under our revolving credit facility to $750 million.

Our indebtedness could have important consequences, such as:

- limiting our ability to obtain additional financing to fund our working capital needs, acquisitions, capital expenditures or other debt service requirements or for other purposes;

- limiting our ability to use operating cash flow in other areas of our business because we must dedicate a substantial portion of these funds to service debt;

- limiting our ability to compete with other companies who are not as highly leveraged, as we may be less capable of responding to adverse economic and industry conditions;

- restricting us from making strategic acquisitions, developing properties or exploiting business opportunities;

- restricting the way in which we conduct our business because of financial and operating covenants in the agreements governing our and certain of our subsidiaries' existing and future indebtedness, including, in the case of certain indebtedness of subsidiaries, certain covenants that restrict the ability of subsidiaries to pay dividends or make other distributions to us;

25

- exposing us to potential events of default (if not cured or waived) under financial and operating covenants contained in our or our subsidiaries' debt instruments that could have a material adverse effect on our business, financial condition and operating results; increasing our vulnerability to a downturn in general economic conditions or in pricing of our products; and

- limiting our ability to react to changing market conditions in our industry and in our customers' industries.

In addition to our debt service obligations, our operations require substantial investments on a continuing basis. Our ability to make scheduled debt payments, to refinance our obligations with respect to our indebtedness and to fund capital and non-capital expenditures necessary to maintain the condition of our operating assets and properties, as well as to provide capacity for the growth of our business, depends on our financial and operating performance, which, in turn, is subject to prevailing economic conditions and financial, business, competitive, legal and other factors.

Subject to the restrictions in our credit agreement (which includes our revolving credit facility and term loan) and the restrictions included in the indentures related to our 6.375% Senior Notes due 2024, 5.00% Senior Notes due 2027, 5.625% Senior Notes due 2029, and the 4.125% Senior Notes due 2030 (the "Match Group Senior Notes"), we and our subsidiaries may incur significant additional indebtedness, including additional secured indebtedness. Although the terms of our credit agreement and the indentures related to the Match Group Senior Notes contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and additional indebtedness incurred in compliance with these restrictions could be significant. If new debt is added to our and our subsidiaries' current debt levels, the risks described above could increase.

***We may not be able to generate sufficient cash to service all of our current and planned indebtedness and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.***

Our ability to satisfy our debt obligations will depend upon, among other things:

- our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, many of which are beyond our control; and

- our future ability to borrow under our revolving credit facility, the availability of which will depend on, among other things, our complying with the covenants in the then-existing agreements governing our indebtedness.

We cannot assure you that our business will generate sufficient cash flow from operations, or that we will be able to draw under our revolving credit facility or otherwise, in an amount sufficient to fund our liquidity needs.

If our cash flows and capital resources are insufficient to service our indebtedness, we may be forced to reduce or delay capital expenditures, sell assets, seek additional capital or restructure or refinance our indebtedness. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at such time. Any refinancing of our debt could be at higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations. In addition, the terms of existing or future debt agreements may restrict us from adopting some of these alternatives. In the absence of such operating results and resources, we could face substantial liquidity problems and might be required to dispose of material assets or operations, sell equity, and/or negotiate with our lenders to restructure the applicable debt, in order to meet our debt service and other obligations. We may not be able to consummate those dispositions for fair market value or at all. Our credit agreement and the indentures related to the Match Group Senior Notes may restrict, or market or business conditions may limit, our ability to avail ourselves of some or all of these options.

Furthermore, any proceeds that we could realize from any such dispositions may not be adequate to meet our debt service obligations then due.

26

***Our debt agreements contain restrictions that will limit our flexibility in operating our business.***

Our credit agreement and the indentures related to the Match Group Senior Notes contain, and any instruments governing future indebtedness of ours would likely contain, a number of covenants that will impose significant operating and financial restrictions on us, including restrictions on our ability to, among other things:

- create liens on certain assets;

- incur additional debt;

- make certain investments and acquisitions;

- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets;

- sell certain assets;

- pay dividends on or make distributions in respect of our capital stock or make restricted payments;

- enter into certain transactions with our affiliates; and

- cause our subsidiaries to pay dividends or make other distributions to us.

Any of these restrictions could limit our ability to plan for or react to market conditions and could otherwise restrict corporate activities. Any failure to comply with these covenants could result in a default under our credit agreement and/or the indentures related to the Match Group Senior Notes or any instruments governing future indebtedness of ours. Upon a default, unless waived, the lenders under our credit agreement could elect to terminate their commitments, cease making further loans, foreclose on our assets pledged to such lenders to secure our obligations under our credit agreement and force us into bankruptcy or liquidation. Holders of the Match Group Senior Notes also have the ability to force us into bankruptcy or liquidation in certain circumstances, subject to the terms of the related indentures. In addition, a default under our credit agreement or the indentures related to the Match Group Senior Notes may trigger a cross default under our other agreements and could trigger a cross default under the agreements governing our future indebtedness. Our operating results may not be sufficient to service our indebtedness or to fund our other expenditures and we may not be able to obtain financing to meet these requirements.

***Variable rate indebtedness that we have incurred or may incur under our credit agreement will subject us to interest rate risk, which could cause our debt service obligations to increase significantly.***

We currently have $425 million of indebtedness outstanding under our term loan and no outstanding borrowings under our revolving credit agreement. Borrowings under the term loan are, and any borrowings under our revolving credit facility will be, at variable rates of interest. Indebtedness that bears interest at variable rates exposes us to interest rate risk. At December 31, 2019, our term loan bore interest at LIBOR plus 2.50% and the rate in effect was 4.44%. If LIBOR were to increase or decrease by 100 basis points, then the annual interest and expense payments on the outstanding balance and rate in effect as of December 31, 2019 on the term loan would increase or decrease, respectively, $4.3 million. See also "Item 7A—Quantitative and Qualitative Disclosures About Market Risk."

**Risks relating to the Separation**

***We may be unable to achieve some or all of the benefits that we expect to achieve through the Separation.***

The full strategic and financial benefits expected to result from the Separation may be delayed or may never occur at all. For instance, there can be no assurance that we will be able to attract transaction partners using its capital stock as acquisition currency and that analysts and investors will regard its new corporate structure as more clear and simple than our current corporate structure.

***If the Transactions, including the Separation and our subsequent merger, were to fail to qualify as a transaction that is generally tax-free for U.S. federal income tax purposes, we and our stockholders could suffer material adverse consequences.***

If the Transactions are implemented, following the completion of the Separation and the merger of Match Group into New Match Merger Sub (the "Merger"), our successor will become a wholly-owned subsidiary of New Match Group and most of IAC's existing other subsidiaries will be held under a separate public company. It is a

27

App. 307

App. 308

condition to each party's obligation to the Transaction Agreement that each of IAC, Match Group, and New IAC receive opinions of IAC's outside counsel, among other things, to the effect that the Separation and related transactions taken together, and the Merger, will be tax-free for U.S. federal income tax purposes. The opinions of counsel will be based upon and rely on, among other things, various facts and assumptions, as well as certain representations, statements and undertakings of IAC, Match Group, and New IAC, including those relating to the past and future conduct of IAC, Match Group, and New IAC. If any of these representations, statements or undertakings is, or becomes, inaccurate or incomplete, or if any of the representations or covenants contained in any of the transaction-related agreements and documents or in any document relating to the opinions of counsel are inaccurate or not complied with by IAC, Match Group, New IAC, or any of their respective subsidiaries, the opinions of counsel may be invalid and the conclusions reached therein could be jeopardized.

Notwithstanding receipt of the opinions of counsel regarding the transactions, the U.S. Internal Revenue Service ("IRS") could determine that some or all of the transactions effected in connection with the Transactions should be treated as taxable for U.S. federal income tax purposes if it determines that any of the representations, assumptions or undertakings upon which the opinions of counsel were based are inaccurate or have not been complied with. Moreover, even if the foregoing representations, assumptions or undertakings are accurate and have been complied with, the opinions of counsel merely represent the judgment of such counsel and are not binding on the IRS or any court, and the IRS or a court may disagree with the conclusions in the opinions of counsel. Accordingly, notwithstanding receipt of the opinions of counsel, there can be no assurance that the IRS will not assert that the transactions effected in connection with the Transactions do not qualify for tax-free treatment for U.S. federal income tax purposes or that a court would not sustain such a challenge. In the event the IRS were to prevail with such a challenge, parties to the Transactions, including IAC (and its successor New Match Group) could be subject to tax with respect to the Transactions.

For example, if the transactions effected in connection with the Separation were to fail to qualify as a transaction that is generally tax-free for U.S. federal income tax purposes under Sections 355 and 368(a)(1)(D) of the Code, in general, for U.S. federal income tax purposes, IAC would recognize a taxable gain as if it had sold the New IAC stock in a taxable sale for its fair market value. Even if the transactions effected in connection with the Separation were to otherwise qualify as a tax-free transaction under Sections 355 and 368(a)(1)(D) of the Code, it may result in taxable gain to IAC under Section 355(e) of the Code if the transactions effected in connection with the Separation were later deemed to be part of a plan (or series of related transactions) pursuant to which one or more persons acquire, directly or indirectly, shares representing a 50 percent or greater interest (by vote or value) in IAC or New IAC. For this purpose, any acquisitions of IAC stock (or New Match stock after the merger) or New IAC stock within the period beginning two years before the Separation and ending two years after the Separation are presumed to be part of such a plan, although IAC or New IAC may be able to rebut that presumption.

If the Transactions are implemented, because our successor and our subsidiaries will form part of New Match Group's consolidated tax group (and because it is possible that our successor will be a disregarded entity, the regarded owner of which for U.S. federal income tax purposes may be New Match), we and our subsidiaries could be liable to satisfy any tax liabilities of New Match with respect to the Transactions if their tax-free treatment for U.S. federal income tax purposes were successfully challenged by the IRS. While, in some cases, New IAC may be obligated under the Tax Matters Agreement to indemnify us for some or all of such taxes, even in those cases, there is no assurance that they will in fact indemnify us.

In addition, if the Merger were determined to be taxable for U.S. federal income tax purposes, we would be subject to tax on the transfer of our assets to New Match Merger Sub. Although, as discussed above, we expect that the Transactions will be respected as tax-free, there can be no assurance in this regard. If we, our successor or our subsidiaries were required to pay taxes imposed on IAC (and its successor New Match) with respect to the Transactions, our cash flows could be adversely affected.

***New Match may not be able to engage in desirable capital-raising or strategic transactions following the Separation.***

Under current U.S. federal income tax law, a distribution that otherwise qualifies for tax-free treatment can be rendered taxable to the distributing corporation and its stockholders as a result of certain post-distribution transactions, including certain acquisitions of shares or assets of the corporation the stock of which is distributed. To preserve the tax-free treatment of the transactions effected in connection with the Separation, the tax matters

28

agreement will impose certain restrictions on New Match and its subsidiaries during the two-year period following the Separation, except in specific circumstances, (1) ceasing to actively conduct certain of their businesses; (2) entering into certain transactions or series of transactions pursuant to which all or a portion of the shares of New Match common stock would be acquired, whether by merger or otherwise; (3) liquidating or merging or consolidating with any other person; (4) issuing equity securities beyond certain thresholds; (5) repurchasing shares New Match common stock, other than in certain open-market transactions; or (6) taking or failing to take any other action that would cause the transactions effected in connection with the Separation to fail to qualify as a transaction that is generally tax-free for U.S. federal income tax purposes under Sections 355 and 368(a)(1)(D) of the Code. These restrictions may limit the ability of New Match to pursue certain equity issuances, strategic transactions, repurchases or other transactions that it may otherwise believe to be in the best interests of its stockholders or that might increase the value of its business.

***After the Separation, actual or potential conflicts of interest may develop between the management and directors of New IAC, on the one hand, and the management and directors of New Match, on the other hand.***

After the Separation, certain New Match directors and the management and directors of New IAC may own both New IAC common stock and New Match common stock. In addition, two of New Match's directors will be executives, and in one case, a director, of New IAC. This ownership overlap could create, or appear to create, potential conflicts of interest when New Match's directors and New IAC's management and directors face decisions that could have different implications for New IAC and New Match. For example, potential conflicts of interest could arise in connection with the resolution of any dispute between New IAC and New Match regarding the terms of the agreements governing the Separation and the relationship between New IAC and New Match thereafter, including the transaction agreement, the employee matters agreement, the tax matters agreement, the transition services agreement, or any commercial agreements between the parties or their affiliates. Potential conflicts of interest could also arise if New IAC and New Match enter into any commercial arrangements in the future.

In addition, Joseph Levin will serve as the executive chairman of the New Match board of directors, while also serving as the Chief Executive Officer of New IAC, Glenn H. Schiffman will serve as a director of New Match while also serving as an executive officer of New IAC, and Alan G. Spoon will serve as a director of each of New Match and New IAC. The fact that Messrs. Levin, Schiffman, and Spoon will hold positions with both New IAC and New Match could create, or appear to create, potential conflicts of interest for each of them when facing decisions that may affect both New IAC and New Match, and each of them also face conflicts of interest with regard to the allocation of his time between New IAC and New Match.

***The Reclassification Exchange Ratio is a calculation that is subject to a number of factors that are outside of the control of IAC and Match Group and will not be known until just before the closing.***

The number of shares of IAC Class M common stock into which shares of IAC common stock and IAC Class B common stock will be reclassified (which we refer to as the "Reclassification Exchange Ratio") is a calculation that will not be known until just before the closing of the Separation and is based on a variety of factors that are outside of the control of IAC and Match Group, including, among other things, the value of the exchangeable notes issued by the exchangeable notes issuers and related hedging instruments that will be retained by New Match, the cost of the New Match stock options to be received by IAC employees in respect of their existing IAC stock options, the number of shares of IAC Class M common stock (or New Match common stock), if any, sold in the IAC Class M equity offering and the number of shares of New Match common stock issued to non-IAC stockholders of Match Group in respect of additional stock elections and non-elections. Accordingly, Match Group stockholders will not know the number of shares of IAC Class M common stock into which the shares of IAC capital stock will be reclassified, and consequently the percentage interest in New Match represented by a share of New Match common stock, until after the date of the IAC annual meeting and the date of the Match special meeting.

***The Separation is subject to certain closing conditions that, if not satisfied or waived, will result in the Separation not being completed, which may cause the market price of Match Group securities to decline.***

The completion of the Separation is subject to the satisfaction (or waiver) of a number of conditions, including the receipt of certain approvals from the stockholders of IAC and Match Group and the absence of material litigation. Some of the conditions to the completion of the Separation are outside of the control of IAC and Match Group. If any condition to the closing of the Separation is not satisfied or waived, the Separation will

29

Table of Contents

not be completed. In addition, IAC and Match Group may terminate the transaction agreement in certain circumstances.

If IAC and Match Group do not complete the Separation, the market price of Match Group securities may fluctuate to the extent that the current market prices of the shares reflect a market assumption that the Separation will be completed. Match Group will also be obligated to pay certain investment banking, financing, legal, and accounting fees and related expenses in connection with the Separation, whether or not the Separation is completed. In addition, Match Group has expended, and will continue to expend, significant management resources in an effort to complete the Separation. If the Separation is not completed, Match Group will have incurred significant costs, including the diversion of management resources, for which it will have received little or no benefit.

***New Match may incur increased expenses if the transition services agreement with New IAC is terminated.***

In connection with the Separation, New Match will enter into a transition services agreement and various other agreements with New IAC, pursuant to which New IAC will provide New Match with certain specified services on a transitional basis in areas where New Match may need assistance and support following the Separation. Depending on the particular service being provided, the agreements will extend for up to twelve months after the Separation, but may be terminated earlier under certain circumstances, including a default. If the transition services agreement is terminated, New Match may be required to obtain such services from a third party. This may be more expensive than the fees that New Match will be required to pay under the agreements with New IAC.

***After the Separation, New Match's certificate of incorporation could prevent New Match from benefiting from corporate opportunities that might otherwise have been available to New Match.***

Subject to obtaining the required approvals from the IAC stockholders, New Match's certificate of incorporation following the Separation is expected to have a "corporate opportunity" provision in which New Match and its affiliates renounce any interests or expectancy in corporate opportunities which become known to any of New Match's directors or officers who are also officers or directors of New IAC.

Generally, New Match's officers or directors who are also New IAC's officers or directors will not be liable to New Match or its stockholders for breach of any fiduciary because such person fails to communicate or offer to New Match a corporate opportunity that has been communicated or offered to New IAC, that may also be a corporate opportunity of New Match or because such person communicates or offers to New IAC any corporate opportunity that may also be a corporate opportunity of New Match. In order for any New Match director or officer who is also a New IAC director or officer not to be liable to New Match or its stockholders, such opportunity cannot become known to the officer or director in his or her capacity as a New Match director or officer and cannot be presented to any party other than New IAC. In addition, such officer or director cannot pursue such opportunity in his or her individual capacity. The corporate opportunity provision may exacerbate conflicts of interest between New IAC and New Match because the provision effectively permits any of New Match's directors or officers who also serve as an officer or director of New IAC to choose to direct a corporate opportunity to New IAC instead of to New Match.

***Exchange of the exchangeable notes may dilute the ownership interests of existing stockholders or may otherwise depress the price of New Match common stock.***

In connection with the Separation, New Match will retain IAC's obligations as a guarantor under the indentures relating to the exchangeable notes. Following completion of the Separation, the exchangeable notes will continue to be exchangeable into shares of New Match common stock in certain circumstances. The exchange of some or all of the exchangeable notes may dilute the ownership interests of New Match stockholders to the extent New Match delivers shares upon exchange of any of the exchangeable notes. While the exchangeable note hedges are expected to reduce the potential dilutive effect on New Match common stock upon any exchange of exchangeable notes and/or offset any cash payment the issuers of the exchangeable notes would be required to make in excess of the principal amount of the exchanged notes, the warrants have a dilutive effect to the extent that the market price per share of New Match common stock exceeds the strike price of the warrants. Any sales in the public market of New Match common stock issuable upon such exchange could adversely affect prevailing market prices of New Match common stock. In addition, the existence of the exchangeable notes may encourage short selling of New Match common stock by market participants because the exchange of the exchangeable notes

30

App. 311

Table of Contents

could be used to satisfy short positions. In addition, the anticipated exchange of the exchangeable notes could depress the price of New Match common stock.

***The shares of New Match common stock to be received by Match stockholders as a result of the Separation will have different rights from the shares of Match common stock and Match Class B common stock currently held.***

Upon completion of the Separation, Match Group stockholders will become New Match stockholders and their rights as stockholders will be governed by New Match's certificate of incorporation and bylaws. Certain of the rights associated with New Match common stock are different from the rights associated with Match Group common stock and Class B common stock. For example, under New Match's certificate of incorporation and bylaws, New Match stockholders (i) will be entitled to one vote per share, (ii) will not have the power to call special meetings of stockholders, (iii) if approved by IAC stockholders at the IAC annual meeting, will not have the power to remove directors without cause and will not have the power to fill director vacancies and (iv) if approved by IAC stockholders at the IAC annual meeting, will not have the power to act by written consent.

**Risks relating to ownership of our common stock prior to the Separation**

***The multi-class structure of our capital stock has the effect of concentrating voting control with holders of our Class B common stock and limiting the ability of holders of our common stock to influence corporate matters.***

Our publicly held common stock has one vote per share and our Class B common stock has ten votes per share. As of January 31, 2020, IAC owned all of the shares of our outstanding Class B common stock and 18,160,609 shares of our common stock, collectively representing approximately 80.7% of our outstanding shares of capital stock and approximately 97.5% of the combined voting power of our outstanding capital stock. Due to the ten-to-one voting ratio between our Class B common stock and common stock, the holders of our Class B common stock collectively will continue to control a majority of the combined voting power of our capital stock, even when the outstanding shares of Class B common stock represent a small minority of our outstanding capital stock, and such voting control will be concentrated with IAC. This concentrated control will significantly limit your ability to influence corporate matters.

***The difference in the voting rights of our common stock and our Class B common stock may harm the value and liquidity of our common stock.***

Holders of our Class B common stock are entitled to ten votes per share and holders of our common stock are entitled to one vote per share. The difference in the voting rights of our common stock and Class B common stock could harm the value of our common stock to the extent that any investor or potential future purchaser of our common stock ascribes value to the right of the holders of our Class B common stock to ten votes per share. The existence of two classes of common stock with different voting rights could result in less liquidity for either class of stock than if there were only one class of our common stock.

***The price of our common stock has been and may continue to be volatile or may decline regardless of our operating performance, and you could lose all or part of your investment.***

During 2019, our common stock closing price traded as high as $91.77 and as low as $41.12 and on February 26, 2020, the closing price of our common stock was $66.04. The market price of our common stock has been and may continue to be subject to wide fluctuations in response to various factors, many of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose part of your investment in our common stock since you might be unable to sell your shares at or above the price you paid. Factors that could cause fluctuations in the market price of our common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;
- volatility in the market prices and trading volumes of technology stocks generally, or those in our industry in particular;
- changes in operating performance and stock market valuations of other technology companies generally, or those in our industry in particular;
- volatility in the market price of our common stock due to the limited number of shares of our common stock held by the public;
- sales of shares of our stock by us and/or our directors, executive officers, employees and stockholders;

App. 313

Table of Contents

- the failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow our company or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, and any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new brands, products or services;

- the public's reaction to our earnings releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our operating results or fluctuations in our operating results;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses or technologies by us or our competitors;

- new laws or regulations or new interpretations of (or changes to) existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management or our board composition; and

- general economic conditions and slow or negative growth in any of our significant markets.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. We currently are, and in the future may be, the target of this type of litigation. See "Item 3—Legal Proceedings." Securities litigation against us could result in substantial costs and a diversion of our management's attention and resources.

***You may experience dilution due to the issuance of additional securities in the future***.

Our dilutive securities consist of vested and unvested options to purchase shares of our common stock, restricted stock unit awards, shares of our common stock issuable to IAC as reimbursement for the cost of vested and unvested IAC equity awards held by our employees and stock appreciation rights settled in IAC stock.

These dilutive securities are reflected in our share calculations underlying our dilutive earnings per share calculation contained in our financial statements for fiscal years ended December 31, 2019, 2018 and 2017. For more information, see "Note 10—Earnings per Share" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data." Intra-quarter movements in our stock price, could lead to more or less dilution than reflected in these calculations.

At the option of IAC, the shares Match Group issues in connection with former subsidiary equity awards, which were converted into Match Group equity awards in 2017, will either be issued to holders of such awards or to IAC. In the event they are issued to IAC, IAC would in turn provide the equity holders with IAC shares of equivalent value to the Match Group shares issued to it. In cases where Match Group shares are issued directly to equity holders, recipients may sell such stock into the open market. If sales are significant and concentrated, these sales could have a temporary impact on the trading value of our stock.

***Our quarterly results or operating metrics could fluctuate significantly, which could cause the trading price of our common stock to decline.***

Our quarterly results and operating metrics have fluctuated historically, and we expect that they could continue to fluctuate in the future as a result of a number of factors, many of which are outside of our control and may be difficult to predict, including:

- the timing, size and effectiveness of our marketing efforts;

32

App. 314

Table of Contents

- fluctuations in the rate at which we attract new users, the level of engagement of such users and the propensity of such users to subscribe to our brands or to purchase à la carte features;

- increases or decreases in our revenues and expenses caused by fluctuations in foreign currency exchange rates;

- the timing, size and effectiveness of non-marketing operating expenses that we may incur to grow and expand our operations, develop new products and remain competitive;

- the performance, reliability and availability of our technology, network systems and infrastructure and data centers;

- operational and financial risks we may experience in connection with historical and potential future acquisitions and investments;

- legal costs and settlements; and

- general economic conditions in either domestic or international markets.

The occurrence of any one of these factors, as well as other factors, or the cumulative effect of the occurrence of one or more of such factors could cause our quarterly results and operating metrics to fluctuate significantly. As a result, quarterly comparisons of results and operating metrics may not be meaningful.

In addition, the variability and unpredictability of our quarterly results or operating metrics could result in our failure to meet our expectations, or those of any of our investors or of analysts that cover our company, with respect to revenues or other operating results for a particular period. If we fail to meet or exceed such expectations for these or any other reasons, the market price of our common stock could fall substantially.

***We do not expect to declare any regular cash dividends in the foreseeable future.***

We paid a special cash dividend in December 2018; however, we have no current plans to pay cash dividends on our common stock and Class B common stock. Instead, we anticipate that all of our future earnings will be retained to support our operations and to finance the growth and development of our business. Any future determination relating to our dividend policy will be made by our board of directors and will depend on a number of factors, including:

- our historical and projected financial condition, liquidity and results of operations;

- our capital levels and needs;

- tax considerations;

- any acquisitions or potential acquisitions that we may consider;

- statutory and regulatory prohibitions and other limitations;

- the terms of any credit agreements or other borrowing arrangements that restrict our ability to pay cash dividends, including the Match Group Credit Agreement and the indentures relating to the Match Group Senior Notes;

- general economic conditions; and

- other factors deemed relevant by our board of directors.

We are not obligated to pay dividends on our common stock or Class B common stock. Consequently, investors may need to rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment. Investors seeking regular cash dividends should not purchase our common stock.

***Provisions in our certificate of incorporation and bylaws or Delaware law may discourage, delay or prevent a change of control of our company or changes in our management and, therefore, depress the trading price of our common stock.***

Delaware corporate law and our certificate of incorporation and bylaws contain provisions that could discourage, delay or prevent a change in control of our company or changes in our management that the stockholders of our company may deem advantageous, including provisions which:

33

App. 315

- authorize the issuance of "blank check" preferred stock that our board could issue to increase the number of outstanding shares and to discourage a takeover attempt;

- limit the ability of our stockholders to call special meetings of stockholders;

- provide that certain litigation against us can only be brought in Delaware; and

- provide that the board of directors is expressly authorized to make, alter or repeal our bylaws.

Any provision of our certificate of incorporation, our bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

Match Group believes that the facilities for its management and operations are generally adequate for its current and near-term future needs. Match Group's facilities, most of which are leased (in some cases, from IAC) in various cities in the United States and abroad, generally consist of executive and administrative offices and data centers.

We believe that our current facilities are adequate to meet our ongoing needs. We also believe that, if we require additional space, we will be able to lease additional facilities on commercially reasonable terms.

## Item 3. Legal Proceedings

### Overview

We are, and from time to time may become, involved in various legal proceedings arising in the normal course of our business activities, such as patent infringement claims, trademark oppositions, and consumer or advertising complaints, as well as stockholder derivative actions, class action lawsuits, and other matters. The amounts that may be recovered in such matters may be subject to insurance coverage. The litigation matters described below involve issues or claims that may be of particular interest to our stockholders, regardless of whether any of these matters may be material to our financial position or operations based upon the standard set forth in the SEC's rules.

### Consumer Class Action Litigation Challenging Tinder's Age-Tiered Pricing

On May 28, 2015, a putative state-wide class action was filed against Tinder in state court in California. *See Allan Candelore v. Tinder, Inc.*, No. BC583162 (Superior Court of California, County of Los Angeles). The complaint principally alleged that Tinder violated California's Unruh Civil Rights Act (the "Unruh Act") by offering and charging users age 30 and over a higher price than younger users for subscriptions to its premium Tinder Plus service. The complaint sought certification of a class of California Tinder Plus subscribers age 30 and over and damages in an unspecified amount. On September 21, 2015, Tinder filed a demurrer seeking dismissal of the complaint. On October 26, 2015, the court issued an opinion sustaining Tinder's demurrer to the complaint without leave to amend, ruling that the age-based pricing differential for Tinder Plus subscriptions did not violate California law in essence because offering a discount to users under age 30 was neither invidious nor unreasonable in light of that age group's generally more limited financial means. On December 29, 2015, in accordance with its ruling, the court entered judgment dismissing the action. On February 1, 2016, the plaintiff filed a notice of appeal from the judgment, and the parties thereafter briefed the appeal. On January 29, 2018, the California Court of Appeal (Second Appellate District, Division Three) issued an opinion reversing the judgment of dismissal, ruling that the lower court had erred in sustaining Tinder's demurrer because the complaint, as pleaded, stated a cognizable claim for violation of the Unruh Act. Because we believe that the appellate court's reasoning was flawed as a matter of law and runs afoul of binding California precedent, on March 12, 2018, Tinder filed a petition with the California Supreme Court seeking interlocutory review of the Court of Appeal's decision. On May 9, 2018, the California Supreme Court denied the petition. The case was then returned to the trial court for further proceedings.

34

App. 316

In a related development, on June 19, 2019, in a substantially similar putative class action asserting the same substantive claims and pending in federal district court in California, the court issued an order granting final approval of a class-wide settlement, the terms of which are not material to the Company. *See Lisa Kim v. Tinder, Inc.*, No. 18-cv-3093 (U.S. District Court, Central District of California). On June 21, 2019, the *Kim* court entered judgment in accordance with its prior order. Because the approved settlement class in *Kim* subsumes the proposed settlement class in *Candelore*, the judgment in *Kim* would effectively render *Candelore* a single-plaintiff lawsuit. Accordingly, on July 11, 2019, two objectors to the *Kim* settlement, represented by the plaintiff's counsel in *Candelore*, filed a notice of appeal from the *Kim* judgment to the U.S. Court of Appeals for the Ninth Circuit. The parties are in the process of briefing the appeal.

On September 13, 2019, Tinder filed a motion to stay the *Candelore* case pending the Ninth Circuit's decision on the appeal of the court-approved settlement in the Kim case. On November 13, 2019, the court issued an order staying the class claims in the *Candelore* case pending the Ninth Circuit's decision on the Kim appeal. We believe that the allegations in the *Candelore* lawsuit are without merit and will continue to defend vigorously against it.

**Tinder Optionholder Litigation Against IAC and Match Group**

On August 14, 2018, ten then-current and former employees of Match Group, LLC or Tinder, Inc. ("Tinder"), an operating business of Match Group, filed a lawsuit in New York state court against IAC and Match Group. *See Sean Rad et al. v. IAC/InterActiveCorp and Match Group, Inc.*, No. 654038/2018 (Supreme Court, New York County). The complaint alleges that in 2017, the defendants: (i) wrongfully interfered with a contractually established process for the independent valuation of Tinder by certain investment banks, resulting in a substantial undervaluation of Tinder and a consequent underpayment to the plaintiffs upon exercise of their Tinder stock options, and (ii) then wrongfully merged Tinder into Match Group, thereby depriving certain of the plaintiffs of their contractual right to later valuations of Tinder on a stand-alone basis. The complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, interference with contractual relations (as against Match Group only), and interference with prospective economic advantage, and seeks compensatory damages in the amount of at least $2 billion, as well as punitive damages. On August 31, 2018, four plaintiffs who were still employed by Match Group filed a notice of discontinuance of their claims without prejudice, leaving the six former employees as the remaining plaintiffs.

On October 9, 2018, the defendants filed a motion to dismiss the complaint on various grounds, including that the 2017 valuation of Tinder by the investment banks was an expert determination any challenge to which is both time-barred under applicable law and available only on narrow substantive grounds that the plaintiffs have not pleaded in their complaint; the plaintiffs opposed the motion. On June 13, 2019, the court issued a decision and order (i) granting the motion to dismiss the claims for breach of the implied covenant of good faith and fair dealing and for unjust enrichment, (ii) granting the motion to dismiss the merger-related claim for breach of contract as to two of the remaining six plaintiffs, and (iii) otherwise denying the motion to dismiss. On June 21, 2019, the defendants filed a notice of appeal from the trial court's partial denial of their motion to dismiss, and the parties thereafter briefed the appeal. On October 29, 2019, the Appellate Division, First Department, issued an order affirming the lower court's decision. On November 22, 2019, the defendants filed a motion for reargument or, in the alternative, leave to appeal the Appellate Division's order to the New York Court of Appeals; the plaintiffs opposed the motion, which remains pending.

On June 3, 2019, the defendants filed a second motion to dismiss based upon certain provisions of the plaintiffs' agreement with a litigation funding firm; the plaintiffs have opposed the motion, which remains pending. On July 15, 2019, the defendants filed an answer denying the material allegations of the complaint, as well as counterclaims against Sean Rad for breach of contract and unjust enrichment based upon his alleged misappropriation of confidential company information. On September 13, 2019, the defendants filed an amended answer and counterclaims, adding claims based on Rad's alleged unauthorized recording of conversations with company employees. On November 21, 2019, the defendants filed a second amended answer and counterclaims, adding claims based on Rad's alleged unauthorized destruction of company information and breach of his non-solicitation obligations.

Document discovery in the case is substantially complete and deposition discovery is underway. On January 30, 2020, the parties participated in a mediation that did not result in resolution of the matter. We believe that the

35

App. 317

Table of Contents

allegations against Match Group and IAC in this lawsuit are without merit and will continue to defend vigorously against it.

**FTC Lawsuit Against Match Group**

In March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com. The FTC raised potential claims relating to Match.com's marketing, chargeback, and online cancellation practices. In November 2018, the FTC proposed to resolve its potential claims via a consent judgment requiring certain changes in those practices, as well as a $60 million payment. Ensuing discussions between the Company and the FTC ended without resolution.

On August 7, 2019, the FTC voted to assert claims against the Company and referred the matter to the U.S. Department of Justice ("DOJ"). The DOJ subsequently declined to pursue a civil case against the Company and referred the matter back to the FTC.

On September 25, 2019, the FTC filed a lawsuit in the Northern District of Texas against Match Group. *See FTC v. Match Group, Inc.*, No. 3:19:cv-02281-K (N.D. Tex.). The complaint alleges that, prior to mid-2018, for marketing purposes Match.com told non-paying users that other users were trying to communicate with them, even though Match.com had identified those subscriber accounts as potentially fraudulent, thereby inducing non-paying users to subscribe and exposing them to the risk of fraud should they subscribe. The complaint also challenges the adequacy of Match.com's disclosure of the terms of its six-month guarantee, the efficacy of its cancellation process, and its handling of chargeback disputes. The complaint seeks among other things permanent injunctive relief, civil penalties, restitution, disgorgement, and costs of suit. On October 17, 2019, the Company filed a motion to dismiss the complaint. The FTC opposed the motion, which remains pending.

On September 26, 2019, the Company received a grand-jury subpoena from the DOJ for documents relating to certain of the marketing-related claims in the FTC's complaint. The Company has cooperated with the DOJ in responding to its subpoena.

Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and will defend vigorously against them.

**Securities Class Action Lawsuit Against Match Group**

On October 3, 2019, a Match Group shareholder filed a securities class action lawsuit in federal court in Texas against Match Group, Inc., its CEO, and its CFO, on behalf of a class of acquirers of Match Group securities between August 6, 2019 and September 25, 2019. *See Phillip R. Crutchfield v. Match Group, Inc., Amanda W. Ginsberg, and Gary Swidler*, No. 3:19-cv-02356-C (Northern District of Texas, Dallas Division). Invoking the allegations in the FTC lawsuit described above, the complaint alleges (i) that Defendants failed to disclose to investors that the Company induced customers to buy and upgrade subscriptions using misleading advertisements, that the Company made it difficult for customers to cancel their subscriptions, and that, as a result, the Company was likely to be subject to regulatory scrutiny; (ii) that the Company lacked adequate disclosure controls and procedures; and (iii) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis. On January 6, 2020, the court approved a stipulation appointing two lead plaintiffs as well as co-lead counsel. On January 23, 2020, the Court entered a scheduling order, which allows Lead Plaintiffs to file an amended complaint on or before March 23, 2020. Match Group believes that the allegations in this lawsuit are without merit and will defend vigorously against them.

**House Oversight Committee Investigation of Online Dating**

On January 30, 2020, Match Group, Inc. received a letter from the House of Representatives' Subcommittee on Economic and Consumer Policy (the "Oversight Committee") regarding its inquiry into underage use of online dating services and efforts by those services to remove registered sex offenders from their platforms. The Oversight Committee is also inquiring about under what circumstances online dating services share or sell sensitive user information with third parties. The Oversight Committee has requested documents and information related to its inquiry. The Company is cooperating with the investigation.

Table of Contents

**Irish Data Protection Commission Inquiry Regarding Tinder's Practices**

On February 3, 2020, we received a letter from the Irish Data Protection Commission (the "DPC") notifying us that the DPC has commenced an inquiry examining Tinder's compliance with the EU's General Data Protection Regulation, focusing on Tinder's processes for handling access and deletion requests and Tinder's user data retention policies. We are planning to fully cooperate with the DPC in connection with this inquiry.

**Item 4. Mine Safety Disclosure**

Not applicable.

37

App. 319

Table of Contents

## PART II

### Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

#### Market for Registrant's Common Equity and Related Stockholder Matters

Our common stock is quoted on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MTCH." There is no established public trading market for our Class B common stock. As of February 26, 2020, the closing price of our common stock on NASDAQ was $66.04.

As of January 31, 2020, there were 26 holders of record of the Company's common stock and one holder of record of the Company's Class B common stock. Because the substantial majority of the outstanding shares of our common stock are held by brokers and other institutions on behalf of shareholders, we are not able to estimate the total number of beneficial shareholders represented by these record holders.

#### Unregistered Sales of Equity Securities

Under the terms of the Employee Matters Agreement dated as of November 24, 2015, by and between IAC/InterActiveCorp ("IAC") and Match Group, Inc. (the "Company"), as amended effective as of April 13, 2016 (the "Employee Matters Agreement"), IAC may cause certain equity awards of the Company to be settled in shares of IAC common stock, par value $0.001 ("IAC Common Stock") and cause the Company to reimburse IAC for the cost of such shares of IAC Common Stock by issuing shares of Company common stock, par value $0.001 ("Company Common Stock") to IAC. The Employee Matters Agreement also provides that the Company will reimburse IAC for the cost of any IAC equity awards held by the Company's employees and former employees and that IAC may elect to receive payment either in cash or Company Common Stock.

On December 31, 2019, 122,696 shares of Company Common Stock were issued to IAC as reimbursement for shares of IAC Common Stock issued in connection with the exercise of IAC stock options held by Match Group employees.

On October 31, 2019; November 30, 2019; and December 31, 2019, 4,385; 66,789; and 22,841 shares, respectively, of Company Common Stock were issued to IAC as reimbursement for shares of IAC Common Stock issued in connection with the exercise and settlement of equity shares of a subsidiary of the Company pursuant to the Employee Matters Agreement.

The issuances of Company Common Stock described above did not involve any underwriters or public offerings and the Company believes that such issuances were exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(a)(2) of such act.

#### Issuer Purchases of Equity Securities

The following table sets forth purchases by the Company of its common stock during the quarter ended December 31, 2019:

| Period | (a) Total Number of Shares Purchased | (b) Average Price Paid Per Share | (c) Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs[1] | (d) Maximum Number of Shares that May Yet Be Purchased Under Publicly Announced Plans or Programs[2] |
|---|---|---|---|---|
| October 2019 | 331,260 | $ 73.64 | 331,260 | 9,938,071 |
| November 2019 | — | $ — | — | 9,938,071 |
| December 2019 | 80,400 | $ 68.16 | 80,400 | 9,857,671 |
| Total | 411,660 | $ 72.57 | 411,660 | 9,857,671 |

[1]   Reflects repurchases made pursuant to the repurchase program originally authorized in May 2017, which has no expiration. On August 30, 2019, the Company's Board of Directors authorized an increase to the repurchase program of 10 million shares, resulting in a total repurchase authorization of 16 million shares.

[2]   Represents the total number of shares of common stock that remained available for repurchase pursuant to the Company's repurchase program, including the increase of 10 million shares authorized on August 30, 2019. The timing and actual number of any shares repurchased will depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities. The

38

Table of Contents

Company is not obligated to purchase any shares under the repurchase program, and repurchases may be commenced, suspended or discontinued from time to time without prior notice.

**Dividend**

On December 19, 2018, we paid a special dividend of $2.00 per share on Match Group common stock and Class B common stock, to stockholders of record as of the close of business on December 5, 2018.

**Stock Performance Graph**

The following graph compares the cumulative total return (assuming dividend reinvestment, as applicable) of Match Group common stock, the NASDAQ Composite index, the Russell 1000 Technology Index, and the Standard & Poor's 500 Stock Index, in each case, based on $100 invested at the close of trading on November 19, 2015 through December 31, 2019. In accordance with applicable SEC rules, Match Group presents the cumulative return of peer issuers. Match Group has selected the NASDAQ Composite Index and the Russell 1000 Technology Index as its peer issuers because they both include companies engaged in many of the same businesses as Match Group. The returns shown are based on historical results and are not intended to suggest future performance.

**COMPARISON OF CUMULATIVE TOTAL RETURN**
**Match Group, Inc. Common Stock**
Among Match Group, Inc., the NASDAQ Composite Index,
the Russell 1000 Technology Index, and the S&P 500 Index



| | 11/19/2015 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 |
|---|---|---|---|---|---|---|
| Match Group, Inc. | $100.00 | $91.93 | $116.01 | $212.42 | $305.27 | $586.05 |
| NASDAQ Composite Index | $100.00 | $98.82 | $107.68 | $139.70 | $135.77 | $185.65 |
| Russell 1000 Technology Index | $100.00 | $97.81 | $111.59 | $154.44 | $152.58 | $224.62 |
| S&P 500 Index | $100.00 | $98.43 | $110.20 | $134.25 | $128.35 | $168.75 |

39

Table of Contents

## Item 6.   Selected Financial Data

The selected financial data set forth in the table below as of December 31, 2019, 2018, 2017, 2016, and 2015 and for the years then ended were derived from our audited consolidated and combined financial statements. This selected financial data should be read in conjunction with the consolidated financial statements and accompanying notes included herein.

| | Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (Dollars in thousands, except per share data) | | | | |
| **Statement of Operations Data:** | | | | | |
| Revenue | $ 2,051,258 | $ 1,729,850 | $ 1,330,661 | $ 1,118,110 | $ 909,705 |
| Earnings from continuing operations | 534,425 | 472,969 | 355,977 | 178,341 | 133,163 |
| Loss from discontinued operations | — | (378) | (5,650) | (6,328) | (12,676) |
| Net earnings attributable to Match Group, Inc. shareholders | 534,731 | 477,939 | 350,148 | 171,451 | 120,383 |
| Earnings per share from continuing operations attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.91 | $ 1.73 | $ 1.35 | $ 0.71 | $ 0.76 |
| Diluted | $ 1.81 | $ 1.61 | $ 1.20 | $ 0.66 | $ 0.72 |
| Earnings per share attributable to Match Group, Inc. shareholders: | | | | | |
| Basic | $ 1.91 | $ 1.73 | $ 1.33 | $ 0.68 | $ 0.69 |
| Diluted | $ 1.81 | $ 1.61 | $ 1.18 | $ 0.64 | $ 0.65 |
| Dividend declared per share | $ — | $ 2.00 | $ — | $ — | $ — |

| | December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (In thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Total assets | $ 2,423,712 | $ 2,053,061 | $ 2,130,146 | $ 2,048,678 | $ 1,909,392 |
| Long-term debt, net including current maturities | 1,603,483 | 1,515,911 | 1,252,696 | 1,176,493 | 1,216,871 |

40

Table of Contents

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Separation**

On December 19, 2019, Match Group and IAC entered into the Transaction Agreement pursuant to which, following the satisfaction of certain closing conditions, including IAC and Match Group stockholder approval, the businesses of Match Group will be separated from the remaining businesses of IAC through Transactions that will result in two, separate public companies—(1) IAC, which will be re-named "Match Group, Inc." and which will own the businesses of Match Group and certain IAC financing subsidiaries, and (2) IAC Holdings, Inc., which will be re-named "IAC/InterActiveCorp" and which will own IAC's other businesses— and the pre-transaction stockholders of Match Group and of IAC owning shares in New Match.

For additional information relating to the Separation and the related transactions and agreements, see "Part I—Item 1—Business —Relationship with IAC—Separation."

**Key Terms:**

**Operating metrics:**

- **North America** - consists of the financial results and metrics associated with users located in the United States and Canada.

- **International** - consists of the financial results and metrics associated with users located outside of the United States and Canada.

- **Direct Revenue** - is revenue that is received directly from end users of our products and includes both subscription and à la carte revenue.

- **Indirect Revenue** - is revenue that is not received directly from an end user of our products, substantially all of which is advertising revenue.

- **Subscribers** - are users who purchase a subscription to one of our products. Users who purchase only à la carte features are not included in Subscribers.

- **Average Subscribers** - is the number of Subscribers at the end of each day in the relevant measurement period divided by the number of calendar days in that period.

- **Average Revenue per Subscriber ("ARPU")** - is Direct Revenue from Subscribers in the relevant measurement period (whether in the form of subscription or à la carte revenue) divided by the Average Subscribers in such period and further divided by the number of calendar days in such period. Direct Revenue from users who are not Subscribers and have purchased only à la carte features is not included in ARPU.

**Operating costs and expenses:**

- **Cost of revenue -** consists primarily of the amortization of in-app purchase fees, compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in data center and customer care functions, credit card processing fees, hosting fees, and data center rent, energy, and bandwidth costs. In-app purchase fees are monies paid to Apple and Google in connection with the processing of in-app purchases of subscriptions and product features through the in-app payment systems provided by Apple and Google.

- **Selling and marketing expense -** consists primarily of advertising expenditures and compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in selling and marketing, and sales support functions. Advertising expenditures includes online marketing, including fees paid to search engines and social media sites, offline marketing (which is primarily television advertising), and payments to partners that direct traffic to our brands.

- **General and administrative expense -** consists primarily of compensation expense (including stock-based compensation expense) and other employee-related costs for personnel engaged in executive management, finance, legal, tax and human resources, acquisition-related contingent consideration fair value adjustments (described below), fees for professional services (including transaction-related costs for acquisitions), and facilities costs.

Case 3:19-cv-02356-S     Document 39     Filed 06/12/20     Page 328 of 451     PageID 851

App. 324

Table of Contents

- **Product development expense -** consists primarily of compensation expense (including stock-based compensation expense) and other employee-related costs that are not capitalized for personnel engaged in the design, development, testing, and enhancement of product offerings and related technology.

- **Acquisition-related contingent consideration fair value adjustments** - relate to the portion of the purchase price of certain acquisitions that is contingent upon the financial performance and/or operating metric targets of the acquired company. The fair value of the liability is estimated at the date of acquisition and adjusted each reporting period until the liability is settled. Significant changes in forecasted earnings and/or operating metrics will result in a significantly higher or lower fair value measurement. The changes in the estimated fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount if the arrangement is longer than one year, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations.

**Long-term debt:**

- **Credit Facility** - The Company's revolving credit facility. At December 31, 2019, $500 million was available under the Credit Facility and the Credit Facility bore interest at LIBOR plus 1.50%. On February 13, 2020, the Credit Facility was amended to, among other things, increase the available borrowing capacity from $500 million to $750 million, reduce interest rate margins by 0.125% to LIBOR plus 1.375%, and extend its maturity from December 7, 2023 to February 13, 2025.

- **Term Loan** - The Company's $425 million term loan. At December 31, 2019, the Term Loan bore interest at LIBOR plus 2.50% and the then applicable rate was 4.44%. On February 13, 2020, the Term Loan was amended to reprice the outstanding balance to LIBOR plus 1.75% and extend its maturity from November 16, 2022 to February 13, 2027.

- **6.375% Senior Notes** - The Company's 6.375% Senior Notes due June 1, 2024, with interest payable each June 1 and December 1, which were issued on June 1, 2016. At December 31, 2019, $400 million aggregate principal amount is outstanding.

- **5.00% Senior Notes** - The Company's 5.00% Senior Notes due December 15, 2027, with interest payable each June 15 and December 15, which were issued on December 4, 2017. At December 31, 2019, $450 million aggregate principal amount is outstanding.

- **5.625% Senior Notes** - The Company's 5.625% Senior Notes due February 15, 2029, with interest payable each February 15 and August 15, which were issued on February 15, 2019. At December 31, 2019, $350 million aggregate principal amount is outstanding.

- **4.125% Senior Notes** - The Company's 4.125% Senior Notes due August 1, 2030, with interest payable each February 1 and August 1, commencing on August 1, 2020, which were issued on February 11, 2020. The proceeds were used to pay expenses associated with the offering and, in the event the Separation is consummated, will be used to fund the Intercompany Loan to IAC. If the Separation is not consummated, the proceeds will be used for general corporate purposes.

**Non-GAAP financial measure:**

- **Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")** - is a Non-GAAP financial measure. See "Principles of Financial Reporting" for the definition of Adjusted EBITDA and a reconciliation of net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA.

## MANAGEMENT OVERVIEW

Match Group, Inc., through its portfolio companies, is a leading provider of dating products available globally. Our portfolio of brands includes Tinder®, Match®, Meetic®, OkCupid®, Hinge®, Pairs™, PlentyOfFish®, and OurTime®, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio companies and their trusted brands, we provide tailored products to meet the varying preferences of our users. Our products are available in over 40 languages to our users all over the world.

42

App. 325

**Sources of Revenue**

All our products provide the use of certain features for free, and then offer a variety of additional features to Subscribers. Our revenue is primarily derived directly from users in the form of recurring subscription fees.

Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by using a credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, all purchases are final and nonrefundable. Fees collected, or contractually due, in advance for subscriptions are deferred and recognized as revenue using the straight-line method over the term of the applicable subscription period, which primarily ranges from one to six months, and corresponding mobile app store fees incurred on such transactions, if any, are deferred and expensed over the same period. We also earn revenue from online advertising, the purchase of à la carte features, and offline events. Online advertising revenue is recognized every time an ad is displayed. Revenue from the purchase of à la carte features is recognized based on usage. Revenue and the related expenses associated with offline events are recognized when each event occurs.

**Trends affecting our business**

Over the last several years, we have seen significant changes in our business. Tinder has grown from incubation to the largest contributing brand in our portfolio and our other brands have generally been stable in the aggregate. This in turn has allowed us to invest in or acquire brands such as Hinge and incubate new brands such as Chispa, BLK, and Ship, where we see significant potential future growth opportunities. With our evolving portfolio of brands, we have seen a number of significant trends in our business including the following:

*Lower cost users.* All of our brands rely on word-of-mouth, or free, customer acquisition to varying degrees. Word-of-mouth acquisition is typically a function of scale (with larger communities driving greater numbers of referrals), youthfulness (with the viral effect being more pronounced in younger populations due, in part, to a significantly higher concentration of single people in any given social circle and the increased adoption of social media and similar platforms among such populations), and monetization rate (with people generally more likely to talk openly about using dating products that are less heavily monetized). Additionally, some, but not all, of our brands spend meaningfully on paid marketing. Accordingly, the average amount we spend to acquire a user differs significantly across brands based in large part on each brand's mix of paid and free acquisition channels. As our mix has shifted toward younger users, our mix of acquisition channels has shifted toward free channels, driving a significant decline over the past several years in the average amount we spend to acquire a new user across our portfolio. As a percentage of revenue, our costs of acquiring Subscribers have declined.

*Changing paid acquisition dynamics.* Even as our acquisition of lower cost users increases, paid acquisition of users remains an important driver of our business. The channels through which we market our brands are always evolving, but we are currently in a period of rapid change as TV and video consumption patterns evolve and internet consumption occurs regularly on mobile devices. As we adapt our paid marketing activities to maximize user engagement with our brands, we may increase our use of paid advertising at brands where we traditionally relied on word-of-mouth engagement to leverage these shifts in media consumption patterns and fuel international growth. Other brands in our portfolio may reduce paid marketing activities to reflect the change in audience engagement.

*Increasing In-App Purchase Fees.* Purchases made by our customers through mobile applications, as opposed to desktop or mobile web, continue to increase. Purchases processed through the in-app payments systems provided by the Apple App Store and Google Play Store are subject to in-app purchase fees, which are generally 30% of the purchase price. As a result, the percentage of our revenues paid to Apple and Google continues to increase. In 2019, Tinder began offering subscribers an alternative payment method to Google's in-app payment system similar to the payment alternatives other brands in our portfolio have historically offered to subscribers through mobile apps on Android. The availability of this alternative payment method has reduced the amount of in-app purchases fees paid to Google as a percentage of total Android revenue. To the extent that app stores fee change, or the mix of our revenue generated through app stores shifts, our results, in particular our profit measures, could be impacted.

*Increase in acceptance and growth of dating products globally.* Over the past decade, there has been meaningful growth in dating product usage in North America and Western Europe, and we see the potential for similar growth in the rest of the world in the years ahead. As more internet-connected singles utilize online dating

43

products and the stigma around dating continues to erode, we believe that there is potential for accelerating growth in the use of dating products globally.

### Other factors affecting the comparability of our results

*Advertising spend.* Our advertising spend, which is included in our selling and marketing expense, has consistently been our largest operating expense. How we deploy our advertising spend varies among brands, with the majority of our advertising spend taking place online, including search engines, social media sites, streaming services and influencers. Additionally, some brands utilize television and out-of-home marketing campaigns, such as on outdoor billboards. For established brands, we seek to optimize for total return on advertising spend by frequently analyzing and adjusting this spend to focus on marketing channels and markets that generate returns above our thresholds. Our data-driven approach provides us the flexibility to scale and optimize our advertising spend. We spend advertising dollars against an expected lifetime value of a Subscriber that is realized over a multi-year period; and while this advertising spend is intended to be profitable on that basis, it is nearly always negative during the period in which the expense is incurred. For newer brands that are gaining scale, or existing brands that are expanding into new geographies, we may make incremental advertising investments to establish the brand before optimizing monetization of the brand. In general, our more established brands spend a higher proportion of their revenue on advertising while our newer brands spend a lower proportion and tend to rely more on word of mouth and other viral marketing. Additionally, advertising spend is typically higher during the first quarter of our fiscal year, and lower during the fourth quarter. See "Seasonality" below.

*Seasonality.* Historically, our business has experienced seasonal fluctuations in quarterly operating results, particularly with respect to our profit measurements. This is driven primarily by a higher concentration of advertising spend in the first quarter, when advertising prices are lowest and demand for our products is highest, and a lower concentration of advertising spend in the fourth quarter, when advertising costs are highest and demand for our products is lowest. Seasonality is not consistent across our brands, with brands targeted at older users generally showing more seasonality than brands targeted at younger users.

*International markets.* Our products are available across the world. Our international revenue represented 53% and 50% of our total revenue for the years ended December 31, 2019 and 2018, respectively. We vary our pricing to align with local market conditions and our international businesses typically earn revenue in local currencies. As foreign currency exchange rates change, translation of the statement of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results.

### 2019 Developments

On February 15, 2019, we issued $350 million aggregate principal amount of the 5.625% Senior Notes. The proceeds from the issuance of the 5.625% Senior Notes were used to repay outstanding borrowings under the Credit Facility, to pay expenses associated with the offering, and for general corporate purposes.

On December 19, 2019, Match Group and IAC entered into the Transaction Agreement, pursuant to which, following the satisfaction of certain closing conditions, including IAC and Match Group stockholder approval, the businesses of Match Group will be separated from the remaining businesses of IAC through Transactions that will result in two, separate public companies—(1) IAC, which will be re-named "Match Group, Inc." and which will own the businesses of Match Group and certain IAC financing subsidiaries, and (2) IAC Holdings, Inc., which will be re-named "IAC/InterActiveCorp" and which will own IAC's other businesses— and the pre-transaction stockholders of Match Group (other than IAC) and of IAC owning shares in New Match. For additional information relating to the Separation and the related transactions and agreements, see "Part I—Item 1—Business—Relationship with IAC—Separation."

### 2019 Consolidated Results

In 2019, revenue, operating income and Adjusted EBITDA grew 19%, 17% and 19%, respectively. Revenue growth was primarily due to strong growth at Tinder and additional contributions from certain other brands. The growth in operating income and Adjusted EBITDA was due to higher revenue and lower selling and marketing expense as a percentage of revenue due to the continued product mix shift toward brands with lower marketing spend as a percentage of revenue, partially offset by an increase in cost of revenue expense primarily due to higher in-app purchase fees as a result of growing revenue sourced through mobile app stores, and higher legal costs. Operating income was further impacted by the impairment of the Match brand in the UK and higher stock-based compensation expense as a percentage of revenue, resulting in decreased growth compared to Adjusted EBITDA.

44

App. 327

Table of Contents

## Results of Operations for the years ended December 31, 2019, 2018 and 2017

The following discussion should be read in conjunction with "Item 8. Consolidated Financial Statements and Supplementary Data." For a discussion regarding our financial condition and results of operations for the year ended December 31, 2018 compared to the year ended December 31, 2017, please refer to Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on February 28, 2019.

### Revenue

| | | | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | $ Change | % Change | 2018 | $ Change | % Change | | 2017 |
| | | | | (Amounts in thousands, except ARPU) | | | | |
| **Direct Revenue:** | | | | | | | | |
| North America | $ 1,024,161 | $ 121,683 | 13% | $ 902,478 | $ 161,144 | 22% | $ | 741,334 |
| International | 983,013 | 208,320 | 27% | 774,693 | 234,778 | 43% | | 539,915 |
| Total Direct Revenue | 2,007,174 | 330,003 | 20% | 1,677,171 | 395,922 | 31% | | 1,281,249 |
| Indirect Revenue | 44,084 | (8,595) | (16)% | 52,679 | 3,267 | 7% | | 49,412 |
| Total Revenue | $ 2,051,258 | $ 321,408 | 19% | $ 1,729,850 | $ 399,189 | 30% | $ | 1,330,661 |
| | | | | | | | | |
| **Direct Revenue** | | | | | | | | |
| Tinder | $ 1,152,045 | $ 346,729 | 43% | $ 805,316 | $ 402,100 | 100% | $ | 403,216 |
| Other brands | 855,129 | (16,726) | (2)% | 871,855 | (6,178) | (1)% | | 878,033 |
| Total Direct Revenue | $ 2,007,174 | $ 330,003 | 20% | $ 1,677,171 | $ 395,922 | 31% | $ | 1,281,249 |
| | | | | | | | | |
| **Percentage of Total Revenue:** | | | | | | | | |
| Direct Revenue: | | | | | | | | |
| North America | 50% | | | 52% | | | | 56% |
| International | 48% | | | 45% | | | | 40% |
| Total Direct Revenue | 98% | | | 97% | | | | 96% |
| Indirect Revenue | 2% | | | 3% | | | | 4% |
| Total Revenue | 100% | | | 100% | | | | 100% |
| | | | | | | | | |
| **Average Subscribers:** | | | | | | | | |
| North America | 4,554 | 393 | 9% | 4,161 | 592 | 17% | | 3,569 |
| International | 4,729 | 1,017 | 27% | 3,712 | 873 | 31% | | 2,839 |
| Total | 9,283 | 1,410 | 18% | 7,873 | 1,465 | 23% | | 6,408 |
| | | | | | | | | |
| *(Change calculated using non-rounded numbers)* | | | | | | | | |
| **ARPU:** | | | | | | | | |
| North America | $ 0.61 | | 4% | $ 0.59 | | 4% | $ | 0.56 |
| International | $ 0.56 | | —% | $ 0.56 | | 10% | $ | 0.51 |
| Total | $ 0.58 | $ 0.01 | 2% | $ 0.57 | $ 0.03 | 6% | $ | 0.54 |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

International Direct Revenue grew $208.3 million, or 27%, in 2019 versus 2018, driven by 27% growth in Average Subscribers. North America Direct Revenue grew $121.7 million, or 13%, in 2019 versus 2018, driven by 9% growth in Average Subscribers, and a 4% increase in ARPU.

App. 328

45

Table of Contents

Growth in International and North America Average Subscribers was primarily driven by Tinder. Hinge and Pairs also contributed to subscriber growth in North America and International, respectively. North America ARPU increased primarily due to increases in ARPU at Tinder as Subscribers purchased premium subscriptions, such as Tinder Gold, as well as additional à la carte features. International ARPU was unfavorably impacted by the strength of the U.S. dollar relative to the Euro, British pound ("GBP"), and certain other currencies.

Indirect Revenue decreased $8.6 million primarily due to lower impressions and a lower price per impression received from an advertising network provider.

### Cost of revenue (exclusive of depreciation)

| | | | | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | $ Change | % Change | 2018 | $ Change | % Change | 2017 |
| | | | | (Dollars in thousands) | | | |
| Cost of revenue | $527,184 | $117,184 | 29% | $410,000 | $130,501 | 47% | $279,499 |
| Percentage of revenue | 26% | | | 24% | | | 21% |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Cost of revenue increased due to an increase in in-app purchase fees of $80.1 million, as revenue continues to be increasingly sourced through mobile app stores; an increase in hosting fees of $21.9 million; and an increase in compensation expense of $11.2 million related to increased headcount and other operating costs in customer care.

### Selling and marketing expense

| | | | | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | $ Change | % Change | 2018 | $ Change | % Change | 2017 |
| | | | | (Dollars in thousands) | | | |
| Selling and marketing expense | $427,440 | $7,486 | 2% | $419,954 | $44,344 | 12% | $375,610 |
| Percentage of revenue | 21% | | | 24% | | | 28% |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Selling and marketing expense increased primarily due to increases in spending at Tinder, Hinge, and Pairs, partially offset by decreases at Meetic, Match, and PlentyOfFish. Selling and marketing expense declined as a percentage of revenue as we continue to generate revenue growth from brands with relatively lower marketing expense.

### General and administrative expense

| | | | | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | $ Change | % Change | 2018 | $ Change | % Change | 2017 |
| | | | | (Dollars in thousands) | | | |
| General and administrative expense | $254,966 | $74,680 | 41% | $180,286 | $482 | —% | $179,804 |
| Percentage of revenue | 12% | | | 10% | | | 14% |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

General and administrative expense increased primarily due to an increase of $38.1 million in legal fees; an increase in compensation of $19.0 million primarily related to stock-based compensation expense due to new equity awards made since the prior year period, modification charges during 2019, and an increase in headcount; and an increase of $4.7 million for non-income taxes that includes the recently enacted French Digital Services Tax, which was made effective retroactively to January 1, 2019.

46

App. 330

Table of Contents

### Product development expense

| | Years Ended December 31, | | | | | | |
| | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | | |
| Product development expense | $151,960 | $19,930 | 15% | $132,030 | $30,880 | 31% | $101,150 |
| Percentage of revenue | 7% | | | 8% | | | 8% |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Product development expense increased primarily as a result of an increase of $18.6 million in compensation, including an increase of $10.3 million in stock-based compensation expense primarily due to the vesting of certain awards for which the market condition was met, and increased headcount at Tinder.

### Depreciation

| | Years Ended December 31, | | | | | | |
| | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | | |
| Depreciation | $32,450 | $(518) | (2)% | $32,968 | $355 | 1% | $32,613 |
| Percentage of revenue | 2% | | | 2% | | | 2% |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Depreciation decreased primarily due to certain internally developed software becoming fully depreciated, partially offset by increased depreciation related to leasehold improvements.

### Operating Income and Adjusted EBITDA

| | Years Ended December 31, | | | | | | |
| | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|---|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | | |
| Operating income | $648,531 | $95,237 | 17% | $553,294 | $192,777 | 53% | $360,517 |
| Percentage of revenue | 32% | | | 32% | | | 27% |
| Adjusted EBITDA | $779,432 | $125,501 | 19% | $653,931 | $184,990 | 39% | $468,941 |
| Percentage of revenue | 38% | | | 38% | | | 35% |

For a reconciliation of net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA, see "Principles of Financial Reporting."

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Operating income and Adjusted EBITDA increased $95.2 million, or 17%, and $125.5 million, or 19%, respectively, primarily as a result of the increase in revenue of $321.4 million and lower selling and marketing expense as a percentage of revenue due to the ongoing product mix shift toward brands with lower marketing spend as a percentage of revenue, partially offset by an increase in cost of revenue due to higher in-app purchase fees and an increase in legal fees. Operating income was also impacted by higher stock-based compensation expense as a percentage of revenue and an increase in amortization due to the impairment of the Match brand in the UK, resulting in decreased growth compared to Adjusted EBITDA.

At December 31, 2019, there was $114.1 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.4 years.

App. 331

App. 332

Table of Contents

*Interest expense*

|  | **Years Ended December 31,** | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|  | **(Dollars in thousands)** | | | | | | |
| Interest expense | $91,719 | $18,302 | 25% | $73,417 | $(4,148) | (5)% | $77,565 |

*For the year ended December 31, 2019 compared to the year ended December 31, 2018*

Interest expense increased primarily due to the issuance of the 5.625% Senior Notes in February 2019. Additionally, the interest rate on the Term Loan, which is based on LIBOR, was higher in the current year period.

*Other (expense) income, net*

|  | **Years Ended December 31,** | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|  | **(Dollars in thousands)** | | | | | | |
| Other (expense) income, net | $(2,026) | $(9,791) | NM | $7,765 | $38,592 | NM | $(30,827) |

—————————

NM = not meaningful

Other expense, net, in 2019 includes a $4.0 million impairment of an equity investment, expense of $1.7 million related to a mark-to-market adjustment pertaining to a liability classified equity instrument, and $0.9 million in net foreign currency losses in the period, partially offset by interest income of $4.4 million.

Other income, net, in 2018 includes $5.3 million in net foreign currency exchange gains due primarily to a strengthening of the U.S. dollar relative to the GBP in the period and $4.9 million of interest income, partially offset by $2.1 million of impairments of certain equity investments and $0.7 million of expense related to a mark-to-market adjustment pertaining to a subsidiary denominated equity instrument.

*Income tax (provision) benefit*

|  | **Years Ended December 31,** | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | **2019** | **$ Change** | **% Change** | **2018** | **$ Change** | **% Change** | **2017** |
|  | **(Dollars in thousands)** | | | | | | |
| Income tax (provision) benefit | $(20,361) | $(5,688) | 39% | $(14,673) | $(118,525) | NM | $103,852 |
| Effective income tax rate | 4% |  |  | 3% |  |  | NM |

For discussion of income taxes, see "Note 3—Income Taxes" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

For the year ended December 31, 2019 and 2018, the Company recorded an income tax provision of $20.4 million and $14.7 million, respectively, representing an effective tax rate of 4% and 3%, respectively, which is lower than the statutory rate of 21% due primarily to excess tax benefits generated by the exercise and vesting of stock-based awards and research credits.

*Related party transactions*

For discussion of related party transactions, see "Note 16—Related Party Transactions" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

Table of Contents

## PRINCIPLES OF FINANCIAL REPORTING

Match Group reports Adjusted EBITDA and Revenue excluding foreign effects, both of which are supplemental measures to U.S. generally accepted accounting principles ("GAAP"). Adjusted EBITDA is among the primary metrics by which we evaluate the performance of our business, on which our internal budget is based, and by which management is compensated. Revenue excluding foreign exchange effects provides a comparable framework for assessing how our business performed without the effect of exchange rate differences when compared to prior periods. We believe that investors should have access to, and we are obligated to provide, the same set of tools that we use in analyzing our results. These non-GAAP measures should be considered in addition to results prepared in accordance with GAAP, but should not be considered a substitute for or superior to GAAP results. Match Group endeavors to compensate for the limitations of the non-GAAP measures presented by providing the comparable GAAP measure with equal or greater prominence and descriptions of the reconciling items, including quantifying such items, to derive the non-GAAP measure. We encourage investors to examine the reconciling adjustments between the GAAP and non-GAAP measure, which we discuss below.

### Adjusted EBITDA

*Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")* is defined as operating income excluding: (1) stock-based compensation expense; (2) depreciation; and (3) acquisition-related items consisting of (i) amortization of intangible assets and impairments of goodwill and intangible assets, if applicable, and (ii) gains and losses recognized on changes in the fair value of contingent consideration arrangements. We believe this measure is useful for analysts and investors as this measure allows a more meaningful comparison between our performance and that of our competitors. The above items are excluded from our Adjusted EBITDA measure because they are non-cash in nature. Adjusted EBITDA has certain limitations because it excludes the impact of these expenses.

*Non-Cash Expenses That Are Excluded From Adjusted EBITDA*

*Stock-based compensation expense* consists principally of expense associated with the grants of stock options, restricted stock units ("RSUs"), performance-based RSUs, and market-based awards. These expenses are not paid in cash, and we include the related shares in our fully diluted shares outstanding using the treasury stock method; however, performance-based RSUs and market-based awards are included only to the extent the applicable performance or market condition(s) have been met (assuming the end of the reporting period is the end of the contingency period). To the extent that stock-based awards are settled on a net basis, the Company remits the required tax-withholding amounts from its current funds.

*Depreciation* is a non-cash expense relating to our property and equipment and is computed using the straight-line method to allocate the cost of depreciable assets to operations over their estimated useful lives, or, in the case of leasehold improvements, the lease term, if shorter.

*Amortization of intangible assets and impairments of goodwill and intangible assets* are non-cash expenses related primarily to acquisitions. At the time of acquisition, the identifiable definite-lived intangible assets of the acquired company, such as customer lists, trade names, and technology, are valued and amortized over their estimated lives. Value is also assigned to acquired indefinite-lived intangible assets, which comprise trade names and trademarks, and goodwill that are not subject to amortization. An impairment is recorded when the carrying value of an intangible asset or goodwill exceeds its fair value. We believe that intangible assets represent costs incurred by the acquired company to build value prior to acquisition and the related amortization and impairment charges of intangible assets or goodwill, if applicable, are not ongoing costs of doing business.

*Gains and losses recognized on changes in the fair value of contingent consideration arrangements* are accounting adjustments to report contingent consideration liabilities at fair value. These adjustments can be highly variable and are excluded from our assessment of performance because they are considered non-operational in nature and, therefore, are not indicative of current or future performance or the ongoing cost of doing business.

49

Table of Contents

The following table reconciles net earnings attributable to Match Group, Inc. shareholders to operating income and Adjusted EBITDA:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| **Net earnings attributable to Match Group, Inc. shareholders** | $ 534,731 | $ 477,939 | $ 350,148 |
| Add back: | | | |
| Net (loss) earnings attributable to noncontrolling interests | (306) | (5,348) | 179 |
| Loss from discontinued operations, net of tax | — | 378 | 5,650 |
| Income tax provision (benefit) | 20,361 | 14,673 | (103,852) |
| Other expense (income), net | 2,026 | (7,765) | 30,827 |
| Interest expense | 91,719 | 73,417 | 77,565 |
| **Operating Income** | 648,531 | 553,294 | 360,517 |
| Stock-based compensation expense | 89,724 | 66,031 | 69,090 |
| Depreciation | 32,450 | 32,968 | 32,613 |
| Amortization of intangibles | 8,727 | 1,318 | 1,468 |
| Acquisition-related contingent consideration fair value adjustments | — | 320 | 5,253 |
| **Adjusted EBITDA** | $ 779,432 | $ 653,931 | $ 468,941 |

**Effects of Changes in Foreign Exchange Rates on Revenue**

The impact of foreign exchange rates on the Company, due to its global reach, may be an important factor in understanding period over period comparisons if movement in exchange rates is significant. Since our results are reported in U.S. dollars, international revenue is favorably impacted as the U.S. dollar weakens relative to other foreign currencies, and unfavorably impacted as the U.S. dollar strengthens relative to other foreign currencies. We believe the presentation of revenue excluding the effects from foreign exchange, in addition to reported revenue, helps improve the ability to understand the Company's performance because it excludes the impact of foreign currency volatility that is not indicative of Match Group's core operating results.

Revenue excluding foreign exchange effects compares results between periods as if exchange rates had remained constant period over period. Revenue excluding foreign exchange effects is calculated by translating current period revenue using prior period exchange rates. The percentage change in revenue excluding foreign exchange effects is calculated by determining the change in current period revenue over prior period revenue where current period revenue is translated using prior period exchange rates.

50

Table of Contents

The following table presents the impact of foreign exchange on total revenue, ARPU, and International ARPU for the year ended December 31, 2019 compared to the year ended December 31, 2018:

| | Years Ended December 31, | | | |
| | 2019 | $ Change | % Change | 2018 |
| | (Dollars in thousands, except ARPU) | | | |
| Revenue, as reported | $ 2,051,258 | $ 321,408 | 19% | $ 1,729,850 |
| Foreign exchange effects | 47,459 | | | |
| Revenue excluding foreign exchange effects | $ 2,098,717 | $ 368,867 | 21% | $ 1,729,850 |
| | | | | |
| *(Percentage change calculated using non-rounded numbers)* | | | | |
| ARPU, as reported | $ 0.58 | | 2% | $ 0.57 |
| Foreign exchange effects | 0.02 | | | |
| ARPU, excluding foreign exchange effects | $ 0.60 | | 4% | $ 0.57 |
| | | | | |
| International ARPU, as reported | $ 0.56 | | —% | $ 0.56 |
| Foreign exchange effects | 0.03 | | | |
| International ARPU, excluding foreign exchange effects | $ 0.59 | | 5% | $ 0.56 |

51

App. 336

Table of Contents

## FINANCIAL POSITION, LIQUIDITY AND CAPITAL RESOURCES

**Financial Position**

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| | **(In thousands)** | | | |
| Cash and cash equivalents: | | | | |
| United States | $ | 322,267 | $ | 83,851 |
| All other countries | | 143,409 | | 103,096 |
| Total cash and cash equivalents | $ | 465,676 | $ | 186,947 |
| | | | | |
| Long-term debt, net: | | | | |
| Credit Facility due December 7, 2023 | $ | — | $ | 260,000 |
| Term Loan due November 16, 2022 | | 425,000 | | 425,000 |
| 6.375% Senior Notes | | 400,000 | | 400,000 |
| 5.00% Senior Notes | | 450,000 | | 450,000 |
| 5.625% Senior Notes | | 350,000 | | — |
| Total long-term debt | | 1,625,000 | | 1,535,000 |
| Less: unamortized original issue discount and original issue premium, net | | 6,282 | | 7,352 |
| Less: unamortized debt issuance costs | | 15,235 | | 11,737 |
| Total long-term debt, net | $ | 1,603,483 | $ | 1,515,911 |

**Long-term Debt**

For a detailed description of long-term debt, see "Note 7—Long-term Debt, net" to the consolidated financial statements included in "Item 8. Consolidated Financial Statements and Supplementary Data."

*IAC Subordinated Loan Facility:*

At December 31, 2019, the Company had an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allowed the Company to make one or more requests to IAC to borrow funds from it. At December 31, 2019, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility. The IAC Subordinated Loan Facility was terminated on February 26, 2020.

**Cash Flow Information**

In summary, the Company's cash flows are as follows:

| | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| | **(In thousands)** | | | | | |
| Net cash provided by operating activities attributable to continuing operations | $ | 658,402 | $ | 603,455 | $ | 321,108 |
| Net cash (used in) provided by investing activities attributable to continuing operations | | (41,450) | | (37,761) | | 118,188 |
| Net cash used in financing activities attributable to continuing operations | | (336,847) | | (649,555) | | (423,714) |

**2019**

Net cash provided by operating activities attributable to continuing operations in 2019 includes adjustments to earnings consisting primarily of $89.7 million of stock-based compensation expense, $32.5 million of depreciation, and $8.7 million of amortization of intangibles. Partially offsetting these adjustments was deferred income tax benefit of $7.5 million primarily related to an increase in tax credit carryforwards, partially offset by the utilization of net operating losses. The decrease in cash from changes in working capital primarily consists of

App. 337

52

App. 338

Table of Contents

an increase in other assets of $24.3 million primarily related to an increase in prepaid hosting services, an increase in accounts receivable of $17.9 million primarily related to an increase in revenue, and a decrease from income taxes payable and receivable of $4.4 million due primarily to the timing of tax payments. These decreases in cash were partially offset by an increase in accounts payable and accrued expenses and other current liabilities of $29.1 million due mainly to the timing of payments, including interest payments; and an increase in deferred revenue of $9.5 million, due mainly to growth in subscription sales.

Net cash used in investing activities attributable to continuing operations in 2019 consists primarily of capital expenditures of $38.8 million that are primarily related to internal development of software and computer hardware to support our products and services.

Net cash used in financing activities attributable to continuing operations in 2019 is primarily due to cash payments of $300.0 million for the repayment of borrowings under the Credit Facility, purchases of treasury stock of $216.4 million, and $203.2 million for withholding taxes paid on behalf of employees for net settled equity awards. Partially offsetting these payments were proceeds of $350.0 million from the issuance of the 5.625% Senior Notes and proceeds of $40.0 million from borrowings under the Credit Facility.

**2018**

Net cash provided by operating activities attributable to continuing operations in 2018 includes adjustments to earnings consisting primarily of $66.0 million of stock-based compensation expense, $33.0 million of depreciation, and $1.3 million of amortization of intangibles. Partially offsetting these adjustments was deferred income tax of $19.6 million primarily related to an increase in tax credit carryforwards, partially offset by the utilization of net operating losses. The increase in cash from changes in working capital primarily consists of an increase in accounts payable and accrued expenses and other current liabilities of $20.8 million due to the timing of payments; a decrease in accounts receivable of $17.3 million primarily related to an accelerated cash receipt from a mobile app store provider; an increase in deferred revenue of $13.1 million, due mainly to growth in subscription sales; and an increase from income taxes payable and receivable of $12.8 million due primarily to the timing of tax payments. These increases in cash were partially offset by an increase in other assets of $14.6 million primarily related to an increase in capitalized mobile app fees.

Net cash used in investing activities attributable to continuing operations in 2018 consists primarily of capital expenditures of $31.0 million that are primarily related to computer hardware and internal development of software to support our products and services and purchases of investments of $3.8 million, partially offset by net cash acquired in a business combination of $1.1 million.

Net cash used in financing activities attributable to continuing operations in 2018 is primarily due to a cash dividend payment of $556.4 million, withholding taxes paid on behalf of employees for net settled stock awards of $207.7 million, purchases of treasury stock of $133.5 million, purchases of non-controlling interests of $10.0 million, and debt issuance costs of $1.3 million. Partially offsetting these payments were proceeds of $260.0 million from a draw on the Credit Facility.

**Liquidity and Capital Resources**

The Company's principal sources of liquidity are its cash flows generated from operations as well as cash and cash equivalents. At December 31, 2019, $500 million was available under the Credit Facility and the Credit Facility bore interest at LIBOR plus 1.50%. On February 13, 2020, the Credit Facility was amended to, among other things, increase the available borrowing capacity from $500 million to $750 million, reduce interest rate margins by 0.125% to LIBOR plus 1.375%, and extend its maturity from December 7, 2023 to February 13, 2025. Additionally on February 13, 2020, the $425 million Term Loan was amended to reprice the outstanding balance from LIBOR plus 2.50% to LIBOR plus 1.75% and extend its maturity from November 16, 2022 to February 13, 2027.

On February 11, 2020, we completed a private offering of $500 million aggregate principal amount of 4.125% Senior Notes due August 1, 2030. The proceeds from these notes were used to pay expenses associated with the offering and, in the event the Separation is consummated, will be used to fund the Intercompany Loan to IAC. If the Separation is not consummated, the proceeds will be used for general corporate purposes.

On January 31, 2020, entities controlled by IAC completed the contribution to Match Group of two office buildings in Los Angeles for 1,378,371 shares of Match Group common stock.

53

Table of Contents

The Company anticipates that it will need to make capital and other expenditures in connection with the development and expansion of its operations. The Company expects that 2020 cash capital expenditures will be between $55 million and $60 million, an increase from 2019 cash capital expenditures primarily related to additional capitalized software cost and building improvements as Tinder expands office space.

The Company believes its expected positive cash flows generated from operations together with its existing cash and cash equivalents and available borrowing capacity under the Credit Facility will be sufficient to fund its normal operating requirements, capital expenditures, debt service, the payment of withholding taxes paid on behalf of employees for net-settled stock-based awards, investing, and other commitments for the foreseeable future. The Company's liquidity could be negatively affected by a decrease in demand for our products and services.

In May 2017, the Board of Directors of the Company authorized Match Group to repurchase up to 6 million shares of its common stock. In August 2019, the Board authorized an increase of 10 million shares in the share repurchase program, for a total authorization of 16 million shares. The timing and actual number of any shares repurchased will depend on a variety of factors, including price, general business and market conditions, and alternative investment opportunities. The Company is not obligated to purchase any shares under the repurchase program, and repurchases may be commenced, suspended or discontinued from time to time without prior notice. We purchased 3.1 million shares related to this repurchase authorization for the year ended December 31, 2019 for $216.4 million. A total of 9.9 million shares remain available for repurchase under the repurchase program. Under the Company's existing tax sharing agreement with IAC, we are restricted from taking any action that could cause IAC to cease to have "control" of the Company within the meaning of Section 386(c) of the Code or result in the loss of IAC's tax consolidation with the Company for U.S. federal income tax purposes; we may repurchase shares of our common stock in order to ensure continued compliance with this requirement. In addition, pursuant to the Transaction Agreement, we agreed to repurchase sufficient shares to maintain IAC's ownership in the Company above 80% plus 500,000 shares at all times prior to the consummation of the Separation.

The Company currently settles substantially all equity awards on a net basis. Assuming all equity awards outstanding on January 31, 2020 were net settled, we would issue 7.6 million common shares (of which 2.2 million are related to vested shares and 5.4 million are related to unvested shares) and, assuming a 50% withholding rate, would remit $597.0 million in cash for withholding taxes (of which $174.7 million is related to vested shares and $422.2 million is related to unvested shares). If we decided to issue a sufficient number of shares to cover the $597.0 million employee withholding tax obligation, 7.6 million additional shares would be issued by the Company.

At December 31, 2019, all of the Company's international cash can be repatriated without significant tax consequences.

Our indebtedness could limit our ability to: (i) obtain additional financing to fund working capital needs, acquisitions, capital expenditures, debt service, or other requirements; and (ii) use operating cash flow to pursue acquisitions or invest in other areas, such as developing properties and exploiting business opportunities. As of December 31, 2019, IAC owns 80.7% of our outstanding shares of capital stock and has 97.5% of the combined voting power of our outstanding capital stock. As a result of IAC's ability to control the election and removal of our board of directors, IAC effectively has the ability to control our financing activities, including the issuance of additional debt and equity securities, the incurrence of other indebtedness, or distributions to shareholders. While the Company believes we will have the ability to access debt and equity markets if needed, such transactions may require the concurrence of IAC.

Following the Separation, if consummated, Match Group will be a wholly owned subsidiary of New Match and New Match will continue to hold interests in certain IAC financing subsidiaries that are the issuers of approximately $1.7 billion aggregate principal amount of currently outstanding exchangeable notes. If the Separation is not completed Match Group will remain a majority-owned subsidiary of IAC.

54

App. 340

## CONTRACTUAL OBLIGATIONS AND COMMERCIAL COMMITMENTS

| Contractual Obligations[a] | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Less Than 1 Year | 1–3 Years | 3–5 Years | More Than 5 Years | Total |
| | (In thousands) | | | | |
| Long-term debt[b][c] | $ 86,765 | $ 599,323 | $ 522,625 | $ 956,094 | $ 2,164,807 |
| Operating leases[d] | 16,184 | 24,176 | 6,305 | 5,727 | 52,392 |
| Purchase obligation[e] | 43,873 | 40,000 | — | — | 83,873 |
| Total contractual obligations | $ 146,822 | $ 663,499 | $ 528,930 | $ 961,821 | $ 2,301,072 |

[a] The Company has excluded $51.9 million in unrecognized tax benefits and related interest from the table above as we are unable to make a reasonably reliable estimate of the period in which these liabilities might be paid. For additional information on income taxes, see "Note 3—Income Taxes" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[b] Represents contractual amounts due including interest on both fixed and variable rate instruments. Long-term debt at December 31, 2019 consists of the 6.375%, 5.00%, and 5.625% Senior Notes of $400 million, $450 million, and $350 million, respectively, which bear interest at fixed rates, and the Term Loan balance of $425 million, which bears interest at a variable rate. The Term Loan bears interest at LIBOR plus 2.50%, or 4.44%, at December 31, 2019. The amount of interest ultimately paid on the Term Loan may differ based on changes in interest rates and outstanding balances. For additional information on long-term debt, see "Note 7—Long-term Debt, net" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[c] Subsequent to December 31, 2019, the Company issued $500 million aggregate principal amount of 4.125% Senior Notes due August 1, 2030 and the $425 million Term Loan was amended to reprice the outstanding balance to LIBOR plus 1.75% and extend the maturity to February 13, 2027. The interest and principal related to the 4.125% Senior Notes and the impact of the repricing and extension of the Term Loan are not reflected in the table above.

[d] The Company leases office space, data center facilities and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. The Company is also committed to pay a portion of the related operating expenses under certain lease agreements. These operating expenses are not included in the table above. For additional information on operating leases, see "Note 13—Leases" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

[e] The purchase obligations consist primarily of a web hosting commitment.

We also had $0.1 million of surety bonds outstanding as of December 31, 2019 that could potentially require performance by the Company in the event of demands by third parties or contingent events.

### *Off-Balance Sheet Arrangements*

Other than the items described above, the Company does not have any off-balance sheet arrangements as of December 31, 2019.

55

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The following disclosure is provided to supplement the descriptions of Match Group's accounting policies contained in "Note 2—Summary of Significant Accounting Policies" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data" in regard to significant areas of judgment. Management of the Company is required to make certain estimates, judgments and assumptions during the preparation of its consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"). These estimates, judgments and assumptions impact the reported amount of assets, liabilities, revenue and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates. Because of the size of the financial statement elements to which they relate, some of our accounting policies and estimates have a more significant impact on our consolidated financial statements than others. What follows is a discussion of some of our more significant accounting policies and estimates.

### Business Combinations and Contingent Consideration Arrangements

Acquisitions have been, and will continue to be, an important part of the Company's growth strategy. The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The fair value of these intangible assets is based on valuations that use information and assumptions provided by management. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations in the past, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is initially recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. The contingent consideration arrangements are generally based upon earnings performance and/or operating metrics. The Company determines the fair value of the contingent consideration arrangements by using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement. The changes in the remeasured fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations.

### Recoverability of Goodwill and Indefinite-Lived Intangible Assets

Goodwill is the Company's largest asset with a carrying value of $1.2 billion at both December 31, 2019 and 2018, representing 51% and 61%, respectively, of the Company's total assets. Indefinite-lived intangible assets, which consist of the Company's acquired trade names and trademarks, have a carrying value of $221.2 million and $230.7 million at December 31, 2019 and 2018, respectively.

Goodwill and indefinite-lived intangible assets are assessed annually for impairment as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value.

In performing its annual goodwill impairment assessment, the Company has the option under GAAP to qualitatively assess whether it is more likely than not that the fair value of a reporting unit is less than its carrying value; if the conclusion of the qualitative assessment is that there are no indicators of impairment, the Company does not perform a quantitative test, which would require a valuation of the reporting unit, as of October 1. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of each reporting unit to its carrying value, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded. The 2019 and 2018 annual assessments did not identify any impairments.

For the Company's annual goodwill test at October 1, 2019, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of its single reporting

Table of Contents

unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were the Company's strong operating performance and that, as of September 30, 2019, its market capitalization of $20.0 billion exceeded the carrying value by approximately $19.8 billion.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair values of its indefinite-lived intangible assets are less than their carrying values, the Company's policy is to determine the fair value of each of its indefinite-lived intangible assets annually as of October 1, in part, because the level of effort required to perform the quantitative and qualitative assessments is essentially equivalent. The Company determines the fair value of its indefinite-lived intangible assets using an avoided royalty DCF valuation analysis. Significant judgments inherent in this analysis include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. The future cash flows are based on the Company's most recent forecast and budget and, for years beyond the budget, the Company's estimates, which are based, in part, on forecasted growth rates. Assumptions used in the avoided royalty DCF analyses, including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2019 and 2018, and the royalty rates used ranged from 3% to 8% in both 2019 and 2018.

If the carrying value of an indefinite-lived intangible asset exceeds its estimated fair value, an impairment equal to the excess is recorded. During the year ended December 31, 2019, the Company recognized an impairment charge related to the Match brand in the UK of $6.6 million. At December 31, 2019 and 2018, the aggregate indefinite-lived intangible asset balance for which the estimate of fair value at that time was less than 110% of their carrying values was approximately $92.3 million and $101.7 million, respectively.

**Recoverability and Estimated Useful Lives of Long-Lived Assets**

We review the carrying value of all long-lived assets, comprising property and equipment and definite-lived intangible assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. In addition, the Company reviews the useful lives of its long-lived assets whenever events or changes in circumstances indicate that these lives may be changed. The carrying value of property and equipment and definite-lived intangible assets is $73.1 million and $65.3 million, at December 31, 2019 and 2018, respectively.

**Income Taxes**

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis. The Company's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statement of cash flows. The tax sharing agreement between the Company and IAC governs the parties' respective rights, responsibilities and obligations with respect to tax matters, including responsibility for taxes attributable to the Company, entitlement to refunds, allocation of tax attributes and other matters.

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided on deferred tax assets if it is determined that it is more likely than not that the deferred tax asset will not be realized. At December 31, 2019 and 2018 the balance of the Company's net deferred tax asset is $122.4 million and $114.2 million, respectively.

57

App. 343

We evaluate and account for uncertain tax positions using a two-step approach. Recognition (step one) occurs when we conclude that a tax position, based solely on its technical merits, is more-likely-than-not to be sustained upon examination. Measurement (step two) determines the amount of benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained. This measurement step is inherently difficult and requires subjective estimations of such amounts to determine the probability of various possible outcomes. At December 31, 2019 and 2018, the Company has unrecognized tax benefits of $55.5 million and $37.6 million, including interest and penalties, respectively. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustment, and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

The ultimate amount of deferred income tax assets realized and the amounts paid for deferred income tax liabilities and uncertain tax positions may vary from our estimates due to future changes in income tax law, state income tax apportionment or the outcome of any review of our tax returns by the various tax authorities, as well as actual operating results of the Company that vary significantly from anticipated results.

The Company has not provided for approximately $2.1 million of deferred taxes on $41.8 million of international cash earnings that are indefinitely reinvested outside the U.S. The remaining $101.6 million of international cash can be repatriated without any significant tax consequences. The Company reassesses its intention to remit or permanently reinvest these cash earnings each reporting period; any required adjustment to the income tax provision would be reflected in the period that the Company changes this intention.

**Stock-Based Compensation**

The Company recorded stock-based compensation expense of $89.7 million and $66.0 million for the years ended December 31, 2019 and 2018, respectively.

Stock-based compensation at the Company is complex due to our desire to attract, retain, and reward employees and managers at many of our brands by allowing them to benefit directly from the value they help to create. We also use equity awards as part of our acquisition strategy. We accomplish these objectives, in part, by issuing equity awards denominated in the equity of our non-public subsidiaries as well as in Match Group Inc. We further refine this approach by tailoring the equity awards to the applicable circumstances. For example, we issue certain equity awards with vesting linked to the achievement of a performance target such as revenue or profits; these awards are referred to as performance awards. In other cases, we link the vesting of equity awards to the achievement of a value target for a subsidiary or the Company's stock price; these awards are referred to as market-based awards.

The Company estimated the fair value of stock options issued in 2018 using a Black-Scholes option pricing model measured at the grant date and is expensing this fair value over the vesting term; no options were issued in 2019. The impact on stock-based compensation expense for the year ended December 31, 2019, assuming a 1% increase in the risk-free interest rate, a 10% increase in the volatility factor and a one-year increase in the weighted average expected term of the outstanding options would be an increase of $1.1 million, $6.9 million and $2.4 million, respectively. The Company also issues restricted stock units ("RSUs"). For RSUs issued, the value of the instrument is measured at the grant date as the fair value of Match Group common stock and, for those with a market condition, the fair value is estimated using a lattice model, and expensed as stock-based compensation expense over the vesting term.

**Recent Accounting Pronouncements**

For a discussion of recent accounting pronouncements, see "Note 2—Summary of Significant Accounting Policies" to the consolidated financial statements included in "Item 8—Consolidated Financial Statements and Supplementary Data."

58

App. 344

Table of Contents

**Item 7A.    Quantitative and Qualitative Disclosures About Market Risk**

**Interest Rate Risk**

The Company's exposure to market risk for changes in interest rates relates primarily to the Company's long-term debt.

At December 31, 2019, the Company's outstanding long-term debt was $1.6 billion, of which $1.2 billion of Senior Notes bear interest at fixed rates. If market rates decline, the Company runs the risk that the required payments on the fixed rate debt will exceed those based on market rates. A 100 basis point increase or decrease in the level of interest rates would, respectively, decrease or increase the fair value of the fixed-rate debt by $69.3 million. Such potential increase or decrease in fair value is based on certain simplifying assumptions, including a constant level and rate of fixed-rate debt for all maturities and an immediate across-the-board increase or decrease in the level of interest rates with no other subsequent changes for the remainder of the period. At December 31, 2019, the $425 million Term Loan bore interest at a variable rate, LIBOR plus 2.50%. At December 31, 2019, the rate in effect was 4.44%. If LIBOR were to increase or decrease by 100 basis points, then the annual interest expense and payments on the Term Loan would increase or decrease, respectively, by $4.3 million based upon the outstanding balance and rate in effect at December 31, 2019.

**Foreign Currency Exchange Risk**

The Company conducts business in certain foreign markets, primarily in various jurisdictions within the European Union ("EU") and Asia. We are primarily exposed to foreign exchange risk for both the Euro and British Pound ("GBP").

For the years ended December 31, 2019, 2018 and 2017, international revenue accounted for 53%, 50% and 46%, respectively, of our consolidated revenue. We have exposure to foreign currency exchange risk related to transactions carried out in a currency other than the U.S. dollar, and investments in foreign subsidiaries with a functional currency other than the U.S. dollar. As foreign currency exchange rates change, translation of the statement of operations of our international businesses into U.S. dollars affects year-over-year comparability of operating results. The average GBP and Euro exchange rates strengthened against the U.S. Dollar by 4% and 5%, respectively, in 2019 compared to 2018. Additionally, the departure of the United Kingdom from the EU, commonly referred to as "Brexit," has caused, and may continue to cause, volatility in currency exchange rates between the U.S. dollar and the GBP. Foreign currency exchange rate changes during the year ended December 31, 2019 negatively impacted revenue by $47.5 million, or 2% of total revenue. See "Principles of Financial Reporting" in "Item 7—Management's Discussion and Analysis of Financial Condition and Results of Operations" for the definition of Revenue excluding foreign exchange effects and a reconciliation of Revenue to Revenue excluding foreign exchange effects. Foreign currency exchange rate changes did not have a material impact on revenue during the year ended December 31, 2018.

Foreign currency exchange gains and losses included in the Company's earnings for the years ended December 31, 2019, 2018 and 2017 are (losses) and gains of $(0.9) million, $5.3 million and $(10.3) million, respectively. The loss in 2017 is primarily related to a U.S. dollar denominated intercompany loan in which the receivable is held by a foreign subsidiary with a GBP functional currency. As the GBP strengthened against the U.S. Dollar during the year, the intercompany loan incurred losses.

Foreign currency exchange gains or losses historically have not been material to the Company. As a result, we have not historically, hedged any foreign currency exposures. The continued growth and expansion of our international operations into new countries increases our exposure to foreign exchange rate fluctuations. Significant foreign exchange rate fluctuations, in the case of one currency or collectively with other currencies, could adversely affect our future results of operations.

App. 345

Table of Contents

**Item 8.    Consolidated Financial Statements and Supplementary Data**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Match Group, Inc. and subsidiaries (the Company) as of December 31, 2019 and 2018, and the related consolidated statements of operations, comprehensive operations, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and the financial statement schedule listed in the Index at Item 15(a) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated February 27, 2020 expressed an unqualified opinion thereon.

**Adoption of ASU No. 2016-02**

As discussed in Note 2 to the consolidated financial statements, the Company changed its method of accounting for leases, which generally requires all leases be recognized in the statement of financial position, in 2019 due to the adoption of ASU No. 2016-02, Leases (Topic 842). The Company adopted the standard effective January 1, 2019 on a prospective basis.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

60

App. 346

App. 347

### Stock-Based Compensation

| | |
|---|---|
| *Description of the Matter* | During the year ended December 31, 2019, the Company recorded stock-based compensation expense of $89.7 million. As discussed in Note 11 to the consolidated financial statements, the Company issues various types of equity awards, including stock options, restricted stock units, performance-based stock units, market-based awards and equity instruments denominated in the shares of certain subsidiaries. |
| | Auditing the Company's accounting for stock-based compensation required complex auditor judgement due to the number and the variety of the types of equity awards, the subjectivity of assumptions used to value stock-based awards (e.g. expected term), the frequent use of performance-based vesting conditions and the existence of awards denominated in the shares of certain subsidiaries. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of the Company's controls over stock-based compensation. For example, we tested controls over the Company's process to assess the completeness of its share-based awards and for measuring and recording stock-based compensation, including management's review of the underlying calculations, the significant assumptions used in valuing certain awards and related valuation reports prepared by its specialists. |
| | To test stock-based compensation expense, we performed audit procedures that included, among others, assessing the completeness of the awards granted and evaluating the methodologies used to estimate the fair value of the awards granted and the significant assumptions described above. Our procedures also included, evaluating the key terms and conditions of awards granted to assess the accounting treatment for a sample of awards and testing the clerical accuracy of the calculation of the expense recorded. Additionally, for certain awards issued by the Company, we involved our internal valuation specialists to assess the valuation methodologies and assumptions used in estimating the fair value of the awards. |

### Recoverability of Indefinite-Lived Intangible Assets

| | |
|---|---|
| *Description of the Matter* | As of December 31, 2019, the Company's indefinite-lived intangible asset balance was $221.2 million. As disclosed in Note 2 to the consolidated financial statements, indefinite-lived intangible assets are assessed annually for impairment as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of an indefinite-lived intangible asset below its carrying value. |
| | Auditing management's impairment test for indefinite-lived intangible assets was complex and judgmental due to the measurement uncertainty in estimating the fair value of indefinite-lived intangible assets. Specifically, the fair value estimates for indefinite-lived intangible assets were sensitive to assumptions such as discount rates, revenue growth rates, royalty rates and projected cash flow terminal growth rates. These assumptions are affected by such factors as expected future market or economic conditions. |

61

App. 348

Table of Contents

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of the Company's controls over its indefinite-lived intangible assets impairment review process. For example, we tested of controls over the Company's forecasting and budgeting process as well as controls over management's review of the significant assumptions used to estimate the fair values of the indefinite-lived intangible assets.

To test the estimated fair value of indefinite-lived intangible assets, our audit procedures included, among others, assessing the methodologies and testing the significant assumptions and underlying data used by the Company. We evaluated the Company's underlying forecast and budget information by comparing the significant assumptions to current industry and economic trends, changes in the Company's business model and assessed the historical accuracy of management's estimates. For example, we evaluated management's forecasted revenue to identify, understand and evaluate changes as compared to historical results. We performed sensitivity analyses of significant assumptions to evaluate the change in the fair value of indefinite-lived intangible assets resulting from changes in the assumptions. In addition, we involved an internal valuation specialist to assist in evaluating the methodologies and significant assumptions applied in developing the fair value estimates. |

/s/ ERNST & YOUNG LLP

We have served as the Company's auditor since 2014.

New York, New York
February 27, 2020

62

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEET**

| | December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| | **(In thousands, except share data)** | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 465,676 | $ 186,947 |
| Accounts receivable, net of allowance of $578 and $724, respectively | 116,459 | 99,052 |
| Other current assets | 94,200 | 57,766 |
| Total current assets | 676,335 | 343,765 |
| Right-of-use assets | 43,288 | — |
| Property and equipment, net | 65,940 | 58,351 |
| Goodwill | 1,239,584 | 1,244,758 |
| Intangible assets, net | 228,324 | 237,640 |
| Deferred income taxes | 140,726 | 134,347 |
| Long-term investments | 5,076 | 9,076 |
| Other non-current assets | 24,439 | 25,124 |
| **TOTAL ASSETS** | $ 2,423,712 | $ 2,053,061 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Accounts payable | $ 20,191 | $ 9,528 |
| Deferred revenue | 218,843 | 209,935 |
| Accrued expenses and other current liabilities | 178,578 | 135,971 |
| Total current liabilities | 417,612 | 355,434 |
| Long-term debt, net | 1,603,483 | 1,515,911 |
| Income taxes payable | 12,597 | 13,918 |
| Deferred income taxes | 18,285 | 20,174 |
| Other long-term liabilities | 51,068 | 21,760 |
| Redeemable noncontrolling interests | 709 | — |
| Commitments and contingencies | | |
| **SHAREHOLDERS' EQUITY** | | |
| Common stock; $0.001 par value; authorized 1,500,000,000 shares; 76,980,538 and 71,513,087 shares issued; and 70,838,209 and 68,460,563 shares outstanding at December 31, 2019 and December 31, 2018, respectively | 77 | 72 |
| Class B convertible common stock; $0.001 par value; authorized 1,500,000,000 shares; 209,919,402 shares issued and outstanding | 210 | 210 |
| Class C common stock; $0.001 par value; authorized 1,500,000,000 shares; no shares issued and outstanding | — | — |
| Preferred stock; $0.001 par value; authorized 500,000,000 shares; no shares issued and outstanding | — | — |
| Additional paid-in capital | (171,765) | (57,575) |
| Retained earnings | 988,509 | 453,778 |
| Accumulated other comprehensive loss | (147,438) | (137,166) |
| Treasury stock; 6,142,329 and 3,052,524 shares, respectively | (349,808) | (133,455) |
| Total Match Group, Inc. shareholders' equity | 319,785 | 125,864 |
| Noncontrolling interests | 173 | — |
| Total shareholders' equity | 319,958 | 125,864 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 2,423,712 | $ 2,053,061 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

App. 352

# MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF OPERATIONS

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2019 | 2018 | 2017 |
|  | (In thousands, except per share data) | | |
| Revenue | $ 2,051,258 | $ 1,729,850 | $ 1,330,661 |
| Operating costs and expenses: | | | |
|   Cost of revenue (exclusive of depreciation shown separately below) | 527,184 | 410,000 | 279,499 |
|   Selling and marketing expense | 427,440 | 419,954 | 375,610 |
|   General and administrative expense | 254,966 | 180,286 | 179,804 |
|   Product development expense | 151,960 | 132,030 | 101,150 |
|   Depreciation | 32,450 | 32,968 | 32,613 |
|   Amortization of intangibles | 8,727 | 1,318 | 1,468 |
| Total operating costs and expenses | 1,402,727 | 1,176,556 | 970,144 |
|   Operating income | 648,531 | 553,294 | 360,517 |
| Interest expense | (91,719) | (73,417) | (77,565) |
| Other (expense) income, net | (2,026) | 7,765 | (30,827) |
| Earnings from continuing operations, before tax | 554,786 | 487,642 | 252,125 |
| Income tax (provision) benefit | (20,361) | (14,673) | 103,852 |
| **Net earnings from continuing operations** | 534,425 | 472,969 | 355,977 |
| Loss from discontinued operations, net of tax | — | (378) | (5,650) |
| **Net earnings** | 534,425 | 472,591 | 350,327 |
| Net loss (earnings) attributable to noncontrolling interests | 306 | 5,348 | (179) |
| **Net earnings attributable to Match Group, Inc. shareholders** | $ 534,731 | $ 477,939 | $ 350,148 |
| **Net earnings per share from continuing operations:** | | | |
|   Basic | $ 1.91 | $ 1.73 | $ 1.35 |
|   Diluted | $ 1.81 | $ 1.61 | $ 1.20 |
| **Net earnings per share attributable to Match Group, Inc. shareholders:** | | | |
|   Basic | $ 1.91 | $ 1.73 | $ 1.33 |
|   Diluted | $ 1.81 | $ 1.61 | $ 1.18 |
| **Dividend declared per share** | $ — | $ 2.00 | $ — |
| **Stock-based compensation expense by function:** | | | |
|   Cost of revenue | $ 3,693 | $ 2,287 | $ 1,701 |
|   Selling and marketing expense | 5,112 | 3,599 | 4,545 |
|   General and administrative expense | 42,863 | 32,346 | 42,840 |
|   Product development expense | 38,056 | 27,799 | 20,004 |
| Total stock-based compensation expense | $ 89,724 | $ 66,031 | $ 69,090 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

App. 353

App. 354

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF COMPREHENSIVE OPERATIONS**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| Net earnings | $ 534,425 | $ 472,591 | $ 350,327 |
| Other comprehensive (loss) income, net of tax | | | |
| Change in foreign currency translation adjustment | (10,272) | (24,967) | 64,588 |
| Total other comprehensive (loss) income | (10,272) | (24,967) | 64,588 |
| Comprehensive income | 524,153 | 447,624 | 414,915 |
| Comprehensive loss (income) attributable to noncontrolling interests | 306 | 5,467 | (701) |
| Comprehensive income attributable to Match Group, Inc. shareholders | $ 524,459 | $ 453,091 | $ 414,214 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

65

App. 355

**MATCH GROUP, INC. AND SUBSIDIARIES**

## CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY

### Years Ended December 31, 2019, 2018 and 2017

| | Redeemable Noncontrolling Interests | Common Stock $0.001 Par Value — $ | Common Stock $0.001 Par Value — Shares | Class B Convertible Common Stock $0.001 Par Value — $ | Class B Convertible Common Stock $0.001 Par Value — Shares | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Loss | Treasury Stock | Total Match Group, Inc. Shareholders' Equity | Noncontrolling Interests | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (In thousands) | | | | | | |
| **Balance as of December 31, 2016** | $ 6,062 | $ 46 | 45,797 | $ 210 | 209,919 | $ 490,587 | $ 182,063 | $ (176,384) | $ — | $ 496,522 | $ — | $ 496,522 |
| Net earnings for the years ended December 31, 2017 | 179 | — | — | — | — | — | 350,148 | — | — | 350,148 | — | 350,148 |
| Other comprehensive income, net of tax | 522 | — | — | — | — | — | — | 64,066 | — | 64,066 | — | 64,066 |
| Stock-based compensation expense | — | — | — | — | — | 54,604 | — | — | — | 54,604 | — | 54,604 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 6 | 6,688 | — | — | (248,787) | — | — | — | (248,781) | — | (248,781) |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 12 | 11,885 | — | — | (215,429) | — | — | — | (215,417) | — | (215,417) |
| Purchase of redeemable noncontrolling interests | (436) | — | — | — | — | — | — | — | — | — | — | — |
| Adjustment of redeemable noncontrolling interests to fair value | (107) | — | — | — | — | 107 | — | — | — | 107 | — | 107 |
| Other | (164) | — | — | — | — | — | — | — | — | — | — | — |
| **Balance as of December 31, 2017** | 6,056 | 64 | 64,370 | 210 | 209,919 | 81,082 | 532,211 | (112,318) | — | 501,249 | — | 501,249 |
| Net earnings (loss) for the years ended December 31, 2018 | 108 | — | — | — | — | — | 477,939 | — | — | 477,939 | (5,456) | 472,483 |
| Other comprehensive loss, net of tax | (119) | — | — | — | — | — | — | (24,848) | — | (24,848) | — | (24,848) |
| Stock-based compensation expense | — | — | — | — | — | 66,031 | — | — | — | 66,031 | — | 66,031 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 5 | 4,173 | — | — | (207,950) | — | — | — | (207,945) | — | (207,945) |
| Issuance of common stock to IAC pursuant to the employee matters agreement | — | 3 | 2,970 | — | — | (3) | — | — | — | — | — | — |
| Dividends ($2.00 per share of Common Stock and Class B Convertible Common Stock) | — | — | — | — | — | — | (556,372) | — | — | (556,372) | — | (556,372) |
| Purchase of treasury stock | — | — | — | — | — | — | — | — | (133,455) | (133,455) | — | (133,455) |
| Purchase of redeemable noncontrolling interests | (3,503) | — | — | — | — | — | — | — | — | — | — | — |
| Purchase of noncontrolling interest | — | — | — | — | — | — | — | — | — | — | (8,128) | (8,128) |
| Adjustment of redeemable noncontrolling interests to fair value | (2,542) | — | — | — | — | 2,542 | — | — | — | 2,542 | — | 2,542 |
| Noncontrolling interests created in an acquisition | — | — | — | — | — | — | — | — | — | — | 14,307 | 14,307 |
| Adjustment to noncontrolling interests related to business acquisition | — | — | — | — | — | 723 | — | — | — | 723 | (723) | — |
| **Balance as of December 31, 2018** | — | 72 | 71,513 | 210 | 209,919 | (57,575) | 453,778 | (137,166) | (133,455) | 125,864 | — | 125,864 |
| Net (loss) earnings for the year ended December 31, 2019 | (333) | — | — | — | — | — | 534,731 | — | — | 534,731 | 27 | 534,758 |
| Other comprehensive loss, net of tax | — | — | — | — | — | — | — | (10,272) | — | (10,272) | — | (10,272) |
| Stock-based compensation expense | — | — | — | — | — | 89,642 | — | — | — | 89,642 | — | 89,642 |
| Issuance of common stock pursuant to stock-based awards, net of withholding taxes | — | 4 | 4,644 | — | — | (203,145) | — | — | — | (203,141) | — | (203,141) |
| Issuance of common stock | | | | | | | | | | | | |

App. 356

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...ance to IAC pursuant to the employee matters agreement | — | 1 | 824 | — | — | (514) | — | — | — | (513) | — | (513) |
| Purchase of treasury stock | — | — | — | — | — | — | — | — | (216,353) | (216,353) | — | (216,353) |
| Noncontrolling interests created in an acquisition | 1,042 | — | — | — | — | — | — | — | — | — | — | 80 |
| Noncontrolling interest created by the exercise of subsidiary denominated equity award | — | — | — | — | — | (173) | — | — | — | (173) | 173 | — |
| Other | — | — | — | — | — | — | — | — | — | — | (27) | (27) |
| **Balance as of December 31, 2019** | $ 709 | $ 77 | 76,981 | $ 210 | 209,919 | $ (171,765) | $ 988,509 | $ (147,438) | $ (349,808) | $ 319,785 | $ 173 | $ 319,958 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

66

App. 357

## MATCH GROUP, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENT OF CASH FLOWS

| | Years Ended December 31, | | |
| | 2019 | 2018 | 2017 |
|---|---|---|---|
| | (In thousands) | | |
| **Cash flows from operating activities attributable to continuing operations:** | | | |
| **Net earnings from continuing operations** | $ 534,425 | $ 472,969 | $ 355,977 |
| Adjustments to reconcile net earnings from continuing operations to net cash provided by operating activities attributable to continuing operations: | | | |
| Stock-based compensation expense | 89,724 | 66,031 | 69,090 |
| Depreciation | 32,450 | 32,968 | 32,613 |
| Amortization of intangibles | 8,727 | 1,318 | 1,468 |
| Deferred income taxes | (7,472) | (19,639) | (118,251) |
| Acquisition-related contingent consideration fair value adjustments | — | 320 | 5,253 |
| Other adjustments, net | 8,536 | 230 | 22,142 |
| Changes in assets and liabilities | | | |
| Accounts receivable | (17,862) | 17,272 | (51,587) |
| Other assets | (24,301) | (14,606) | (10,547) |
| Accounts payable and other liabilities | 29,076 | 20,769 | (16,801) |
| Income taxes payable and receivable | (4,379) | 12,765 | (1,002) |
| Deferred revenue | 9,478 | 13,058 | 32,753 |
| **Net cash provided by operating activities attributable to continuing operations** | 658,402 | 603,455 | 321,108 |
| **Cash flows from investing activities attributable to continuing operations:** | | | |
| Net cash (used) acquired in business combinations | (3,759) | 1,136 | (280) |
| Capital expenditures | (38,754) | (30,954) | (28,833) |
| Proceeds from the sale of a business, net | — | — | 96,144 |
| Proceeds from the sale of a long-term investment | — | — | 60,163 |
| Purchases of investments | — | (3,800) | (9,076) |
| Other, net | 1,063 | (4,143) | 70 |
| **Net cash (used in) provided by investing activities attributable to continuing operations** | (41,450) | (37,761) | 118,188 |
| **Cash flows from financing activities attributable to continuing operations:** | | | |
| Borrowings under the Credit Facility | 40,000 | 260,000 | — |
| Term Loan borrowings | — | — | 75,000 |
| Proceeds from Senior Notes offering | 350,000 | — | 450,000 |
| Principal payments on Credit Facility | (300,000) | — | (445,172) |
| Debt issuance costs | (5,593) | (1,281) | (12,285) |
| Purchase of treasury stock | (216,353) | (133,455) | — |
| Dividends | — | (556,372) | — |
| Proceeds from issuance of common stock pursuant to stock-based awards | — | 12 | 59,442 |
| Withholding taxes paid on behalf of employees on net settled stock-based awards | (203,177) | (207,720) | (254,210) |
| Purchase of noncontrolling interests | (1,650) | (9,980) | (436) |
| Purchase of stock-based awards | — | — | (272,459) |
| Acquisition-related contingent consideration payments | — | (185) | (23,429) |
| Other, net | (74) | (574) | (165) |
| **Net cash used in financing activities attributable to continuing operations** | (336,847) | (649,555) | (423,714) |
| Total cash provided by (used in) continuing operations | 280,105 | (83,861) | 15,582 |

67

App. 358

**MATCH GROUP, INC. AND SUBSIDIARIES**

**CONSOLIDATED STATEMENT OF CASH FLOWS (continued)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (In thousands) | | |
| Net cash used in operating activities attributable to discontinued operations | — | — | (6,061) |
| Net cash used in investing activities attributable to discontinued operations | — | — | (471) |
| Total cash used in discontinued operations | — | — | (6,532) |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | (1,442) | (1,760) | 9,940 |
| **Net increase (decrease) in cash, cash equivalents, and restricted cash** | 278,663 | (85,621) | 18,990 |
| Cash, cash equivalents, and restricted cash at beginning of period | 187,140 | 272,761 | 253,771 |
| **Cash, cash equivalents, and restricted cash at end of period** | $ 465,803 | $ 187,140 | $ 272,761 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these statements.

68

App. 359

**MATCH GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### NOTE 1—ORGANIZATION

Match Group, Inc., through its portfolio companies, is a leading provider of dating products available globally. Our portfolio of brands includes Tinder®, Match®, Meetic®, OkCupid®, Hinge®, Pairs™, PlentyOfFish®, and OurTime®, as well as a number of other brands, each designed to increase our users' likelihood of finding a meaningful connection. Through our portfolio companies and their trusted brands, we provide tailored products to meet the varying preferences of our users. Our products are available in over 40 languages to our users all over the world. Match Group has one operating segment, Dating, which is managed as a portfolio of dating brands.

As used herein, "Match Group," the "Company," "we," "our," "us," and similar terms refer to Match Group, Inc. and its subsidiaries, unless the context indicates otherwise.

As of December 31, 2019, IAC/InterActiveCorp's ("IAC") economic ownership interest and voting interest in Match Group were 80.7% and 97.5%, respectively.

**Separation**

On December 19, 2019, Match Group and IAC entered into a Transaction Agreement (the "Transaction Agreement") pursuant to which, following the satisfaction of certain closing conditions, including IAC and Match Group stockholder approval, the businesses of Match Group will be separated from the remaining businesses of IAC through a series of transactions (the "Transactions") that will result in two, separate public companies—(1) IAC, which will be re-named "Match Group, Inc." (referred to herein as "New Match") and which will own the businesses of Match Group and certain IAC financing subsidiaries, and (2) IAC Holdings, Inc. (which we refer to as "New IAC"), which will be re-named "IAC/InterActiveCorp" and which will own IAC's other businesses—and the pre-transaction stockholders of Match Group (other than IAC) and of IAC owning shares in New Match (the "Separation"). Completion of the Separation is expected to occur in mid-second quarter of 2020.

Under the terms of the Transaction Agreement, if the closing of the Transactions occurs, Match Group will merge with and into an indirect wholly-owned subsidiary of IAC ("New Match Merger Sub"), with New Match Merger Sub surviving the merger as an indirect wholly-owned subsidiary of New Match. Match Group stockholders (excluding shares owned by IAC, Match Group, or any of their respective wholly-owned subsidiaries) will receive, through the merger, in exchange for each outstanding share of Match Group common stock that they hold, one share of New Match common stock and, at the holder's election, either (i) $3.00 in cash or (ii) a fraction of a share of New Match common stock with a value of $3.00 (calculated pursuant to the Transaction Agreement) (an "additional stock election"). In the event the holder fails to make a valid election, the holder will be treated as if such holder made an additional stock election. As a result of the merger and other transactions contemplated by the Transaction Agreement, Match Group stockholders (other than IAC) will become stockholders of New Match, which will hold the businesses of Match Group and the IAC financing subsidiaries and be separate from the other business of IAC.

Following the Separation, Match Group will be a wholly-owned subsidiary of New Match and New Match will continue to own certain IAC financing subsidiaries that are the issuers of approximately $1.7 billion aggregate principal amount of currently outstanding exchangeable notes. If the Separation is not completed, Match Group will remain a majority-owned subsidiary of IAC, and IAC may pursue other options with respect to its ownership interest in Match Group.

Under the terms of the Transaction Agreement, Match Group has agreed to make a loan (the "Intercompany Loan") to IAC in connection with the closing of the Transactions, in an aggregate principal amount equal to the product of (i) $3.00 and (ii) the number of shares of Match Group capital stock outstanding immediately prior to the effective time of the Separation, excluding any shares of Match Group capital stock held by a wholly-owned subsidiary of Match Group. Following receipt by IAC of the full amount of the Intercompany Loan, IAC will contribute the proceeds of the loan, less an amount equal to the product of $3.00 multiplied by the aggregate number of shares of Match capital stock in respect of which a valid cash election has been made, to New IAC as part of the closing of the Transactions. Following the Separation, the Intercompany Loan will be the obligation of New Match payable to Match Group and may be eliminated during certain intercompany transactions between

69

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

New Match and Match Group. In the event that the Separation is not consummated, we do not intend to make the Intercompany Loan.

**NOTE 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of Presentation and Consolidation**

The Company prepares its consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP"). The consolidated financial statements include the accounts of the Company, all entities that are wholly-owned by the Company and all entities in which the Company has a controlling financial interest. Intercompany transactions and accounts have been eliminated.

For the purposes of these consolidated financial statements, income taxes have been computed on an as if Match Group stand-alone, separate tax return basis.

**Accounting for Investments in Equity Securities**

Investments in equity securities, other than those of our consolidated subsidiaries, are accounted for at fair value or under the measurement alternative of the Financial Accounting Standards Board's ("FASB") Accounting Standards Update ("ASU") No. 2016-01, *Recognition and Measurement of Financial Assets and Financial Liabilities*, following its adoption on January 1, 2018, with any changes to fair value recognized within other income (expense), net each reporting period. Under the measurement alternative, equity investments without readily determinable fair values are carried at cost minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar securities of the same issuer; value is generally determined based on a market approach as of the transaction date. A security will be considered identical or similar if it has identical or similar rights to the equity securities held by the Company. The Company reviews its investments in equity securities without readily determinable fair values for impairment each reporting period when there are qualitative factors or events that indicate possible impairment. Factors we consider in making this determination include negative changes in industry and market conditions, financial performance, business prospects, and other relevant events and factors. When indicators of impairment exist, the Company prepares quantitative assessments of the fair value of our investments in equity securities, which require judgment and the use of estimates. When our assessment indicates that the fair value of the investment is below its carrying value, the Company writes down the investment to its fair value and records the corresponding charge within other income (expense), net.

**Accounting Estimates**

Management of the Company is required to make certain estimates, judgments, and assumptions during the preparation of its consolidated financial statements in accordance with GAAP. These estimates, judgments, and assumptions impact the reported amounts of assets, liabilities, revenue, and expenses and the related disclosure of contingent assets and liabilities. Actual results could differ from these estimates.

On an ongoing basis, the Company evaluates its estimates and judgments including those related to: the fair values of cash equivalents; the carrying value of accounts receivable, including the determination of the allowance for doubtful accounts; the determination of revenue reserves; the carrying value of right-of-use assets ("ROU assets"); the useful lives and recoverability of definite-lived intangible assets and property and equipment; the recoverability of goodwill and indefinite-lived intangible assets; the fair value of equity securities without readily determinable fair values; contingencies; unrecognized tax benefits; the valuation allowance for deferred income tax assets; and the fair value of and forfeiture rates for stock-based awards, among others. The Company bases its estimates and judgments on historical experience, its forecasts and budgets, and other factors that the Company considers relevant.

**Revenue Recognition**

The Company accounts for a contract with a customer when it has approval and commitment from all parties, the rights of the parties and payment terms are identified, the contract has commercial substance, and collectability of consideration is probable. Revenue is recognized when control of the promised services is transferred to our customers and in an amount that reflects the consideration the Company expects to be entitled to in exchange for those services.

70

App. 361

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's revenue is primarily derived directly from users in the form of recurring subscriptions. Subscription revenue is presented net of credits and credit card chargebacks. Subscribers pay in advance, primarily by credit card or through mobile app stores, and, subject to certain conditions identified in our terms and conditions, generally all purchases are final and nonrefundable. Revenue is initially deferred and is recognized using the straight-line method over the term of the applicable subscription period, which generally ranges from one to six months. Revenue is also earned from online advertising, the purchase of à la carte features and offline events. Online advertising revenue is recognized when an advertisement is displayed. Revenue from the purchase of à la carte features is recognized based on usage. Revenue associated with offline events is recognized when each event occurs.

As permitted under the practical expedient available under ASU No. 2014-09, the Company does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less, (ii) contracts with variable consideration that is allocated entirely to unsatisfied performance obligations or to a wholly unsatisfied promise accounted for under the series guidance, and (iii) contracts for which the Company recognizes revenue at the amount which we have the right to invoice for services performed.

*Transaction Price*

The objective of determining the transaction price is to estimate the amount of consideration the Company is due in exchange for its services, including amounts that are variable. The Company determines the total transaction price, including an estimate of any variable consideration, at contract inception and reassesses this estimate each reporting period.

The Company excludes from the measurement of transaction price all taxes assessed by governmental authorities that are both (i) imposed on and concurrent with a specific revenue-producing transaction and (ii) collected from customers. Accordingly, such tax amounts are not included as a component of revenue or cost of revenue.

For contracts that have an original duration of one year or less, the Company uses the practical expedient available under ASU No. 2014-09 applicable to such contracts and does not consider the time value of money.

*Assets Recognized from the Costs to Obtain a Contract with a Customer*

The Company has determined that certain costs, primarily mobile app store fees, meet the requirements to be capitalized as a cost of obtaining a contract. The Company recognizes an asset for these costs if we expect to recover those costs. Mobile app store fees are amortized over the period of contract performance. Specifically, the Company capitalizes and amortizes mobile app store fees over the term of the applicable subscription.

During the years ended December 31, 2019 and 2018, the Company recognized expense of $364.7 million and $284.7 million, respectively, related to the amortization of these costs. The contract asset balances at December 31, 2019 and 2018, and January 1, 2018 related to costs to obtain a contract are $28.5 million, $29.2 million, and $22.5 million, respectively, included in "Other current assets" in the accompanying consolidated balance sheet.

*Accounts Receivables, Net of Allowance for Doubtful Accounts and Revenue Reserves*

The majority of our users purchase our products through mobile app stores. At December 31, 2019, two mobile app stores accounted for approximately 56% and 13%, respectively, of our gross accounts receivables. The comparable amounts at December 31, 2018 were 45% and 21%, respectively. We evaluate the credit worthiness of these two mobile app stores on an ongoing basis and do not require collateral from these entities. We generally collect these balances between 30 and 45 days following the purchase. Payments made directly through our applications are processed by third-party payment processors. We generally collect these balances within 3 to 5 days following the purchase. The Company also maintains allowances to reserve for potential credits issued to users or other revenue adjustments. The amounts of these reserves are based primarily upon historical experience.

Accounts receivable related to indirect revenue include amounts billed and currently due from customers. The Company maintains an allowance for doubtful accounts to provide for the estimated amount of accounts receivable that will not be collected. The allowance for doubtful accounts is based upon a number of factors, including the length of time accounts receivable are past due, the Company's previous loss history, and the

71

App. 362

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

specific customer's ability to pay its obligation. The time between the Company issuance of an invoice and payment due date is not significant; customer payments that are not collected in advance of the transfer of promised services are generally due no later than 30 days from invoice date.

*Deferred Revenue*

Deferred revenue consists of advance payments that are received or are contractually due in advance of the Company's performance. The Company's deferred revenue is reported on a contract by contract basis at the end of each reporting period. The Company classifies deferred revenue as current when the term of the applicable subscription period or expected completion of our performance obligation is one year or less. The deferred revenue balances are $218.8 million, $209.9 million, and $198.3 million at December 31, 2019 and 2018, and January 1, 2018, respectively. During the years ended December 31, 2019 and 2018, the Company recognized $209.9 million and $198.3 million of revenue that was included in the deferred revenue balance as of December 31, 2018 and January 1, 2018, respectively. At December 31, 2019 and 2018, there is no non-current portion of deferred revenue.

*Disaggregation of Revenue*

The following table presents disaggregated revenue:

|  | For the Years Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Direct Revenue: | | | |
| North America | $ 1,024,161 | $ 902,478 | $ 741,334 |
| International | 983,013 | 774,693 | 539,915 |
| Total Direct Revenue | 2,007,174 | 1,677,171 | 1,281,249 |
| Indirect Revenue (principally advertising revenue) | 44,084 | 52,679 | 49,412 |
| Total Revenue | $ 2,051,258 | $ 1,729,850 | $ 1,330,661 |
| | | | |
| **Direct Revenue** | | | |
| Tinder | $ 1,152,045 | $ 805,316 | $ 403,216 |
| Other brands | 855,129 | 871,855 | 878,033 |
| Total Direct Revenue | $ 2,007,174 | $ 1,677,171 | $ 1,281,249 |

**Cash and Cash Equivalents**

Cash and cash equivalents include cash and short-term investments, with maturities of less than 91 days from the date of purchase. Domestically, cash equivalents primarily consist of AAA rated government money market funds and time deposits. Internationally, cash equivalents primarily consist of money market funds.

**Property and Equipment**

Property and equipment, including significant improvements, are recorded at cost. Repairs and maintenance costs are expensed as incurred. Depreciation is computed using the straight-line method over the estimated useful lives of the assets or, in the case of leasehold improvements, the lease term, if shorter.

| Asset Category | Estimated Useful Lives |
|---|---|
| Computer equipment and capitalized software | 2 to 3 years |
| Furniture and other equipment | 5 years |
| Leasehold improvements | 6 to 10 years |

The Company capitalizes certain internal use software costs including external direct costs utilized in developing or obtaining the software and compensation for personnel directly associated with the development of the software. Capitalization of such costs begins when the preliminary project stage is complete and ceases when

App. 363

72

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

the project is substantially complete and ready for its intended purpose. The net book value of capitalized internal use software is $27.5 million and $19.5 million at December 31, 2019 and 2018, respectively.

**Business Combinations**

The purchase price of each acquisition is attributed to the assets acquired and liabilities assumed based on their fair values at the date of acquisition, including identifiable intangible assets that either arise from a contractual or legal right or are separable from goodwill. The Company typically engages outside valuation experts to assist in the allocation of purchase price to the identifiable intangible assets acquired but, management has ultimate responsibility for the valuation methods, models, and inputs used and the resulting purchase price allocation. The excess purchase price over the net tangible and identifiable intangible assets is recorded as goodwill and is assigned to the reporting unit that is expected to benefit from the combination as of the acquisition date.

In connection with certain business combinations, the Company has entered into contingent consideration arrangements that are determined to be part of the purchase price. Each of these arrangements is initially recorded at its fair value at the time of the acquisition and reflected at current fair value for each subsequent reporting period thereafter until settled. Generally, our contingent consideration arrangements are based upon financial performance and/or operating metric targets. The Company generally determines the fair value of the contingent consideration arrangements by using probability-weighted analyses to determine the amounts of the gross liability, and, if the arrangement is long-term in nature, applying a discount rate that appropriately captures the risk associated with the obligation to determine the net amount reflected in the consolidated financial statements. Significant changes in forecasted earnings or operating metrics would result in a significantly higher or lower fair value measurement. The changes in the remeasured fair value of the contingent consideration arrangements during each reporting period, including the accretion of the discount, if applicable, are recognized in "General and administrative expense" in the accompanying consolidated statement of operations. See "Note 6—Financial Instruments" for changes in the contingent consideration arrangements.

**Goodwill and Indefinite-Lived Intangible Assets**

The Company assesses goodwill on its one reporting unit and indefinite-lived intangible assets for impairment annually as of October 1, or more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit or the fair value of an indefinite-lived intangible asset below its carrying value.

When the Company elects to perform a qualitative assessment and concludes it is not more likely than not that the fair value of the reporting unit is less than its carrying value, no further assessment of that reporting unit's goodwill is necessary; otherwise, a quantitative assessment is performed and the fair value of the reporting unit is determined. If the carrying value of the reporting unit exceeds its fair value an impairment loss equal to the excess is recorded.

For the Company's annual goodwill test at October 1, 2019, a qualitative assessment of goodwill was performed because the Company concluded it was more likely than not that the fair value of its single reporting unit was in excess of its carrying value. The primary factors that the Company considered in its qualitative assessment were the Company's strong operating performance and that, as of September 30, 2019, its market capitalization of $20.0 billion exceeded its carrying value by approximately $19.8 billion. A qualitative assessment was also performed for 2018 and the Company concluded it was more likely than not that the fair value of the reporting unit was in excess of its carrying value.

The Company foregoes a qualitative assessment and tests the goodwill for impairment when it concludes that it is more likely than not that there may be an impairment. If needed, the annual or interim quantitative test of the recovery of goodwill involves a comparison of the estimated fair value of the Company's reporting unit to its carrying value, including goodwill. If the estimated fair value of the reporting unit exceeds its carrying value, goodwill of the reporting unit is not impaired. If the carrying value of the reporting unit exceeds its estimated fair value, an impairment loss equal to the excess is recorded.

While the Company has the option to qualitatively assess whether it is more likely than not that the fair values of its indefinite-lived intangible assets are less than their carrying values, the Company's policy is to

73

App. 365

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

determine the fair value of each of its indefinite-lived intangible assets annually as of October 1, in part, because the level of effort required to perform the quantitative and qualitative assessments is essentially equivalent. The Company determines the fair value of its indefinite-lived intangible assets using an avoided royalty DCF valuation analysis. Significant judgments inherent in this analysis include the selection of appropriate royalty and discount rates and estimating the amount and timing of expected future cash flows. The discount rates used in the DCF analyses are intended to reflect the risks inherent in the expected future cash flows generated by the respective intangible assets. The royalty rates used in the DCF analyses are based upon an estimate of the royalty rates that a market participant would pay to license the Company's trade names and trademarks. The future cash flows are based on the Company's most recent forecast and budget and, for years beyond the budget, the Company's estimates, which are based, in part, on forecasted growth rates. Assumptions used in the avoided royalty DCF analyses, including the discount rate and royalty rate, are assessed annually based on the actual and projected cash flows related to the asset, as well as macroeconomic and industry specific factors. The discount rates used in the Company's annual indefinite-lived impairment assessment ranged from 11% to 26% in both 2019 and 2018, and the royalty rates used ranged from 3% to 8% in both 2019 and 2018. During the year ended December 31, 2019, the Company recognized an impairment charge related to the Match brand in the UK of $6.6 million, which is included within amortization. At December 31, 2019 and 2018, the aggregate indefinite-lived intangible asset balance for which the estimate of fair value at that time was less than 110% of their carrying values was approximately $92.3 million and $101.7 million, respectively.

**Long-Lived Assets and Intangible Assets with Definite Lives**

Long-lived assets, which consist of ROU assets, property and equipment, and intangible assets with definite lives, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. The carrying value of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. If the carrying value is deemed not to be recoverable, an impairment loss is recorded equal to the amount by which the carrying value of the long-lived asset exceeds its fair value. Amortization of definite-lived intangible assets is computed either on a straight-line basis or based on the pattern in which the economic benefits of the asset will be realized.

**Fair Value Measurements**

The Company categorizes its financial instruments measured at fair value into a fair value hierarchy that prioritizes the inputs used in pricing the asset or liability. The three levels of the fair value hierarchy are:

- Level 1: Observable inputs obtained from independent sources, such as quoted market prices for identical assets and liabilities in active markets.

- Level 2: Other inputs, which are observable directly or indirectly, such as quoted market prices for similar assets or liabilities in active markets, quoted market prices for identical or similar assets or liabilities in markets that are not active, and inputs that are derived principally from or corroborated by observable market data. The fair values of the Company's Level 2 financial assets are primarily obtained from observable market prices for identical underlying securities that may not be actively traded. Certain of these securities may have different market prices from multiple market data sources, in which case an average market price is used.

- Level 3: Unobservable inputs for which there is little or no market data and require the Company to develop its own assumptions, based on the best information available in the circumstances, about the assumptions market participants would use in pricing the assets or liabilities. See "Note 6—Financial Instruments" for a discussion of fair value measurements made using Level 3 inputs.

The Company's non-financial assets, such as goodwill, intangible assets, ROU assets, and property and equipment, are adjusted to fair value only when an impairment is recognized. The Company's financial assets, comprising of equity securities without readily determinable fair values, are adjusted to fair value when observable price changes are identified or an impairment is recognized. Such fair value measurements are based predominantly on Level 3 inputs.

74

App. 366

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Advertising Costs**

Advertising costs are expensed in the period incurred (when the advertisement first runs for production costs that are initially capitalized) and represent online marketing, including fees paid to search engines and social media sites; offline marketing, which is primarily television advertising; and partner-related payments to those who direct traffic to our websites. Advertising expense is $388.6 million, $386.0 million and $340.4 million for the years ended December 31, 2019, 2018 and 2017, respectively.

**Legal Costs**

Legal costs are expensed as incurred.

**Income Taxes**

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed on an as if Match Group stand-alone, separate return basis. Match Group's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statement of cash flows.

The Company accounts for income taxes under the liability method, and deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying values of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled. A valuation allowance is provided if it is determined that it is more likely than not that the deferred tax asset will not be realized. The Company records interest, net of any applicable related income tax benefit, on potential income tax contingencies as a component of income tax expense.

The Company evaluates and accounts for uncertain tax positions using a two-step approach. Recognition (step one) occurs when the Company concludes that a tax position, based solely on its technical merits, is more-likely-than-not to be sustainable upon examination. Measurement (step two) determines the amount of benefit that is greater than 50% likely to be realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. De-recognition of a tax position that was previously recognized would occur when the Company subsequently determines that a tax position no longer meets the more-likely-than-not threshold of being sustained.

On December 22, 2017, the U.S. enacted the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act imposes a new minimum tax on global intangible low taxed income ("GILTI") earned by foreign subsidiaries beginning in 2018. The FASB Staff Q&A, Topic 740 No. 5, Accounting for Global Intangible Low-Taxed Income, states that an entity may make an accounting policy election to either recognize deferred taxes for temporary differences expected to reverse as GILTI in future years or provide for the tax expense related to GILTI in the year the tax is incurred. The Company elected to recognize the tax on GILTI as a period expense in the period the tax is incurred.

**Earnings Per Share**

Basic earnings per share is computed by dividing net earnings attributable to Match Group shareholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share reflects the potential dilution that could occur if stock options and other commitments to issue common stock were exercised or equity awards vested resulting in the issuance of common stock that could share in the earnings of the Company.

**Foreign Currency Translation and Transaction Gains and Losses**

The financial position and operating results of foreign entities whose primary economic environment is based on their local currency are consolidated using the local currency as the functional currency. These local currency assets and liabilities are translated at the rates of exchange as of the balance sheet date, and local currency revenue and expenses of these operations are translated at average rates of exchange during the period. Translation gains and losses are included in accumulated other comprehensive income as a component of shareholders' equity. Transaction gains and losses resulting from assets and liabilities denominated in a currency

75

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

other than the functional currency are included in the consolidated statement of operations as a component of other (expense) income, net. See "Note 18—Consolidated Financial Statement Details" for additional information regarding foreign currency exchange gains and losses.

Translation gains and losses relating to foreign entities that are liquidated or substantially liquidated are reclassified out of accumulated other comprehensive loss into earnings. Losses of $0.7 million during the year ended December 31, 2017 are included in "Other (expense) income, net" in the accompanying consolidated statement of operations.

**Stock-Based Compensation**

Stock-based compensation is measured at the grant date based on the fair value of the award and is generally expensed over the requisite service period. See "Note 11—Stock-based Compensation" for a discussion of the Company's stock-based compensation plans.

**Redeemable Noncontrolling Interests**

Noncontrolling interests in the consolidated subsidiaries of the Company are ordinarily reported on the consolidated balance sheet within shareholders' equity, separately from the Company's equity. However, securities that are redeemable at the option of the holder and not solely within the control of the issuer must be classified outside of shareholders' equity. Accordingly, all noncontrolling interests that are redeemable at the option of the holder are presented outside of shareholders' equity in the accompanying consolidated balance sheet.

In connection with the acquisition of certain subsidiaries, management of these businesses has retained an ownership interest. The Company is party to fair value put and call arrangements with respect to these interests. These put and call arrangements allow management of these businesses to require the Company to purchase their interests or allow the Company to acquire such interests at fair value, respectively. These put and call arrangements do not meet the definition of a derivative instrument as the put agreements do not provide for net settlement. These put and call arrangements become exercisable by the Company and the counterparty at various dates in the future. One of these arrangements was exercised during each of the years ended December 31, 2018 and 2017. These put arrangements are exercisable by the counter-party outside the control of the Company. Accordingly, to the extent that the fair value of these interests exceeds the value determined by normal noncontrolling interest accounting, the value of such interests is adjusted to fair value with a corresponding adjustment to additional paid-in capital. During the years ended December 31, 2018 and 2017, the Company recorded adjustments of $2.5 million and $0.1 million, respectively, to decrease these interests to fair value. No exercises or adjustments were made for the year ended December 31, 2019. Fair value determinations require high levels of judgment and are based on various valuation techniques, including market comparables and discounted cash flow projections.

**Certain Risks and Concentrations**

The Company's business is subject to certain risks and concentrations including dependence on third-party technology providers, exposure to risks associated with online commerce security and credit card fraud.

Financial instruments, which potentially subject the Company to concentration of credit risk, consist primarily of cash and cash equivalents. Cash and cash equivalents are principally maintained with financial institutions that are not covered by deposit insurance.

**Recent Accounting Pronouncements**

*Accounting Pronouncement adopted by the Company*

The Company adopted ASU 2016-02, *Leases (Topic 842)* ("ASC 842") effective January 1, 2019. ASC 842 superseded previously existing guidance on accounting for leases and generally requires all leases to be recognized in the statement of financial position.

The adoption of ASC 842 resulted in the recognition of right-of-use assets (the "ROU assets") and related lease liabilities of $53.0 million and $57.9 million, respectively, as of January 1, 2019, with no cumulative effect adjustment. The adoption of ASC 842 had no impact on the Company's consolidated results of operations and

76

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

consolidated statement of cash flows. In addition, the adoption of ASC 842 did not impact the leverage calculations set forth in the agreements governing the outstanding debt or credit agreements of the Company, because, in each circumstance, the leverage calculations are not affected by the lease liabilities that were recorded upon adoption of ASC 842.

The Company adopted ASC 842 prospectively and, therefore, did not revise comparative period information or disclosure. In addition, the Company elected the package of practical expedients permitted under ASC 842.

See "Note 13—Leases" for additional information on the adoption of ASC 842.

*Accounting Pronouncement not yet adopted by the Company*

In December 2019, the FASB issued ASU No. 2019-12, which simplifies the accounting for income taxes, eliminates certain exceptions within ASC 740, *Income Taxes*, and clarifies certain aspects of the current guidance to promote consistency among reporting entities. The provisions of ASU 2019-12 are effective for reporting periods beginning after December 15, 2020 with early adoption permitted. Most amendments within ASU No. 2019-12 are required to be applied on a prospective basis, while certain amendments must be applied on a retrospective or modified retrospective basis. The Company expects to early adopt ASU No. 2019-12 effective January 1, 2020 on a modified retrospective basis for those amendments that are not applied on a prospective basis. The adoption of ASU No. 2019-12 is not expected to have a material impact on the Company's consolidated financial statements.

## Reclassifications

Certain prior year amounts have been reclassified to conform to the current year presentation.

## NOTE 3—INCOME TAXES

Match Group is included within IAC's tax group for purposes of federal and consolidated state income tax return filings. In all periods presented, current income tax provision and deferred income tax benefit have been computed for Match Group on an as if stand-alone, separate return basis. Match Group's payments to IAC for its share of IAC's consolidated federal and state tax return liabilities have been reflected within cash flows from operating activities in the accompanying consolidated statement of cash flows.

U.S. and foreign earnings before income taxes are as follows:

|  | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2019 | | 2018 | | 2017 | |
|  | (In thousands) | | | | | |
| U.S. | $ | 476,402 | $ | 392,798 | $ | 143,286 |
| Foreign |  | 78,384 | | 94,844 | | 108,839 |
| Total | $ | 554,786 | $ | 487,642 | $ | 252,125 |

77

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The components of the provision (benefit) for income taxes are as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | (In thousands) | | |
| **Current income tax provision (benefit):** | | | |
| Federal | $ 964 | $ (688) | $ (11,533) |
| State | 342 | 341 | (512) |
| Foreign | 26,527 | 34,659 | 26,444 |
| Current income tax provision | 27,833 | 34,312 | 14,399 |
| **Deferred income tax benefit:** | | | |
| Federal | 2,991 | (11,158) | (102,337) |
| State | (9,567) | (1,846) | (15,731) |
| Foreign | (896) | (6,635) | (183) |
| Deferred income tax benefit | (7,472) | (19,639) | (118,251) |
| Income tax provision (benefit) | $ 20,361 | $ 14,673 | $ (103,852) |

The tax effects of cumulative temporary differences that give rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below. The valuation allowance is primarily related to deferred tax assets for tax credits and net operating losses.

| | December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| | (In thousands) | |
| **Deferred tax assets:** | | |
| Net operating loss carryforwards | $ 105,141 | $ 127,630 |
| Tax credit carryforwards | 70,137 | 43,501 |
| Disallowed interest carryforwards | 21,682 | 13,751 |
| Stock-based compensation | 14,274 | 12,684 |
| Other | 24,496 | 13,019 |
| Total deferred tax assets | 235,730 | 210,585 |
| Less valuation allowance | (54,878) | (47,448) |
| Net deferred tax assets | 180,852 | 163,137 |
| **Deferred tax liabilities:** | | |
| Intangible assets | (43,568) | (45,363) |
| Right-of-use assets | (10,056) | — |
| Property and equipment | (3,896) | (2,686) |
| Other | (891) | (915) |
| Total deferred tax liabilities | (58,411) | (48,964) |
| Net deferred tax assets | $ 122,441 | $ 114,173 |

Upon the Separation, the Company will be allocated a portion of tax attributes related to the IAC consolidated federal and state tax filings pursuant to the Internal Revenue Code and applicable state law. This allocation will require that the Company's net deferred tax asset (computed above on an as if standalone, separate

App. 371

78

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

return basis) be adjusted as of the separation date. As of December 31, 2019, the Company's net deferred tax asset is estimated to increase by $54.2 million due to the Separation. The final allocation of tax attributes and resulting adjustment to the Company's deferred taxes will be impacted by multiple factors, including, but not limited to, the ultimate date of the Separation and the amount of taxable income or loss generated by the IAC consolidated tax group in the year of the Separation

At December 31, 2019, the Company has federal and state net operating losses ("NOLs") of $342.9 million and $147.4 million, respectively. If not utilized, $13.8 million of the federal NOLs can be carried forward indefinitely, and $329.1 million will expire at various times primarily between 2033 and 2037. The state NOLs will expire at various times primarily between 2032 and 2038. Federal and state NOLs of $317.6 million and $103.7 million, respectively, can be used against future taxable income without restriction and the remaining NOLs will be subject to limitations under Section 382 of the Internal Revenue Code, separate return limitations, and applicable state law. At December 31, 2019, the Company has foreign NOLs of $98.2 million available to offset future income. Of these foreign NOLs, $91.0 million can be carried forward indefinitely and $7.2 million will expire at various times between 2020 and 2029. During 2019, the Company recognized tax benefits related to NOLs of $0.5 million. At December 31, 2019, the Company has federal capital losses of $12.2 million. If not utilized, the capital losses will expire during 2021 and 2022. Utilization of capital losses will be limited to the Company's ability to generate future capital gains. At December 31, 2019, the Company has federal and foreign disallowed interest carryforwards of $60.7 million and $46.4 million, respectively, that can be carried forward indefinitely and can be used against future taxable income.

At December 31, 2019, the Company has tax credit carryforwards of $99.4 million. Of this amount, $70.2 million relates to federal and state tax credits for research activities, $29.0 million relates to foreign tax credits, and $0.2 million to various other credits. Of these credit carryforwards, $29.1 million can be carried forward indefinitely and $70.3 million will expire at various times primarily between 2026 and 2039.

The Company regularly assesses the realizability of deferred tax assets considering all available evidence, including, to the extent applicable, the nature, frequency and severity of prior cumulative losses, forecasts of future taxable income, tax filing status, the duration of statutory carryforward periods, available tax planning and historical experience.

During 2019, the Company's valuation allowance increased by $7.4 million primarily due to an increase in foreign and state net operating losses and foreign interest deduction carryforwards. At December 31, 2019, the Company has a valuation allowance of $54.9 million related to the portion of credits, NOLs, and other items for which it is more likely than not that the tax benefit will not be realized.

79

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

A reconciliation of the income tax provision (benefit) to the amounts computed by applying the statutory federal income tax rate to earnings before income taxes is shown as follows:

|  | Years Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|  | (In thousands) | | |
| Income tax provision at the federal statutory rate of 21% (35% for 2017) | $ 116,505 | $ 102,405 | $ 88,244 |
| State income taxes, net of effect of federal tax benefit | 10,404 | 7,742 | 3,403 |
| Stock-based compensation | (90,374) | (92,140) | (278,342) |
| Research credits | (27,248) | (6,701) | (2,652) |
| Withholding taxes | 6,296 | 4,462 | — |
| Foreign income taxed at a different statutory rate | 3,526 | 13,129 | (15,014) |
| Deferred tax adjustment for enacted changes in tax laws and rates | (587) | 136 | 68,594 |
| Non-taxable foreign currency exchange gains and losses | (557) | (2,086) | 6,231 |
| Transition tax | — | (3,178) | 23,748 |
| Other, net | 2,396 | (9,096) | 1,936 |
| Income tax provision (benefit) | $ 20,361 | $ 14,673 | $ (103,852) |

A reconciliation of the beginning and ending amount of unrecognized tax benefits, including penalties but excluding interest, is as follows:

|  | December 31, | | |
|  | 2019 | 2018 | 2017 |
|  | (In thousands) | | |
| Balance at January 1 | $ 35,679 | $ 25,063 | $ 25,913 |
| Additions based on tax positions related to the current year | 11,221 | 8,589 | 697 |
| Additions for tax positions of prior years | 7,599 | 3,901 | 1,104 |
| Reductions for tax positions of prior years | (283) | (134) | (1,233) |
| Expiration of applicable statute of limitations | (892) | (1,740) | (1,418) |
| Balance at December 31 | $ 53,324 | $ 35,679 | $ 25,063 |

The Company recognizes interest and, if applicable, penalties related to unrecognized tax benefits in the income tax provision. At December 31, 2019 and 2018, the Company had accrued $2.2 million and $1.9 million, respectively, for the payment of interest. At December 31, 2019 and 2018, the Company had accrued $0.9 million and $1.2 million, respectively, for penalties.

Match Group is routinely under audit by federal, state, local and foreign authorities in the area of income tax as a result of previously filed separate company tax returns and consolidated tax returns with IAC. These audits include questioning the timing and the amount of income and deductions and the allocation of income and deductions among various tax jurisdictions. The Internal Revenue Service ("IRS") is currently auditing IAC's federal income tax returns for the years ended December 31, 2010 through 2016, which includes the operations of Match Group. The statute of limitations for years 2010 through 2012 have been extended to November 30, 2020, and the statute of limitations for years 2013 through 2015 have been extended to December 31, 2020. Various other jurisdictions are open to examination for tax years beginning with 2009. Income taxes payable include reserves considered sufficient to pay assessments that may result from examination of prior year tax returns. We consider many factors when evaluating and estimating our tax positions and tax benefits, which may require periodic adjustment, and which may not accurately anticipate actual outcomes. Although management currently believes changes to reserves from period to period and differences between amounts paid, if any, upon resolution of issues raised in audits and amounts previously provided will not have a material impact on the liquidity, results

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future.

At December 31, 2019 and 2018, unrecognized tax benefits, including interest, were $55.5 million and $37.6 million, respectively. At December 31, 2019 and 2018, approximately $41.5 million and $22.6 million, respectively, were included in unrecognized tax benefits for tax positions included in IAC's consolidated tax return filings. If unrecognized tax benefits at December 31, 2019 are subsequently recognized, $51.9 million, net of related deferred tax assets and interest, would reduce income tax expense. The comparable amount as of December 31, 2018 was $35.6 million. The Company believes that it is reasonably possible that its unrecognized tax benefits could decrease by approximately $17.3 million by December 31, 2020, primarily due to settlements and expirations of statutes of limitations.

On December 22, 2017, the U.S. enacted the Tax Act, which subjected to U.S. taxation certain previously deferred earnings of foreign subsidiaries as of December 31, 2017 ("Transition Tax") and implemented a number of changes that take effect on January 1, 2018, including but not limited to, a reduction of the U.S. federal corporate tax rate from 35% to 21% and a new minimum tax on GILTI earned by foreign subsidiaries. The Company was able to make a reasonable estimate of the Transition Tax and recorded a provisional transition tax expense in 2017. During 2018, the Company finalized this calculation, which resulted in a $3.2 million reduction in the Transition Tax. The net reduction in the Transition Tax was due primarily to the utilization of additional foreign tax credits, partially offset by additional taxable earnings and profits of our foreign subsidiaries based on guidance issued by the IRS subsequent to December 21, 2017.

The Company has not provided for approximately $2.1 million of deferred taxes on $41.8 million of international cash earnings that are indefinitely reinvested outside the U.S. The remaining $101.6 million of international cash can be repatriated without any significant tax consequences. The Company reassesses its intention to remit or permanently reinvest these cash earnings each reporting period; any required adjustment to the income tax provision would be reflected in the period that the Company changes this intention.

## NOTE 4—DISCONTINUED OPERATIONS

On March 31, 2017, Match Group sold its Non-dating business, which operated under the umbrella of The Princeton Review, to ST Unitas, a global education technology company. We recognized a loss on the sale of the business in the years ended December 31, 2018 and 2017 of $0.4 million (reflecting an adjustment to the loss on sale recorded in 2017), and $2.1 million, respectively, which is reported within discontinued operations.

The key components of loss from discontinued operations for the years ended December 31, 2018 and 2017 consist of the following:

|  | For the years Ended December 31, | |
|---|---|---|
|  | **2018** | **2017** |
|  | (In thousands) | |
| Revenue | $ — | $ 23,980 |
| Operating cost and expenses | — | (29,601) |
| Operating loss | — | (5,621) |
| Other expense | (378) | (2,136) |
| Income tax benefit | — | 2,107 |
| Loss from discontinued operations | $ (378) | $ (5,650) |

81

App. 376

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 5—GOODWILL AND INTANGIBLE ASSETS

Goodwill and intangible assets, net, are as follows:

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| | (In thousands) | |
| Goodwill | $ 1,239,584 | $ 1,244,758 |
| Intangible assets with indefinite lives | 221,199 | 230,684 |
| Intangible assets with definite lives, net | 7,125 | 6,956 |
| Total goodwill and intangible assets, net | $ 1,467,908 | $ 1,482,398 |

An impairment of $6.6 million was recognized on the Match brand in the UK, which is included within amortization, during the year ended December 31, 2019.

The following table presents the balance of goodwill, including the changes in the carrying value of goodwill, for the years ended December 31, 2019 and 2018:

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| | (In thousands) | |
| Balance at January 1 | $ 1,244,758 | $ 1,247,644 |
| Additions | 3,553 | 11,187 |
| Foreign Exchange Translation | (8,727) | (14,073) |
| Balance at December 31 | $ 1,239,584 | $ 1,244,758 |

Intangible assets with indefinite lives are trade names and trademarks acquired in various acquisitions. At December 31, 2019 and 2018, intangible assets with definite lives are as follows:

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
| | (In thousands) | | | |
| Patent and technology | $ 10,797 | $ (5,876) | $ 4,921 | 8.9 |
| Trade names | 6,297 | (4,986) | 1,311 | 3.0 |
| Customer lists | 262 | (262) | — | — |
| Other | 3,513 | (2,620) | 893 | 4.0 |
| Total | $ 20,869 | $ (13,744) | $ 7,125 | 7.2 |

82

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | December 31, 2018 | | | |
| | Gross Carrying Amount | Accumulated Amortization | Net | Weighted-Average Useful Life (Years) |
|---|---|---|---|---|
| | (In thousands) | | | |
| Patent and technology | $ 10,715 | $ (4,859) | $ 5,856 | 8.5 |
| Trade names | 4,814 | (4,814) | — | — |
| Customer Lists | 270 | (270) | — | — |
| Other | 3,000 | (1,900) | 1,100 | 5.0 |
| Total | $ 18,799 | $ (11,843) | $ 6,956 | 7.9 |

At December 31, 2019, amortization of intangible assets with definite lives is estimated to be as follows:

| | (In thousands) |
|---|---|
| 2020 | $ 2,052 |
| 2021 | 1,346 |
| 2022 | 951 |
| 2023 | 564 |
| 2024 and thereafter | 2,212 |
| Total | $ 7,125 |

**NOTE 6—FINANCIAL INSTRUMENTS**

**Long-term investments**

At December 31, 2019 and 2018, the carrying value of the Company's investments in equity securities without readily determinable fair values totaled $5.1 million and $9.1 million, respectively, and is included in "Long-term investments" in the accompanying consolidated balance sheet.

*Equity securities without readily determinable fair values*

For all equity securities without readily determinable fair values as of December 31, 2019, the Company has elected the measurement alternative. Since the adoption of ASU 2016-01 on January 1, 2018, the cumulative downward adjustments (including impairments) to the carrying value of equity securities without readily determinable fair values was $6.1 million through December 31, 2019. For the years ended December 31, 2019 and 2018, we recognized impairments of $4.0 million and $2.1 million, respectively, which are included in "Other (expense) income, net" in the accompanying consolidated statement of operations.

*Cost method investments (prior to the adoption of ASU No. 2016-01)*

During the year ended December 31, 2017, we recognized an other-than-temporary impairment charge of $2.3 million related to certain cost method investments as a result of our assessment of the near-term prospects and financial condition of the investees.

On October 23, 2017, a cost method investment with a carrying value of $51.1 million was sold for net proceeds of $60.2 million resulting in a pre-tax gain of $9.1 million, which is included in "Other (expense) income, net" in the accompanying consolidated statement of operations.

83

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Fair Value Measurements**

The following tables present the Company's financial instruments that are measured at fair value on a recurring basis:

| | December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 150,865 | $ — | $ — | $ 150,865 |
| Time deposits | — | 30,000 | — | 30,000 |
| Total | $ 150,865 | $ 30,000 | $ — | $ 180,865 |

| | December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | Quoted Market Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Fair Value Measurements |
| | (In thousands) | | | |
| **Assets:** | | | | |
| Cash equivalents: | | | | |
| Money market funds | $ 72,546 | $ — | $ — | $ 72,546 |
| **Liabilities:** | | | | |
| Contingent consideration arrangements | $ — | $ — | $ (1,974) | $ (1,974) |

The following table presents the changes in the Company's financial instruments that are measured at fair value on a recurring basis using significant unobservable inputs (Level 3):

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| | Contingent Consideration Arrangements | |
| | (In thousands) | |
| Balance at January 1 | $ (1,974) | $ (2,647) |
| Total net (losses): | | |
| Fair value adjustments | — | (320) |
| Included in other comprehensive (loss) income | (14) | 45 |
| Settlements | 1,988 | 948 |
| Balance at December 31 | $ — | $ (1,974) |

**Contingent consideration arrangements**

As of December 31, 2019, there are no contingent consideration arrangements. The contingent consideration arrangement liability at December 31, 2018 of $2.0 million is included in "Accrued expenses and other current liabilities" and was paid during the year ended December 31, 2019.

App. 379

84

App. 380

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Financial instruments measured at fair value only for disclosure purposes**

The following table presents the carrying value and the fair value of financial instruments measured at fair value only for disclosure purposes.

|  | December 31, 2019 | | December 31, 2018 | |
|  | Carrying Value | Fair Value | Carrying Value | Fair Value |
| --- | --- | --- | --- | --- |
|  | (In thousands) | | | |
| Long-term debt, net [a] | $ (1,603,483) | $ (1,696,033) | $ (1,515,911) | $ (1,513,683) |

_____

[a]  At December 31, 2019 and 2018, the carrying value of long-term debt, net includes unamortized original issue discount and debt issuance costs of $21.5 million and $19.1 million, respectively.

At December 31, 2019 and 2018, the fair value of long-term debt, net is estimated using observable market prices or indices for similar liabilities, which are Level 2 inputs. At December 31, 2018, we considered the Company's $500 million revolving credit facility (the "Credit Facility"), which has a variable interest rate, to have a fair value equal to its carrying value. The Credit Facility did not have an outstanding balance at December 31, 2019.

**NOTE 7—LONG-TERM DEBT, NET**

Long-term debt, net consists of:

|  | December 31, | |
|  | 2019 | 2018 |
| --- | --- | --- |
|  | (In thousands) | |
| Credit Facility due December 7, 2023 | $ — | $ 260,000 |
| Term Loan due November 16, 2022 | 425,000 | 425,000 |
| 6.375% Senior Notes due June 1, 2024 (the "6.375% Senior Notes"); interest payable each June 1 and December 1 | 400,000 | 400,000 |
| 5.00% Senior Notes due December 15, 2027 (the "5.00% Senior Notes"); interest payable each June 15 and December 15 | 450,000 | 450,000 |
| 5.625% Senior Notes due February 15, 2029 (the "5.625% Senior Notes"); interest payable each February 15 and August 15 | 350,000 | — |
| Total long-term debt | 1,625,000 | 1,535,000 |
| Less: Unamortized original issue discount and original issue premium, net | 6,282 | 7,352 |
| Less: Unamortized debt issuance costs | 15,235 | 11,737 |
| Total long-term debt, net | $ 1,603,483 | $ 1,515,911 |

85

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Senior Notes*:

The 5.625% Senior Notes were issued on February 15, 2019. The proceeds from these notes were used to repay outstanding borrowings under the Credit Facility, to pay expenses associated with the offering, and for general corporate purposes. At any time prior to February 15, 2024, these notes may be redeemed at a redemption price equal to the sum of the principal amount, plus accrued and unpaid interest and a make-whole premium set forth in the indenture governing the notes. Thereafter, these notes may be redeemed at redemption prices set forth below, together with accrued and unpaid interest to the applicable redemption date, if redeemed during the twelve-month period beginning on February 15 of the years indicated below:

| Beginning February 15, | Percentage |
|---|---|
| 2024 | 102.813% |
| 2025 | 101.875% |
| 2026 | 100.938% |
| 2027 and thereafter | 100.000% |

The 5.00% Senior Notes were issued on December 4, 2017. These notes were issued at 99.027% of par. The proceeds of $445.6 million, along with cash on hand, were used to redeem the $445.2 million of outstanding senior notes due in 2022 (the "6.75% Senior Notes") and pay the related call premium. At any time prior to December 15, 2022, these notes may be redeemed at a redemption price equal to the sum of the principal amount, plus accrued and unpaid interest and a make-whole premium set forth in the indenture governing the notes. Thereafter, these notes may be redeemed at the redemption prices set forth below, together with accrued and unpaid interest thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on December 15 of the years indicated below:

| Beginning December 15, | Percentage |
|---|---|
| 2022 | 102.500% |
| 2023 | 101.667% |
| 2024 | 100.833% |
| 2025 and thereafter | 100.000% |

The 6.375% Senior Notes were issued on June 1, 2016, and are currently redeemable. These notes may be redeemed at the redemption prices set forth below, together with accrued and unpaid interest thereon to the applicable redemption date, if redeemed during the twelve-month period beginning on June 1 of the years indicated below:

| Beginning June 1, | Percentage |
|---|---|
| 2019 | 104.781% |
| 2020 | 103.188% |
| 2021 | 101.594% |
| 2022 and thereafter | 100.000% |

The indentures governing the 5.00% and 6.375% Senior Notes contain covenants that would limit the Company's ability to pay dividends or to make distributions and repurchase or redeem Match Group stock in the event a default has occurred or Match Group's consolidated leverage ratio (as defined in the indentures) exceeds 5.0 to 1.0. At December 31, 2019, there were no limitations pursuant thereto. There are additional covenants that limit the ability of the Company and its subsidiaries to, among other things, (i) incur indebtedness, make investments, or sell assets in the event the Company is not in compliance with certain financial ratios set forth therein, and (ii) incur liens, enter into agreements restricting the ability of the Company's subsidiaries to pay dividends, enter into transactions with affiliates and consolidate, merge or sell substantially all of their assets. The indenture governing the 5.625% Senior notes is less restrictive than the indentures governing the 6.375% and 5.00% Senior Notes and generally only limits the Company's and its subsidiaries' ability to, amount other things,

App. 382

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

create liens on assets, and our ability to consolidate, merge, sell or otherwise dispose of all or substantially all of our assets.

The 5.00%, 5.625%, and 6.375% Senior Notes rate equally in right of payment.

*Term Loan and Credit Facility*:

The Company entered into the Term Loan under a credit agreement (the "Credit Agreement") on November 16, 2015. At both December 31, 2019 and 2018, the outstanding balance on the Term Loan was $425 million and the loan bore interest at LIBOR plus 2.50%. The interest rate of the Term Loan was 4.44% and 5.09%, at December 31, 2019 and 2018, respectively. Interest payments are due at least quarterly through the term of the loan. The Term Loan provides for annual principal payments as part of an excess cash flow sweep provision, the amount of which, if any, is governed by the secured net leverage ratio contained in the Credit Agreement.

On December 7, 2018, the $500 million Credit Facility was amended to, among other things, modify the leverage ratio levels in the pricing grid used to calculate the applicable rate and extend its maturity to December 7, 2023. At December 31, 2019, there were no outstanding borrowings under the Credit Facility. At December 31, 2018, the outstanding borrowings under the Credit Facility were $260 million, which bore interest at LIBOR plus 1.50%, or 3.97%, and were repaid with a portion of the net proceeds from the issuance of the 5.625% Senior Notes, described above. The annual commitment fee on undrawn funds, based on the current leverage ratio, is 25 basis points at both December 31, 2019 and 2018, respectively. Borrowings under the Credit Facility bear interest, at the Company's option, at a base rate or LIBOR, in each case plus an applicable margin, based on the Company's consolidated net leverage ratio. The terms of the Credit Facility require the Company to maintain a consolidated net leverage ratio of not more than 5.0 to 1.0 and a minimum interest coverage ratio of not less than 2.0 to 1.0 (in each case as defined in the agreement).

The Credit Facility and Term Loan contain covenants that would limit the ability of the Company to pay dividends, make distributions or repurchase our stock in the event the Company's secured net leverage ratio exceeds 2.0 to 1.0, while the Term Loan remains outstanding and, thereafter, if the consolidated net leverage ratio exceeds 4.0 to 1.0, or in the event a default has occurred. There are additional covenants under these debt agreements that limit the ability of the Company and its subsidiaries to, among other things, incur indebtedness, pay dividends or make distributions. Obligations under the Credit Facility and Term Loan are unconditionally guaranteed by certain Match Group wholly-owned domestic subsidiaries and are also secured by the stock of certain Match Group domestic and foreign subsidiaries. The Term Loan and outstanding borrowings, if any, under the Credit Facility rank equally with each other, and have priority over the 5.00%, 5.625%, and 6.375% Senior Notes to the extent of the value of the assets securing the borrowings under the Credit Agreement.

*Long-term debt maturities:*

| Years Ending December 31, | (In thousands) |
|---|---:|
| 2022 | $ 425,000 |
| 2024 | 400,000 |
| 2027 | 450,000 |
| 2029 | 350,000 |
| Total | 1,625,000 |
| Less: Unamortized original issue discount | 6,282 |
| Less: Unamortized debt issuance costs | 15,235 |
| Total long-term debt, net | $ 1,603,483 |

## NOTE 8—SHAREHOLDERS' EQUITY

### Description of Common Stock, Class B Convertible Common Stock and Class C Common Stock

The rights of holders of Match Group common stock, Class B common stock and Class C common stock are identical, except for voting rights, conversion rights and dividend rights. Holders of common stock are entitled to

App. 384

87

App. 385

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

one vote per share on all matters to be voted upon by the stockholders. Holders of Class B common stock are entitled to ten votes per share on all matters to be voted upon by stockholders. Holders of Class C common stock have no voting rights, except as otherwise required by the laws of the State of Delaware, in which case holders of Class C common stock are entitled to one one-hundredth (1/100) of a vote per share. Holders of the Company's common stock, Class B common stock and Class C common stock do not have cumulative voting rights in the election of directors.

Shares of Match Group's Class B common stock are convertible into shares of our common stock at the option of the holder at any time on a share for share basis. Such conversion ratio will in all events be equitably preserved in the event of any recapitalization of Match Group by means of a stock dividend on, or a stock split or combination of, our outstanding common stock or Class B common stock, or in the event of any merger, consolidation or other reorganization of Match Group with another corporation. Upon the conversion of a share of our Class B common stock into a share of our common stock, the applicable share of Class B common stock will be retired and will not be subject to reissue. Shares of common stock and Class C common stock have no conversion rights.

The holders of shares of Match Group common stock, Class B common stock and Class C common stock are entitled to receive, share for share, such dividends as may be declared by Match Group's Board of Directors out of funds legally available therefor. In the event of a liquidation, dissolution or winding up, holders of the Company's common stock, Class B common stock and Class C common stock are entitled to receive ratably the assets available for distribution to the stockholders after payment of all liabilities and accrued but unpaid dividends and liquidation preferences on any outstanding preferred stock.

At December 31, 2019, IAC holds 209.9 million shares of our Class B common stock, representing 100% of our outstanding Class B common stock, and 16.6 million shares of our common stock, representing 23.5% of our outstanding common stock. IAC's ownership interest is 80.7% and IAC holds 97.5% of the outstanding total voting power of the Company.

In the event that Match Group issues or proposes to issue any shares of Match Group common stock, Class B common stock or Class C common stock (with certain limited exceptions), including shares issued upon the exercise, conversion or exchange of options, warrants and convertible securities, IAC will generally have a purchase right that permits it to purchase for fair market value, as defined in an investor rights agreement, up to such number of shares of the same class as the issued shares as would (i) enable IAC to maintain the same ownership interest in the Company that it had immediately prior to such issuance or proposed issuance, with respect to issuances of our voting capital stock, or (ii) enable IAC to maintain ownership of at least 80.1% of each class of the Company's non-voting capital stock, with respect to issuances of our non-voting capital stock.

### Special Dividend

On December 19, 2018, we paid a special dividend of $2.00 per share on Match Group common stock and Class B common stock, to stockholders of record as of the close of business on December 5, 2018, in the aggregate amount equal to $556.4 million, which was funded with cash on hand and borrowings under our revolving credit facility.

### Reserved Common Shares

In connection with equity compensation plans, 48.0 million shares of Match Group common stock are reserved at December 31, 2019.

### Common Stock Repurchases

In May 2017, Match Group's Board of Directors authorized the repurchase of 6 million shares of Match Group common stock. In August 2019, the Board authorized an increase of 10 million shares in the share repurchase program, for a total authorization of 16 million shares. At December 31, 2019, the Company has approximately 9.9 million shares remaining in its share repurchase authorization.

During each of the years ended December 31, 2019 and 2018, the Company repurchased 3.1 million shares of Match Group common stock for aggregate consideration, on a trade date basis, of $216.4 million and $133.5 million, respectively. No repurchases were made during 2017.

88

App. 386

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 9—ACCUMULATED OTHER COMPREHENSIVE LOSS

The following tables present the components of accumulated other comprehensive loss and items reclassified out of accumulated other comprehensive loss into earnings. For the years ended December 31, 2019, 2018, and 2017, the Company's accumulated other comprehensive losses relate to foreign currency translation adjustments.

|  | Accumulated Other Comprehensive (Loss) Income |
|---|---|
|  | (In thousands) |
| Balance at January 1, 2017 | $ (176,384) |
| Other comprehensive income before reclassifications | 63,352 |
| Amounts reclassified into earnings | 714 |
| Balance at December 31, 2017 | (112,318) |
| Other comprehensive loss | (24,848) |
| Balance at December 31, 2018 | (137,166) |
| Other comprehensive loss | (10,272) |
| Balance at December 31, 2019 | $ (147,438) |

At December 31, 2019, 2018 and 2017, there was no tax benefit or provision on the accumulated other comprehensive loss.

89

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### NOTE 10—EARNINGS PER SHARE

The following table sets forth the computation of the basic and diluted earnings per share attributable to Match Group shareholders:

| | Years Ended December 31, | | | | | |
| | 2019 | | 2018 | | 2017 | |
| | Basic | Diluted | Basic | Diluted | Basic | Diluted |
|---|---|---|---|---|---|---|
| | (In thousands, except per share data) | | | | | |
| **Numerator** | | | | | | |
| Net earnings from continuing operations | $ 534,425 | $ 534,425 | $ 472,969 | $ 472,969 | $ 355,977 | $ 355,977 |
| Net loss (earnings) attributable to noncontrolling interests | 306 | 306 | 5,348 | 5,348 | (179) | (179) |
| Impact from subsidiaries' dilutive securities | — | (666) | — | — | — | — |
| Net earnings from continuing operations attributable to Match Group, Inc. shareholders | 534,731 | 534,065 | 478,317 | 478,317 | 355,798 | 355,798 |
| Loss from discontinued operations, net of tax | — | — | (378) | (378) | (5,650) | (5,650) |
| Net earnings attributable to Match Group, Inc. shareholders | $ 534,731 | $ 534,065 | $ 477,939 | $ 477,939 | $ 350,148 | $ 350,148 |
| | | | | | | |
| **Denominator** | | | | | | |
| Weighted average basic shares outstanding | 280,490 | 280,490 | 277,005 | 277,005 | 264,014 | 264,014 |
| Dilutive securities[a][b] | — | 14,843 | — | 19,770 | — | 32,062 |
| Denominator for earnings per share— weighted average shares | 280,490 | 295,333 | 277,005 | 296,775 | 264,014 | 296,076 |
| | | | | | | |
| **Earnings (loss) per share:** | | | | | | |
| Earnings per share from continuing operations | $ 1.91 | $ 1.81 | $ 1.73 | $ 1.61 | $ 1.35 | $ 1.20 |
| Loss per share from discontinued operations, net of tax | $ — | $ — | $ — | $ — | $ (0.02) | $ (0.02) |
| Earnings per share attributable to Match Group, Inc. shareholders | $ 1.91 | $ 1.81 | $ 1.73 | $ 1.61 | $ 1.33 | $ 1.18 |

_____

[a] If the effect is dilutive, weighted average common shares outstanding include the incremental shares that would be issued upon the assumed exercise of stock options and subsidiary denominated equity and the vesting of restricted stock units ("RSUs"). For the years ended December 31, 2019, 2018, and 2017, 0.3 million, 0.2 million and 4.7 million potentially dilutive securities, respectively, are excluded from the calculation of diluted earnings per share because their inclusion would have been anti-dilutive.

[b] Market-based awards and performance-based stock options ("PSOs") and restricted stock units ("PSUs") are considered contingently issuable shares. Market-based awards, PSOs and PSUs are included in the denominator for earnings per share if (i) the applicable market or performance condition(s) has been met and (ii) the inclusion of the market-based award, PSOs and PSUs are dilutive for the respective reporting periods. For the years ended December 31, 2019, 2018, and 2017, 0.8 million, 0.7 million, and 3.8 million market-based awards, PSOs and PSUs, respectively, were excluded from the calculation of diluted earnings per share because the market or performance conditions had not been met.

https://www.sec.gov/Archives/edgar/data/1575189/000157518920000018/mtch-20191231.htm                111/144

App. 389

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**NOTE 11—STOCK-BASED COMPENSATION**

The Company currently has two active stock and annual incentive plans, one which became effective in 2015 upon the completion of the IPO and another plan approved by shareholders in 2017. The 2015 plan replaced two historical plans that governed equity awards granted prior to the IPO. The 2015 plan covers stock options to acquire shares of Match Group common stock and RSUs granted pursuant to the historical plans and stock options and stock settled stock appreciation rights denominated in the equity of certain of our subsidiaries granted prior to the IPO, as well as provides for the future grant of these and other equity awards. The 2015 and 2017 plans authorize the Company to grant awards to its employees, officers, directors and consultants. At December 31, 2019, there were 30.9 million shares available for the future grant of equity awards under the 2015 and 2017 plans collectively.

The 2015 and 2017 plans have a stated term of ten years and provide that the exercise price of stock options granted will not be less than the market price of the Company's common stock on the grant date. Neither plan specifies grant dates or vesting schedules of awards as those determinations have been delegated to the Compensation and Human Resources Committee of Match Group's Board of Directors (the "Committee"). Each grant agreement reflects the vesting schedule for that particular grant as determined by the Committee. Stock options granted subsequent to September 1, 2015 will generally vest in four equal annual installments over a four-year period. RSU awards outstanding generally vest over a three- or four-year period. Market-based awards outstanding generally vest over a two- to four-year period.

Stock-based compensation expense recognized in the consolidated statement of operations includes expense related to the Company's stock options and RSUs, performance-based stock options, market-based RSUs and PSUs for which vesting is considered probable, equity instruments denominated in shares of subsidiaries, and IAC denominated stock options, RSUs and market-based awards held by Match Group employees. The amount of stock-based compensation expense recognized is net of estimated forfeitures, as the expense recorded is based on awards that are ultimately expected to vest. The forfeiture rate is estimated at the grant date based on historical experience and revised, if necessary, in subsequent periods if actual forfeitures differ from the estimated rate. At December 31, 2019, there is $114.1 million of unrecognized compensation cost, net of estimated forfeitures, related to all equity-based awards, which is expected to be recognized over a weighted average period of approximately 2.4 years.

The total income tax benefit recognized in the accompanying consolidated statement of operations for the years ended December 31, 2019, 2018 and 2017 related to all stock-based compensation is $110.4 million, $107.2 million and $295.1 million, respectively.

The aggregate income tax benefit recognized related to the exercise of stock options for the years ended December 31, 2019, 2018, and 2017 is $73.4 million, $103.3 million, and $310.9 million, respectively. As the Company is currently in a NOL position there will be some delay in the timing of the realization of cash benefit of income tax deductions related to stock-based compensation because it will be dependent upon the amount and timing of future taxable income and the timing of estimated income tax payments.

91

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Stock Options**

Stock options outstanding at December 31, 2019 and changes during the year ended December 31, 2019 are as follows:

| | | | Weighted Average Exercise Price | | Weighted Average Remaining Contractual Term (In Years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| | Shares | | | | | | |
| | | | (Shares and intrinsic value in thousands) | | | | |
| Outstanding at January 1, 2019 | 19,495 | $ | 14.72 | | | | |
| Exercised | (6,637) | | 13.88 | | | | |
| Forfeited | (1,080) | | 11.97 | | | | |
| Expired | (2) | | 11.76 | | | | |
| Outstanding at December 31, 2019 [a] | 11,776 | $ | 15.44 | | 6.4 | $ | 785,108 |
| Options exercisable | 5,513 | $ | 13.46 | | 5.7 | $ | 378,482 |

_____

[a] Included in the outstanding balance at December 31, 2019 are 0.6 million performance-based stock options, which vest in varying amounts and years depending upon certain performance conditions. The Company does not expect any shares to vest based on our current assessment of the performance conditions. The table above includes these awards at their maximum potential payout.

The aggregate intrinsic value in the table above represents the difference between Match Group's closing stock price on the last trading day of 2019 and the exercise price, multiplied by the number of in-the-money options that would have been exercised had all option holders exercised their options on December 31, 2019. The total intrinsic value of stock options exercised during the years ended December 31, 2019, 2018 and 2017 is $344.2 million, $455.1 million and $533.8 million, respectively.

The following table summarizes the information about stock options outstanding and exercisable at December 31, 2019:

| | Options Outstanding | | | | Options Exercisable | | | |
|---|---|---|---|---|---|---|---|---|
| Range of Exercise Prices | Outstanding at December 31, 2019 | Weighted-Average Remaining Contractual Life in Years | | Weighted-Average Exercise Price | Exercisable at December 31, 2019 | Weighted-Average Remaining Contractual Life in Years | | Weighted-Average Exercise Price |
| | (Shares in thousands) | | | | | | | |
| $0.01 to $10.00 | 2,502 | 6.3 | $ | 8.85 | 1,172 | 6.3 | $ | 8.37 |
| $10.01 to $20.00 | 6,820 | 6.0 | | 14.31 | 3,623 | 5.1 | | 13.18 |
| $20.01 to $30.00 | 2,099 | 7.8 | | 23.98 | 679 | 7.8 | | 22.78 |
| $30.01 to $40.00 | 355 | 8.0 | | 33.10 | 39 | 8.0 | | 30.97 |
| | 11,776 | 6.4 | $ | 15.44 | 5,513 | 5.7 | $ | 13.46 |

The fair value of stock option awards, with the exception of market-based awards, is estimated on the grant date using the Black-Scholes option pricing model. The Black-Scholes option pricing model incorporates various assumptions, including expected volatility and expected term. When options are granted, the Company uses a blend of Match Group's historical volatility and IAC's historical volatility. The risk-free interest rates are based on U.S. Treasuries with comparable terms as the awards, in effect at the grant date. The expected term is based upon the combination of the initial vesting term and the historical exercise behavior of our employees after vest. The following are the weighted average assumptions used in the Black-Scholes option pricing model:

App. 391

App. 392

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | Years Ended December 31, | |
|---|---|---|
|  | **2018** | **2017** |
| Expected volatility | 29 % | 27 % |
| Risk-free interest rate | 2.5 % | 1.9 % |
| Expected term | 5.3 years | 5.0 years |
| Dividend yield | — % | — % |

There were no stock options granted by the Company during the year ended December 31, 2019. Approximately 0.6 million and 8.2 million stock options were granted by the Company during the years ended December 31, 2018 and 2017, respectively. The weighted average fair value of stock options granted during the years ended December 31, 2018, and 2017 were $10.63 and $5.67, respectively.

Cash received from stock option exercises for the years ended December 31, 2018, and 2017 is less than $0.1 million, and $59.4 million respectively. No cash was received from stock option exercises for the year ended December 31, 2019. The decrease in cash received from stock option exercises in 2019 and 2018 compared to 2017 is due to substantially all options being net settled for the exercise price beginning in late 2017.

**Restricted Stock Units and Performance-based Stock Units**

RSUs and PSUs are awards in the form of phantom shares or units denominated in a hypothetical equivalent number of shares of Match Group common stock and with the value of each RSU and PSU equal to the fair value of Match Group common stock at the date of grant. Each RSU and PSU grant is subject to service-based vesting, where a specific period of continued employment must pass before an award vests. PSUs also include performance-based vesting, where certain performance targets set at the time of grant must be achieved before an award vests. For RSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term. For PSU grants, the expense is measured at the grant date as the fair value of Match Group common stock and expensed as stock-based compensation over the vesting term if the performance targets are considered probable of being achieved.

Unvested RSUs and PSUs outstanding at December 31, 2019 and changes during the year ended December 31, 2019 are as follows:

|  | RSUs | | PSUs | |
|---|---|---|---|---|
|  | **Number of shares** | **Weighted Average Grant Date Fair Value** | **Number of shares[a]** | **Weighted Average Grant Date Fair Value** |
|  | (Shares in thousands) | | | |
| Unvested at January 1, 2019 | 2,759 | $ 29.38 | — | $ — |
| Granted | 1,464 | 61.88 | 346 | 57.78 |
| Vested | (917) | 25.32 | — | — |
| Forfeited | (257) | 40.17 | — | — |
| Unvested at December 31, 2019 | 3,049 | $ 45.29 | 346 | $ 57.78 |

_____

(a)  Represents the maximum shares issuable.

The weighted average fair value of RSUs and PSUs granted during the years ended December 31, 2019, 2018, and 2017, based on market prices of Match Group's common stock on the grant date, was $61.10, $42.24 and $19.21, respectively. The total fair value of RSUs that vested during the years ended December 31, 2019, 2018, and 2017 was $23.2 million, $9.0 million and $6.7 million, respectively. No PSUs vested during the years ended December 31, 2019, 2018, and 2017.

App. 393

App. 394

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Market-based Awards**

During 2018 and 2017, the Company granted market-based awards to certain employees. The number of awards that ultimately vest for certain awards is dependent upon Match Group's stock price and for other awards on the valuation of a wholly-owned business. The grant date fair value of each market-based award is estimated using a lattice model that incorporates a Monte Carlo simulation of Match Group's stock price and, as necessary, the valuation of the subsidiary. Each market-based award is subject to service-based vesting, where a specific period of continued employment must pass before an award vests in addition to the market condition.

Market-based awards outstanding at December 31, 2019 and changes during the year ended December 31, 2019 are as follows:

|  | Market-based awards | |
| --- | --- | --- |
|  | Number of shares | Weighted Average Grant Date Price |
|  | (Shares in thousands) | |
| Unvested at January 1, 2019 | 4,609 | $ 18.28 |
| Vested | (2,375) | 18.16 |
| Forfeited | (170) | 18.18 |
| Expired | (133) | 18.95 |
| Unvested at December 31, 2019 | 1,931 | $ 19.68 |

The weighted average fair value of market-based awards granted during the years ended December 31, 2018, and 2017, based on the valuation model, was $6.88 and $7.50, respectively. There were no market-based awards granted for the year ended December 31, 2019. The total fair value of market-based awards that vested during the years ended December 31, 2019, 2018, and 2017 was $16.5 million, $4.9 million and $3.1 million, respectively.

**Net Settlement of Awards**

We settle substantially all equity awards on a net basis. Assuming all equity awards outstanding on December 31, 2019 were net settled on that date, we would have issued 8.0 million common shares (of which 2.6 million are related to vested shares and 5.4 million are related to unvested shares) and, assuming a 50% withholding rate, would have remitted $655.9 million in cash for withholding taxes (of which $209.5 million is related to vested shares and $446.4 million is related to unvested shares). If we decided to issue a sufficient number of shares to cover the $655.9 million employee withholding tax obligation, 8.0 million additional shares would be issued by the Company.

**Converted Tinder Options**

In July 2017, the Company elected to convert all outstanding equity awards of its wholly-owned Tinder business into Match Group options at a value determined through a process involving two investment banks. These converted Match Group options are included in the option tables above.

These former subsidiary denominated awards, when exercised, can be settled by Match Group issuing shares of its common stock equal in value to the intrinsic value of the award being settled, net of shares with a value equal to the withholding taxes due, which taxes are remitted by Match Group to the government on behalf of the employees or the employee can pay the exercise price and applicable withholding taxes and receive the number of Match Group shares equal to the number of options exercised. At the time of settlement, IAC has the option to issue its own shares directly to the award holders, in which case Match Group would in turn issue its shares to IAC as reimbursement. In either settlement scenario, the same number of Match Group shares would be issued.

During the year ended December 31, 2017, we made cash payments totaling $272.5 million to purchase certain fully vested options.

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**IAC Denominated Stock Options**

There were no IAC stock options granted by IAC under its equity incentive plans to employees of Match Group during the years ended December 31, 2019, 2018 and 2017. Approximately 0.1 million IAC stock options remain outstanding to employees of Match Group as of December 31, 2019. The fair value of each stock option award was estimated on the grant date using the Black–Scholes option pricing model. IAC stock options were granted with exercise prices at least equal to the fair value on the date of grant, vest ratably in annual installments over a four-year period and expire ten years from the date of grant.

**NOTE 12—GEOGRAPHIC INFORMATION**

Revenue by geography is based on where the customer is located. Geographic information about revenue and long-lived assets is presented below:

|  | Years Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2018** | **2017** |
|  | (In thousands) | | |
| **Revenue** | | | |
| United States | $ 972,747 | $ 872,977 | $ 722,446 |
| All other countries | 1,078,511 | 856,873 | 608,215 |
| Total | $ 2,051,258 | $ 1,729,850 | $ 1,330,661 |

The United States is the only country from which revenue is greater than 10 percent of total revenue.

|  | December 31, | |
| --- | --- | --- |
|  | **2019** | **2018** |
|  | (In thousands) | |
| **Long-lived assets (excluding goodwill and intangible assets)** | | |
| United States | $ 48,505 | $ 35,004 |
| France | 7,270 | 11,591 |
| Canada | 7,849 | 8,927 |
| All other countries | 2,316 | 2,829 |
| Total | $ 65,940 | $ 58,351 |

**NOTE 13—LEASES**

The Company leases office space, data center facilities, and equipment used in connection with its operations under various operating leases, many of which contain escalation clauses. Several of these lease agreements relate to properties owned by IAC. See "Note 16—Related Party Transactions" for additional information on the intercompany lease agreements.

ROU assets represent the Company's right to use the underlying assets for the lease term and lease liabilities represent the present value of the Company's obligation to make payments arising from leases. ROU assets and related lease liabilities are based on the present value of fixed lease payments over the lease term using the Company's incremental borrowing rates on the lease commencement date or January 1, 2019 for leases that commenced prior to that date. The Company combines the lease and non-lease components of lease payments in determining ROU assets and related lease liabilities. If the lease includes one or more options to extend the term of the lease, the renewal option is considered in the lease term if it is reasonably certain the Company will exercise the options. Lease expense is recognized on a straight-line basis over the term of the lease. As permitted by ASC 842, leases with an initial term of twelve months or less ("short-term leases") are not recorded on the accompanying consolidated balance sheet.

App. 398

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Variable lease payments consist primarily of common area maintenance, utilities, and taxes, which are not included in the recognition of ROU assets and related lease liabilities. The Company's lease agreements do not contain any material residual value guarantees or material restrictive covenants.

| Leases | Balance Sheet Classification | December 31, 2019 |
|---|---|---|
| | | (In thousands) |
| **Assets:** | | |
| Right-of-use assets | Right-of-use assets | $ 43,288 |
| **Liabilities:** | | |
| Current lease liabilities | Accrued expenses and other current liabilities | $ 14,003 |
| Long-term lease liabilities | Other long-term liabilities | 32,475 |
| Total lease liabilities | | $ 46,478 |

| Lease Cost | Income Statement Classification | Year Ended December 31, 2019 |
|---|---|---|
| | | (In thousands) |
| Fixed lease cost | Cost of revenue | $ 3,560 |
| Fixed lease cost | General and administrative expense | 15,850 |
| Total fixed lease cost[a] | | 19,410 |
| Variable lease cost | Cost of revenue | 358 |
| Variable lease cost | General and administrative expense | 3,219 |
| Total variable lease cost | | 3,577 |
| Net lease cost | | $ 22,987 |

---

[a] Includes approximately $3.0 million of short-term lease cost, and less than $0.4 million of sublease income, for the year ended December 31, 2019.

Maturities of lease liabilities as of December 31, 2019[b]:

| | (In thousands) |
|---|---|
| 2020 | $ 15,953 |
| 2021 | 15,106 |
| 2022 | 8,909 |
| 2023 | 3,399 |
| 2024 | 2,905 |
| After 2024 | 5,727 |
| **Total** | 51,999 |
| Less: Interest | (5,521) |
| Present value of lease liabilities | $ 46,478 |

---

[b] Operating lease payments exclude $0.4 million of legally binding minimum lease payments for leases signed but not yet commenced.

App. 399

96

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following are the weighted average assumptions used for lease term and discount rate as of December 31, 2019:

| | |
|---|---:|
| Remaining lease term | 4.0 years |
| Discount rate | 5.05 % |

| | | Year Ended December 31, 2019 |
|---|---|---:|
| | | (In thousands) |
| **Other information:** | | |
| Right-of-use assets obtained in exchange for lease liabilities | $ | 4,720 |
| Cash paid for amounts included in the measurement of lease liabilities | $ | 18,508 |

**NOTE 14—COMMITMENTS AND CONTINGENCIES**

**Commitments**

The Company has funding commitments in the form of purchase obligations and surety bonds. The purchase obligations due in less than one year are $43.9 million and the purchase obligations due between one and three years are $40.0 million for a total of $83.9 million in purchase obligations. The purchase obligations primarily relate to web hosting services with $40.0 million due for both the years ended December 31, 2020 and 2021. Surety bonds totaling $0.1 million are currently outstanding as of December 31, 2019.

**Contingencies**

In the ordinary course of business, the Company is a party to various lawsuits. The Company establishes reserves for specific legal matters when it determines that the likelihood of an unfavorable outcome is probable and the loss is reasonably estimable. Management has also identified certain other legal matters where we believe an unfavorable outcome is not probable and, therefore, no reserve is established. Although management currently believes that resolving claims against us, including claims where an unfavorable outcome is reasonably possible, will not have a material impact on the liquidity, results of operations, or financial condition of the Company, these matters are subject to inherent uncertainties and management's view of these matters may change in the future. The Company also evaluates other contingent matters, including income and non-income tax contingencies, to assess the likelihood of an unfavorable outcome and estimated extent of potential loss. It is possible that an unfavorable outcome of one or more of these lawsuits or other contingencies could have a material impact on the liquidity, results of operations, or financial condition of the Company. See "Note 3—Income Taxes" for additional information related to income tax contingencies.

*Tinder Optionholder Litigation against IAC and Match Group*

On August 14, 2018, ten then-current and former employees of Match Group, LLC or Tinder, Inc. ("Tinder"), an operating business of Match Group, filed a lawsuit in New York state court against IAC and Match Group. *See Sean Rad et al. v. IAC/InterActiveCorp and Match Group, Inc.*, No. 654038/2018 (Supreme Court, New York County). The complaint alleges that in 2017, the defendants: (i) wrongfully interfered with a contractually established process for the independent valuation of Tinder by certain investment banks, resulting in a substantial undervaluation of Tinder and a consequent underpayment to the plaintiffs upon exercise of their Tinder stock options, and (ii) then wrongfully merged Tinder into Match Group, thereby depriving certain of the plaintiffs of their contractual right to later valuations of Tinder on a stand-alone basis. The complaint asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, interference with contractual relations (as against Match Group only), and interference with prospective economic advantage, and seeks compensatory damages in the amount of at least $2 billion, as well as punitive damages. On August 31, 2018, four plaintiffs who were still employed by Match Group filed a notice of discontinuance of their claims without prejudice, leaving the six former employees as the remaining plaintiffs.

97

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

On October 9, 2018, the defendants filed a motion to dismiss the complaint on various grounds, including that the 2017 valuation of Tinder by the investment banks was an expert determination any challenge to which is both time-barred under applicable law and available only on narrow substantive grounds that the plaintiffs have not pleaded in their complaint; the plaintiffs opposed the motion. On June 13, 2019, the court issued a decision and order (i) granting the motion to dismiss the claims for breach of the implied covenant of good faith and fair dealing and for unjust enrichment, (ii) granting the motion to dismiss the merger-related claim for breach of contract as to two of the remaining six plaintiffs, and (iii) otherwise denying the motion to dismiss. On June 21, 2019, the defendants filed a notice of appeal from the trial court's partial denial of their motion to dismiss, and the parties thereafter briefed the appeal. On October 29, 2019, the Appellate Division, First Department issued an order affirming the lower court's decision. On November 22, 2019, the defendants filed a motion for reargument or, in the alternative, leave to appeal the Appellate Division's order to the New York Court of Appeals; the plaintiffs opposed the motion, which remains pending. On June 3, 2019, the defendants filed a second motion to dismiss based upon certain provisions of the plaintiffs' agreement with a litigation funding firm; the plaintiffs have opposed the motion, which remains pending.

Document discovery in the case is substantially complete, and deposition discovery is underway. On January 30, 2020, the parties participated in a mediation that did not result in resolution of the matter. We believe that the allegations in this lawsuit are without merit and will continue to defend vigorously against it.

*FTC Lawsuit against Match Group*

In March 2017, the Federal Trade Commission ("FTC") requested information and documents in connection with a civil investigation regarding certain business practices of Match.com. The FTC raised potential claims relating to Match.com's marketing, chargeback, and online cancellation practices. In November 2018, the FTC proposed to resolve its potential claims via a consent judgment requiring certain changes in those practices, as well as a $60 million payment. Ensuing discussions between the Company and the FTC ended without resolution.

On August 7, 2019, the FTC voted to assert claims against the Company and referred the matter to the U.S. Department of Justice ("DOJ"). The DOJ subsequently declined to pursue a civil case against the Company and referred the matter back to the FTC.

On September 25, 2019, the FTC filed a lawsuit in the Northern District of Texas against Match Group. *See FTC v. Match Group, Inc.*, No. 3:19-cv-02281-K (N.D. Tex.). The complaint alleges that, prior to mid-2018, for marketing purposes Match.com told non-paying users that other users were trying to communicate with them, even though Match.com had identified those subscriber accounts as potentially fraudulent, thereby inducing non-paying users to subscribe and exposing them to the risk of fraud should they subscribe. The complaint also challenges the adequacy of Match.com's disclosure of the terms of its former six-month guarantee, the efficacy of its cancellation process, and its handling of chargeback disputes. The complaint seeks among other things permanent injunctive relief, civil penalties, restitution, disgorgement, and costs of suit. On October 17, 2019, the Company filed a motion to dismiss the complaint. The FTC opposed the motion, which remains pending.

On September 26, 2019, the Company received a grand-jury subpoena from the DOJ for documents relating to certain of the marketing-related claims in the FTC's complaint. The Company has cooperated with the DOJ in responding to its subpoena.

Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and will defend vigorously against them.

98

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

## NOTE 15—SUPPLEMENTAL CASH FLOW INFORMATION

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 |
| | | (In thousands) | | | | |
| Cash paid (received) during the year for: | | | | | | |
| Interest | $ | 78,278 | $ | 71,308 | $ | 71,893 |
| Income tax payments, including amounts paid to IAC under the tax sharing agreement | | 33,592 | | 39,267 | | 28,938 |
| Income tax refunds, including amounts refunded from IAC under the tax sharing agreement | | (1,380) | | (17,720) | | (13,537) |

| | December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 | | 2016 |
| | | (In thousands) | | | | | | |
| Cash and cash equivalents | $ | 465,676 | $ | 186,947 | $ | 272,624 | $ | 253,651 |
| Restricted cash included in other current assets | | 127 | | 193 | | 137 | | 120 |
| Total cash, cash equivalents and restricted cash as shown on the consolidated statement of cash flow | $ | 465,803 | $ | 187,140 | $ | 272,761 | $ | 253,771 |

## NOTE 16—RELATED PARTY TRANSACTIONS

**Relationship with IAC**

In connection with the IPO in 2015, the Company entered into certain agreements relating to our relationship with IAC. These agreements include a master transaction agreement; an investor rights agreement; a tax sharing agreement; a services agreement; an employee matters agreement and a subordinated loan agreement.

For the years ended December 31, 2019, 2018 and 2017, the Company incurred $7.9 million, $7.6 million, and $9.9 million, respectively, pursuant to the services agreement. Included in these amounts are $5.8 million, $5.2 million and $5.1 million, respectively, for leasing of office space for certain of our businesses at properties owned by IAC. In December 2017, certain international subsidiaries of the Company agreed to sell net operating losses that were not expected to be utilized to an IAC subsidiary for $0.9 million. All amounts were paid in full by the Company at December 31, 2019, 2018, and 2017.

At December 31, 2019, $15.1 million of both the ROU assets and the lease liabilities represented leases between the Company and IAC.

*Master Transaction Agreement*

The master transaction agreement sets forth the agreements between IAC and the Company regarding the principal transactions necessary to separate our business from IAC, as well as governs certain aspects of our relationship with IAC post IPO. Under the master transaction agreement, the Company agrees to assume all of the assets and liabilities related to its business and agrees to indemnify IAC against any losses arising out of any breach by the Company of the master transaction agreement or the other transaction related agreements described below. IAC also agrees to indemnify the Company against losses arising out of any breach by IAC of the master transaction agreement or any of the other transaction related agreements.

99

App. 403

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

### *Investor Rights Agreement*

Under the investor rights agreement, the Company provides IAC with (i) specified registration and other rights relating to its shares of our common stock and (ii) anti-dilution rights. See "Note 8—Shareholders' Equity" for additional information on the anti-dilution rights.

### *Tax Sharing Agreement*

The tax sharing agreement governs the rights, responsibilities, and obligations of the Company and IAC with respect to tax liabilities and benefits, entitlements to refunds, preparation of tax returns, tax contests and other tax matters regarding U.S. federal, state, local and foreign income taxes. Under the tax sharing agreement, the Company is generally responsible and required to indemnify IAC for: (i) all taxes imposed with respect to any consolidated, combined or unitary tax return of IAC or one of its subsidiaries that includes the Company or any of its subsidiaries to the extent attributable to the Company or any of its subsidiaries, as determined under the tax sharing agreement, and (ii) all taxes imposed with respect to any of the Company's subsidiaries' consolidated, combined, unitary or separate tax returns.

At December 31, 2019, there was $0.2 million of outstanding payables pursuant to the tax sharing agreement. At December 31, 2018, there were no outstanding receivables or payables pursuant to the tax sharing agreement. Refunds from IAC during the years ended December 31, 2018 and 2017 pursuant to this agreement were $7.0 million and $10.9 million. For the year ended December 31, 2019, there were no payments to or refunds from IAC pursuant to this agreement.

### *Services Agreement*

The services agreement governs services that IAC provides to the Company including, among others: (i) assistance with certain legal, finance, internal audit, treasury, information technology support, insurance and tax matters, including assistance with certain public company reporting obligations; (ii) payroll processing services; (iii) tax compliance services; and (iv) such other services as to which IAC and the Company may agree. In addition, under the services agreement the Company provides IAC informational technology services and such other services as to which IAC and the Company may agree. The services agreement had an initial term of one year from the date of the IPO, and provides for automatic renewals for additional one-year periods, subject to IAC's continued ownership of a majority of the combined voting power of the Company's voting stock.

### *Employee Matters Agreement*

The employee matters agreement covers a wide range of compensation and benefit issues related to the allocation of liabilities associated with: (i) employment or termination of employment, (ii) employee benefit plans and (iii) equity awards. Under the employee matters agreement, the Company's employees participate in IAC's U.S. health and welfare plans, 401(k) plan and flexible benefits plan and the Company reimburses IAC for the costs of such participation. In the event IAC no longer retains shares representing at least 80% of the aggregate voting power of shares entitled to vote in the election of the Company's Board of Directors, Match Group will no longer participate in IAC's employee benefit plans, but will establish its own employee benefit plans that will be substantially similar to the plans sponsored by IAC.

The employee matters agreement also requires the Company to reimburse IAC for the cost of any IAC equity awards held by Match Group's employees and former employees and that IAC may elect to receive payment either in cash or Company common stock. With respect to equity awards originally denominated in shares of the Company's subsidiaries, IAC may require those awards to be settled in either shares of IAC's common stock or in shares of the Company's common stock and, to the extent shares of IAC common stock are issued in settlement, the Company will reimburse IAC for the cost of those shares by issuing to IAC additional shares of the Company's common stock.

During the years ended December 31, 2019, 2018 and 2017, 0.8 million, 3.0 million and 11.9 million shares, respectively, of Company common stock were issued to IAC pursuant to the employee matters agreement; 0.7 million, 2.5 million and 11.3 million, respectively, of which were issued as reimbursement for shares of IAC common stock issued in connection with the exercise and settlement of equity awards originally denominated in shares of a subsidiary of the Company; and 0.1 million, 0.5 million and 0.6 million, respectively, of which were

100

App. 404

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

issued as reimbursement for shares of IAC common stock issued in connection with the exercise and vesting of IAC equity awards held by Company employees.

*IAC Subordinated Loan Facility*

Prior to the IPO, the Company entered into an uncommitted subordinated loan facility with IAC (the "IAC Subordinated Loan Facility"), which allowed the Company to make one or more requests to IAC to borrow funds. If IAC agreed to fulfill any such borrowing request, the related indebtedness would be incurred in accordance with the terms of the IAC Subordinated Loan Facility. Any indebtedness outstanding under the IAC Subordinated Loan Facility would be by its terms subordinated in right of payment to the obligations under the Match Group Credit Agreement and the Match Group Senior Notes, and would bear interest at the applicable rate set forth in the pricing grid in the Match Group Credit Agreement, which rate is based on the Company's consolidated net leverage ratio at the time of borrowing, plus an additional amount to be agreed upon. The IAC Subordinated Loan Facility had a scheduled final maturity date of no earlier than 90 days after the maturity date of the Match Group Credit Facility or the latest maturity date in respect of any class of Term Loans outstanding under the Match Group Credit Agreement. At December 31, 2019, the Company had no indebtedness outstanding under the IAC Subordinated Loan Facility. The IAC Subordinated Loan Facility was terminated on February 26, 2020.

**NOTE 17—BENEFIT PLANS**

Match Group employees are eligible to participate in a retirement savings plan sponsored by IAC in the United States, which is qualified under Section 401(k) of the Internal Revenue Code. Under the IAC/InterActiveCorp Retirement Savings Plan (the "Plan"), participating employees may contribute up to 50% of their pre-tax earnings, but not more than statutory limits. Prior to July 2019, the employer match under the Plan was fifty cents for each dollar a participant contributed in the Plan, with a maximum contribution of 3% of a participant's eligible earnings. Beginning July 1, 2019, the employer match under the Plan was changed to 100% of the first 10% of a participant's eligible earnings, subject to IRS limits on the Company's matching contribution that a participant contributes to the Plan. Matching contributions under the Plan for the years ended December 31, 2019, 2018 and 2017 were $5.8 million, $2.8 million and $2.2 million, respectively. Matching contributions are invested in the same manner as each participant's voluntary contributions in the investment options provided under the Plan. An investment option in the Plan is IAC common stock, but neither participant nor matching contributions are required to be invested in IAC common stock. The increase in matching contributions in 2019 is primarily due to the aforementioned change of the Company's matching contribution in the second half of 2019.

Internationally, Match Group also has or participates in various benefit plans, primarily defined contribution plans. The Company's contributions for these plans for the years ended December 31, 2019, 2018 and 2017 were $3.1 million, $2.8 million and $2.2 million, respectively.

**NOTE 18—CONSOLIDATED FINANCIAL STATEMENT DETAILS**

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2019 | | 2018 | |
|  | (In thousands) | | | |
| **Other current assets:** | | | | |
| Capitalized mobile app fees | $ | 28,478 | $ | 29,216 |
| Prepaid expenses |  | 55,676 |  | 19,476 |
| Other |  | 10,046 |  | 9,074 |
| Other current assets | $ | 94,200 | $ | 57,766 |

App. 405

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | (In thousands) | |
| **Property and equipment, net:** | | |
| Computer equipment and capitalized software | $ 144,405 | $ 136,083 |
| Leasehold improvements | 27,628 | 24,529 |
| Furniture and other equipment | 8,442 | 7,395 |
| Projects in progress | 8,026 | 3,369 |
|  | 188,501 | 171,376 |
| Accumulated depreciation and amortization | (122,561) | (113,025) |
| Property and equipment, net | $ 65,940 | $ 58,351 |

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | (In thousands) | |
| **Accrued expenses and other current liabilities:** | | |
| Accrued advertising expense | $ 32,201 | $ 40,894 |
| Accrued employee compensation and benefits | 47,745 | 38,378 |
| Accrued professional fees | 22,728 | 14,118 |
| Current lease liabilities | 14,003 | — |
| Other | 61,901 | 42,581 |
| Accrued expenses and other current liabilities | $ 178,578 | $ 135,971 |

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
|  | (In thousands) | | |
| **Other (expense) income, net** | $ (2,026) | $ 7,765 | $ (30,827) |

Other expense, net, in 2019 includes a $4.0 million impairment of an equity investment, expense of $1.7 million related to a mark-to-market adjustment pertaining to a liability classified equity instrument, and $0.9 million in net foreign currency losses in the period, partially offset by interest income of $4.4 million.

Other income, net in 2018 includes $5.3 million in net foreign currency exchange gains due primarily to a strengthening of the U.S. dollar relative to the British Pound in the period and $4.9 million of interest income, partially offset by $2.1 million related to impairments of certain equity investments and $0.7 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity instrument.

Other expense, net, in 2017 includes expenses of $15.4 million related to the redemption of our 6.75% Senior Notes and repricing of the Term Loan, $13.0 million related to a mark-to-market adjustment pertaining to a subsidiary denominated equity award held by a non-employee, $10.3 million in net foreign currency exchange losses, and a $2.3 million other-than-temporary impairment charge related to a cost method investment resulting from of our assessment of the near-term prospects and financial condition of the investee. These expenses were partially offset by a gain on the sale of a cost method investment of $9.1 million.

Case 3:19-cv-02356-S     Document 39     Filed 06/12/20     Page 411 of 451     PageID 934

App. 407

Table of Contents

## MATCH GROUP, INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### NOTE 19—QUARTERLY RESULTS (UNAUDITED)

| | Quarter Ended March 31 | Quarter Ended June 30 | Quarter Ended September 30 | Quarter Ended December 31 |
|---|---|---|---|---|
| | (In thousands, except per share data) | | | |
| **Year Ended December 31, 2019** | | | | |
| Revenue | $ 464,625 | $ 497,973 | $ 541,493 | $ 547,167 |
| Cost of revenue | 120,224 | 126,665 | 138,225 | 142,070 |
| Operating income | 118,828 | 172,898 | 176,604 | 180,201 |
| Earnings from continuing operations | 123,034 | 127,968 | 151,406 | 132,017 |
| Net earnings attributable to Match Group, Inc. shareholders | 123,034 | 127,973 | 151,498 | 132,226 |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [a] | $ 0.44 | $ 0.46 | $ 0.54 | $ 0.47 |
| Diluted [a] | $ 0.42 | $ 0.43 | $ 0.51 | $ 0.45 |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [a] | $ 0.44 | $ 0.46 | $ 0.54 | $ 0.47 |
| Diluted [a] | $ 0.42 | $ 0.43 | $ 0.51 | $ 0.45 |
| | | | | |
| **Year Ended December 31, 2018** | | | | |
| Revenue | $ 407,367 | $ 421,196 | $ 443,943 | $ 457,344 |
| Cost of revenue | 93,944 | 97,334 | 107,512 | 111,210 |
| Operating income | 112,233 | 150,165 | 139,895 | 151,001 |
| Earnings from continuing operations | 99,678 | 131,358 | 127,950 | 113,983 |
| (Loss) earnings from discontinued operations, net of tax | — | — | (378) | — |
| Net earnings attributable to Match Group, Inc. shareholders | 99,736 | 132,500 | 130,159 | 115,544 |
| **Per share information from continuing operations attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [a] | $ 0.36 | $ 0.48 | $ 0.47 | $ 0.42 |
| Diluted [a] | $ 0.33 | $ 0.45 | $ 0.44 | $ 0.39 |
| **Per share information attributable to the Match Group, Inc. shareholders:** | | | | |
| Basic [a] | $ 0.36 | $ 0.48 | $ 0.47 | $ 0.42 |
| Diluted [a] | $ 0.33 | $ 0.45 | $ 0.44 | $ 0.39 |

_____

[a]   Quarterly per share amounts may not add to the related annual per share amount because of differences in the average common shares outstanding during each period.

### NOTE 20—SUBSEQUENT EVENTS

On January 31, 2020, entities controlled by IAC completed the contribution to Match Group of two office buildings in Los Angeles, which are primarily occupied by Tinder, for 1,378,371 shares of Match Group common stock.

On February 11, 2020, we completed a private offering of $500 million aggregate principal amount of 4.125% Senior Notes due August 1, 2030. The proceeds from these notes were used to pay expenses associated with the offering and, in the event the Separation is consummated, will be used to fund the Intercompany Loan to IAC. If the Separation is not consummated, the proceeds will be used for general corporate purposes.

App. 408

103

App. 409

Table of Contents

**MATCH GROUP, INC. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

On February 13, 2020, the $500 million Credit Facility was amended to, among other things, increase the available borrowing capacity to $750 million, reduce interest rate margins by 0.125% to LIBOR plus 1.375%, and extend its maturity to February 13, 2025. Additionally on February 13, 2020, the $425 million Term Loan was amended to reprice the outstanding balance to LIBOR plus 1.75% and extend its maturity to February 13, 2027.

104

Table of Contents

**Item 9.   Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not applicable.

**Item 9A.   Controls and Procedures**

**Conclusion Regarding the Effectiveness of the Company's Disclosure Controls and Procedures**

The Company monitors and evaluates on an ongoing basis its disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant.

As required by Rule 13a-15(b) of the Exchange Act, Match Group management, including the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), conducted an evaluation, as of the end of the period covered by this report, of the effectiveness of the Company's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). Based on this evaluation, the CEO and the CFO concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

**Management's Report on Internal Control Over Financial Reporting**

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) for the Company. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States. Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, our management used the criteria for effective internal control over financial reporting described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on this assessment, management has determined that, as of December 31, 2019, the Company's internal control over financial reporting is effective. The effectiveness of our internal control over financial reporting as of December 31, 2019 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their attestation report, included herein.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Changes in Internal Control Over Financial Reporting**

The Company monitors and evaluates on an ongoing basis its internal control over financial reporting in order to improve its overall effectiveness. In the course of these evaluations, the Company modifies and refines its internal processes as conditions warrant. As required by Rule 13a-15(d), Match Group management, including the CEO and the CFO, also conducted an evaluation of the Company's internal control over financial reporting to determine whether any changes occurred during the quarter ended December 31, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. Based on that evaluation, there has been no such change during the quarter ended December 31, 2019.

Table of Contents

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Match Group, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Match Group, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, Match Group, Inc. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Company as of December 31, 2019 and 2018, and the related consolidated statements of operations, comprehensive operations, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes and the financial statement schedule listed in the Index at Item 15(a), and our report dated February 27, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ ERNST & YOUNG LLP

New York, New York
February 27, 2020

106

App. 412

Table of Contents

**Item 9B.  Other Information**

Not applicable.

107

Table of Contents

App. 413

## PART III

The information required by Part III (Items 10, 11, 12, 13 and 14) has been incorporated by reference to Match Group's definitive Proxy Statement to be used in connection with its 2020 Annual Meeting of Stockholders (the "2020 Proxy Statement"), as set forth below in accordance with General Instruction G(3) of Form 10-K, or will be provided in an amendment on Form 10-K/A.

### Item 10. Directors, Executive Officers and Corporate Governance

The information required by Item 401 of Regulation S-K relating to directors and executive officers of Match Group is set forth in the sections entitled "Information Concerning Director Nominees" and "Information Concerning Match Group Executive Officers Who Are Not Directors," respectively, in the 2020 Proxy Statement or will be provided in an amendment on Form 10-K/A. The information required by Item 406 of Regulation S-K relating to Match Group's Code of Ethics is set forth under the caption "Part I-Item 1-Business-Additional Information-Code of ethics" of this annual report and is incorporated herein by reference. The information required by subsections (c)(3), (d)(4) and (d)(5) of Item 407 of Regulation S-K is set forth in the sections entitled "Corporate Governance" and "The Board and Board Committees" in the 2020 Proxy Statement and is incorporated by reference or will be provided in an amendment on Form 10-K/A.

### Item 11. Executive Compensation

The information required by Item 402 of Regulation S-K relating to executive and director compensation is set forth in the sections entitled "Executive Compensation" and "Director Compensation" in the 2020 Proxy Statement and is incorporated herein by reference or will be provided in an amendment on Form 10-K/A. The information required by subsections (e)(4) and (e)(5) of Item 407 of Regulation S-K relating to certain compensation committee matters is set forth in the sections entitled "The Board and Board Committees," "Compensation Committee Report" and "Compensation Committee Interlocks and Insider Participation" in the 2020 Proxy Statement and is incorporated herein by reference or will be provided in an amendment on Form 10-K/A; provided, that the information set forth in the section entitled "Compensation Committee Report" shall be deemed furnished herein and shall not be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The information regarding ownership of Match Group common stock and Class B common stock required by Item 403 of Regulation S-K and securities authorized for issuance under Match Group's various equity compensation plans required by Item 201(d) of Regulation S-K is set forth in the sections entitled "Security Ownership of Certain Beneficial Owners and Management" and "Equity Compensation Plan Information," respectively, in the 2020 Proxy Statement and is incorporated herein by reference or will be provided in an amendment on Form 10-K/A.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Information regarding certain relationships and related transactions involving Match Group required by Item 404 of Regulation S-K and director independence determinations required by Item 407(a) of Regulation S-K is set forth in the sections entitled "Certain Relationships and Related Person Transactions" and "Corporate Governance," respectively, in the 2020 Proxy Statement and is incorporated herein by reference or will be provided in an amendment on Form 10-K/A.

### Item 14. Principal Accounting Fees and Services

Information required by Item 9(e) of Schedule 14A regarding the fees and services of Match Group's independent registered public accounting firm and the pre-approval policies and procedures applicable to services provided to Match Group by such firm is set forth in the sections entitled "Fees Paid to Our Independent Registered Public Accounting Firm" and "Audit and Non-Audit Services Pre-Approval Policy," respectively, in the 2020 Proxy Statement and is incorporated herein by reference or will be provided in an amendment on Form 10-K/A.

108

App. 414

## PART IV

**Item 15. Exhibits and Financial Statement Schedules**

*(a) List of documents filed as part of this Report:*

**(1) Consolidated Financial Statements of Match Group, Inc.**

Report of Independent Registered Public Accounting Firm: Ernst & Young LLP.

Consolidated Balance Sheet as of December 31, 2019 and 2018.

Consolidated Statement of Operations for the Years Ended December 31, 2019, 2018, and 2017.

Consolidated Statement of Comprehensive Operations for the Years Ended December 31, 2019, 2018, and 2017.

Consolidated Statement of Shareholders' Equity for the Years Ended December 31, 2019, 2018, and 2017.

Consolidated Statement of Cash Flows for the Years Ended December 31, 2019, 2018, and 2017.

Notes to Consolidated Financial Statements.

**(2) Consolidated Financial Statement Schedule of Match Group, Inc.**

| Schedule Number | |
| --- | --- |
| II | Valuation and Qualifying Accounts. |

All other financial statements and schedules not listed have been omitted since the required information is either included in the Consolidated Financial Statements or the notes thereto, is not applicable or is not required.

**(3) Exhibits**

See Exhibit Index below for a complete list of Exhibits to this report.

**Item 16. Form 10-K Summary**

None.

109

Table of Contents

## EXHIBIT INDEX

The documents set forth below, numbered in accordance with Item 601 of Regulation S-K, are filed herewith, incorporated by reference herein by reference to the location indicated, or furnished herewith.

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 2.1 | Stock Purchase Agreement, dated as of July 13, 2015, by and among Match.com Inc., Plentyoffish Media Inc., Markus Frind, Markus Frind Family Trust No. 2, and Frind Enterprises Ltd. | 8-K | 000-20570 | 2.1 | 7/17/2015 | |
| 2.2* | Transaction Agreement, dated as of December 19, 2019, by and among IAC/InterActiveCorp, Match Group, Inc., IAC Holdings, Inc. and Valentine Merger Sub LLC. | 8-K | 001-37636 | 2.1 | 12/23/2019 | |
| 3.1 | Amended and Restated Certificate of Incorporation of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 11/24/2015 | |
| 3.2 | Amended and Restated By-laws of Match Group, Inc. | 8-K | 001-37636 | 3.1 | 12/7/2017 | |
| 4.1 | Indenture, dated June 1, 2016, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 6/2/2016 | |
| 4.2 | Investor Rights Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 4.1 | 11/24/2015 | |
| 4.3 | Indenture, dated December 4, 2017, between Match Group, Inc. and Computershare Trust Company, N.A., as Trustee. | 8-K | 001-37636 | 4.1 | 12/4/2017 | |
| 4.4 | Indenture, dated as of February 15, 2019, between Match Group, Inc. and Computershare Trust Company, N.A. as trustee. | 8-K | 001-37636 | 4.1 | 2/15/2019 | |
| 4.5 | Description of Securities | | | | | † |
| 10.1 | Master Transaction Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.1 | 11/24/2015 | |
| 10.2 | Employee Matters Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.2 | 11/24/2015 | |
| 10.3 | Amendment No. 1 to the Employee Matters Agreement, dated as of April 13, 2016, by and between Match Group, Inc. and IAC/InterActiveCorp. | 10-Q | 001-37636 | 10.1 | 5/10/2016 | |
| 10.4 | Tax Sharing Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.3 | 11/24/2015 | |
| 10.5 | Services Agreement, dated as of November 24, 2015, by and between Match Group, Inc. and IAC/InterActiveCorp. | 8-K | 001-37636 | 10.4 | 11/24/2015 | |
| 10.6 | Contribution Agreement, dated as of December 19, 2019, by and among TMC Realty, L.L.C., 8831-8833 Sunset, LLC and Match Group, Inc. | 8-K | 001-37636 | 10.1 | 12/23/2019 | |
| 10.7 | Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.5 | 11/24/2015 | |
| 10.8 | First Amendment to the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 8/4/2017 | |
| 10.9 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.7 | 2/28/2017 | |
| 10.10 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2015 Stock and Annual Incentive Plan.(1) | 10-K | 001-37636 | 10.8 | 2/28/2017 | |
| 10.11 | Match Group, Inc. Amended and Restated 2017 Stock and Annual Incentive Plan.(1) | 8-K | 001-37636 | 10.1 | 6/21/2018 | |
| 10.12 | Form of Terms and Conditions for Stock Options granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.1 | 11/9/2017 | |

110

App. 416

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 10.13 | Form of Terms and Conditions for Restricted Stock Units granted under the Match Group, Inc. 2017 Stock and Annual Incentive Plan.(1) | 10-Q | 001-37636 | 10.2 | 11/9/2017 | |
| 10.14 | Summary of Non-Employee Director Compensation Arrangements.(1) | 10-K | 001-37636 | 10.9 | 3/28/2016 | |
| 10.15 | Amended and Restated Credit Agreement, dated as of November 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 10-K | 001-37636 | 10.11 | 3/28/2016 | |
| 10.16 | Amendment No. 3, dated as of December 8, 2016, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 12/8/2016 | |
| 10.17 | Amendment No. 4, dated as of August 14, 2017, to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, as further amended as of December 8, 2016, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties thereto. | 8-K | 001-37636 | 10.1 | 8/17/2017 | |
| 10.18 | Amendment No. 5 dated as of December 7, 2018 to the Credit Agreement dated as of October 7, 2015, as amended and restated as of November 16, 2015, as further amended as of December 16, 2015, as further amended as of December 8, 2016, and as further amended as of August 14, 2017, among Match Group, Inc., as borrower, the Lenders party thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other parties thereto. | 8-K | 001-37636 | 10.1 | 12/13/2018 | |
| 10.19 | Employment Agreement between Amanda W. Ginsberg and Match Group, Inc. dated as of July 20, 2018.(1) | 8-K | 001-37636 | 10.1 | 7/26/2018 | |
| 10.20 | Employment Agreement between Gary Swidler and Match Group, Inc. dated as of August 8, 2018.(1) | 8-K | 001-37636 | 10.1 | 8/14/2018 | |
| 10.21 | Employment Agreement between Jared Sine and Match Group, Inc. dated as of August 8, 2018.(1) | 8-K | 001-37636 | 10.2 | 8/14/2018 | |
| 10.22 | Employment Agreement between Sharmistha Dubey and Match Group, Inc. dated as of August 8, 2018.(1) | 10-Q | 001-37636 | 10.5 | 11/9/2018 | |
| 21.1 | Subsidiaries of the Registrant as of December 31, 2019. | | | | | † |
| 23.1 | Consent of Ernst & Young LLP. | | | | | † |
| 31.1 | Certification of the Chief Executive Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes | | | | | † |
| 31.2 | Certification of the Chief Financial Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | | † |
| 32.1 | Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 32.2 | Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | | ‡ |
| 101.INS | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | | |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | | | | † |

111

Table of Contents

| Exhibit No. | Exhibit Description | Incorporated by Reference | | | | Filed (†) or Furnished (‡) Herewith (as indicated) |
|---|---|---|---|---|---|---|
| | | Form | SEC File No. | Exhibit | Filing Date | |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | | | | † |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | | | | † |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | | | | † |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | | | | † |
| 104 | Cover Page Interactive Data File (formatted as Incline XBRL and contained in Exhibit 101) | | | | | |

---

(1)    Reflects management contracts and management and director compensatory plans.

\* Certain schedules and exhibits to the Transaction Agreement have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The Company hereby agrees to furnish supplementally a copy of any omitted schedule and/or exhibit to the SEC upon request.

112

App. 418

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

February 27, 2020

**MATCH GROUP, INC.**

By: _____/s/ GARY SWIDLER_____

Gary Swidler

*Chief Financial Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on February 27, 2020:

| Signature | Title |
|---|---|
| /s/ JOSEPH LEVIN<br>Joseph Levin | Chairman of the Board |
| /s/ AMANDA W. GINSBERG<br>Amanda W. Ginsberg | Chief Executive Officer and Director<br>(Principal Executive Officer) |
| /s/ GARY SWIDLER<br>Gary Swidler | Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ PHILIP D. EIGENMANN<br>Philip D. Eigenmann | Senior Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) |
| /s/ SHARMISTHA DUBEY<br>Sharmistha Dubey | Director |
| /s/ ANN L. McDANIEL<br>Ann L. McDaniel | Director |
| /s/ THOMAS J. McINERNEY<br>Thomas J. McInerney | Director |
| /s/ GLENN H. SCHIFFMAN<br>Glenn H. Schiffman | Director |
| /s/ PAMELA S. SEYMON<br>Pamela S. Seymon | Director |
| /s/ ALAN G. SPOON<br>Alan G. Spoon | Director |
| /s/ MARK STEIN<br>Mark Stein | Director |
| /s/ GREGG WINIARSKI<br>Gregg Winiarski | Director |

App. 419

https://www.sec.gov/Archives/edgar/data/1575189/000157518920000018/mtch-20191231.htm

143/144

**Schedule II**

## MATCH GROUP, INC. AND SUBSIDIARIES

## VALUATION AND QUALIFYING ACCOUNTS

| Description | Balance at Beginning of Period | Charges to Earnings | | Charges to Other Accounts | | Deductions | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | | |
| **2019** | | | | | | | | |
| Allowance for doubtful accounts | $ 724 | $ 79 | (a) | $ (8) | | $ (217) | (d) | $ 578 |
| Deferred tax valuation allowance | 47,448 | 7,472 | (b) | (42) | (c) | — | | 54,878 |
| Other reserves | 3,008 | | | | | | | 2,901 |
| **2018** | | | | | | | | |
| Allowance for doubtful accounts | $ 778 | $ 83 | (a) | $ (15) | | $ (122) | (d) | $ 724 |
| Deferred tax valuation allowance | 24,795 | 22,675 | (e) | (22) | (c) | — | | 47,448 |
| Other reserves | 2,544 | | | | | | | 3,008 |
| **2017** | | | | | | | | |
| Allowance for doubtful accounts | $ 676 | $ 427 | (a) | $ (47) | | $ (278) | (d) | $ 778 |
| Deferred tax valuation allowance | 23,411 | 1,157 | (f) | 227 | (c) | — | | 24,795 |
| Other reserves | 2,822 | | | | | | | 2,544 |

_____

(a) Additions to the allowance for doubtful accounts are charged to expense.

(b) Amount is primarily related to foreign and state net operating losses and foreign interest deduction carryforwards.

(c) Amount is related to currency translation adjustments on foreign net operating losses.

(d) Write-off of fully reserved accounts receivable.

(e) Amount is primarily related to foreign tax credits and foreign interest deduction carryforwards.

(f) Amount is primarily related to an other-than-temporary impairment charge for a certain cost method investment and an increase in foreign tax loss carryforwards.

114

# Exhibit 6

barchart

# Match Group Inc CS (MTCH)

**85.91** +0.23 (+0.27%) 12:15 ET [NASDAQ]

85.76 x 100   85.98 x 100   REALTIME by (Cboe BZX)

**PRICE HISTORY** for Fri, Jun 12th, 2020

Alerts ❗   Watch ⭐   Help ❓

Barchart offers historical data through Barchart OnDemand. Barchart OnDemand provides both premium market data delivery through a collection of web services APIs (JSON, XML and CSV formats) and a limited free service. For more information, please visit: **Barchart OnDemand**: www.barchart.com/ondemand

You can also contact Barchart Sales at 866-333-7587 or solutions@barchart.com for more information or additional options about historical market data.

| DAILY PRICES | LATEST TRADES | CORPORATE ACTIONS | HISTORICAL DATA DOWNLOAD |

| 11/05/2018 📅 | - | 06/12/2020 📅 | ⬇ download |

☐ Dividend Adjust

Historical daily price data is available for up to two years.

For more data, Barchart Premier members can download more historical data (going back to Jan. 1, 1980) and can download Intraday, Daily, Weekly, Monthly or Quarterly data **on the Historical Download tab**. Additional underlying chart data and study values can be downloaded using the **Interactive Charts**.

| Time ▾ | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|
| 06/12/2020 | 88.15 | 88.34 | 84.37 | 86.32 | +0.64 | 416,179 |
| 06/11/2020 | 84.97 | 86.70 | 82.57 | 85.68 | -2.77 | 2,946,400 |
| 06/10/2020 | 90.13 | 90.68 | 87.65 | 88.45 | -1.24 | 1,993,800 |
| 06/09/2020 | 90.35 | 90.49 | 87.51 | 89.69 | +0.18 | 2,603,300 |
| 06/08/2020 | 90.47 | 92.85 | 89.34 | 89.51 | -0.58 | 1,797,100 |
| 06/05/2020 | 91.54 | 92.60 | 89.42 | 90.09 | -1.29 | 1,846,000 |
| 06/04/2020 | 92.90 | 94.07 | 89.64 | 91.38 | -2.63 | 1,865,800 |
| 06/03/2020 | 94.38 | 95.57 | 91.82 | 94.01 | -0.35 | 1,956,600 |
| 06/02/2020 | 93.78 | 94.57 | 90.76 | 94.36 | +2.63 | 2,081,700 |
| 06/01/2020 | 89.12 | 92.68 | 89.11 | 91.73 | +2.69 | 2,150,000 |
| 05/29/2020 | 89.88 | 90.25 | 87.72 | 89.04 | +0.11 | 1,455,800 |
| 05/28/2020 | 84.72 | 91.77 | 84.49 | 88.93 | +2.96 | 3,033,500 |
| 05/27/2020 | 85.49 | 86.12 | 83.10 | 85.97 | +0.48 | 865,200 |
| 05/26/2020 | 86.50 | 86.74 | 84.32 | 85.49 | +0.56 | 759,100 |
| 05/22/2020 | 84.60 | 86.75 | 83.10 | 84.93 | +0.93 | 787,300 |
| 05/21/2020 | 84.86 | 85.61 | 82.48 | 84.00 | -0.64 | 860,800 |
| 05/20/2020 | 86.31 | 87.49 | 83.44 | 84.64 | -1.08 | 1,704,900 |
| 05/19/2020 | 83.72 | 87.89 | 83.07 | 85.72 | +2.12 | 1,602,900 |
| 05/18/2020 | 80.00 | 84.18 | 79.27 | 83.60 | +5.43 | 2,415,400 |
| 05/15/2020 | 76.98 | 78.56 | 76.50 | 78.17 | +0.80 | 1,760,400 |
| 05/14/2020 | 73.20 | 77.60 | 73.09 | 77.37 | +2.62 | 1,896,600 |
| 05/13/2020 | 77.71 | 78.45 | 72.28 | 74.75 | -3.07 | 2,902,900 |
| 05/12/2020 | 80.36 | 81.00 | 77.30 | 77.82 | -2.12 | 2,485,800 |
| 05/11/2020 | 79.31 | 81.30 | 79.04 | 79.94 | -0.05 | 3,125,600 |
| 05/08/2020 | 83.30 | 83.98 | 79.63 | 79.99 | -2.64 | 3,119,000 |
| 05/07/2020 | 88.50 | 90.00 | 82.37 | 82.63 | -4.72 | 3,697,600 |
| 05/06/2020 | 83.41 | 87.38 | 82.84 | 87.35 | +7.25 | 3,125,700 |
| 05/05/2020 | 78.50 | 81.04 | 78.02 | 80.10 | +2.92 | 1,838,900 |
| 05/04/2020 | 74.52 | 77.36 | 74.06 | 77.18 | +2.54 | 1,880,000 |
| 05/01/2020 | 75.62 | 77.05 | 74.39 | 74.64 | -2.32 | 1,119,100 |
| 04/30/2020 | 78.00 | 79.99 | 76.63 | 76.96 | -2.63 | 1,624,400 |
| 04/29/2020 | 76.61 | 80.61 | 76.25 | 79.59 | +4.35 | 1,441,200 |
| 04/28/2020 | 79.31 | 79.79 | 75.15 | 75.24 | -3.14 | 1,865,200 |
| 04/27/2020 | 82.20 | 82.81 | 77.97 | 78.38 | -2.85 | 1,912,400 |
| 04/24/2020 | 80.99 | 81.82 | 79.67 | 81.23 | +0.85 | 1,005,200 |
| 04/23/2020 | 80.31 | 82.36 | 79.04 | 80.38 | +0.35 | 1,355,800 |
| 04/22/2020 | 78.12 | 80.81 | 77.51 | 80.03 | +3.13 | 1,389,600 |
| 04/21/2020 | 79.33 | 80.17 | 75.78 | 76.90 | -3.13 | 1,337,700 |
| 04/20/2020 | 79.23 | 83.59 | 78.95 | 80.03 | +0.03 | 2,238,800 |
| 04/17/2020 | 80.00 | 81.32 | 78.81 | 80.00 | +1.13 | 3,055,400 |
| 04/16/2020 | 75.70 | 80.41 | 75.09 | 78.87 | +4.38 | 3,355,600 |
| 04/15/2020 | 72.08 | 76.13 | 69.86 | 74.49 | +1.23 | 2,884,700 |
| 04/14/2020 | 69.58 | 74.13 | 69.58 | 73.26 | +4.78 | 2,603,700 |
| 04/13/2020 | 67.25 | 69.37 | 65.99 | 68.48 | +0.37 | 1,897,100 |
| 04/09/2020 | 70.31 | 71.00 | 66.66 | 68.11 | -1.10 | 2,457,800 |
| Time ▾ | Open | High | Low | Last | Change | Volume |

App. 423

/

| Time | Open | High | Low | Last | Change | Volume |
|------|------|------|-----|------|--------|--------|
| 04/08/2020 | 71.06 | 72.59 | 68.91 | 69.21 | -0.97 | 2,119,600 |
| 04/07/2020 | 70.65 | 71.96 | 67.77 | 70.18 | +1.77 | 3,322,000 |
| 04/06/2020 | 66.98 | 68.93 | 64.33 | 68.41 | +4.71 | 2,098,500 |
| 04/03/2020 | 62.53 | 64.76 | 62.21 | 63.70 | +1.51 | 1,376,500 |
| 04/02/2020 | 60.75 | 64.15 | 60.17 | 62.19 | +0.58 | 1,281,700 |
| 04/01/2020 | 64.13 | 64.97 | 60.42 | 61.61 | -4.43 | 2,482,300 |
| 03/31/2020 | 65.70 | 68.79 | 65.70 | 66.04 | -0.63 | 2,132,900 |
| 03/30/2020 | 62.23 | 67.70 | 62.23 | 66.67 | +4.19 | 2,532,000 |
| 03/27/2020 | 60.39 | 64.35 | 60.16 | 62.48 | -1.10 | 1,972,600 |
| 03/26/2020 | 65.52 | 73.25 | 61.98 | 63.58 | -2.02 | 4,024,300 |
| 03/25/2020 | 59.00 | 68.50 | 58.50 | 65.60 | +7.74 | 6,023,900 |
| 03/24/2020 | 50.70 | 58.33 | 50.70 | 57.86 | +9.15 | 4,694,200 |
| 03/23/2020 | 46.90 | 50.13 | 44.74 | 48.71 | +1.36 | 3,854,200 |
| 03/20/2020 | 51.68 | 52.94 | 47.31 | 47.35 | -3.41 | 4,844,500 |
| 03/19/2020 | 50.38 | 53.16 | 48.92 | 50.76 | -1.24 | 4,080,600 |
| 03/18/2020 | 53.11 | 55.91 | 47.27 | 52.00 | -5.02 | 3,659,000 |
| 03/17/2020 | 55.01 | 58.10 | 51.79 | 57.02 | +2.63 | 4,437,500 |
| 03/16/2020 | 53.70 | 56.54 | 52.59 | 54.39 | -6.08 | 6,139,000 |
| 03/13/2020 | 59.60 | 60.80 | 55.62 | 60.47 | +2.90 | 3,622,200 |
| 03/12/2020 | 57.49 | 60.97 | 55.80 | 57.57 | -5.45 | 4,206,600 |
| 03/11/2020 | 64.30 | 65.03 | 61.69 | 63.02 | -2.80 | 2,574,300 |
| 03/10/2020 | 65.24 | 66.38 | 63.05 | 65.82 | +1.78 | 2,053,900 |
| 03/09/2020 | 60.00 | 65.76 | 53.25 | 64.04 | -1.52 | 3,394,100 |
| 03/06/2020 | 64.53 | 65.59 | 62.98 | 65.56 | -1.05 | 2,250,500 |
| 03/05/2020 | 66.32 | 67.98 | 65.58 | 66.61 | -1.45 | 2,368,900 |
| 03/04/2020 | 67.05 | 68.80 | 65.37 | 68.06 | +2.26 | 2,746,500 |
| 03/03/2020 | 68.14 | 68.56 | 64.38 | 65.80 | -2.34 | 4,149,100 |
| 03/02/2020 | 65.00 | 68.21 | 63.53 | 68.14 | +3.14 | 3,845,300 |
| 02/28/2020 | 62.41 | 65.50 | 62.23 | 65.00 | +0.20 | 3,133,600 |
| 02/27/2020 | 63.83 | 66.91 | 63.13 | 64.80 | -1.24 | 3,190,500 |
| 02/26/2020 | 67.98 | 68.81 | 65.52 | 66.04 | -1.71 | 3,753,700 |
| 02/25/2020 | 70.39 | 70.92 | 67.23 | 67.75 | -2.40 | 2,899,400 |
| 02/24/2020 | 69.59 | 71.06 | 68.60 | 70.15 | -3.35 | 3,283,300 |
| 02/21/2020 | 74.89 | 74.98 | 72.80 | 73.50 | -1.65 | 1,300,300 |
| 02/20/2020 | 75.85 | 76.79 | 73.60 | 75.15 | -0.77 | 1,640,300 |
| 02/19/2020 | 77.30 | 77.64 | 75.88 | 75.92 | -0.78 | 1,499,000 |
| 02/18/2020 | 76.50 | 77.23 | 75.32 | 76.70 | +0.20 | 1,822,700 |
| 02/14/2020 | 75.31 | 77.09 | 75.09 | 76.50 | +1.29 | 2,240,600 |
| 02/13/2020 | 74.91 | 75.96 | 73.78 | 75.21 | -0.29 | 1,652,500 |
| 02/12/2020 | 74.54 | 75.71 | 73.01 | 75.50 | +0.92 | 2,515,500 |
| 02/11/2020 | 76.02 | 76.40 | 74.53 | 74.58 | -1.23 | 1,786,500 |
| 02/10/2020 | 77.28 | 78.10 | 75.68 | 75.81 | -1.94 | 1,637,300 |
| 02/07/2020 | 79.33 | 80.20 | 77.40 | 77.75 | -1.76 | 4,869,900 |
| 02/06/2020 | 76.25 | 82.26 | 76.25 | 79.51 | +3.51 | 7,927,200 |
| 02/05/2020 | 80.05 | 81.37 | 75.24 | 76.00 | -6.93 | 7,092,100 |
| 02/04/2020 | 82.00 | 83.01 | 80.52 | 82.93 | +2.21 | 3,134,200 |
| 02/03/2020 | 78.27 | 80.72 | 78.24 | 80.72 | +2.50 | 2,166,300 |
| 01/31/2020 | 80.26 | 81.06 | 78.01 | 78.22 | -2.83 | 2,034,900 |
| 01/30/2020 | 80.57 | 81.09 | 79.92 | 81.05 | +0.02 | 1,211,500 |
| 01/29/2020 | 83.19 | 83.77 | 80.94 | 81.03 | -2.93 | 2,181,800 |
| 01/28/2020 | 84.92 | 85.29 | 83.92 | 83.96 | -0.39 | 1,124,500 |
| 01/27/2020 | 82.44 | 84.76 | 81.46 | 84.35 | -1.22 | 2,481,300 |
| 01/24/2020 | 88.79 | 89.49 | 85.47 | 85.57 | -2.90 | 1,513,700 |
| 01/23/2020 | 89.88 | 90.65 | 88.47 | 88.47 | -1.09 | 1,718,700 |
| 01/22/2020 | 90.25 | 91.32 | 89.31 | 89.56 | -0.19 | 1,179,500 |
| 01/21/2020 | 90.25 | 91.51 | 89.54 | 89.75 | -1.36 | 2,426,200 |
| 01/17/2020 | 91.98 | 92.36 | 90.22 | 91.11 | -1.34 | 2,506,700 |
| 01/16/2020 | 91.67 | 92.51 | 91.31 | 92.45 | +1.35 | 1,334,200 |
| 01/15/2020 | 89.97 | 91.90 | 89.75 | 91.10 | +1.38 | 1,360,700 |
| 01/14/2020 | 89.87 | 90.37 | 88.90 | 89.72 | +0.14 | 1,547,700 |
| 01/13/2020 | 87.99 | 91.38 | 87.61 | 89.58 | +2.45 | 3,028,400 |
| 01/10/2020 | 86.51 | 87.50 | 85.13 | 87.13 | +1.38 | 2,000,000 |
| 01/09/2020 | 85.93 | 87.08 | 85.37 | 85.75 | +0.70 | 1,631,100 |
| 01/08/2020 | 83.70 | 85.94 | 83.66 | 85.05 | +1.23 | 1,853,000 |
| 01/07/2020 | 84.16 | 84.62 | 83.25 | 83.82 | -0.50 | 1,135,900 |
| 01/06/2020 | 83.38 | 84.33 | 82.77 | 84.32 | +0.22 | 1,569,100 |
| 01/03/2020 | 83.00 | 84.30 | 83.00 | 84.10 | -0.09 | 850,800 |
| 01/02/2020 | 82.77 | 84.79 | 82.71 | 84.19 | +2.08 | 1,711,400 |
| 12/31/2019 | 82.94 | 83.33 | 81.98 | 82.11 | -0.87 | 1,176,000 |
| 12/30/2019 | 83.92 | 83.92 | 81.58 | 82.98 | -1.05 | 1,234,000 |
| 12/27/2019 | 82.83 | 84.21 | 82.16 | 84.03 | +1.52 | 2,299,700 |
| 12/26/2019 | 80.95 | 82.55 | 80.35 | 82.51 | +1.57 | 1,143,100 |
| 12/24/2019 | 80.21 | 81.73 | 80.21 | 80.94 | +0.76 | 565,700 |
| 12/23/2019 | 80.34 | 80.70 | 79.27 | 80.18 | +0.32 | 1,771,700 |
| 12/20/2019 | 77.79 | 81.28 | 76.65 | 79.86 | +2.51 | 4,822,100 |
| 12/19/2019 | 72.51 | 77.97 | 72.50 | 77.35 | +6.11 | 5,882,900 |
| 12/18/2019 | 71.24 | 72.28 | 70.91 | 71.24 | +0.20 | 2,361,600 |
| 12/17/2019 | 72.57 | 72.99 | 69.08 | 71.04 | -1.27 | 2,878,700 |

| Time | Open | High | Low | Last | Change | Volume |
|------|------|------|-----|------|--------|--------|

| Time | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|
| 12/16/2019 | 72.17 | 73.04 | 71.36 | 72.31 | +0.40 | 2,454,600 |
| 12/13/2019 | 68.98 | 71.93 | 68.98 | 71.91 | +2.82 | 1,954,200 |
| 12/12/2019 | 68.53 | 69.51 | 68.21 | 69.09 | +0.47 | 2,950,900 |
| 12/11/2019 | 68.05 | 68.90 | 67.54 | 68.62 | +0.37 | 1,332,000 |
| 12/10/2019 | 67.96 | 69.05 | 67.77 | 68.25 | +0.44 | 1,238,000 |
| 12/09/2019 | 67.69 | 68.32 | 67.22 | 67.81 | -0.06 | 1,714,500 |
| 12/06/2019 | 68.16 | 68.42 | 66.94 | 67.87 | -0.26 | 1,921,200 |
| 12/05/2019 | 67.94 | 68.72 | 67.65 | 68.13 | +0.15 | 897,700 |
| 12/04/2019 | 68.28 | 69.47 | 67.85 | 67.98 | -0.28 | 1,481,600 |
| 12/03/2019 | 66.98 | 68.38 | 66.66 | 68.26 | -0.16 | 1,455,600 |
| 12/02/2019 | 70.39 | 70.73 | 67.57 | 68.42 | -2.06 | 1,723,500 |
| 11/29/2019 | 70.08 | 70.73 | 69.77 | 70.48 | +0.33 | 496,300 |
| 11/27/2019 | 70.37 | 70.54 | 69.69 | 70.15 | -0.22 | 1,121,300 |
| 11/26/2019 | 69.40 | 70.88 | 69.40 | 70.37 | +1.09 | 4,062,500 |
| 11/25/2019 | 70.10 | 70.46 | 68.80 | 69.28 | -0.59 | 1,553,700 |
| 11/22/2019 | 70.26 | 70.29 | 69.40 | 69.87 | -0.17 | 1,169,500 |
| 11/21/2019 | 70.47 | 72.50 | 70.03 | 70.04 | -0.43 | 1,368,900 |
| 11/20/2019 | 71.62 | 72.38 | 69.49 | 70.47 | -1.39 | 2,123,200 |
| 11/19/2019 | 70.92 | 71.87 | 70.86 | 71.86 | +0.77 | 1,003,700 |
| 11/18/2019 | 70.43 | 71.56 | 69.92 | 71.09 | +1.01 | 1,053,700 |
| 11/15/2019 | 69.55 | 70.70 | 69.07 | 70.08 | +0.70 | 961,100 |
| 11/14/2019 | 68.05 | 69.50 | 67.71 | 69.38 | +0.68 | 1,068,800 |
| 11/13/2019 | 67.99 | 69.14 | 67.85 | 68.70 | +0.29 | 987,100 |
| 11/12/2019 | 68.54 | 68.99 | 67.22 | 68.41 | -0.28 | 1,797,300 |
| 11/11/2019 | 68.79 | 69.25 | 68.28 | 68.69 | -0.39 | 1,663,200 |
| 11/08/2019 | 70.02 | 70.06 | 67.42 | 69.08 | -0.62 | 3,729,200 |
| 11/07/2019 | 68.31 | 71.30 | 68.31 | 69.70 | +2.66 | 5,083,700 |
| 11/06/2019 | 62.25 | 67.22 | 61.50 | 67.04 | -1.73 | 10,398,800 |
| 11/05/2019 | 71.22 | 72.14 | 68.77 | 68.77 | -2.44 | 6,407,100 |
| 11/04/2019 | 73.18 | 73.42 | 71.04 | 71.21 | -1.79 | 2,804,200 |
| 11/01/2019 | 73.11 | 74.76 | 72.06 | 73.00 | +0.01 | 2,258,800 |
| 10/31/2019 | 73.78 | 74.92 | 72.88 | 72.99 | -0.74 | 1,515,600 |
| 10/30/2019 | 72.80 | 74.04 | 71.96 | 73.73 | +0.94 | 1,161,200 |
| 10/29/2019 | 74.00 | 75.43 | 72.71 | 72.79 | -1.06 | 1,882,300 |
| 10/28/2019 | 74.04 | 74.57 | 72.81 | 73.85 | -0.09 | 1,088,200 |
| 10/25/2019 | 73.66 | 74.47 | 73.05 | 73.94 | +0.08 | 1,035,300 |
| 10/24/2019 | 73.58 | 74.78 | 72.55 | 73.86 | +0.40 | 1,332,700 |
| 10/23/2019 | 71.49 | 73.57 | 71.28 | 73.46 | +2.18 | 2,063,300 |
| 10/22/2019 | 72.89 | 73.17 | 71.01 | 71.28 | -1.69 | 1,151,600 |
| 10/21/2019 | 72.30 | 73.81 | 71.16 | 72.97 | +1.42 | 1,411,300 |
| 10/18/2019 | 75.83 | 76.20 | 71.52 | 71.55 | -4.25 | 1,812,200 |
| 10/17/2019 | 76.53 | 77.11 | 75.64 | 75.80 | -0.82 | 1,149,100 |
| 10/16/2019 | 75.16 | 76.63 | 74.03 | 76.62 | +1.37 | 1,289,600 |
| 10/15/2019 | 74.00 | 75.55 | 73.00 | 75.25 | +1.25 | 1,609,200 |
| 10/14/2019 | 74.06 | 74.63 | 72.40 | 74.00 | -0.10 | 1,933,600 |
| 10/11/2019 | 75.20 | 75.92 | 72.78 | 74.10 | -1.92 | 4,792,000 |
| 10/10/2019 | 77.31 | 78.20 | 75.32 | 76.02 | +0.06 | 1,715,600 |
| 10/09/2019 | 75.60 | 77.06 | 75.06 | 75.96 | +0.42 | 1,187,000 |
| 10/08/2019 | 76.82 | 77.50 | 75.06 | 75.54 | -2.43 | 1,744,100 |
| 10/07/2019 | 77.01 | 78.31 | 75.71 | 77.97 | +3.54 | 3,955,700 |
| 10/04/2019 | 74.70 | 75.74 | 73.71 | 74.43 | -0.57 | 1,409,600 |
| 10/03/2019 | 71.88 | 75.21 | 71.88 | 75.00 | +2.63 | 2,725,900 |
| 10/02/2019 | 71.69 | 72.66 | 69.93 | 72.37 | -0.59 | 1,274,000 |
| 10/01/2019 | 71.29 | 73.66 | 71.10 | 72.96 | +1.52 | 1,911,300 |
| 09/30/2019 | 71.96 | 72.87 | 70.08 | 71.44 | -0.97 | 1,922,200 |
| 09/27/2019 | 73.73 | 74.15 | 71.02 | 72.41 | +0.97 | 1,898,700 |
| 09/26/2019 | 70.27 | 72.15 | 69.54 | 71.44 | unch | 1,910,200 |
| 09/25/2019 | 72.25 | 74.54 | 66.57 | 71.44 | -1.39 | 8,099,800 |
| 09/24/2019 | 78.62 | 79.05 | 71.97 | 72.83 | -5.33 | 3,329,500 |
| 09/23/2019 | 78.62 | 78.90 | 77.84 | 78.16 | -0.52 | 930,000 |
| 09/20/2019 | 79.36 | 80.15 | 77.51 | 78.68 | -0.56 | 1,927,200 |
| 09/19/2019 | 79.92 | 81.11 | 78.41 | 79.24 | +0.08 | 1,334,600 |
| 09/18/2019 | 80.00 | 80.00 | 76.81 | 79.16 | -0.55 | 1,836,600 |
| 09/17/2019 | 78.01 | 79.90 | 76.92 | 79.71 | +3.10 | 2,178,000 |
| 09/16/2019 | 73.49 | 76.79 | 72.00 | 76.61 | +1.68 | 1,859,200 |
| 09/13/2019 | 75.82 | 77.05 | 74.65 | 74.93 | -1.24 | 1,332,200 |
| 09/12/2019 | 75.65 | 77.36 | 75.53 | 76.17 | +1.34 | 1,756,700 |
| 09/11/2019 | 75.43 | 77.77 | 74.19 | 74.83 | -0.71 | 2,225,000 |
| 09/10/2019 | 76.25 | 78.61 | 75.12 | 75.54 | -2.42 | 2,741,200 |
| 09/09/2019 | 82.00 | 82.40 | 77.34 | 77.96 | -3.51 | 2,471,500 |
| 09/06/2019 | 81.61 | 82.64 | 79.52 | 81.47 | -0.27 | 1,962,700 |
| 09/05/2019 | 88.55 | 89.38 | 79.52 | 81.74 | -3.90 | 7,772,500 |
| 09/04/2019 | 84.87 | 86.06 | 84.10 | 85.64 | +1.66 | 1,907,800 |
| 09/03/2019 | 84.80 | 85.75 | 83.36 | 83.98 | -0.82 | 1,356,500 |
| 08/30/2019 | 85.89 | 86.19 | 83.96 | 84.80 | -0.80 | 1,166,800 |
| 08/29/2019 | 85.67 | 86.15 | 83.80 | 85.60 | +0.60 | 1,415,600 |
| 08/28/2019 | 84.39 | 85.35 | 83.07 | 85.00 | +0.17 | 1,353,700 |
| 08/27/2019 | 86.89 | 87.39 | 84.42 | 84.83 | -1.10 | 1,796,600 |

| Time | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|

App. 425

| Time | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|
| 08/26/2019 | 86.45 | 87.00 | 84.08 | 85.93 | +0.47 | 1,592,400 |
| 08/23/2019 | 86.10 | 87.51 | 85.16 | 85.46 | -1.02 | 1,941,300 |
| 08/22/2019 | 85.54 | 86.83 | 84.64 | 86.48 | +1.13 | 2,133,400 |
| 08/21/2019 | 84.13 | 85.60 | 83.45 | 85.35 | +2.18 | 1,707,300 |
| 08/20/2019 | 82.85 | 83.77 | 81.78 | 83.17 | +0.25 | 1,524,900 |
| 08/19/2019 | 85.20 | 85.50 | 81.14 | 82.92 | -1.59 | 2,024,800 |
| 08/16/2019 | 83.25 | 84.80 | 83.07 | 84.51 | +2.04 | 2,092,900 |
| 08/15/2019 | 81.82 | 82.91 | 80.01 | 82.47 | +2.94 | 2,511,000 |
| 08/14/2019 | 79.66 | 80.77 | 77.87 | 79.53 | -1.07 | 2,637,300 |
| 08/13/2019 | 82.50 | 84.94 | 80.33 | 80.60 | -2.04 | 3,125,900 |
| 08/12/2019 | 85.59 | 85.89 | 79.82 | 82.64 | -2.99 | 3,639,100 |
| 08/09/2019 | 87.24 | 87.55 | 82.24 | 85.63 | -1.54 | 3,286,100 |
| 08/08/2019 | 89.50 | 89.50 | 85.10 | 87.17 | -4.60 | 8,717,200 |
| 08/07/2019 | 85.47 | 95.32 | 82.32 | 91.77 | +17.86 | 14,540,100 |
| 08/06/2019 | 72.29 | 74.58 | 72.29 | 73.91 | +2.50 | 3,467,800 |
| 08/05/2019 | 73.00 | 73.16 | 69.86 | 71.41 | -3.78 | 2,635,200 |
| 08/02/2019 | 75.36 | 76.86 | 74.64 | 75.19 | -0.25 | 1,553,800 |
| 08/01/2019 | 75.38 | 77.66 | 74.95 | 75.44 | +0.15 | 1,335,900 |
| 07/31/2019 | 75.41 | 76.26 | 73.23 | 75.29 | +0.24 | 1,161,400 |
| 07/30/2019 | 76.26 | 76.31 | 74.75 | 75.05 | -1.49 | 793,900 |
| 07/29/2019 | 77.36 | 77.52 | 75.22 | 76.54 | -0.65 | 820,400 |
| 07/26/2019 | 76.61 | 78.10 | 75.44 | 77.19 | -0.51 | 1,262,300 |
| 07/25/2019 | 77.97 | 78.82 | 77.11 | 77.70 | -0.33 | 1,024,200 |
| 07/24/2019 | 76.47 | 78.42 | 76.37 | 78.03 | +1.69 | 911,700 |
| 07/23/2019 | 76.95 | 77.29 | 75.17 | 76.34 | -0.45 | 1,425,400 |
| 07/22/2019 | 76.30 | 77.79 | 76.22 | 76.79 | +0.77 | 1,243,800 |
| 07/19/2019 | 77.33 | 79.30 | 75.69 | 76.02 | -0.44 | 2,385,700 |
| 07/18/2019 | 73.55 | 77.48 | 73.35 | 76.46 | +3.32 | 3,139,000 |
| 07/17/2019 | 72.42 | 74.31 | 71.89 | 73.14 | +0.85 | 1,029,000 |
| 07/16/2019 | 73.15 | 75.00 | 71.78 | 72.29 | -0.79 | 2,136,200 |
| 07/15/2019 | 73.14 | 73.81 | 72.80 | 73.08 | +0.05 | 896,300 |
| 07/12/2019 | 71.84 | 73.13 | 71.01 | 73.03 | +0.80 | 893,500 |
| 07/11/2019 | 73.86 | 74.00 | 71.56 | 72.23 | -1.07 | 840,000 |
| 07/10/2019 | 72.52 | 74.12 | 71.21 | 73.30 | +1.20 | 1,270,500 |
| 07/09/2019 | 70.51 | 72.80 | 70.43 | 72.10 | +1.40 | 1,044,800 |
| 07/08/2019 | 71.88 | 71.88 | 69.73 | 70.70 | -1.58 | 1,239,400 |
| 07/05/2019 | 71.13 | 72.92 | 70.60 | 72.28 | +0.74 | 1,369,600 |
| 07/03/2019 | 70.38 | 72.08 | 70.02 | 71.54 | +1.84 | 1,183,000 |
| 07/02/2019 | 68.78 | 69.82 | 67.94 | 69.70 | +0.79 | 1,143,200 |
| 07/01/2019 | 68.60 | 69.68 | 68.02 | 68.91 | +1.64 | 1,225,100 |
| 06/28/2019 | 68.12 | 68.79 | 67.19 | 67.27 | -0.96 | 1,753,400 |
| 06/27/2019 | 66.88 | 69.04 | 66.77 | 68.23 | +1.57 | 1,196,700 |
| 06/26/2019 | 68.13 | 68.75 | 65.50 | 66.66 | -0.45 | 2,518,200 |
| 06/25/2019 | 71.19 | 71.45 | 66.89 | 67.11 | -4.37 | 2,487,400 |
| 06/24/2019 | 67.30 | 72.06 | 67.28 | 71.48 | +4.69 | 3,908,100 |
| 06/21/2019 | 68.63 | 68.70 | 65.46 | 66.79 | -2.41 | 2,094,000 |
| 06/20/2019 | 70.98 | 72.28 | 69.02 | 69.20 | -1.14 | 2,023,100 |
| 06/19/2019 | 71.67 | 71.73 | 67.92 | 70.34 | -1.41 | 2,682,600 |
| 06/18/2019 | 73.16 | 73.91 | 71.58 | 71.75 | -0.78 | 880,100 |
| 06/17/2019 | 72.16 | 73.68 | 71.77 | 72.53 | +0.44 | 834,700 |
| 06/14/2019 | 72.97 | 72.97 | 71.21 | 72.09 | -0.48 | 831,500 |
| 06/13/2019 | 72.14 | 73.45 | 71.75 | 72.57 | +0.79 | 1,087,300 |
| 06/12/2019 | 69.77 | 71.88 | 69.65 | 71.78 | +1.62 | 920,400 |
| 06/11/2019 | 70.93 | 71.97 | 69.05 | 70.16 | -0.17 | 893,100 |
| 06/10/2019 | 71.67 | 73.20 | 70.13 | 70.33 | -0.66 | 1,148,700 |
| 06/07/2019 | 70.73 | 72.82 | 70.51 | 70.99 | +0.26 | 1,416,600 |
| 06/06/2019 | 71.47 | 71.99 | 69.77 | 70.73 | -0.61 | 1,004,300 |
| 06/05/2019 | 69.14 | 71.48 | 69.12 | 71.34 | +2.88 | 1,498,500 |
| 06/04/2019 | 66.24 | 68.55 | 65.94 | 68.46 | +2.64 | 1,809,900 |
| 06/03/2019 | 68.28 | 68.92 | 65.37 | 65.82 | -2.83 | 2,284,500 |
| 05/31/2019 | 68.87 | 69.12 | 68.15 | 68.65 | -1.02 | 958,500 |
| 05/30/2019 | 69.64 | 70.24 | 68.95 | 69.67 | +0.35 | 1,194,900 |
| 05/29/2019 | 69.02 | 70.11 | 68.17 | 69.32 | -0.75 | 1,607,900 |
| 05/28/2019 | 69.68 | 70.96 | 69.41 | 70.07 | +0.81 | 1,219,500 |
| 05/24/2019 | 69.62 | 70.53 | 68.78 | 69.26 | -0.10 | 1,161,700 |
| 05/23/2019 | 69.80 | 70.61 | 68.68 | 69.36 | -1.26 | 1,847,500 |
| 05/22/2019 | 70.80 | 71.62 | 70.32 | 70.62 | -0.73 | 2,044,900 |
| 05/21/2019 | 72.76 | 73.49 | 70.92 | 71.35 | -0.78 | 1,481,800 |
| 05/20/2019 | 71.98 | 73.40 | 71.08 | 72.13 | -0.76 | 1,685,900 |
| 05/17/2019 | 73.60 | 75.28 | 72.87 | 72.89 | -1.13 | 1,841,500 |
| 05/16/2019 | 70.87 | 75.12 | 70.50 | 74.02 | +3.29 | 2,543,600 |
| 05/15/2019 | 67.79 | 71.53 | 67.54 | 70.73 | +2.81 | 2,523,700 |
| 05/14/2019 | 69.37 | 70.45 | 67.66 | 67.92 | -1.32 | 2,286,300 |
| 05/13/2019 | 65.94 | 69.88 | 65.29 | 69.24 | +1.97 | 3,641,500 |
| 05/10/2019 | 67.15 | 67.85 | 65.28 | 67.27 | +0.12 | 1,823,700 |
| 05/09/2019 | 67.45 | 67.81 | 63.39 | 67.15 | -0.73 | 3,757,600 |
| 05/08/2019 | 63.29 | 68.75 | 62.60 | 67.88 | +7.51 | 7,193,500 |
| 05/07/2019 | 62.05 | 62.94 | 59.80 | 60.37 | -2.18 | 2,504,000 |

| Time | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|

| Time | Open | High | Low | Last | Change | Volume |
|---|---|---|---|---|---|---|
| 05/06/2019 | 59.55 | 63.00 | 58.68 | 62.55 | +0.64 | 1,858,100 |
| 05/03/2019 | 61.00 | 62.28 | 60.62 | 61.91 | +1.50 | 955,800 |
| 05/02/2019 | 60.17 | 60.62 | 59.18 | 60.41 | -0.03 | 852,300 |
| 05/01/2019 | 60.65 | 61.70 | 60.00 | 60.44 | +0.04 | 891,800 |
| 04/30/2019 | 61.11 | 61.76 | 59.92 | 60.40 | -1.05 | 1,511,700 |
| 04/29/2019 | 62.31 | 62.57 | 61.22 | 61.45 | -0.47 | 910,000 |
| 04/26/2019 | 62.48 | 62.75 | 61.83 | 61.92 | -0.25 | 1,006,100 |
| 04/25/2019 | 62.23 | 62.56 | 60.64 | 62.17 | +0.52 | 963,200 |
| 04/24/2019 | 62.34 | 63.12 | 61.53 | 61.65 | -0.21 | 1,307,500 |
| 04/23/2019 | 61.43 | 62.63 | 61.30 | 61.86 | +0.82 | 1,627,000 |
| 04/22/2019 | 58.98 | 61.26 | 58.81 | 61.04 | +1.94 | 1,901,600 |
| 04/18/2019 | 58.60 | 59.57 | 57.51 | 59.10 | +0.50 | 1,049,100 |
| 04/17/2019 | 57.96 | 59.90 | 57.96 | 58.60 | +0.79 | 1,441,500 |
| 04/16/2019 | 61.00 | 61.95 | 57.39 | 57.81 | -2.37 | 2,935,700 |
| 04/15/2019 | 57.35 | 61.31 | 56.93 | 60.18 | +2.98 | 4,218,500 |
| 04/12/2019 | 58.00 | 58.32 | 56.27 | 57.20 | -0.67 | 662,600 |
| 04/11/2019 | 57.16 | 58.51 | 56.91 | 57.87 | +0.88 | 1,274,400 |
| 04/10/2019 | 56.79 | 57.13 | 56.23 | 56.99 | +0.33 | 1,080,500 |
| 04/09/2019 | 55.73 | 56.86 | 55.22 | 56.66 | +0.85 | 783,900 |
| 04/08/2019 | 54.91 | 55.88 | 53.83 | 55.81 | +0.89 | 1,064,300 |
| 04/05/2019 | 55.52 | 55.79 | 54.84 | 54.92 | -0.31 | 1,019,000 |
| 04/04/2019 | 57.44 | 57.68 | 54.51 | 55.23 | -2.09 | 1,764,000 |
| 04/03/2019 | 57.16 | 57.79 | 56.83 | 57.32 | +0.64 | 1,085,000 |
| 04/02/2019 | 56.27 | 57.12 | 55.38 | 56.68 | +0.42 | 1,207,300 |
| 04/01/2019 | 57.25 | 58.39 | 55.65 | 56.26 | -0.35 | 1,969,500 |
| 03/29/2019 | 56.19 | 56.96 | 55.63 | 56.61 | +0.74 | 1,430,300 |
| 03/28/2019 | 55.50 | 56.21 | 54.92 | 55.87 | +0.63 | 1,246,400 |
| 03/27/2019 | 57.15 | 57.89 | 54.81 | 55.24 | -1.74 | 1,420,600 |
| 03/26/2019 | 57.41 | 58.09 | 56.47 | 56.98 | +0.04 | 1,063,500 |
| 03/25/2019 | 57.49 | 58.12 | 56.41 | 56.94 | -0.65 | 1,530,800 |
| 03/22/2019 | 59.14 | 59.57 | 57.38 | 57.59 | -1.92 | 1,481,200 |
| 03/21/2019 | 57.98 | 59.93 | 57.88 | 59.51 | +1.38 | 1,854,500 |
| 03/20/2019 | 56.93 | 58.57 | 56.87 | 58.13 | +0.98 | 2,140,900 |
| 03/19/2019 | 55.87 | 57.32 | 55.50 | 57.15 | +1.46 | 1,616,100 |
| 03/18/2019 | 55.29 | 56.24 | 55.29 | 55.69 | +0.69 | 1,762,200 |
| 03/15/2019 | 54.44 | 55.18 | 53.74 | 55.00 | +0.84 | 2,116,900 |
| 03/14/2019 | 53.38 | 54.67 | 52.63 | 54.16 | +0.70 | 1,422,500 |
| 03/13/2019 | 54.14 | 55.06 | 53.35 | 53.46 | -0.44 | 1,088,400 |
| 03/12/2019 | 53.74 | 54.47 | 52.84 | 53.90 | +0.32 | 1,487,300 |
| 03/11/2019 | 53.35 | 54.41 | 53.35 | 53.58 | +0.55 | 1,945,300 |
| 03/08/2019 | 53.00 | 53.91 | 52.31 | 53.03 | -0.76 | 1,679,400 |
| 03/07/2019 | 54.73 | 55.10 | 53.70 | 53.79 | -0.91 | 1,123,000 |
| 03/06/2019 | 55.08 | 55.57 | 54.39 | 54.70 | -0.39 | 872,500 |
| 03/05/2019 | 54.54 | 55.29 | 54.21 | 55.09 | +0.61 | 898,600 |
| 03/04/2019 | 55.84 | 55.92 | 53.00 | 54.48 | -1.12 | 1,824,400 |
| 03/01/2019 | 55.98 | 56.00 | 55.21 | 55.60 | +0.22 | 1,208,300 |
| 02/28/2019 | 55.84 | 55.93 | 54.90 | 55.38 | -0.40 | 973,400 |
| 02/27/2019 | 54.91 | 56.00 | 54.55 | 55.78 | +0.43 | 934,400 |
| 02/26/2019 | 55.80 | 56.06 | 54.64 | 55.35 | -0.62 | 1,374,300 |
| 02/25/2019 | 57.43 | 58.65 | 55.60 | 55.97 | -1.32 | 1,715,900 |
| 02/22/2019 | 56.83 | 57.50 | 56.60 | 57.29 | +0.56 | 1,262,300 |
| 02/21/2019 | 56.38 | 57.18 | 56.09 | 56.73 | +0.25 | 1,029,200 |
| 02/20/2019 | 57.31 | 57.55 | 55.76 | 56.48 | -0.60 | 1,372,300 |
| 02/19/2019 | 57.37 | 57.80 | 56.69 | 57.08 | -0.25 | 1,391,600 |
| 02/15/2019 | 58.09 | 58.09 | 56.43 | 57.33 | -0.45 | 1,625,500 |
| 02/14/2019 | 57.24 | 58.10 | 56.52 | 57.78 | +0.15 | 1,096,100 |
| 02/13/2019 | 57.68 | 58.07 | 57.19 | 57.63 | -0.02 | 1,330,200 |
| 02/12/2019 | 58.36 | 58.49 | 57.07 | 57.65 | -0.08 | 1,521,500 |
| 02/11/2019 | 57.50 | 58.39 | 56.81 | 57.73 | +1.12 | 3,254,800 |
| 02/08/2019 | 54.54 | 57.28 | 53.35 | 56.61 | +0.85 | 3,309,400 |
| 02/07/2019 | 57.90 | 60.91 | 55.20 | 55.76 | +2.68 | 9,679,300 |
| 02/06/2019 | 53.82 | 54.75 | 52.73 | 53.08 | -2.60 | 3,880,600 |
| 02/05/2019 | 54.44 | 55.79 | 54.44 | 55.68 | +1.25 | 2,787,800 |
| 02/04/2019 | 51.76 | 54.68 | 51.50 | 54.43 | -0.30 | 2,416,200 |
| 02/01/2019 | 53.49 | 55.03 | 53.31 | 54.73 | +1.24 | 2,190,900 |
| 01/31/2019 | 52.71 | 54.57 | 52.67 | 53.49 | +1.03 | 1,701,700 |
| 01/30/2019 | 52.69 | 52.75 | 51.72 | 52.46 | +0.37 | 1,633,100 |
| 01/29/2019 | 52.79 | 52.79 | 51.35 | 52.09 | -0.40 | 1,188,600 |
| 01/28/2019 | 51.75 | 52.74 | 50.71 | 52.49 | +0.12 | 1,222,300 |
| 01/25/2019 | 51.03 | 52.60 | 50.70 | 52.37 | +1.92 | 1,400,300 |
| 01/24/2019 | 49.74 | 50.63 | 49.72 | 50.45 | +1.04 | 1,167,200 |
| 01/23/2019 | 48.79 | 49.44 | 48.41 | 49.41 | +1.19 | 1,171,700 |
| 01/22/2019 | 47.91 | 49.24 | 47.57 | 48.22 | unch | 1,228,200 |
| 01/18/2019 | 47.06 | 48.72 | 47.06 | 48.22 | +1.16 | 1,806,400 |
| 01/17/2019 | 46.02 | 47.88 | 45.91 | 47.06 | +0.88 | 2,027,300 |
| 01/16/2019 | 46.48 | 46.88 | 45.52 | 46.18 | -0.29 | 1,328,800 |
| 01/15/2019 | 44.73 | 46.85 | 44.73 | 46.47 | +2.11 | 1,585,900 |
| 01/14/2019 | 44.22 | 44.80 | 43.38 | 44.36 | -0.33 | 1,680,400 |
| Time | Open | High | Low | Last | Change | Volume |

| Time ▾ | Open | High | Low | Last | Change | Volume |
|--------|------|------|-----|------|--------|--------|
| 01/11/2019 | 44.83 | 45.77 | 44.46 | 44.69 | -0.35 | 1,308,600 |
| 01/10/2019 | 44.61 | 45.27 | 44.08 | 45.04 | +0.03 | 1,369,600 |
| 01/09/2019 | 45.00 | 45.64 | 44.37 | 45.01 | +0.23 | 1,759,200 |
| 01/08/2019 | 44.07 | 45.18 | 43.43 | 44.78 | +1.41 | 2,470,400 |
| 01/07/2019 | 43.39 | 44.20 | 42.83 | 43.37 | +0.32 | 1,472,000 |
| 01/04/2019 | 41.70 | 43.86 | 40.78 | 43.05 | +1.93 | 2,460,100 |
| 01/03/2019 | 41.77 | 42.29 | 40.47 | 41.12 | -1.26 | 1,827,900 |
| 01/02/2019 | 42.06 | 42.83 | 41.56 | 42.38 | -0.39 | 1,677,800 |
| 12/31/2018 | 42.39 | 43.01 | 41.78 | 42.77 | +0.70 | 1,297,800 |
| 12/28/2018 | 42.62 | 43.30 | 41.38 | 42.07 | -0.55 | 1,590,200 |
| 12/27/2018 | 40.45 | 42.62 | 40.45 | 42.62 | +0.54 | 1,202,600 |
| 12/26/2018 | 39.48 | 42.11 | 39.39 | 42.08 | +3.11 | 1,942,100 |
| 12/24/2018 | 38.81 | 39.88 | 37.68 | 38.97 | unch | 983,700 |
| 12/21/2018 | 40.12 | 41.31 | 38.82 | 38.97 | -1.08 | 4,296,600 |
| 12/20/2018 | 41.09 | 41.20 | 38.59 | 40.05 | -0.95 | 2,932,200 |
| 12/19/2018 | 41.90 | 42.75 | 40.80 | 41.00 | -0.95 | 3,012,700 |
| 12/18/2018 | 42.13 | 42.46 | 41.38 | 41.95 | +0.93 | 1,954,100 |
| 12/17/2018 | 42.99 | 43.19 | 40.79 | 41.02 | -2.18 | 2,707,600 |
| 12/14/2018 | 41.52 | 43.73 | 41.24 | 43.20 | +1.05 | 3,025,700 |
| 12/13/2018 | 43.00 | 43.14 | 41.68 | 42.15 | -0.56 | 1,880,200 |
| 12/12/2018 | 40.86 | 43.12 | 40.52 | 42.71 | +2.50 | 4,874,500 |
| 12/11/2018 | 40.62 | 41.24 | 39.56 | 40.21 | +0.10 | 1,550,400 |
| 12/10/2018 | 39.82 | 41.38 | 39.18 | 40.11 | +0.24 | 1,357,100 |
| 12/07/2018 | 40.72 | 41.28 | 39.31 | 39.87 | -1.30 | 2,258,800 |
| 12/06/2018 | 37.00 | 41.67 | 37.00 | 41.17 | +2.75 | 4,141,000 |
| 12/04/2018 | 39.46 | 39.94 | 37.86 | 38.42 | -3.04 | 2,749,900 |
| 12/03/2018 | 41.51 | 41.86 | 40.14 | 41.46 | +1.19 | 3,991,300 |
| 11/30/2018 | 41.19 | 41.53 | 39.58 | 40.27 | -1.08 | 2,684,300 |
| 11/29/2018 | 40.13 | 41.77 | 39.70 | 41.35 | +1.39 | 2,328,900 |
| 11/28/2018 | 38.28 | 40.07 | 38.28 | 39.96 | +1.88 | 2,228,700 |
| 11/27/2018 | 38.69 | 39.36 | 38.01 | 38.08 | -1.13 | 1,330,000 |
| 11/26/2018 | 39.08 | 39.50 | 38.58 | 39.21 | +0.76 | 2,097,800 |
| 11/23/2018 | 37.64 | 38.59 | 37.28 | 38.45 | +0.53 | 1,056,700 |
| 11/21/2018 | 37.00 | 38.44 | 36.96 | 37.92 | +1.56 | 2,471,200 |
| 11/20/2018 | 34.32 | 37.03 | 33.30 | 36.36 | +0.10 | 5,571,800 |
| 11/19/2018 | 39.32 | 39.65 | 36.21 | 36.26 | -3.74 | 5,025,200 |
| 11/16/2018 | 41.03 | 41.52 | 39.98 | 40.00 | -0.97 | 2,075,400 |
| 11/15/2018 | 40.20 | 41.06 | 39.06 | 40.97 | +0.80 | 3,541,800 |
| 11/14/2018 | 42.29 | 42.60 | 40.06 | 40.17 | -1.61 | 3,362,400 |
| 11/13/2018 | 41.27 | 42.55 | 40.96 | 41.78 | +0.83 | 2,828,600 |
| 11/12/2018 | 42.59 | 42.73 | 40.36 | 40.95 | -1.76 | 3,096,300 |
| 11/09/2018 | 43.05 | 43.50 | 41.48 | 42.71 | -0.96 | 4,309,100 |
| 11/08/2018 | 42.76 | 45.10 | 42.76 | 43.67 | +0.95 | 4,499,500 |
| 11/07/2018 | 43.93 | 44.00 | 40.76 | 42.72 | -8.75 | 15,526,300 |
| 11/06/2018 | 50.94 | 52.60 | 50.50 | 51.47 | +0.28 | 4,038,700 |
| 11/05/2018 | 52.43 | 52.51 | 49.72 | 51.19 | -0.96 | 2,752,200 |
| **Time** ▾ | **Open** | **High** | **Low** | **Last** | **Change** | **Volume** |

## New Highs

| Period | Made New High | Percent From Last |
|--------|---------------|-------------------|
| 5-Day | 1 time | -8.11% |
| 1-Month | 8 times | -10.73% |
| 3-Month | 14 times | -10.73% |
| 6-Month | 17 times | -10.73% |
| YTD | 10 times | -10.73% |
| 52-Week | 9 times | -10.73% |
| 2-Year | 31 times | -10.73% |
| 3-Year | 37 times | -10.35% |
| 5-Year | 42 times | -10.35% |

App. 428

| Period | Made New Low | Percent From Last |
|--------|--------------|-------------------|
| 10-Year | 21 times | -10.35% |
| 20-Year | 20 times | -10.35% |

# New Lows

| Period | Made New Low | Percent From Last |
|--------|--------------|-------------------|
| 5-Day | 3 times | +3.33% |
| 1-Month | 1 time | +18.04% |
| 3-Month | 5 times | +90.70% |
| 6-Month | 11 times | +90.70% |
| YTD | 19 times | +90.70% |
| 52-Week | 10 times | +90.70% |
| 2-Year | 12 times | +156.22% |
| 3-Year | 2 times | +417.08% |
| 5-Year | 5 times | +918.79% |
| 10-Year | 3 times | +918.79% |
| 20-Year | 3 times | +918.79% |

App. 429

/

# Exhibit 7

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Jun 11, 2020 | 9,791.24 | 9,868.08 | 9,491.31 | 9,492.73 | 9,492.73 | 5,271,000,000 |
| Jun 10, 2020 | 10,012.32 | 10,086.89 | 9,962.58 | 10,020.35 | 10,020.35 | 5,128,400,000 |
| Jun 09, 2020 | 9,867.19 | 10,002.50 | 9,863.27 | 9,953.75 | 9,953.75 | 5,281,860,000 |
| Jun 08, 2020 | 9,823.44 | 9,927.13 | 9,780.61 | 9,924.75 | 9,924.75 | 6,143,120,000 |
| Jun 05, 2020 | 9,703.54 | 9,845.69 | 9,685.35 | 9,814.08 | 9,814.08 | 6,572,850,000 |
| Jun 04, 2020 | 9,649.65 | 9,716.14 | 9,560.41 | 9,615.81 | 9,615.81 | 6,074,320,000 |
| Jun 03, 2020 | 9,651.86 | 9,707.78 | 9,627.17 | 9,682.91 | 9,682.91 | 4,638,380,000 |
| Jun 02, 2020 | 9,566.53 | 9,611.22 | 9,472.08 | 9,608.38 | 9,608.38 | 3,962,460,000 |
| Jun 01, 2020 | 9,471.42 | 9,571.28 | 9,462.32 | 9,552.05 | 9,552.05 | 3,824,770,000 |
| May 29, 2020 | 9,382.35 | 9,505.55 | 9,324.73 | 9,489.87 | 9,489.87 | 423,570,000 |
| May 28, 2020 | 9,392.99 | 9,523.64 | 9,345.28 | 9,368.99 | 9,368.99 | 4,064,220,000 |
| May 27, 2020 | 9,346.12 | 9,414.62 | 9,144.28 | 9,412.36 | 9,412.36 | 4,462,450,000 |
| May 26, 2020 | 9,501.21 | 9,501.21 | 9,333.16 | 9,340.22 | 9,340.22 | 4,432,310,000 |
| May 22, 2020 | 9,278.55 | 9,328.28 | 9,239.41 | 9,324.59 | 9,324.59 | 3,641,830,000 |
| May 21, 2020 | 9,375.19 | 9,405.25 | 9,254.85 | 9,284.88 | 9,284.88 | 3,725,950,000 |
| May 20, 2020 | 9,305.62 | 9,392.82 | 9,304.20 | 9,375.78 | 9,375.78 | 4,292,470,000 |
| May 19, 2020 | 9,227.46 | 9,317.25 | 9,183.25 | 9,185.10 | 9,185.10 | 4,144,770,000 |
| May 18, 2020 | 9,177.15 | 9,267.22 | 9,154.35 | 9,234.83 | 9,234.83 | 4,318,310,000 |
| May 15, 2020 | 8,839.99 | 9,018.40 | 8,821.38 | 9,014.56 | 9,014.56 | 4,221,500,000 |
| May 14, 2020 | 8,788.04 | 8,945.71 | 8,705.25 | 8,943.72 | 8,943.72 | 3,945,080,000 |
| May 13, 2020 | 9,006.05 | 9,074.16 | 8,752.68 | 8,863.17 | 8,863.17 | 4,244,110,000 |
| May 12, 2020 | 9,225.15 | 9,250.96 | 9,000.07 | 9,002.55 | 9,002.55 | 4,315,070,000 |
| May 11, 2020 | 9,054.91 | 9,241.92 | 9,053.17 | 9,192.34 | 9,192.34 | 3,898,690,000 |
| May 08, 2020 | 9,056.89 | 9,125.98 | 9,018.21 | 9,121.32 | 9,121.32 | 3,777,340,000 |
| May 07, 2020 | 8,973.78 | 9,015.99 | 8,932.86 | 8,979.66 | 8,979.66 | 3,762,070,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 431

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 436 of 451    PageID 959

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| May 06, 2020 | 8,874.70 | 8,933.25 | 8,819.37 | 8,854.39 | 8,854.39 | 3,620,030,000 |
| May 05, 2020 | 8,809.66 | 8,909.96 | 8,781.31 | 8,809.12 | 8,809.12 | 3,913,360,000 |
| May 04, 2020 | 8,555.32 | 8,715.82 | 8,537.83 | 8,710.71 | 8,710.71 | 3,422,150,000 |
| May 01, 2020 | 8,681.29 | 8,754.46 | 8,566.84 | 8,604.95 | 8,604.95 | 3,722,520,000 |
| Apr 30, 2020 | 8,911.02 | 8,926.11 | 8,825.83 | 8,889.55 | 8,889.55 | 4,316,380,000 |
| Apr 29, 2020 | 8,802.70 | 8,957.27 | 8,765.01 | 8,914.71 | 8,914.71 | 4,378,540,000 |
| Apr 28, 2020 | 8,825.69 | 8,830.57 | 8,600.70 | 8,607.73 | 8,607.73 | 3,707,540,000 |
| Apr 27, 2020 | 8,717.98 | 8,754.57 | 8,697.37 | 8,730.16 | 8,730.16 | 3,678,460,000 |
| Apr 24, 2020 | 8,530.08 | 8,642.93 | 8,464.42 | 8,634.52 | 8,634.52 | 3,673,170,000 |
| Apr 23, 2020 | 8,528.84 | 8,635.23 | 8,475.20 | 8,494.75 | 8,494.75 | 3,734,720,000 |
| Apr 22, 2020 | 8,434.55 | 8,537.31 | 8,404.54 | 8,495.38 | 8,495.38 | 3,025,060,000 |
| Apr 21, 2020 | 8,460.69 | 8,480.29 | 8,215.69 | 8,263.23 | 8,263.23 | 3,756,290,000 |
| Apr 20, 2020 | 8,553.38 | 8,684.91 | 8,553.38 | 8,560.73 | 8,560.73 | 3,796,950,000 |
| Apr 17, 2020 | 8,667.48 | 8,670.30 | 8,531.69 | 8,650.14 | 8,650.14 | 4,335,020,000 |
| Apr 16, 2020 | 8,479.11 | 8,560.16 | 8,393.27 | 8,532.36 | 8,532.36 | 3,995,870,000 |
| Apr 15, 2020 | 8,355.96 | 8,464.66 | 8,308.79 | 8,393.18 | 8,393.18 | 3,333,750,000 |
| Apr 14, 2020 | 8,353.21 | 8,531.11 | 8,338.08 | 8,515.74 | 8,515.74 | 3,732,820,000 |
| Apr 13, 2020 | 8,127.69 | 8,200.44 | 8,035.95 | 8,192.42 | 8,192.42 | 3,146,860,000 |
| Apr 09, 2020 | 8,169.01 | 8,227.91 | 8,072.32 | 8,153.58 | 8,153.58 | 4,123,670,000 |
| Apr 08, 2020 | 7,975.72 | 8,114.43 | 7,901.94 | 8,090.90 | 8,090.90 | 3,470,730,000 |
| Apr 07, 2020 | 8,129.99 | 8,146.43 | 7,881.22 | 7,887.26 | 7,887.26 | 4,069,410,000 |
| Apr 06, 2020 | 7,660.17 | 7,938.33 | 7,617.79 | 7,913.24 | 7,913.24 | 3,849,100,000 |
| Apr 03, 2020 | 7,477.27 | 7,518.72 | 7,288.11 | 7,373.08 | 7,373.08 | 3,279,100,000 |
| Apr 02, 2020 | 7,317.45 | 7,501.70 | 7,307.95 | 7,487.31 | 7,487.31 | 3,608,190,000 |
| Apr 01, 2020 | 7,459.50 | 7,566.37 | 7,301.98 | 7,360.58 | 7,360.58 | 3,685,510,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 432

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 437 of 451    PageID 960

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Mar 31, 2020 | 7,740.06 | 7,880.31 | 7,642.86 | 7,700.10 | 7,700.10 | 4,059,700,000 |
| Mar 30, 2020 | 7,583.46 | 7,784.35 | 7,539.97 | 7,774.15 | 7,774.15 | 3,846,900,000 |
| Mar 27, 2020 | 7,554.25 | 7,716.24 | 7,491.14 | 7,502.38 | 7,502.38 | 3,977,010,000 |
| Mar 26, 2020 | 7,462.21 | 7,809.83 | 7,462.21 | 7,797.54 | 7,797.54 | 3,999,850,000 |
| Mar 25, 2020 | 7,421.36 | 7,671.21 | 7,276.40 | 7,384.30 | 7,384.30 | 4,666,440,000 |
| Mar 24, 2020 | 7,196.15 | 7,418.37 | 7,169.86 | 7,417.86 | 7,417.86 | 4,417,380,000 |
| Mar 23, 2020 | 6,847.28 | 6,984.94 | 6,631.42 | 6,860.67 | 6,860.67 | 4,330,610,000 |
| Mar 20, 2020 | 7,248.07 | 7,354.44 | 6,854.67 | 6,879.52 | 6,879.52 | 5,239,940,000 |
| Mar 19, 2020 | 6,996.45 | 7,341.38 | 6,858.38 | 7,150.58 | 7,150.58 | 4,762,170,000 |
| Mar 18, 2020 | 6,902.32 | 7,182.83 | 6,686.36 | 6,989.84 | 6,989.84 | 4,890,820,000 |
| Mar 17, 2020 | 7,072.00 | 7,406.23 | 6,828.91 | 7,334.78 | 7,334.78 | 4,900,000,000 |
| Mar 16, 2020 | 7,392.73 | 7,422.20 | 6,882.86 | 6,904.59 | 6,904.59 | 4,594,360,000 |
| Mar 13, 2020 | 7,610.39 | 7,875.93 | 7,219.09 | 7,874.88 | 7,874.88 | 4,685,890,000 |
| Mar 12, 2020 | 7,398.58 | 7,712.33 | 7,194.67 | 7,201.80 | 7,201.80 | 5,066,530,000 |
| Mar 11, 2020 | 8,136.25 | 8,181.36 | 7,850.95 | 7,952.05 | 7,952.05 | 4,273,890,000 |
| Mar 10, 2020 | 8,219.76 | 8,347.40 | 7,930.43 | 8,344.25 | 8,344.25 | 4,431,930,000 |
| Mar 09, 2020 | 7,957.93 | 8,243.31 | 7,943.16 | 7,950.68 | 7,950.68 | 4,530,350,000 |
| Mar 06, 2020 | 8,469.02 | 8,612.36 | 8,375.13 | 8,575.62 | 8,575.62 | 4,279,850,000 |
| Mar 05, 2020 | 8,790.09 | 8,921.08 | 8,677.39 | 8,738.59 | 8,738.59 | 3,748,090,000 |
| Mar 04, 2020 | 8,834.10 | 9,019.96 | 8,757.66 | 9,018.09 | 9,018.09 | 3,602,870,000 |
| Mar 03, 2020 | 8,965.10 | 9,070.32 | 8,602.89 | 8,684.09 | 8,684.09 | 4,336,700,000 |
| Mar 02, 2020 | 8,667.14 | 8,952.81 | 8,543.35 | 8,952.17 | 8,952.17 | 4,232,760,000 |
| Feb 28, 2020 | 8,269.74 | 8,591.82 | 8,264.16 | 8,567.37 | 8,567.37 | 5,301,170,000 |
| Feb 27, 2020 | 8,744.03 | 8,904.11 | 8,562.05 | 8,566.48 | 8,566.48 | 390,750,000 |
| Feb 26, 2020 | 9,011.55 | 9,148.32 | 8,927.80 | 8,980.78 | 8,980.78 | 3,567,830,000 |

*Close price adjusted for splits.        **Adjusted close price adjusted for both dividends and splits.

App. 433

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 438 of 451    PageID 961

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Feb 25, 2020 | 9,301.20 | 9,315.26 | 8,940.49 | 8,965.61 | 8,965.61 | 3,583,400,000 |
| Feb 24, 2020 | 9,188.44 | 9,322.88 | 9,166.01 | 9,221.28 | 9,221.28 | 3,177,000,000 |
| Feb 21, 2020 | 9,708.01 | 9,715.95 | 9,542.33 | 9,576.59 | 9,576.59 | 2,743,010,000 |
| Feb 20, 2020 | 9,799.20 | 9,820.86 | 9,636.94 | 9,750.97 | 9,750.97 | 2,735,610,000 |
| Feb 19, 2020 | 9,782.81 | 9,838.37 | 9,777.10 | 9,817.18 | 9,817.18 | 2,462,530,000 |
| Feb 18, 2020 | 9,679.04 | 9,747.68 | 9,675.80 | 9,732.74 | 9,732.74 | 2,273,460,000 |
| Feb 14, 2020 | 9,728.90 | 9,746.36 | 9,693.05 | 9,731.18 | 9,731.18 | 2,222,240,000 |
| Feb 13, 2020 | 9,657.04 | 9,748.32 | 9,650.02 | 9,711.97 | 9,711.97 | 2,239,270,000 |
| Feb 12, 2020 | 9,688.60 | 9,728.77 | 9,666.69 | 9,725.96 | 9,725.96 | 2,355,000,000 |
| Feb 11, 2020 | 9,680.89 | 9,714.74 | 9,617.21 | 9,638.94 | 9,638.94 | 2,423,670,000 |
| Feb 10, 2020 | 9,493.63 | 9,628.66 | 9,493.63 | 9,628.39 | 9,628.39 | 2,179,310,000 |
| Feb 07, 2020 | 9,526.64 | 9,570.09 | 9,496.53 | 9,520.51 | 9,520.51 | 2,238,670,000 |
| Feb 06, 2020 | 9,540.98 | 9,575.66 | 9,505.68 | 9,572.15 | 9,572.15 | 2,267,300,000 |
| Feb 05, 2020 | 9,574.10 | 9,574.94 | 9,454.93 | 9,508.68 | 9,508.68 | 2,462,470,000 |
| Feb 04, 2020 | 9,398.39 | 9,485.38 | 9,374.05 | 9,467.97 | 9,467.97 | 2,445,420,000 |
| Feb 03, 2020 | 9,190.72 | 9,299.85 | 9,188.55 | 9,273.40 | 9,273.40 | 2,420,510,000 |
| Jan 31, 2020 | 9,324.33 | 9,324.80 | 9,123.22 | 9,150.94 | 9,150.94 | 2,685,840,000 |
| Jan 30, 2020 | 9,211.15 | 9,303.00 | 9,185.18 | 9,298.93 | 9,298.93 | 2,333,500,000 |
| Jan 29, 2020 | 9,318.26 | 9,329.12 | 9,249.04 | 9,275.16 | 9,275.16 | 2,223,480,000 |
| Jan 28, 2020 | 9,201.82 | 9,288.87 | 9,182.33 | 9,269.68 | 9,269.68 | 2,157,830,000 |
| Jan 27, 2020 | 9,092.46 | 9,185.45 | 9,088.04 | 9,139.31 | 9,139.31 | 2,583,330,000 |
| Jan 24, 2020 | 9,446.21 | 9,451.43 | 9,273.23 | 9,314.91 | 9,314.91 | 2,611,710,000 |
| Jan 23, 2020 | 9,377.72 | 9,409.20 | 9,334.13 | 9,402.48 | 9,402.48 | 2,460,050,000 |
| Jan 22, 2020 | 9,413.61 | 9,439.29 | 9,375.13 | 9,383.77 | 9,383.77 | 2,449,390,000 |
| Jan 21, 2020 | 9,361.07 | 9,397.58 | 9,350.20 | 9,370.81 | 9,370.81 | 2,684,540,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 434

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Jan 17, 2020 | 9,392.37 | 9,393.48 | 9,346.81 | 9,388.94 | 9,388.94 | 2,522,670,000 |
| Jan 16, 2020 | 9,313.45 | 9,357.92 | 9,301.32 | 9,357.13 | 9,357.13 | 2,301,400,000 |
| Jan 15, 2020 | 9,253.76 | 9,298.82 | 9,231.14 | 9,258.70 | 9,258.70 | 2,435,650,000 |
| Jan 14, 2020 | 9,270.61 | 9,298.33 | 9,226.49 | 9,251.33 | 9,251.33 | 2,542,170,000 |
| Jan 13, 2020 | 9,213.72 | 9,274.49 | 9,193.06 | 9,273.93 | 9,273.93 | 2,530,270,000 |
| Jan 10, 2020 | 9,232.95 | 9,235.20 | 9,164.66 | 9,178.86 | 9,178.86 | 2,378,990,000 |
| Jan 09, 2020 | 9,202.27 | 9,215.95 | 9,158.50 | 9,203.43 | 9,203.43 | 2,534,700,000 |
| Jan 08, 2020 | 9,068.03 | 9,168.89 | 9,059.38 | 9,129.24 | 9,129.24 | 2,464,090,000 |
| Jan 07, 2020 | 9,076.64 | 9,091.93 | 9,042.55 | 9,068.58 | 9,068.58 | 2,352,850,000 |
| Jan 06, 2020 | 8,943.50 | 9,072.41 | 8,943.50 | 9,071.47 | 9,071.47 | 2,788,120,000 |
| Jan 03, 2020 | 8,976.43 | 9,065.76 | 8,976.43 | 9,020.77 | 9,020.77 | 2,567,400,000 |
| Jan 02, 2020 | 9,039.46 | 9,093.43 | 9,010.89 | 9,092.19 | 9,092.19 | 2,848,370,000 |
| Dec 31, 2019 | 8,918.74 | 8,975.36 | 8,912.77 | 8,972.60 | 8,972.60 | 2,182,800,000 |
| Dec 30, 2019 | 9,004.45 | 9,006.36 | 8,909.19 | 8,945.99 | 8,945.99 | 2,042,420,000 |
| Dec 27, 2019 | 9,049.47 | 9,052.00 | 8,987.32 | 9,006.62 | 9,006.62 | 1,832,200,000 |
| Dec 26, 2019 | 8,970.21 | 9,022.46 | 8,968.46 | 9,022.39 | 9,022.39 | 1,634,920,000 |
| Dec 24, 2019 | 8,955.01 | 8,957.12 | 8,934.36 | 8,952.88 | 8,952.88 | 1,014,520,000 |
| Dec 23, 2019 | 8,950.20 | 8,956.64 | 8,934.55 | 8,945.65 | 8,945.65 | 2,025,450,000 |
| Dec 20, 2019 | 8,911.84 | 8,931.91 | 8,901.87 | 8,924.96 | 8,924.96 | 3,825,460,000 |
| Dec 19, 2019 | 8,838.97 | 8,888.13 | 8,838.97 | 8,887.22 | 8,887.22 | 2,415,950,000 |
| Dec 18, 2019 | 8,834.65 | 8,848.76 | 8,820.42 | 8,827.74 | 8,827.74 | 2,727,870,000 |
| Dec 17, 2019 | 8,829.47 | 8,831.99 | 8,804.60 | 8,823.36 | 8,823.36 | 2,374,120,000 |
| Dec 16, 2019 | 8,791.31 | 8,833.45 | 8,789.77 | 8,814.23 | 8,814.23 | 2,346,290,000 |
| Dec 13, 2019 | 8,713.91 | 8,768.87 | 8,697.58 | 8,734.88 | 8,734.88 | 2,188,720,000 |
| Dec 12, 2019 | 8,645.36 | 8,745.82 | 8,633.60 | 8,717.32 | 8,717.32 | 2,388,270,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 435

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Dec 11, 2019 | 8,631.12 | 8,658.48 | 8,622.36 | 8,654.05 | 8,654.05 | 1,937,850,000 |
| Dec 10, 2019 | 8,623.56 | 8,650.76 | 8,600.82 | 8,616.18 | 8,616.18 | 2,053,390,000 |
| Dec 09, 2019 | 8,650.86 | 8,678.85 | 8,619.77 | 8,621.83 | 8,621.83 | 2,088,520,000 |
| Dec 06, 2019 | 8,634.25 | 8,665.44 | 8,630.58 | 8,656.53 | 8,656.53 | 2,053,530,000 |
| Dec 05, 2019 | 8,587.93 | 8,588.89 | 8,541.92 | 8,570.70 | 8,570.70 | 2,123,380,000 |
| Dec 04, 2019 | 8,557.45 | 8,584.88 | 8,552.38 | 8,566.67 | 8,566.67 | 2,150,680,000 |
| Dec 03, 2019 | 8,460.72 | 8,523.98 | 8,435.40 | 8,520.64 | 8,520.64 | 2,308,600,000 |
| Dec 02, 2019 | 8,672.84 | 8,672.84 | 8,540.16 | 8,567.99 | 8,567.99 | 2,225,940,000 |
| Nov 29, 2019 | 8,682.01 | 8,697.32 | 8,664.04 | 8,665.47 | 8,665.47 | 1,099,090,000 |
| Nov 27, 2019 | 8,669.59 | 8,705.91 | 8,662.58 | 8,705.18 | 8,705.18 | 1,744,580,000 |
| Nov 26, 2019 | 8,635.40 | 8,659.73 | 8,625.62 | 8,647.93 | 8,647.93 | 2,434,570,000 |
| Nov 25, 2019 | 8,559.65 | 8,633.15 | 8,559.65 | 8,632.49 | 8,632.49 | 2,256,070,000 |
| Nov 22, 2019 | 8,530.54 | 8,535.46 | 8,477.49 | 8,519.88 | 8,519.88 | 1,877,090,000 |
| Nov 21, 2019 | 8,527.87 | 8,530.73 | 8,487.29 | 8,506.21 | 8,506.21 | 2,056,230,000 |
| Nov 20, 2019 | 8,543.57 | 8,578.27 | 8,468.63 | 8,526.73 | 8,526.73 | 2,596,030,000 |
| Nov 19, 2019 | 8,578.02 | 8,589.76 | 8,536.73 | 8,570.66 | 8,570.66 | 2,075,000,000 |
| Nov 18, 2019 | 8,529.16 | 8,559.78 | 8,503.62 | 8,549.94 | 8,549.94 | 2,047,240,000 |
| Nov 15, 2019 | 8,524.48 | 8,540.83 | 8,506.80 | 8,540.83 | 8,540.83 | 2,188,210,000 |
| Nov 14, 2019 | 8,461.06 | 8,485.36 | 8,441.58 | 8,479.02 | 8,479.02 | 2,106,550,000 |
| Nov 13, 2019 | 8,455.02 | 8,496.90 | 8,451.34 | 8,482.10 | 8,482.10 | 2,173,320,000 |
| Nov 12, 2019 | 8,471.07 | 8,514.84 | 8,462.99 | 8,486.09 | 8,486.09 | 1,987,820,000 |
| Nov 11, 2019 | 8,431.26 | 8,467.29 | 8,425.48 | 8,464.28 | 8,464.28 | 1,715,470,000 |
| Nov 08, 2019 | 8,422.67 | 8,475.57 | 8,405.89 | 8,475.31 | 8,475.31 | 1,974,190,000 |
| Nov 07, 2019 | 8,455.11 | 8,483.16 | 8,415.87 | 8,434.52 | 8,434.52 | 2,393,950,000 |
| Nov 06, 2019 | 8,426.57 | 8,426.57 | 8,379.33 | 8,410.63 | 8,410.63 | 2,332,650,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 436

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Nov 05, 2019 | 8,446.62 | 8,457.39 | 8,421.05 | 8,434.68 | 8,434.68 | 2,316,710,000 |
| Nov 04, 2019 | 8,445.50 | 8,451.37 | 8,421.30 | 8,433.20 | 8,433.20 | 2,149,910,000 |
| Nov 01, 2019 | 8,335.05 | 8,386.75 | 8,326.56 | 8,386.40 | 8,386.40 | 2,057,310,000 |
| Oct 31, 2019 | 8,314.38 | 8,321.80 | 8,248.81 | 8,292.36 | 8,292.36 | 2,258,270,000 |
| Oct 30, 2019 | 8,284.28 | 8,315.50 | 8,241.70 | 8,303.98 | 8,303.98 | 1,928,420,000 |
| Oct 29, 2019 | 8,313.35 | 8,319.29 | 8,275.14 | 8,276.85 | 8,276.85 | 1,834,530,000 |
| Oct 28, 2019 | 8,285.77 | 8,335.56 | 8,285.27 | 8,325.99 | 8,325.99 | 1,956,280,000 |
| Oct 25, 2019 | 8,150.59 | 8,249.97 | 8,150.59 | 8,243.12 | 8,243.12 | 1,894,740,000 |
| Oct 24, 2019 | 8,180.04 | 8,187.84 | 8,137.66 | 8,185.80 | 8,185.80 | 1,882,490,000 |
| Oct 23, 2019 | 8,090.24 | 8,122.88 | 8,078.35 | 8,119.79 | 8,119.79 | 1,805,030,000 |
| Oct 22, 2019 | 8,188.12 | 8,194.62 | 8,101.98 | 8,104.30 | 8,104.30 | 1,847,200,000 |
| Oct 21, 2019 | 8,137.42 | 8,164.14 | 8,117.26 | 8,162.99 | 8,162.99 | 1,752,860,000 |
| Oct 18, 2019 | 8,149.85 | 8,157.36 | 8,045.37 | 8,089.54 | 8,089.54 | 2,012,930,000 |
| Oct 17, 2019 | 8,176.91 | 8,183.64 | 8,131.25 | 8,156.85 | 8,156.85 | 1,861,570,000 |
| Oct 16, 2019 | 8,119.81 | 8,146.15 | 8,103.38 | 8,124.18 | 8,124.18 | 1,886,720,000 |
| Oct 15, 2019 | 8,074.85 | 8,166.18 | 8,071.81 | 8,148.71 | 8,148.71 | 1,836,650,000 |
| Oct 14, 2019 | 8,044.35 | 8,069.85 | 8,036.41 | 8,048.65 | 8,048.65 | 1,419,730,000 |
| Oct 11, 2019 | 8,047.34 | 8,115.80 | 8,046.80 | 8,057.04 | 8,057.04 | 2,176,080,000 |
| Oct 10, 2019 | 7,904.56 | 7,982.84 | 7,899.81 | 7,950.78 | 7,950.78 | 1,778,740,000 |
| Oct 09, 2019 | 7,895.96 | 7,930.92 | 7,873.52 | 7,903.74 | 7,903.74 | 1,553,900,000 |
| Oct 08, 2019 | 7,898.27 | 7,921.88 | 7,823.73 | 7,823.78 | 7,823.78 | 1,933,580,000 |
| Oct 07, 2019 | 7,956.41 | 8,013.31 | 7,942.08 | 7,956.29 | 7,956.29 | 1,739,450,000 |
| Oct 04, 2019 | 7,908.44 | 7,986.62 | 7,899.39 | 7,982.47 | 7,982.47 | 1,736,890,000 |
| Oct 03, 2019 | 7,787.02 | 7,872.26 | 7,700.00 | 7,872.26 | 7,872.26 | 2,141,490,000 |
| Oct 02, 2019 | 7,851.13 | 7,852.70 | 7,744.96 | 7,785.25 | 7,785.25 | 2,495,160,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 437

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Oct 01, 2019 | 8,026.83 | 8,062.50 | 7,906.29 | 7,908.68 | 7,908.68 | 2,243,650,000 |
| Sep 30, 2019 | 7,964.09 | 8,012.16 | 7,949.63 | 7,999.34 | 7,999.34 | 1,805,820,000 |
| Sep 27, 2019 | 8,047.11 | 8,051.83 | 7,890.28 | 7,939.63 | 7,939.63 | 2,037,720,000 |
| Sep 26, 2019 | 8,070.12 | 8,072.11 | 7,991.02 | 8,030.66 | 8,030.66 | 1,832,800,000 |
| Sep 25, 2019 | 7,990.66 | 8,095.00 | 7,935.57 | 8,077.38 | 8,077.38 | 2,015,270,000 |
| Sep 24, 2019 | 8,147.23 | 8,158.83 | 7,969.65 | 7,993.63 | 7,993.63 | 2,302,600,000 |
| Sep 23, 2019 | 8,106.49 | 8,135.81 | 8,085.34 | 8,112.46 | 8,112.46 | 1,780,160,000 |
| Sep 20, 2019 | 8,184.88 | 8,202.82 | 8,086.16 | 8,117.67 | 8,117.67 | 3,359,380,000 |
| Sep 19, 2019 | 8,193.59 | 8,237.43 | 8,174.32 | 8,182.88 | 8,182.88 | 1,792,700,000 |
| Sep 18, 2019 | 8,174.62 | 8,179.87 | 8,086.22 | 8,177.39 | 8,177.39 | 2,034,880,000 |
| Sep 17, 2019 | 8,148.65 | 8,188.23 | 8,139.82 | 8,186.02 | 8,186.02 | 1,850,340,000 |
| Sep 16, 2019 | 8,121.64 | 8,165.33 | 8,121.25 | 8,153.54 | 8,153.54 | 1,869,220,000 |
| Sep 13, 2019 | 8,190.57 | 8,210.20 | 8,165.47 | 8,176.71 | 8,176.71 | 1,976,770,000 |
| Sep 12, 2019 | 8,206.58 | 8,243.80 | 8,176.73 | 8,194.47 | 8,194.47 | 2,159,260,000 |
| Sep 11, 2019 | 8,091.68 | 8,169.68 | 8,081.56 | 8,169.68 | 8,169.68 | 2,310,440,000 |
| Sep 10, 2019 | 8,049.98 | 8,086.53 | 8,001.68 | 8,084.16 | 8,084.16 | 2,362,860,000 |
| Sep 09, 2019 | 8,130.91 | 8,131.66 | 8,052.34 | 8,087.44 | 8,087.44 | 2,172,240,000 |
| Sep 06, 2019 | 8,125.58 | 8,134.39 | 8,098.52 | 8,103.07 | 8,103.07 | 1,876,380,000 |
| Sep 05, 2019 | 8,061.29 | 8,134.42 | 8,061.29 | 8,116.83 | 8,116.83 | 2,096,300,000 |
| Sep 04, 2019 | 7,949.81 | 7,981.41 | 7,928.94 | 7,976.88 | 7,976.88 | 1,891,300,000 |
| Sep 03, 2019 | 7,906.44 | 7,940.37 | 7,847.32 | 7,874.16 | 7,874.16 | 1,936,210,000 |
| Aug 30, 2019 | 8,015.16 | 8,017.91 | 7,914.74 | 7,962.88 | 7,962.88 | 1,665,840,000 |
| Aug 29, 2019 | 7,945.78 | 7,992.29 | 7,925.83 | 7,973.39 | 7,973.39 | 1,700,840,000 |
| Aug 28, 2019 | 7,798.35 | 7,866.87 | 7,766.67 | 7,856.88 | 7,856.88 | 1,656,930,000 |
| Aug 27, 2019 | 7,908.78 | 7,916.83 | 7,795.18 | 7,826.95 | 7,826.95 | 1,913,760,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 438

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Aug 26, 2019 | 7,829.58 | 7,856.04 | 7,789.05 | 7,853.74 | 7,853.74 | 1,688,860,000 |
| Aug 23, 2019 | 7,943.65 | 8,005.34 | 7,730.77 | 7,751.77 | 7,751.77 | 2,207,070,000 |
| Aug 22, 2019 | 8,038.79 | 8,048.58 | 7,937.12 | 7,991.39 | 7,991.39 | 1,777,630,000 |
| Aug 21, 2019 | 8,017.07 | 8,036.94 | 7,998.50 | 8,020.21 | 8,020.21 | 1,716,370,000 |
| Aug 20, 2019 | 7,989.36 | 8,010.58 | 7,948.09 | 7,948.56 | 7,948.56 | 1,747,580,000 |
| Aug 19, 2019 | 8,006.18 | 8,026.75 | 7,895.99 | 8,002.81 | 8,002.81 | 1,934,980,000 |
| Aug 16, 2019 | 7,828.35 | 7,907.52 | 7,828.35 | 7,895.99 | 7,895.99 | 1,995,130,000 |
| Aug 15, 2019 | 7,790.20 | 7,805.93 | 7,716.55 | 7,766.62 | 7,766.62 | 2,182,590,000 |
| Aug 14, 2019 | 7,877.33 | 7,900.28 | 7,762.87 | 7,773.94 | 7,773.94 | 2,522,870,000 |
| Aug 13, 2019 | 7,852.37 | 8,065.24 | 7,851.58 | 8,016.36 | 8,016.36 | 2,346,980,000 |
| Aug 12, 2019 | 7,907.49 | 7,924.99 | 7,833.79 | 7,863.41 | 7,863.41 | 2,056,360,000 |
| Aug 09, 2019 | 7,997.19 | 8,020.56 | 7,910.35 | 7,959.14 | 7,959.14 | 2,224,330,000 |
| Aug 08, 2019 | 7,921.59 | 8,041.12 | 7,896.15 | 8,039.16 | 8,039.16 | 2,415,670,000 |
| Aug 07, 2019 | 7,747.27 | 7,881.38 | 7,702.42 | 7,862.83 | 7,862.83 | 2,453,230,000 |
| Aug 06, 2019 | 7,804.51 | 7,845.01 | 7,739.57 | 7,833.27 | 7,833.27 | 2,201,610,000 |
| Aug 05, 2019 | 7,823.33 | 7,836.45 | 7,662.90 | 7,726.04 | 7,726.04 | 2,636,740,000 |
| Aug 02, 2019 | 8,056.42 | 8,068.80 | 7,953.67 | 8,004.07 | 8,004.07 | 2,252,550,000 |
| Aug 01, 2019 | 8,190.56 | 8,311.04 | 8,080.52 | 8,111.12 | 8,111.12 | 2,792,650,000 |
| Jul 31, 2019 | 8,290.80 | 8,299.83 | 8,110.02 | 8,175.42 | 8,175.42 | 2,667,060,000 |
| Jul 30, 2019 | 8,231.77 | 8,295.46 | 8,228.02 | 8,273.61 | 8,273.61 | 1,884,300,000 |
| Jul 29, 2019 | 8,325.10 | 8,325.28 | 8,247.37 | 8,293.33 | 8,293.33 | 1,874,780,000 |
| Jul 26, 2019 | 8,294.30 | 8,339.64 | 8,291.12 | 8,330.21 | 8,330.21 | 1,954,350,000 |
| Jul 25, 2019 | 8,294.68 | 8,295.95 | 8,233.40 | 8,238.54 | 8,238.54 | 2,023,130,000 |
| Jul 24, 2019 | 8,227.36 | 8,321.81 | 8,226.50 | 8,321.50 | 8,321.50 | 1,947,550,000 |
| Jul 23, 2019 | 8,242.50 | 8,251.83 | 8,193.89 | 8,251.40 | 8,251.40 | 1,832,220,000 |

*Close price adjusted for splits.     **Adjusted close price adjusted for both dividends and splits.

App. 439

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 444 of 451    PageID 967

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Jul 22, 2019 | 8,171.99 | 8,218.42 | 8,171.54 | 8,204.14 | 8,204.14 | 1,845,770,000 |
| Jul 19, 2019 | 8,241.34 | 8,245.78 | 8,144.63 | 8,146.49 | 8,146.49 | 1,878,730,000 |
| Jul 18, 2019 | 8,151.76 | 8,215.58 | 8,135.12 | 8,207.24 | 8,207.24 | 2,016,310,000 |
| Jul 17, 2019 | 8,224.00 | 8,230.67 | 8,184.66 | 8,185.21 | 8,185.21 | 1,846,960,000 |
| Jul 16, 2019 | 8,251.66 | 8,259.75 | 8,204.23 | 8,222.80 | 8,222.80 | 1,933,960,000 |
| Jul 15, 2019 | 8,263.18 | 8,264.78 | 8,236.27 | 8,258.19 | 8,258.19 | 1,783,980,000 |
| Jul 12, 2019 | 8,209.20 | 8,245.66 | 8,201.52 | 8,244.14 | 8,244.14 | 1,824,870,000 |
| Jul 11, 2019 | 8,219.28 | 8,226.18 | 8,171.63 | 8,196.04 | 8,196.04 | 1,966,970,000 |
| Jul 10, 2019 | 8,183.19 | 8,228.60 | 8,160.56 | 8,202.53 | 8,202.53 | 2,060,510,000 |
| Jul 09, 2019 | 8,061.41 | 8,146.98 | 8,061.32 | 8,141.73 | 8,141.73 | 1,866,770,000 |
| Jul 08, 2019 | 8,112.91 | 8,161.79 | 8,078.39 | 8,098.38 | 8,098.38 | 177,320,000 |
| Jul 05, 2019 | 8,123.28 | 8,171.97 | 8,093.66 | 8,161.79 | 8,161.79 | 149,410,000 |
| Jul 03, 2019 | 8,129.57 | 8,170.23 | 8,122.34 | 8,170.23 | 8,170.23 | 1,548,190,000 |
| Jul 02, 2019 | 8,086.65 | 8,109.37 | 8,063.11 | 8,109.09 | 8,109.09 | 1,946,320,000 |
| Jul 01, 2019 | 8,145.85 | 8,150.45 | 8,059.29 | 8,091.16 | 8,091.16 | 2,208,900,000 |
| Jun 28, 2019 | 7,988.76 | 8,010.15 | 7,961.46 | 8,006.24 | 8,006.24 | 4,078,990,000 |
| Jun 27, 2019 | 7,939.36 | 7,976.58 | 7,935.47 | 7,967.76 | 7,967.76 | 2,023,120,000 |
| Jun 26, 2019 | 7,933.92 | 7,974.28 | 7,903.07 | 7,909.97 | 7,909.97 | 2,104,750,000 |
| Jun 25, 2019 | 8,005.27 | 8,007.31 | 7,879.15 | 7,884.72 | 7,884.72 | 2,127,310,000 |
| Jun 24, 2019 | 8,040.58 | 8,047.56 | 8,004.63 | 8,005.70 | 8,005.70 | 2,070,370,000 |
| Jun 21, 2019 | 8,028.69 | 8,073.02 | 8,011.20 | 8,031.71 | 8,031.71 | 2,894,340,000 |
| Jun 20, 2019 | 8,087.45 | 8,088.88 | 7,996.87 | 8,051.34 | 8,051.34 | 2,053,530,000 |
| Jun 19, 2019 | 7,970.26 | 7,998.59 | 7,930.38 | 7,987.32 | 7,987.32 | 2,014,080,000 |
| Jun 18, 2019 | 7,920.98 | 8,005.21 | 7,911.67 | 7,953.88 | 7,953.88 | 2,244,920,000 |
| Jun 17, 2019 | 7,819.43 | 7,865.98 | 7,812.61 | 7,845.02 | 7,845.02 | 1,935,290,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 440

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 445 of 451    PageID 968

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Jun 14, 2019 | 7,807.19 | 7,819.21 | 7,778.12 | 7,796.66 | 7,796.66 | 1,804,340,000 |
| Jun 13, 2019 | 7,822.56 | 7,848.36 | 7,813.60 | 7,837.13 | 7,837.13 | 1,838,930,000 |
| Jun 12, 2019 | 7,803.13 | 7,819.16 | 7,773.97 | 7,792.72 | 7,792.72 | 1,952,790,000 |
| Jun 11, 2019 | 7,901.04 | 7,909.99 | 7,798.63 | 7,822.57 | 7,822.57 | 2,114,680,000 |
| Jun 10, 2019 | 7,798.87 | 7,895.44 | 7,795.76 | 7,823.17 | 7,823.17 | 2,049,370,000 |
| Jun 07, 2019 | 7,652.97 | 7,767.02 | 7,647.91 | 7,742.10 | 7,742.10 | 2,066,020,000 |
| Jun 06, 2019 | 7,582.24 | 7,634.12 | 7,546.22 | 7,615.55 | 7,615.55 | 2,070,940,000 |
| Jun 05, 2019 | 7,585.68 | 7,589.47 | 7,498.17 | 7,575.48 | 7,575.48 | 2,115,570,000 |
| Jun 04, 2019 | 7,413.94 | 7,529.50 | 7,385.02 | 7,527.12 | 7,527.12 | 2,369,150,000 |
| Jun 03, 2019 | 7,441.21 | 7,457.66 | 7,292.22 | 7,333.02 | 7,333.02 | 2,576,920,000 |
| May 31, 2019 | 7,470.95 | 7,506.86 | 7,448.23 | 7,453.15 | 7,453.15 | 2,236,940,000 |
| May 30, 2019 | 7,565.46 | 7,595.90 | 7,527.66 | 7,567.72 | 7,567.72 | 1,872,000,000 |
| May 29, 2019 | 7,553.02 | 7,581.11 | 7,503.94 | 7,547.31 | 7,547.31 | 2,278,790,000 |
| May 28, 2019 | 7,655.66 | 7,693.74 | 7,603.76 | 7,607.35 | 7,607.35 | 2,352,670,000 |
| May 24, 2019 | 7,675.57 | 7,694.15 | 7,631.25 | 7,637.01 | 7,637.01 | 1,682,920,000 |
| May 23, 2019 | 7,660.72 | 7,665.15 | 7,585.32 | 7,628.28 | 7,628.28 | 2,243,420,000 |
| May 22, 2019 | 7,749.80 | 7,786.33 | 7,738.35 | 7,750.84 | 7,750.84 | 1,881,830,000 |
| May 21, 2019 | 7,765.57 | 7,804.44 | 7,752.92 | 7,785.72 | 7,785.72 | 1,993,210,000 |
| May 20, 2019 | 7,714.06 | 7,747.27 | 7,678.35 | 7,702.38 | 7,702.38 | 2,122,410,000 |
| May 17, 2019 | 7,829.03 | 7,918.71 | 7,810.35 | 7,816.28 | 7,816.28 | 2,134,120,000 |
| May 16, 2019 | 7,832.58 | 7,946.23 | 7,826.67 | 7,898.05 | 7,898.05 | 2,163,120,000 |
| May 15, 2019 | 7,682.80 | 7,838.72 | 7,682.24 | 7,822.15 | 7,822.15 | 2,001,530,000 |
| May 14, 2019 | 7,689.66 | 7,776.20 | 7,665.30 | 7,734.49 | 7,734.49 | 2,084,850,000 |
| May 13, 2019 | 7,720.07 | 7,760.83 | 7,627.22 | 7,647.02 | 7,647.02 | 2,478,860,000 |
| May 10, 2019 | 7,881.31 | 7,949.34 | 7,759.34 | 7,916.94 | 7,916.94 | 2,387,720,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 441

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 446 of 451    PageID 969

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| May 09, 2019 | 7,853.21 | 7,929.78 | 7,796.16 | 7,910.59 | 7,910.59 | 2,520,770,000 |
| May 08, 2019 | 7,946.24 | 8,004.49 | 7,923.35 | 7,943.32 | 7,943.32 | 2,175,100,000 |
| May 07, 2019 | 8,043.52 | 8,070.97 | 7,899.02 | 7,963.76 | 7,963.76 | 2,376,660,000 |
| May 06, 2019 | 7,981.85 | 8,135.54 | 7,981.85 | 8,123.29 | 8,123.29 | 1,966,120,000 |
| May 03, 2019 | 8,092.88 | 8,164.71 | 8,084.80 | 8,164.00 | 8,164.00 | 2,046,040,000 |
| May 02, 2019 | 8,046.48 | 8,094.06 | 7,976.77 | 8,036.77 | 8,036.77 | 2,158,600,000 |
| May 01, 2019 | 8,132.93 | 8,146.00 | 8,048.23 | 8,049.64 | 8,049.64 | 2,247,420,000 |
| Apr 30, 2019 | 8,104.91 | 8,124.61 | 8,050.55 | 8,095.39 | 8,095.39 | 2,115,770,000 |
| Apr 29, 2019 | 8,147.65 | 8,176.08 | 8,136.41 | 8,161.85 | 8,161.85 | 1,761,110,000 |
| Apr 26, 2019 | 8,100.28 | 8,146.42 | 8,060.89 | 8,146.40 | 8,146.40 | 1,971,270,000 |
| Apr 25, 2019 | 8,150.85 | 8,151.84 | 8,075.41 | 8,118.68 | 8,118.68 | 2,063,270,000 |
| Apr 24, 2019 | 8,122.88 | 8,139.55 | 8,101.70 | 8,102.01 | 8,102.01 | 2,022,490,000 |
| Apr 23, 2019 | 8,026.75 | 8,128.87 | 8,023.81 | 8,120.82 | 8,120.82 | 2,075,070,000 |
| Apr 22, 2019 | 7,969.37 | 8,017.15 | 7,965.90 | 8,015.27 | 8,015.27 | 1,776,060,000 |
| Apr 18, 2019 | 7,998.45 | 8,002.31 | 7,950.97 | 7,998.06 | 7,998.06 | 2,089,360,000 |
| Apr 17, 2019 | 8,044.97 | 8,052.40 | 7,973.38 | 7,996.08 | 7,996.08 | 2,290,690,000 |
| Apr 16, 2019 | 8,000.57 | 8,017.56 | 7,978.81 | 8,000.23 | 8,000.23 | 2,095,330,000 |
| Apr 15, 2019 | 7,987.16 | 7,993.33 | 7,933.57 | 7,976.01 | 7,976.01 | 1,816,920,000 |
| Apr 12, 2019 | 7,984.15 | 7,992.09 | 7,952.61 | 7,984.16 | 7,984.16 | 1,955,290,000 |
| Apr 11, 2019 | 7,975.20 | 7,975.20 | 7,933.41 | 7,947.36 | 7,947.36 | 1,956,840,000 |
| Apr 10, 2019 | 7,922.73 | 7,965.33 | 7,916.90 | 7,964.24 | 7,964.24 | 1,998,280,000 |
| Apr 09, 2019 | 7,924.77 | 7,945.55 | 7,897.61 | 7,909.28 | 7,909.28 | 2,067,570,000 |
| Apr 08, 2019 | 7,924.89 | 7,955.90 | 7,891.85 | 7,953.88 | 7,953.88 | 2,069,190,000 |
| Apr 05, 2019 | 7,914.51 | 7,940.45 | 7,909.14 | 7,938.69 | 7,938.69 | 2,148,730,000 |
| Apr 04, 2019 | 7,894.26 | 7,917.65 | 7,844.96 | 7,891.78 | 7,891.78 | 2,094,200,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 442

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Apr 03, 2019 | 7,891.18 | 7,938.26 | 7,870.90 | 7,895.55 | 7,895.55 | 2,487,210,000 |
| Apr 02, 2019 | 7,824.61 | 7,854.92 | 7,811.28 | 7,848.69 | 7,848.69 | 2,110,100,000 |
| Apr 01, 2019 | 7,800.24 | 7,831.45 | 7,777.09 | 7,828.91 | 7,828.91 | 2,198,050,000 |
| Mar 29, 2019 | 7,726.71 | 7,733.62 | 7,688.51 | 7,729.32 | 7,729.32 | 2,233,470,000 |
| Mar 28, 2019 | 7,660.07 | 7,689.16 | 7,619.82 | 7,669.17 | 7,669.17 | 1,902,060,000 |
| Mar 27, 2019 | 7,702.05 | 7,712.84 | 7,582.09 | 7,643.38 | 7,643.38 | 2,221,650,000 |
| Mar 26, 2019 | 7,700.00 | 7,738.17 | 7,649.21 | 7,691.52 | 7,691.52 | 2,068,900,000 |
| Mar 25, 2019 | 7,618.98 | 7,662.38 | 7,579.29 | 7,637.54 | 7,637.54 | 2,130,230,000 |
| Mar 22, 2019 | 7,800.25 | 7,817.83 | 7,642.57 | 7,642.67 | 7,642.67 | 2,490,730,000 |
| Mar 21, 2019 | 7,705.43 | 7,850.11 | 7,705.43 | 7,838.96 | 7,838.96 | 2,483,580,000 |
| Mar 20, 2019 | 7,721.95 | 7,779.24 | 7,674.04 | 7,728.97 | 7,728.97 | 2,424,400,000 |
| Mar 19, 2019 | 7,747.40 | 7,767.89 | 7,699.15 | 7,723.95 | 7,723.95 | 2,433,160,000 |
| Mar 18, 2019 | 7,696.38 | 7,737.67 | 7,677.74 | 7,714.48 | 7,714.48 | 2,274,490,000 |
| Mar 15, 2019 | 7,658.41 | 7,714.96 | 7,652.04 | 7,688.53 | 7,688.53 | 3,447,190,000 |
| Mar 14, 2019 | 7,644.79 | 7,653.10 | 7,627.02 | 7,630.91 | 7,630.91 | 2,176,510,000 |
| Mar 13, 2019 | 7,621.38 | 7,677.07 | 7,619.46 | 7,643.41 | 7,643.41 | 2,366,350,000 |
| Mar 12, 2019 | 7,571.85 | 7,611.13 | 7,560.46 | 7,591.03 | 7,591.03 | 2,161,400,000 |
| Mar 11, 2019 | 7,442.56 | 7,558.23 | 7,442.40 | 7,558.06 | 7,558.06 | 2,226,950,000 |
| Mar 08, 2019 | 7,334.35 | 7,411.52 | 7,332.92 | 7,408.14 | 7,408.14 | 2,245,430,000 |
| Mar 07, 2019 | 7,483.79 | 7,489.08 | 7,397.19 | 7,421.46 | 7,421.46 | 2,440,840,000 |
| Mar 06, 2019 | 7,575.38 | 7,579.02 | 7,499.87 | 7,505.92 | 7,505.92 | 2,242,810,000 |
| Mar 05, 2019 | 7,582.29 | 7,598.66 | 7,543.54 | 7,576.36 | 7,576.36 | 2,142,610,000 |
| Mar 04, 2019 | 7,636.62 | 7,643.66 | 7,501.56 | 7,577.57 | 7,577.57 | 2,569,590,000 |
| Mar 01, 2019 | 7,587.45 | 7,603.04 | 7,540.75 | 7,595.35 | 7,595.35 | 2,463,190,000 |
| Feb 28, 2019 | 7,533.31 | 7,561.90 | 7,516.48 | 7,532.53 | 7,532.53 | 2,647,080,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 443

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Feb 27, 2019 | 7,526.42 | 7,562.29 | 7,485.39 | 7,554.51 | 7,554.51 | 2,423,360,000 |
| Feb 26, 2019 | 7,535.29 | 7,573.22 | 7,524.31 | 7,549.30 | 7,549.30 | 2,257,710,000 |
| Feb 25, 2019 | 7,585.30 | 7,602.69 | 7,551.61 | 7,554.46 | 7,554.46 | 2,363,140,000 |
| Feb 22, 2019 | 7,481.63 | 7,527.54 | 7,479.01 | 7,527.54 | 7,527.54 | 2,417,680,000 |
| Feb 21, 2019 | 7,475.41 | 7,485.75 | 7,430.89 | 7,459.71 | 7,459.71 | 2,119,080,000 |
| Feb 20, 2019 | 7,490.31 | 7,513.70 | 7,455.25 | 7,489.07 | 7,489.07 | 2,181,760,000 |
| Feb 19, 2019 | 7,450.75 | 7,507.79 | 7,450.27 | 7,486.77 | 7,486.77 | 2,120,790,000 |
| Feb 15, 2019 | 7,468.57 | 7,477.28 | 7,440.26 | 7,472.41 | 7,472.41 | 2,257,750,000 |
| Feb 14, 2019 | 7,390.25 | 7,454.42 | 7,375.71 | 7,426.95 | 7,426.95 | 2,103,370,000 |
| Feb 13, 2019 | 7,437.46 | 7,461.66 | 7,413.84 | 7,420.38 | 7,420.38 | 2,093,800,000 |
| Feb 12, 2019 | 7,358.85 | 7,419.43 | 7,349.80 | 7,414.62 | 7,414.62 | 2,124,330,000 |
| Feb 11, 2019 | 7,327.37 | 7,343.56 | 7,290.03 | 7,307.90 | 7,307.90 | 1,897,800,000 |
| Feb 08, 2019 | 7,232.30 | 7,299.44 | 7,225.14 | 7,298.20 | 7,298.20 | 2,086,260,000 |
| Feb 07, 2019 | 7,316.50 | 7,336.74 | 7,235.05 | 7,288.35 | 7,288.35 | 2,295,080,000 |
| Feb 06, 2019 | 7,400.44 | 7,410.77 | 7,346.72 | 7,375.28 | 7,375.28 | 2,167,130,000 |
| Feb 05, 2019 | 7,356.34 | 7,408.68 | 7,355.36 | 7,402.08 | 7,402.08 | 2,265,520,000 |
| Feb 04, 2019 | 7,266.28 | 7,348.23 | 7,261.07 | 7,347.54 | 7,347.54 | 2,099,470,000 |
| Feb 01, 2019 | 7,256.37 | 7,299.94 | 7,243.41 | 7,263.87 | 7,263.87 | 2,383,430,000 |
| Jan 31, 2019 | 7,208.17 | 7,303.12 | 7,205.95 | 7,281.74 | 7,281.74 | 2,918,710,000 |
| Jan 30, 2019 | 7,094.79 | 7,201.31 | 7,065.57 | 7,183.08 | 7,183.08 | 2,544,050,000 |
| Jan 29, 2019 | 7,087.49 | 7,092.29 | 7,011.47 | 7,028.29 | 7,028.29 | 2,089,690,000 |
| Jan 28, 2019 | 7,075.01 | 7,086.30 | 7,034.25 | 7,085.68 | 7,085.68 | 2,435,480,000 |
| Jan 25, 2019 | 7,128.18 | 7,174.56 | 7,111.09 | 7,164.86 | 7,164.86 | 2,440,840,000 |
| Jan 24, 2019 | 7,042.25 | 7,078.96 | 7,029.95 | 7,073.46 | 7,073.46 | 2,400,290,000 |
| Jan 23, 2019 | 7,061.65 | 7,084.85 | 6,953.23 | 7,025.77 | 7,025.77 | 2,274,420,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 444

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Jan 22, 2019 | 7,109.57 | 7,110.16 | 6,979.81 | 7,020.36 | 7,020.36 | 2,380,950,000 |
| Jan 18, 2019 | 7,134.10 | 7,185.38 | 7,096.62 | 7,157.23 | 7,157.23 | 2,451,240,000 |
| Jan 17, 2019 | 7,010.13 | 7,113.95 | 7,003.62 | 7,084.46 | 7,084.46 | 2,128,840,000 |
| Jan 16, 2019 | 7,033.75 | 7,079.63 | 7,028.12 | 7,034.69 | 7,034.69 | 2,149,580,000 |
| Jan 15, 2019 | 6,931.39 | 7,025.85 | 6,928.12 | 7,023.83 | 7,023.83 | 2,038,090,000 |
| Jan 14, 2019 | 6,908.03 | 6,936.22 | 6,887.48 | 6,905.92 | 6,905.92 | 1,942,210,000 |
| Jan 11, 2019 | 6,947.46 | 6,975.65 | 6,933.60 | 6,971.48 | 6,971.48 | 2,066,500,000 |
| Jan 10, 2019 | 6,908.65 | 6,991.37 | 6,877.08 | 6,986.07 | 6,986.07 | 2,179,080,000 |
| Jan 09, 2019 | 6,923.06 | 6,985.22 | 6,899.56 | 6,957.08 | 6,957.08 | 2,422,590,000 |
| Jan 08, 2019 | 6,893.44 | 6,909.58 | 6,795.86 | 6,897.00 | 6,897.00 | 2,380,290,000 |
| Jan 07, 2019 | 6,757.53 | 6,855.60 | 6,741.40 | 6,823.47 | 6,823.47 | 2,507,550,000 |
| Jan 04, 2019 | 6,567.14 | 6,760.69 | 6,554.24 | 6,738.86 | 6,738.86 | 2,579,550,000 |
| Jan 03, 2019 | 6,584.77 | 6,600.21 | 6,457.13 | 6,463.50 | 6,463.50 | 2,607,290,000 |
| Jan 02, 2019 | 6,506.91 | 6,693.71 | 6,506.88 | 6,665.94 | 6,665.94 | 2,261,800,000 |
| Dec 31, 2018 | 6,649.52 | 6,659.96 | 6,570.06 | 6,635.28 | 6,635.28 | 2,098,560,000 |
| Dec 28, 2018 | 6,616.79 | 6,684.18 | 6,529.22 | 6,584.52 | 6,584.52 | 2,199,090,000 |
| Dec 27, 2018 | 6,457.19 | 6,583.01 | 6,336.97 | 6,579.49 | 6,579.49 | 2,415,870,000 |
| Dec 26, 2018 | 6,257.86 | 6,555.53 | 6,214.34 | 6,554.36 | 6,554.36 | 2,558,940,000 |
| Dec 24, 2018 | 6,278.49 | 6,355.18 | 6,190.17 | 6,192.92 | 6,192.92 | 1,647,270,000 |
| Dec 21, 2018 | 6,573.49 | 6,586.68 | 6,304.63 | 6,332.99 | 6,332.99 | 4,534,120,000 |
| Dec 20, 2018 | 6,607.76 | 6,666.20 | 6,447.91 | 6,528.41 | 6,528.41 | 3,258,090,000 |
| Dec 19, 2018 | 6,777.59 | 6,868.86 | 6,586.50 | 6,636.83 | 6,636.83 | 2,899,950,000 |
| Dec 18, 2018 | 6,809.82 | 6,847.27 | 6,733.71 | 6,783.91 | 6,783.91 | 2,595,400,000 |
| Dec 17, 2018 | 6,886.46 | 6,931.81 | 6,710.01 | 6,753.73 | 6,753.73 | 2,665,240,000 |
| Dec 14, 2018 | 6,986.37 | 7,027.17 | 6,898.99 | 6,910.66 | 6,910.66 | 2,200,510,000 |

*Close price adjusted for splits.     **Adjusted close price adjusted for both dividends and splits.

App. 445

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 450 of 451    PageID 973

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|---|---|---|---|---|---|---|
| Dec 13, 2018 | 7,135.28 | 7,154.64 | 7,034.82 | 7,070.33 | 7,070.33 | 2,143,520,000 |
| Dec 12, 2018 | 7,127.00 | 7,197.29 | 7,096.56 | 7,098.31 | 7,098.31 | 2,412,300,000 |
| Dec 11, 2018 | 7,121.66 | 7,129.83 | 6,983.01 | 7,031.83 | 7,031.83 | 2,246,060,000 |
| Dec 10, 2018 | 6,959.63 | 7,047.62 | 6,878.99 | 7,020.52 | 7,020.52 | 2,367,560,000 |
| Dec 07, 2018 | 7,163.49 | 7,205.37 | 6,945.27 | 6,969.25 | 6,969.25 | 2,475,160,000 |
| Dec 06, 2018 | 7,017.05 | 7,189.52 | 6,984.34 | 7,188.26 | 7,188.26 | 2,833,870,000 |
| Dec 04, 2018 | 7,407.95 | 7,421.11 | 7,150.11 | 7,158.43 | 7,158.43 | 2,635,810,000 |
| Dec 03, 2018 | 7,486.13 | 7,486.51 | 7,392.22 | 7,441.51 | 7,441.51 | 2,621,020,000 |
| Nov 30, 2018 | 7,279.30 | 7,332.79 | 7,255.68 | 7,330.54 | 7,330.54 | 2,542,820,000 |
| Nov 29, 2018 | 7,267.37 | 7,319.96 | 7,217.69 | 7,273.08 | 7,273.08 | 1,983,460,000 |
| Nov 28, 2018 | 7,135.08 | 7,292.71 | 7,090.98 | 7,291.59 | 7,291.59 | 2,390,260,000 |
| Nov 27, 2018 | 7,041.23 | 7,105.14 | 7,014.36 | 7,082.70 | 7,082.70 | 2,067,360,000 |
| Nov 26, 2018 | 7,026.50 | 7,083.93 | 7,003.12 | 7,081.85 | 7,081.85 | 2,011,180,000 |
| Nov 23, 2018 | 6,919.52 | 6,987.89 | 6,919.16 | 6,938.98 | 6,938.98 | 958,950,000 |
| Nov 21, 2018 | 6,985.51 | 7,029.93 | 6,951.62 | 6,972.25 | 6,972.25 | 1,858,050,000 |
| Nov 20, 2018 | 6,867.43 | 6,994.75 | 6,830.76 | 6,908.82 | 6,908.82 | 2,664,950,000 |
| Nov 19, 2018 | 7,217.24 | 7,224.12 | 7,011.40 | 7,028.48 | 7,028.48 | 2,354,020,000 |
| Nov 16, 2018 | 7,193.60 | 7,274.86 | 7,171.70 | 7,247.87 | 7,247.87 | 2,438,260,000 |
| Nov 15, 2018 | 7,112.83 | 7,274.26 | 7,072.36 | 7,259.03 | 7,259.03 | 2,508,720,000 |
| Nov 14, 2018 | 7,265.39 | 7,285.57 | 7,101.17 | 7,136.39 | 7,136.39 | 2,540,220,000 |
| Nov 13, 2018 | 7,230.69 | 7,319.12 | 7,182.86 | 7,200.87 | 7,200.87 | 2,343,940,000 |
| Nov 12, 2018 | 7,364.05 | 7,371.09 | 7,193.77 | 7,200.87 | 7,200.87 | 2,289,070,000 |
| Nov 09, 2018 | 7,468.51 | 7,474.34 | 7,349.48 | 7,406.90 | 7,406.90 | 2,418,490,000 |
| Nov 08, 2018 | 7,544.17 | 7,566.93 | 7,499.71 | 7,530.88 | 7,530.88 | 2,462,430,000 |
| Nov 07, 2018 | 7,446.09 | 7,572.93 | 7,435.87 | 7,570.75 | 7,570.75 | 2,677,530,000 |

*Close price adjusted for splits.    **Adjusted close price adjusted for both dividends and splits.

App. 446

Case 3:19-cv-02356-S    Document 39    Filed 06/12/20    Page 451 of 451    PageID 974

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Nov 06, 2018 | 7,326.07 | 7,400.64 | 7,320.89 | 7,375.96 | 7,375.96 | 2,285,680,000 |
| Nov 05, 2018 | 7,344.08 | 7,349.23 | 7,255.88 | 7,328.85 | 7,328.85 | 2,166,470,000 |

*Close price adjusted for splits.      **Adjusted close price adjusted for both dividends and splits.

App. 447