## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MATCH GROUP, INC., AMANDA W. GINSBERG, and GARY SWIDLER,<br><br>Defendants. | Case No.: 3:19-cv-02356<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................... 1

II.     STATEMENT OF THE ALLEGED FACTS ........................................................ 3

        A.      Match Is A Metrics-Driven Online Dating Company............................................. 3

        B.      Match's Revenue Growth Was Driven By Misconduct on its Websites ............... 4

                1.      Rampant Fraudulent and Risky Accounts on Match Websites................... 4

                2.      Defendants Failed to Adequately Address These Problems ....................... 5

                3.      Marketing Was Based on Fraudulent and Illegitimate Accounts .............. 6

                4.      Deceptive Billing Sustained An Improperly Inflated User Base ............... 7

        C.      Defendants' Material Misrepresentations and Omissions ..................................... 7

                1.      The Membership Integrity Fraud (¶¶89-129) ............................................ 8

                2.      The Reported Results Fraud (¶¶130-136) .................................................. 8

                3.      The Internal Controls Fraud (¶¶137-143) ................................................. 8

                4.      The FTC Investigation Fraud (¶¶144-158) ............................................... 9

        D.      Defendants' Scienter ............................................................................................. 9

                1.      Defendants' Knowledge or Deliberate Recklessness ............................... 9

                        a.      Meetings, Conversations, And First-Hand Accounts ..................... 9

                        b.      Internal Reports and Closely Tracked Metrics ........................... 10

                2.      Defendants were Motivated to Commit Fraud......................................... 11

                3.      Other Facts Evidencing Defendants' Scienter ........................................ 11

        E.      The Truth About Defendants' Fraud Begins to Emerge ...................................... 12

III.    STANDARD OF REVIEW ............................................................................... 13

IV.     PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS .. 13

        A.      Plaintiffs Adequately Allege Falsity ................................................................... 13

1. The Membership Integrity Fraud ................................................................. 14

2. The Reported Results Fraud ...................................................................... 17

3. The Internal Controls Fraud ..................................................................... 18

4. The FTC Investigation Fraud .................................................................... 19

5. The PSLRA Safe Harbor and Bespeaks Caution Doctrine Do Not Apply 20

B. Plaintiffs Adequately Allege Defendants' Scienter ............................................ 23

1. Applicable Legal Standards ....................................................................... 23

2. Defendants' Motive and Opportunity to Commit Fraud ............................ 24

   a. The Individual Defendants' Insider Transactions ......................... 25

   b. Match Raised Hundreds of Millions in Funds ............................. 26

   c. Sales, When Coupled with Resignations, Evidence Scienter ....... 27

3. Defendants' Knowledge or Recklessness ................................................. 28

   a. Extensive CW Allegations Strongly Support Scienter ................ 28

   b. Additional Conduct Supports a Strong Inference of Scienter ....... 35

4. Defendants' Competing Inference Is Not More Compelling ................... 36

C. Plaintiffs Adequately Allege Loss Causation ...................................................... 37

D. The §20(a) Claim Is Otherwise Not Challenged ................................................. 40

V.   CONCLUSION ............................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ...............................................................................28, 31

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ...............................................................................19, 31

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)........................................................................................39

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ....................................................................................39

*Anastasio v. Internap Network Servs. Corp.*, No. 1:08-cv-03462-JOF,
    2010 WL 11459838 (N.D. Ga. Sept. 15, 2010) ........................................................32

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
    105 F. Supp. 3d 1246 (D. Kan. 2015)........................................................................23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................13

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018)........................................................................20

*Ayers v. Thompson*,
    358 F.3d 356 (5th Cir. 2004) ....................................................................................23

*Barrie v. Intervoice-Brite, Inc.*,
    397 F.3d 249 (5th Cir. 2005) .......................................................................28, 30, 32

*Basic v. Levinson*,
    485 U.S. 224 (1988)............................................................................................39, 40

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................13

*Berger v. Compaq Comput. Corp.*, No. H-98-1148,
    1999 WL 33620108 (S.D. Tex. Dec. 21, 1999)........................................................25

*Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW,
    2017 WL 3168522 (N.D. Cal. July 26, 2017)...........................................................21

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) .................................................................................20

*Brody v. Zix Corp.*, No. 3:04-CV1931-K,
   2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)...............................................................25, 31

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................................32, 33

*Catogas v. Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) .......................................................................................39

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
   497 F.3d 546 (5th Cir. 2007) ..........................................................................25, 26, 28, 29, 34

*Chamberlain v. Reddy Ice Holdings, Inc.*,
   757 F. Supp. 2d 683 (E.D. Mich. 2010)...........................................................................36, 37

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, No. A-15-CV-374-LY,
   2016 WL 6075540 (W.D. Tex. Sept. 16, 2016).....................................................................17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
   129 F. Supp. 3d 48 (S.D.N.Y. 2015).....................................................................................23

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)...................................................................................34

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ...............................................................................................23

*Dillard v. Platform Specialty Prods. Corp.*, No. 16-cv-80490,
   2016 WL 10586301 (S.D. Fla. Dec. 8, 2016) .......................................................................26

*Duncan v. Pencer*, No. 94 Civ. 0321 (LAP),
   1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ...........................................................................27

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).....................................................................................................37, 38

*Eng v. Edison Int'l*, No. 315CV01478BENKSC,
   2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ......................................................................39

*Eshelman v. Orthoclear Holdings, Inc.*, No. C 07-1429 JSW,
   2009 WL 506864 (N.D. Cal. Feb. 27, 2009) ........................................................................20

*Fener v. Belo Corp.*,
   425 F. Supp. 2d 788 (N.D. Tex. 2006) .................................................................................25

*Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479-GMN-DJA,
   2020 WL 2748309 (D. Nev. May 27, 2020)................................................................23

*Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*,
   53 F. Supp. 3d 882 (E.D. La. 2014)...........................................................................22

*Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*,
   Nos. 13–3935, 2014 WL 6638793 (E.D. La. Nov. 21, 2014)....................................31

*Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ...............................................................................24, 27

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) .....................................................................................32

*Freidus v. ING Groep N.V.*,
   736 F. Supp. 2d 816 (S.D.N.Y. 2010),
   *aff'd in part, vacated in part on other grounds,* 60 F. App'x 59 (2d Cir. 2015) ....................22

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017).......................................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................22

*Gamboa v. Citizens, Inc.*, No. A-17-CV-241-RP,
   2018 WL 2107205 (W.D. Tex. May 7, 2018) ............................................................14

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) .....................................................................................39

*Hall v. Johnson & Johnson*, No. 18-1833 (FLW),
   2019 WL 7207491 (D.N.J. Dec. 27, 2019).................................................................20

*Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978,
   2017 WL 6379334 .....................................................................................................28

*Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978,
   2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) .........................................21, 22, 28, 31

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)....................................................................................................39

*Hess v. Am. Physicans Capital, Inc.*,
   No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)...............................22

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...............................................................................20, 23

*Ho v. Flotek Indus., Inc.*,
    248 F. Supp. 3d 847 (S.D. Tex. 2017) ....................................................................14

*In re Anadarko Petroleum Corp. Class Action Litig.*,
    957 F. Supp. 2d 806 (S.D. Tex. 2013) ...................................................................23

*In re ArthroCare Corp. Sec. Litig.*,
    726 F. Supp. 2d 696 (W.D. Tex. 2010)...................................................................35

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA)*
    *Litig.*,
    No. 09 Civ.. 5411 (PKC), 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012) ...............18

*In re Bayer AG Sec. Litig.*,
    No. 03 Civ.1546 WHP, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004) ..................20

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................26

*In re BP p.l.c. Sec. Litig.*,
    843 F. Supp. 2d 712 (S.D. Tex. 2012) ...............................................................23, 27

*In re BP p.l.c. Sec. Litig.*,
    922 F. Supp. 2d 600 (S.D. Tex. 2013) ...................................................................23

*In re BP p.l.c. Sec. Litig.*,
    No. 4:12-cv-01256, 2017 WL 7037706 (S.D. Tex. June 30, 2017).........................23

*In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*,
    830 F. Supp. 361 (S.D. Tex. 1993) .........................................................................18

*In re Centerline Holdings Co. Sec. Litig.*,
    613 F. Supp. 2d 394 (S.D.N.Y. 2009)......................................................................14

*In re Cobalt Int'l Energy, Inc.*,
    No. H-14-3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016).................................21

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................34

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ................................................................................26

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ...............................................................16, 17

*In re EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016).....................................................................34

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
  No. 14 Civ.. 0950 (LAK) (AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ....................20

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ....................................................................................33

*In re Fleming Cos. Sec. & Derivative Litig.*,
  No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004)....................28, 31

*In re Flowers Foods, Inc. Sec. Litig.*,
  No. 7:16-CV-222 (WLS), 2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)...............................20

*In re FoxHollow Techs., Inc., Sec. Litig.*,
  No. C 06-4595 PJH, 2008 WL 2220600 (N.D. Cal. May 27, 2008) .......................................23

*In re GeoPharma, Inc. Sec. Litig.*,
  411 F. Supp. 2d 434 (S.D.N.Y. 2006)....................................................................................14

*In re HD Supply Holdings, Inc. Sec. Litig.*,
  341 F. Supp. 3d 1342 (N.D. Ga. 2018) ..................................................................................14

*In re Henry Schein, Inc. Sec. Litig.*,
  No. 18-CV-01428 (MKB), 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019).............................40

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998).................................................................................................23

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) ..................................................................................14

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd,* 616 F. App'x 442 (2d Cir. 2015)..................19, 33

*In re Marsh & McLennan Cos. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................................18

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................................26

*In re Odyssey Healthcare, Inc. Sec. Litig.*,
  424 F. Supp. 2d 880 (N.D. Tex. 2005) ..................................................................................31

*In re Portal Software, Inc. Sec. Litig.*,
  No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)...................................27

*In re Party City Sec. Litig.*,
  147 F. Supp. 2d 282 (D.N.J. 2001) ......................................................................................26

*In re Questcor Sec. Litig.*,
No. CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013)...................................26

*In re Quintel Entm't Inc. Sec. Litig.*,
72 F. Supp. 2d 283 (S.D.N.Y. 1999)...................................................................................26

*In re Res. Am. Sec. Litig.*,
No. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) ......................................................27

*In re SeaChange Int'l, Inc.*,
No. Civ.A. 02-12116-DPW, 2004 WL 240317 (D. Mass. Feb. 6, 2004) ...............................22

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................................................37

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014)........................................................................................27

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)......................................................................................................25

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................................................................................26

*In re Time Warner, Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)..........................................................................................................27

*In re Toronto-Dominion Bank Sec. Litig.*,
No. 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018)........................................26

*In re UBS AG Sec. Litig.*,
No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...............................23

*In re Urban Outfitters, Inc., Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................................................................................35

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ........................................................................................29, 34, 35

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2008).................................................................................................33, 35

*Iron Workers Benefit & Pension Fund - Iron Workers Dist. Council Phila. &
Vicinity v. Anadarko Petroleum Corp.*,
788 F. App'x 268 (5th Cir. 2019) .......................................................................................23, 34

*Irvin v. S. Snow Mfg., Inc.*,
517 F. App'x 229 (5th Cir. 2013) .............................................................................................27

*Kakkar v. Bellicum Pharm., Inc.*,
    No. 4:18-CV-338, 2020 WL 2845279 (S.D. Tex. May 29, 2020)......................................31, 36

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................................13

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009) ...............................................................................................32

*Kurtzman v. Compaq Computer Corp.*,
    No. CIV.A.H-99-1011, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)................................22

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ...............................................................................................25

*Local No. 38 Int'l Bhd.. of Elec. Workers Pension Fund v Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)..................................................................................31

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...............................13, 17, 20, 21, 22, 23, 24, 32, 33, 38, 39, 40

*Mandalevy v. Bofi Holding, Inc.*,
    No. 17cv667-GPC-KSC, 2018 WL 6436723 (S.D. Cal. Dec. 7, 2018)...................................20

*Marcus v. J.C. Penney Co.*
    No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)................22, 31

*Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse Inc.*,
    No. H–09–3265, 2011 WL 3059229 (S.D. Tex. July 22, 2011)............................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...............................................................................................................24

*MicroCapital Fund LP v. Conn's Inc.*,
    No. 4:18-CV-1020, 2019 WL 3451153 ....................................................................23, 26, 31

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................................21

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ...............................................................................................18

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.
    Ret. Ass'n*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30,
    2016) ...................................................................................................................................26

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
    898 F.3d 461 (5th Cir. 2018) ...............................................................................................40

*N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) ...............................................................28, 39

*Naglich v. Applied Optoelectronics*,
  436 F. Supp. 3d 954 (S.D. Tex. 2020) ...............................................................39, 40

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001) ....................................................................................24

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) .......................................................................31, 35, 36

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018).....................................................................33

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................28

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
  50 F. Supp. 3d 1328 (C.D. Cal. 2014) .....................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...................................................................................................23

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ....................................................................................34

*Panter v. Marshall Field & Co.*,
  646 F.2d 271 (7th Cir. 1981) ....................................................................................23

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)......................................................................................18

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. Dec. 23, 2015) ......................................................31

*Pensions & Death Benefits v. CSK Auto Corp.*,
  525 F. Supp. 2d 1116 (D. Ariz. 2007) .....................................................................34

*Plaisance v. Schiller*,
  No. CV H-17-3741, 2019 WL 1205628 (S.D. Tex. Mar. 14, 2019).......................40

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.
  Allscripts-Misys Healthcare Sols., Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) .......................................................................18

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
  *Arbitron, Inc.*,
    278 F.R.D. 335 (S.D.N.Y. 2011) ........................................................................28

*Plymouth Cty. Ret. Sys. v. Patterson Cos.*,
  No. 18-cv-871, 2019 WL 3336119 (D. Minn. July 25, 2019) .................................20

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
  777 F. App'x 726 (5th Cir. 2019) .......................................................................23

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v.*
  *Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ................................................................37, 38, 39, 40

*R2 Invs. LDC v. Phillips*,
  401 F.3d 638 (5th Cir. 2005) ..............................................................................24

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013).................................................................................27

*Ramirez v. Exxon Mobil Corp.*,
  334 F. Supp. 3d 832 (N.D. Tex. 2018) .......................................................22, 28, 35

*Ranieri v. AdvoCare Int'l, L.P.*,
  336 F. Supp. 3d 701 (N.D. Tex. 2018) .................................................................27

