**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:19-cv-2356 |
| MATCH GROUP, INC., AMANDA W. GINSBERG and GARY SWIDLER, | § § § § | |
| Defendants. | § § § | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

ARGUMENT AND AUTHORITIES.............................................................................. 2

    I. PLAINTIFFS HAVE NOT IDENTIFIED AN ACTIONABLE MISSTATEMENT  OR DEMONSTRATED A STRONG INFERENCE OF SCIENTER ............................................................................................................ 2

        A. The Opposition Does Not Identify an Actionable Misstatement or Omission ................................................................................................. 3

        B. Plaintiffs' Scienter Allegations Are Patently Insufficient.............................. 11

    II. PLAINTIFFS HAVE NOT PLED LOSS CAUSATION .......................................... 15

CONCLUSION AND PRAYER FOR RELIEF .............................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
　292 F.3d 424 (5th Cir. 2002) ...............................................................................3, 9, 11

*Alaska Elec. Pension Fund v. Asar*,
　768 F. App'x 175 (5th Cir. 2019) ..........................................................................9, 11, 16

*Axar Master Fund, Ltd. v. Bedford*,
　308 F. Supp. 3d 743 (S.D.N.Y. 2018)......................................................................11, 16

*In re Bayer AG Secs. Litig.*,
　2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004)..........................................................15

*In re BHP Billiton Ltd. Secs. Litig.*,
　276 F. Supp. 3d 65 (S.D.N.Y. 2017)........................................................................6, 7

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
　2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................................7

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
　497 F.3d 546 (5th Cir. 2007) ...............................................................................9, 12

*Cho v. UCBH Holdings, Inc.*,
　890 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................................11

*Cho v. UCBH Holdings, Inc.*,
　No. C 09-4208 JSW, 2011 WL 3809903 (N.D. Cal. May 17, 2011).......................11

*City of Pontiac Gen. Emps. Ret. Sys. v. Dell, Inc.*,
　2016 WL 6075540 (W.D. Tex. Sept. 16, 2016)........................................................14

*City of Warwick Mun. Empls. Pen. Fund v. Rackspace Hosting, Inc.*,
　2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)...............................................................6

*In re Cobalt Energy, Inc.*,
　2016 WL 215476 (S.D. Tex. Jan. 19, 2016).............................................................15

*Das v. Rio Tino PLC*,
　332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................................8

*Edgar v. Anadarko Petroleum Corp.*,
　2019 WL 1167786 (S.D. Tex. Mar. 13, 2019)...........................................................10, 12, 13

*Empls. Ret. Sys. v. Whole Foods Mkt., Inc.*
　905 F.3d 892 (5th Cir. 2018) .................................................................................4

*Eng v. Edison Int'l*,
    2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ............................................................16

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................................15

*Eshelman v. Orthoclear Holdings, Inc.*,
    2009 WL 506864 (N.D. Cal. Feb. 27, 2009) .............................................................11

*In re Flowers Foods, Inc. Secs. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)............................................................15

*Gallagher v. Abbott Labs.*,
    269 F.3d 806 (7th Cir. 2001) ....................................................................................10

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)..........................................................................6

*Greenberg v. Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) ....................................................................................16

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F Supp. 3d 372 (S.D.N.Y. 2018).........................................................................12

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019)................................................................11

*In re HD Supply Holdings, Inc. Sec. Litig.*,
    341 F. Supp. 3d 1324 (N.D. Ga. 2018)......................................................................14

*Heck v. Orion Grp. Holdings, Inc.*,
    -- F. Supp. 3d --, 2020 WL 3403111 (S.D. Tex. June 19, 2020) ......................................12, 15

*Heinze v. Tesco Corp.*,
    -- F.3d --, 2020 WL 4814094 (5th Cir. Aug. 19, 2020)..............................................2

*In re Hertz Global Holdings, Inc. Secs. Litig.*,
    No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017)..............................................6

*Higgonbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007) ....................................................................................14

*Ho v. Flotek*,
    248 F. Supp. 3d 847 (S.D. Tex. 2017), *aff'd*, 915 F.3d 975 (5th Cir. 2019) ............................3

*Huang v. EZCORP, Inc.*,
    259 F. Supp. 3d 563 (W.D. Tex. 2017).......................................................................12

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ..................................................................................9, 12

*Iron Workers Benefit and Pension Fund v. Anadarko Petroleum Corp.*,
    788 F. App'x 268 (5th Cir. 2019) ......................................................................3, 10, 13, 14

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
    34 F. Supp. 3d 298 (S.D.N.Y. 2014)....................................................................................11

*Kakkar v. Bellicum Pharms., Inc.*,
    2020 WL 2845279 (S.D. Tex. May 29, 2020)...............................................................1, 2, 3, 13

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) ...............................................................................................7

*In re KBR, Inc. Secs. Litig.*,
    2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) ....................................................................4

*In re Key Energy Servs., Inc. Secs. Litig.*,
    166 F. Supp. 3d 822 (S.D. Tex. 2016) ................................................................................4

*In re Kosmos Energy Ltd. Sec. Litig.*,
    955 F. Supp. 2d 658 (N.D. Tex. 2013) ..............................................................................14

*Lewis v. YRC Worldwide Inc.*,
    2020 WL 1493915 (S.D.N.Y. Mar. 27, 2020) ...................................................................8

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..............................................................................................15

*In re Magnum Hunter Res. Corp.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).........................9

*Mandalevy v. BofI Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018).....................................................................4

*Mandalevy v. Bofl Holding, Inc.*,
    2018 WL 6436723 (S.D. Cal. Dec. 7, 2018)........................................................................10

*Marcus v. J.C. Penney Co., Inc.*,
    2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)....................................................................15

*Markman v. Whole Foods Market, Inc.*,
    No. 1:15-cv-681-LY, 2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)...................................7

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)..................................................................................5

*Miller v. Cadence Bancorporation*,
    2020 WL 4581736 (S.D. Tex. Aug. 7, 2020) ...............................................................2, 8, 11, 12

*Naglich v. Applied Optoelectronics*,
    436 F. Supp. 3d 954 (S.D. Tex. 2020) ..............................................................................15, 16

*In re NVIDIA Corp. Secs. Litig.*,
    776 F.3d 1046 (9th Cir. 2014) ............................................................................................6

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
    50 F. Supp. 3d 1328 (C.D. Cal. 2014) ...............................................................................9

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ..........................................................................11

*Owens v. Jastrow*,
    789 F.3d 538 (5th Cir. 2015) ...............................................................................................9, 12

*Phillips v. Harvest Nat. Res, Inc.*,
    2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) ..........................................................................8

*In re Plains All Am. Pipeline, L.P. Secs. Litig.*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd*, 777 F. App'x .....................................................10

