# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br><br>MATCH GROUP, INC., AMANDA W. GINSBERG, and GARY SWIDLER,<br><br>                Defendants. | Civil Action No. 3:19-CV-2356<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................1

II. STATEMENT OF FACTS ...................................................................................................3

    A. The SAC Allegations Address the Court's Concerns................................................3

        1. Expanded CW Allegations ...............................................................................3

        2. Modified Misstatements ....................................................................................9

        3. Expanded Scienter Allegations........................................................................12

    B. Post-SAC Facts Offer Support And Can Be Pled On Further Amendment ..........16

    C. Defendants' Material Misrepresentations and Omissions ......................................20

        1. The Membership Integrity Fraud (¶¶97-135).............................................20

        2. The Reported Results Fraud (¶¶136-142).....................................................20

    D. The Truth About Defendants' Fraud Begins to Emerge.........................................21

III. STANDARD OF REVIEW.................................................................................................22

IV. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS ..............22

    A. Plaintiffs Adequately Allege Materially False and Misleading Statements ..........22

        1. Ginsberg's *Wall Street Journal* Interview and Article ..............................22

        2. The Other Membership Integrity Fraud Misstatements ............................26

        3. The Reported Results Fraud Misstatements ...............................................30

        4. Defendants' Arguments Lack Merit ............................................................31

    B. Plaintiffs Adequately Allege that Defendants Acted with Scienter ......................33

        1. Applicable Legal Standards...........................................................................33

        2. Defendants' Motive and Opportunity to Commit Fraud ..........................33

        3. Defendants' Knowledge and Recklessness .................................................38

    C. Plaintiffs Adequately Allege Loss Causation........................................................42

    D. Plaintiffs Adequately Allege Control Person Liability..........................................45

V. CONCLUSION ..................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
   291 F.3d 336, 353 (5th Cir. 2002) ...............................................................................38

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
   572 F.3d 221 (5th Cir. 2009) .......................................................................................44

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .....................................................................................................22

*Barrie v. Intervoice-Brite, Inc.,*
   397 F.3d 249 (5th Cir. 2005) .......................................................................................38

*Basic v. Levinson,*
   485 U.S. 224 (1988) .................................................................................26, 27, 28, 45

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .....................................................................................................22

*Carter v. Transp. Workers Union of Am. Loc. 556,*
   353 F. Supp. 3d 556 (N.D. Tex. 2019) ...............................................................*passim*

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.,*
   497 F.3d 546 (5th Cir. 2007) .................................................................34, 35, 36, 38

*Crutchfield v. Match Group, Inc.,*
   No. 19-cv-2356-S, 2021 WL 1167578 (N.D. Tex. Mar. 26, 2021)...................*passim*

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) ...............................................................................................42, 43

*Eng v. Edison Int'l,*
   No. 315CV01478BENKSC, 2018 WL 1367419 (S.D. Cal. Mar. 16, 2018).............45

*Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.,*
   565 F.3d 200 (5th Cir. 2009) .......................................................................................33

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.,*
   No. H-20-0576, 2021 WL 182316 (S.D. Tex. Jan. 19, 2021) ....................................31

*Greenberg v. Crossroads Sys., Inc.,*
   364 F.3d 657 (5th Cir. 2004) .......................................................................................45

*Hall v. Rent-A-Center, Inc.*,
No. 4:16cv978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...........................................29, 37

*Hall v. Rent-A-Ctr., Inc.*,
No. 4:16cv978, 2017 WL 6379334 n.8 (E.D. Tex. Dec. 14, 2017)..........................................37

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ......................................................................................................44

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw*,
537 F.3d 527, 545 (5th Cir. 2008) ..............................................................................41

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ......................................................................41

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
No. 09 Civ. 5411 (PKC), 2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012) .................32

*In re BP p.l.c. Sec. Litig.*,
4:10-md-2185, 2017 WL 7037706 (July 13, 2017)....................................................24

*In re BP p.l.c. Sec. Litig.*,
No. 4:10-md-2185, 2018 WL 501594 (Jan. 19, 2018) ..............................................24

*In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*,
830 F. Supp. 361 (S.D. Tex. 1993)..............................................................................32

*In re Cobalt Int'l Energy, Inc.*,
No. H-14-3428, 2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ...................................32

*In re Crown Am. Realty Tr. Sec. Litig.*,
No. Civ. A. 95-202J, 1997 WL 599299 (W.D. Pa. Sept. 15, 1997) .........................25

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ....................................................................................35

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..........................................................................36

*In re Fleming Cos. Sec. & Derivative Litig.*,
No. CIVA503MD1530TJW, 2004 WL 5278716 (E.D. Tex. June 16, 2004)............37

*In re Henry Schein, Inc. Sec. Litig.*,
No. 18-CV-01428 (MKB), 2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ..............45

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
   236 F. Supp. 3d 824 (S.D.N.Y. 2017) ...............................................................25

*In re Marsh & McLennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...............................................................32

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*,
   543 F.3d 150 (3d Cir. 2008) ............................................................................25

*In re ORFA Sec. Litig.*,
   654 F. Supp. 1449 (D.N.J. Feb. 10, 1987)........................................................25

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................36

*In re Silvercorp Metals, Inc. Sec. Litig.*,
   26 F. Supp. 3d 266 (S.D.N.Y. 2014) .................................................................34

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018) ...............................................................24

*In re Toronto-Dominion Bank Sec. Litig.*,
   No. 17-1665 (NLH/JS), 2018 WL 6381882 (D.N.J. Dec. 6, 2018)................31, 34

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009)...............................................................36

*LaGrasta v. First Union Sec., Inc.*,
   No. 2:01-CV-251-FTM29DNF, 2005 WL 1875469 ...........................................25

*Lane v. Page*,
   549 F. Supp. 2d 1296 (D.N.M. July 17, 2009) ..................................................25

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) .................................................................33, 34, 36

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .....................................................................*passim*

*Marcus v. J.C. Penney Co.*,
   No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)........32

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..........................................................................................33

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
898 F.3d 461 (5th Cir. 2018) ................................................................................45

*N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) ..................................................................37

*Naglich v. Applied Optoelectronics*,
436 F. Supp. 3d 954 (S.D. Tex. 2020) ...................................................................45

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) .................................................................................30

*Perez v. Higher One Holdings, Inc.*,
No. 3:14-cv-755 (AWT), 2017 WL 4246775 (Sept. 25, 2017) ...............................31

*Plaisance v. Schiller*,
No. CV H-17-3741, 2019 WL 1205628 (S.D. Tex. Mar. 14, 2019) ........................45

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.
Allscripts-Misys Healthcare Sols., Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ....................................................................32

*Plymouth Cty. Ret. Sys. v. Patterson Cos.*,
No. 18-cv-871 (MJD/SER), 2019 WL 3336119 (D. Minn. July 25, 2019).............32

*Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) .........................................................................26

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..............................................................42, 43, 44, 45

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ................................................................................33

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ..............................................................32, 41

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) ...................................................................32

*Rougier v. Applied Optoelectronics, Inc*,
No. 4:17-CV-2399, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) .....................36, 41

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ..................................................................................32

*Sec. & Exch. Comm'n v. Narayan*,
   3:16-CV-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ............................................30

*Shurkin v. Golden State Vintners, Inc.*,
   303 F. App'x 431 (9th Cir. 2008) ..............................................................................................32

*Singh v. 21Vianet Grp., Inc.*,
   No. 2:14-cv-00894-JRG-RSP, 2017 WL 4322483 (E.D. Tex. Sept. 13, 2017) .......................41

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ..............................................................................................33, 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .........................................................................................................*passim*

*U.S. ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) .....................................................................................................30

*Van Dongen v. CNinsure, Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ..................................................................................34, 35

*Walker v. Rent-A-Ctr.*,
   No. 5:02-CV-3-DF, 2005 WL 8161388 (E.D. Tex. July 25, 2005) ...........................................31

*Wieland v. Stone Energy*,
   No. 05-2088, 2007 WL 2903178 (Aug. 17, 2007) ....................................................................38

## STATUTES

15 U.S.C. §78t(a) ..............................................................................................................................45

15 U.S.C. §78u-4(b)(4) .....................................................................................................................42

## RULES

Fed. R. Civ. P. 9(b) ..........................................................................................................................10

Fed. R. Civ. P. 8................................................................................................................................42

## REGULATIONS

17 C.F.R. § 229.303...................................................................................................................20, 30

Co-Lead Plaintiffs, Phillip R. Crutchfield and Samir Ali Cherif Benouis ("Plaintiffs") respectfully submit this Opposition to Defendants' Motion to Dismiss (Dkt. No. 54) ("MTD") their Second Amended Class Action Complaint (Dkt. No. 51) ("SAC"). For the reasons below, Plaintiffs respectfully request that Defendants' Motion be denied in full.

## I. INTRODUCTION

On December 20-21, 2018, the *Wall Street Journal* published video and print interviews with Defendant Ginsberg, the CEO of the largest online dating company, who touted its market dominance to investors as enhancing both user safety and reputational capital, by boasting, "***It helps for us to have a portfolio [of matchmaking apps] because if there's bad behavior on one app, we can identify that user, we'll kick him off all the apps***." She described Match's "***one strike you're out***" policy and referenced "***processes and best practices across the organization to keep bad actors out***." These statements touted approaches, processes, and capabilities that served to reassure investors and analysts that Match protected users and investors alike from "bad behavior" by "bad actors" whose misconduct could put users at risk or harm Match's stock price.

Ginsberg's statements were materially false and misleading when made. Match simply lacked those purported approaches, processes, and capabilities, as evidenced by the SAC's extensive CW allegations and *Propublica / Columbia Journalism*'s investigative reporting. Match's various brands handled "bad actors" – fraudsters, bots, scammers, sex offenders, and felons – in wildly disparate ways. No brand prevented these "bad actors" from signing up in the first place, often using assumed names, fake identities, phony profile pictures, and stolen credit cards. Match.com did not screen for felons. Tinder did not screen for felons or sex offenders. Users who registered via app stores or in-app purchases could not be screened. Users registering directly with Match.com could not be run against a sex offender registry because basic identifying information – name, birth date, address – was not required. Bad actors often upgraded to long-

1

term paying subscriptions to gain access to functionalities in furtherance of their misconduct and to legitimize their accounts and avoid detection. The small teams tasked with retroactively addressing massive volumes of user complaints and auto-flagged accounts had stringent quotas to meet and as little as *36 to 60 seconds* to address the details of fraud or sexual assault claims, review user messages, and make a decision on blocking or removing the user – from just that single brand. There is no evidence in the record that integrity employees had the time, resources, staffing, capability, or wherewithal to forensically research bad actors across Match's portfolio of brands.

Ginsberg was at least deliberately reckless in making these statements. Match's screening system was prompted by a sexual assault lawsuit but had gaping holes. When Match brand PlentyofFish repeatedly reduced monthly forecasts to account for an unabating volume of bad actor accounts, Ginsberg and Defendant Swidler grew frustrated and were "tired of hearing about it," but deliberately failed to increase staffing or resources to actually address the problem. As reported by *Propublica* / *Columbia Journalism*, rape and sexual assault victims, like Natalie Dong and Sue M., who bravely contacted Match brands to report their rapists/assailants, received boilerplate responses or none at all. PlentyofFish failed to acknowledge Sue M.'s report of the man charged with her felony assault, despite her providing his username and offering the police report. Ms. Dong fought for *weeks* to get her rapist removed by Match brands during summer 2019. Whereas Bumble – a non-Match brand – responded within *20 minutes*, Match brand Hinge took *three days* to respond and remove him. Ms. Dong spent *weeks* fighting to get him removed from Tinder, providing his username, age, phone number, and details and identifying him as "dangerous" to "women users [who] deserve to be kept safe" – before she finally stood outside Tinder's offices with a large sign demanding action. Had Ginsberg's statements from six months prior been even remotely true, such herculean efforts would have been unnecessary.

Indeed, the sheer volume of paying and non-paying illegitimate and "bad actor" accounts across Match's brands, as described by several CWs, illustrates both falsity and scienter for Ginsberg's misstatements and the other misstatements the SAC alleges. Match.com's Senior Finance Manager prepared detailed monthly Finance Department analyses showing that 15% of all registrations over three years were consistently fraudulent. Tinder's Director of Finance cited its Director of Analytics in revealing Tinder had a working assumption that 20% of all accounts were bots or fraudulent. These shocking numbers, encompassing tens of millions of user accounts – a volume hopelessly uncontrollable for Match's small anti-fraud teams – affected Match's reported results, both indirectly and directly. Over 30% of Match's paying memberships resulted from its "aggressive" marketing of purported interest by other users, including illegitimate and "bad actor" accounts, which pushed paid upgrades needed to access messages, a "percentage" of which were fraudulent, and to send replies. More directly, 15% to 20% of fake, fraudulent, and bad actor accounts on Tinder were themselves paying accounts, and Match.com's Fraud Department removed up to 4,000 paying accounts every day, which was 50% - 62.5% of the total accounts removed daily (meaning just 37.5% to 50% were non-paying). These metrics, which were closely tracked internally, equate to millions of paying accounts removed every year.

