**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| PHILLIP R. CRUTCHFIELD, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-cv-2356 |
| | § | |
| MATCH GROUP, INC., AMANDA W. GINSBERG AND GARY SWIDLER, | § § § | |
| | § | |
| Defendants. | § | |
| | § | |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

- i -

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................ 1

ARGUMENT AND AUTHORITIES................................................................................... 2

I.    THE "NEW" ALLEGATIONS DO NOT SHOW  FALSITY OR SUPPORT A
      STRONG INFERENCE OF SCIENTER ........................................................... 2

II.   PLAINTIFFS' NEW EXHIBITS ONLY FURTHER SUPPORT DISMISSAL............... 8

III.  THE GINSBERG INTERVIEW DOES NOT SUPPORT A  CLAIM.............................. 9

CONCLUSION AND PRAYER FOR RELIEF ............................................................ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ....................................................................................6

*In re Administaff, Inc. Secs. Litig.*,
   2006 WL 846378 (S.D. Tex. Mar. 30, 2006) .............................................................2

*Alaska Elec. Pens. Fnd. v. Flotek Indus., Inc.*,
   915 F.3d 975 (5th Cir. 2019) ....................................................................................2

*Bodri v. GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) .....................................................................10

*Callinan v. Lexicon Pharms., Inc.*,
   479 F. Supp. 3d 379 (S.D. Tex. 2020) .....................................................................10

*Chun v. Fluor Corp.*,
   2021 WL 1788626 (N.D. Tex. May 5, 2021) .........................................................1, 2

*In re Cobalt Energy, Inc.*,
   2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ...............................................................7

*Fin. Acquisition Partners LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) ....................................................................................1

*FindWhat Inv. Grp. v. FindWhat.com*,
   658 F.3d 1282 (11th Cir. 2011) ...............................................................................10

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ....................................................................................6

*In re Franklin Bank Corp. Secs. Litig.*,
   782 F. Supp. 2d 364 (S.D. Tex. Mar. 21, 2011) .....................................................10

*Hall v. Rent-A-Center, Inc.*,
   2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...........................................................7

*Hamano v. Activision Blizzard, Inc.*,
   2019 WL 7882076 (C.D. Cal. Oct. 17, 2019) ..........................................................10

*Heck v. Orion Grp. Holdings, Inc.*,
   468 F. Supp. 3d 828 (S.D. Tex. 2020) .......................................................................2

*Heinze v. Tesco Corp.*,
   971 F.3d 475 (5th Cir. 2020) .................................................................................2, 5

*Ind. Elec. Workers' Pens. Tr. Fnd. IBEW v. Shaw Grp.*,
    537 F.3d 527 (5th Cir. 2008) ..................................................................................5

*In re Integrated Elec. Servs., Inc. Secs. Litig.*,
    2006 WL 54021 (S.D. Tex. Jan. 10, 2006), *aff'd*, 497 F.3d 546 (5th Cir. 2007) .....................2

*Iron Workers Benefit and Pension Fund v. Anadarko Petroleum Corp.*,
    788 F. App'x 268 (5th Cir. 2019) ............................................................................6

*Kakkar v. Bellicum Pharms., Inc.*,
    2020 WL 2845279 (S.D. Tex. May 29, 2020).....................................................2, 6

*In re KBR, Inc. Secs. Litig.*,
    2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) .........................................................5

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..................................................................................7

*Marcus v. J.C. Penney Co., Inc.*,
    2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) .......................................................7

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ......................................................2

*Parker v. Hyperdynamics Corp.*,
    2015 WL 5024027 (S.D. Tex. Aug. 25, 2015) ......................................................2

*Perez v. Higher One Holdings, Inc..*,
    2017 WL 4246775 (D. Conn. Sept. 25, 2017)........................................................7

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ...................................................................7

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ..................................................................................6

*In re SeeBeyond Techs. Corp. Secs. Litig.*
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................................7

*Smallen v. Western Union Co.*,
    No. 17-cv-00474, 2019 WL 1382823 (D. Colo. Mar. 27, 2019), *aff'd*, 950
    F.3d 1297 (10th Cir. 2020) ....................................................................................9

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..................................................................................6

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ..................................................................................7

*Stephens v. Uranium Energy Corp.*,
    2016 WL 3855860 (S.D. Tex. July 15, 2016).........................................................2