*Richman v. Goldman Sachs Grp., Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012).................................................................20

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ..............................................................................31

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*,
  No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592 (M.D. Fla. Mar. 30, 2009) ........................32

*Rougier v. Applied Optoelectronics, Inc*,
  No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) ......................................35

*Rubinstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) ............................................................................20, 21

*RYH Props., LLC v. West*,
  No. 5:08-CV-172 DF, 2009 WL 10676645 (E.D. Tex. Aug. 3, 2009).................................21

*S. Cherry St. LLC v. Hennessee Grp.*,
  LLC, 573 F.3d 98 (2d Cir. 2009)........................................................................24

*Sanders v. AVEO Pharm., Inc.*,
No. CIV.A. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) ...........................14

*SEC v. Life Partners Holdings, Inc.*,
41 F. Supp. 3d 550 (W.D. Tex. 2013)...................................................................................26

*Shemian v. Research In Motion Ltd.*,
No. 11 Civ. 4068 (RJS), 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ................................23

*Singh v. 21Vianet Grp., Inc.*,
No. 2:14-cv-00894-JRG-RSP, 2017 WL 4322483 (E.D. Tex. Sept. 13, 2017).................28, 35

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)...................................................................................................23

*Smallen v. W. Union Co.*,
No. 17-cv-00474-KLM, 2019 WL 1382823 (D. Colo. Mar. 27, 2019)..................................23

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................................................................................24, 27, 32

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .........................................................................21, 24, 33, 39, 40

*Stephens v. Uranium Energy Corp.*,
No. H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016) .............................................36

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)...................................................................................18

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)..................................................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................13, 24, 32, 33, 34, 36, 37

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
325 F. Supp. 3d 728 (N.D. Tex. 2018) .................................................................................34

*U.S. v. Erickson*,
601 F.2d 296 (7th Cir. 1979) ...............................................................................................37

*U.S. v. Jackson*,
426 F.3d 301 (5th Cir. 2005) ...............................................................................................27

*Van Dongen v. CNinsure, Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013)..............................................................................27, 28

*Walker v. Rent-A-Ctr.*,
No. 5:02-CV-3-DF, 2005 WL 8161388 (E.D. Tex. July 25, 2005)....................................18, 19

*Waterford Twp. Gen. Emps.' Ret. Sys. v. BankUnited Fin. Corp.*,
No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) ........................................23

*Wieland v. Stone Energy Corp.*,
No. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007)............................................18, 29

*Wilbush v. Ambac Fin. Grp., Inc.*,
271 F. Supp. 3d 473 (S.D.N.Y. 2017)....................................................................................22

*Wu Winfred Huang v. EZCorp, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017)..................................................................................34

*Zagami v. Cellceutix Corp.*,
No. 15 CIV. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016)..................................18

## Statutes

15 U.S.C. §78u-4(b)(1)(B)......................................................................................................13

15 U.S.C. §78u-4(b)(2)(A)......................................................................................................32

15 U.S.C. §78u-4(b)(4) ...........................................................................................................37

## Rules

Fed. R. Civ. P. 8....................................................................................................................37

Fed. R. Civ. P. 9(b) ...............................................................................................................31

Fed. R. Civ. P. 12(b)(6)..........................................................................................................39

SEC Rule 10b–5.....................................................................................................................20

Co-Lead Plaintiffs, Phillip R. Crutchfield and Samir Ali Cherif Benouis ("Plaintiffs") respectfully submit this Opposition to Defendants'[1] Motion to Dismiss (Dkt. No. 38) ("MTD") their Amended Class Action Complaint (Dkt. No. 37) ("CAC"). For the reasons below, Plaintiffs respectfully request that Defendants' Motion be denied in full.

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

This is a securities class action alleging violations of the Securities Exchange Act of 1934 ("Exchange Act") against Match, its CEO, and its CFO. Match operates several dating websites and derives revenue from payments by a portion of its members – those it can convert from a free or trial membership to a premium or paid membership. To gauge its success, Match employs metrics that it reports to investors, including paid member count ("PMC"), average revenue per use ("ARPU"), and the conversion rate from unpaid to paid memberships, in addition to traditional metrics like revenues and earnings. Throughout the Class Period (November 6, 2018 to January 31, 2020), Defendants misrepresented Match as having a solid, growing website user base, adequate internal controls, and strong reported results.

Unknown to investors, however, Match's websites suffered from rampant levels of fake profiles, scammers, Internet "bots," sex offenders, and other fraudulent and dangerous users. These nefarious actors sought to extract money or things of value from Match's legitimate customers. Most of Match's brands failed to screen for sex offenders and other dangerous users. Former employees ("CWs") described these negative undisclosed facts, including a 15% to 20% rate of fraudulent accounts on Match's websites for years. This widely-known problem, was a frequent topic at high-level and company-wide meetings and was not a secret to Defendant Ginsberg, Defendant Swidler, and other Match executives, who closely tracked financial and "red flag" metrics showing data about illegitimate accounts that were detailed in monthly reports they received at monthly forecast meetings and that was prominently displayed on the highly-visible wall of screens at Match headquarters, where Ginsberg's office was located. CWs also stated that

---

[1]     Defendants are Match Group ("Match Group" or "Match"), Chief Executive Officer ("CEO") Amanda W. Ginsberg ("Ginsberg"), and Chief Financial Officer ("CFO") Gary Swidler ("Swidler").

Match simply assumed the existence of such a high number of fraudulent accounts, and failed to adjust Company forecasts to exclude such accounts.

Investors were also unaware of the extent to which Match understaffed and impeded its own anti-fraud efforts.  The CWs stated that small teams of just eight people were tasked with manually and quickly scouring millions of potentially fraudulent accounts, in high volume and at high speed.  These measures were further undermined by Match's widespread anti-user conduct, including aggressively marketing all messages and "likes" by fraudulent accounts to entice legitimate users to upgrade to paid subscriptions, hiding terms, employing stringent cancellation and refund policies, failing to protect legitimate users and employees from threats.  The CWs also described the Company's failure to implement its touted anti-fraud measures, and the retaliation the Company imposed when employees took measures to protect consumers from fraudsters and dangerous users.

Also undisclosed to investors were several investigations into Match's business practices, including, that in March 2017, the Federal Trade Commission ("FTC") started an investigation into Match.com's fraudulent business practices, including Match's capitalization on the existence of illegitimate accounts through its deceptive marketing practices and anti-user conduct – the same conduct about which numerous CWs allege first-hand accounts in the Complaint – and that in November 2018, the FTC proposed a $60 million consent judgment.  Defendants did not disclose this material information to investors until February 28, 2019, *nearly 2 years later,* while the fraud continued.  And, just weeks before they finally decided to say something and the truth would start to be revealed, Defendants capitalized on the fraud by announcing an offering of $300 million, and both Ginsberg and Swidler sold exercised options and stock units for millions in ill-gotten gains from prices inflated by the alleged fraud.  The FTC eventually filed a complaint against Match confirming the CWs' allegations that Match capitalized on the existence of illegitimate accounts through deceptive marketing practices and that Match purposefully made it difficult for users to cancel paid memberships.

The Company ultimately revealed the truth through a series of partial disclosures that: (1) the FTC had filed a complaint against Match; (2) Match's legal costs were soaring; (3) an investigative report revealed that Match's websites failed to screen for sex offenders; and (4) a Congressional investigation was launched into the legitimacy and legality of Match's user base. As a result of Defendants' misrepresentations, class members have suffered significant damages.

Contrary to Defendants' Motion to Dismiss ("MTD"), Plaintiffs have adequately alleged falsity, scienter, and loss causation under the Exchange Act. First, Plaintiffs have adequately alleged falsity by specifying the statements alleged to have been misleading and the reasons why such statements were misleading. Second, Plaintiffs have adequately alleged scienter based upon, among other things: (1) CW accounts demonstrating that Defendants had access to information that contradicted their representations; (2) insider sales totaling more than $35 million and the acquisition of more than 100,000 shares at no cost; (3) Match's offering, in which the Company sought $300 million in funds; (4) suspicious resignations of key Company personnel; (5) Defendants' false certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"); and (6) the fact that the issues alleged involve Match's core operations. Finally, Plaintiffs have adequately alleged loss causation by providing Defendants with an indication of the loss and the causal connection that Plaintiffs have in mind. As a result, the Court should deny Defendants' MTD.

## II.    STATEMENT OF THE ALLEGED FACTS

### A.    Match Is A Metrics-Driven Online Dating Company

Match runs dating websites like Match.com., Tinder, and PlentyofFish, with a "freemium" model offering basic features after a simple registration and enhanced features if users upgrade to paid/premium memberships, from which it derives most revenues. ¶¶27, 31-34, 36, 194.[2] Conversion and retention of free members to paying members was its main strategic goal. *Id.*

Defendants closely tracked metrics like total registered members, conversion rate from unpaid to paid memberships, paid member count ("PMC"), and average revenue per user

---

[2]    Unless otherwise indicated, all emphasis is added, all internal citations and quotations are omitted, and all paragraph ("¶") references are to Plaintiffs' Amended Class Action Complaint (Dkt. No. 37) ("CAC").

("ARPU"). ¶35. They alternated focus between PMC and ARPU, which decreased if Match spent more money on security or safety. ¶¶19, 46, 48. They also tracked "red flag" metrics, many in real-time, like: (1) the number of fraudulent member accounts; (2) their percentage of total memberships; (3) whether those numbers were stable; (4) the rates at which such accounts were removed; and (5) unusual spikes in registrations or site activity that signaled larger-scale website attacks from "bots." ¶¶35-36. Such metrics were detailed in reports distributed and presented by CW1 (Senior Manager of Financial Planning and Analysis at Match), CW2 (Senior Finance Manager at Match.com), and CW7 (Tinder's Director of Finance), at monthly forecast meetings attended by CEO Ginsberg and CFO Swidler. ¶¶19, 46, 48. These reports included fraudulent accounts, without downward adjustments, that Match considered as "business as usual." ¶¶45, 54.

### B.    Match's Revenue Growth Was Driven By Misconduct on its Websites

### 1.    Rampant Fraudulent and Risky Accounts on Match Websites

Match's websites had rampant fraudulent and illegitimate accounts that inflated Match's user counts and revenues (when such bad actors paid for upgraded access), posed reputational and legal risks, and created *bona fide* dangers for legitimate members. CW5 (Senior Fraud Investigator at Match.com) said romance scammers tried to get members' contact in an average of 15 hours, but some were "slow burners," who communicated with members long-term before extorting money. ¶38. According to CW7, some fraudsters upgraded to paid accounts to access enhanced features that aided fraud, thereby impacting reported revenues and PMC. ¶¶3, 47. CW6 (Senior Security Engineer at Match.com) said "bots" (Internet-based robots that perform automated jobs or use malware to gain control of a computer) created fraudulent accounts and broke into other user accounts. ¶¶55-56. Match.com's registered users also included *unscreened* felons (¶60) and at least *hundreds* of sex offenders (¶59). CW11, who worked in Tinder's Trust and Safety Division, saw *dozens* of sex-offender complaints each year from users. ¶¶38, 55, 59-61. As CW3 stated, "romance scams and fraud accounts are not whisper words around Match." ¶39. Indeed, according to CW2's analysis, *15%* of all Match.com memberships were fraudulent consistently throughout CW2's entire 3-year tenure. ¶44. CW1 said CW2 should be trusted to know that

number because CW2 analyzed Match.com financials and spent ~10 days each month preparing detailed forecast reports. *Id.* Tinder's Director of Analytics told CW7 that roughly *20%* of Tinder accounts were bots and/or fraudulent. ¶¶25, 45.

### 2.    Defendants Failed to Adequately Address These Problems

Despite *millions* of fraudulent or dangerous accounts (¶4), Defendants did not sufficiently pre-screen such accounts, remove those detected on Match websites, or ensure that such accounts did not harm legitimate members or adversely impact Match's reported metrics or reputation. ¶40. Match.com's "flagging" system failed to screen or red flag *any*: (a) non-paying accounts (the majority of user accounts); (b) paying accounts that only tripped *one* automated trigger (*e.g.*, paying with stolen credit cards); or (c) paying accounts that tripped multiple triggers but got an automated fraud "probability" score too low for review / removal. ¶¶22, 40-42. CW4 (Match.com Senior Product Manager) said only subscribing accounts were screened for fraud. ¶41.

CW5, corroborated by CW3 (Match.com Director of Training and Quality Assurance) and CW4, said the overworked Fraud Department, whose eight members' work was "24/7" and "never-ending," had to review 1,200+ accounts per day – 150 every hour for an eight-hour shift – that the system flagged. ¶¶22, 40, 42. Facing intense pressure to rapidly review flagged accounts, CW5 spent just five to 15 seconds per account and one minute on harder-to-resolve accounts, admitting it was easier to just let flagged profiles remain rather than remove them erroneously. ¶¶41, 44, 53. During a seven-year tenure, CW5 may have deleted 1.7 million accounts, roughly 30% to 40% of those CW5 reviewed. *Id.* CW5 said the Fraud Department would have benefitted from more workers, but requests for help were met with promises of enhanced security measures to make it tougher to register, which never materialized due to cost concerns. ¶¶4, 53.

Despite screening, there was still a high volume of sex offenders on Match.com. ¶58. CW8 (Manager of Community Operations at Match.com) was one of just four people reviewing a queue of profiles deemed potential offenders. ¶59. CW9 (an Escalation Specialist) said just one person at Match.com had a reactive role in investigating complaints of sex offenders (¶58), and Match.com did not pre-screen sex offenders to prevent them from registering. ¶59. As a result,

*hundreds* of sex offenders were retroactively removed each year from Match.com, at the rate of one a day.  ¶59.  CW11 said Tinder did not screen for sex offenders *at all*.  ¶¶61-63.  CW11 said that any sex offenders removed from Tinder were only due to sexually assaulted or threatened users taking the time to navigate a complex process to make a report that fortuitously made it to the Trust and Safety Division.  *Id.*  CW10 (Senior Product Designer at Match.com) said there were felons on Match.com despite conversations about whether to screen for them.  ¶60.