*Plymouth Cnty. Ret. Sys. v. Patterson Cos.*,
    2019 WL 3336119 (D. Minn. July 25, 2019) .............................................................................9

*Police and Fire Ret. Sys. of City of Detroit v. Plains All American Pipeline, L.P.*,
    776 F. App'x 726 (5th Cir. 2019) ..............................................................................................4

*In re Pretium Res. Inc. Secs. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017).........................................................................................7

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) .....................................................................................15

*Richman v. Goldman Sachs Group, Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).........................................................................................9

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ......................................................................................................3

*In re SeaChange Intern., Inc.*,
    2004 WL 240317 (D. Mass. Feb. 6, 2004) ...............................................................................11

*Shurkin v. Golden State Vintners, Inc.*,
    303 F. App'x 431 (9th Cir. 2008) .............................................................................................10

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)...........................................................................................................4

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ......................................................................................................3

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ....................................................................................................15

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)...........................................................................................................7

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014).......................................................................................15

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)...........................................................................................................7

*In re SunEdison, Inc. Secs. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018)..................................................................................7

*In re Tempur Sealy Int'l, Inc. Secs. Litig.*,
    No. 17-cv-2169 (LAK), 2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019)....................................6

*Tharp v. Acacia Communs., Inc.*,
    321 F. Supp. 3d 206 (D. Mass. 2018) ...................................................................................7

*Thorpe v. Walter Inv. Mgmt., Corp.*,
    111 F. Supp. 3d 1336 (S.D. Fla. 2015) ...............................................................................11

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    325 F. Supp. 3d 728 (N.D. Tex. 2018) .............................................................................6, 12

*Waterford T'ship Gen. Empls. Ret. Sys. v. SunTrust Banks, Inc.*,
    No. 1:09-CV-617-TWT, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) ..................................8

*Wieland v. Stone Energy Corp.*,
    2007 WL 2903178 (W.D. La. Aug. 17, 2007).......................................................................15

*Zagami v. Cellceutix Corp.*,
    15 Civ. 7194 (KPF), 2016 WL 3199531 (S.D.N.Y. June 8, 2016)...........................................7

**INTRODUCTION[1]**

Plaintiffs' Opposition fails to identify any actionable misstatement or any particularized facts supporting any inference—much less the strong, cogent and compelling inference required by the PSLRA—that Amanda Ginsberg or Gary Swidler personally acted with fraudulent intent or severe recklessness with respect to any specific purported misstatement. Generalized assertions that Match Group received customer complaints or faced challenges preventing third parties from abusing its products do not support an inference (much less a strong one as required by the caselaw) that Match Group's cautious statements to investors were fraudulent. All businesses of Match Group's size—with tens of millions of users in the United States alone—receive customer complaints and face business challenges due to bad actors. Match Group did not guarantee to investors that it was completely free from customer complaints or that third parties will never abuse its services. Far from it; Match Group *affirmatively disclosed* this risk to its investors.[2]

Rather, just like in other securities cases dismissed on the pleadings, Plaintiffs conflate generalized knowledge of business challenges with particularized knowledge that specific public disclosures were false. *See Kakkar v. Bellicum Pharms., Inc.*, 2020 WL 2845279, at *4 (S.D. Tex. May 29, 2020) ("Plaintiff erroneously conflates 'knowledge' with 'an intent to deceive'"; "Plaintiff must identify specific facts demonstrating scienter for each alleged misstatement made by each individual Defendant and not just describe what Defendants generally did or knew").

---

[1] The page limit for this Reply was extended to 16 pages. *See* ECF #41. All capitalized terms other than "Opposition" have the same meaning as in Defendants' opening brief.

[2] *See, e.g.*, App. 144, Ex. 2, Feb. 28, 2019 Form 10-K at 16 (disclosing risk that Match Group users could engage in inappropriate or dishonest conduct and warning about concerns over "romance scams" and "financial fraud"); App. 254, Ex. 4 ("There are definitely registered sex offenders on our free products"); Compl. ¶ 145; App. 157, Ex. 2, Feb. 28, 2019 Form 10-K at 29 (warning that the FTC was seeking $60 million to settle potential claims over alleged Match.com business practices); ECF #38, Motion to Dismiss ("MTD") at 9 (discussing risk disclosure that users of Match Group's products may engage in actions "*deemed to be hostile, offensive, defamatory, inappropriate, untrue or unlawful*," that Match Group's safeguards may not be sufficient to prevent such conduct, and that users "could be physically, financially, emotionally or otherwise harmed" by persons encountered through Match Group's services).

Recognizing this, Plaintiffs resort to a Gish gallop of arguments—attempting to obscure the straightforward bases for dismissal with irrelevant assertions in order to paper over the deficiencies in their claims.  Plaintiffs go so far as to stretch the allegations in their Complaint past the point of breaking; in the Opposition, for example, they state as fact the existence of a "wall of screens" in Match Group's offices showing "red flag" metrics.  (Opp. at 29.)  The Complaint, however, alleges only that the wall of screens included general traffic patterns, amount of users on the site, CPU memory, etc., and "that *if* there was an unusual traffic spike, it *could* indicate *to CW6* that it was due to 'bots' or because fraudsters had found a new way to avoid detection on the site."  (Compl. ¶ 51 (emphasis added).)  Plaintiffs' desperation is telling.  The Complaint does not satisfy the PSLRA and should be dismissed with prejudice, with no further amendment.[3]

## ARGUMENT AND AUTHORITIES

I.    **PLAINTIFFS HAVE NOT IDENTIFIED AN ACTIONABLE MISSTATEMENT OR DEMONSTRATED A STRONG INFERENCE OF SCIENTER**

As extensively laid out in Defendants' moving papers, Plaintiffs cannot survive dismissal merely by showing that the disclosures were arguably misleading or could have been clearer (which Plaintiffs have not done in any event).  The Opposition fails to identify any particularized facts showing that Ginsberg and Swidler personally made specific misstatements that they knew were so blatantly, inarguably and beyond-the-pale misleading as to support a strong inference of