As discussed below, Plaintiffs respectfully submit that these and other enhanced SAC allegations address the Court's concerns and satisfy their pleading burden at this stage.

## II. STATEMENT OF FACTS

### A. The SAC Allegations Address the Court's Concerns

#### 1. Expanded CW Allegations

The SAC addresses many of the Court's specific concerns stated in the MTD Order (*Crutchfield v. Match Group, Inc.*, No. 19-cv-2356-S, 2021 WL 1167578 (N.D. Tex. Mar. 26, 2021)) with supplemental CW allegations that augment the FAC's pleading and that Plaintiffs

respectfully submit satisfy their pleading burden at this stage.[1]  Indeed, Plaintiffs' new allegations provide detailed information regarding, among other things: (1) the percentage of fraudulent accounts that were incorporated into Match's paid accounts, demonstrating that fraudulent members were paying to access Match's features (¶¶48-50);[2] and (2) the frustration expressed by Ginsberg and Swidler at PlentyofFish reducing its forecasts.  ¶54.  At minimum, these targeted, enhanced allegations demonstrate Plaintiffs' ability to use further amendments to provide the Court with additional factual allegations as directed.

### a. The Impacts of Illegitimate and Fraudulent Accounts

The MTD Order stated that "[i]mportantly, while Plaintiffs repeatedly assert that, during the Relevant Time Period, a substantial percentage of Match's user accounts were fraudulent, the Amended Complaint does not specifically distinguish between allegedly fraudulent *paying* users, *i.e.*, 'subscribers,' whose accounts and payments would directly affect Match's financial reports, and *non-paying* users who merely use Match's free services."  *Id.* at *12.  The Court raised this 'paying vs. non-paying' concern regarding the falsity of both the Membership Integrity Fraud misstatements (*id.*) and the Reported Results Fraud misstatements (*id.* at *13-14), and regarding

---

[1]  Like the FAC, the SAC pleads that Match operates dating websites and apps such as Match.com., Tinder, and PlentyofFish, . provideing a "freemium" model offering basic features after a simple registration and enhanced features if users upgrade to paid/premium memberships, from which it derives most revenues.  *See* ¶¶2, 33-37. Conversion and retention of free members to paying members was its main strategic goal.  *Id.*  Defendants closely tracked metrics like total registered members, conversion rate from unpaid to paid memberships, paid member count ("PMC"), and average revenue per user ("ARPU"), alternating focus between PMC and ARPU, which decreased if Match spent more money on security or safety.  ¶¶37, 52.  They also tracked "red flag" metrics, many in real-time, like: (1) the number of fraudulent member accounts; (2) their percentage of total memberships; (3) whether those numbers were stable; (4) the rates at which such accounts were removed; and (5) unusual spikes in registrations or site activity that signaled larger-scale website attacks from "bots."  ¶¶37, 61, 72, 163, 171.  Such metrics were detailed in reports distributed and presented by CW1 (Senior Manager of Financial Planning and Analysis at Match), CW2 (Senior Finance Manager at Match.com), and CW7 (Tinder's Director of Finance), at monthly forecast meetings attended by Defendants Ginsberg and Swidler.  *Id.*  These reports included fraudulent accounts, without downward adjustments, that Match considered as "business as usual."  *Id.*

[2]  Unless otherwise indicated, all emphasis is added, all quotations and internal citations are omitted, and all "¶" references are to SAC paragraphs.  Defendants' Appendix submitted a purported redline of the SAC against the FAC as Exhibit A, to which Plaintiffs hereby object to the extent that it contains any inaccuracies.

Defendants' scienter (*id.* at *17). Contrary to Defendants' argument (*see* Motion at 7 n.16 and 19-20), the SAC addresses this concern in two ways.

First, the SAC's CW allegations confirm that illegitimate accounts materially inflated ***both*** Match Group's consolidated reported user statistics, metrics, and trends ***and*** its reported financial results. *See* ¶5. The SAC (like the FAC) realleges, *inter alia*: (1) CW2, Match.com's Senior Finance Manager at headquarters, prepared a Finance Department analysis showing that 15% of all Match.com registrations from February 2016 – February 2019 were fraudulent, based on CW2's close review of financials for ten days each month (¶¶21, 46); (2) CW7, Tinder's Director of Finance, said that Tinder had a working assumption that 20% of all its accounts were bots or fraudulent, citing Tinder's Director of Analytics, Bob Wilson (¶47); and CW5, a long-time Match.com Senior Fraud Investigator on Match.com and Match Group's affinity brands, described illegitimate accounts as "slow burners" engaged in long-term fraud efforts (¶40).

The SAC adds new CW allegations establishing that a "***significant***" percentage of scam accounts ***paid*** for <u>***extended***</u> *length* (three-month, six-month, or 1-year) memberships (¶¶5, 50) – a huge problem on Tinder, Match Group's highest-earning brand with $800 million+ in 2018 revenue (¶¶6, 122),[3] and on Match.com and Match Group's affinity brands.[4] CW11, one of six Tinder Trust & Safety Division members, said ***15% - 20%*** of fake, fraudulent, and bad-actor accounts on Tinder were ***paid*** subscriptions, including bots, users posing as someone else, accounts

---

[3]      Defendants wrongly attempt to repackage the SAC and compartmentalize the alleged fraud to one specific Match brand or another, *e.g.*, by repeatedly saying that the FTC lawsuit only involved Match.com (*see, e.g.*, Motion at 7, 8). To the contrary, the SAC arises from misstatements and omissions about fraudulent, illegitimate, dangerous and/or bad-actor accounts across Match's suite of brands, including Match.com, the "affinity" brands, and Tinder, and it alleges partial corrective disclosures concerning not only fraud accounts on Match.com, but also, *e.g.*, sex offenders on Match.com, Tinder, OkCupid, and PlentyofFish (¶153) and underage users and sex offenders on Match branded websites (¶¶156-157).

[4]      The SAC alleges that Match Group's so-called "affinity" brands were the People Media Group collection of niche sites like ourtime.com and blackpeoplemeet.com (*see* ¶24), which did not include Tinder. These allegations clarify for the Court some confusion regarding the Match Group umbrella of brands. *See, e.g.*, MTD Order at 1 n.3.

using stolen credit cards to pay for subscriptions, and scammers trying to defraud other users. *See* ¶48. CW13, a Community Operations Manager at Tinder who managed a team of employees that reviewed accounts flagged as potentially fake, fraudulent, or bad actors, said that Tinder kept regularly updated, internal estimates of active fake, fraudulent, and bad-actor accounts. *Id.*[5] CW5, a long-time Senior Fraud Investigator on Match.com and the affinity brands, said ***all eight*** Fraud Department members ***each*** blocked 400-500 ***paying*** accounts ***daily***, which was roughly 25% of the total accounts each of them reviewed daily or 50% - 62.5% of the accounts each removed for fraud every day. *See* ¶49. Thus, the Fraud Department team together removed ***3,200 – 4,000 paying accounts every day*** from Match.com and the affinity brands alone (¶49), data closely tracked and analyzed in an internal company database (¶57).

CW5 credibly explained why such a high percentage of fraudsters paid for subscriptions (fraudulent schemes by their nature require two-way communication, and only paying memberships could send or read messages) and why they chose longer subscriptions of ***three-six months+*** (to legitimize the account, avoid detection, and make removal more costly). *See* ¶50. CW5 called the Fraud Department the "most hated" team internally because of its negative impacts on revenues. When members of the Fraud Department blocked and removed accounts, the Match.com system automatically refunded ***all*** subscription fees, even for longer six-month or one-year memberships, because they were often paid with stolen credit cards. *See* ¶55.[6] Not

---

[5] CW13 cited a nondisclosure agreement as precluding CW13 from providing specific numbers to quantify those estimates. *Id*. This is a common concern among employees of dating companies, as evidenced by the May 17, 2021 *ProPublica/Columbia Journalism Investigations* Article discussed in §II.B., *infra*.

[6] Defendants egregiously disregard these allegations, to cherry-pick and contort CW5's statements, which cannot be read as "Match.com quickly weeded out most fraudulent accounts," as they claim. *See, e.g.*, Motion at 8, 16. Indeed, Defendants often argue out of both sides of their mouths, *e.g.*, when they tout Match.com's purportedly "significant efforts" in stopping fraud through "blocked" bad-actor accounts. *Id.* Defendants cannot have it both ways – if the blocking of bad-actor accounts was "significant," then so, too, were the impacts on revenues and reported user metrics from blocking such a significant number of user accounts. Moreover, Defendants' analogy to colleges or sports/concert venues refunding monies paid by expelled bad actors (Motion at 9 n.21) is absurd. No college or venue

surprisingly, CW5 stated confidently that Match tracked the percentage of fraudulent accounts that were paid, due to the significant amount of refunds – information that the "higher ups" wanted to know. *Id.*

Second, the SAC details the ***indirect*** effects of fraud accounts on Match Group revenues and user metrics from its websites and apps, *e.g.*, due to ***the company's*** improper marketing of such accounts to non-paying, legitimate users to entice them to ***upgrade*** into ***paying*** subscriptions. This process was performed through "aggressive" email solicitations highlighting "winks" or messages from purported love interests (which in reality were fraudulent or illegitimate accounts) that could only be viewed or read after an upgrade into paid memberships like Tinder Gold (¶¶5, 74-77, 173). These memberships had inadequately-described pricing, and they were hard to cancel once activated, leading to ***thousands*** of daily customer complaints over billing issues (¶¶81-92, 173). CW2 said that "over 30%" of paying memberships were non-paying members who converted to subscribers after receiving a notification that they had a message they could not read unless they upgraded, and that a "percentage" of the messages so marketed were fraudulent. ¶173.

### b. PlentyofFish Frustration

The Court noted the FAC's allegation that repeated adjustments to financial forecasts at Match's PlentyofFish brand was a "point of frustration" for Defendants Ginsberg and Swidler, but found that there were competing inferences as to the reasons. MTD Order at *2, *17 & n.17. The SAC provides a clarification from CW1, the Senior Manager of Financial Planning and Analysis at Match headquarters who made the FAC's original "frustration" statement and added in the SAC that Ginsberg and Swidler were frustrated that PlentyofFish kept reducing forecasts due to the removal of fake/fraudulent accounts and were "tired of hearing about it." *See* ¶¶54, 167. Yet,

---

regularly expels 15%-20% of all users, month after month, year after year, such that leadership assumes an even larger percentage of bad actors are in the building, while perpetuating a threadbare security team.

CW1 also made clear that Ginsberg and Swidler did nothing to enhance PlentyofFish's staffing or resources to combat fraud, because anti-fraud measures were viewed as not revenue-generating, so additional funding to prevent fraud was not allocated, despite the problem's persistence. ¶99. As pled in the SAC, the inference is clear – Ginsberg and Swidler turned a bind eye, so long as the fraud rate was sufficiently predictable. This enhanced description in the SAC bolsters Plaintiffs' alleged scienter inference.

### c.    Inadequate Anti-Fraud Measures

The SAC details Match brands' threadbare anti-fraud measures that allowed illegitimate accounts to proliferate, dangerous users to operate undetected, and understaffed, overworked teams to be driven to exhaustion. For instance: (1) CW3, CW4, and CW5 described fraud-flagging software that was not triggered even when a user employed any one of a cloaked IP address, masking software, or stolen credit cards (¶42); (2) CW4 said that non-paying fraudulent and illegitimate accounts (which Match used in its marketing to real users) were not screened for fraud (¶43); and (3) CW5, a long-time Senior Fraud Investigator on Match.com and Match Group's affinity brands described a small, eight-person Fraud Department tasked to manually review and block ***millions*** of illegitimate accounts at a break-neck, relentless pace (¶¶24, 46). *See* §II.A.1.a., *supra*. That CW5's team had to work "24 hours a day, 7 days a week, 365 days a year" is not a positive, as Defendants spin (Motion at 5 and n.12), but rather evidence of severe understaffing that required each team member to manually review 1,200 accounts per day (¶44). Over even a 12-hour day, that meant 100 accounts per hour, or an account every 36 seconds, all day long, without a single pause or break the entire shift – a pace that precludes ***any*** thoughtful analysis, let alone follow-up across Match's other branded websites.