*Stockman v. Flotek Indus., Inc.*,
    2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) .......................................................2

*In re SunEdison, Inc. Secs. Litig.*,
　　300 F. Supp. 3d 444 (S.D.N.Y. 2018)..................................................................................7

*Stone v. Life Partners Holdings, Inc.*,
　　26 F. Supp. 3d 575 (W.D. Tex. 2014)..................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　　551 U.S. 308 (2007).................................................................................................3, 9, 10

*Town of Davie Pens. Plan v. Pier 1 Imports, Inc.*,
　　325 F. Supp. 3d 728 (N.D. Tex. 2018) (Scholer, J.) ..........................................................1

*Wade v. WellPoint, Inc.*,
　　892 F. Supp. 2d 1102 (S.D. Ind. Aug. 31, 2012) .............................................................10

*Wieland v. Stone Energy Corp.*,
　　2007 WL 2903178 (W.D. La. Aug. 17, 2007)....................................................................7

**Rules and Statutes**

Fed. R. Civ. P. 12...................................................................................................................8, 10

Private Securities Litigation Reform Act....................................................................................1

SEC Rule 10b-5 .......................................................................................................................2, 5

SEC Rule 14a-9............................................................................................................................5

**INTRODUCTION**

The Opposition confirms that it is time to dismiss this case with prejudice.  Plaintiffs do not and cannot explain how their paltry additions to the prior complaint[1] demonstrate the falsity of any disclosure or establish that any individual Defendant personally knew of facts contradicting their statements, which must be pled with particularity to establish scienter against Match Group. Instead of identifying cogent and compelling new allegations, Plaintiffs' Opposition replows acres of old ground while citing readily distinguishable authorities that only serve to underscore the types of critical particularized facts required to survive dismissal that have ***not*** been pled here.

Having been afforded the opportunity to file a second amended complaint, and having come nowhere close to curing any (let alone all) of the numerous deficiencies in the prior amended complaint, further leave to amend should be denied.[2]  Plaintiffs fail to cite any examples where a district court within this circuit allowed a ***third*** amended complaint in a securities class action after the first two (including the initial complaint and the consolidated complaint after selection of lead plaintiffs) failed to satisfy the PSLRA.  Indeed, securities plaintiffs in this circuit often do not get

---

[1] Tellingly, not only did Plaintiffs fail to provide a courtesy redline copy of their amended pleading so that the Court could easily see the supposedly compelling new allegations, but Plaintiffs have actually ***objected*** to Defendants' submission of a redline.  If the new allegations actually moved the needle, one would expect Plaintiffs to go out of their way to ***highlight*** this material for the Court, rather than trying to obscure it through meritless objections.  The objection lacks merit in any event, as Plaintiffs do not specifically assert the exhibit is inaccurate.

[2] *See Town of Davie Pens. Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 749 (N.D. Tex. 2018) (Scholer, J.) (denying further leave to amend where, like here, securities plaintiff was afforded opportunity to amend after dismissal of initial consolidated complaint, and amended complaint again failed to satisfy PSLRA); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006) (affirming denial of leave to amend after second amended complaint dismissed with prejudice); *Chun v. Fluor Corp.*, 2021 WL 1788626, at *3 (N.D. Tex. May 5, 2021) (denying leave to amend after securities plaintiff had opportunity to correct deficiencies in initial consolidated complaint; observing that "further bites at the proverbial apple would prejudice the defendants by delaying this suit's conclusion and subjecting the defendants to additional costs").

a *second* bite after the initial consolidated or amended complaint, much less a third,[3] which would unduly prolong this litigation and undercut the PSLRA's goals of limiting the burdens on defendants from securities fraud claims that do not meet the particularity requirements.[4]

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.    THE "NEW" ALLEGATIONS DO NOT SHOW FALSITY OR SUPPORT A STRONG INFERENCE OF SCIENTER**

The Opposition fails to explain how the "new" allegations demonstrate an actionable misstatement or support anything close to a strong inference of scienter.  Much of the Opposition is devoted to CW11's vague assertion that "15% to 20% of fake, fraudulent, and bad actor accounts on Tinder were themselves paying accounts."  (*See* Opp. at 3).  In the SAC, however, CW11 defined this "15% to 20%" category to include not just "bots," "scammers," and fake accounts,