CW1 said that fraud was accepted on Match's websites if there was no adverse variance in key metrics.  ¶¶54, 65.  CW2 corroborated this fact, stating that Match considered fraudulent accounts as "business as usual."  ¶54.  CW1 stated that Tinder had the most resources to identify and remove fraudulent accounts, but Match's focus was on Tinder's "rocket ship trajectory" growth and not on combatting fraud and removing sex offenders.  ¶¶54, 65.  CW1 said Match.com and older brands were just breaking even and operated with half the staff dedicated to fraud.  ¶54.

### 3.  Marketing Was Based on Fraudulent and Illegitimate Accounts

Match used communications from illegitimate accounts in advertisements to non-paying members to entice them to upgrade to paid or premium memberships.  ¶¶66-68.  CW2 said that marketing emails from Match.com to non-subscribers were "aggressive," that Match.com "would promote all messages, even if they were fraudulent," and that a percentage of messages marketed to non-subscribers were fraudulent.  ¶66.  CW2 said if a "bot" or fraudulent account liked a non-paying member's profile, Match.com instantaneously notified the member of that activity.  ¶68.  CW3 said that non-paying members received emails on all account activity to lure them to upgrade to paid memberships, whereas subscribers did not get emails on every activity.  *Id.*  CW2 said it was "definitely over 30%" of members who subscribed after being notified of a message that could not be read unless they upgraded.  ¶66.  After doing so, many new subscribers complained that the people who "liked" them never existed or had been removed (¶67), which CW4 explained as an account scoring low enough to be flagged and pending review, but not so much as to reach Match's high threshold for automatic deletion.  ¶68.

### 4.    Deceptive Billing Sustained An Improperly Inflated User Base

The CWs also described Match's billing gimmicks designed to prevent misled customers from easily cancelling their accounts, thus maintaining improperly inflated revenues from an artificially-elevated user base.  CW3 and CW9 described the hidden, stringent guidelines for a six-month guarantee, which promised an extra six months free if a paid six-month membership failed to generate a connection.  ¶¶71-72.  In escalation meetings, CW9 asked to give refunds or membership extensions to members, because "people are calling every day" to complain.  *Id.*

CW3 said fake profiles were the most common customer complaint, followed by billing complaints.  *Id.*  CW2, corroborated by CW9, said Match.com refused to refund members due to encounters with fraudulent accounts.  ¶78.  CW2, CW8, CW9 and CW10 all described the purposefully cumbersome and lengthy process to cancel membership, with customers complaining that they cancelled but were still getting billed.  ¶¶74, 77.  CW2 said cancellation policies became more stringent around quarterly and year-end reports, when Match wanted to show increased PMC and restricted membership refunds for any reason.  ¶75.

Match employees faced retaliation if they tried to assist.  Even if customers feared for their safety, CW9 was told to avoid offering refunds and to not suggest hiding profiles because Match wanted as many users as possible featured on its sites.  ¶¶79, 86.  When CW9 did so, Match cited it (and refunding customers duped into paying for recurring membership) as bases for firing CW9.  *Id.*  Match also terminated CW10 in retaliation for disputes over deceptive cancellation and refund policies that hid terms and conditions, deceived customers with messaging, made cancellations difficult, and grew and maintained the user base at all costs.  ¶¶81-82, 87.  Match's lack of safety concerns extended to its employees.  ¶80.  CW1 said that at least six times, Match received threats from angry callers prompting it to bring in armed security guards to HQ without explanation.  *Id.*

### C.    Defendants' Material Misrepresentations and Omissions

The CAC organizes Defendants' misrepresentations and omissions into four categories (¶88), with statement-specific reasons why each was false or misleading.  ¶¶89-137.

### 1.    The Membership Integrity Fraud (¶¶89-129)

Defendants misrepresented the integrity and quality of Match's membership, portraying a solid, growing website user base, which belied CW accounts of widespread fraud, by stating, *e.g.*, "*we had another terrific quarter in Q3 with accelerated growth on top and bottom line, continued excellent performance at Tinder and improvement in non-Tinder subscriber trends*" (¶122); "*there are early signs that indicate our enhancements to the customer experience are leading to improved organic registrations due to a stronger word-of-mouth marketing*" (¶93); "*Tinder did drive a ton of growth this quarter. And we hit actually a big milestone, at the end of the quarter we had five million subscribers*" (¶103); "[w]e have made a lot of progress over the last couple of quarters, *satisfactory rates are up, conversions up*" (¶113); "*[o]ur growth accelerated and our momentum enabled us to increase our full-year outlook while investing in the future*" (¶115); and "*[i]f there's bad behavior on one app,*" then "*we can identify that user, [and] we'll kick him off all the apps*" (¶128); "*International subscriber growth was particularly strong, driven primarily by Tinder and Pairs…*" (¶124).

### 2.    The Reported Results Fraud (¶¶130-136)

In violation of Regulation S-K, Item 303 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2), in quarterly and annual reports signed by Ginsberg and Swidler, Match reported revenues, earnings, PMC, ARPU, conversions of unpaid to paid memberships, and positive or insufficiently negative reports of Match's underlying business on its websites, without disclosing the underlying, negative trend that the results were generated through the inclusion of fraudulent accounts and that Match faced material undisclosed risks due to this underlying conduct, as detailed by the CWs, and due to the FTC investigation.  ¶¶130-136.

### 3.    The Internal Controls Fraud (¶¶137-143)

Ginsberg and Swidler also made misrepresentations in their signed certifications under the Sarbanes-Oxley Act of 2002 ("SOX") that accompanied Match's Forms 10-K and 10-Q:

> "*Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*";

8

> *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."*

¶¶138-142.

### 4. The FTC Investigation Fraud (¶¶144-158)

Defendants also misrepresented the merits of the FTC's investigation. Defendants said repeatedly "Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and will defend vigorously against them." ¶¶145, 149, 151, 155, 157. They misrepresented, *inter alia*, that the FTC made "completely meritless allegations supported by consciously misleading figures," stating "[w]e catch and neutralize 85% of potentially improper accounts in the first four hours, typically before they are even active on the site, and 96% of improper accounts within a day;" and "[w]e've developed industry leading tools and AI that block 96% of bots and fake accounts from our site within a day and are relentless in our pursuit to rid our site of these malicious accounts." ¶153.

### D. Defendants' Scienter

### 1. Defendants' Knowledge or Deliberate Recklessness

The CAC alleges specific details of Defendants' knowledge or deliberate recklessness regarding their public statements to investors, thereby evidencing their scienter.

### a. Meetings, Conversations, And First-Hand Accounts

CW1 stated that policies, including those for fraud detection, were decided upon by the Board of Directors, with CEO Ginsberg, CFO Swidler, and "Shar" Dubey (Match's then-President and current CEO) weighing in, and each website brand enacted the policies. ¶50. The CWs also described meetings and first-hand accounts regarding Match's widely-known struggle with fraud and Ginsberg's and Swidler's knowledge thereof.

In monthly forecast meetings *attended by Ginsberg, Swidler*, and other executives, CW2 discussed with Swidler how to increase PMC and set refunds to retain members. ¶48. CW1 said PlentyofFish's problem with fraudulent accounts, the largest internally-reported among Match's

brands, was a constant topic at these meetings, and that PlentyofFish's adjusting its PMC and ARPU numbers down to account for fraud frustrated Swidler and Ginsberg. ¶49. CW3 called Match.com's fraudulent accounts "a widely known company struggle" (¶39) and said "everyone in the building was aware of those issues – it was not a secret." ¶50. CW4 corroborated, adding that fraudulent accounts were a frequent topic at twice-weekly operations meetings (¶¶50, 180), and Ginsberg spoke at company-wide meetings about fraudulent accounts on Match.com (¶39). CW1 and CW2 said Ginsberg knew of consistent customer issues and had company-wide discussions about user experience. ¶¶71-84.

CW1 added that Ginsberg and Swidler knew of sex offenders and fraudsters on Tinder, but focused on its growth, positive metrics, and "awesome numbers." ¶¶64-65. CW1 said Dubey worked closely with Ginsberg (daily) and Swidler (several times a week), was very hands-on with Tinder's operations (at one point spending three to four days per week for a period of six months at Tinder's HQ), and thus knew of the issues. *Id.* CW1 said during that period, Dubey regularly called in from Tinder's HQ to meetings at Match's HQ, before and during which she spoke with CW1, and would have made Ginsberg, Swidler, and executives aware of such issues. ¶64.

### b.     Internal Reports and Closely Tracked Metrics

Ginsberg, Swidler, and other Match executives received financial reports that intentionally did not adjust Match forecasts to identify, isolate, and reduce fraudulent activity on Match websites, and that, instead, included revenues and positive metrics derived from fraudsters who paid for premium memberships to access enhanced features. For example, CW7 conducted analyses and prepared financial reports for Ginsberg and Swidler detailing Tinder's key metrics, including PMC, but ***did not*** adjust downward to account for fraud. ¶¶25, 45. ***At the direction of Ginsberg and Swidler***, CW1 consolidated reports summarizing Match website brands' performance and forecasts that did not adjust for fraud, like those prepared by CW7, into a 30-minute presentation and report for the monthly forecast meeting, ***attended by Ginsberg, Swidler*** and other executives. ¶¶45-46. CW1's monthly reports contained financials and metrics, both on a consolidated basis and divided by website brand, such as PMC, ARPU, expenses, revenue,

10

EBIDTA, a forecast, and a budget. ¶46. Supplementary materials gave Ginsberg and Swidler "granular, day-to-day" metrics, like the total number of users and "net adds," all reflecting fraud accounts and revenues derived therefrom without downward adjustments. ¶¶3, 46. CW2 corroborated that Ginsberg and Swidler received these financial reports, including year-over-year numbers, at monthly forecast meetings, and that Ginsberg knew of efforts to boost numbers before earnings reports and received daily reports on where the numbers stood. ¶48.

Defendants also knew of, or recklessly disregarded, red flags beyond those set forth in these reports. ¶¶176-180. For instance, CW1, CW6, and CW9 described a highly-visible wall of screens (pictured in ¶180) in plain sight on the main floor of Match's HQ, where Ginsberg's office was located, which displayed real-time "red flag" metrics like website usage levels, traffic patterns, and unusual traffic spikes indicative of "bots" or fraudsters. ¶¶35, 51-52, 57, 180. CW3 and CW8 added that any major customer issue (fake profiles and billing being the two most common (¶73)), triggered internal reports and daily breakdowns available to Defendants, and that customers would contact Ginsberg, Swidler, and other executives directly with complaints. ¶83.

### 2. Defendants were Motivated to Commit Fraud

The CAC pleads motive and opportunity supporting a strong scienter inference based on highly-suspicious insider trading activity by Ginsberg and Swidler (¶182), which yielded them a combined *$35.5 million* in ill-gotten gains, as well as *100,000+ more shares acquired at no cost* during the alleged fraud. ¶¶182-183. Their transactions were suspicious in amount compared to their salaries and suspicious in timing vis-à-vis the alleged misstatements, partial corrective disclosures, FTC investigation developments, and resignations by insiders including Ginsberg (who moved to an "advisory role" with continued stock option vesting). *See* ¶¶184-185, 188-192; Appendix 1. It also alleges that Match sought to raise hundreds of millions of dollars through a private offering during the fraud, further evidencing scienter. ¶193.

### 3. Other Facts Evidencing Defendants' Scienter

The scienter inference is buttressed by the fact that Defendants: (1) failed to disclose an

11

SEC investigation into financial fraud/issuer disclosure from May 16, 2016 - January 3, 2017 (¶¶186-187); (2) concealed until February 2019 the FTC's investigation, when the FTC had requested documents in March 2017 and proposed a $60 million consent judgment in November 2018 (¶160); and (3) misrepresented the FTC investigation thereafter (¶¶144-158).  Indeed, Ginsberg and Sam Yagan (Match's former CEO), the only two Board members at Match during the period of underlying misconduct in the FTC complaint, suspiciously resigned during the fraud, with Yagan resigning *one day* before the FTC announced its lawsuit and Ginsberg resigning the *same day* Congress announced its investigation.  ¶¶172, 188-192.  Scienter is also supported by the core operations doctrine (¶¶194-195); Defendants signing, being quoted in, and SOX certifying Match's SEC filings (¶¶196-197); and the fraud's violating Match's Code of Conduct (¶¶198-203).

### E.    The Truth About Defendants' Fraud Begins to Emerge

The CAC pleads that artificial inflation in Match's stock price was removed by a series of partial corrective disclosures on February 28, 2019, August 9, 2019, August 12, 2019, September 25, 2019, November 6, 2019, December 2, 2019, and January 31, 2020, which the Court must view holistically, causing Plaintiffs and the Class to suffer damages.  ¶¶159-175.

After disclosing on February 28, 2019, that the FTC had begun an investigation in March 2017 and proposed a $60 million resolution in November 2018 (¶160), Match falsely and misleadingly refuted and minimized its validity and muted stock price impacts. ¶148.  The February 28, 2019 filing called the FTC's legal challenges meritless and claimed Match would "vigorously defend" itself, a repeated mantra.  ¶¶149, 151, 153, 155, 157, 160.  These actions muted the effects of corrective disclosures, not only on February 28, 2019, but also on: (1) August 9, 2019, when Match announced that the FTC asserted claims and the DOJ opened an investigation (¶162); (2) September 25, 2019, when the FTC announced it sued Match.com for deceptive marketing and cancellation practices (¶165); and (3) November 6, 2019, when Match disclosed its revenues were impacted by a large rise in legal costs due to the FTC and DOJ investigations (¶167). But for these tactics, the stock price declines would have been greater.  ¶¶161, 163-164, 166, 168.

On December 2, 2019, the CJI published findings that Tinder and other Match websites

12

failed to screen for sex offenders, leading to sexual assaults on users, and a Match spokesperson's admission that "[t]here are definitely registered sex offenders on our free products." ¶¶169-170. On January 31, 2020, Congress announced that it sought information from Match about the failure to screen underage users, amidst reports that sex offenders used dating sites. ¶¶172-173. On both disclosures, Match's share price fell. ¶¶171, 174.

## III.   STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts also must "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

## IV.   PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS

To state an Exchange Act claim, a plaintiff must allege: "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Id.* at 238–39.