---

[3] Courts frequently deny further leave to amend when, as here, the initial amended complaint after the appointment of lead plaintiffs does not satisfy the PSLRA and the plaintiff fails to show how any purported additional factual allegations would salvage the complaint. *See, e.g., Kakkar*, 2020 WL 2845279, at *5 (denying similar "nested" request to amend initial amended complaint in footnote at end of response); *Heinze v. Tesco Corp.*, -- F.3d --, 2020 WL 4814094, at *8 (5th Cir. Aug. 19, 2020) (affirming denial of leave to amend initial amended complaint where securities plaintiff "already had one opportunity to amend" and "has not identified how amendment would cure the defects . . . ."); *Miller v. Cadence Bancorporation*, 2020 WL 4581736, at *5 (S.D. Tex. Aug. 7, 2020) (dismissing initial amended complaint with prejudice).  Plaintiffs do not explain how their conclusory assertions about the February 20, 2020 Congressional request for information about sex offenders and sexual assault (about which no purported misstatements have been alleged), the departure of Tinder CEO Elie Seidman (which, as with the existing "resignation" allegations discussed in footnote 26 *infra*, is not alleged to have anything to do with any purported fraud) or unnamed "further developments in the FTC lawsuit" would cure the numerous deficiencies in Plaintiffs' existing amended complaint.

fraud.[4]  Plaintiffs instead assert that the "blatantly misleading" requirement does not apply to the "false statement" element, but do not dispute that this requirement applies to the scienter element. *See* Opp. at 13 n.3.  Scienter must be pled personally as to Ginsberg and Swidler and may not be established through group-pled allegations that lack specific details about specific reports or communications informing them of specific facts contradicting their own public disclosures.[5]

**A.      The Opposition Does Not Identify an Actionable Misstatement or Omission**

The Opposition identifies four categories of purported misstatements:   (i) alleged misstatements regarding the "integrity" of Match Group's subscriber base across multiple products (even though the FTC complaint pertained only to Match.com[6]); (ii) the reporting of financial results without "confessing" the "integrity" issues; (iii) certifications that Match Group had adequate internal controls; and (iv) alleged misstatements regarding the FTC matter.  (*See, e.g.*, Opp. at 14-20.)  Not one of these "categories," however, includes any actionable misstatements.[7]

---

[4] *See* MTD at 11 n. 47; *Ho v. Flotek*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Flotek's actual disclosures are not so blatantly misleading as to be severely reckless"), *aff'd*, 915 F.3d 975 (5th Cir. 2019).

[5] *See Kakkar*, 2020 WL 2845279, at *4 ("Plaintiff must identify specific facts demonstrating scienter for each alleged misstatement made by each individual Defendant and not just describe what Defendants generally did or knew"); *Iron Workers Benefit and Pension Fund v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269-70 (5th Cir. 2019) (affirming dismissal despite evidence that "could have led [individual defendants] to conclude that Anadarko's Colorado operations weren't in compliance with Commission rules," where allegations did not support strong inference that "Walker and McBride were aware that Anadarko was, as a matter of law, in violation of Commission rules"); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (noting that a corporation is deemed to have scienter only if the individual who made the misrepresentation has scienter); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly **who supplied the information** [that contradicted company's public disclosures] or **when** [management] knew the information"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (dismissing complaint that "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them").

[6] Likewise, while Plaintiffs spend much of the Opposition discussing Match Group's alleged shortcomings in preventing registered sex offenders from accessing its products (despite the FTC suit not having anything to do with registered sex offenders), Plaintiffs do not identify a single instance where Match Group publicly represented that its products were free of registered sex offenders.  Indeed, it is undisputed that the publicly available terms of use for Match Group brand services state that criminal background checks are not conducted.  *See* App. 256, Ex. 4.

[7] Further, as set forth on page 12 of Defendants' opening brief, several of the challenged statements are statements of opinion and forward-looking statements, for which Plaintiffs have likewise failed to state a claim.

**Membership Integrity.**  Contrary to Plaintiffs' assertions, Match Group never assured investors that no fraudulent accounts existed and, to the contrary, expressly warned investors that it could not stop all bad actors from abusing its products or from causing physical, financial or emotional harm to Match Group's customers.[8]  The Fifth Circuit has rejected other "event-driven" cases despite far stronger allegations that the company affirmatively touted the business practices placed at issue by the alleged regulatory violations or internal problems.[9]  As in those cases, the Opposition does not (and cannot) identify any statement where Match Group declared that it had no fraudulent accounts, would always be fully compliant with government regulations or would successfully prevent all persons from using their products for improper purposes.[10]

**Reported Results.**  The Opposition does not assert that Match Group's reported financial results are misleading for any reason other than Match Group's purported failure to "confess" that

---

[8] *See supra* footnote 2.  Plaintiffs also identify no affirmative misstatements regarding cancellation practices.  Contrary to Plaintiffs' assertion (Opp. at 21-22), a risk disclosure is not affirmatively misleading unless it can be construed as an "assurance that a certain bad outcome has not already occurred."  *In re Liberty Tax, Inc. Secs. Litig.*, 435 F. Supp. 3d 457, 466 (S.D.N.Y. 2020).  Again, nothing in Match Group's cautionary statements or other disclosures conveyed anything approaching an "assurance" that none of Match Group's customers were bad actors.  *See infra* footnote 9.

[9] *See Empls. Ret. Sys. v. Whole Foods Mkt., Inc.* 905 F.3d 892, 901-02 (5th Cir. 2018) (rejecting securities fraud claim based on New York regulatory action against Whole Foods Market for overcharging customers; agreeing that company's public commitments to transparency, quality and responsibility were not rendered misleading by alleged violations and did not trigger duty to disclose); *Police and Fire Ret. Sys. of City of Detroit v. Plains All American Pipeline, L.P.*, 776 F. App'x 726, 731 (5th Cir. 2019) (affirming dismissal of securities class action arising from 2015 oil spill ***that resulted in criminal charges***, despite affirmative statements emphasizing "Plains' commitment to proper systems and their intention to comply with regulations, which obviously turned out to be insufficient . . . ."); *Singh v. Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019) (general statements regarding regulatory compliance and company's code of ethics are not material statements of fact, even if such statements are allegedly followed by "significant regulatory violations"); *In re KBR, Inc. Secs. Litig.*, 2018 WL 4208681, at *5-6 (S.D. Tex. Aug. 31, 2018) (dismissing claims based on alleged violations of anti-bribery laws, despite allegations that company touted code of conduct); *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *7 (S.D. Cal. June 19, 2018) (statements in SEC filings regarding BofI's regulatory compliance and code of ethics were not actionable despite alleged AML violations); *In re Key Energy Servs., Inc. Secs. Litig.*, 166 F. Supp. 3d 822, 860-61 (S.D. Tex. 2016) (rejecting securities claims over alleged FCPA violations that required company to record "massive" impairment).