The SAC makes clear that the widespread, illegitimate accounts at issue included dangerous users across Match's brands. The SAC realleges that Match.com and Tinder failed to prevent sex offenders from registering, Match.com did not screen for felons, and Tinder did not screen for felons or sex offenders. *See* ¶¶67-69, 71. The SAC adds that Match.com's sex offender screening system had serious flaws, including that users who registered via app stores or in-app purchases could not be searched *at all*, and that even users who registered directly with Match.com could *not* be subjected to a sex offender registry search because Match.com failed to require basic identifying information (full name, birthdate, mailing address). *See* ¶65.[7] Among the user subset who could be searched, 3% were flagged for hits on sex offender registries (*id.*), which triggered a tedious manual review by a small, four-person team described by CW3, CW8, and CW9 (¶66). By contrast, these CWs said Match.com had an eight-person team *retroactively* investigate user complaints about other users and one person to reactively investigate serious issues like sex offender complaints. *Id.*

### 2. Modified Misstatements

The SAC presents a modified set of alleged misstatements, conforming the pleadings to the rulings in the MTD Order and adding new, unvetted allegations. *See* ¶¶97-135 (Membership Integrity Fraud); ¶¶136-142 (Reported Results Fraud). Plaintiffs respectfully submit that these SAC allegations sufficiently plead actionably false or misleading misstatements or omissions.

The Court raised concerns regarding Defendant Ginsberg's alleged misstatement that "if there's bad behavior on one app," Match "can identify that user and we'll kick him off all the apps"

---

[7] Match.com's stated reason for failing to request this basic identifying information – privacy concerns – lacks validity. Given that the sex offender screening system was implemented in the wake of litigation over sexual assault by users (¶65), such information is *commonly* requested in website registrations, and Match.com itself could ensure that any such information provided at registration would be kept private and confidential. Thus, Defendants' argument that this purported excuse is "undoubtedly a legitimate concern" (Motion at 12) rings hollow.

across Match's brands.  *See* MTD Order at *5, *13.  The Court expressed the concern that the December 2, 2019 *Propublica*/*Columbia Journalism Investigations* article pled in Plaintiffs' prior FAC as having published Ginsberg's misstatement in actuality attributed it to her prior interview by the *Wall Street Journal* "sometime" in 2018, a timing ambiguity that precluded satisfaction of Fed. R. Civ. P. 9(b) pleading standards.  *Id.* at 23.  The Court added that the context provided within the December 2, 2019 article, where Match explicitly disclosed the existence of registered sex offenders on free products and a lack of uniform screening protocol for such individuals, meant that the information Ginsberg omitted would not have significantly altered the total mix of information available, making her misstatement, as published in that article at that time, immaterial.  *Id.* at 23-24.

The SAC fully addresses these concerns.  *See* ¶¶104(a)-(c).  First, it alleges Ginsberg's full misstatements, including: "***It helps for us to have a portfolio [of matchmaking apps] because if there's bad behavior on one app, we can identify that user, we'll kick him off all the apps***.  I do say 'him' because generally we see more bad behavior with men.'"  *Id.*  Second, the SAC alleges that Defendant Ginsberg's misstatements were published on December 21, 2018 in a *Wall Street Journal* article titled "*The CEO Behind Tinder, OKCupid on the Future of Online Dating*."  *Id.*  It alleges that this "*Wall Street Journal* article was the original publication of this quote, providing the 'where and when' for Ginsberg's comments, and it was the source document from which *Propublica* authors pulled the quote a year later for their piece published on December 2, 2019."  *Id.*  Third, addressing the Court's point regarding the context Defendants provided a year later, the SAC alleges that "the *Wall Street Journal* article contains no statement by Ginsberg or Match regarding registered sex offenders being on Match's free products or Match lacking a uniform screening protocol for such individuals.  The *Wall Street Journal* article's context is devoid of any

hedging language whatsoever concerning Defendant Ginsberg's reassuring statements concerning user safety on Match-branded websites and apps." *Id.*

Indeed, Ginsberg's contemporaneous statements double down on Match's purported removal of "bad actors" from the full suite of Match brands and products. For instance, the SAC alleges that the *Wall Street Journal* published a video interview with Ginsberg the day before – on December 20, 2018 – captioned "*Match Group CEO Mandy Ginsberg: How I Work*," which contained the alleged misstatement, "[I]t's really important for me to make sure that ***we do everything we can to provide safety and security for our users – everything from one strike you're out to making sure that we put in processes and best practices across the organization to keep bad actors out***." *See* ¶102.

The SAC pleads that, given the undisclosed facts revealed by the CWs, *see, e.g.*, §II.A.1.-3., *supra*, Ginsberg's statements on December 20-21, 2018 were materially false and misleading. *See* ¶¶103, 105.[8] Indeed, in the Membership Integrity Fraud, the SAC pleads several new, untested misstatements (*see, e.g.*, ¶¶102, 104, 112, 118, 120, 122) and modified versions of other misstatements (*see, e.g.*, ¶¶98, 100, 106, 110, 116, 126, 128, 130, 134), or it realleges a set of original misstatements in the context of enhanced overall pleading (*see, e.g.*, ¶¶108, 114, 124, 132).[9] It pleads enhanced allegations, drawing from the CWs, as to why these misstatements and omissions were materially false and misleading. *See* ¶¶99, 101, 103, 105, 107, 109, 111, 113, 115, 117, 119, 121, 123, 125, 127, 129, 131, 133, 135. The SAC also realleges misstatements and

---

[8] Defendants' attempts to downplay Ginsberg's statements as a "soft" interview (Motion at 11), whatever that means, are meritless. Suffice it to say, a CEO's videotaped and reported remarks to the *Wall Street Journal*, even if interlaced with an occasional personal anecdote, are closely watched by analysts and the market, and Defendants cite no authority whatsoever permitting them to score the "hardness" of such an interview at the Rule 12(b)(6) stage. Also unavailing is Defendants' comment that Ginsberg's interview was "plainly available" when the FAC was filed (Motion at 15), as the SAC superseded the FAC after the Court raised concerns and granted leave to amend. They cite no authority for the proposition that securities plaintiffs cannot raise more misstatements in later amendments.
[9] Defendants are simply wrong in claiming that Ginsberg's *Wall Street Journal* interview is the only "new" misstatement and that the SAC merely "repeats the same" misstatements as the FAC. *See* Motion at 15.

omissions in the Reported Results Fraud (¶¶137-141), with modified allegations, enhanced after the CW additions, as to why they were false or misleading (¶¶136, 142).[10]

### 3. Expanded Scienter Allegations

The SAC pleads an enhanced scienter section (SAC §V.F., ¶¶161-198) with new and expanded allegations that must be read holistically with facts realleged from the prior FAC under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). As discussed in §II.A.1.a., *supra*, the SAC addresses the Court's specific concern that the FAC insufficiently differentiated between paying versus non-paying illegitimate and fraudulent accounts on Match's branded apps and websites (*see* MTD Order at *17). Plaintiffs buttress the original statements of: (1) CW1, CW2, and CW7 (¶¶162-163) with the additional statements of CW11, who said that 15%-20% of fake, fraudulent, and bad-actor accounts were paid subscriptions (¶165); (2) CW5 who said all eight Fraud Department members reviewed ~2,200 flagged Match.com and affinity brand accounts daily, blocked ~45% of them (~990) daily for fraudulent activity, and found a "significant percentage" of the blocked accounts were paying users, many on long-term subscriptions (¶166); (3) CW13, who said that Tinder kept ongoing internal estimates of existing, active accounts that were fake, fraudulent, or bad actors not caught by the anti-fraud team and "there's knowledge of that" within Tinder's leadership (¶165); and (4) CW5 who was confident that Match tracked the percentage of paying fraudulent accounts, a data point that the "higher ups" "want to know" and "always wanted to keep track of" (¶166).

As discussed in §II.A.1.b., *supra*, the SAC addresses the Court's question regarding CW1's statement about "frustration" by Ginsberg and Swidler over downward forecast adjustments by PlentyofFish. MTD Order at *2, *17 & n.17. In the SAC, CW1 clarified that they were frustrated

---

[10] Following MTD Order's guidance, Plaintiffs did not reallege the Internal Controls Fraud or the FTC Investigation Fraud and the correlating misstatements and omissions.

that PlentyofFish kept reducing forecasts due to removal of fake/fraudulent accounts and were "tired of hearing about it," yet did not increase its anti-fraud resources. *See* ¶¶54, 167.

The SAC also augments CW4's description of twice weekly meeting discussions of fraud accounts and descriptions by CW6, CW9, and CW1 of a wall of screens at headquarters that tracked website usage levels and traffic patterns and revealed "bot" or fraudster activities (¶168), first pled in the FAC, with CW5's description of an internal database that: (a) was accessible at any time; (b) tracked how many accounts each Fraud Department investigator reviewed daily, the reasons why accounts were flagged, and how many were blocked for fraudulent activity; and (c) could generate reports on the entire Fraud Department's metrics. ¶169. The SAC also pleads scienter based on the material direct and indirect effects of fraudulent and illegitimate accounts on Match's reported results and metrics, as described in §II.A.1.a., *supra*. *See* ¶173.

The SAC also addresses the Court's statements as to whether Defendants had a duty of disclosure. MTD Order at *14-15 n.21. It pleads that Defendants had a duty to disclose the undisclosed facts regarding fraudulent accounts and their impacts on Match's operations and reported results, both direct impacts due to inflating subscription revenues and indirect impacts due to Match's "aggressive" marketing of fraud accounts to entice legitimate, non-paying users to convert into paid subscriptions like Tinder Gold, by promoting reactions and messages from fraud accounts that were only accessible via a paid subscription. ¶170. It pleads that this duty arose when Defendants spoke publicly about issues regarding Match's marketing, consumer satisfaction and customer experience, subscription levels and revenues, and user levels and growth, in specific alleged misstatements expressly identified as giving rise to the duty. *Id.*[11]

---

[11] The SAC alleges that this duty arose due to Defendants' discussion of these topics in the 11/6/2018 Press Release, 11/6/2018 Form 8-K, 11/7/2018 Investor Call, Q3 2018 Form 10-Q, 12/21/2018 Article with Ginsberg interview excerpts, 2/6/2019 Press Release, 2/6/2019 Form 8-K, 2/6/2019 Article, 2/7/2019 Investor Call, Ginsberg's 2/7/2019 Interview, 2018 Form 10-K, 5/7/2019 Press Release, 5/7/2019 Form 8-K, Ginsberg's 5/8/2019 CNBC

The SAC alleges that Defendants Ginsberg and Swidler also had a duty to disclose undisclosed facts, described in §II.A.1.c., *supra*, regarding sex offenders and felons on Match's branded apps and websites, Match.com's failure to screen for felons, and Tinder's failure to screen for felons or sex offenders, as described by CW9, CW10, and CW11. ¶¶67-69, 71, 171-172.[12] It describes how a lawsuit led to a system meant to screen users against a national offender registry that had glaring, undisclosed, debilitating loopholes, like the inability to screen users who registered via app stores, in-app purposes, or even directly via Match.com due to the failure to require basic, common registration information like a user's name, address, and birthdate. ¶¶65, 171. CW3, CW8, and CW9 describe how, among the subset of Match.com users who could be screened, 3% triggered offender hits, yet only a small, four-person team thereafter did tedious, proactive manual review of their accounts – despite so many incidents arising that Match.com had an eight-person team retroactively investigating user complaints and one person investigating sex offender complaints retroactively. ¶66. The SAC pleads that the duty to disclose arose when Defendants chose to publicly speak about user safety issues. ¶172.

The SAC also addresses the Court's concerns regarding the motive and opportunity allegations arising from Ginsberg's and Swidler's insider transactions, specifically that, as pled in the FAC, it was unclear whether they were in suspicious amounts or at suspicious times or whether the timing or scope of those transactions were unusual or out of line with prior trading. *See* MTD Order at *19-20. Beyond repleading the FAC's allegations as to transaction dates and amounts (¶¶175-176) and the suspicious comparison against Ginsberg's and Swidler's salary and bonus

---

Interview, Swidler's 5/9/2019 Yahoo! Finance Interview, Q1 2019 Form 10-Q, July/August HBR Article, 8/6/2019 Press Release, 8/6/2019 Form 8-K, 8/7/2019 Investor Call, Q2 2019 Form 10-Q, 9/10/2019 Conference, 11/5/2019 Form 8-K, 11/6/2019 Investor Call, and Q3 2019 Form 10-Q. ¶170.

[12]     CW1 described how Match's then-President (and current CEO) Shar Dubey spent 3 – 4 days per week at Tinder for six months in 2017, when she interacted with Ginsberg daily and Swidler several times weekly. ¶171.