---

[3] *See Heinze v. Tesco Corp.*, 971 F.3d 475, 485 (5th Cir. 2020) (affirming denial of leave to amend after *first* amended complaint was dismissed with prejudice); *Alaska Elec. Pens. Fnd. v. Flotek Indus., Inc.*, 915 F.3d 975, 979 (5th Cir. 2019) (affirming dismissal of initial amended complaint after appointment of lead plaintiffs); *Kakkar v. Bellicum Pharms., Inc.*, 2020 WL 2845279, at *5 (S.D. Tex. May 29, 2020) (denying leave to amend after initial consolidated complaint in securities class action); *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 863 (S.D. Tex. 2020) (denying leave to file second amended complaint in Rule 10b-5 action); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *24 (S.D. Tex. July 15, 2016) (denying leave to amend after dismissing *first* amended complaint in securities class action); *Parker v. Hyperdynamics Corp.*, 2015 WL 5024027, at *20 (S.D. Tex. Aug. 25, 2015) (court entered final judgment of dismissal with prejudice after plaintiff's consolidated complaint); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *32 (S.D. Tex. Sept. 29, 2010) (dismissing with prejudice after initial consolidated complaint); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074, at *6 (S.D. Tex. Sept. 18, 2007) (dismissing with prejudice initial consolidated complaint filed after selection of lead counsel); *In re Administaff, Inc. Secs. Litig.*, 2006 WL 846378 (S.D. Tex. Mar. 30, 2006) (dismissing initial consolidated complaint with prejudice); *In re Integrated Elec. Servs., Inc. Secs. Litig.*, 2006 WL 54021 (S.D. Tex. Jan. 10, 2006), *aff'd*, 497 F.3d 546, 556 (5th Cir. 2007) (dismissing initial amended complaint with prejudice, which Fifth Circuit affirmed).

[4] *See Chun*, 2021 WL 1788626, at *3 (observing that "further bites at the proverbial apple would prejudice the defendants by delaying this suit's conclusion and subjecting the defendants to additional costs"); *Oppenheim Pramerica*, 2007 WL 2720074, at *6 ("The Court will not further delay the final resolution of this dispute by allowing yet another amendment").

but also any "users violating site rules" – an unparticularized catch-all category that potentially includes purported violations of unspecified "site rules," which completely undercuts this statistic because it includes users wholly unrelated to Plaintiffs' allegations.  (*See* SAC ¶ 48, 99(a).) Strategically ambiguous allegations of this sort are inconsistent with the PSLRA's particularity requirement and further weigh against inferring scienter.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) ("[O]missions and ambiguities count against inferring scienter, for plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"); *see also infra* at 10 n. 25.

Plaintiffs also fail again to identify any specifics as to how long these purported "bad actor" accounts stayed active, how much revenue (if any) was received from these accounts, what portion of this purported "15-20%" figure actually comprised "fake" or "scammer" accounts, or what specific knowledge Ginsberg or Swidler had regarding specific amounts of revenue obtained from purportedly fake accounts (or regarding any other purported facts that Plaintiffs say contradict their disclosures).  CW13 confirmed that Tinder, like other Match Group apps, had an "anti-fraud team" of employees who flagged potentially fraudulent accounts and "caught" bad actors – allegations that undercut any inference that Defendants deliberately allowed bad actors to use Tinder or consciously chose to receive revenue from "bad actors." (*See* SAC ¶¶ 32, 48.)  CW5 likewise admitted that Match.com "automatically refunded" subscription fees from blocked accounts,[5] that he personally blocked more than one million accounts, and that the average fraudulent account was removed within "15 hours."  (*See* SAC ¶¶ 40, 46, 49, 55.)  Again, the fact that Match.com quickly weeded out fraudulent accounts and automatically refunded subscription

---

[5] *See* SAC ¶ 55.

fees for those accounts[6] eviscerates any inference that Match.com intentionally pocketed revenues from fraudulent subscribers or wanted fraudsters and criminals to have free reign on its site. Plaintiffs likewise fail to allege particularized facts showing that Tinder or any other Match Group app intentionally allowed fraudulent, criminal, or dangerous persons to use their sites so that they could receive revenue from these types of users (which is illogical given that this would likely cause legitimate paying customers to go elsewhere, thus hurting Match Group's bottom line[7]).