### A.   Plaintiffs Adequately Allege Falsity

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).[3]

---

[3]     Defendants incorrectly claim that Plaintiffs must allege that Defendants' statements "were so blatantly and inarguably misleading as to be fraudulent." MTD at 3, 11, 19. Not so. Plaintiffs must merely "identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called particularity requirement." *Lormand*, 565 F.3d at 239. Defendants' cases – to which Defendants cite for their scienter analysis, not falsity – do not support their erroneous assertion. (*See* MTD at 11 n.47) (citing *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir.

### 1.     The Membership Integrity Fraud

Defendants misrepresented the integrity and quality of Match's membership and related metrics.  *See* §II.C.1., *supra*.  For instance, on November 6, 2018, Match stated that "[t]otal Revenue grew 29% over the prior year quarter to $444 million, driven by 23% Average Subscriber growth and 6% ARPU growth" and that "[a]verage Subscribers increased to 8.1 million, a 23% increase over the prior year quarter."  ¶90.  Similarly, on November 7, 2018, Defendants also touted Match's top-line growth, subscriber growth, and organic registrations.  ¶¶91-92.  Defendants made similar representations on other dates.  ¶¶95, 99, 105, 107, 109, 111, 120, 124.  Defendants also misrepresented Match's operational condition.  For example, on September 10, 2019, Swidler stated that "if you look at our Tinder, Match, OKCupid, Plenty of Fish brand in Canada . . . you can see that subscriber growth has basically stayed on trend from the Facebook launch of dating back in November of '18 to today."  ¶117.  Swidler added that "we're on track, you know, to do what we thought this year."  ¶118.[4]  On November 6, 2019, Defendants represented that Match had "improvement in non-Tinder subscriber trends."  ¶122.  Additionally, on December 2, 2019, CEO Ginsberg stated that "[i]f there's bad behavior on one app," then "we can identify that user, [and] we'll kick him off all the apps."  ¶¶126-28.  Defendants made similar misrepresentations on other dates.  ¶¶101, 103, 113, 115, 111, 126-28.

Defendants' representations were materially false and misleading for several reasons.  First, there was a significant percentage of fraudulent accounts on Match's website brands.  *See, e.g.*, ¶¶91(a), 94(a), 96(a), 98(a), 100(a), 102(a), 104(a), 106(a), 108(a), 110(a), 112(a), 116(a), 119(a), 121(a), 123(a), 125(a), 129(b).  For instance, CW2 stated that 15% of all Match.com

---

2001); *Gamboa v. Citizens, Inc.*, No. A-17-CV-241-RP, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018); *Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017); *Sanders v. AVEO Pharm., Inc.*, No. CIV.A. 13-11157-DJC, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015); *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 403–04 (S.D.N.Y. 2009); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006)). Defendants also cite cases for the vanilla proposition that courts in this Circuit and District sometimes dismiss securities cases.  MTD at n.1 & 2.  These cases are based upon different facts, and Plaintiffs can similarly string-cite a large volume of cases within the Fifth Circuit and nationwide that have upheld securities claims.

[4]      *See, e.g.*, *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342, 1353-54 (N.D. Ga. 2018) (holding that Defendants' statements that the company was "on track" were actionable); *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 666 (N.D. Tex. 2013) (holding that a statement that "production in the first quarter was proceeding according to plan, when it was not increasing, was an untrue statement of material fact").

14

membership registrations were fraudulent. *Id.* According to CW7, Tinder worked with the assumption that approximately 20% of all accounts and other account activity on Tinder were fraudulent. *Id.* Yet, CW2 and CW1 stated that Match's forecasts and operations reports, aside from those at PlentyofFish, did not adjust to exclude fraudulent accounts. *Id.* Match, moreover, did not provide adequate staffing and resources to remove fraudulent accounts. *Id.* Contrary to Defendants' assertion (MTD at 10, 17), these facts demonstrate the falsity of Ginsberg's statement that "[i]f there's bad behavior on one app," then "we can identify that user, [and] we'll kick him off all the apps." ¶¶126-28.

Second, Defendants' statements were also false and misleading because Match was focused on financial metrics and increasing membership rather than protecting users from fraudulent and dangerous accountholders. *See, e.g.*, ¶¶91(b), 94(b), 96(b), 100(b), 116(b), 119(b), 121(b), 123(b), 125(b), 129(c). For instance, CW1 said that PlentyofFish had the biggest reported problem with fraudulent accounts, and that Match executives – particularly CEO Ginsberg and CFO Swidler – were aware of, and frustrated by, attempts to constantly remove fraud from the website because Match would have to revise its financial numbers downward. *Id.* CW2 said that for older sites, there was an attitude of acceptance of fraud. *Id.*

Third, Defendants' representations were false and misleading because increases in the paid user base of Match's website did not occur organically, but rather because of Match's deceptive marketing practices. *See, e.g.*, ¶¶91(c), 94(c), 96(c), 98(b), 100(c), 102(b), 104(b), 106(b), 108(b), 110(b), 112(b), 114(a), 116(c), 119(c), 121(c), 123(c), 125(c). For instance, Match used communications from fraudulent account holders to generate deceptive advertisements. *Id.* CW2 and CW1 described Match.com's subscription model as trying to get as many people to subscribe as possible and to hope they forgot about the subscription and continued to pay for it. *Id.* Furthermore, once Match.com induced customers into signing up for subscriptions based on marketing fraudulent profiles, Match.com used deceptive guarantees and convoluted billing practices to prevent subscribers from easily cancelling their accounts. *Id.* Additionally, CW2 stated that the cancellation policies became more stringent around quarterly and year-end reports

15

when Match wanted to show more paid members. *Id*; *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 696 (S.D. Tex. 2002) (falsity adequately alleged where defendants' misconduct occurred "at critical junctures, just before quarter-end or year-end"). According to CW1 and CW2, Defendants, particularly Ginsberg, were aware of customers complaining that they could not cancel their memberships. *Id.*

Fourth, Defendants' statements were also false and misleading because Match.com maintained several deceptive practices to induce customers to subscribe and keep them subscribed. *See, e.g.*, ¶¶91(d), 94(d), 96(d), 100(d), 102(c), 112(c), 114(b), 116(d), 119(d), 121(d), 123(d), 125(d). As CW2 stated, Match.com sent non-paying users misleading advertisements that touted communications from people Match.com identified as potentially fraudulent and led users to believe that the communications were from people interested in a dating relationship. *Id*. According to CW3, Match.com guaranteed certain customers a free subscription renewal if they failed to meet someone in order to promote subscriptions, but failed to adequately disclose the requirements of its guarantee. *Id*. CW8 also stated that Match.com misled consumers with a confusing cancellation process that caused consumers to believe they had cancelled their subscriptions when they had not done so. *Id*. Additionally, Match's deceptive practices were the subject of an ongoing FTC investigation that Defendants failed to disclose and misrepresented. *See, e.g.*, ¶¶91(e), 94(e), 96(e), 98(c), 100(e), 102(d)), 104(c)-(d), 106(c)-(d), 108(c), 110(c), 112(d), 114(c), 116(e), 119(e), 121(e), 123(e), 125(e) 129(d).

Finally, Defendants' statements were also false and misleading because Match's website brands, except Match.com, did not screen for sex offenders. *See, e.g.*, ¶¶94(f), 114(d), 123(f), 129(a). For example, CW11 said that it was up to legitimate members to report sex offenders or other dangerous site users. *Id*. CW11 also said that there was no proactive screening for sex offenders, and that sex-offender complaints arose every few weeks. *Id*. Furthermore, the CJI findings later revealed that former Match employees on sites like Tinder and OKCupid received scant training and support for handling users' rape complaints and had to devise their own ad-hoc procedures for addressing such complaints. *Id*. Additionally, CW1 said that Dubey (Match's then-

16

President and current CEO) was hands-on regarding Tinder's operations, and that Dubey had extensive contacts with CEO Ginsberg and CFO Swidler, who would have been aware of red flags such as not screening for sex offenders or other bad actors. *Id*. CW8 also stated that a sex offender was removed from Match.com every day, and CW10 said Match.com did not screen for felons. *Id*. Thus, Defendants "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, No. A-15-CV-374-LY, 2016 WL 6075540, at *3 (W.D. Tex. Sept. 16, 2016).

### 2.     The Reported Results Fraud

Defendants also misrepresented Match's reported results. *See* §II.C.2., *supra*. For instance, in Match's Q3 2018 Form 10-Q, Match stated that "[i]nternational Direct Revenue grew $54.7 million, or 38%, in 2018 versus 2017, primarily driven by 29% growth in Average Subscribers and a 7% increase in ARPU." ¶131. Match also claimed, "North America Direct Revenue grew $46.8 million, or 25%, in 2018 versus 2017, driven by 18% growth in Average Subscribers and 6% growth in ARPU." *Id*. Defendants added that "[i]nternational Direct Revenue grew $188.3 million, or 50%, in 2018 versus 2017, primarily driven by 34% growth in Average Subscribers and a 13% increase in ARPU" and that "North America Direct Revenue grew $126.5 million, or 23%, in 2018 versus 2017, driven by 18% growth in Average Subscribers and 4% growth in ARPU." *Id*. Defendants made similar misrepresentations on other dates. ¶¶132-36.

Plaintiffs adequately allege falsity regarding these misrepresentations. Defendants reported Match's financial results without disclosing that they were generated through the inclusion of widespread accounts, including paid subscriptions, created by scammers, fraudsters, "bots," sex offenders, and other dangerous site users. *See, e.g.*, ¶¶91(b), 94(b), 96(b), 100(b), 116(b), 119(b), 121(b), 123(b), 125(b), 129(c), 136. Defendants also failed to adequately disclose that Match faced material undisclosed risks due to this underlying misconduct. *Id*.[5] These

---

[5]     Defendants repeatedly attempt to characterize Match's reported results as "accurate." MTD at 3-4, 13, 15-16. However, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. Defendants'

17

misstatements also violated Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2). ¶¶130, 136.  Item 303 required Defendants to describe, *inter alia*, "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income," 17 C.F.R. §229.303(a)(3)(i)-(ii), and its interim results to describe, *inter alia*, "any material changes in the registrant's results of operations."  17 C.F.R. §229.303(b)(2); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).  Although the Fifth Circuit has not yet held that Item 303 creates a duty to disclose under the Exchange Act and acknowledged that other circuits are split on the issue (*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 436 (5th Cir. 2019)), district courts within the Fifth Circuit have held that plaintiffs can adequately plead "facts that may support a claim that defendants violated SEC Regulation S-K" by explaining the basis for a complaint's alleged violation of Item 303.  *Walker v. Rent-A-Ctr.*, No. 5:02-CV-3-DF, 2005 WL 8161388, at *13–14 (E.D. Tex. July 25, 2005). Plaintiffs have done so here.  ¶¶130-36.

### 3.    The Internal Controls Fraud

Defendants also signed false SOX certifications.  *See* §II.C.3., *supra*; ¶¶137-143.  SOX certifications are actionable when defendants are severely reckless in signing such certifications. *See, e.g.*, *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 590-99 (W.D. Tex. 2014) (defendants' SOX certifications actionable); *Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2007) ("Plaintiffs have . . . sufficiently alleged that the

---

cases do not address this principle.  MTD at 13-14 n.57; *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 Civ.. 5411 (PKC), 2012 WL 1353523, at *7 (S.D.N.Y. Apr. 12, 2012); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 881 (N.D. Ill. 2011); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361 (S.D. Tex. 1993).  Additionally, *Browning-Ferris* is inapplicable because it was decided before the enactment of the PSLRA, and *Marsh* is inapplicable because it did not involve metrics like those that Defendants misrepresented here, such as PMC, ARPU, and the conversion rate from unpaid to paid memberships.  MTD at 4 n.10, 13 n.57. *Zagami v. Cellceutix Corp.*, No. 15 CIV. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016), is distinguishable (MTD at 16 n.65) because the court held that, unlike here, the information there "was no more accessible to Defendants than it was to investors."  *Id*. at *14.

18

[SOX] certifications . . . contained false and misleading information."). Defendants were severely reckless because: (1) there was a significant, known percentage of fraudulent accounts on Match's websites; (2) Match focused on financial metrics and increasing membership rather than protecting users; (3) increases in paid user base did not occur organically, but rather due to Match's deceptive marketing practices; (4) Match.com maintained deceptive practices to induce customers to subscribe and keep them subscribed; and (5) Match's websites, except Match.com, did not screen for sex offenders. *See, e.g.*, ¶143. Thus, "plaintiffs have adequately explained the reason or reasons why [defendant's] alleged breakdown of internal controls is misleading or fraudulent." *Walker*, 2005 WL 8161388, at *14–15.[6]

### 4.    The FTC Investigation Fraud

Defendants also misrepresented the merits of the FTC's investigation. *See* §II.C.4., *supra*; ¶¶144-158. On February 28, 2019, Match stated that the FTC proposed to resolve its claims for $60 million and specific changes in its business practices. ¶145. Match added, however, that the FTC's claims were "without merit." *Id*. On August 8, 2019, Match said the FTC voted to sue it, but again asserted that the claims were "without merit." ¶151. On September 25, 2019, Match announced that the FTC had "filed a lawsuit against us today making completely meritless allegations supported by consciously misleading figures." ¶153. Defendants' statements were false and misleading because: (1) there was a significant percentage of fraudulent accounts on Match's websites; (2) Match was not focused on protecting users from fraudulent and dangerous accountholders; and (3) Match's websites, except Match.com, did not screen for sex offenders. *See, e.g.*, ¶¶146, 150, 152, 154, 156, 158. Once Defendants chose to speak, "they had a duty to

---

[6]       Defendants cite *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002), *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328 (C.D. Cal. 2014), and *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015), to claim that alleged internal control deficiencies "are consistently held insufficient to demonstrate securities fraud." MTD at 16-17 n.67. *Abrams*, however, was decided **before** the enactment of SOX. In *Oklahoma Firefighters*, 50 F. Supp. 3d at 1356, the court denied one defendant's motion to dismiss "on the ground that [plaintiffs] have failed to allege that he made an actionable misstatement" because SOX certifications can, in fact, constitute false and misleading statements. In *Magnum*, 26 F. Supp. 3d at 294-99, the court based its decision upon facts demonstrating that defendants "sought to rectify weaknesses" that are inapplicable here.

disclose a mix of information that is not misleading." *Lormand*, 565 F.3d at 248-249.[7]  "[W]here

Plaintiff has sufficiently alleged Defendants' knowledge that an aspect of the company was at risk,

the Court cannot conclude that Defendants' subsequent assertions that relevant lawsuits are

without merit are not actionable as a matter of law."  *In re Flowers Foods, Inc. Sec. Litig.*, No.