[10] Contrary to the impression left by the Opposition (Opp. at 15), Ginsberg did not guarantee in the December 2, 2018 *Pro Publica* article that Match Group would remove all bad actors from its products.  The article included statements that "[t]here are definitely registered sex offenders" who use the products, that Match Group relied on user complaints to catch bad actors, that PlentyofFish does not conduct criminal background checks and that Tinder, OkCupid and PlentyofFish users are not screened against registered sex offender lists.  (*See* MTD at 17; App. 256, Ex. 4.)

these undisputedly accurate results were supposedly derived from fraudulent accounts and improper marketing practices. (*See* Opp. at 17-18.) This theory does not support a claim. It is well-settled that a plaintiff cannot premise a securities fraud claim on the argument that a company's otherwise accurate financial information triggers a duty to "confess" purported regulatory violations or other issues arguably undermining the "integrity" of the revenues.[11]

Further, as with the Complaint, the Opposition misleadingly conflates the issue of fraudulent ***unpaid registrations*** (which do not generate subscription revenue) with fraudulent ***paid subscriptions*** (which do generate subscription revenue). Nowhere in the Complaint do Plaintiffs identify at all (let alone with any particularity) how many ***paid subscribers*** (as opposed to nonpaying registered users who gained temporary access to free content on Tinder, Match.com, Plenty of Fish and other Match Group products) were operating fraudulent accounts. Nor do Plaintiffs allege any particularized facts showing that Ginsberg or Swidler personally knew how many paid subscriber accounts (or, for that matter, unpaid registered users) were fraudulent or how long the fraudulent accounts existed before being shut down (or how many actually got access to Match Group's products), or that they were aware of any purportedly fraudulent marketing practices or any specific impact on Match Group's reported financial results. Plaintiffs admit that the typical fraudulent account was shut down within fifteen hours[12] and plead no facts showing that any financial statements were incorrect or have been (or were required by Match Group's auditor to be) restated due to the issues identified above, let alone by how much, or that Ginsberg or Swidler knew of any purported inaccuracy in Match Group's financials (there was none).

---

[11] *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (dismissing fraud claim when company failed to disclose improper source of revenues but otherwise accurately reported its revenues); *see also* ECF #42 (MTD) at 13 & n. 57 (collecting cases).

[12] *See* Compl. ¶ 38.

Simply put, there is no particularized allegation showing that Match Group's challenges in keeping third parties from misusing its products had *any* material impact on Match Group's financial statements or caused *any* statement about Match Group's performance to be misleading. While the Opposition baldly asserts (p. 4) that Match Group's websites "had rampant fraudulent and illegitimate accounts that inflated Match's user counts and revenues (when such bad actors paid for upgraded access)," the Complaint's actual allegations regarding fraudulent accounts pertain to *nonpaying* users, with no particularized allegation that fraudulent users actually "paid for upgraded access" (or otherwise paid for subscriptions) in any significant volume.[13]

The Opposition also errs (p. 18) in claiming that Defendants' financial statements violated Item 303 of Regulation S-K by not disclosing the alleged "integrity" issues. Plaintiffs admit that "the Fifth Circuit has not yet held that Item 303 creates a duty to disclose under the Exchange Act." Opp. at 18; *Pier 1*, 935 F.3d at 436. This Court should thus decline to recognize such a duty. *See In re NVIDIA Corp. Secs. Litig.*, 776 F.3d 1046, 1056 (9th Cir. 2014) (holding that Item 303 does not create duty to disclose under Securities Act). But even assuming that such a duty exists, Plaintiffs have failed to plead facts showing that Match Group improperly failed to disclose any "*known* trends" that would adversely affect future revenues.[14] As set forth above, there are

---

[13] *See* Compl. ¶ 44 (alleging that "15% of all Match.com membership *registrations* were fraudulent") (emphasis added); ¶45 (alleging that 20% of Tinder "accounts" were illegitimate). While CW7 purportedly "said there was no doubt that there were fraudulent accountholders who paid to have premium Tinder account features" (*id.*), neither CW7 nor any other confidential witness allege with particularity how many fraudulent Tinder users actually paid for features that required a subscription.

[14] *See Pier 1*, 935 F.3d at 436 (discussing requirement that purported trend must be "known" and must be reasonably expected to "have a material . . . unfavorable impact on . . . revenues"); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) (dismissing claim where complaint failed to show that trend was "known" to defendants); *In re Tempur Sealy Int'l, Inc. Secs. Litig.*, No. 17-cv-2169 (LAK), 2019 WL 1368787, at *11 (S.D.N.Y. Mar. 26, 2019) (complaint "failed to plead the existence of a trend known to management"); *In re Hertz Global Holdings, Inc. Secs. Litig.*, No. 13-7050, 2017 WL 1536223, at *19 n. 7 (D.N.J. Apr. 27, 2017) ("Because Plaintiffs have not pled that Defendants knew about these issues when they signed the SOX certifications, they also have not pled that Defendants knew they needed to make Item 303 disclosures in those same filings"); *In re BHP Billiton Ltd. Secs. Litig.*, 276 F. Supp. 3d 65, 88-89 (S.D.N.Y. 2017) (even though BHP knew of significant risks to dam, plaintiffs failed to show that risk was likely to have material adverse effect on financials); *City of Warwick Mun. Empls. Pen. Fund v. Rackspace Hosting, Inc.*, 2019 WL 452051, at *8 (S.D.N.Y. Feb. 5, 2019) (dismissing claim where "Plaintiffs have

no particularized allegations that Ginsberg or Swidler "knew" of any unfavorable revenue "trend" resulting from the alleged issues described in the Complaint. Indeed, Plaintiffs allege no facts showing that any "trend" existed at all with respect to fraudulent accounts or the other issues alleged in the Complaint.[15] Further, as stated above, Match Group timely disclosed the FTC inquiry (including the $60 million settlement proposal) and made specific warnings about problems with fraudulent users and sex offenders.[16] Even if a duty to disclose existed, Defendants have easily satisfied it.[17] And even if Plaintiffs could show some disclosure deficiency (which they cannot), the deficiency is not sufficiently blatant and inexcusable to rise to the level of fraud.[18]

---

failed to sufficiently allege . . . how or why the [undisclosed event] would necessarily have a material, detrimental effect on Rackspace's financials and operations").

[15] *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218-19, 221 (5th Cir. 2004) (failure to disclose a five-month price decline for an incomplete fiscal period was not a trend required to be disclosed by Item 303, particularly because the decline had "not significantly impacted Torch's gross revenue" at the time of the IPO); *Markman v. Whole Foods Market, Inc.*, No. 1:15-cv-681-LY, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016) (no Section 10(b) liability for alleged Item 303 omission where omitted facts do not render affirmative statements misleading) (citing *In re NVIDIA Corp.*, 768 F.3d at 1056); *In re BHP Billiton Ltd. Secs. Litig.*, 276 F. Supp. 3d 65, 88-89 (S.D.N.Y. 2017) (even though BHP knew of significant risks to dam, plaintiffs failed to show that risk was likely to have material adverse effect on financials); *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at*10 (S.D.N.Y. Jan. 14, 2010) (holding that two-month or single-quarter impact was not a "trend" disclosable under Item 303; collecting cases); *In re Pretium Res. Inc. Secs. Litig.*, 256 F. Supp. 3d 459, 482 n. 11 (S.D.N.Y. 2017) (same).