(¶177), the SAC pleads that even when transactions aligned with known Restricted Stock Unit (RSU) or stock option vesting dates, they support scienter, because Ginsberg and Swidler timed the alleged misstatements and omissions so as to inflate Match's stock price in the leadup to those vesting dates and delayed corrective events and disclosures until after their transactions, thereby wrongly maximizing net profit. ¶178. The SAC illustrates with specific reference to Ginsberg's and Swidler's transactions during February 9 – 11, 2019,[13] as well as Ginsberg's transactions on December 21, 2018,[14] on May 30, 2019,[15] and on December 21, 2019.[16] *Id.* The SAC also pleads that Ginberg's and Swidler's Class Period transactions exceeded their transactions before the Class Period. ¶179. Specifically, Swidler sold over 71,500 *more* shares (+20%) for $3,727,991 *more* in net proceeds (+24%) than he did during the same-length period just before the Classs Period. *Id.* Similarly, Ginsberg netted over $6,644,000 *more* in Class Period proceeds (+40%), as compared to the same-length prior period. *Id.*

The SAC further pleads scienter with enhanced allegations regarding resignations. *See* ¶181-186. It repleads the September 24, 2019 *unexplained* resignation of Match's Vice Chairman/former CEO. ¶182. It adds detail regarding Ginsberg's resignation, including that it

---

[13] The SAC connects Ginsberg's and Swidler's February 9, 2019 RSU conversion, Swidler's February 11, 2019 options exercise, Swidler's and Ginsberg's February 9-11, 2019 stock sales, and Match's February 8, 2019 announcement of a $300 million offering as having occurred *just after* the misstatements and omissions made in the 2/6/2019 Form 8-K, 2/6/2019 Press Release, 2/6/2019 Article, 2/7/2019 Investor Call, and Ginsberg's 2/7/2019 Interview and *just before* Match's disclosure of the FTC investigation on February 28, 2019. *See* ¶178.

[14] The SAC ties Ginsberg's RSU conversions and stock sales on December 21, 20218 to misstatements and omissions made *just prior* in Ginsberg's 12/20/2018 Interview and the 12/21/2018 Articles with excerpts of her interview, the Q3 2019 Form 10-Q filed on November 9, 2018, the 11/7/2018 Investor Call, and the 11/6/2018 Form 8-K and 11/6/2018 Press Release. *See* ¶178.

[15] The SAC pleads that Ginsberg's May 30, 2019 options exercises and stock sales occurred *just after* the 5/7/2019 Form 8-K, 5/7/2019 Press Release, 5/8/2019 Investor Call, Ginsberg's 5/8/2019 Interview, Swidler's 5/8/2019 Interview, and the Q1 2019 Form 10-Q filed on May 9, 2019, and *shortly before* the corrective disclosures in early August 2019. *See* ¶178.

[16] The SAC likewise pleads that Ginsberg's December 21, 2019 RSU conversions and stock sales occurred *shortly after* the 11/5/2019 Form 8-K, 11/5/2019 Press Release, 11/6/20129 Investor Call, and Q3 2019 Form 10-Q filed on November 7, 2019, and *just before* the January 31, 2020 announcements of a Congressional investigation and Ginsberg's resignation as Match CEO. *See* ¶178.

was announced the ***same day*** as a Congressional subcommittee announced an investigation into Match regarding, *inter alia*, underage users and the risks posed by registered sex offenders and violent criminal users and released a letter to Match requesting documents (¶183), yet Ginsberg was permitted to retain a lavish executive compensation package and continued vesting of options, on the heels of extensive insider trading. ¶¶184-185. It also alleges that Tinder's CEO resigned shortly after the Class Period while the FTC investigation remained pending. ¶186.

### B. Post-SAC Facts Offer Support And Can Be Pled On Further Amendment

The *ProPublica*/*Columbia Journalism Investigations* authors who wrote the December 2, 2019, article that was pled in the FAC (FAC ¶¶126-128), evaluated by the Court (MTD Order at 8, 14, 23-24), and repleaded in the SAC (¶¶153-154), recently published an explosive follow-up article on May 17, 2021, linking to company statements, with respect to both of which Plaintiffs respectfully seek judicial notice. *See* Declaration of Ex Kano S. Sams II in Support of Plaintiffs' Request for Judicial Notice ("Sams Decl."), Exhibits ("Exs.") A-B. The May 17, 2021 article was heavily sourced, based on interviews with 50+ current and former employees of dating apps / websites including Match brands PlentyofFish, OkCupid, and Hinge; screenshots of company policies at Hinge and OkCupid; and links to formal statements by Match and other companies in response. Its reported facts and findings strongly support the SAC's falsity and scienter pleading, particularly as regards Ginsberg's *Wall Street Journal* misstatements discussed in §II.A.2., *supra*; fully corroborate the SAC's CW allegations regarding the woeful inadequacy of anti-fraud measures, as discussed in §II.A.1.c., *supra*, and are a basis for Plaintiffs to further amend the pleadings, if the Court deems necessary. *See Carter v. Transp. Workers Union of Am. Loc. 556*, 353 F. Supp. 3d 556, 582 (N.D. Tex. 2019) (Scholer, J.) ("Because further amendment may not be futile, the Court *sua sponte* grants Plaintiff leave to amend her pleadings").

The May 17, 2021, article recounts the horrific experience of Natalie Dong, a 21 year-old woman raped during the summer of 2019 by someone she met on a dating app, a man she knew used multiple apps, including Match brands Hinge and Tinder. *See* Sams Decl., Ex. A at 1-2. She contacted each of them to report what happened and get him removed. *Id.* at 2. Whereas Bumble (a non-Match company) responded in 20 minutes, Match brand Hinge took three days to respond and remove him. *Id.* If Ginsberg's statements on December 20-21, 2018 (just six months prior) (*see* §II.A.2., *supra*) were true, at that belated point, Match would have identified and removed him also from Match's other branded apps and websites across its portfolio, including Tinder. Yet, that did not happen, and Tinder's response was ***egregious***, extending ***weeks***, forcing Ms. Dong to send multiple emails with ***no visible progress***, including her email providing her rapist's username, age, phone number and other details, which garnered ***no response***; her email 12 days later seeking and update and sharing how other dating apps had replied, which prompted a Tinder employee to tell her that Tinder could not provide additional information; and her May 21, 2019 email stating, "He is dangerous, and your women users deserve to be kept safe. Shame on you." *Id.* at 2, 4. Finally, Ms. Dong stood outside of Tinder's offices with a large black posterboard sign, prompting an employee to collect the same information she had previously provided. *Id.* at 4. Only then did Tinder finally ban her rapist. *Id.* The authors spoke to 29 other Tinder users who reported a sexual assault, of which only nine said they even received a response from the company. *Id.* at 7.

The article recounts Sue M.'s similarly terrible experience reporting her sexual assault to PlentyofFish, with details like the man's username and an offer to provide a copy of her police report, which had led to his being charged with a felony. *Id.* A PlentyofFish employee responded – ***twice*** – to Sue M.'s messages with boilerplate, asking for username details and encouraging a report to law enforcement. *Id.* The man's user profile eventually left the app, but PlentyofFish

17

would not confirm for Sue M. that he was removed, nor would they acknowledge her pending criminal case. *Id*. The article authors relayed Sue M.'s story to Match (with consent), but the company did not respond to their written questions. *Id*.

The May 17, 2021 *ProPublica*/*Columbia Journalism Investigations* article also strongly corroborates the SAC's CW allegations as to the dramatic understaffing of anti-fraud measures, particularly the descriptions by CW3, CW8, CW9, and especially CW5 of a relentless, break-neck review pace by small, overworked teams that precluded any meaningful investigation of complaints and that rendered Ginsberg's claim that Match identified and removed dangerous users across its full portfolio of dating brands utterly meritless and detached from reality. The article describes employees who handle customer complaints (a/k/a moderators) and teams focused on fraud and abuse claims, while noting that "no site has a team exclusively dedicated to addressing… sexual assault." *Id.* at 2. During interviews, current and former employees of Match brands PlentyofFish, OkCupid, and Hinge, among other companies, "describe[d] small moderation teams juggling hundreds of complaints a day," being paid "just a few dollars more than minimum wage," who "receive little training on how to handle factually complex and possibly criminal complaints involving rape," and must "contend with customer service quotas that make it difficult to answer routine inquiries. *Id.* at 3.

The May 17, 2021 article also corroborates CW5's detailed description of the understaffed, overworked eight-person Fraud Department's impossible task of manually reviewing and blocking ***millions*** of illegitimate accounts on Match.com and the affinity brands, whereby each team member reviewed 1,200 accounts per day, equating to one account every 36 seconds over a 12-hour day, and each team member blocked 400-500 paying accounts daily – a pace that precludes any thoughtful analysis or deeper investigation. *See* §§II.A.1.a. and A.1.c., *supra*. The article

18

describes similar demands at other Match brands. Hinge moderators review potentially problematic profiles flagged by software at the rate of 60 per hour, giving them just *60 seconds* to assess the details of sexual assault claims, review user messages, and decide whether to escalate the issue and block the user, according to Hinge company policy and two Hinge employees interviewed by the article authors. *See* Sams Decl., Ex. A at 3. OkCupid imposes a 15-complaint per hour quota on employees reviewing sexual assault claims, giving them just *four minutes* to review user profiles and messages, decide on a course of action, and respond to the complainant, according to OkCupid company policy and two OkCupid employees interviewed by the article authors. *Id.* Four former and current OkCupid employees said that it relied on part-time and volunteer moderators to handle at least *150 complaints per day*. *Id.* at 7. Hinge and OkCupid employees said that complicated cases, like sexual assault, can put moderators behind hourly quotas for the rest of their workday. *Id.* at 3.

Based on the author's interviews and investigation, the article described "a patchwork of company systems in which executives tout customer safety while pushing policies designed for issuing refunds rather than vetting the intricacies of sexual violence." *Id.* at 3. Match told *ProPublica* and *Columbia Journalism* back in 2019, when the earlier article was written, that Match lacked uniform procedures across its brands for responding to customer sexual assault complaint. *Id.* at 4. Even today, one Match brand's manual for priority cases devotes only *two pages* to sexual assault, advising employees to "answer quickly, respond empathetically, give resources for help" but telling them "don't send victims to police" and "choose language carefully" – guidance that company documents suggest grew from impromptu handbooks independently created by employees. *Id.* at 6. When the article authors asked for a corporate statement, Match provided a *three-sentence* response, lacking specifics. *See* Sams Decl., Ex. B.

The foregoing facts strongly support the SAC's falsity and scienter pleading.

**C.      Defendants' Material Misrepresentations and Omissions**

The SAC organizes Defendants' misrepresentations and omissions into two categories with statement-specific reasons why each was false or misleading.  ¶¶96-142.

**1.      The Membership Integrity Fraud (¶¶97-135)**

Defendants misrepresented the integrity and quality of Match's membership, portraying a solid, growing website user base, which belied CW accounts of widespread fraud, by stating, *e.g.*, "***we had another terrific quarter in Q3 with accelerated growth on top and bottom line, continued excellent performance at Tinder and improvement in non-Tinder subscriber trends***" (¶134); "***there are early signs that indicate our enhancements to the customer experience are leading to improved organic registrations due to a stronger word-of-mouth marketing***" (¶100); "***Tinder did drive a ton of growth this quarter. And we hit actually a big milestone, at the end of the quarter we had five million subscribers***" (¶118); "***[i]f there's bad behavior on one app,***" then "***we can identify that user, [and] we'll kick him off all the apps***" (¶104); and "***International subscriber growth was particularly strong, driven primarily by Tinder and Pairs…***" (¶134). Additionally, the SAC pleads several new, untested misstatements (*see, e.g.*, ¶¶102, 104, 112, 118, 120, 122) and modified versions of other misstatements (*see, e.g.*, ¶¶98, 100, 106, 110, 116, 126, 128, 130, 134), or it realleges a set of original misstatements in the context of enhanced overall pleading (*see, e.g.*, ¶¶108, 114, 124, 132).

**2.      The Reported Results Fraud (¶¶136-142)**

In violation of Regulation S-K, Item 303 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2), in quarterly and annual reports signed by Ginsberg and Swidler, Match reported revenues, earnings, PMC, ARPU, conversions of unpaid to paid memberships, and positive or insufficiently negative reports of Match's underlying business on its websites, without disclosing the underlying, negative

trend that the results were generated through the inclusion of fraudulent accounts and that Match faced material undisclosed risks due to this underlying conduct, as detailed by the CWs, and due to the FTC investigation. ¶¶136-142.