The Opposition also fails to show how the SAC's vague assertion that "'a significant percentage' of those blocked accounts [on Match.com] were paid subscribers, often at the 3-month or 6-month levels" shows that Match Group defrauded investors.  (*See* SAC ¶¶ 99(a), 101(a), 103(a).)  Plaintiffs admit that these accounts were blocked and that the subscription fees were refunded, which if anything weighs against any inference that Defendants acted fraudulently. (*See id.* ¶ 55 (admitting that Match.com "automatically refunded the entirety of the subscription fees, even in the case of longer 6-month or 1-year subscriptions")).  Plaintiffs further posit that alleged scammers purchased these longer subscriptions "likely in an effort to make the fraudulent account seem more legitimate" and "'to throw us off their trail'" (*see id.* ¶ 50), which again supports an inference that Defendants were not consciously ignoring alleged fraudulent activity.  The fact that allegedly fraudulent users were actively trying to make it harder to detect their activity undercuts

---

[6] There is no merit to Plaintiffs' assertion that Defendants have mischaracterized Plaintiffs' confidential witness allegations and are trying to "have it both ways" in noting Defendants' efforts to combat fraud while criticizing Plaintiffs' failure to allege any specific revenue impact (Opp. 6 n. 6).  Like its predecessor, the SAC is replete with allegations that Match Group did indeed undertake significant efforts to weed out fraud.  It is also fully consistent to point out Match Group's anti-fraud efforts while criticizing Plaintiffs' complete lack of particularized allegations about revenue impacts.  Bad actors pose problems not because of the amount of revenue they supposedly contribute before their accounts are shut down, but because of their potential to harm and drive away legitimate users, which would negatively affect Match Group's revenues.

[7] *See* SAC ¶ 40.

the inference that Defendants knowingly allowed these accounts to remain active.  The vague term "significant percentage" also does not meet the PSLRA's particularity requirements.

More fundamentally, Plaintiffs again fail to tether their "confidential witness" allegations to any specific alleged misstatements or to any specific individual Defendant.  Under Fifth Circuit law, a "pure" omission is not actionable unless it renders specific affirmative statements materially misleading.[8]  As the Court previously concluded, and as numerous cases confirm, Match Group's mere publication of accurate financial results does not contain an implicit affirmative representation that all revenues were obtained from non-bad-actor users.[9]  Indeed, no reasonable investor could infer such a guarantee from Match Group's financial statements in light of Match Group's specific warnings that users could engage in misconduct.[10]  Further, while Plaintiffs concede that subscriptions from blocked Match.com accounts were refunded, there is no particularized allegation identifying any accounting or legal rule actually requiring Match Group to refund every dollar allegedly received from users engaged in inappropriate conduct.

---

[8] *See Heinze*, 971 F.3d at 483 (holding that "a pure-omission theory that is untethered to any specific false or misleading representation" is "not cognizable" under analogous false-statement language in SEC Rule 14a-9); *Ind. Elec. Workers' Pens. Tr. Fnd. IBEW v. Shaw Grp.*, 537 F.3d 527, 541-42 (5th Cir. 2008) (holding that pure-omission claims are likewise not actionable under Section 10(b) or Rule 10b-5).

[9] Plaintiff asserts that, in addition to Ginsberg's *Wall Street Journal* interview, the SAC also alleges additional purported misstatements.  *See* Opp. at 11 n. 9.  But the other supposedly "new" statements – including generalized truthful statements about the growth of Tinder subscribers – are not materially different from the similar statements rejected as insufficient to support a claim in the prior complaint.  *See* SAC ¶¶ 120, 122; ECF No. 54 at 20 n. 58; *In re KBR, Inc. Secs. Litig.*, 2018 WL 4208681, at *4 (S.D. Tex. Aug. 31, 2018) ("Bare reports of net income and revenue are not actionable for failing to disclose alleged misconduct"); *Crutchfield*, 2021 WL 1167578, at *12 (rejecting claims based on statements about Match's financial and operational conditions).