7:16-CV-222 (WLS), 2018 WL 1558558, at \*8 (M.D. Ga. Mar. 23, 2018); *see also In re Bayer

AG Sec. Litig.*, No. 03 Civ.1546 WHP, 2004 WL 2190357, at \*14 (S.D.N.Y. Sept. 30, 2004) ("this

Court cannot conclude that defendants' assertions concerning the merits of . . . litigation are not

actionable as a matter of law").  Thus, Plaintiffs have adequately alleged falsity.[8]

### 5.    The PSLRA Safe Harbor and Bespeaks Caution Doctrine Do Not Apply

The PSLRA's safe harbor provision and the bespeaks caution doctrine do not insulate

Defendants' misrepresentations.  The "requirement for meaningful cautions calls for substantive

---

[7]    Defendants claim they "had no duty to disclose the FTC investigation before February 28, 2019."  MTD at 12 n.48, 18, n.74.  However, "[a] duty to say anything" imposes "a duty to speak the full truth."  *Lormand*, 565 F.3d at 249.  On March 1, 2018, Defendants stated: (1) "[w]e are subject to a variety of laws and regulations . . . that involve matters that are important to or may otherwise impact our business, including . . . online commerce, advertising, user privacy, . . . protection of minors, consumer protection, sex-trafficking, . . . securities law compliance"; (2)  "[t]hese laws and regulations, ***as well as any associated inquiries or investigations or any other government actions***, may be costly to comply with and may . . . increase our operating costs, require significant management time and attention, and subject us to remedies that may harm our business, including fines or demands or orders that we modify or cease existing business practices"; and (3) "concerns about harms and the use of dating products and social networking platforms for illegal conduct, such as romance scams, financial fraud, and sex-trafficking, ***could produce future*** legislation ***or other governmental action***."  *See* Defendants' Appendix of Exhibits ("App.") at 20-23.  They failed to disclose that ***years previously*** in March 2017, the FTC ***had already begun*** an investigation, and that in November 2018, the FTC was demanding $60 million and business changes to resolve its claims.  *See* ¶145.  Defendants' cases are thus distinguishable.  *See* MTD at 13 n.54 (citing *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 654 (S.D. Tex. 2016); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ.. 0950 (LAK) (AJP), 2015 WL 4931357, at \*20 (S.D.N.Y. Aug. 19, 2015)).  Defendants also cite *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), for the proposition that there is no continuous disclosure requirement (MTD at 10 n.42), but the Fifth Circuit has held otherwise.  *See Rubinstein v. Collins*, 20 F.3d 160, 170 n.41 (5th Cir. 1994) ("defendants have a duty under Rule 10b–5 to correct statements if those statements have become materially misleading in light of subsequent events.").  Defendants' out-of-circuit cases (MTD at 18 n.74) do not suggest otherwise.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (SEC Wells Notice merely indicates desire of enforcement staff to move forward "which it has no power to effectuate"); *Mandalevy v. Bofi Holding, Inc.*, No. 17cv667-GPC-KSC, 2018 WL 6436723, at \*7 (S.D. Cal. Dec. 7, 2018) (same); *Plymouth Cty. Ret. Sys. v. Patterson Cos.*, No. 18-cv-871 (MJD/SER), 2019 WL 3336119, at \*14 (D. Minn. July 25, 2019) (distinguishing Wells Notices from FTC investigation but holding that there were no public statements to which a duty to disclose attached); *see* App. at 194, 196, 296, 299, 598, 600.

[8]    Defendants cite to *Hall v. Johnson & Johnson*, No. 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019), but the court there held that "Plaintiff has not identified any specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits . . . ."  *Id*. at \*19; MTD at 4 n.14.  The same is true for *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743 (S.D.N.Y. 2018) and *Eshelman v. Orthoclear Holdings, Inc.*, No. C 07-1429 JSW, 2009 WL 506864 (N.D. Cal. Feb. 27, 2009); MTD at 4 n.14.  Such is not the case here.

company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Lormand*, 565 F.3d at 244-45. "Defendants bear the burden of demonstrating applicability of the PSLRA's safe harbor" and the bespeaks caution doctrine. *RYH Props., LLC v. West*, No. 5:08-CV-172 DF, 2009 WL 10676645, at \*10 n.3 (E.D. Tex. Aug. 3, 2009).

First, "[s]tatements describing past or present conditions are not forward-looking statements that trigger the PSLRA's safe harbor." *Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978, 2017 WL 6398742, at \*18 (E.D. Tex. Oct. 19, 2017).[9] Also, because a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present" (*Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014)), the safe harbor provision is inapplicable to the present-tense portions of Defendants' mixed statements.[10]

Second, even "somewhat specific" warnings are inadequate when they "do not provide sufficiently meaningful caution about [a] clearly present danger that was materializing." *Lormand*, 565 F.3d at 247. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Rubinstein*, 20 F.3d at 171; *In re Cobalt Int'l Energy, Inc.*, No. H-14-3428, 2016 WL 215476, at \*6 (S.D. Tex. Jan. 19, 2016). Defendants said certain risks "***could***" adversely

---

[9]     *See, e.g.*, ¶¶90, 92, 95, 99, 105, 107, 109, 111, 120, 124, 131-35 (reported results); ¶¶138-42 (internal controls); ¶¶145, 149, 151, 153, 155, 157 (FTC investigation); ¶97 (2018 ***marked*** "the best year in our history for shareholders"); ¶103 ("Tinder ***did drive*** a ton of growth this quarter. And ***we hit*** actually a big milestone, at the end of the quarter ***we had*** five million subscribers."); ¶113 ("***[w]e have made*** a lot of progress over the last couple of quarters, satisfactory rates ***are up***, conversions ***up***, we're feeling really optimistic"); ¶117 ("you ***can see*** that subscriber growth ***has basically stayed*** on trend . . . . You ***don't see*** any interruption or effect on subscriber growth . . . .We ***actually see*** acceleration of Tinder subscriber growth across that period. . . . we ***don't see*** any deceleration of Tinder as a result of Facebook. And, in fact, ***we are very pleased*** with growth that ***we are showing*** on a year per year basis . . . ."); ¶122 ("we ***had*** another terrific quarter in Q3 with accelerated growth on top and bottom line, continued excellent performance at Tinder and improvement in non-Tinder subscriber trends").

[10]    *See, e.g.*, ¶93 ("there are early signs that indicate our enhancements to the customer experience are leading to improved organic registrations due to stronger word-of-mouth marketing. We are optimistic that these organic trends will eventually offset pressure"); ¶101 ("Match and Meetic continue to evolve their product"); ¶115 ("[o]ur growth accelerated and our momentum enabled us to increase our full-year outlook"); ¶118 ("we're on track . . . . to do what we thought this year"); ¶128 ("[i]f there's bad behavior on one app," then "we can identify that user, [and] we'll kick him off all the apps"). *See also Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at \*5 (N.D. Cal. July 26, 2017) ( "[w]e believe we're still on track" is a "statement of present opinion" that "is not forward-looking, and therefore is not covered by the PSLRA safe harbor provision"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 957, 964 (N.D. Cal. 2014) (statements that the company was "on track" are not forward-looking).

21

affect Match's business (App. at 22-23, 146), while failing to disclose that these risks were *already materializing*. For example, they failed to disclose that in March 2017, the FTC *had already begun* an investigation, and that in November 2018 the FTC was demanding $60 million and changes in Match's business practices to resolve potential claims. ¶145. "When risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus v. J.C. Penney Co.* No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015); *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 851 (N.D. Tex. 2018) (because "a reasonable investor would have found it significant" to consider these issues, "the bespeaks caution doctrine cannot provide a basis for dismissal").[11]

Third, "Defendants negated any cautionary statements through their concomitant false and misleading reassurances." *Hall*, 2017 WL 6398742, at *19; *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010), *aff'd in part, vacated in part on other grounds,* 60 F. App'x 59 (2d Cir. 2015). Match's disclaimers were overshadowed by Defendants' representations that the FTC's legal challenges were "without merit." *See* App. at 159, 250-51. Because "Defendants' misleading Class Period statements are alleged to have contradicted, and thus nullified any risk disclosures," the safe harbor provision and bespeaks caution doctrine are inapplicable. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010). Finally, "[b]ecause reasonable minds could . . . disagree as to whether the mix of information in the [allegedly actionable] document is misleading, the statutory safe harbor provision cannot provide the basis for dismissal as matter of law." *Lormand*, 565 F.3d at 248.

Defendants incorrectly suggest that by qualifying their statements with words like "believe" or "think," Defendants are immune from liability. MTD at 12. "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how

---

[11]     Because the CAC adequately pleads knowledge, "the safe harbor provision is inapplicable to all alleged misrepresentations," *Lormand*, 565 F.3d at 244, and Defendants' cases are inapplicable. *See* MTD at 4 n.14, 13 n.53 (citing *In re SeaChange Int'l, Inc.*, No. Civ.A. 02-12116-DPW, 2004 WL 240317 (D. Mass. Feb. 6, 2004); *Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882 (E.D. La. 2014); *Kurtzman v. Compaq Computer Corp.*, No. CIV.A.H-99-1011, 2000 WL 34292632 (S.D. Tex. Dec. 12, 2000)). Cases involving loss reserves (MTD at 12 nn.51 & 52), are inapposite. *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473 (S.D.N.Y. 2017); *Hess v. Am. Physicians Capital, Inc.*, No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005).

22

the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). However, "the Supreme Court, in *Omnicare, . . .* rejected the argument that opinion phrases, such as 'we believe' or 'we think' categorically disqualified a statement from being actionable, stating 'those magic words can preface nearly any conclusion and the resulting statements, as we have shown, remain perfectly capable of misleading investors.'" *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019); *MicroCapital Fund LP v. Conn's Inc.*, No. 4:18-CV-1020, 2019 WL 3451153, at *5 n.8, *8 n.16 (S.D. Tex. July 24, 2019).[12]

### B.     Plaintiffs Adequately Allege Defendants' Scienter

#### 1.     Applicable Legal Standards

When evaluating scienter pleading, a court must "accept all factual allegations in the

---

[12]     Without identifying any specific language, Defendants contend that cases discussing "[g]eneralized optimistic statements" are applicable. MTD at 13 n.55, 14, n.62. Not only are "arguments [that] are insufficiently developed" deemed "waived" (*Ayers v. Thompson*, 358 F.3d 356, 368 n.18 (5th Cir. 2004)), but Defendants' representations constituted "concrete factual and material misrepresentations and omissions" that "cannot be considered mere puffery." *Lormand*, 565 F.3d at 249 n.14. Defendants' extra-jurisdictional cases merely hold that certain statements that "could be actionable in some cases" were "not in the circumstances alleged," and Defendants fail to demonstrate that the statements and their context are applicable here. *See* MTD at 13 n.55, n.62 (citing *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 78 (S.D.N.Y. 2015); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998); *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *20 (S.D.N.Y. Mar. 29, 2013); *Waterford Twp. Gen. Emps.' Ret. Sys. v. BankUnited Fin. Corp.*, No. 08-CIV-22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010); *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1260 (D. Kan. 2015); *In re FoxHollow Techs., Inc., Sec. Litig.*, No. C 06-4595 PJH, 2008 WL 2220600, at *26 (N.D. Cal. May 27, 2008); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)). Defendants' assertion that courts are hostile to "event driven" cases (MTD at 13 & n.56) is also meritless and ignores cases arising from events like the Gulf oil spill. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, No. 4:12-cv-01256, 2017 WL 7037706, at *13 (S.D. Tex. June 30, 2017); *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 835 (S.D. Tex. 2013); *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 624 (S.D. Tex. 2013); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 774 (S.D. Tex. 2012). Defendants' other cases lacked the facts alleged here. *See* MTD at 13 n.56, 14 n.59 & n.61 (citing *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019); *Iron Workers Benefit & Pension Fund - Iron Workers Dist. Council Phila. & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269 (5th Cir. 2019); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287 (7th Cir. 1981); *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479-GMN-DJA, 2020 WL 2748309, at *17 (D. Nev. May 27, 2020)). In *Plains*, 777 F. App'x at 731-32 (MTD at 14 n.60), two actionable statements either had "no author named" or arguments not found the complaint. The cases Defendants cite to support their argument that courts dismiss claims alleging failures of anti-fraud measures (MTD at 15 & n. 63) are distinguishable. *Smallen v. W. Union Co.*, No. 17-cv-00474-KLM, 2019 WL 1382823, at *15 (D. Colo. Mar. 27, 2019) (defendants stated the investigations were "too preliminary," and unlike here, defendants did not make repeated assurances that investigations into, *inter alia,* anti-fraud measures, were without merit with knowledge of facts to the contrary; *Higginbotham*, 495 F.3d at 759-60 (confidential sources only provided "slim" evidence that defendants belatedly knew of problems with fraud prevention).

23

complaint as true" and review all allegations holistically. *Tellabs*, 551 U.S. at 322; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251. The scienter inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs,* 551 U.S. at 324. It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*; *Matrixx*, 563 U.S. at 48. If "[t]he inference of intentional deception is, at the very least, equally as compelling as any alternative inference, [] a tie favors the plaintiff." *Lormand*, 565 F.3d at 254 (citing *Tellabs*, 551 U.S. at 323-324); *Spitzberg*, 758 F.3d at 686 ("where there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss").

Notably, knowledge <u>or</u> recklessness can satisfy the §10(b) scienter element. *Id*. at 684.[13] While severe recklessness is more than mere negligence, it still "resembles a slightly lesser species of intentional misconduct." *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408-409 (5th Cir. 2001). Moreover, "motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). When a complaint alleges motive, the strength of its circumstantial scienter evidence need not be as great. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005).

### 2.      Defendants' Motive and Opportunity to Commit Fraud

The CAC is replete with allegations evidencing Defendants' motive and opportunity to commit fraud – and their enrichment from doing so. *See* ¶¶182-185, 193; §II.D.2., *supra.* Thus, the circumstantial evidence of scienter may be correspondingly lesser. *R2*, 401 F.3d at 644.