[16] By contrast, the defendants in *Walker v. Rent-A-Center* allegedly did not disclose that it was extensively relying on "free time" promotional offers without depreciating the value of its rental inventory to reflect the free use, thus rendering the financial statements misleading, with a confidential witness substantiating the allegation. *See* 2005 WL 8161388, at *9-10 (E.D. Tex. July 25, 2005). Here, Plaintiffs plead no facts showing what if any financial impact the alleged fraudulent accounts allegedly had on Match Group's financials, and Match Group repeatedly disclosed the fact that it faced risks from bad actors using its products.

[17] *See Zagami v. Cellceutix Corp.*, 15 Civ. 7194 (KPF), 2016 WL 3199531, at *14-15 (S.D.N.Y. June 8, 2016) (dismissing claim where company generally disclosed fact that clinical trials were capital-intensive and uncertain; "Plaintiff has not cited to case law suggesting that Item 303 requires" greater specificity); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (Item 303 satisfied with disclosure that company was "generally vulnerable to changing regulations" in Hawaii); *Tharp v. Acacia Communs., Inc.*, 321 F. Supp. 3d 206, 225 (D. Mass. 2018) (Item 303 satisfied by reference to "economic slowdown in China"); *In re SunEdison, Inc. Secs. Litig.*, 300 F. Supp. 3d 444, 467-68 (S.D.N.Y. 2018) (disclosures that company's "significant indebtedness" was "expect[ed] to continue" and required "significant cash flow" held sufficient).

[18] *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106-7 (2d Cir. 2015) (holding that even where plaintiff sufficiently alleged an Item 303 violation, alleged violation did not rise to level of fraud sufficient to plead Section 10(b) claim); *Sanders*, 2015 WL 1276824, at *10 (no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable.").

**Internal Controls.**   The Opposition likewise fails to identify any false statements regarding Match Group's internal controls over financial reporting.  Indeed, the fact that Match Group's outside auditor, Ernst & Young, provided clean audit opinions throughout (and after) the class period, without requiring Match Group to restate any of its financial results or to disclose any internal control weaknesses, eviscerates any inference that Match Group's financial statements or internal controls certifications were false.[19]  Plaintiffs plead no facts contradicting these opinions.

Plaintiffs' "internal control" and "Sarbanes-Oxley certification" arguments would fail even if Match Group had later been required to recognize a material weakness in its internal controls, which again it had not.  "'SOX certifications [regarding the accuracy of financial statements and the sufficiency of internal controls] contain[] an important qualification that the certifying officer's statements are true based on [his or her] knowledge.'" *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *16 (S.D.N.Y. Mar. 27, 2020) (quoting *Das v. Rio Tino PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018)).  Plaintiffs therefore "must sufficiently allege that Defendants knew that the financial statements were inaccurate" or that material control weaknesses existed. *See Lewis*, 2020 WL 1493915, at *16.  No such facts are pled.  Again, not even Match Group's "Big Four" outside audit firm found any accounting irregularities or control weaknesses, despite the fact that their audit of the 2019 financials occurred ***after*** both the FTC suit and the original complaint in this suit were already disclosed to the auditor.  *See Phillips*, 2016 WL 4523849, at *3

---

[19] *See, e.g.*, *Miller*, 2020 WL 4581736, at *3 (dismissing claim where Ernst & Young audited company's financial statements and "did not require a restatement, indicating that the [challenged accounting decision] was acceptable"; and where Ernst & Young likewise "gave an unqualified opinion on Cadence's controls, indicating the controls in place were appropriate"); *Phillips v. Harvest Nat. Res, Inc.*, 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016) (fact that "major accounting firm approved the filings" weighs against inferring fraud); *Waterford T'ship Gen. Empls. Ret. Sys. v. SunTrust Banks, Inc.*, No. 1:09-CV-617-TWT, 2010 WL 3368922, at *2 (N.D. Ga. Aug. 19, 2010) (dismissing securities case where "[t]he Plaintiff does not allege that anyone – other than the Plaintiff – has said that [the bank] should restate its financial reports from the first three quarters of 2008. . . .  Life is too short to say more about this").

("That a major accounting firm approved the filings shows that the [alleged] errors were not so obvious that their publication demonstrates an intent to defraud investors").

Moreover, courts consistently reject internal control allegations as insufficient to demonstrate scienter even in situations (unlike here) where the auditors did require the company to make significant financial restatements or recognize substantial material weaknesses in its internal controls, and even in cases (unlike here) where the plaintiffs presented "confidential witness" allegations claiming that the named defendants were apprised of the control problems.[20]

**FTC Matter.** The Opposition likewise fails to show how Defendants made any actionable misstatements regarding the FTC inquiry and lawsuit, let alone with scienter. Plaintiffs fault Match Group for not disclosing the inquiry until the February 28, 2019 Form 10-K, which was Match Group's first SEC Form 10-K or 10-Q filing after the FTC made its initial $60 million settlement request in November 2018. (*See* Opp. at 22; Compl. ¶ 145.) But there is no assertion that the FTC ever advised Match Group prior to November 2018 that it intended to pursue

---

[20] *See, e.g.*, *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 181 (5th Cir. 2019) (affirming dismissal despite large financial restatement, material control weaknesses and Audit Committee report concluding that the Company's then-CFO engaged in inappropriate accounting practices and fostered an inappropriate tone at the top); *Owens v. Jastrow*, 789 F.3d 538, 541 (5th Cir. 2015) (rejecting securities complaint even where the defendant overvalued its mortgage-backed securities portfolio *by 100%* and was forced by bank regulators to write down the entire *$1.62 billion* portfolio, and despite allegations that a confidential witness sent an email directly to defendants detailing deficiencies in company's internal valuation models, and reiterated his or her concerns at meetings attended by defendants); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 537-40 (5th Cir. 2008) (affirming dismissal of 10b-5 claims based on accounting irregularities despite allegations from several confidential sources that defendants told colleagues to report higher completion rates on construction projects, that one defendant was "informed, in great detail, . . . of all the problems associated with" the company's project-tracking software, that the company "improperly recognized millions of dollars of revenue on every single one of its EPC contracts," and that "the problems were widely known throughout the company"); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (affirming dismissal of 10b-5 claims arising from material weaknesses in internal controls despite allegations that a confidential former employee "overheard comments at headquarters about the company's accounting practices indicating that [it] lacked the internal controls it repeatedly lauded and embraced a culture of financial manipulation that favored hitting financial numbers rather than accurate accounting" and that the CEO told a confidential former executive that "he did not want to know the details of a revenue issue so that he would not be liable"); *Abrams*, 292 F.3d at 431-32 (internal control deficiencies insufficient to show scienter); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. 2014) ("Mere allegations that [the defendant] had deficient internal controls are insufficient to give rise to a strong inference of scienter."); *In re Magnum Hunter Res. Corp.*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014) (disclosure of "numerous" (thirteen) material weaknesses and dismissal of auditor did not show fraud), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