**D.      The Truth About Defendants' Fraud Begins to Emerge**

Plaintiffs allege that artificial inflation in Match's stock price was removed by a series of partial corrective disclosures on February 28, 2019, August 9, 2019, August 12, 2019, September 25, 2019, November 6, 2019, December 2, 2019, and January 31, 2020, which the Court must view holistically, causing Plaintiffs and the Class to suffer damages. ¶¶143-159; 202-206.   After disclosing on February 28, 2019, that the FTC had begun an investigation in March 2017 and proposed a $60 million resolution in November 2018 (¶144), Match falsely and misleadingly refuted and minimized its validity and muted stock price impacts. ¶145.  These actions muted the effects of corrective disclosures, not only on February 28, 2019, but also on: (1) August 9, 2019, when Match announced that the FTC asserted claims and the DOJ opened an investigation (¶146); (2) September 25, 2019, when the FTC announced it sued Match.com for deceptive marketing and cancellation practices (¶149); and (3) November 6, 2019, when Match disclosed its revenues were impacted by a large rise in legal costs due to the FTC and DOJ investigations (¶151). But for these tactics, the stock price declines would have been greater. ¶¶143-159; 202-206.

On December 2, 2019, the CJI published findings that Tinder and other Match websites failed to screen for sex offenders, leading to sexual assaults on users, and a Match spokesperson's admission that "[t]here are definitely registered sex offenders on our free products."  ¶¶153-54. On January 31, 2020, Congress announced that it sought information from Match about the failure to screen underage users, amidst reports that sex offenders used dating sites.  ¶¶156-157.  On both disclosures, Match's share price fell.  ¶¶155, 158.

## III. STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts also must "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

## IV. PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT VIOLATIONS

To state a Securities Exchange Act of 1934 §10(b) claim, a plaintiff must allege: "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Id*. at 238–39.

### A. Plaintiffs Adequately Allege Materially False and Misleading Statements

#### 1. Ginsberg's *Wall Street Journal* Interview and Article

Ginsberg was interviewed by the *Wall Street Journal*, which published video clips on December 20, 2018 (¶102) and an article with excerpts on December 21, 2018 (¶¶104(a)-(c)) that was the source of the *Propublica/Columbia Journalism Investigations* article pled in the FAC and addressed in the MTD Order at 8, 23-24. Defendants do not credibly dispute that Match and its branded apps and websites fundamentally ***lacked*** the anti-fraud capabilities that Ginsberg described: "***It helps for us to have a portfolio [of matchmaking apps] because if there's bad behavior on one app, we can identify that user, we'll kick him off all the apps***." ¶104(c).

For starters, her statement is ***not*** "generalized," as Defendants claim (Motion at 10, 17 and n.51).  It was **_specific_**, touting Match's dominance in the dating space as an advantage, due to a purported capability to see "bad behavior on one app," "identify that user" on that app, track him down on "all the apps," and "kick him off all the apps" in Match's large portfolio.  *Id.*[17]  If that capability had actually existed, it would have been a powerful, industry-leading functionality that would have differentiated Match from competitors, something of clear interest to investors.

In actuality, however, Match had no such capabilities, and Ginsberg's statement was materially false and misleading.  ¶105.  As described by the CWs summarized in §II.A.1.a. and A1.c.., *supra*, Match and its branded websites and apps failed to screen for bad actors like sex offenders or felons, often lacked any ability to flag or identify bad actors, and even when they did, relied on overworked, understaffed anti-fraud team members who had ***36 seconds*** to decide whether to remove them from the website or app that was flagged before moving on to the next flagged account, and the next, to reach 1,200 accounts per day, every day, 365 days a year.  ***None*** of the CWs recount having sufficient time, staffing, resources, or technological capability to take the far more involved step of researching a bad actor across all of Match's various branded websites or apps, many of which – like Tinder – did not even require users to provide their *own name* at registration, to purportedly conduct a widespread, cross-portfolio removal as Ginsberg described.[18]  For all these reasons, Ginsberg's other statements about a "***one strike you're out***"

<hr />

[17]  Even a cursory read of Defendants' "generalized positive statements" cited cases in their ***pair*** of nearly page-long footnotes (Motion at 17 n.51 and at 18 n.52) makes clear that all are readily distinguishable.  Ginsberg's misstatements at issue cannot rationally be viewed as "generalized," "aspirational" statements about a "solid" or "strong" "commitment to safety," the "highest standards," a "safety-first culture," or making safety the "highest priority," so the n.51 cases are inapposite.  Ginsberg did not speak generally about a "code of conduct," "best practices," or "inten[t] to comply with legal requirements," "generalized positive goals," "good monitoring systems," "regulatory compliance," a "code of ethics," "commitment to transparency," "good corporate governance practices," "trustworthy culture," "commitment to integrity," so the n.52 cases are likewise inapposite.

[18]  As discussed in §II.B., *supra*, the company policies and statements by employees of other Match Group brands, like Hinge and OkCupid, summarized in the May 17, 2021 *ProPublica*/*Columbia Journalism Investigations* article buttress the SAC's CW statements.

policy and "***processes and best practices across the organization to keep bad actors out***" (¶102), were also materially false and misleading. ¶103.[19]

The SAC's allegations address the Court's concerns (*see* MTD Order at 23-24), as explained in §II.A.2., *supra*. They provide the "where and when" of Ginsberg's misstatements, as the Court requested, contrary to Defendants' argument (Motion at 17 and n.50). To be clear, Plaintiffs need not – as Defendants suggest (*see* Motion at 9 n.22) – detail precisely when, down to the minute, Ginsberg actually spoke every word to the *Wall Street Journal* journalists. Neither the PSLRA nor Rule 9(b) require that level of precision, or else securities plaintiffs could never plead an SEC filing, company press release, or news article as a misstatement without also pleading the precise date(s) (and times?) on which their underlying text were drafted or their quotes uttered. That is simply not the standard. A statement is "made," for purpose of Exchange Act liability, when it is ***publicly*** published, broadcast, or disseminated, such that it actually reaches the ears of the market and can affect the stock price. Consequently, courts routinely hold that plaintiffs have pled actionable securities claims against individual defendants who are quoted in articles that merely recite their comments without disclosing their precise timing. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2017 WL 7037706, at \*13 (July 13, 2017) (refusing to dismiss individual defendant after upholding the falsity and scienter pleading as to his quoted statement in a magazine article), *reconsideration denied by In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2018 WL 501594 (Jan. 19, 2018) (refusing that defendant's motion for reconsideration and upholding the rulings on falsity and scienter); *see also In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444,

---

[19] The existence of a "safety advisory council" is a red herring that does not undercut the falsity of Ginsberg's misstatements, contrary to Defendants' argument (Motion at 11, 16-17). The record is devoid of any facts concerning the mandate, role, or actions of that council, which would be outside the corners of the SAC at issue on this Rule 12(b)(6) motion, let alone ones that speak to Ginsberg's specific claims, *e.g.*, of removing identified bad actors from all of Match's websites and apps across its portfolio.

479-480 (S.D.N.Y. 2018) (upholding falsity and scienter pleading as to a quoted statement by CEO printed in a September 2, 2015 *Bloomberg* article, based on contrary information known by August 27, 2015, despite article not disclosing precisely when the quoted statement was made to *Bloomberg*); *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 831-835 (S.D.N.Y. 2017) (upholding falsity and scienter pleading as to statements by CFO in news articles); *In re Crown Am. Realty Tr. Sec. Litig.*, No. Civ. A. 95-202J, 1997 WL 599299, at *17-*18 (W.D. Pa. Sept. 15, 1997) (complaint adequately alleged falsity of an individual defendant's quote in a news article).[20]

Moreover, the SAC makes clear that the *Wall Street Journal* article, unlike the December 2019 *ProPublica*/*Columbia Journalism Investigations* article pled in the FAC and analyzed in the MTD Order at 23-24, lacks ***any*** hedging language or contemporaneous disclosure regarding registered sex offenders being on Match's free products. *See* ¶¶104(a)-(c). Defendants effectively concede as much, by choosing to completely minimize *any* substantive value so they can spin the *Wall Street Journal* article as a "soft" piece (a legally irrelevant point). *See* Motion at 9-11.

Faced with the SAC's enhanced pleading, Defendants exaggerate Plaintiffs' burden, *e.g.* claiming that for Plaintiffs to state an actionable claim, Ginsberg had to have claimed that Match "was 100% successful in keeping out 'bad actors,'" or that she had to make an "assurance" that Match's apps were "completely free of bad actors," or that her statements had to be "grotesquely

---

[20]    Indeed, courts treat news articles consistently in analogous circumstances. For instance, courts routinely hold that the publication date of an article (and not the precise dates on which its underlying quoted statements were uttered) to be the trigger for plaintiffs to be on inquiry notice. *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 543 F.3d 150, 161-164 (3d Cir. 2008) (affirming district court holding that the publication date of a *New York Times* article discussing an individual defendant's statements was the trigger date for inquiry notice); *Lane v. Page*, 549 F. Supp. 2d 1296, 1301-1303 (D.N.M. July 17, 2009) (publication date of a *Wall Street Journal* article that quoted company executive was the trigger date for inquiry notice). Similarly, courts often find that class periods are deemed to end on the publication date of articles that reveal fraud (and not the antecedent dates on which those quoted in the articles may have first uttered their comments to the reporter). *See, e.g.*, *LaGrasta v. First Union Sec., Inc.*, No. 2:01-CV-251-FTM29DNF, 2005 WL 1875469, at * (M.D. Fla. Aug. 8, 2005) (publication date of *SmartMoney* article held to be the point at which reliance stops and the class period ends); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449 (D.N.J. Feb. 10, 1987) (finding publication date of *Barron's* article to reveal fraud and end the class period and rejecting party's attempt to use a different date).

misleading." *See* Motion at 10-11, 16.[21]  Not surprisingly, Defendants cite no authority for their read of the pleading standards, which is unsupported by the PSLRA or applicable jurisprudence. To the contrary, "to fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Lormand*, 565 F.3d at 248 (quoting *Basic v. Levinson*, 485 U.S. 224, 231-232 (1988)); *Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 729 (5th Cir. 2019) (quoting *Basic*, 485 U.S. at 231-232). The information that Ginsberg omitted certainly qualifies.  Defendants otherwise cherry-pick snippets of CW statements, *e.g.*, CW5's partial comment that the average fraud account was removed within 15 hours (¶40), while ignoring the portions that illustrate why Ginsberg's statements were false and misleading, *e.g.*, the rest of CW5's *same sentence* stating that other fraudsters were "slow burners" who developed long-term communication with the users they targeted (*id.*) or CW5's newly-pled statement that many fraudsters paid for three-month and six-month subscriptions, *inter alia*, to gain access to enhanced communication features, make their account seem more legitimate, and make it more costly for Match to remove them and refund their fees (¶50).  *See also supra*.

### 2.     The Other Membership Integrity Fraud Misstatements

As discussed in §II.A.1.a., *supra*, the SAC addresses the Court's desire for allegations illustrating the impacts of fraudulent and bad-actor accounts, including the ratio of paying to non-paying accounts.  *See* MTD Order at 22, 25, 33.  Its allegations, accepted as true and viewed in the light most favorable to Plaintiffs, as is required at the Rule 12(b)(6) stage, holistically illustrate

---

[21]     Defendants resort to the same tactic regarding their "paid subscriptions" arguments, suggesting that Plaintiffs need to plead that Match "assured investors that 100% of its revenue came from customers who did not engage in improper conduct" or that Match "guaranteed that all bad actors were excluded."  *See* Motion at 19-20.

that illegitimate accounts materially inflated ***both*** Match Group's consolidated reported user statistics, metrics, and trends ***and*** its reported financial results.  This impact was due to: (1) the ***direct*** consequence of removing and blocking such accounts – many of them long-term subscriptions of three-months, six-months or even one year and refunding their subscription fees due to the high rate of payment via stolen credit cards; and (2) the ***indirect*** impacts of Match's "aggressive" marketing of such accounts to non-paying, legitimate users to entice upgrades into paid subscriptions to gain access to "winks," messages, and other communications from fraudsters posing as real potential matches, causing the upsold, mislead users to complain and seek refunds.

The SAC also realleges high-placed CW statements establishing a consistent 15%-20% illegitimacy rate among users across Match's branded websites and apps, including its golden goose, Tinder.  CW2, Match.com's Senior Finance Manager at headquarters, spent one-third of every month studying financial data and preparing monthly Finance Department analyses that revealed that 15% of Match.com registrations over a three-year period were fraudulent (¶¶21, 46), while CW7, Tinder's Director of Finance, said it assumed 20% of accounts were bots or fraudulent, per Tinder's Director of Analytics, Bob Wilson (¶47).  These allegations were never credibly disputed.  Instead, the Court sought more detail as to direct impacts on Match's reported results.