[10] *See* ECF No. 54, MTD at 6.  While the Court correctly concluded that the allegations fail to show how the alleged omissions significantly alter the total mix of information (which applies with full force to the SAC), the allegations would fail even if the omissions did alter the total mix of information, as none of Match Group's affirmative statements are rendered misleading by the alleged omissions.  *See supra* footnote 8 (discussing inactionability of pure-omission claims).

The Opposition also fails to show how the new allegations establish that Ginsberg or Swidler personally knew of facts contradicting their disclosures, which is reason enough to dismiss the SAC.[11] In cases like this, where the "core operations" doctrine does not apply,[12] the complaint must allege with particularity that the individual defendants received specific information contradicting their disclosures.[13] Again, generalized knowledge that an online dating company faces challenges from bad actors trying to access their systems is not the same as specific knowledge that specific statements by specific individual Defendants were false.[14]

As previously stated, the SAC's allegations about stock sales and executive resignations are not substantively different from the allegations in the prior complaint, which the Court thoroughly and correctly rejected.[15] The fact that executives sold a modestly greater amount of

---

[11] *See Crutchfield*, 2021 WL 1167578, at *16 ("To determine whether a corporate statement was made with the requisite scienter, courts look to the state of mind of the individual corporate official or officials who made the statement"); *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (plaintiff must establish intent of individual who made the alleged misstatement and may not rely on "collective" knowledge); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366, 383 (5th Cir. 2004) (same).

[12] *See Crutchfield*, 2021 WL 1167578, at *18 (rejecting application of core operations and "special circumstances" doctrines).

[13] *See Iron Workers Benefit and Pension Fund v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269-70 (5th Cir. 2019) (affirming dismissal despite evidence that "could have led [individual defendants] to conclude that Anadarko's Colorado operations weren't in compliance with Commission rules," where allegations did not support strong inference that "Walker and McBride were aware that Anadarko was, as a matter of law, in violation of Commission rules"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (dismissing complaint that "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them").

[14] *See Kakkar*, 2020 WL 2845279, at *4 ("Plaintiff must identify specific facts demonstrating scienter for each alleged misstatement made by each individual Defendant and not just describe what Defendants generally did or knew").

[15] *See Crutchfield*, 2021 WL 1167578, at *19-21 (rejecting stock sale allegations); *id.* at *20-21 (rejecting allegations regarding resignations of Ginsberg and Yagan, and noting (as remains the case in the SAC) that "Plaintiffs also do not plead any facts regarding Yagan's knowledge of" the

stock or received more proceeds from stock sales during a time period when the stock price rose

52.8% (due to reasons wholly unconnected to the purported fraud) does not show scienter.[16]

Plaintiffs' case citations, by contrast, involve readily distinguishable complaints containing

particularized facts showing that the executives knew of specific information contradicting their

public disclosures.[17]  Having failed again to allege such facts, Plaintiffs' case should be dismissed.

---

alleged misconduct).  Plaintiffs' conclusory speculation that Yagan resigned because of a Congressional investigation that resulted in no charges against Match Group is the opposite of particularized, cogent, and compelling.

[16] *See* ECF No.54, MTD at 13, 24-25.

[17] In *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), one of the individual defendants wrote internal emails and memos warning that the company's pivot toward customers with sub-prime credit profiles would cause "our business plan to fail" and vigorously opposing the plan, while simultaneously representing to investors that "we think these" customers can be reached "profitably."  *See id.* at 235-36.  Nothing of the sort is alleged here.  In *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 587-88, 600-01 (W.D. Tex. 2014), the outside auditor refused to approve the company's financials, and the complaint offered far more particularized allegations regarding the individual defendants' awareness of the improper calculations.  In *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *5 (W.D. La. Aug. 17, 2007), the complaint included confidential witnesses directly alleging that a named defendant falsified reserve reports.  In *In re SunEdison, Inc. Secs. Litig.*, the CEO publicly stated the company would start "generating cash" after privately telling Board six days earlier that company would still be cash-negative.  300 F. Supp. 3d 444, 480 (S.D.N.Y. 2018).  In *Hall v. Rent-A-Center, Inc.*, the complaint pled specific facts showing how the CEO and CFO "were made aware of information" that contradicted their public statements.  2017 WL 6398742, at *28 (E.D. Tex. Oct. 19, 2017). In *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684–85 (5th Cir. 2014), defendants in "an extremely small" E&P company allegedly used an "industry-specific term" that communicated to investors that certain production or geologic testing had already been conducted but later admitted that no such production or testing had in fact occurred.  In *In re Cobalt Energy, Inc.*, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016), the defendants allegedly knew "there was 'not even a remote chance'" the well at issue would be successful, yet continued to tout it.  In *Perez v. Higher One Holdings, Inc.*, the complaint cited confidential witnesses who alleged senior executives knew facts that contradicted the company's publicly stated account of why a customer relationship ended.  2017 WL 4246775, at *6 (D. Conn. Sept. 25, 2017).  In *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 855 (N.D. Tex. 2018), the complaint included specific emails where individual defendants were allegedly told of and approved proxy cost metrics that were lower than the publicly touted proxy cost.  In *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *2-3 (E.D. Tex. Sept. 29, 2015), the company announced it was raising new capital one day after the CEO assured he did not see conditions requiring the company to do so.  In *In re SeeBeyond Techs. Corp. Secs. Litig.*,