---

[13]      Defendants overstate the standard as requiring *only* actual knowledge. *See* MTD at 19 & n.78 (stating allegations must "establish with particularity that Ginsberg and Swidler *knew* of facts that render their disclosures fraudulent" and citing *S. Cherry St. LLC v. Hennessee Grp.*, LLC, 573 F.3d 98, 109 (2d Cir. 2009), for the proposition that recklessness approximates "actual intent").

### a.      The Individual Defendants' Insider Transactions

"Insider stock sales can enhance an inference of scienter if the trading occurs at suspicious times or in suspicious amounts." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016). "A trade is suspicious if sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Id.*[14] "In this circuit, officer trading may give rise to an inference of scienter if it is unusual in timing or scope." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 553 (5th Cir. 2007). "[P]rior trading history does not need to be pleaded as a *per se* matter; instead, the court looks at the information that is pleaded and determines whether the timing or scope is unusual." *Id.* "[O]ne relevant factor to the scope and timing of a sale is whether the profits were substantial relative to the seller's ordinary compensation." *Id*.

The CAC details Ginsberg's and Swidler's Class Period transactions in Match stock, stock options, and stock units (RSUs), yielding a combined *$35.5 million* (*$16.3 million* for Ginsberg, *$19.2 million* for Swidler) in net profit and *100,000+ more shares acquired at no cost* (~67,000 for Ginsberg, ~34,000 for Swidler) during the alleged fraud. ¶¶182-183.[15] It alleges these transactions were suspicious compared to their salaries: (i) Ginsberg's salary was $500,000 (part of $1.25 million in total compensation including bonus) in 2017 and $750,000 (part of $2.5 million in total compensation) in 2018, and (ii) Swidler's salary was $550,000 in both 2017 and 2018 (part of $1.8 million and $2 million in total compensation, respectively). ¶184. Their net cash profit was *vast multiples* thereof: Ginsberg's $16.3 million profit was *2,100%* of 2018 salary (*650%* of 2018 total compensation), while Swidler's $19.2 million profit was *3,500%* of 2018 salary (*960%* of 2018 total compensation). *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278

---

[14]      Defendants overstate the Fifth Circuit standard as requiring sales "*dramatically* out of line" with prior trading, citing *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 813 (N.D. Tex. 2006)'s quotation of Ninth Circuit precedent. MTD at 22-23 & n.90-91. The *Fener* complaint only alleged that one of five defendants sold stock, provided no context for the amount sold, and failed to address if the sales were made pursuant to a trading plan. *Id.* at 813-814.

[15]      That Defendants profited from transactions in stock options and RSUs carries the same weight as direct transactions in stock. *See, e.g.*, *Brody v. Zix Corp.*, No. 3:04-CV1931-K, 2006 WL 2739352, at *6-7 (N.D. Tex. Sept. 26, 2006) (stock options exercised evidenced strong inference of scienter); *Berger v. Compaq Comput. Corp.*, No. H-98-1148, 1999 WL 33620108, at *8, *17 (S.D. Tex. Dec. 21, 1999) (same); *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 538, 554-555 (S.D.N.Y. 2017) (same re: RSUs).

(3d Cir. 2006) (inferring scienter when trading profits "nearly doubled" defendant's earnings "over the previous three years"). These transactions were also suspicious in timing vis-à-vis the alleged misstatements, partial corrective disclosures, and resignations. *See* ¶185; Appendix 1. That all named Defendants engaged in insider sales during the fraud enhances the scienter inference.[16]

Defendants' counter-arguments (MTD at 7, 22-23) lack merit. Plaintiffs need not more fully allege Defendants' prior trading history, *Cent. Laborers*, 497 F.3d at 553,[17] nor do they need to allege that Defendants' sales occurred at a Class-Period high. *See, e.g.*, *In re Daou Sys.*, *Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (suspicious sales not at class period peak price contributed to strong scienter inference); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (sales at an average price of ~13% of class period high supported scienter inference).[18] For instance, most of Ginsberg's sales occurred on May 30, 2019, at prices higher than the closing price of 129 out of 139 prior trading days. *See* App. at 423-429. Tellingly, Defendants offer ***no*** counter-narrative to explain their massive insider sales.[19]

### b.     Match Raised Hundreds of Millions in Funds

The CAC alleges that Match sought to raise $300 million during the fraud, announcing a suspiciously-timed offering on February 8, 2019 (¶193), as Ginsberg's and Swidler's insider sales

---

[16]     *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665 (NLH/JS), 2018 WL 6381882, at *15-*16 (D.N.J. Dec. 6, 2018) ("*TD*") (that all individual defendants sold shares or exercised options in class period showed scienter); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 296-297 (S.D.N.Y. 1999) (same).

[17]     Defendants argue (MTD at 22 and n.91) that their Class Period transactions should be compared against their holdings. If the Court desires, such a comparison can be included in a further amended complaint.

[18]     *See also Microcapital*, 2019 WL 3451153, at *16-*17 (defendants' sales supported scienter despite being small percent of holdings, below class period peak, not immediately after alleged misstatements, well before corrective disclosures); *SEC v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550 (W.D. Tex. 2013) (that defendant did not sell at market peak "would hardly be remarkable," as insider trading gives culprits illegal window into stock's rising direction without informing how far it will rise); *In re Questcor Sec. Litig.,* No. CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013) (insiders' trades below class period high supported scienter despite "not wait[ing] until the last possible moment to sell").

[19]     Defendants' cited cases (MTD at 23 n.92) are distinguishable. *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (no scienter where defendant sales were 8% of combined holdings); *Dillard v. Platform Specialty Prods. Corp.*, No. 16-cv-80490, 2016 WL 10586301, at *9 (S.D. Fla. Dec. 8, 2016) (sales could not be deemed unusual where only information provided was amount and date); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (no allegations beyond amount, gross proceeds, and dates); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *19 (S.D.N.Y. Sept. 30, 2016) (no scienter where two defendants lacked sales and three others collectively sold 8,630 shares for proceeds of $219,375); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) (no scienter where three main defendants lacked sales).

26

generated ~$28 million in proceeds during February 9-11, 2019 (¶182(a)-(b)) – just before Match belatedly disclosed on February 28, 2019 that the FTC had requested documents in March 2017 (two years prior) and proposed a $60 million judgment in November 2018 (four months prior) (¶145). *See* ¶193; Appendix 1. These allegations evidence corporate scienter. *See, e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-277 (S.D.N.Y. 2014) ($117 million offering evidenced corporate scienter even when all individual defendants dismissed from case).[20]

Defendants fail to address the offering or offer a more plausible, exculpatory inference,[21] arguing only that Plaintiffs may not employ "group pleading" or "collective scienter." MTD at 5 n.17, 18-19 n.75 (citing *Flaherty*, 565 F.3d at 208; *Southland*, 365 F.3d at 366). Plaintiffs do not do so. The CW allegations link Ginsberg and Swidler directly to information rendering their public statements materially false and misleading. *See* §II.D.1.a.-b. *supra*; §IV.B.3. *infra*. That said, more recent decisions make clear that corporate scienter is viable, *e.g.*, when "an announcement . . . is so dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *See Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 722-723 (N.D. Tex. 2018) (*citing BP*, 843 F. Supp. 2d at 789, 791 (corporate scienter for misstatements "so far from the truth as to support a finding of reckless indifference")).[22]

### c.      Sales, When Coupled with Resignations, Evidence Scienter

CEO Ginsberg's suspicious resignation, along with that of former CEO Sam Yagan (*see* §II.D.3. *supra;* Appendix 1), viewed holistically with alleged insider sales, further evidence

---

[20]      *See also TD*, 2018 WL 6381882, at *18-*19 ($2.75 billion in note offerings support scienter); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ($109.6 million offering can be motive for fraud); *In re Res. Am. Sec. Litig.*, No. 98-5446, 2000 WL 1053861, at *6-*7 (E.D. Pa. July 26, 2000) (secondary offering); ; *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (same); *Duncan v. Pencer,* No. 94 Civ. 0321 (LAP), 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996) (public offerings); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269-70 (2d Cir. 1993) (same).

[21]      Defendants have thus waived any such potential arguments at this stage of the litigation. *See*, *e.g.*, *U.S. v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005); *Irvin v. S. Snow Mfg., Inc.*, 517 F. App'x 229, 231 (5th Cir. 2013).

[22]      *See also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (plaintiff can use corporate scienter to plead scienter inference against corporate defendant without raising inference attributing scienter to individual defendant); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 195-96 (2d Cir. 2008) (possible to raise scienter inference for a company without doing so for a specific individual defendant).

scienter. *Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017 (adopting magistrate's ruling that termination/resignation of CEO and CFO are circumstantial evidence supporting strong scienter inference); *Hall*, 2017 WL 6398742, at *34 (magistrate's ruling as to same).[23]

### 3.    Defendants' Knowledge or Recklessness

The CAC sufficiently pleads Defendants' scienter regarding their misrepresentations and omissions based on their possession of, knowledge of, and access to contradictory information. *See* §II.D.1., *supra*; *see, e.g.*, *Ramirez*, 334 F. Supp. 3d at 853 (holding that defendants' access to contradictory information provided "more than mere conclusory allegations that Defendants . . . must have had knowledge" of the information); *Singh v. 21Vianet Grp., Inc.*, No. 2:14-cv-00894-JRG-RSP, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (same).

### a.    Extensive CW Allegations Strongly Support Scienter

CW allegations are common in U.S. securities litigation, given the PSLRA discovery stay until resolution of a motion to dismiss. *See, e.g.*, *Cent. Laborers*, 497 F.3d at 552 ("Confidential source statements are a permissible basis on which to make an inference of scienter.") (*citing ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)).[24]  In the Fifth Circuit, CWs need not be identified: (1) where other alleged facts give an adequate basis for believing that misrepresentations were made or (2) where the CWs are identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (quoting *ABC Arbitrage*, 291 F.3d at 353).  The latter prong is met by alleging "particular

---

[23]    *See also N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) (resignation of high level officials may contribute to scienter inference); *In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at *35 (E.D. Tex. June 16, 2004) (same); *Van Dongen*, 951 F. Supp. 2d at 474 (sales by defendants and insiders pled motive while resignations / retirements of insiders involved in scheme added to scienter inference).

[24]    *See also Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.*, 278 F.R.D. 335, 341 (S.D.N.Y. 2011) ("It is, of course, entirely proper and common for a plaintiff to rely on confidential witnesses in a complaint, and attributions to such witnesses may and often are credited on motions directed to the pleadings.") (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

job descriptions, individual responsibilities, and specific employment dates for the witnesses."
*Cent. Laborers*, 497 F.3d at 552.

The CAC alleges cross-corroborating statements by 12 CWs, including high-level personnel, who worked at Match's HQ, where Ginsberg had an office and where Ginsberg and Swidler regularly met with executives and employees, including the CWs, to discuss pertinent subjects. *See* §§II.D.1.-2. *supra*. It provides the required employment details (¶¶19-30), with the CWs' first-hand accounts detailed below (¶¶36-87). These allegations suffice. *See, e.g.*, *Wieland*, 2007 WL 2903178, at *5 ("Plaintiffs have provided general descriptions of the employment duties of . . . the confidential witnesses [ ], the field in which they worked, and the dates that they were employed . . . . This background information is sufficient . . . .").[25] Defendants fail to refute these descriptive allegations, and thus waive challenges at this stage (*see* n.21, *supra*). MTD at 19-22.

Contrary to the MTD at 6 and 19, the CW allegations reveal *specific* facts, not a "hodgepodge of vague assertions," known or recklessly disregarded by Ginsberg and Swidler, rendering their misrepresentations materially false or misleading. As detailed in §§II.A., B. and D. *supra*: (i) Match websites were plagued by fake profiles, fraudsters, Internet "bots," felons, and sex offenders, a problem "*widely known*" and "*not a secret*" that "*everyone* in the building *was aware* [of]" per CW3; (ii) CW1, CW6, and CW9 described a highly-visible *wall of screens* at Match HQ, where Ginsberg's office was located, displaying *real-time "red flag" metrics*; (iii) CW4, CW5, CW8, CW10, and CW11 said Match failed to pre-screen illegitimate accounts, limited automated flagging to a small subset of such accounts, vastly understaffed its overworked anti-fraud personnel, and rejected anti-fraud technologies due to costs; (iv) CW4 said fraudulent accounts were frequent topics at *twice weekly operations meetings* and *Ginsberg spoke at company-wide meetings* about such accounts on Match.com; (v) CW1 regularly spoke with *Dubey (Match's then-President)*, who worked three-four days weekly for six months at Tinder HQ and

---

[25]   This case differs from Defendants' cases (MTD at 6 n.22), *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 537 (5th Cir. 2008), where plaintiffs failed to provide specifics to suggest the CWs would possess the information alleged, and *Material Yard Workers Local 1175 Benefit Funds v. Men's Wearhouse Inc.*, No. H–09–3265, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011), where the CWs' testimony seemed unreliable or the CWs were not in a position to know about facts on which they testified.

29

*knew of sex offenders and fraudsters* on its website; (vi) CW1 said Dubey regularly dialed into *meetings at Match HQ* from Tinder's HQ and *worked closely with Ginsberg* (daily) *and Swidler* (several times weekly), who she would have *apprised* of Tinder's issues; (vii) CW1, CW2, and CW7 revealed that Match *closely tracked financial and "red flag" metrics* showing <u>**15%-20% of accounts were illegitimate**</u>, including ones upgraded to paid accounts for access to enhanced features; (viii) CW1, CW2, and CW7 compiled these metrics, after in-depth analysis, into *monthly reports, "granular" supplements, and 30-minute presentations given to Ginsberg and Swidler*; (ix) CW1 and CW2 said these materials were discussed at *monthly forecast meetings attended by Ginsberg and Swidler*; (x) CW1 and CW2 said "red flag" metrics and fraudulent accounts, if stable, were seen as "*business as usual*" and not removed from forecasts or reported metrics; (xi) CW2, CW3, and CW4 described Match's *"aggressive" marketing* of messages and "likes" by fraudulent accounts to entice legitimate users to upgrade to paid subscriptions, with a 30% conversion success rate; (xii) CW1, CW2, CW3, CW8, CW9, and CW10 described *widespread anti-user conduct*, including hidden terms, stringent cancellation policies, refund refusals, failure to protect legitimate users and employees from threats, and retaliation against employees who helped users; (xiii) CW3 and CW8 said *customers directly contacted Ginsberg and Swidler* with complaints, and that major customer issues like fake profile or billing complaints triggered *internal reports and daily breakdowns* available to Defendants; (xiv) CW1 and CW2 said *Ginsberg knew of customer issues, had company-wide discussions* about user experience, *and got daily reports* on number-boosting efforts before earnings reports; (xv) CW2 *discussed with Swidler* how to increase paid memberships and set refund policies; and (xvi) CW1 said that *Ginsberg and Swidler weighed in* on Match's anti-fraud and other policies.  Courts routinely credit such CW statements as evidencing scienter.  *See*, *e.g*., *Barrie*, 397 F.3d at 264 (reversing dismissal after holding scienter adequately pled based on holistic view of bonuses, stock sales, and CW reports alleging knowledge and recklessness).