litigation.  Companies have no duty to disclose pre-suit government inquiries, and, at a minimum, any purported duty to do so here was not so clear-cut and obvious as to render Match Group's disclosures fraudulent.[21]  Match Group timely and appropriately disclosed the settlement request in the "Legal Proceedings" section of the next required periodic SEC financial disclosure after the request.  *See Shurkin v. Golden State Vintners, Inc.*, 303 F. App'x 431, 433 (9th Cir. 2008) (holding that the securities laws "require only periodic[,] not continuous disclosure"); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 809 (7th Cir. 2001) (same).  The Opposition cites no authority showing that Match Group was required to disclose the FTC inquiry any sooner than it did.

The Opposition likewise fails to show how any of Match Group's subsequent disclosures regarding the merits of the FTC inquiry were actionably false, let alone so inexcusably misleading as to be fraudulent.  Plaintiffs allege no particularized facts showing precisely what was alleged in the FTC complaint, what legal claims were asserted or what the legal standard is for holding Match Group liable in that action, let alone any particularized facts supporting a strong inference that Ginsberg or Swidler knew that the FTC was likely to prevail on its claims (which Plaintiffs have not).  The Fifth Circuit has rejected far stronger allegations that named defendants supposedly knew about regulatory violations and has insisted that plaintiffs show that the executives were aware that the company "was, as a matter of law, in violation" of the regulations.[22]

---

[21] *See Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (no duty to disclose "Wells notice" from SEC); *see also Plymouth Cnty. Ret. Sys. v. Patterson Cos.*, 2019 WL 3336119, at \*14 (D. Minn. July 25, 2019) (no duty to disclose government investigation in quarterly financials before government agency make known that it was contemplating filing suit or bringing charges); *Mandalevy v. Bofl Holding, Inc.*, 2018 WL 6436723, at \*7 (S.D. Cal. Dec. 7, 2018) (same).

[22] *See Anadarko*, 788 F. App'x at 269-70 (affirming dismissal despite evidence that "could have led [individual defendants] to conclude that Anadarko's Colorado operations weren't in compliance with Commission rules," where allegations did not support strong inference that "Walker and McBride were aware that Anadarko was, as a matter of law, in violation of Commission rules"); *Edgar v. Anadarko Petroleum Corp.*, 2019 WL 1167786, at \*14-16 (S.D. Tex. Mar. 13, 2019) (district court opinion detailing allegations of biannual meetings, PowerPoint presentations, weekly reports and budgets that purportedly put Walker and McBride on notice of regulatory violations); *In re Plains All Am. Pipeline, L.P. Secs. Litig.*, 307 F. Supp. 3d 583, 639-42 (S.D. Tex. 2018) (rejecting allegation that individual

Having furnished no particularized allegations regarding the contents of the FTC suit, the applicable legal standards for proving a claim in that action, or the Individual Defendants' personal knowledge of facts actually showing a regulatory violation, Plaintiffs have failed to plead an actionable claim over the FTC disclosures (or regarding Defendants' statements with respect to the merits of the FTC claims).[23]  Again, Match Group tempered its disclosures regarding the FTC inquiry with a warning that the FTC was seeking a $60 million settlement.  The allegations do not show an actionable misstatement, much less support a strong inference of fraud.[24]

### B.    Plaintiffs' Scienter Allegations Are Patently Insufficient

The Opposition's scienter arguments are even weaker.  For the reasons set forth in Defendants' opening brief, the "core operations" theory (*i.e.*, the argument that scienter can simply be imputed to the officers based on their titles given the alleged importance of the business practices at issue) simply does not apply to a company of this size and scope, and the "stock sale" and "stock offering" allegations likewise do not show scienter.[25]  There is also no merit whatsoever

---

defendants received reports showing alleged violations and were required by law to compile reports that would have revealed safety violations), *aff'd*, 777 F. App'x at 731.

[23] Reports reflecting conclusions by government enforcement bodies (or even by a company's own audit committee) will not support a strong inference of fraud absent particularized allegations supporting a strong inference as to each defendant's state of mind.  *See Asar*, 768 F. App'x at 181 (conclusions in company's own audit committee report insufficient); *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (allegations from SEC complaints are "unproved and are contested" and may "not be used to establish facts to demonstrate scienter"); *Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903, at *12-13 (N.D. Cal. May 17, 2011) (holding that an FDIC report concluding that "UCB senior executives" engaged in "intentional misconduct" was insufficiently particularized to show scienter as to the CFO); *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015) (explaining that, "as state of mind is the key issue in analyzing scienter, unless [a government] investigation reveals each defendant's state of mind for the alleged fraud, the effect of the investigation on the scienter analysis is limited"); *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014) (stating that government investigations are "not tremendously probative" of scienter absent particularized findings of scienter).

[24] *See* MTD at 4 n. 14 (collecting cases).

[25] *See* MTD at 19 n. 76; *id.* at 22-23.  The fact that Match Group conducted a stock offering in February 2019 likewise does not show scienter.  *See Abrams*, 292 F.3d at 434 (alleged motive to inflate stock price "to allow for successful stock offerings" insufficient to show scienter); *Miller*, 2020 WL 4581736, at *1, *4 (fact that company conducted stock offerings insufficient to show scienter); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) (rejecting "stock offering" motive argument).

to Plaintiffs' groundless assertion (Opp. at 12) that the resignations of Ginsberg and director Sam Yagan (who is not named as a defendant) somehow demonstrate scienter.[26]

The Opposition likewise fails to explain how Plaintiffs' vague confidential witness allegations show that Ginsberg or Swidler knew of specific facts that contradicted their public disclosures. Confidential witnesses must be sharply discounted.[27] Courts have consistently rejected far stronger confidential witness allegations.[28] As detailed on pages 20-21 of Defendants' opening brief, not only do the witnesses offer no particularized insight into the individual Defendants' state of mind, but the witnesses actually depict a company that made significant

---

[26] *See, e.g., Heck v. Orion Grp. Holdings, Inc.*, -- F. Supp. 3d --, 2020 WL 3403111, at * (S.D. Tex. June 19, 2020) (holding resignations insufficient absent "specific evidence indicating that the resigning officials knew of the alleged misconduct") (internal citations and quotation marks omitted); *Gregory v. ProNAi Therapeutics Inc.*, 297 F Supp. 3d 372, 415 (S.D.N.Y. 2018) (refusing to infer scienter because "[o]fficials resign for many innocuous reasons"). Plaintiffs plead no facts contradicting Match Group's Form 8-K disclosures that Ginsberg and Yagan did not resign based on any disagreement regarding Match Group's policies or practice. (Compl. ¶¶ 189-91.) Further, as Plaintiffs surely know, it was widely reported that Ginsberg resigned due to health reasons. Plaintiffs' cynical assertion that Ginsberg and Yagan resigned because of fraud is utterly baseless, offensive, and lacks credibility.