In response, the SAC pleads that CW11, one of six Trust & Safety Division members, said ***15% - 20%*** of Tinder's fake, fraudulent, and bad-actor accounts were ***paid*** subscriptions, including bots, users posing as someone else, accounts using stolen credit cards to pay, and scammers.  *See* ¶48.  CW13, a Community Operations Manager whose team reviewed flagged Tinder accounts, said that Tinder kept regularly updated, internal estimates of active fake, fraudulent, and bad-actor accounts.  *Id.*  A Senior Fraud Investigator, CW5's statement demonstrated that the Fraud Department's eight-person team collectively removed ***3,200 – 4,000 paying accounts daily*** from

Match.com and the affinity brands alone (¶49) and that a high percentage of fraudsters were "slow burners" who paid for longer-term subscriptions – 3-month, 6-month, even 1-year – both to gain access to two-way communications to further their schemes and to legitimize their account, avoid detection, and make removal costly. ¶¶40, 50. CW5 added that an internal company database closely tracked each Fraud Department investigator's daily metrics – total accounts reviewed, total accounts blocked for fraudulent activity, and the reasons why accounts were flagged – and could be used to generate reports showing those metrics by investigator or for the Fraud Department as a whole. ¶57. CW5 said that the executive "higher ups" wanted to know the percentage of fraudulent accounts that were paid, due to the significance of subscription fee refunds, and confidently confirmed that the company tracked that percentage. ¶55. CW5 added that the Fraud Department was the "most hated" internal team, because of its negative impacts on revenues arising from the practice of refunding of *all* subscription fees from accounts that were removed and blocked for illegitimate activities, even long-term 6-month or 1-year memberships, which were often paid with stolen credit cards. *Id.*

As discussed in §II.A.1.b., *supra*, the SAC also resolved any ambiguity and competing inferences as to the FAC's pleading of Ginsberg's and Swidler's "frustration" over the repeated Class Period adjustments to financial forecasts at Match's PlentyofFish brand as discussed at regular meetings (*see* MTD Order at *2, *17 and n.17), by alleging CW1's clarify statement that Ginsberg and Swidler were frustrated that PlentyofFish kept reducing forecasts due to the removal of fake / fraudulent accounts and were "tired of hearing about it" (*see* ¶¶54, 167), yet did nothing to increase PlentyofFish's anti-fraud staffing or resources (¶99). Where a complaint pleads CW statements regarding specific meetings where corporate officers are made aware of negative adverse facts, including details about how the information was conveyed and who was involved,

those allegations are not conclusory and satisfy the PSLRA's pleading standards.  *See, e.g.*, *Hall v. Rent-A-Center, Inc.*, No. 4:16cv978, 2017 WL 6398742, at \*29 (E.D. Tex. Oct. 19, 2017).

These allegations collectively evidence internal knowledge of a material, ***direct*** impact on Match's reported results, given Defendants' concession that "[m]ore than 97% of Match Group's revenue comes from subscriptions and à-la-carte payments" (Motion at 5) and given that Tinder alone earned $800 million+ in 2018 revenue (¶¶6, 122).  Yet, as described in §II.A.1.a., *supra*, the SAC goes further, detailing the ***indirect*** effects of fraud accounts on Match Group revenues and user metrics, *e.g.*, due to ***the company's*** improper, "aggressive" marketing of illegitimate or fraudulent accounts to *bona fide* users to entice them to ***upgrade*** into ***paying*** subscriptions they otherwise did not want, like Tinder Gold, so they could see and respond to "winks" or messages from purported love interests marketed to them, which was only possible on an upgraded, paid membership (¶¶5, 74-77, 173).  These upgrades had poorly described pricing and were hard to cancel, leading to ***thousands*** of daily customer billing complaints (¶¶81-92, 173).  CW2 said that "over 30%" of paying memberships were non-paying members who converted to subscribers after receiving a notification that they had a message they could not read unless they upgraded, and that a "percentage" of the messages so marketed were fraudulent.  ¶173.

The SAC pleads why these undisclosed facts render the alleged Membership Integrity Fraud misstatements (¶¶97-135) materially false and misleading.  *See* §II.C.1., *supra.*  Defendants present only two arguments to the contrary.  First, they again resort to exaggerating Plaintiffs' burden as needing to plead, *e.g.*, that Match "assured investors that 100% of its revenue came from customers who did not engage in improper conduct" or that Match "guaranteed that all bad actors were excluded" (*see* Motion at 19-20) in order to state a claim, which is invalid for the reasons discussed in §IV.A.1. *supra*.  Second, Defendants call the SAC's allegations "conclusory" (Motion

at 19-20) – whenever an allegation or CW statement is disadvantageous to their argument – always without citing any legal authority. Yet, conclusions "naturally inferred from the allegations" are "not conclusory or speculative." *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 194 (5th Cir. 2009).[22]

### 3. The Reported Results Fraud Misstatements

As discussed in §II.C.2., *supra*, the SAC also pleads why Defendants' failure to disclose these undisclosed facts and CW allegations when they attributed Match's quarterly and annual financial results to metrics like growth trends in average subscribers and average revenue per user (ARPU) rendered the Reported Results Fraud misstatements (¶¶137-141) materially false and misleading in violation of SEC Regulation S-K, Item 303, 17 C.F.R. §229.303(a)(3)(i)-(ii) and (b)(2). *See* ¶¶136, 142. Beyond the disclosure duties outlined in §II.A.3., *supra*, Item 303 imposes a specific duty to disclose, *inter alia*, "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income," 17 C.F.R. §229.303(a)(3)(i)-(ii), and in interim results to describe, *inter alia*, "any material changes in the registrant's results of operations." 17 C.F.R. §229.303(b)(2); *Panther Partners Inc. v. Ikanos*

---

[22] Although Defendants claim that the company's anti-fraud measures were adequate (Motion at 5 n.12 & 23), Plaintiffs allege, based upon CW accounts, that such measures were inadequate. ¶¶44, 46, 60. Defendants also claim that Match Group's publicly available terms of use "make clear [that] such background checks are not performed." (Motion at 3 n.3 & 11). However, the article upon which Defendants rely: (1) claims that the Terms of Use for PlentyofFish does not conduct criminal background or identity verification checks, but that "[f]or nearly a decade, its flagship website, Match, has issued statements and signed agreements promising to protect users from sexual predators" and "has a policy of screening customers against government sex offender registries;" Defendants' Appendix of Exhibits in Support of Defendants' Motion to Dismiss (Doc. 39) at 254-55; and (2) any lack of background checks for PlentyofFish does not negate Ginsberg's "bad behavior" statement. Finally, Defendants suggest that Plaintiffs may be asserting an independent scheme liability claim (Motion at 21), but since Plaintiffs' claims are based upon Defendants' misrepresentations and omissions, Defendants are liable under Section 10(b) because of such misconduct, not based upon scheme liability beyond such misrepresentations and omissions. *Sec. & Exch. Comm'n v. Narayan*, No. 3:16-CV-1417-M, 2017 WL 4652063, at *7 (N.D. Tex. Aug. 28, 2017).

*Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). As the Court noted (MTD Order at \*14), the Fifth Circuit has not addressed this issue, but district courts have held that plaintiffs can adequately plead "facts that may support a claim that defendants violated SEC Regulation S-K" by explaining the basis for a complaint's alleged Item 303 violation. *Walker v. Rent-A-Ctr.*, No. 5:02-CV-3-DF, 2005 WL 8161388, at \*13–14 (E.D. Tex. July 25, 2005). *See also Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, No. H-20-0576, 2021 WL 182316, at \*7 (S.D. Tex. Jan. 19, 2021) (court upheld Rule 10b-5(c) claim where plaintiffs alleged failure to disclose complete information necessary to understand company's financial position violated Item 303).

Defendants wrongly claim that Plaintiffs seek for them to "confess" negative information absent a duty. *See* Motion at 20-21. Not so. Their decision to ***attribute*** reported financial results to certain underlying causes, when those underlying causes are subject to undisclosed negative trends, is what gives rise to an Item 303 disclosure duty, which can be violated and give rise to Exchange Act §10(b) liability even when Forms 10-K and 10-Q otherwise present accurate, GAAP-compliant financial figures. *See, e.g.*, *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665 (NLH/JS), 2018 WL 6381882, at \*15-\*16 (D.N.J. Dec. 6, 2018) (upholding a Reported Results Fraud based on the attributions of accurate, GAAP-compliant financial statements). *See also Perez v. Higher One Holdings, Inc.*, No. 3:14-cv-755 (AWT), 2017 WL 4246775, at \*8 (Sept. 25, 2017) (upholding an Operating Results Fraud based on the attributions of financial results). Thus, Plaintiffs have adequately alleged falsity.

### 4. Defendants' Arguments Lack Merit

Defendants' falsity arguments lack merit. For instance, Defendants claim that Match's risk warnings insulate them from liability. Motion at 5-6, 17. Yet, even "somewhat specific" warnings are inadequate when they "do not provide sufficiently meaningful caution about [a] clearly present danger that was materializing." *Lormand*, 565 F.3d at 247. "To warn that the untoward may occur

31

when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Rubinstein*, 20 F.3d at 171; *In re Cobalt Int'l Energy, Inc.*, No. H-14-3428, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016). Indeed, Defendants point to Match's warnings about "challenges preventing improper behavior on its apps," which warned only that certain risks "***could***" adversely affect Match's business and that its counter-measures "***may***" fall short, while failing to disclose that these risks were ***already materializing***, as described by the CWs.[23] Despite Defendants' assertion (Motion at 5-6, 20-21 & n.60), "[a] duty to say anything" imposes "a duty to speak the full truth." *Lormand*, 565 F.3d at 249.[24] Their out-of-circuit cases (Motion at 20 & 60) do not suggest otherwise.[25] Moreover, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. Defendants' cases do not address this principle. Motion at 20 n.58.[26]

---

[23]    *See Marcus v. J.C. Penney Co.* No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015); *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 851 (N.D. Tex. 2018) (because "a reasonable investor would have found it significant" to consider these issues, "the bespeaks caution doctrine cannot provide a basis for dismissal").

[24]    The SAC also pleads that Defendants had a duty to disclose the undisclosed facts regarding fraudulent accounts and their impacts on Match's operations and reported results (¶170), and that Defendants also had a duty to disclose undisclosed facts regarding sex offenders and felons on Match's branded apps and websites, Match.com's failure to screen for felons, and Tinder's failure to screen for felons or sex offenders. ¶¶67-69, 71, 171-172.

[25]    *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (SEC Wells Notice merely indicates desire of enforcement staff to move forward "which it has no power to effectuate"); *Plymouth Cty. Ret. Sys. v. Patterson Cos.*, No. 18-cv-871 (MJD/SER), 2019 WL 3336119, at *14 (D. Minn. July 25, 2019) (distinguishing Wells Notices from FTC investigation but holding that there were no public statements to which a duty to disclose attached). Similarly, *Shurkin v. Golden State Vintners, Inc.*, 303 F. App'x 431 (9th Cir. 2008) fails to address controlling authority in this circuit that "defendants have a duty under Rule 10b–5 to correct statements if those statements have become materially misleading in light of subsequent events." *Rubinstein v. Collins*, 20 F.3d 160, 170 n.41 (5th Cir. 1994).

[26]    *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09 Civ.. 5411 (PKC), 2012 WL 1353523, at *7 (S.D.N.Y. Apr. 12, 2012); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 881 (N.D. Ill. 2011); *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006); *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361 (S.D. Tex. 1993).

### B.  Plaintiffs Adequately Allege that Defendants Acted with Scienter

#### 1.  Applicable Legal Standards

When evaluating scienter pleading, a court must "accept all factual allegations in the complaint as true" and review all allegations holistically. *Tellabs*, 551 U.S. at 322; *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251. Knowledge or recklessness can satisfy the §10(b) scienter element. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). The scienter inference "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.; *Matrixx*, 563 U.S. at 48. If "[t]he inference of intentional deception is, at the very least, equally as compelling as any alternative inference, [] a tie favors the plaintiff." *Lormand*, 565 F.3d at 254. Moreover, "motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009). When a complaint alleges motive, the strength of its circumstantial scienter evidence need not be as great. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005).

#### 2.  Defendants' Motive and Opportunity to Commit Fraud

The SAC is replete with allegations evidencing Defendants' motive and opportunity to commit fraud – and their enrichment from doing so. ¶¶175-179. Thus, the circumstantial evidence of scienter may be correspondingly lesser. *R2*, 401 F.3d at 644.

"Insider stock sales can enhance an inference of scienter if the trading occurs at suspicious times or in suspicious amounts." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v.*

33

*Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016). "[P]rior trading history does not need to be pleaded as a *per se* matter; instead, the court looks at the information that is pleaded and determines whether the timing or scope is unusual." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 553 (5th Cir. 2007). Defendants' repeated assertion that Defendants' sales must be "dramatically out of line" with prior sales (Motion at 13, 24) does not constitute the proper standard. Instead, Plaintiffs must merely allege that such sales occurred "at suspicious times or in suspicious amounts." *Local 731*, 810 F.3d at 960.