## II.    PLAINTIFFS' NEW EXHIBITS ONLY FURTHER SUPPORT DISMISSAL[18]

Plaintiffs' two proposed exhibits (ECF No. 58-3 and 58-4) simply confirm Plaintiffs' inability to plead a securities fraud claim.  As the Court noted in addressing the original December 2, 2019 *ProPublica* article, Match Group candidly disclosed that it "cannot implement a uniform screening protocol" and that "[t]here are definitely registered sex offenders on our free products," which weighed against an inference "that Ginsberg or Swidler intended to hide or otherwise mislead investors regarding Match's fraudulent or dangerous users, or efforts to combat such users."  *Crutchfield*, 2021 WL 1167578, at \*18.  The May 17, 2021 *ProPublica* article attached as Exhibit A repeats the "lacked uniform procedures" statement from 2019 (*see* ECF No. 58-3 at 4) and noted more recent statements that Match Group has "invested in new technology to enhance its safety features," is "working toward uniform policies across all of our companies," is "partnering with a victims' advocacy group to audit its sexual violence policies," and will "work to improve our systems," (*see id.* at 4, 11).  Those statements convey a desire to improve, not to defraud.  While Plaintiffs criticize Match Group's "three-sentence response" to *ProPublica* as "lacking specifics" (*see* Opp. at 19[19]), the fact that Match Group again refrained from publicly overstating its capabilities and instead signaled room for improvement further weighs against

---

the complaint alleged that the defendants "admittedly lied to analysts and investors" – a far cry from the allegations here.  266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003).

[18] Defendants agree the exhibits can be judicially noticed for the limited purpose of showing what was written in the article and the content of statements made by Match Group and other companies. Defendants object to the extent Plaintiffs seek judicial notice regarding the truth of the underlying factual assertions in the *ProPublica* article.  But even if everything in the article is accepted as true for Rule 12 purposes and is deemed to have been pled in the SAC, the article still does nothing to show a material misstatement or to support a strong inference of scienter.

[19] By using the phrase "three-sentence," Plaintiffs erroneously portray Exhibit B as constituting the totality of Match Group's response to the *ProPublica* article.  (*See* Opp. at 19.)  But the article itself also notes that Match Group also furnished statements from a December 2020 press release regarding the safety audit.  Regardless, the exhibits do nothing to suggest falsity or scienter.

inferring an intent to defraud investors about Match Group's apps.  Further, the May 17 article

discussed alleged safety lapses at several competitor dating apps, including Zoosk, Coffee Meets

Bagel, Grindr, and Bumble, suggesting that Match Group's apps are not alone in facing challenges

from potential bad actors and thus further undercutting any inference of fraud.[20]

## III.   THE GINSBERG INTERVIEW DOES NOT SUPPORT A CLAIM

The Opposition's assertions regarding Ginsberg's *Wall Street Journal* interview likewise

add nothing to this case.  Indeed, it is difficult to square the Opposition's assertion that Ginsberg's

generalized statements during the interview were concrete, actionable misrepresentations with the

Opposition's subsequent assertion (p. 19) that the similar statements Match Group made to