Defendants overstate the burden as requiring a plaintiff to allege "the content of internal communications" providing "specific information contradicting their public statements."  MTD at

30

5, 19.  To the contrary, even where scienter pleading rests *only* on allegations of internal reports, a complaint need only specify "who prepared internal company reports, how frequently the reports were prepared and who reviewed them."  *ABC Arbitrage*, 291 F.3d at 355-56 (declining to require details like "report titles, when they were prepared . . . their content, and the sources from which plaintiffs obtained this information," because even under Rule 9(b) and the PSLRA, "we do not require the pleading of detailed evidentiary matter in securities litigation").[26]  The CAC does so. When considered *holistically* with other allegations, even reports and other information shared with defendants lacking specific details can support scienter.  *See, e.g.*, *MicroCapital*, 2019 WL 3451153 at \*15 ("while Plaintiffs do not describe in detail the content of each daily report given to [Defendant] or the matters discussed in each meeting he attended, when considered holistically with other allegations … there is enough context to infer that the reports and other information shared with [him] showed delinquencies were rising").[27]  Defendants' cited cases (MTD at 5 n.19, 19 n.79, and 22 n.87) do not counsel otherwise.[28]

Significantly, the CW allegations here are corroborated by the FTC investigation and

---

[26]     *See also Hall*, 2017 WL 6398742, at \*30 (complaint need only have corroborating details regarding contents of contrary reports, their authors and recipients, and connect the reports to the speaking executive in a persuasive way) (*citing Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017)).

[27]     *See also, e.g.*, *Marcus*, 2015 WL 5766870, at \*6 (allegations defendants knew facts undermining their statements because inventory purchases were subject of monthly meetings and regular review by them, combined with other allegations, supported strong scienter inference); *Brody*, 2006 WL 2739352, at \*7 (CW allegations that defendants regularly received tracking reports that would have alerted them that their statements were materially misleading supported strong scienter inference); *Fleming*, 2004 WL 5278716, at \*28-\*34 (CW allegations that defendants received weekly reports and attended weekly meetings concerning data on financial performance supported strong scienter inference); *Hall*, 2017 WL 6398742, at \*30 (CW allegations of specific meetings, reports, and practices whereby defendants were made aware of adverse facts supported strong scienter inference).

[28]     Defendants' authority is distinguishable.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (no scienter where internal reports were sole evidence of knowledge but alleged in general terms not identifying who supplied the information or when they knew it); *Abrams*, 292 F.3d at 432 (no scienter based on unsupported general claim about existence of confidential corporate reports with contrary information, general familiarity with company inner workings, and GAAP violations); *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 889-90 (N.D. Tex. 2005) (no scienter based defendants' corporate positions, reporting of irregularities to "senior management," existence of internal audit and monitoring programs without providing any details of reports); *Local No. 38 Int'l Bhd.. of Elec. Workers Pension Fund v Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (no scienter based on bare allegations that reports contained sort of information that the Board reviewed); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. Dec. 23, 2015) (no scienter where no reports or meetings were alleged); *Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*, Nos. 13–3935, 2014 WL 6638793, at \*27 (E.D. La. Nov. 21, 2014) (same); *Kakkar v. Bellicum Pharm., Inc.*, No. 4:18-CV-338, 2020 WL 2845279, at \*3 (S.D. Tex. May 29, 2020) (no scienter based on a safety database, a CW who noticed production slowdown, a defendant's resignation, and defendants' "general knowledge" of clinical procedures).

31

lawsuit alleging the same underlying misconduct. *See, e.g.*, ¶¶4, 7, 165. That Defendants delayed disclosure of the FTC investigation and its $60 million consent judgment offer (¶¶160, 187) further support a scienter inference. *See, e.g.*, *Frank v. Dana Corp.*, 646 F.3d 954, 961-62 (6th Cir. 2011) (investigation into company accounting practices added to strong scienter inference).[29] [30]

Defendants claim the CAC's detailed "Scienter" section (¶¶176-203) is insufficient and that Plaintiffs must actually tie specific scienter allegations to specific misstatements. MTD at 5, 19. The PSRLA provides only that "the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). It does ***not*** mandate that plaintiffs literally explain, statement-by-statement, why each was made with scienter, nor do courts require such a painstaking, voluminous pleading. *See, e.g. Barrie*, 397 F.3d at 263-264 (holding scienter adequately alleged based on cumulative allegations concerning bonuses, stock sales, and CW statements as to knowledge and recklessness); *Lormand*, 565 F.3d at 252 (analyzing scienter as to two types of alleged misrepresentations and not performing a statement-by-statement analysis).[31]

---

[29]      *See also Carlton v. Cannon*, 184 F. Supp. 3d 428, 479-80 (S.D. Tex. 2016) (while government investigation is insufficient on its own, it is not irrelevant to the scienter analysis) (citing *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009)); *Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26MAP, 2009 WL 3853592, at *7 (M.D. Fla. Mar. 30, 2009) (courts commonly hold pending government investigations to provide notice of possible fraud, *i.e.*, pendency of an investigation suggests that "a fraud may have occurred and may not be ignored.").

[30]      Contrary to the MTD at 5-6 and n.20, the CAC does not "simply rely on the FTC lawsuit" alone, but rather, alleges it as part of a holistic pleading. Even Defendants' authority *concedes* that government lawsuits indeed have "limited" or "probative" effects in the scienter analysis. The FTC lawsuit cross-corroborates the CWs and supports scienter even if it does not "contain[] allegations that Ginsberg or Swidler made false disclosures to investors or personally acted with scienter," as such "smoking-gun" evidence is not required under *Tellabs,* 551 U.S. at 324. Defendants also wrongly assert that certain CWs "have nothing to do with the FTC suit." Underlying misconduct at *any* Match website evidences the pervasive, company-wide issues rendering Defendants' statements and omissions false and misleading. Moreover, while the CAC does allege a specific FTC Investigation Fraud (¶¶144-158), it also alleges a Membership Integrity Fraud (¶¶89-129), a Reported Results Fraud (¶¶130-136), and an Internal Controls Fraud (¶¶137-143) that are broader than the FTC lawsuit, and it alleges partial correctives including published investigation results into sexual assault on dating apps and the announcement of a Congressional investigation of dating apps use by sex offenders and underage users (¶¶169-174).

[31]      Defendants' cited cases (MTD at 5 n.18) are distinguishable. *See Southland*, 365 F.3d at 370, 375-76 (no scienter where complaint made "unsupported general claim of the existence of company reports" and failed to say who gave contradictory information to Defendants, when, where, and on what occasions); *Anastasio v. Internap Network Servs. Corp.*, No. 1:08-cv-03462-JOF, 2010 WL 11459838, at *9 (N.D. Ga. Sept. 15, 2010) (no scienter

Defendants' otherwise criticize certain CWs allegations.  MTD at 20-21.  They assert that CW5, CW7, CW8, CW10, CW11, and CW12 do not claim to have had contact with Ginsberg or Swidler and argue that these CWs thus have no bearing on the scienter analysis.  *Id*.  If the law only valued CWs who interacted personally with individual defendants, then allegations of all but the most senior corporate personnel would be disregarded.  *Tellabs* expressly **disclaimed** the need for such "irrefutable" or "smoking-gun" evidence in the required holistic analysis (*see* 551 U.S. at 324), and courts routinely reject defense calls for it.  *See Spitzberg*, 758 F.3d at 682, 684-85 (reversing dismissal after crediting allegations by CW who worked for non-party business partner of company and had no interactions with individual defendants); *Carlton*, 184 F. Supp. 3d at 473 (court can rely on accounts of CWs "several levels removed from any operational authority").[32] Thus, the statements by these CWs can and should be fully credited and considered.  The same goes for the CW6's and CW9's statements describing a wall of screens displaying "red flag" metrics at corporate HQ where Ginsberg had her office and CW3's observation that customers contacted Ginsberg, Swidler, and other executives directly about their complaints.  MTD at 20.

Finally, Defendants claim the CAC pleads only that Ginsberg and Swidler "were generally aware" of "business challenges" without "a single particularized allegation showing they knew of facts that rendered their public disclosures fraudulent."  MTD at 20-22.  The CAC alleges, *inter alia*, that: (1) CW2 spent 10 days every month dissecting metrics and preparing detailed forecast reports consistently showing over a three-year period that 15% of Match.com memberships were fraudulent; (2) every month, CW1 consolidated such reports (along with those by CW7 for Tinder, which had a 20% account fraud rate), without any adjustment to isolate the fraud, into a 30-minute

---

where it was not alleged who was given contradictory information, when, or what defendants were told); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 888 (W.D.N.C. 2001) (no scienter where complaint did not allege any defendant knew of information); *Magnum*, 616 F. App'x at 446 (bare allegation of "changed" production numbers without details about what the numbers were or how they related to defendants or alleged fraud).

[32]    *See also, e.g.*, *TD*, 2018 WL 6381882 at *1, *4-*7, *12-*14 (scienter sufficiently pled by allegations of insider transactions, core operations, SOX certifications, and statements of 19 lower-level CWs ranging from bank tellers to district VPs, **none of whom** interacted with the individual defendants and only **one of whom** put knowledge of underlying scheme into "corporate office"); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-269 (3d Cir. 2008) (*Tellabs* holistic analysis did not require plaintiffs to "point to any particular document or conversation that would have informed [CEO and CFO] of unusual discounting"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 483 (S.D.N.Y. 2018) (plaintiff not required to allege specific contact between CWs and individual defendants).

presentation and report, with granular supplementary materials, given to Ginsberg and Swidler, at their direction, for monthly forecast meetings, where the data was discussed; (3) Ginsberg and Swidler saw fraudulent accounts as "business as usual," failed to increase deficient anti-fraud measures or to adjust Match's internal forecasts and externally-reported performance and financial metrics to remove illegitimate accounts; (4) Ginsberg and Swidler grew frustrated when PlentyofFish tried to adjust metrics like PMC and ARPU down, and they oversaw "aggressive" marketing that used fraud accounts to entice legitimate users to upgrade into paid subscriptions to boost Match's numbers; and (5) the scope of fraudulent accounts was "widely-known" at Match HQ, where Ginsberg's office was near a wall of highly-visible screens showing "red flag" metrics in real-time. *See* §II.D.1., *supra*.[33]   When viewed holistically with the CAC's other scienter allegations described herein, these CW allegations support a strong inference of scienter.[34] [35]

---

[33]   Courts routinely hold that CW descriptions of common knowledge of widespread problems support a strong scienter inference. *See, e.g.*, *TD*, 2018 WL 6381882, at *7 (statements of 19 lower-level CWs evidenced underlying widespread misconduct, which supported scienter despite no CW directly attributing direct knowledge to defendants) (citing *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008) (same result from 14 lower-level CWs)); *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209-210 (S.D.N.Y. 2016) (scienter sufficiently pled based on, *inter alia*, "collective picture" by CWs of widespread misconduct); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-638 (S.D.N.Y. 2010) (scienter based on, *inter alia*, CW allegations of widespread knowledge of problems, which "everyone knew," and access to similar information that should have been monitored); *Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (scienter where CWs confirmed, *inter alia*, widespread irregularities).

[34]   Under *Tellabs*, Plaintiffs need not plead "smoking gun" evidence like the exact moments Ginsberg or Swidler saw "red flag" metrics on the wall of screens at HQ, the precise emails relaying customer complaints to them, or the specific titles and line item contents of the forecast reports they received every month of the Class Period. Defendants' implied, competing inference is not plausible – that, despite Match's laser-focus on a handful of key metrics that revealed the prevalence of underlying illegitimate accounts on its websites, Ginsberg and Swidler *never* viewed the highly-visible wall of screens, *never* read the unadjusted forecast reports they requested that did not adjust for fraud, *never* read customer complaints emailed to them, etc. Such an inference is certainly not ***more*** compelling, as it must be under *Tellabs* for their MTD to be granted.

[35]   Defendants' citation to distinguishable cases (*see* MTD at 21-22 n.86) does not counsel otherwise. *See Iron Workers,* 788 F. App'x at 270 (no insider sales, motive, or linkage between information received by individual defendants and knowledge of fraud); *Owens v. Jastrow*, 789 F.3d 529, 542-43 (5th Cir. 2015) (CW sent one email to individual defendants with vague warnings); *Shaw*, 537 F.3d at 537-40 (no scienter based on unspecific meetings, letters, and reports, and allegations of CWs insufficiently identified to support probability they were in positions to understand or know of problems); *Cent. Laborers*, 497 F.3d at 552 (CWs not in positions to possess information pleaded); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 744 (N.D. Tex. 2018) (complaint pled no sales or clear motive  and strength of circumstantial evidence not correspondingly greater); *Wu Winfred Huang v. EZCorp, Inc.*, 259 F. Supp. 3d 563, 570-71 (W.D. Tex. 2017) (inconsistent CW statements, no explanation how administrative assistant would know report findings, and unspecified allegations of  "series of meetings" where defendant informed of "accounting issues").

34

### b.   Additional Conduct Supports a Strong Inference of Scienter

The CAC alleges other bases that collectively add to a strong scienter inference.

First, Ginsberg and Swidler *signed* and *SOX-certified* the false or misleading SEC filings – *both actions* creating affirmative duties to investigate and speak truthfully, which they breached. ¶¶196-197.  These allegations also support scienter.[36]  Defendants ignore the SOX allegations, thus waiving any argument at this stage.  *See* n.21, *supra*.