[27] *See* MTD at 6 n. 22.

[28] *See e.g., Edgar*, 2019 WL 1167786, at *18 (rejecting confidential witness allegations that "only speculate that the individual defendants might have received or reviewed internal reports documenting unsafe practices" but were "not alleged to have said that [the individual Defendants] read a particular report stating, or were told by company employees, that Anadarko violated Colorado laws"), *aff'd*, 788 Fed. Appx at 270 (despite evidence that "could have led [executives] to conclude" that Anadarko was not in compliance, allegations did not show executives were "aware that Anadarko was, as a matter of law, in violation of Commission rules"); *Owens*, 787 F.3d at 542-45 (holding that allegations that a confidential witness sent an email directly to defendants detailing deficiencies in company's internal valuation models, and reiterated his or her concerns at meetings attended by defendants, did not give rise to strong inference of scienter despite company's resulting $1.62 billion impairment and subsequent bankruptcy); *Shaw Grp.*, 537 F.3d at 537-40 (affirming dismissal of 10b-5 claims despite confidential witness allegations that defendants told colleagues to report higher completion rates, that one defendant was "informed, in great detail, . . . of all the problems associated with" the company's project-tracking software, that the company "improperly recognized millions of dollars of revenue on every single one of its EPC contracts," and that "the problems were widely known throughout the company"); *Cent. Laborers*, 497 F.3d at 552 (affirming dismissal despite allegations that a confidential former employee "overheard comments at headquarters about the company's accounting practices indicating that [it] lacked the internal controls it repeatedly lauded and embraced a culture of financial manipulation that favored hitting financial numbers rather than accurate accounting" and that the CEO told a confidential former executive that "he did not want to know the details of a revenue issue so that he would not be liable"); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 744 (N.D. Tex. 2018) (holding that no compelling inference of scienter could be drawn from allegations by "numerous confidential witnesses" that defendants "were personally aware of the excessive inventory and markdown risk"); *Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 570-71, 577-78 (W.D. Tex. 2017) (rejecting confidential witness allegations that defendant was aware of accounting deficiencies).

efforts to **combat** fraud, including by deploying dedicated fraud detection teams and shutting down most fraudulent accounts within hours.  (*See* Compl. ¶¶ 38, 40.)

The Opposition again overstates what the Complaint alleges the witnesses actually said regarding the "wall of screens," the contents of reports purportedly prepared for meetings attended by Match Group executives[29] or the percentage of fraudulent accounts and their purported financial impact.   Plaintiffs fail to allege that the "wall of screens" or the purported "[m]eetings, [c]onversations, and [f]irst-[h]and accounts" summarized on pages 9-12 of the Opposition resemble the type of communication demanded in *Anadarko* ("a particular report [or communication] stating . . . that Anadarko violated Colorado laws" or a communication showing that the named defendants were "aware that Anadarko was, as a matter of law, in violation of Commission rules").  *See e.g., Edgar*, 2019 WL 1167786, at \*18, *aff'd*, 788 Fed. Appx at 269-70.

As in *Anadarko*, the confidential witness allegations merely suggest (at most) that Ginsberg and Swidler may have attended meetings where the issue of fraudulent accounts was discussed generally.  These allegations simply do not constitute particularized facts showing that Ginsberg and Swidler were actually made "aware that [Match Group] was, as a matter of law, in violation" of any specific regulation.  *See* 788 Fed. Appx at 270.  General knowledge that Match Group faces risks from fraudulent accounts or has received customer complaints is not the same as specific knowledge that Match Group is actually violating FTC regulations or is making false statements to investors.  *See Kakkar*, 2020 WL 2845279, at \*4 ("Plaintiff erroneously conflates 'knowledge'

---

[29] As a particularly egregious example, the Opposition asserts that Ginsberg and Swidler "tracked 'red flag' metrics," including "the number of fraudulent member accounts" and "the rates at which such accounts were removed," and that "[s]uch metrics were detailed in reports distributed and presented by [CW1, CW2 and CW7] at monthly forecast meetings attended by CEO Ginsberg and CFO Swidler."  (Opp. at 4.)  This vastly overstates what the Complaint actually alleges in the paragraphs cited for this proposition (Compl. ¶¶ 19, 46, 48), which **do not allege that the "reports" said anything about fraudulent accounts.** *See Plains All American*, 777 F. App'x at 732 (rejecting assertion in briefing that was not actually pled in complaint).

- 13 -

with 'an intent to deceive'" and cannot survive dismissal merely by describing "what Defendants generally did or knew"); *Anadarko*, 788 F. App'x at 269-70 (affirming dismissal despite evidence that merely "*could have* led [individual defendants] to conclude that Anadarko's Colorado operations weren't in compliance with Commission rules"). The fact that some accounts were fraudulent, that Match Group's products were sometimes used by registered sex offenders, or that some customers allegedly found it difficult to cancel their subscriptions, does not mean that Match Group has violated FTC rules or defrauded investors. No company's fraud prevention system "is so foolproof that it cannot be evaded." *Higgonbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759-60 (7th Cir. 2007). And again, Match Group disclosed that it faced challenges from bad actors trying to abuse its products. Merely alleging that the executives discussed an issue that the company had publicly disclosed to investors does not show fraud.

The Opposition likewise fails to explain how any facts or business practices specifically known to Ginsberg or Swidler actually violated any FTC regulation or contradicted any Match Group public disclosure. Plaintiffs utterly fail to plead any facts showing that Ginsberg or Swidler were aware of the specific business practices actually alleged in the FTC complaint (*i.e.*, the purported failure to screen "love interest" alerts from persons with fraudulent accounts to nonpaying Match.com users, or the specific customer cancellation issues challenged by the FTC), let alone that they knew (or even had reason to suspect) that any of these alleged practices violated FTC rules or contradicted Match Group's disclosures to investors (which they did not).