Plaintiffs address the Court's concerns regarding the Individual Defendants' insider transactions, such as the concern that "Plaintiffs have not sufficiently explained how Ginsberg's and Swidler's transactions were in suspicious amounts or at suspicious times." *Crutchfield*, 2021 WL 1167578 at *20. Plaintiffs sufficiently explain in the SAC by alleging more comparative details regarding such transactions. *See* §II.A.3., *supra*; ¶¶178-179.

First, the SAC closely connects Ginsberg's and Swidler's insider transactions with the dates of their alleged misstatements and the dates of the alleged corrective disclosures and events. *See* §II.A.3. *supra*; ¶178. For instance, the SAC ties Ginsberg's and Swidler's February 9-11, 2019 RSU conversions, options exercises, and stock sales, and Match's February 8, 2019 announcement of a $300 million offering as having occurred ***just after*** the misstatements and omissions made in the 2/6/2019 Form 8-K, 2/6/2019 Press Release, 2/6/2019 Article, 2/7/2019 Investor Call, and Ginsberg's 2/7/2019 Interview and ***just before*** Match's disclosure of the FTC investigation on February 28, 2019. *See* §II.A.3. *supra*; ¶178.[27] The SAC does the same for

---

[27] The SAC again pleads (*See* ¶180) that Match's $300 million in suspiciously timed offerings support scienter. *See, e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275-277 (S.D.N.Y. 2014) ($117 million offering evidenced corporate scienter even when all individual defendants dismissed from case); *TD*, 2018 WL 6381882, at *18-*19 ($2.75 billion in note offerings support scienter); *Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ($109.6 million offering can be motive for fraud).

Ginsberg's RSU conversions and stock sales on December 21, 2018, Ginsberg's May 30, 2019 options exercises and stock sales, and Ginsberg's December 21, 2019 RSU conversions. *See* §II.A.3. *supra*; ¶178.

Second, contrary to the Motion at 24 and n.71, the SAC further details Ginsberg's and Swidler's Class Period transactions in Match stock, stock options, and RSUs. ¶¶175-179. Plaintiffs again plead that these transactions were suspicious compared to Defendants salaries in 2017, when Ginsberg's salary was $500,000 ($1.25 million total compensation) and Swidler's salary was $550,000 ($1.8 million total compensation), and in 2018, when Ginsberg's salary was $750,000 ($2.5 million total compensation) and Swidler's salary was $550,000 ($2 million total compensation). *Id.* Ginsberg's $16.3 million net profit from Class Period insider transactions was 2,100% of 2018 salary (650% of 2018 total compensation), while Swidler's $19.2 million net profit was 3,500% of 2018 salary (960% of 2018 total compensation). As discussed in §II.A.3. *supra*, the SAC augments these allegations by pleading that Ginsberg's and Swidler's Class Period transactions exceeded their pre-Class Period transactions, in that Swidler sold over 71,500 *more* shares (+20%) for $3,727,991 *more* in net proceeds (+24%) than he did during the same-length period just before the Classs Period, while Ginsberg netted over $6,644,000 *more* in Class Period proceeds (+40%), as compared to the same-length prior period. *Id.* ¶179.

Defendants' arguments (Motion at 24-25) lack merit. Plaintiffs need not more fully allege Defendants' prior trading history, *Cent. Laborers*, 497 F.3d at 553, nor do they need to allege that sales occurred at a Class-Period high. *See, e.g., In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (suspicious sales not at class period peak price contributed to strong scienter inference). Defendants' argument that they should benefit from an inference because they retained options (Motion at 12) is meritless, as they have not provided any information regarding vesting dates,

35

leaving it unclear whether the retained options could have been exercised. Defendants' assertion that Match's purported stock price increase negates any scienter supported by their stock sales is incorrect. (Motion at 4 & n.4, 13, 24). Plaintiffs allege that the fraud increased Match's stock price and that Defendants sold at inflated prices, profiting from such sales. ¶¶175-179. That Swidler sold 20% more stock for 24% more profit or that Ginsberg made 40% more from sales are all unrefuted allegations that support scienter. Defendants also claim that "[t]he fact that Ginsberg and Swidler sold at different times also undercuts any inference of fraud." Motion at 25 & n.74. However, courts consider whether the trading occurs at suspicious times or in suspicious amounts and whether all defendants sold stock (at any time) during the Class Period – not whether they did so in lockstep. *Local 731*, 810 F.3d at 960; *Cent. Laborers*, 497 F.3d at 553. Defendants' assertion that because transactions may have coincided with the vesting dates for RSUs or options, there can be no liability also fails, as courts have found that Defendants can use fraud to inflate a company's stock price in advance of vesting or exercise dates.[28] Defendants also suggest that the fact that Ginsberg and Swidler did not sell of the shares from the options and RSUs they exercised negates an inference of scienter (Motion at 12), but courts have not required the sale of all of a defendant's securities in order to establish scienter. *See, e.g.*, *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *13 (S.D. Tex. Mar. 27, 2019) (holding that sales that constituted 18% of an insider's total holdings supported a strong inference of scienter).[29]

---

[28] *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) ("The Court finds that, although evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales."); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) ("The fact that there might be an innocent explanation for the timing of [defendant's] sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations-which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss.").

[29] *See also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (stock sales that amounted to 7.6% of personal holdings added to a finding of a strong inference of scienter).

The SAC supports scienter with enhanced allegations regarding suspicious resignations, by repleading the *unexplained* September 24, 2019 resignation of Match's Vice Chairman/former CEO (¶182), adding color regarding Ginsberg's resignation the ***same day*** as a Congressional subcommittee announced an investigation into Match and requested documents regarding underage users, sex offenders, and violent criminal users (¶183) that permitted her to retain a lavish executive compensation package and continued vesting of options (¶¶184-185), and supplementing with allegations that Tinder's CEO resigned shortly after the Class Period while the FTC investigation remained pending (¶186). *See* §II.A.3. *supra*. When viewed holistically with the alleged insider sales, these enhanced allegation evidence scienter.[30] ¶¶181-186; *see Hall v. Rent-A-Ctr., Inc.*, No. 4:16cv978, 2017 WL 6379334, at \*12 n.8 (E.D. Tex. Dec. 14, 2017) (adopting magistrate's ruling that termination/resignation of CEO and CFO are circumstantial evidence supporting strong scienter inference); *Hall*, 2017 WL 6398742, at \*34 (magistrate's ruling as to same). These allegations, combined with those repleaded from the FAC regarding Ginsberg's post-resignation Board of Directors appointments,[31] address the Court's concerns (*id.*) regarding Defendants' counter-inference concerning her unfortunate health issues and add to the strong inference of scienter alleged. *See N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 754 (N.D. Tex. 2013) (resignation of high-level officials may contribute to scienter inference); *In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, 2004 WL 5278716, at \*35 (E.D. Tex. June 16, 2004) (same).[32]

---

[30] These allegations address the Court's concern that Ginsberg's and Yagan's resignations as pled in the FAC "without more" did not support a strong inference of scienter. *See Crutchfield*, 2021 WL 1167578, at \*22.

[31] Specifically, the SAC pleads that Ginsberg joined the Board of Directors of Uber Technologies, Inc. just ***two weeks*** after resigning from Match in February 2020, the ***same month*** as she also joined the Board of Directors of Z-Work Acquisition Corp, while maintaining her membership on the Board of JC Penney Co., Inc. ¶183. A year later, she joined the Board of thredUP on February 2, 2021. *Id.*

[32] Contrary to Defendants' provocative accusation (Motion at 14 & n.37), Plaintiffs' particularlized allegations are neither "groundless" nor "character attacks" on Defendant Ginsberg, and it is a virtual certainty that every C-suite executive ever sued for securities fraud touted how highly regarded they were in their industry and community.

### 3. Defendants' Knowledge and Recklessness

Plaintiffs also sufficiently plead Defendants' scienter regarding their misrepresentations and omissions based on their possession of, knowledge of, and access to contradictory information.

### a. Extensive CW Allegations Strongly Support Scienter

The SAC's CW accounts (*see* §II.A.1., *supra*) support a strong scienter inference. *See Cent. Laborers*, 497 F.3d at 552 ("Confidential source statements are a permissible basis on which to make an inference of scienter."). In the Fifth Circuit, CWs need not be identified: (1) where other alleged facts give an adequate basis for believing misrepresentations were made or (2) where CWs are identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (quoting *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

The SAC alleges cross-corroborating statements by numerous CWs, including high-level personnel, who worked at Match's HQ, where Ginsberg had an office and where Ginsberg and Swidler regularly met with executives and employees, including the CWs, to discuss pertinent subjects. It provides the required employment details (¶¶20-32), with the CWs' first-hand accounts (¶¶38-142). *Wieland v. Stone Energy*, No. 05-2088, 2007 WL 2903178, at *5 (Aug. 17, 2007) ("Plaintiffs have provided general descriptions of the employment duties of . . . the confidential witnesses [ ], the field in which they worked, and the dates that they were employed . . . . This background information is sufficient . . . .") Significantly, the *ProPublica / Columbia Journalism* investigative articles corroborate the CW statements on multiple issues of importance, as discussed in §II.B., *supra*.

As explained in §II.A.1., *supra*, the SAC's enhanced allegations specifically address the Court's concerns in the MTD Order, *Crutchfield*, 2021 WL 1167578 at *12-*14, *17, confirming

that illegitimate accounts materially inflated ***both*** Match Group's consolidated reported user statistics, metrics, and trends ***and*** its reported financial results.

First, the SAC establishes the ***direct*** impacts of illegitimate accounts. The SAC realleges, *inter alia*, that CW2, Match.com's Senior Finance Manager at headquarters, prepared monthly Finance Department analyses based on 10 days of data review per month showing that 15% of all Match.com registrations over three years were consistently fraudulent (¶¶21, 46); CW7, Tinder's Director of Finance, revealed that Tinder's working assumption was that 20% of all its accounts were bots or fraudulent, citing Tinder's Director of Analytics, Bob Wilson (¶47); CW5, a long-time Senior Fraud Investigator on Match.com and Match Group's affinity brands, described illegitimate accounts as "slow burners" engaged in long-term schemes (¶40). To address the Court's concerns, the SAC also pleads ***new*** allegations, detailed in §II.A.1.a., *supra*, that CW11, one of six Tinder Trust & Safety Division members, said ***15% - 20%*** of fake, fraudulent, and bad-actor accounts on Tinder were ***paid*** subscriptions, including bots, users posing as someone else, accounts using stolen credit cards to pay for subscriptions, and scammers trying to defraud other users (¶48); CW5 said a ***significant*** percentage of scam accounts ***paid*** for ***extended*** length (three-month, six-month, or 1-year) memberships (¶¶5, 50) and added that ***all eight*** Fraud Department members ***each*** blocked 400-500 ***paying*** accounts ***daily*** (roughly 25% of the total accounts reviewed daily or 50% - 62.5% of the accounts removed for fraud daily), meaning ***3,200 – 4,000 paying accounts removed every day*** from Match.com and the affinity brands alone (¶49); CW13, a Tinder Community Operations Manager who managed a team that reviewed accounts flagged as potentially fake, fraudulent, or bad actors, said Tinder kept regularly updated, internal estimates of active fake, fraudulent, and bad-actor accounts (¶48); and CW5 said an internal company database closely tracked these metrics and could be used to generate reports (¶57).

Second, as described in §II.A.1.a., *supra*, the SAC details the significant **indirect** effects of fraud accounts on Match revenues and user metrics, including that **the company's** improper marketing of such accounts, through "aggressive" emails highlighting them as purported love interests, to non-paying, legitimate users upsold them into **paying** subscriptions, like Tinder Gold, with inadequately-described pricing and difficult cancellation policies that led to **thousands** of daily customer complaints over billing issues (¶¶5, 74-77, 81-92, 173); and that CW2 said that "over 30%" of paying subscriptions were non-paying members who converted to subscribers after receiving a notification that they had a message they could not read unless they upgraded, and that a "percentage" of the messages so marketed were fraudulent (173).