*ProPublica* in Plaintiffs' Exhibit B were "lacking specifics."  Ginsberg again made no assurance

during the interview that Match Group conducted criminal background checks, used any specific

type of screening process, had uniform policies across all Match Group apps, or that its apps were

completely free of bad actors.  Instead, Ginsberg specifically warned during the interview that

"bad behavior" occurred on Match Group apps.[21]  And again, implicit in the statement that "we'll

kick" bad actors off Match Group's applications is the underlying premise that bad actors were

able to access the apps in the first instance.  Plaintiffs again tellingly make no allegation that Match

Group's publicly available terms of use for its apps make any false promises regarding what

screening was done in connection with that app.[22]  Ginsberg's statements must also be read in

---

[20] *See* Ex. A at 6, 7, and 8; *Smallen v. Western Union Co.*, No. 17-cv-00474, 2019 WL 1382823, at *15 (D. Colo. Mar. 27, 2019) ("Plaintiffs provide no allegations that, despite any problems Western Union may have been experiencing, the company was not still a market leader" in preventing misuse of its services), *aff'd*, 950 F.3d 1297 (10th Cir. 2020).

[21] *See* SAC ¶ 6.

[22] *See* ECF No. 54 at 3 n. 3 (noting that terms of use make clear that criminal background checks are not conducted); *see id.* at 12, 16.  The absence of such allegations weighs against inferring fraud.  *See Tellabs*, 551 U.S. at 326 ("[O]missions and ambiguities" weigh against inferring fraud).

context with Match Group's prior Form 10-K cautionary statements about risks posed by bad actors accessing its apps.  As stated above, there are also no particularized allegations showing that Ginsberg knew of any specific alleged problems with respect to the use of Match Group apps by sex offenders, criminals, or other bad actors that contradicted her statements.

Plaintiffs' objection to Defendants' submission of the video and article as exhibits – which are plainly fair game on a motion to dismiss,[23] and to which Plaintiffs again raise no specific accuracy objection – is also telling.  It is ***Plaintiffs'*** burden to plead particularized facts showing ***in context*** that the challenged statements are materially misleading or fraudulent,[24] so Plaintiffs should have no problem with the Court's consideration of those exhibits if their full context supported Plaintiffs' claims.[25]  Regardless, with or without the exhibits, Plaintiffs' claims fail.

## CONCLUSION AND PRAYER FOR RELIEF[26]

For the foregoing reasons, the SAC should be dismissed with prejudice.

---

[23] It is well-settled that district courts may consider "'the full text of documents partially quoted in the complaint'" in deciding a Rule 12 motion to dismiss.  *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 399 (S.D. Tex. 2020) (internal quotations and citations omitted).

[24] *Hamano v. Activision Blizzard, Inc.*, 2019 WL 7882076, at *2 (C.D. Cal. Oct. 17, 2019) ("What Plaintiff has failed to allege, however, is the ***factual context*** necessary to imply Acitivision made these statements fraudulently" (emphasis added)); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) ("Plaintiff omits the context in which the statements were made.  A statement is misleading only if a reasonable investor, reading the statement fairly and in context, would be misled"); *In re Franklin Bank Corp. Secs. Litig.*, 782 F. Supp. 2d 364, 400 (S.D. Tex. Mar. 21, 2011) (evaluating defendants' statements in context of "the overall discussion" and finding no inference of scienter from ambiguous statement); *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1138 (S.D. Ind. Aug. 31, 2012) (observing, in evaluating motive allegations, that "[a] plaintiff's failure to supply adequate context adequately hampers a court's ability" to infer scienter)).

[25] *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1304 (11th Cir. 2011) (applying *Tellabs* and inferring that plaintiffs' omissions of details from their complaint was likely done "strategically after concluding that the information would not be helpful to their allegations").

[26] Defendants reassert their prior arguments with respect to loss causation and Section 20.

Dated: July 11, 2021

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP


/s/ *Peter A. Stokes*

Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
gerard.pecht@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

Robert L. Greeson
State Bar No. 24045979
robert.greeson@nortonrosefulbright.com
Veronica Portillo Kendrick
State Bar No. 24103528
veronica.kendrick@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75214
Telephone: (214) 855-8200
Facsimile: (214) 855-8200

*Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on July 11, 2021, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Peter A. Stokes*

Peter A. Stokes


- 11 -