Second, the core operations doctrine imputes knowledge to a company's top executives if "some combination" of four considerations favor scienter: (1) a company's size, (2) a transaction's importance to its continued vitality, (3) the misrepresented or omitted information is readily apparent to the speaker, and (4) the defendants' statements were internally inconsistent.  *Neiman*, 854 F.3d at 750.  While Match is large (MTD at 19 n.76), the other considerations favor applying the core operations doctrine given, *inter alia*, that: (i) *98%* of Match's revenue derives from recurring subscriptions fees; (ii) the underlying misconduct was evident in closely-watched metrics compiled into monthly reports and presentations given to Defendants; (iii) those metrics revealed *15% - 20%* of Match users were illegitimate, undermining Match's reported metrics and putting its *bona fide* members at risk; and (iv) the underlying misconduct was serious enough for the FTC to investigate and pursue a complaint.  ¶¶34, 194-195.[37]  Defendants' cited cases (MTD at 19 n.76)

---

[36]     *See, e.g.*, *Shaw*, 537 F.3d at 545 (SOX certifications add to scienter when signatories "had a reason to know, or should have suspected," due to "red flags," that financial statements had material misstatements or omissions); *Ramirez*, 334 F. Supp. 3d at 854 (the fact that defendants signed company's SEC filings supported a strong inference of scienter); *Singh*, 2017 WL 4322483, at *3 (strong scienter inference because "SOX certifications may contribute significantly to inference of scienter if defendants had reason to know or suspect the financial statements they were then signing contained material misrepresentations or omissions"); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 725 (W.D. Tex. 2010) (red flags, role of individual defendants in company, magnitude and duration of fraud, insider trading, and SOX certifications collectively give rise to strong scienter inference of at least severe recklessness).

[37]     *See, e.g.*, *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *12 (S.D. Tex. Mar. 27, 2019) ("The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false."); *TD*, 2018 WL 6381882 at *46-*48 (core operations doctrine supported scienter, even absent a document or CW showing defendants' knowledge, where segment at issue was 60% of earnings) (citing *Avaya*, 564 F.3d at 271-272 (core operations doctrine supported scienter where no CW statement or particular document showed knowledge), and *In re Urban Outfitters*, *Inc., Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (core operations doctrine applied where segment was 44% of sales)).

do not counsel otherwise.[38]

Third, Defendants' conduct also violated Match's Code of Conduct, which required accurate SEC filings, honesty in business dealings, reporting of actual or imminent violations, and no retaliation against employees. ¶¶198-203. *See, e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010) (where code of conduct specifically addressed conduct implicated in case, court considered it as part of analysis that found scienter pled).[39]

### 4. Defendants' Competing Inference Is Not More Compelling

In accordance with *Tellabs*, the CAC's scienter inference is strong, cogent, and at least as compelling as any counter-inferences. Defendants willfully grew and maintained Match's user base and revenues while viewing a consistent 15% - 20% level of fraudulent, dangerous accounts in paying and non-paying membership across Match's websites as "business as usual." Extensive, regular conversations, meetings, presentations, and reports – described first-hand by the very CWs who analyzed the data, compiled and presented the materials, and participated in the meetings – and even a wall of screens unavoidably visible on the main floor of company HQ, put Match's financial metrics and its "red flag" metrics squarely in Defendants' hands. Yet, Defendants: (1) willfully understaffed a small, overworked anti-fraud team; (2) failed to implement available screening and anti-fraud technologies; (3) grew frustrated when one website tried to adjust its numbers to discount and remove fraudulent accounts; (4) continued to include illegitimate accounts in Match's internal and externally-reported performance and financial metrics; (5) sought to grow paid memberships through "aggressive" marketing based on those illegitimate accounts; (6) oversaw stringent cancellation and refund policies to lock in *bona fide* members who expressed concern; (7) and permitted retaliation against employees who helped users. Simultaneously, they failed to disclose the FTC's investigation and proposed $60 million consent judgment and later

---

[38]     Unlike here, in Defendants' cited cases, *Stephens v. Uranium Energy Corp.*, No. H-15-1862, 2016 WL 3855860 (S.D. Tex. July 15, 2016) and *Kakkar*, 2020 WL 2845279, the plaintiffs did not allege motive through insider sales or otherwise, so the strength of circumstantial evidence had to be greater, and failed to allege a "combination" of considerations for the core operations doctrine to apply under *Neiman*, 854 F.3d at 749-750.

[39]     Defendants' argument that public statements about a company's code of conduct are not actionable is irrelevant. MTD at 14, 15 n.63. Plaintiffs allege the Code of Conduct as scienter evidence, not as a false statement later

36

downplayed its validity, all while netting $35.5 million from insider transactions and stock sales at prices inflated by their misrepresentations.  When the fraud was revealed, Ginsberg resigned.

To grant dismissal under *Tellabs*, Defendants must posit a ***more compelling*** inference. Their attempt (MTD at 23) is premised on their view that: (1) disclosing in February 2019 that the FTC had launched an investigation in March 2017 and proposed a $60 million consent judgment in November 2018 was timely; (2) having an eight-person team retroactively review millions of potentially fraudulent, already-live accounts at the rate of 15 seconds per account constituted "significant efforts to *prevent* fraud" (as versus react to it); (3) and that stock declines causing multi-million dollar investment losses for Match investors (most of whom were *not* constant holders throughout the entire period of "return" to which Defendants point and many of whom sold at losses after the declines) were only "modest and temporary."  On this flawed basis, Defendants posit: "Under any logic, the strongest inference is that Defendants made honest disclosures, treated their investors well, and did not act with fraudulent intent."  *Id.*  A holistic view of the CAC demonstrates otherwise.[40]

### C.      Plaintiffs Adequately Allege Loss Causation

Plaintiffs have also adequately alleged loss causation.  The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. §78u-4(b)(4).  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Importantly, the court in *Dura* assumed "that neither the Rules nor the securities statutes impose any special further requirement [beyond Rule 8] in respect to the pleading of proximate causation or economic loss."  *Dura*, 544 U.S. at 346; *Pub. Employees Ret.*

---

[40]      Defendants contend that because "a Big Four auditor" purportedly gave "unqualified clean audit opinions," this fact "weighs against inferring fraud."  MTD at 17, 23.  However, "[i]f a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance." *U.S. v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979); *see also In re SeeBeyond Tech. Corp. Sec. Litig*., 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (E&Y's certification of the financial statements did not negate scienter inference).

*Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). Additionally, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand*, 565 F.3d at 261 & n.31.

The CAC meets these standards. On February 28, 2019, Match disclosed the FTC's proposal to resolve potential claims against Match.com. ¶160. On this news – which was muted by Match's reassurances – its stock price fell .72%. ¶161. On August 9, 2019, Match disclosed that the FTC was asserting claims against it, causing Match's stock price to fall 1.8% (¶¶162-63) then another 3.5% (¶164). Additionally, on September 25, 2019, the FTC announced that it had sued Match.com for deceiving consumers, failing to resolve disputed charges, and intentionally making it difficult to cancel subscriptions. ¶165. On this news, Match's share price fell nearly 2%. ¶166. On November 6, 2019, Match also disclosed that it faced increased legal costs, which caused Match's stock price to fall 2.5%. ¶¶167-68. On December 2, 2019, the CJI reported that Match screens for sexual predators on Match.com, but not on its other websites, causing Match's stock price to fall nearly 3%. ¶¶169-71. On January 31, 2020, Congress disclosed that it launched an investigation of Match into reports of underage use of dating apps and the improper use of personal data, causing Match's share price to fall 3.5%. ¶¶172-74. Because these allegations provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind," Plaintiffs have adequately alleged loss causation. *Dura*, 544 U.S. at 347.

Defendants argue that Plaintiffs have not adequately alleged loss causation because: (1) Match's stock-price declines were purportedly statistically insignificant; and (2) its disclosures supposedly were not corrective. MTD at 23-25. Both arguments fail. First, Defendants improperly analyze each corrective disclosure *individually* when courts must assess them *collectively*. *Amedisys*, 769 F.3d at 322-24. For instance, *Amedisys* involved multiple partial disclosures, none of which was independently sufficient, including: (1) a report that merely raised "[s]peculation of wrongdoing;" (2) an announcement of the resignation of two officers that did "nothing" to "reveal[] the truth behind earlier misstatements;" (3) an article based on an analysis

38

of publicly-available data; (4) announcements of governmental investigations – none of which led to findings of wrongdoing; and (5) a disappointing earnings report. *Id.* Thus, partial disclosures – like those here – can "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation for purposes of a Rule 12(b)(6) analysis." *Id.* at 324.[41]

Second, Defendants improperly suggest that Plaintiffs must plead that corrective disclosures directly revealed fact-for-fact the precise topics of the misrepresentations alleged. MTD at 24-25. A disclosure must merely relate to the same subject matter as the alleged misrepresentations; it need not be a mirror-image disclosure. *Amedisys*, 769 F.3d at 322-24; *Spitzberg*, 758 F.3d at 688-89. For instance, contrary to Defendants' conclusory argument (MTD at 25), The alleged corrective disclosures regarding sex offenders are related to Defendants' misstatements and to pervasive underlying misconduct, as detailed by the CWs. "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). Thus, Plaintiffs have adequately alleged loss causation.[42]

---

[41] Additionally, even the presence of "increases in stock prices after a partial disclosure that is within a series of disclosures does not preclude a final showing of loss causation." *Lormand*, 565 F.3d at 266 n.33. Thus, Defendants' argument "deals with the actual timing of the loss, and not whether the plaintiff pleaded a plausible causal relationship between the defendants' fraud and the plaintiff's economic loss." *Id.* Moreover, determining whether declines were statistically significant (MTD at 24 n.97) is premature because "defendants may introduce such evidence *at the merits stage*," not the pleading stage. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014). The same is true for Defendants' argument regarding the Nasdaq Index. MTD at 3 n.8.

[42] Although Defendants argue that the alleged declines were temporary (MTD at 2-3), "a share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost value." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). Also, Defendants' reliance on *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311 (5th Cir. 2008) and *Eng v. Edison Int'l*, No. 315CV01478BENKSC, 2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) (MTD at 24 n.96 & 97) is misplaced because they either precede or ignore *Amedisys*, 769 F.3d at 322-24. Unlike *Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954 (S.D. Tex. 2020) and *N. Port*, 936 F. Supp. 2d at 761 (MTD at 24 n.96, 25 n.103), the misrepresentations here directly relate to Match's disclosures. Defendants, moreover, mischaracterize *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004) (MTD at 24 n.97), because the court held that "[w]e realize that whether a drop in a stock's price is statistically significant will vary depending on the average trading range for that particular stock" and that "[a] drop of 10% for a volatile stock may not be statistically significant whereas the same drop for a stock with little average movement may be significant." *Greenberg*, 364 F.3d at 665 n.9. Defendants cite no cases in this Circuit that hold that stock declines within a stock's average trading range are statistically insignificant as a matter of law. Defendants also suggest that any attribution of Match's stock decline on August 10-12, 2019 to its August 9, 2019 disclosure is "demonstrably untrue." MTD at 24. In *Basic v. Levinson*, 485 U.S. 224 (1988), however, the Supreme Court refused to "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Id.* at 249 n.28. Thus, "a delayed reaction can still satisfy the pleading requirements" for

39

### D.      The §20(a) Claim Is Otherwise Not Challenged

If there is a §10(b) violation, the §20(a) claim should not be dismissed.

## V.      CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion.  If the Court is inclined to grant Defendants' Motion, Plaintiffs respectfully request leave to further amend to address any pleading deficiencies it may identify.  *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477-78 (5th Cir. 2018).[43]

---

loss causation.  *Lormand*, 565 F.3d at 266 n.33.  Contrary to the MTD at 24, a disclosure that the FTC had sued Match.com (¶165) is different from a disclosure that the FTC was planning to sue.  ¶162; *see In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at *27 (E.D.N.Y. Sept. 27, 2019) (loss causation adequately alleged based upon a disclosure of a FTC lawsuit because "new information was revealed to the market").  Defendants' attempt to attribute declines to COVID-19 (MTD at 2 n.7) fails because "the PSLRA does not obligate a plaintiff to deny affirmatively that other factors affected the stock price in order to defeat a motion to dismiss."  *Spitzberg*, 758 F.3d at 687-88.  Finally, Defendants cite to *Naglich* and *Plaisance v. Schiller*, No. CV H-17-3741, 2019 WL 1205628, at *6 (S.D. Tex. Mar. 14, 2019) to claim that a statement is not corrective unless the existence of actionable fraud is more probable than it would be without those disclosures (MTD at 25 n. 103, 107), but this standard "is not a steep or difficult one to satisfy."  *Amedisys*, 769 F.3d at 321.  The corrective disclosures meet this standard.

[43]      Further amendments could include, *inter alia*, additional corroborative CW allegations, more comparative assessments of Defendants' insider transactions (*see* n.17 *supra*), and/or recent, negative developments, *e.g.*: (a) a February 20, 2020 Congressional press release (still not disclosed by Match) stating a letter was sent to current CEO Dubey asking Match to immediately check users against sex offender registries and to disclose its efforts to respond to reports of sexual violence that were a result of users meeting through Match services and stating that legislation depends on Match's response (*see* https://schakowsky.house.gov/media/press-releases/schakowsky-kuster-lead-letter-match-group-president-calling-improvements); (b) the resignation of Tinder's CEO, Elie Seidman (*see* https://www.sec.gov/Archives/edgar/data/891103/000089110320000016/mtch8-k20200731ex991.htm); (c) further developments in the FTC lawsuit against Match.com or the DOJ and Congressional investigations into Match.

Dated:  August 26, 2020

Respectfully submitted,

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo

POMERANTZ LLP
Jeremy A. Lieberman (admitted pro hac vice)
Matthew L. Tuccillo (admitted pro hac vice)
Jennifer B. Sobers (admitted pro hac vice)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for Samir Ali Cherif Benouis and Co-Lead Counsel for the Class*

*/s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

GLANCY PRONGAY & MURRAY LLP
Ex Kano S. Sams II (admitted pro hac vice)
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com
Email: clinehan@glancylaw.com

*Counsel for Phillip R. Crutchfield and Co-Lead Counsel for the Class*

Joe Kendall
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com

*Local Counsel for the Class*

41

42

## CERTIFICATE OF SERVICE

This is to certify that on August 26, 2020, I have filed the foregoing on the Court's CM/ECF electronic filing system, and that by virtue of this filing, all attorneys of record will be served electronically with true and exact copies of this filing.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

42