Plaintiffs' case citations are readily distinguishable.[30]

---

[30] In *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1324, 1353-54 (N.D. Ga. 2018) and *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 666 (N.D. Tex. 2013), the defendants affirmatively represented that they were "on track" with respect to supply-chain execution or that production was "proceeding according to plan," which the plaintiffs contradicted through specific factual allegations showing that the company was not "on track" to meet such plans. Likewise, in *City of Pontiac Gen. Emps. Ret. Sys. v. Dell, Inc.*, 2016 WL 6075540, at *3-4 (W.D. Tex. Sept. 16, 2016), the plaintiffs alleged that the defendants' affirmative representations about first-quarter revenue expectations were rendered false by "specific problems" known to the defendants. By contrast, Plaintiffs plead no

## II.      PLAINTIFFS HAVE NOT PLED LOSS CAUSATION

The Opposition similarly fails to show how Plaintiffs have pled loss causation, which is unsurprising given the 52.8% ***increase*** in the stock price.  (*See* MTD at 2.)  While a corrective disclosure need not be a fact-for-fact "mirror image" of an alleged misstatement, it must nonetheless be tethered to an actionable misstatement and must make the fraudulent nature of the purported misstatement more probable than it would be without the corrective disclosure.[31]

Plaintiffs' allegations fall far short of these requirements for the reasons identified on pages 23-25 of Defendants' opening brief.  In particular, Plaintiffs have pled no facts showing that any

---

facts showing that Match Group was not "on track" to meet its revenue and growth expectations.  (*See* Opp. at 14.)  There is no assertion that Match Group missed any forecast or was later required to restate or correct any statements about Match Group's financial performance.  In *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), one of the individual defendants wrote internal emails and memos warning that the company's pivot toward customers with sub-prime credit profiles would cause "our business plan to fail" and vigorously opposing the plan, while simultaneously representing to investors that "we think these" customers can be reached "profitably."  *See id.* at 235-36.  Nothing of the sort is alleged here.  Further, unlike in *Lormand* (where the company's stock declined by 80%), Match Group's stock ***rose by 52.8%*** during the class period.  *See* ECF #38, MTD at 2.  In *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 587-88, 600-01 (W.D. Tex. 2014), the outside auditor refused to approve the company's financials, and the complaint offered far more particularized allegations regarding the individual defendants' awareness of the improper calculations (which, unlike here, were actually alleged with particularity to have a significant impact on the company's financial statements).  In *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *5 (W.D. La. Aug. 17, 2007), the complaint included confidential witnesses directly alleging that a named defendant falsified reserve reports.  In *In re Flowers Foods, Inc. Secs. Litig.*, 2018 WL 1558558, at *13-14 (M.D. Ga. Mar. 23, 2018), the company received an opinion from an outside law firm that its distributor program was illegal, and the officers were allegedly warned numerous times about the illegality, yet the company persisted in the program.  In *In re Bayer AG Secs. Litig.*, 2004 WL 2190357, at *10 (S.D.N.Y. Sept. 30, 2004), the executives were specifically advised at a specific meeting of adverse event reports serious enough to threaten a major drug's viability.  In *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684–85 (5th Cir. 2014), defendants in "an extremely small" E&P company allegedly used an "industry-specific term" that communicated to investors that certain production or geologic testing had already been conducted but later admitted that no such production or testing had in fact occurred.  In *In re Cobalt Energy, Inc.*, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016), the defendants allegedly knew "there was 'not even a remote chance'" the well at issue would be successful, yet continued to tout it.  In *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 855 (N.D. Tex. 2018), the complaint included specific emails where individual defendants were allegedly told of and approved proxy cost metrics that were lower than the publicly touted proxy cost.  In *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *2-3 (E.D. Tex. Sept. 29, 2015), the company announced it was raising new capital one day after the CEO assured he did not see conditions requiring the company to do so.  Plaintiffs also unavailingly cite the *Enron* litigation, which involved copious allegations of concrete misstatements, and which serves only to illustrate the types of severe allegations in cases that survive dismissal that are not present here.  *See* Opp. at 16; *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 696 (S.D. Tex. 2002).

[31] *See Heck v. Orion Grp. Holdings, Inc.*, -- F. Supp. 3d --, 2020 WL 3403111, at *23 (S.D. Tex. June 19, 2020) (no loss causation for stock drop caused by goodwill impairment where there was no allegation "that defendants knew but failed to disclose earlier that Orion's goodwill was impaired"); *Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 977-78 (S.D. Tex. 2020) (no loss causation where the alleged corrective disclosure "did not reveal that . . . the existence of actionable fraud is more probable than it would be without those disclosures").

of the post-September 25, 2019 "corrective disclosures" were "corrective" of any prior alleged misstatement about the FTC matter.  Only one of those purported "corrective" disclosures – the November 6, 2019 disclosure regarding an increase in legal fees for defending the FTC allegations and two unrelated suits (one of which accounted for the bulk of the increased fees) – even references the FTC matter.  (*See* MTD at 24.)  Again, the fact that a company has decided to spend money defending an already-disclosed litigation matter does not make the existence of fraud more likely.[32]  The remaining alleged post-September 25, 2019 "corrective disclosures" pertained to registered sex offenders and other matters wholly unrelated to the FTC complaint, and thus could not be "corrective" of Match Group's September 25, 2019 statement about the merits of the FTC complaint.  In addition, Plaintiffs cite no cases where the Fifth Circuit or any court in this circuit have found loss causation for a stock drop as insignificant as the 0.72% stock drop after the alleged February 28, 2019 "correction," nor does the Opposition assert that this miniscule decline exceeded the average daily trading range for Match Group's stock.[33]

Plaintiffs have thus failed to allege loss causation.  The control person claim also fails.[34]

### CONCLUSION AND PRAYER FOR RELIEF

Plaintiffs do not cite a single case where allegations as weak as those presented here survived a motion to dismiss.  For the reasons set forth in footnote 3, leave to file yet another amended complaint should be denied.  This case should be dismissed with prejudice.

---

[32] *See Axar*, 308 F. Supp. 3d at 757 (fact that company was in settlement negotiations was not inconsistent with statement that case was without merit); *Naglich*, 2020 WL 476078, at *16 (statement not corrective unless "the existence of actionable fraud is more probable than it would be without those disclosures").

[33] *See* MTD at 24 n. 97 (collecting cases).

[34] *See Asar*, 768 F. App'x at 189 (no control person liability absent a viable primary claim).

Dated: September 25, 2020

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP


/s/ *Peter A. Stokes*

Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 474-5201
Facsimile:  (512) 536-4598

*Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on September 25, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.


/s/ *Peter A. Stokes*
Peter A. Stokes

- 17 -