Last, the SAC pleads violations of affirmative disclosure duties by Ginsberg and Swidler, as well as their knowledge or deliberate recklessness as to the facts and circumstances making their public statements materially false and misleading. *See* §II.A.3., *supra*. It pleads that they had a duty to disclose undisclosed facts regarding fraudulent accounts and their direct and indirect impacts on Match's operations and reported results, which arose when Defendants spoke publicly about issues regarding Match's marketing, consumer satisfaction and customer experience, subscription levels and revenues, and user levels and growth, in specific alleged misstatements expressly identified as giving rise to the duty (¶170). *See* §II.A.3 *supra*. It also alleges that they had a duty to disclose undisclosed facts regarding sex offenders and felons on Match's branded apps and websites, Match.com's and Tinder's failure to screen for felons or sex offenders, the loopholes and deficiencies in Match's screening system, and the inability of small employee teams to adequately investigate and remove bad actors (¶171-172). *Id.* These allegations satisfy the Court's concerns, as expressed in the MTD Order at *14-*15 n.21. The SAC also pleads CW1's clarification that Ginsberg and Swidler's "frustration" at PlentyofFish's repeated downward

forecast adjustments were because they were "tired of hearing about it," despite failing to increase its anti-fraud resources. *See* ¶¶54, 167. These allegations address the Court's questions in the MTD Order at *2, *17 & n.17. The SAC also augments repleaded FAC allegations concerning twice weekly meeting discussions of fraud accounts and the wall of screens at headquarters tracking website usage levels and traffic patterns and revealing "bot" or fraudster activities, with CW5's description of an internal database, accessible at any time, which tracked all Fraud Department investigators daily metrics in accounts flagged, reviewed, and blocked and which could generate reports on the entire Fraud Department's metrics (¶169). *See* §II.A.2. The SAC bolsters these allegations by repleading that Defendants' signing and SOX certifying the allegedly false or misleading SEC filings created affirmative duties to investigate and speak truthfully, which they breached (¶190-192),[33] and that the core operations doctrine should apply in light of the SAC's enhanced allegations (¶¶187-189).[34] These allegations suffice. *See, e.g., Ramirez*, 334 F. Supp. 3d at 853 (holding that defendants' access to contradictory information provided "more than mere conclusory allegations that Defendants . . . must have had knowledge" of the information); *Singh v. 21Vianet Grp., Inc*., No. 2:14-cv-00894-JRG-RSP, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (same). In accordance with *Tellabs*, the SAC's scienter inference is strong, cogent,

---

[33]    *See, e.g.*, *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw*, 537 F.3d 527, 545 (5th Cir. 2008) (SOX certifications add to scienter when signatories "had a reason to know, or should have suspected," due to "red flags," that financial statements had material misstatements or omissions); *Ramirez*, 334 F. Supp. 3d at 854 (defendants signing company's SEC filings supported a strong inference of scienter); *Singh*, 2017 WL 4322483, at *3 (strong scienter inference because "SOX certifications may contribute significantly to inference of scienter if defendants had reason to know or suspect the financial statements they were then signing contained material misrepresentations or omissions"); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 725 (W.D. Tex. 2010) (red flags, role of individual defendants in company, magnitude and duration of fraud, insider trading, and SOX certifications collectively give rise to strong scienter inference of at least severe recklessness).

[34]    *See, e.g.*, *Rougier v. Applied Optoelectronics, Inc*, No. 4:17-CV-2399, 2019 WL 6111516, at *12 (S.D. Tex. Mar. 27, 2019) ("The Fifth Circuit has held that material misstatements as to a company's most significant asset can give rise to a strong inference that those misstatements were made with knowledge of their falsity or severe recklessness in not knowing that they were false."). Indeed, Defendants concede that subscriptions and *a la carte* payments accounted for 97% of Match's revenue. Motion at 5.

and at least as compelling as any counter-inferences.  Moreover, the *ProPublica / Columbia Journalism* investigative article lends further support on judicial notice.[35]

### C.  Plaintiffs Adequately Allege Loss Causation

Plaintiffs have also adequately alleged loss causation because all of the corrective disclosures are related to the fraud alleged.  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); 15 U.S.C. §78u-4(b)(4).  Importantly, the court in *Dura* assumed "that neither the Rules nor the securities statutes impose any special further requirement [beyond Rule 8 of the Federal Rules of Civil Procedure] in respect to the pleading of proximate causation or economic loss."  *Dura*, 544 U.S. at 346; *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).  Additionally, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation."  *Lormand*, 565 F.3d at 261 & n.31.

Plaintiffs meet these standards.  On February 28, 2019, Match disclosed the FTC's proposal to resolve potential claims against Match.com.  ¶144.  On this news – which was muted by Match's reassurances – its stock price fell .72%.  ¶145.  On August 9, 2019, Match disclosed that the FTC was asserting claims against it, causing Match's stock price to fall 1.8% (¶¶146-47) then another

---

[35]     Defendants incorrectly claim that Plaintiffs must allege that Defendants' statements "were so blatantly and inarguably misleading as to be fraudulent." Motion at 22 n.66. Not so. Plaintiffs must merely "identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called particularity requirement." *Lormand*, 565 F.3d at 239.  Defendants' cases do not support their erroneous assertion that "Plaintiffs must also show that the challenged statements were more than arguably or debatably misleading to show scienter." *See* Motion at 22 & n.66 (citations omitted).  Defendants' cited authority for the contention that the Fifth Circuit has rejected stronger allegations (Motion at 22-23 and n.67) is a puzzle-pleaded argument, based on distinguishable cases, that ignores the SAC's robust allegations at issue – for instance, ***none*** of those cases involved a CEO telling the Wall Street Journal that the company removed dangerous bad actors from all branded websites and apps in its portfolio, when not only did that capability not exist, but there were also assault victims begging the company to take such action, only to fall on deaf ears as illustrated by the *ProPublica/Columbia Journalism Investigations* Article.

3.5% (¶148). Additionally, on September 25, 2019, the FTC announced that it had sued Match.com for deceiving consumers, failing to resolve disputed charges, and intentionally making it difficult to cancel subscriptions. ¶149. On this news, Match's share price fell nearly 2%. ¶150. On November 6, 2019, Match also disclosed that it faced increased legal costs, which caused Match's stock price to fall 2.5%. ¶¶151-52. On December 2, 2019, the CJI reported that Match screens for sexual predators on Match.com, but not on its other websites, causing Match's stock price to fall nearly 3%. ¶¶153-55. On January 31, 2020, Congress disclosed that it launched an investigation of Match into reports of underage use of dating apps and the improper use of personal data, causing Match's share price to fall 3.5%. ¶¶156-58. Because these allegations provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind," Plaintiffs have adequately alleged loss causation. *Dura*, 544 U.S. at 347.

Recycling previous arguments, Defendants claim Plaintiffs have not adequately alleged loss causation because: (1) Match's disclosures were not corrective; and (2) Match's stock-price declines were purportedly statistically insignificant. Motion at 25-26. Both arguments again fail.

First, Defendants improperly suggest that corrective disclosures must directly reveal fact-for-fact the precise topics of the misrepresentations alleged. Motion at 25-26. Although a disclosure must merely ***relate*** to the same subject matter as the alleged misrepresentations, it need not be a ***mirror-image*** disclosure. *Amedisys*, 769 F.3d at 322-24; *Spitzberg*, 758 F.3d at 688-89. For instance, contrary to Defendants' conclusory assertion that "[n]one of the alleged misstatements had anything to do with underage users or the improper selling of personal data" (Motion at 26), the alleged corrective disclosures regarding sex offenders are related to Defendants' misstatements and to pervasive underlying misconduct, as detailed by the CWs. ¶¶38-142. Indeed, contrary to Defendants' contention that "the FTC investigation and complaint

pertained only to alleged issues with Match.com, not Tinder or other apps," (Motion at 7, 25), Plaintiffs alleged that Match issued corrective disclosures revealing that Match websites had fraudulent accounts (¶¶144-58) and that Tinder had bad-actor accounts – a form of illegitimate users who posed a reputational risk and who generated improper revenues. ¶48. As the Fifth Circuit has recognized, "[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

Second, although Defendants assert that the stock drops alleged were not statistically significant (Motion at 25 n.78), determining whether declines were statistically significant is premature because "defendants may introduce such evidence *at the merits stage*," not the pleading stage. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014). Additionally, contrary to Defendants' contention that loss causation cannot be established because Match purportedly "delivered a 52.8% stock price increase over the class period" (Motion at 4 & n.4, 13), even the presence of "increases in stock prices after a partial disclosure that is within a series of disclosures does not preclude a final showing of loss causation." *Lormand*, 565 F.3d at 266 n.33. Thus, Defendants' argument "deals with the actual timing of the loss, and not whether the plaintiff pleaded a plausible causal relationship between the defendants' fraud and the plaintiff's economic loss." *Id*. Additionally, Defendants improperly analyze each corrective disclosure *individually* when courts must assess them *collectively*. *Amedisys*, 769 F.3d at 322-24. For instance, *Amedisys* involved multiple partial disclosures, none of which was independently sufficient, including: (1) a report that merely raised "[s]peculation of wrongdoing;" (2) an announcement of the resignation of two officers that did "nothing" to "reveal[] the truth behind earlier misstatements;" (3) an article based on an analysis of publicly-available data; (4) announcements of governmental investigations

44

– none of which led to findings of wrongdoing; and (5) a disappointing earnings report. *Id*. Thus, partial disclosures – like those here – can "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation for purposes of a Rule 12(b)(6) analysis." *Id.* at 324. Thus, Plaintiffs have adequately alleged loss causation.[36]

### D. Plaintiffs Adequately Allege Control Person Liability

Contrary to the Motion at 27, the SAC adequately pleads a primary §10(b) violation and that the Individual Defendants controlled Match. ¶¶15-18; 229-34. Thus, the control person claim under Section 20(a) of the Exchange Act. 15 U.S.C. §78t(a) should be upheld.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. If, however, the Court is inclined to grant the motion, Plaintiffs respectfully request leave to further amend. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477-78 (5th Cir. 2018).[37]

---

[36]   Defendants' reliance on *Eng v. Edison Int'l*, No. 315CV01478BENKSC, 2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) (Motion at 24 n.78) is misplaced because *Eng* ignores the analysis in *Amedisys*, 769 F.3d at 322-24. *Amedisys* is a controlling circuit opinion unlike *Eng*, which is an out-of-circuit district court opinion. Additionally, unlike *Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954 (S.D. Tex. 2020) and *Plaisance v. Schiller*, No. CV H-17-3741, 2019 WL 1205628, at *6 (S.D. Tex. Mar. 14, 2019) (Motion at 25 n.77), the misrepresentations here directly relate to Match's disclosures. Although Defendants attempt to rely upon these cases to suggest that a statement is not corrective unless the existence of actionable fraud is more probable than it would be without those disclosures (Motion at 25 n.77), this standard "is not a steep or difficult one to satisfy." *Amedisys*, 769 F.3d at 321. Defendants, moreover, mischaracterize *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004) (Motion at 25 n.78), because the court held that "[w]e realize that whether a drop in a stock's price is statistically significant will vary depending on the average trading range for that particular stock" and that "[a] drop of 10% for a volatile stock may not be statistically significant whereas the same drop for a stock with little average movement may be significant." *Id*. at 665 n.9. Defendants cite no cases in this Circuit that hold that stock declines within a stock's average trading range are statistically insignificant as a matter of law. Additionally, contrary to Defendants' suggestion (Motion at 25-26, a disclosure that the FTC had sued Match.com (¶149) is more serious than a disclosure that the FTC had conducted an investigation (¶144) or was planning to sue. ¶146; *see In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428 (MKB), 2019 WL 8638851, at *27 (E.D.N.Y. Sept. 27, 2019) (loss causation adequately alleged based upon a disclosure of a FTC lawsuit because "new information was revealed to the market"). Defendants also suggest that any attribution of Match's stock decline on August 10-12, 2019 to its August 9, 2019 disclosure is "demonstrably untrue." Motion at 26 & n.80. In *Basic v. Levinson*, 485 U.S. 224 (1988), however, the Supreme Court refused to "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Id.* at 249 n.28. Thus, "a delayed reaction can still satisfy the pleading requirements" for loss causation. *Lormand*, 565 F.3d at 266 n.33.

[37]   Plaintiffs' Request for Judicial Notice ("RJN") demonstrates that Plaintiffs can plead additional facts if necessary, such as the May 17, 2021 *ProPublica / Columbia Journalism* discussed in §II.B., *supra*. *See, e.g.*, *Carter*, 353 F. Supp. 3d at 582 (Scholer, J.).

Dated: June 21, 2021

Respectfully submitted,

*/s/ Matthew L. Tuccillo*

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Matthew L. Tuccillo (admitted *pro hac vice*)
Jennifer B. Sobers (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for Samir Ali Cherif Benouis and*
*Co-Lead Counsel for the Class*

**GLANCY PRONGAY & MURRAY LLP**
Ex Kano S. Sams II (admitted *pro hac vice*)
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com
Email: clinehan@glancylaw.com

*Counsel for Phillip R. Crutchfield and*
*Co-Lead Counsel for the Class*

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com

*Local Counsel for the Class*

CERTIFICATE OF SERVICE

I hereby certify that on this day, June 21, 2021, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Ex Kano S. Sams II*

Ex Kano S. Sams II